| | |
|---|---|
| 1 | Susan E. Coleman (SBN 171832) |
| 2 | E-mail: scoleman@bwslaw.com<br>Carmen M. Aguado (SBN 291941) |
| 3 | E-mail: caguado@bwslaw.com<br>BURKE, WILLIAMS & SORENSEN, LLP |
| 4 | 444 South Flower Street, Suite 2400<br>Los Angeles, CA 90071-2953 |
| 5 | Tel: 213.236.0600    Fax: 213.236.2700 |
| 6 | Attorneys for Defendants<br>THE GEO GROUP, INC., DIAZ, CAMPOS and |
| 7 | CITY OF ADELANTO |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR ARNOLDO RIVERA MARTINEZ; ISAAC ANTONIO LOPEZ CASTILLO; JOSUE VLADIMIR CORTEZ DIAZ; JOSUE MATEO LEMUS CAMPOS; MARVIN JOSUE GRANDE RODRIGUEZ; ALEXANDER ANTONIO BURGOS MEJIA; LUIS PEÑA GARCIA; JULIO CESAR BARAHONA CORNEJO, as individuals, | Case No. 5:18-cv-01125-SP<br><br>**DECLARATION OF JANE DIAZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Magistrate Judge:    Honorable Sheri Pym |
| Plaintiffs, | |
| v. | |
| THE GEO GROUP, Inc., a Florida corporation; the CITY OF ADELANTO, a municipal entity; GEO LIEUTENANT DURAN, sued in her individual capacity; GEO LIEUTENANT DIAZ, sued in her individual capacity; GEO SERGEANT CAMPOS, sued in his individual capacity; SARAH JONES, sued in her individual capacity; THE UNITED STATES OF AMERICA; and DOES 1-10, individuals, | |
| Defendants. | |

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 1 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

I, JANE DIAZ, declare as follows:

1. I have personal knowledge of the matters set forth herein, except as to those matters stated on information and belief, and would competently testify thereto if called and sworn as a witness. This declaration is made in support of Defendants' motion for summary judgment or, in the alternative, summary adjudication.

2. From 1997 to 2008, I was employed by The GEO Group, Inc. ("GEO") at the Desert View Modified Community Correctional Facility ("Desert View Facility") where the highest rank that I held was captain. Thereafter, from 2016 to April 2019, I was employed by GEO at the Adelanto Detention Facility ("Facility") where the last title that I held was lieutenant.

3. When I was hired by GEO in 1997, I was required to attend pre-service training. In or around 1998, after I completed an application and interview process, I was promoted from officer to lieutenant. Upon promotion, I was required to attend additional training that was specific to supervisors. Thereafter, in or around 2001, I was promoted to the position of training administrator before becoming a captain. As the training administrator, I ensured all GEO officers at the Desert View Facility completed their annual 40-hours of in-service training, among other things.

4. While employed at the Desert View Facility, I was never disciplined nor did I ever receive a complaint.

5. In 2016 when I returned to work with GEO as a lieutenant, I was required to complete a 40-hour orientation (i.e. pre-service training), which included training on GEO's use of force policy, hunger strike policy, and how to communicate with detainees. I also completed approximately three to four weeks of on-the-floor training with command staff (e.g., the captain, the chief, and other lieutenants).

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 2 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

6. It is my understanding that per GEO's use of force policy, force can be used only as a last alternative after all other reasonable efforts to resolve a situation have failed. Staff is permitted to use only the amount of force necessary to gain control of the detainee, and staff must first attempt to gain a detainee's willing cooperation before using force. Additionally, it is my understanding that the use of force policy requires that staff first use presence without action. If staff is still unable to gain compliance, staff is then trained to use verbal commands and, if still unable to gain compliance, then soft techniques, (e.g. grasping, pressure to pressure points, chemical agents, "come-along" holds).

7. In addition to pre-service use of force training, in my capacity as a lieutenant, I had training that was specific to the use of chemical agents. The training consisted of watching a video that was approximately one hour and explained when it was appropriate to use chemical agents. It is my understanding that chemical agents can be used in very limited circumstances including when it is determined that a delay in bringing a situation (involving a detainee) under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage. The training also included instruction on decontamination procedures to implement after a detainee makes contact with a chemical agent.

8. After the in class training, I was escorted outside and sprayed with a chemical agent directly in my face for a one-second burst. After being sprayed, I was required to immediately open my eyes and complete an obstacle course that required me to complete various tasks, including handcuffing an individual. Once I completed the course, which took me about 15 minutes, I was allowed to use a water fountain to wash the spray off my face. The training that I completed is the same training that any GEO employee would have to complete prior being permitted to carry and use chemical agents.

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 3 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

9. On June 12, 2017, my shift was from 6:00 a.m. to 2:30 pm. Typically, I would conduct a shift briefing with the officers before the 6:00 a.m. shift starts, then return to the watch office to finish administrative work, and then walk the floor. I believe it was after my briefing that an officer gave me a piece of paper that had a list of names and informed me that a group of detainees in 2-Charlie (a dorm) threatened to go on a hunger strike. I was informed that they refused to comply with orders to go to their beds for purposes of "count."

10. At the Facility, it is a GEO policy that at specified time throughout the day, all detainees must return to their bunks for "count." The officer assigned to the dorm will announce that it is time for count by using words to the effect of "get back to your bunks," "count time," or "rack up" approximately ten (10) minutes before the count to allow detainees time to prepare for count (e.g. use the restroom). When the detainee returns to his/her bunk for count, this is commonly referred to as "racking up for count." The detainees are well aware of the count procedures given it is a routine practice that occurs multiple times throughout each day.

11. The officer assigned to the dorm then counts the detainees at their beds. During this time, the entire dorm, including the day room (an area with tables for the detainees to sit at), is closed down/empty and the dorm should be very quiet. Once the officer that is assigned to the dorm completes the count, a second officer conducts a second count to confirm accuracy. Ultimately, the dorm officers report the total from their dorm to central control. Then, all of the dorm numbers are added together to determine the total number of detainees at the entire Facility. The detainees are required to stay at their bunks until the count is cleared for the entire Facility unless there is an emergency or specific reason that the detainee does not have to be by his/her bunk (e.g. if the detainee is in the medical unit or speaking to an ICE agent).

///

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 4 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

1   12.   The entire count process takes approximately 30 to 45 minutes. If
2   count is not completed within an hour, it is my understanding that the Facility
3   Administrator would be admonished by ICE and have to provide an explanation as
4   to why the count was delayed. The count procedure is important because it is the
5   mechanism by which the Facility is able to determine whether a detainee has
6   escaped from the Facility.

7   13.   The count procedures are identified in the detainee handbook under the
8   section called "OFFICIAL COUNTS." Additionally, the handbook states that a
9   failure to stand for count and interference with count are violations of the rules and
10  considered "high moderate offenses" that warrant discipline. Detainees are
11  provided a copy of the handbook in the language that they speak when they arrive
12  at the Facility. Attached to the Appendix of Exhibits as Exhibit "A" is a true and
13  correct copy of the English version of the detainee handbook that is given to
14  detainees.

15  14.   Based on the information that was provided to me, at around 6:32 a.m.,
16  I went to the dorm with several officers to evaluate the situation. When I arrived, I
17  saw a group of nine detainees (eight of which were later identified as the plaintiffs
18  in this matter) sitting at two tables in the day room. The following is a
19  representation of the location of each plaintiff at the two tables.

|  | Table A |  |
|---|---|---|
| Rodriguez<br>Plf. Martinez | **A** | Detainee 1<br>Plf. Garcia |
| Cornejo<br>Castillo<br>Mejia | **B** | Plf. Diaz<br>Plf. Campos |

26  ///
27  ///
28

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 5 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

15. I tried to speak to Plaintiffs at the tables. However, they would not speak to me. At the time, I believed it was because they only spoke Spanish, but I later learned that they also spoke English.

16. Generally, when I cannot communicate with a detainee due to a language barrier, I will ask another officer, a detainee, or use the "hotline" for interpretation services. Here, I asked an officer (I believe it was Officer Reyes, Officer Martinez, or both) that spoke Spanish to speak to Plaintiffs. Based on information from the officer(s) that spoke Spanish, Plaintiffs were refusing to comply with orders and threatened to go on a hunger strike if their demands were not met. Based on information and belief, their demand related to the amount of their bond and they wanted to speak to an ICE agent. It was repeatedly explained to them that ICE agents were not present at the Facility at that hour, they should rack up for count, and that their demands could be addressed after count was completed.

17. Aside from the information that was conveyed to Plaintiffs in Spanish, I also informed them in English that they needed to rack up for count and they would have to wait until after count to address their concerns with ICE. They responded by saying "no," shaking their heads indicating their refusal, and continuing to sit at the two tables.

18. Based on the video recording of the incident, the officers were able to remove Plaintiffs Rodriguez and Martinez from Table A at around 6:38:01 a.m. The video demonstrates that the officers did not kick or strike Plaintiffs Rodriguez and Martinez despite both men resisting the officers. In fact, at around 6:38:55, while the officers tried to remove Plaintiff Martinez by walking between the two tables, Plaintiff Martinez grabbed on to Plaintiff Diaz, who was seated at Table B, so the officers could not escort him out. The officers were able to separate the two without using any strikes, kicks, or punches. By approximately 6:39:19, Plaintiffs Rodriguez and Martinez were out of the dorm.

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 6 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

19. While the officers were trying to remove Plaintiffs Rodriguez and Martinez, at around 6:38:09, Plaintiffs Diaz, Campos, Cornejo, Castillo, and Mejia that were seated at Table B linked their arms in a form of active resistance.

20. Based on the video, I followed behind the officers and Plaintiff Martinez while they were exiting the dorm. During this time, at around 6:39:32, Plaintiff Garcia moved from Table A to Table B. The following is a representation of the location of the new seating arrangement:

| Cornejo<br>Castillo<br>Mejia | **B** | Plf. Diaz<br>Plf. Campos<br>Garcia |
|---|---|---|

21. Meanwhile, because of the disruption caused by Plaintiffs, the other detainees became riled up. They began to yell alongside Plaintiffs and were no longer standing by their bunks because they were observing the escalating situation. The dorm, during a period that is supposed to be very quiet, was in an uproar and completely out of control.

22. At around 6:41:56, only Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia were all seated at Table B.

23. At this point, after being in the dorm for almost 10 minutes, it became clear that Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia were not going to comply with our verbal commands, they were actively resisting, and they were causing the other detainees to become, likewise, out of control. I assessed that I needed to regain control before things became worse and count was even further delayed. As a result, I informed them that if they did not comply, I would have to use a chemical agent – which I did not want to have to use. It is my understanding that in addition to me stating this in English, it was also communicated to them in Spanish.

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 7 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

24. I determined that chemical agents were appropriate in this circumstance because I was unable to gain compliance of the remaining plaintiffs despite my use of presence, verbal commands, and soft techniques. Also, the continued delay in resolving the confrontation was now causing a major disturbance within the dorm and entire Facility.

25. Based on the video recording, at around 6:42:21, I sprayed a very short burst of a chemical agent down the center of Table B and intentionally did not directly spray Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia. My intention was to get their attention and end the confrontation. Importantly, in the video recording, Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia placed their heads down on the table before I sprayed which made me confident that, despite their refusal to speak English, they understood my intent to use a chemical agent and also knew what it was.

26. It is my understanding that the plaintiffs allege that I used a chemical agent more than once. However, in the instances where plaintiffs allege that I used the chemicals agents (e.g., at 6:38 am and 6:39 a.m.) there are officers in the immediate vicinity of where I allegedly sprayed. I would *never* spray if there is an officer in very close proximity of the target of my spray because I would not want an officer to be impacted by the spray. Instead, based on my training, I would advise that I am going to use my spray and instruct the officers to step away. In the one instance where I used a chemical agent (at around 6:42:21 a.m.), immediately before I sprayed, the video recording demonstrates the officers stepped back from Table B, which is consistent with my training to instruct officers to step back.

27. My use of a chemical agent – which was the only force that I used on this date – had no impact on Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia. They all remained seated and they did not even flinch in the slightest bit. Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia then wrapped their legs around the legs of Table B. As a result, I used my radio and called for backup

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 8 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

because the situation required additional assistance. My call for assistance is broadcasted to all radios; thus, any officer or staff within the Facility with a radio is able to hear it and respond.

28. Based on the video recording, at around 6:43:47, two officers try to pull Garcia away from the table. At around 6:43:54, Plaintiff Campos grabbed on to Garcia and pushed the officers away from Garcia with his left hand/arm. As a result of Plaintiff Campos' conduct, a third officer tried to help remove Garcia. Plaintiffs Campos and Garcia were eventually separated, and Garcia was taken out of the dorm at around 6:44:15 despite his resistance.

29. Next, based on the video recording, at around 6:45:58, the officers tried to remove Plaintiff Mejia from the table. Plaintiff Mejia grabbed on to Plaintiff Castillo but the officers were able to separate the two without using any strikes, punches, or kicks. They were able to pull the two apart despite Plaintiff Mejia's active resistance.

30. At around the same time, in response to my call, Sgt. Campos arrived at around 6:46:18. In 2016, I met Sgt. Campos during my pre-service training; he assisted with one of the courses. I have never supervised Sgt. Campos and I did not work the same shift as him. Our interactions were limited to greetings made in passing. I did not specifically request his assistance nor did I have any way of knowing that he would be the person that would respond.

31. Immediately after Sgt. Campos arrived, he assisted the officers with Plaintiff Mejia, who was resisting to such a degree that the officers could not escort him out of the dorm. While Sgt. Campos assisted the officers with Plaintiff Mejia, based on the video, others officers continued to try to break up Plaintiffs Diaz, Campos, Cornejo, and Castillo by untangling their arms, but Plaintiffs Diaz, Campos, Cornejo, and Castillo resisted and refused to be removed from Table B. Eventually, the three officers were able to pull Castillo away from the table.

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 9 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

32. When Sgt. Campos finished helping the officers with Plaintiff Mejia, Sgt. Campos sprayed towards the only remaining plaintiffs at Table B (Plaintiffs Diaz, Campos, and Cornejo) with a chemical agent twice. By 6:48:19, Plaintiffs had been taken out of the dorm and I had no further contact with them.

33. Based on information and belief, Plaintiffs were evaluated by medical after they were escorted out of the dorm room. Significantly, in watching the video, medical staff arrived to the dorm at around 6:34. I stood next to medical staff at around 6:37:06. In other words, I knew medical staff was present during the situation and, based on information and belief, medical staff would treat Plaintiffs if necessary.

34. Also, since Plaintiffs Garcia, Diaz, Campos, Cornejo, and Mejia made contact with chemical agents, they needed to be decontaminated and eventually taken to medical. Importantly, the medical unit only has two cells and, here, there were six plaintiffs that needed to be seen. In situations where the medical unit does not have capacity, officers are trained to take detainees to intake and placed in holding cells or the triage area until the medical unit has the capacity to see them.

35. Based on information and belief, Plaintiffs Garcia, Diaz, Campos, Cornejo, and Mejia were placed under showers and rinsed off for purposes of decontamination.

36. I remained in the dorm room for a period of time and then went to the watch office to prepare the use of force report as required by GEO's use of force policy. Captain McCusker, my supervisor, assisted me in the preparation of the use of force report, which included written statements from the involved officers. Attached to the Appendix of Exhibits as Exhibit "B" is a true and correct copy of the use of force report that I prepared with Captain McCusker's assistance, including the written statements that were provided by the involved officers.

37. As indicated on the use of force report, Plaintiffs were cited for violating rule 213, which prohibits detainees from engaging in or inciting a group

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 10 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

demonstration in the dorm. Here, as described above, Plaintiffs refused to comply with orders to rack up, engaged in active resistance, and caused the entire dorm to become riled up. The rules that detainees are required to follow are cited in the detained handbook under "Disciplinary Segregation – Category II Offenses." Category II Offenses are considered "high offenses."

38. Once a detainee is found to be in violation of a rule at the Facility, they are placed in administrative segregation pending an investigation and hearing on the matter. Here, I prepared the Administrative Segregation Order ("Order") for each Plaintiff. The Order was placed in their respective files while they were in Administrative Segregation. Generally, the detainees will sign the Order when they are in the process of being moved to Administrative Segregation or once they are placed. Attached to the Appendix of Exhibits as Exhibit "C" is a true and correct copy of the Order that was completed for each detainee.

39. When a detainee is placed in Administrative Segregation, a supervisor completes an investigation and determines whether the detainee in fact violated the stated rule. The detainee's file, which includes the Order, is intended to assist the investigating officer.

40. In addition to the completing the use of force report and Order, I also completed the Incident of Prohibited Acts and Notice of Charges ("Notice") for each plaintiff and gave Captain McCusker the completed Notices. Attached to the Appendix of Exhibits as Exhibit "D" is a true and correct copy of the Notice that was completed for each plaintiff.

41. It is my understanding that Plaintiffs have alleged they were physically injured as a result of the chemical agent. Given that I have been directly sprayed in my face, I know that immediately after being sprayed, there is a tingling sensation. Afterwards, the tingling sensation only returned when I showered at home because water, whether it is hot or cold, may activate the spray. The impact of the spray lasted until the day after I had been sprayed. I never applied any creams or

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 11 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

1  ointments to my face as a result of the spray; I simply used water decontaminate my
2  face.

3   42.   It is important that the rules of the Facility, including count
4  procedures, are enforced consistently. If they are not, it can cause detainees to be
5  confused as to whether they need to comply with the rules in the future.
6  Additionally, when a detainee strikes staff, it is a serious rule violation and the
7  detainee is typically taken to Administrative Segregation pending disciplinary
8  proceedings. Alternatively, a detainee can also be arrested by the San Bernardino
9  Sheriff's Department for striking an officer.

10   43.   While employed with GEO, I did not have any responsibilities related
11  to the handling of grievances filed by detainees. There were *very* limited occasions
12  when the Grievance Coordinator would advise me of a grievance related to a GEO
13  officer for purposes of notifying me that she needed to speak to the detainee that
14  filed the grievance. To the extent that Plaintiffs filed grievances or made complaints
15  of any kind, I have no knowledge of said grievances or complaints.

16   44.   It is my understanding that Plaintiffs alleged that they complained that
17  the food at Adelanto Detention Facility was not good; however, GEO staff,
18  including myself, would eat the same food as detainees. I did not find the food
19  problematic.

20   45.   It is my understanding that Plaintiffs alleged that they complained
21  about the medical care at the Facility. If I ever heard a detainee complain about
22  access to medical care, I would take whatever steps that I could to ensure they
23  received adequate treatment, such as contacting medical staff and requesting that
24  they see the detainee that made the complaint.
25  ///
26  ///
27  ///
28  ///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 12 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ

46. Moreover, while employed with GEO, I did not have the ability to determine whether detainees would have restrictions placed on their access to the phones. Based on information and belief, only the Facility Administrator and/or ICE have the ability to make that determination. I have no knowledge of any incidents at the Facility where detainees were prevented from making calls to certain numbers. To the extent that Plaintiffs had restrictions placed on their access to the phones, I have no knowledge of said restriction(s) nor did I take any actions to cause said restriction.

47. On June 12, 2017, I never physically touched any of the Plaintiffs, and the only force that I used was a very short burst of a chemical agent that is captured on video. After Plaintiffs failed to comply with presence and verbal commands, incited the entire dorm, and delayed count procedures, I did, however, direct the GEO officers to try to remove Plaintiffs from the tables to end the disturbance that was causing a major disruption throughout the entire Facility. I observed the GEO officers use only the amount of force that was reasonably necessary to gain compliance of Plaintiffs, which consisted of pulling them away from the tables. The involved GEO officers never used strikes, kicks, or punches on or against Plaintiffs. Had I witnesses a GEO officer use that level of force, I would have immediately stopped him/her.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on *Nov 4, 2019*, 2019, at *1823*, California.

*/s/ Jane R Diaz*
JANE DIAZ

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4852-0602-0768 v1
05788-0035

- 13 -

5:18-CV-01125-R-GJS
DIAZ DECLARATION ISO MSJ