Rachel Steinback, SBN 310700
Law Office of Rachel Steinback
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
Law Office of Carol Sobel
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*
*[Additional Counsel on Following Page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

OMAR ARNOLDO RIVERA
MARTINEZ; ISAAC ANTONIO
LOPEZ CASTILLO; JOSUE
VLADIMIR CORTEZ DIAZ; JOSUE
MATEO LEMUS CAMPOS;
MARVIN JOSUE GRANDE
RODRIGUEZ; ALEXANDER
ANTONIO BURGOS MEJIA; LUIS
PEÑA GARCIA; JULIO CESAR
BARAHONA CORNEJO, as
individuals,

                    Plaintiffs,

v.

The GEO Group, Inc., a Florida
corporation; the City of Adelanto, a
municipal entity; GEO Lieutenant Diaz,
sued in her individual capacity; GEO
Sergeant Campos, sued in his individual
capacity; Sarah Jones, sued in her
individual capacity; The United States
of America; Correct Care Solutions,
Inc.; and DOES 1-10, individuals;

                    Defendants.

Case No. 5:18-cv-01125-SP
*Assigned to: Honorable Sheri Pym*

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS THE GEO GROUP,
INC. AND CITY OF ADELANTO'S
MOTION FOR SUMMARY
JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL
SUMMARY JUDGMENT**

**<u>Hearing:</u>**
Date:      December 17, 2019
Time:      10:00 a.m.
Courtroom: 3

Catherine Sweetser, SBN 271142
Kristina Harootun, SBN 308718
Schonbrun Seplow Harris & Hoffman LLP
11543 W. Olympic Boulevard
Los Angeles, CA 90064
(t) 310-396-0731
(f) 310-399-7040
(e) csweetser@sshhlaw.com
(e) kharootun@sshhlaw.com

Colleen Flynn, SBN 2324281
Law Office of Colleen Flynn
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 213-252-9444
(f) 213-252-0091
(e) cflynn@yahoo.com

Matthew Strugar, SBN 232951
Law Office of Matthew Strugar
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 323-696-2299
(e) matthew@matthewstrugar.com

*Attorneys for Plaintiffs.*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    STATEMENT OF FACTS ..................................................................1

    A.  The City of Adelanto Contracted With GEO Group to Run Its Detention Facility. ..................................................................................1

    B.  GEO Officers Used Excessive Force Against Plaintiffs in Response to Their Hunger Strike. ..........................................................................2

    C.  The Excessive Force Was Due to GEO and the City's Policies. .................3

    D.  Plaintiffs Were Retaliated Against and Had Communications Blocked When They Tried to Tell People Outside the Facility About the Hunger Strike and Excessive Force...............................................5

III.    LEGAL STANDARD ........................................................................5

IV.  ARGUMENT ........................................................................................6

    A.  THE GEO GROUP CAN BE SUED UNDER 42 U.S.C. § 1983 ................6

    B.  A REASONABLE JUROR COULD HOLD DEFENDANTS LIABLE UNDER *MONELL*...............................................................................8

     1.  A Reasonable Juror Could Find That Defendants Are Liable Because Their Final Policymaker Ratified the Relevant Actions................8

       a. The Undisputed Facts Demonstrate That Defendant City of Adelanto Delegated Final Policymaking Authority to GEO ......................9

        1. The IGSA and Services Agreement Expressly Delegate Final Policymaker Authority to GEO.................................................9

        2. Defendant City of Adelanto Delegated Its Policymaking to Defendant GEO in Practice ..........................................10

       b. GEO's Warden Was the Final Policymaker for Defendant GEO. ..........11

       c. The Warden Ratified All of the Conduct That Violated Plaintiffs' Constitutional Rights...............................................................12

       d. Captain McCusker Was Also A Final Policymaker and Ratified the Unconstitutional Conduct..........................................................14

     2. A Reasonable Juror Could Find that GEO Group Failed to Train Its Officers, Leading Them to Violate Plaintiffs' Constitutional Rights. .......15

     3. A Reasonable Juror Could Find That GEO Group Failed to Have Operating Showers That Could Be Used Safely for Pepper Spray Decontamination, In Violation of Plaintiffs' Constitutional Rights............16

     4. A Reasonable Juror Could Find That GEO Unlawfully Retaliated Against Plaintiffs by Restricting Their Phone Access, In Violation of Plaintiffs' Constitutional Rights. ...................................................16

    C.  PLAINTIFFS' STATE LAW CLAIMS SHOULD PROCEED TO TRIAL..............................................................................................18

     1. Defendants Are Liable for the Underlying Torts .......................18

     2. The City Is Liable for GEO's State Law Violations. .......................18

       a. The City Falls Under the Regulated Hirer Exception ..............................19

i

1

# **TABLE OF CONTENTS - CONT'D**

2

b.If the City Argues It Did Not Delegate Its Duties to GEO, the City Is
Vicariously Liable for the Torts of Its Agent GEO ................................21

3. Defendants Are Liable for Negligent Training and Negligent
Supervision ....................................................................................................22

a. The City Negligently Supervised GEO .................................................22

b. GEO Negligently Trained and Supervised Its Employees ...................22

V.       CONCLUSION.............................................................................................25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

<u>*Federal Cases*</u>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................6

*Bowoto v. Chevron Texaco Corp.*,
  312 F. Supp. 2d 1229 (N.D. Cal. 2004) ....................................22

*Bruce v. Ylst*,
  351 F.3d 1283 (9th Cir. 2003)...................................................17

*Bunnett & Co., Inc. v. Gearheart*,
  2018 WL 2387837 (N.D. Cal. May 25, 2018) ...........................22

*Castillon v. Corr. Corp. of Am.*,
  2015 WL 13732323 (D. Idaho, Dec. 3, 2015) ...................12, 14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................5, 6

*Christie v. Iopa*,
  176 F.3d 1231 (9th Cir. 1999) ..................................................10

*Corr. Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001) .....................................................................7

*Doe v. Hagee*,
  473 F. Supp. 2d 989 (N.D. Cal. 2007) .....................................24

*Estate of Osuna v. Cty. of Stanislaus*,
  392 F. Supp. 3d 1162 (E.D. Cal. 2019)....................................22

*Franklin v. Foxworth*,
  31 F.3d 873 (9th Cir. 1994)......................................................15

*Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*,
  627 F. Supp. 2d 1187 (E.D. Cal. 2009)....................................23

1

## <u>TABLE OF AUTHORITIES – CONT'D</u>

2

*Page(s)*

3

*Federal Cases-Continued*

4

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) ...............................................................17

5

6

*Gordon v. Ryan*, CV-11-8153-PCT-RCB (JFM),
  2012 WL 2572265 (D. Ariz., May 23, 2012).........................................12

7

8

*Harrelson v. Dupnik*,
  970 F. Supp. 2d 953 (D. Ariz. 2013)......................................................20

9

10

*Harris v. Vector Mktg. Corp.*,
  656 F. Supp. 2d 1128 (N.D. Cal. 2009) .................................................21

11

12

*Henry v. Cty. of Shasta*,
  132 F.3d 512 (9th Cir. 1997)..................................................................23

13

14

*Henry v. Cty. of Shasta*,
  137 F.3d 1372 (9th Cir. 1998)................................................................23

15

16

*Hopper v. City of Pasco*,
  241 F.3d 1067 (9th Cir. 2001)..................................................................8

17

18

*Hyland v. Wonder*,
  117 F.3d 405 (9th Cir. 1997)..................................................................11

19

20

*In re Coupon Clearing Service, Inc.*,
  113 F.3d 1091 (9th Cir.1997).................................................................21

21

22

*Jama v. U.S.I.N.S.*,
  343 F. Supp. 2d 338 (D.N.J. 2004) ..........................................................7

23

24

*Jett v. Dallas Indep. Sch. Dist.*,
  491 U.S. 701 (1989) ...........................................................................8, 10

25

26

*Lies v. Farrell Lines, Inc.*,
  641 F.2d 765 (9th Cir. 1981)..................................................................21

27

28

# TABLE OF AUTHORITIES – CONT'D

*Page(s)*

*Federal Cases-Continued*

*Lytle v. Carl,*
  382 F.3d 978 (9th Cir. 2004)..................................................................8, 10, 11, 14

*Martinez v. Monterey Cty. Sheriffs Office,*
  2019 WL 176791 (N.D. Cal. Jan 11, 2019) .......................................................9, 10

*Mendiola-Martinez v. Arpaio,*
  836 F.3d 1239 (9th Cir. 2016) ...................................................................................8

*Minneci v. Pollard,*
  565 U.S. 118 (2012) ...................................................................................................7

*Monell v. Dep't of Soc. Srvcs. of City of New York,*
  436 U.S. 658 (1978) ...................................................................................................8

*Oyenik v. Corizon Health Inc.,*
  696 F. App'x 792 (9th Cir. 2017)..........................................................................6, 7

*Pembaur v. City of Cincinnati,*
  475 U.S. 469 (1986) ...................................................................................................8

*Perez v. Nevada,*
  2017 WL 4172268 (D. Nev. Sept. 20, 2017) ..........................................................24

*Querry v. Smale,*
  2009 WL 2151896 (S.D. Cal., July 15, 2009).........................................................15

*Rabinovitz v. City of Los Angeles,*
  287 F. Supp. 3d 933 (C.D. Cal. 2018)...............................................................13, 14

*Rhodes v. Robinson,*
  408 F.3d 559 (9th Cir. 2005)....................................................................................17

*Russell v. U.S. Dep't of the Army,*
  191 F.3d 1016 (9th Cir. 1999)....................................................................................7

## <u>TABLE OF AUTHORITIES – CONT'D</u>

*Page(s)*

<u>*Federal Cases-Continued*</u>

*Sugimoto v. Exportadora De Sal, S.A. De C.V.*,
    19 F.3d 1309 (9th Cir. 1994) .................................................................................19

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) ..................................................................................8

*Ulrich v. City & Cty. of S.F.*,
    308 F.3d 968 (9th Cir. 2002) ..................................................................................10

*Villarreal v. City of Monterey*,
    254 F. Supp. 3d 1168 (N.D. Cal. 2017) ..................................................................10

*Weisbuch v. County of Los Angeles*,
    119 F.3d 778 (9th Cir. 1997) ............................................................................13, 14

*West v. Atkins*,
    487 U.S. 42 (1988) ...............................................................................................6, 7

*Wiley v. Pliler*,
    2007 WL 2344888 (E.D. Cal. Aug. 15, 2007) .......................................................12

*Wiley v. Pliler*,
    2007 WL 2702972 (E.D. Cal. Sept. 17, 2007) .......................................................12

*Winger v. City of Garden Grove*,
    2014 WL 12852387 (C.D. Cal. Jan. 27, 2014) ......................................................6, 7

*Womack v. GEO Grp., Inc.*,
    2013 WL 491979 (D. Ariz. Feb. 8, 2013) ................................................................7

<u>*State Cases*</u>

*Biles v. Richter*,
    206 Cal. App. 3d 325 (1988) ..................................................................................23

*C.A. v. William S. Hart Union High Sch. Dist.*,
    53 Cal. 4th 861 (2012) ............................................................................................22

# TABLE OF AUTHORITIES – CONT'D

*Page(s)*

<u>*State Cases-Continued*</u>

*de Villers v. Cty. of San Diego*,
  156 Cal. App. 4th 238 (2007)..................................................................22

*Doe v. Roman Catholic Archbishop of Los Angeles*,
  247 Cal. App. 4th 953 (2016)..................................................................21

*Eli v. Murphy*,
  39 Cal. 2d 598 (1952)..............................................................................20

*Giraldo v. Dep't of Corr. & Rehab.*,
  168 Cal. App. 4th 231 (2008)............................................................20, 22

*Hegyes v. Unjian Enterprises, Inc.*,
  234 Cal. App. 3d 1103 (Ct. App. 1991) ..................................................21

*Jackson v. AEG Live, LLC*,
  233 Cal. App. 4th 1156 (2015).................................................................21

*Mary M. v. City of Los Angeles*,
  54 Cal.3d 202 (1991)...............................................................................18

*Millsap v. Fed. Express Corp.*,
  227 Cal. App. 3d 425 (Ct. App. 1991) ...............................................18, 19

*Munoz v. City of Union*,
  148 Cal. App. 4th 173 (2007)..................................................................22

*Padilla v. Pomona Coll.*,
  166 Cal. App. 4th 661 (2008)..................................................................20

*Privette v. Superior Court*,
  5 Cal. 4th 689 (1993)...............................................................................19

*Secci v. United Independent Taxi Drivers, Inc.*,
  8 Cal. App. 5th 846 (Ct. App. 2017) ..................................................19, 20

1

## <u>TABLE OF AUTHORITIES – CONT'D</u>

2
3

*Page(s)*

<u>State Cases-Continued</u>

*State Farm Fire & Casualty Co. v. Keenan*,
   171 Cal.App.3d 1 (1985)........................................................................23

*Van Arsdale v. Hollinger*,
   68 Cal. 2d 245 (1968)............................................................................20

<u>State Statutes</u>

California Government Code, § 815.4...........................................................18

<u>Federal Rules</u>

Federal Rule of Civil Procedure 56(c).........................................................6

<u>State Regulations</u>

Cal. Code Regs. tit. 24, § 1231.3.4.............................................................19

<u>Other Authorities</u>

*Restatement (Second) of Torts* § 409.........................................................19

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Both the GEO Group, Inc. ("GEO" or "GEO Group") and the City of Adelanto ("the City") are liable for the constitutional violations and state law torts committed by the officers against innocent asylum-seekers being detained at the Adelanto Detention Facility.  The City of Adelanto and GEO Group can be sued under §1983 as they were acting under color of state law. Moreover, the City of Adelanto delegated its policymaking authority to GEO, and GEO's policymakers, including the Warden and Captain McCusker, signed off on the major use of force against Plaintiffs and found it to be in policy. The Warden was responsible for the decision to block detainee's phone calls on the basis that facts about the incident were given to outside persons and the press. The Warden and Captain McCusker also ignored ongoing complaints about the temperature of the showers, while knowing that pepper spray should be decontaminated with cool water.

The facility failed to train its officers properly on when a major use of force can and cannot be used, and on how to deploy OC Spray.  GEO Group and the City of Adelanto are liable for the failure to train and for negligent training under both federal and California law.  The City also is liable for the temperature of the showers under state law as a regulated hirer, and for negligent supervision of its employees.  Finally, GEO is liable in respondeat superior for the actions of its employees, and defendants do not argue otherwise. [1]

## II.    STATEMENT OF FACTS

### A. The City of Adelanto Contracted With GEO Group to Run Its Detention Facility.

The City of Adelanto entered into a contract (the Intergovernmental Services Agreement, or IGSA) with Immigration and Customs Enforcement (ICE) to house

---

[1] Their only argument is that there were no underlying violations.  As set out in in the brief responding to Lieutenant Diaz and Sergeant Campos' motion, as well as below, there were multiple violations of law in the egregious treatment of plaintiffs.

1

detainees at a city-run detention facility**.**  PSUF 1.  In May 2011, the City of Adelanto entered into a contract (the "Services Contract") with the GEO Group, Inc., a private detention company, to run the Adelanto facility. PSUF 2.   At that time, it was against the federal government's conflict of interest rules for GEO to contract with ICE directly.  PSUF 3.  The Services Contract delegated the obligations and responsibilities of the City, including the right to make policies for the facility, to GEO. PSUF 4, 5.

During his tenure as Warden, Warden Janecka did not recall a single inspection of the facility by the City of Adelanto.  PSUF 100.  Nor did the City ever contact GEO's Compliance Administrator to coordinate an audit or address complaints.  PSUF 101, 102.  Even after being notified of serious problems at the Adelanto Detention Facility, the City took no affirmative action to address them. PSUF 96-99.

**B. GEO Officers Used Excessive Force Against Plaintiffs in Response to Their Hunger Strike.**

On the morning of June 12, 2017, Plaintiffs were being held in the Adelanto Detention Facility.  PSUF 7.  Plaintiffs had many complaints about the conditions there, and decided as a group that they would begin a hunger strike until a GEO or ICE supervisor addressed their complaints.  *Id.*  They wrote out a two-page letter in Spanish setting forth their demands and explaining that they were undertaking a peaceful hunger strike.  PSUF 7, 8.  They then gave this letter to the dorm officer, Officer Gillon, and had other detainees translate their demands and explain to him what was going on.  PSUF 8. Officer Gillon took the letter to Lieutenant Diaz, the shift supervisor that morning. PSUF 9.

In response to her receipt of the letter, Lieutenant Diaz yelled at the detainees in English; stopped the only Spanish speaking officer from attempting to talk to them after a very short time of only two minutes; ordered the use of force against the detainees within five minutes of when she arrived on the scene; and pepper

sprayed the detainees.  PSUF 10-11.  In short, Lieutenant Diaz escalated the situation and used force punitively, as laid out in more detail in the accompanying opposition to Diaz's Motion for Summary Judgment.   Lieutenant Diaz testified that she thought Plaintiffs' peaceful hunger strike was a rebellion that warranted a major use of force.  PSUF 59.

Lieutenant Diaz also called another supervisor, Sergeant Campos, over from the other side of the facility.  PSUF 12.  When Sergeant Campos arrived, he ordered officers to push a detainee against the wall, then ordered officers to step away from the detainees who were sitting peacefully at the table, and sprayed the remaining detainees at extremely close range.  PSUF 12-13.  Sergeant Campos also stated that a rebellion was when a small group chooses not to comply.  PSUF 61.  The detainees were hurt both by the use of force against them and by the pepper spray.  PSUF 21-23.

The detainees were then further hurt when the officers failed to decontaminate them properly.  *Id.*  The officers waited over two hours to decontaminate the detainees, and then put them into hot showers fully clothed and still handcuffed.  PSUF 15.  The hot showers exacerbated the effects of the pepper spray, creating an extremely painful burning sensation.  PSUF 16.

## C.  The Excessive Force Was Due to GEO and the City's Policies.

The City delegated its policymaking authority to the Warden, and no one else at the City did any review of GEO's policies during the relevant time period.  PSUF 30, 31. GEO's final policymaker was Warden Janecka, who had the power to make changes at the facility, including to policy, and who arrived to the scene shortly after the incident and observed the amount of pepper spray still in the air.  PSUF 31-34.  The Warden also watched a video of the incident and reviewed all the serious incident reports before initialing them and sending them on to corporate headquarters.  PSUF 35-39.  Warden Janecka and Captain McCusker both ratified

1  what had happened during the incident and found that Lieutenant Diaz was not out

2  of policy and had acted in accordance with her training.  PSUF 36-39; PSUF 87-91.

3      As policymakers for GEO, Warden Janecka and Captain McCusker also both

4  ratified the policy of not having cold water showers available, even though

5  supervisors were given pepper spray to carry and use. PSUF 18-19. The City had

6  basic obligations under California law that it had to follow in any City detention

7  facility, namely California Building Code Title 24 - Minimum Standards for Local

8  Detention Facilities. PSUF 6.  Under Title 24 - Minimum Standards for Local

9  Detention Facilities, the City is required under California law to ensure hot, cold,

10  and tempered showers.  PSUF 17**.**  The showers at the facility only had one

11  temperature available: hot water. PSUF 18-19 .  Using warm or hot water on pepper

12  spray can increase the burning sensation and further hurt detainees; Captain

13  McCusker classifies the pain from OC Spray as an 8 out of 10 and noted that the

14  first time being exposed is the most painful and traumatic.  PSUF 21, 22.  The

15  facility had received complaints about the water being too hot in the past, and

16  during the incident the detainees complained to the officers about the extreme

17  burning sensation from the hot water.  PSUF 19; 24.

18      Sergeant Campos and Lieutenant Diaz also classified this incident as a

19  rebellion.  "Rebellion" is a vague term which in the policies justifies a major use of

20  force; both Campos and Diaz identified peaceful "noncompliance" as a rebellion.

21  PSUF 47, 60, 62, 63.  No one receives training on the meaning of that term at the

22  facility.  PSUF 61, 62, 64. The Warden explained at deposition that a rebellion is

23  when a large group of detainees tries to actively take over a portion of the facility.

24  PSUF 64.  Sergeant Campos and Lieutenant Diaz, and the other officers, were not

25  adequately trained on when a major use of force was and was not warranted. PSUF

26  53, 54, 55. The policy explicitly states that pepper spray is a major use of force.

27  PSUF 48.

28  *///*

4

1    In most facilities, a refresher course in OC spray use is required each year,

2 but Geo Group did not refresh the training on OC spray protocols. PSUF 55-56.

3 Campos said that he did not remember the factors required to deploy OC spray.

4 PSUF 67. Geo Group has not made any changes to their general training even after

5 needing to retrain individual staff following detainee grievances; nor did they make

6 a change to their training after this incident. PSUF 57-58. GEO also did not

7 properly train its officers on decontamination to ensure that decontamination

8 happened as soon as possible and is done with cold water. PSUF 25-26, 71. In this

9 case, Plaintiffs were left for over two hours and then showered fully clothed in hot

10 water. PSUF 71.

11
12    **D. Plaintiffs Were Retaliated Against and Had Communications Blocked
      When They Tried to Tell People Outside the Facility About the Hunger
13    Strike and Excessive Force.**

14    After the incident occurred, the Plaintiffs were held in segregation. PSUF

15 75. At the facility, calls were monitored by the Security Threat Investigator, Barry

16 Belt, who had the power to request blocking of calls. PSUF 76-78. Mr. Belt

17 always went through the Warden, who he reported to directly, to get phone numbers

18 blocked. PSUF 81-82. He would send notes concerning what had happened on the

19 calls to the Warden, and then would let the Warden make the final decision on

20 whether to recommend blocking a phone number. *Id.*

21    Plaintiffs' calls were blocked purely because they reported out facts about the

22 incident to outside persons who could file grievances on their behalf and

23 encouraged them to file grievances. PSUF 83.

24
25 **III.   LEGAL STANDARD**

26    Summary judgment is an extreme remedy that is only available if "there is no

27 genuine issue as to any material fact and that the moving party is entitled to a

28 judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

(citing Federal Rule of Civil Procedure 56(c)). The inquiry performed is a "threshold inquiry" to determine whether there are genuine factual issues that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). "If reasonable minds could differ as to the import of the evidence," the motion must be denied. *Id*. at 250-51. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp*., 477 U.S. at 323. It is never enough to conclusorily assert that the plaintiff has no evidence. *Id*. at 328 (White, J., concurring).

## IV.   ARGUMENT

### A. THE GEO GROUP CAN BE SUED UNDER 42 U.S.C. § 1983

The Court in this case has already ruled that the City of Adelanto's contractors (and subcontractors) are state actors who can be sued under 42 U.S.C. § 1983. *See* Order Granting in Part and Denying in Part Sarah Jones' Motion to Dismiss, Dkt. 69, at 4) (C.D. Cal. April 30, 2019) (citing *West v. Atkins*, 487 U.S. 42, 55 (1988).  GEO contracted directly with the City of Adelanto, and thus was acting under color of state law. *Oyenik v. Corizon Health Inc.,* 696 F. App'x 792, 794 (9th Cir. 2017) The *Bivens* cases Defendant cites do not apply to §1983. *Winger v. City of Garden Grove*, No. SA13-CV-0267-AG-RNBx, 2014 WL 12852387, at *3 (C.D. Cal. Jan. 27, 2014).

The undisputed facts show that GEO Group entered into a contract with the City of Adelanto – not DHS, ICE, or any other entity of the U.S. Government – to manage and operate the Adelanto Detention Facility. PSUF 1-3.  That contract was in effect through June 2019.  *See* Dkt. 108-4, Janecka Decl. at ¶ 3. As such, in June 2017 (and for the entirety of June 2011 through June 2019), GEO Group acted

1    under color of state law. The Court made this finding long ago, in its ruling on

2    Defendant Sarah Jones's Motion to Dismiss Plaintiffs' Complaint.  Order Granting

3    in Part and Denying in Part Sarah Jones' Motion to Dismiss, Dkt. 69, at 4 (citing

4    *West v. Atkins*, 487 U.S. at 55). GEO presents no new facts that would disturb the

5    Court's ruling, nor does it present any cases compelling a contrary conclusion.

6    Several courts within the Ninth Circuit have held that GEO Group can be sued

7    under section 1983. *See, e.g.*, *Winger,*2014 WL 12852387, at *3; *Womack v. GEO*

8    *Grp., Inc*., No. 12-CV-1524-PHX-SRB, 2013 WL 491979, at *1 (D. Ariz. Feb. 8,

9    2013).

10          The cases GEO Group cites are inapposite, and they all deal with federal

11   rather than municipal contractors. *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016,

12   1019 (9th Cir. 1999) (discussing whether a federal civil service employee can sue

13   the federal government under § 1983); *Jama v. U.S.I.N.S.*, 343 F. Supp. 2d 338, 362

14   (D.N.J. 2004) (discussing whether a company contracting directly with the federal

15   government, and without any state government involved, is liable under §1983, and

16   finding that "[b]ecause state action is not involved 42 U.S.C. § 1983 is

17   unavailable"). GEO Group also relies on cases stating that no *Bivens* action would

18   lie against a federal contractor. *Minneci v. Pollard*, 565 U.S. 118, 131 (2012); *Corr.*

19   *Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Whether *Bivens* would apply here

20   is irrelevant; *Minneci* does not extend to section 1983 claims. *Winger v. City of*

21   *Garden Grove*, No. SACV130267-AG-RNBx, 2014 WL 12852387, at *3 (C.D.

22   Cal. Jan. 27, 2014) (collecting cases and finding that,"*Minneci* does not apply to

23   section 1983 claims."). Nothing precludes a contractor to a municipality from being

24   sued under 42 U.S.C. § 1983.  *See*, e.g., *Oyenik v. Corizon Health Inc.,* 696 F.

25   App'x 792, 794 (9th Cir. 2017).

26   ///

27   ///

28   ///

**B. A REASONABLE JUROR COULD HOLD DEFENDANTS LIABLE UNDER *MONELL*.**

Defendants are subject to suit under § 1983 for constitutional rights violations when a policy or custom violates an individual's constitutional rights. *Monell v. Dep't of Soc. Srvcs. of City of New York*, 436 U.S. 658, 690-92 (1978); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012). There are three ways a plaintiff may establish policy or custom for *Monell* liability: (1) a municipal employee committed the violation per a longstanding practice or custom; (2) the individual who committed the constitutional violation was a person with final policymaking authority; or (3) an official with final policymaking authority ratified a subordinate's unconstitutional decision and the basis for it. *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001). *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-82 (1986); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). If the final policymaker ratifies the actions of a subordinate or subordinates, even if there is only a single incident, that subjects the City to *Monell* liability. *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) ("It does not matter that the final policymaker may have subjected only one person to only one unconstitutional action.").

**1. A Reasonable Juror Could Find That Defendants Are Liable Because Their Final Policymaker Ratified the Relevant Actions**

Municipalities are liable for constitutional violations when the person causing the violation has final policymaking authority. *See Pembaur*, 475 U.S. at 480. Moreover, there is no requirement that the policy receive formal approval through the body's official decision-making channels. *Monell*, 436 U.S. 690-91. The Ninth Circuit has recognized that once a municipality has delegated final policymaking authority to another official, that official's ratification of a subordinate's unconstitutional behavior makes the city liable under *Monell*. *See*

*Lytle*, 382 F.3d at 983, 986. Here, there is evidence that Adelanto delegated final policymaking authority on the use of force to GEO, and that GEO, through its Warden, ratified its guards' use of force against Plaintiffs and their subsequent failure to decontaminate Plaintiffs. Therefore, as the final policymaker, the Warden's ratification of the unconstitutional behavior gives rise to municipal liability against Adelanto.

### a. The Undisputed Facts Demonstrate That Defendant City of Adelanto Delegated Final Policymaking Authority to GEO

#### 1. *The IGSA and Services Agreement Expressly Delegate Final Policymaker Authority to GEO*

The City of Adelanto has delegated the final policymaking authority at the facility to GEO.  In interpreting the Intergovernmental Service Agreement ("IGSA") between ICE and Defendant City of Adelanto, this Court found that the terms of the IGSA expressly delegated the responsibility for a "detailed list of 'Covered Services'" to the City. Dkt. 70 at 7. The City subsequently delegated its own policymaker authority to GEO in the Services Contract. PSUF 1-5. The Services Contract delegates the "obligations and responsibilities of the City [as though they] were fully rewritten here as applying to GEO."  PSUF 4.  Moreover, this Court found that the responsibility to render services for the detention facility was "delegated to Adelanto and, through its sub-contractor agreement, GEO." Dkt. 70 at 7.

The City attempts to argue that because it did not have a policy that it promulgated that was the moving force behind the violations of Plaintiffs' constitutional rights, it cannot be held liable under section 1983. Dkt. 108 at 10-12. That argument ignores the caselaw that a municipality may be held liable for the policies of a contractor to whom it has delegated final policymaking authority.

The case the City primarily relies upon, *Martinez v. Monterey Cty. Sheriffs Office*, No. 18-CV-00475-BLF, 2019 WL 176791 (N.D. Cal. Jan 11, 2019), is

1   inapposite here, and, in fact, states that Monterey could have been liable if its policy
2   was to adopt the policies created by its private contractor. *Id*. at *3.  In that case, the
3   *Monell* claims failed because there were no constitutional violations by the jailors.
4   *Id*. at *3.  In the other case the City cites, *Villarreal v. City of Monterey*, 254 F.
5   Supp. 3d 1168, 1183 (N.D. Cal. 2017), the County was held liable as a matter of
6   law for the actions of its Sheriff as they constituted "inaction that amounted to
7   acquiescence in the unconstitutional conduct." (citations and quotation marks
8   omitted). The City was dismissed for the acts of the arresting officers, but only
9   because the officers were from another jurisdiction and were "*temporary*
10  *independent contractors*" for the span of one half day while the usual police
11  department underwent an inspection. *Id*. at 1193, 1195 (emphasis added). Plaintiffs
12  made no allegations about any policy that the CSU officers had to follow; made no
13  allegations that the City had delegated policymaking authority to the CSU officers;
14  and made no allegations that anyone in the City ratified the conduct. Based on the
15  absence of those allegations, the court dismissed the complaint as to the City. The
16  court did so without prejudice, granting the plaintiffs leave to amend the complaint.
17  *Id*. at 1196. Neither of the City's cited cases relieve it of liability under *Monell*.

18          *2.  Defendant City of Adelanto Delegated Its Policymaking to*
19              *Defendant GEO in Practice.*

20          Whether policymaking authority has been delegated is a fact-based inquiry
21  concerning whether officials' decisions are subject to municipal review or are
22  constrained by outside policies. *See Christie v. Iopa*, 176 F.3d 1231, 1236-37 (9th
23  Cir. 1999); *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 985 (9th Cir. 2002). Even if
24  a municipality retains a technical right to review decisions, "the way a local
25  government entity operates in practice" is also relevant. *See Lytle*, 382 F.3d at 983,
26  985-86 (quoting *Jett*, 491 U.S. at 737). GEO's policies and practices constituted the
27  City's official municipal policy.

28

In a case regarding retaliatory dismissal in a Juvenile Probation Department, the Ninth Circuit found that the judges who had final policymaking authority had delegated that authority to the Chief Juvenile Probation Officer based on testimony that the Chief Juvenile Probation Officer had full authority as to the internal management and operation of the department, and that other policymaking officials "attempted not to interfere." *Hyland v. Wonder*, 117 F.3d 405, 415-16 (9th Cir. 1997). In *Lytle*, the defendant argued that it had not delegated final employment policymaking authority to the superintendents because the board retained the ability to review employment decisions. 382 F.3d at 984. The Court dismissed this argument because the board never exercised it that right. *Id*. at 985.

Here, according to the person most knowledgeable and current City Manager at Adelanto, there is no person in the City responsible for inspecting GEO's facility. PSUF 103. In his deposition, the City Manager plainly stated that Adelanto relied on GEO's policies, explaining, "It's my understanding that we contracted with GEO to maintain all documentations, policies, procedure and oversee the facility on behalf of the City." PSUF 104.   He added, "We relied on GEO to perform all . . . responsibilities on our behalf" and "we relied on GEO for-- to oversee the detention center". *Id.* While the City keeps records of GEO's policies, the current City Manager has never reviewed them and it is unclear if anyone in the City has done so. PSUF 30. Like in *Hyland* and *Lytle*, therefore, the evidence supports a finding that GEO had the ultimate authority to set policies and practices for the operation of the Adelanto Detention Facility. There is no indication from anything Defendants produced in discovery, written or testimonial, that states the City ever acted otherwise.

**b. GEO's Warden Was the Final Policymaker for Defendant GEO.**

It is undisputed that Warden Janecka was the final policymaker on Adelanto policies for GEO (and thus, for the City as well).  PSUF 28-29. (stating clearly as the PMK for GEO Group that he is the "final decisionmaker"). The Warden had the

final power to implement policy changes at Adelanto Detention Facility and was responsible for managing the day-to-day operations at Adelanto Detention Facility. PSUF 28-29. The Warden also testified that complaints stopped at his desk and it was his decision whether or not to address them.  PSUF 29.

These facts, without more, are enough to confirm that the Warden was a final policymaker on these matters.  Courts have not contested claims that the Warden and other private prison officials have final policymaker status. *See e.g., Castillon v. Corr. Corp. of Am.*, No. 1:12-cv-00559-EJL-CWD, 2015 WL 13732323 , at *29(D. Idaho, Dec. 3, 2015), *rejected on other grounds,* No. 1:12-CV-00559-EJL, 2016 WL 3676116 (finding that a housing manager was not a policymaker because she, unlike the warden and other officials at the private detention center, did not establish policy for housing); *Gordon v. Ryan*, CV-11-8153-PCT-RCB (JFM), 2012 WL 2572265, at *4 (D. Ariz., May 23, 2012) (finding that plaintiff had stated a claim against a prison complex administrator by alleging that she was a final policymaker with respect to the injuries at issue); *Wiley v. Pliler*, No. CIV S-04-1922-MCE-KJMP, 2007 WL 2344888, at *7 (E.D. Cal. Aug. 15, 2007), *report and recommendation adopted*, No. CIV S-04-1922-MCE-KJMP, 2007 WL 2702972 (E.D. Cal. Sept. 17, 2007) (recognizing that the "warden, as policymaker" had different interests than other officers in collateral estoppel analysis).

### c.  The Warden Ratified All of the Conduct That Violated Plaintiffs' Constitutional Rights.

As set forth in detail in Plaintiffs' Response in Opposition to Defendants Diaz and Campos's Motion for Summary Judgment, genuine issues of material fact are in dispute that prevent the summary adjudication of Plaintiffs' excessive force, retaliation, and due process claims. As set out below, the Warden ratified this conduct.

It is undisputed that the Warden arrived at Adelanto Detention Facility shortly after the incident; that he went to 2-Charlie (the site of the incident); and

1    that he discussed what had happened with the officers.  PSUF 32. It is also

2    undisputed that the Warden reviewed the Serious Incident Report (the report GEO

3    requires a supervisory officer to create after an "incident" has occurred at the

4    Facility – here, a Use of Force Incident) and signed off on it. PSUF 39.  As the

5    Warden attests, "This procedure is  . . . [a] mechanism to review the reasonableness

6    of the actions taken by staff and confirm the actions conform to GEO's policies and

7    procedures." Dkt. 108-4, Janecka Decl. ¶ 8.   The undisputed actions the Warden

8    (as final policymaker) took -- in visiting the dorm where the incident occurred after

9    the incident, observing the amount of pepper spray present in the environment,

10   reviewing the video of force used and speaking with the involved supervisor to tell

11   her what she did was within policy, and signing off on the SIR constitutes a clear

12   ratification of the officers' actions.  PSUF 32-39.

13         It is also undisputed that the Warden had ultimate responsibility for the

14   conditions in the facility and made decisions whether to address complaints or not.

15   PSUF 28-29.

16         Defendants rely on cases with much less affirmative behavior to argue that

17   ratification must be more than acquiescence.  *Weisbuch v. County of Los Angeles*,

18   119 F.3d 778, 781 (9th Cir. 1997); *Rabinovitz v. City of Los Angeles*, 287 F. Supp.

19   3d 933, 968 (C.D. Cal. 2018).   In *Weisbuch,* the County Board of Supervisors was

20   not involved in the plaintiff's transfer of position; the Board did not make any

21   statement or sign any forms concerning the transfer.  119 F.3d at 781. Similarly, in

22   *Rabinovitz*, the only evidence was that the officer had never "been disciplined in

23   any way in connection with a school interview."  287 F.Supp.3d at 968.  The report

24   presented to the City concluded that the facts did not reflect what Rabinovitz

25   described.  *Id.*

26         The Warden in this case ratified both the use of force and the basis for it by

27   not just reviewing the officer's reports but also visiting the scene, speaking to the

28   officers, reviewing the video and signing off on the use of force shown therein.

PSUF 32-39.  Diaz was told by the Warden that her actions were appropriate, and the Warden signed off on the SIRs and transmitted them to headquarters.  *Id.* (Moreover, McCusker helped her complete the use of force report and checked off that it was in policy. PSUF 88-89. As discussed below, McCusker is an additional policymaker for GEO and thus for the City).   The policymakers here affirmatively participated, unlike the policymakers in *Weisbuch* or *Rabinovitz.*  If the jury finds the underlying actions to have violated Plaintiffs' constitutional rights, in addition to the GEO Group, Defendant City of Adelanto must be held liable under *Monell*.

### d.  Captain McCusker Was Also A Final Policymaker and Ratified the Unconstitutional Conduct.

Local governments can delegate final policymaking authority to multiple people, and official subordinates other than the Warden can be final policymakers. *See Lytle v. Carl*, 382 F.3d at 983-85 (finding that where a school Board of Trustees had expressly delegated policymaking authority to the superintendent, the assistant superintendent was an additional final policymaker whose actions subjected the municipality to liability); *Castillon*, 2015 WL 13732323, at *29 (finding that the defendant housing manager was not a policymaker because she, unlike officials such as the Warden and Director of Security, could not approve and adopt policies).

Captain McCusker was also a final policymaker.  The Captain was required to participate, and in fact, did participate, in after-action reviews for use of force incidents. Dkt. 108-4, Janecka Decl. ¶ 5; PSUF 87-88.  Like the assistant superintendent in *Lytle* whose delegated policymaker functions gave rise to government liability, Captain McCusker's role as a Captain at Adelanto in reviewing and ratifying GEO subordinate's use of force therefore establishes that he is a final policymaker.

Plaintiff has proffered sufficient evidence to create a material dispute that, in addition to Warden Janecka, Captain McCusker also ratified the unconstitutional conduct in this case.  Captain McCusker found that the use of force against

Plaintiffs was within policy and assisted in the preparation of reports after the incident.  PSUF 88-89. [2]

### 3. A Reasonable Juror Could Find that GEO Group Failed to Train Its Officers, Leading Them to Violate Plaintiffs' Constitutional Rights.

The Ninth Circuit recognizes that inadequate police training may serve as the basis of section 1983 municipal liability when the failure to train amounts to deliberate indifference to the rights of individuals with whom the police come into contact. *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994) (Reinhardt, C.J., concurring).  A police department's failure to train its officers on how to use force may be causally connected to the plaintiff's injury and sufficient to support a section 1983 claim.  *Querry v. Smale*, No. 09CV0215WQH(POR), 2009 WL 2151896, at *4 (S.D. Cal., July 15, 2009).

Lieutenant Diaz and Sergeant Campos both stated that a rebellion was occurring that warranted a major use of force under GEO Group's policy.  PSUF 58-59.  Despite using terms such as "rebellion" and "disturbance" in GEO's use of force policy, there is a material dispute of fact as to whether GEO properly trained its officers on the meaning of these terms.  PSUF 51-54.  These terms have no definition in GEO's policies and are given little attention in the training modules. *Id.*  GEO also did not provide refresher training every two years to officials with pepper spray, and Sergeant Campos did not know the appropriate distance to maintain from people being sprayed nor the factors for when pepper spray may be used.  PSUF 55-56; 66; 105-06.   The failure to provide meaningful training is further underscored by the fact that Captain McCusker had to correct several errors on the use of force reports.  PSUF 50, 90, 92.  Accordingly, a reasonable juror could find that GEO is liable for failing to train its employees.

---

[2] The argument made above for McCusker applies with equal force to Command Level staff that GEO may argue are the relevant authority and approved the use of force.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**4.   A Reasonable Juror Could Find That GEO Group Failed to Have Operating Showers That Could Be Used Safely for Pepper Spray Decontamination, In Violation of Plaintiffs' Constitutional Rights.**

Plaintiffs present extensive evidence that GEO violated their right to be free of excessive force when it failed to provide showers that could properly decontaminate them after they were subjected to OC spray.  Despite universally accepted protocols directing that post-spray decontamination be promptly effectuated using cold or temperate water, PSUF 20-23, 74.  The showers at Adelanto Detention Facility had no cold (or temperate) water settings, and were instead equipped with a single hot water temperature setting. Decl. of Martinez, ¶ 4, Decl. of Castillo ¶ 4; PSUF 18-19. The Warden had the ultimate responsibility for the showers. PSUF 19.  Moreover, the facility had previously received complaints about the showers being too hot.  The Warden had the ultimate responsibility for addressing such complaints, which were reviewed at least at the command level. PSUF 19, 29.

The policy of not having cold water inside the facility damaged Plaintiffs by failing to provide a safe method of decontamination for them. Plaintiffs testified that they were further hurt by the pain of the showers, which were at too hot a temperature for safe decontamination.  PSUF 14, 20-23.  A reasonable juror could therefore find GEO and the City of Adelanto liable for violating Plaintiffs' constitutional rights because its policymakers made a choice to not provide cold water showers at the facility, which caused the officers to fail to properly "decontaminate" Plaintiffs and subject them to even more pain.

**5.   A Reasonable Juror Could Find That GEO Unlawfully Retaliated Against Plaintiffs by Restricting Their Phone Access, In Violation of Plaintiffs' Constitutional Rights.**

Plaintiffs claim GEO unlawfully blocked their calls after they were assaulted and placed in segregation. Their testimony is supported by contemporaneous documentation undertaken by some of their attorneys, who were denied access to

16

their clients and complained to GEO about it. PSUF 75, 85-86. GEO denies having improperly blocked any calls and contends that to the extent any calls were blocked, they were blocked in accordance with policies enacted to ensure the security of the institution. Due to the disputed nature of the facts, this claim must go to a trier of fact.

While First Amendment rights are curtailed in prison, they are not lost. *See Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003) (finding that prison officials can be held liable for retaliatory actions). Prison officials cannot use a proper and neutral procedure in retaliation for a prisoner's exercise of his constitutional rights. *See, e.g., Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (holding that "repeated threats of transfer because of [the plaintiff's] complaints about the administration of the [prison] library" were sufficient to ground a retaliation claim). Relatedly, the Ninth Circuit has definitively held it is unlawful for correctional institutions to chill detainees' First Amendment rights – which is precisely what Plaintiffs claim. *See Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005).

Plaintiffs' evidence demonstrates a clear material dispute of fact as to whether GEO Group personnel acted to block calls to phone numbers based on whether the Plaintiffs in this case were telling outside persons about the hunger strike they had participated in and the excessive force they had suffered.  PSUF 83-86.  Plaintiffs' calls were blocked after Plaintiffs had phone calls discussing the hunger strike and the excessive force they were subjected to.  *Id*.  GEO's Person Most Knowledgeable, Barry Belt, testified that GEO personnel can monitor calls and typically request authority to block a call through the Warden or ICE.  PSUF 81-82.  The uncontroverted evidence shows that the Warden ratifies decisions regarding telephone number blocking. PSUF 81-82.  Given the genuine disputes of material fact, Plaintiffs' claim must be adjudicated by a jury.

///

///

### C. PLAINTIFFS' STATE LAW CLAIMS SHOULD PROCEED TO TRIAL.

#### 1. Defendants Are Liable for the Underlying Torts

As set out in Plaintiffs' response to Defendants Diaz and Campo's Motion for Summary Judgment, GEO employees committed a number of underlying torts, including negligence, battery, assault, intentional inflict of emotional distress, and violation of the Bane Act.  In addition, GEO employees Janecka and Belt also negligently and purposefully retaliated against Plaintiffs. As set out above in Sections VI.D-E,  Janecka failed to ensure that cold water was present to decontaminate victims of OC spray, and Janecka and Belt acted in concert to retaliate against Plaintiffs for telling people outside the facility what happened to them by blocking communications. GEO is liable for these actions in *respondeat superior* as all these torts were committed within the scope of their employment. *Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 209 (1991).  GEO does not argue otherwise.

#### 2. The City Is Liable for GEO's State Law Violations.

The City of Adelanto is liable for the actions of its contractor GEO Group, as it is a regulated hirer that cannot contract around its ongoing duty toward detainees in its care.  More, if the City disclaims delegation of its duties under *Monell*, the City is liable because it necessarily controlled GEO's operations. By retaining such control over GEO, the City is also liable as an exception to the rule of nonliability.

California Government Code, § 815.4 provides for liability against public entities for the actions of independent contractors "to the same extent that the public entity would be subject to such liability if it were a private person."  "It has been held that the general rule of nonliability of an employer of an independent contractor for the contractor's negligence is subject to exceptions of such magnitude as to leave only a small area in which the general rule operates." *Millsap v. Fed. Express Corp.*, 227 Cal. App. 3d 425, 433 (Ct. App. 1991). Courts have, for policy reasons, created so many exceptions to this general rule of nonliability that "the rule

1  is now primarily important as a preamble to the catalog of its exceptions." *Privette*

2  *v. Superior Court*, 5 Cal. 4th 689, 693 (1993), *as modified on denial of reh'g* (Sept.

3  16, 1993) (citation and quotation marks omitted). "The rule 'can now be said to be

4  general only in the sense that it is applied when no good reason is found for

5  departing from it.'" *Sugimoto v. Exportadora De Sal, S.A. De C.V.*, 19 F.3d 1309,

6  1312 (9th Cir. 1994) (quoting *Restatement (Second) of Torts* § 409, comment b).

7  ### a. The City Falls Under the Regulated Hirer Exception

8  Under the regulated hirer exception, the City cannot escape liability by

9  subcontracting its duties to abide by regulations that it is subject to. The "policy

10  behind the regulated hirer exception . . . emphasizes that the effectiveness of public

11  regulations 'would be impaired if the [the City] could circumvent them by having

12  the regulated operations conducted by an independent contractor.'" *Secci v. United*

13  *Independent Taxi Drivers, Inc.*, 8 Cal. App. 5th 846, 860–61 (Ct. App.

14  2017), *review denied* (May 17, 2017) (quoting *Millsap*, 227 Cal. App. 3d at 434).

15  Notably, the regulated hirer exception does not only apply to activities that involve

16  an increased risk of danger, as long as the underlying concern of the regulation is

17  safety. *See id.* at 861 ("While driving a taxi is not as potentially dangerous as

18  transporting hazardous materials or driving a large vehicle on public highways, the

19  regulations are a matter of public safety.").

20  Under Title 24 "Minimum Standard for Local Detention Facilities", the City

21  is subject to various regulations that are intended to protect the safety of detainees.

22  A requirement that appears throughout Title 24 is the need for hot, cold, and

23  temperate water to be available throughout the facility, including showers. Cal.

24  Code Regs. tit. 24, § 1231.3.4 ("Showers must be available to all inmates on a ratio

25  of at least one shower to every 20 inmates or fraction thereof and must provide hot

26  and cold water or tempered water.").

27  ///

28  ///

These regulations comport with the special duty a local entity takes on regarding people it holds in detention. *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 248 (Ct. App. 2008) ("It is well settled that a state, by reason of the special relationship created by its custody of a prisoner, is under a duty to the prisoner to take reasonable action to protect the prisoner against unreasonable risk of physical harm.") (citation omitted). As this Court so aptly observed, "[i]mmigrant detainees, such as Plaintiffs here, are vulnerable and dependent upon the government agents and/or contractors in whose care they are placed in much the same way as a prisoner is vulnerable and dependent upon his jailers." Dkt. 69 at 6.

The policy considerations of the regulated hirer exception apply with great force here. *See Harrelson v. Dupnik*, 970 F. Supp. 2d 953, 974 (D. Ariz. 2013) ("Were the statutes to provide otherwise, a mental-hold patient harmed by a contractee would have no recourse against the county even though it is the county that is expressly responsible for the person's care . . . and it is the county that chose the contractee . . ."). In the context of vulnerable detainees, "[t]he effectiveness of [these] regulations is necessarily impaired if [the City] conducts its business by engaging independent contractors over whom it exercises no control." *Secci*, 8 Cal. App. 5th at 860 (quoting *Eli v. Murphy*, 39 Cal. 2d 598, 600 (1952)). These regulations were, in fact, impaired, and the safety of detainees at Adelanto was compromised. PSUF 17-24. As Plaintiffs' evidence demonstrates, the Adelanto Detention Center did not have cold or temperate showers available, and as a result, Plaintiffs were subjected to hot showers that exacerbated pain after they were pepper sprayed. PSUF 16-24. "Accordingly . . . it is necessary to treat the [City's] duties [under Title 24] as nondelegable." *Id.*; *Van Arsdale v. Hollinger*, 68 Cal. 2d 245, 251 (1968) ("A nondelegable duty may be imposed by statute, by charter, or by common law"); *Padilla v. Pomona Coll.*, 166 Cal. App. 4th 661, 671-72 (2008) ("Nondelegable duties may arise when a statute provides specific safeguards or precautions to insure the safety of others.") (internal citations omitted); *Harrelson*,

F. Supp. 2d at 974 ("It is in the public interest that the county remain ultimately liable for any breach of that very important duty.").

"It is the province of the jury . . . to conduct a fact-based inquiry into whether the particular defendant's conduct was negligent at all, and if so, whether it was a proximate cause of the plaintiff's injury." *Hegyes v. Unjian Enterprises, Inc.*, 234 Cal. App. 3d 1103, 1147 (Ct. App. 1991), *reh'g denied and opinion modified* (Oct. 23, 1991); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 770 (9th Cir. 1981).  A reasonable jury could find that the City's breach of this nondelegable duty was the proximate cause of the Plaintiffs' exacerbated injuries from the improper decontamination.

### b. If the City Argues It Did Not Delegate Its Duties to GEO, the City Is Vicariously Liable for the Torts of Its Agent GEO.

If the City attempts to argue that it did not delegate some policymaking authority under *Monell*, it is inevitably liable for the torts of its agent GEO. *Doe v. Roman Catholic Archbishop of Los Angeles*, 247 Cal. App. 4th 953, 969 (2016) ("[A] principal may be liable for the wrongful conduct of its agent, even if that conduct is criminal.").  Importantly, "an agent may also be an independent contractor." *Jackson v. AEG Live, LLC*, 233 Cal. App. 4th 1156, 1184 (2015); *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1133 (N.D. Cal. 2009) ("Agent and independent contractor are not mutually exclusive categories.").  The City claims that City Manager Hart "visited the Facility to discuss operations and assess whether it was being managed properly," and also worked with the Warden to resolve issues at the facility.  Hart Decl. ¶ 9.  If the City claims it maintained a right to control GEO's actions, GEO is properly considered the City's agent.  *See In re Coupon Clearing Service, Inc.,* 113 F.3d 1091, 1100 (9th Cir.1997) (noting that "[i]t is well-established that one who contracts to act on another's behalf and is subject to the other's control . . . may still be acting as an agent and also as an independent contractor").  A reasonable juror may find then that the City ratified

1    the use of force in this case by failing to disavow it.  *Bunnett & Co., Inc. v.*

2    *Gearheart*, No. 17-CV-01475-RS, 2018 WL 2387837, at *3 (N.D. Cal. May 25,

3    2018) ("Where the acts by the agent were not within the scope of

4    the agency relationship, if they are not disavowed by the principal, failure to

5    disavow may constitute ratification." (quoting *Bowoto v. Chevron Texaco Corp.*,

6    312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004)).

7    **3.  Defendants Are Liable for Negligent Training and Negligent Supervision**

8    **a.  The City Negligently Supervised GEO**

9         As a matter of law, a negligent training and supervision claim may be

10   brought against a municipality when they have a special duty to the plaintiff. The

11   California Supreme Court distinguished both *de Villers v. Cty. of San Diego*, 156

12   Cal. App. 4th 238, 255-56 (2007) and *Munoz v. City of Union*, 148 Cal. App. 4th

13   173, 177 (2007)—two cases that Defendants cite to—on the basis that in both of

14   those cases there was no special duty of care that came into play. *C.A. v. William S.*

15   *Hart Union High Sch. Dist*., 53 Cal. 4th 861, 875 (2012). "In contrast, school

16   personnel have a duty to protect students from harm, which includes an obligation

17   to exercise ordinary care in hiring, training, supervising, and discharging school

18   personnel." *Id.* at 874 (citations and quotations omitted); *Estate of Osuna v. Cty. of*

19   *Stanislaus*, 392 F. Supp. 3d 1162, 1182 (E.D. Cal. 2019) ("the potential legal

20   responsibility of District administrators and supervisors for negligently hiring or

21   retaining ... arises from the special relationship they had with plaintiff.").  As

22   discussed above, here too there is a special relationship between jailers and

23   detainees. *See Giraldo*, 168 Cal. App. 4th at 248. And that duty to comply with

24   safety regulations could not be delegated to GEO. *See supra* Section IV.F.2.A.

25        Despite having knowledge of the deficiencies at the Adelanto Detention

26   Center, the evidence demonstrates that the City essentially turned a blind eye to any

27   of the day-to-day operations at Adelanto. PSUF 96-104. The City itself never took

28   any action during the relevant time period to alter its relationship with GEO or

1  correct any of GEO's deficiencies. Even though under the IGSA the City retained a

2  right to inspect the facility, there is, at the very least a dispute of fact, as to whether

3  the City ever conducted any meaningful inspections of the facility.  PSUF 94-104.

4  Since the City preserved the right to inspect and discuss with the Warden any issues

5  that arose, Hart Decl. ¶ 9, they had knowledge about the deficiencies within the

6  facility and can be held liable on that basis.   This conduct meets even the more

7  exacting standard of deliberate indifference, and therefore easily constitutes

8  negligence. *See Henry v. Cty. of Shasta*, 137 F.3d 1372, 1372 (9th Cir.

9  1998) ("When a county continues to turn a blind eye to severe violations of inmates'

10  constitutional rights—despite having received notice of such violations—a rational

11  fact finder may properly infer the existence of a previous policy or custom of

12  deliberate indifference.") (*amending on rehearing Henry v. Cty. of Shasta*, 132 F.3d

13  512 (9th Cir. 1997).

14  **b.  GEO Negligently Trained and Supervised Its Employees**

15       "A plaintiff alleging negligent training under California law must show that

16  the employer negligently trained the employee as to the performance of the

17  employee's job duties and as a result of such negligent instruction, the employee

18  while carrying out his job duties caused injury or damage to the plaintiff." *Garcia*

19  *ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1208 (E.D. Cal.

20  2009) (citing *State Farm Fire & Casualty Co. v. Keenan*, 171 Cal.App.3d 1, 23

21  (1985)). "In general, the issue of a defendant's negligence presents a question of

22  fact for the jury." *Biles v. Richter*, 206 Cal. App. 3d 325, 332, 253 (1988).

23  Defendants do not dispute that GEO had a special duty of care to Plaintiffs. Rather,

24  their argument focuses on whether GEO breached any duty to provide proper

25  training to guards at the facility.

26       Contrary to Defendants' assertions, there is a slew of evidence to show that

27  Campos and Diaz were not properly trained. The uncontroverted facts show that

28  Diaz and Campos had little to no understanding of GEO's use of force policy.

PSUF 59-69, 105-106.  Despite having terms such as "rebellion", "riot", or "disturbance" in the use of force policy, GEO did not provide adequate training as to these terms. PSUF 50-54; 59-64. GEO did not provide refresher training every two years to officials with pepper spray, and Sergeant Campos both did not know the appropriate distance to maintain from people being sprayed nor the factors for when pepper spray may be used.  PSUF 55-56; 66; 105-06.   GEO failed to provide cold showers nor did GEO train its guards on the effects of hot water on someone who has been OC sprayed, or on the temperature the water should be during decontamination. PSUF 25-26. Drawing all inferences in favor of Plaintiffs, a reasonable juror could therefore find that the lack of training or any written definition of these terms was the proximate cause of Campos, Diaz, and the other assaulting officers' actions.

Because GEO did not properly train its employees, they are also liable for negligent supervision.  The deficient training in use of force and decontamination in this case makes it reasonably foreseeable that "[GEO] knows or should have known that [Campos and Diaz] presented a risk of danger to others." *Doe v. Hagee*, 473 F. Supp. 2d 989, 998 (N.D. Cal. 2007) (citation omitted).  Without proper supervision and training, Diaz and Campos knew they could act with impunity and suffer no consequence.  *Perez v. Nevada*, No. 215CV01572APGCWH, 2017 WL 4172268, at *6 (D. Nev. Sept. 20, 2017), *aff'd sub nom. Perez v. Cox*, No. 17-17140, 2019 WL 4413261 (9th Cir. Sept. 16, 2019) (denying motion to dismiss negligent supervision claim when complaint alleged that defendant Nevada Department of Corrections when it did not train subordinates to address widespread practice that was against its policy).  Accordingly, drawing all inferences in Plaintiffs' favor, a reasonable juror could find that GEO's negligent supervision was also a proximate cause of Campos, Diaz, and other assaulting officers' conduct.

///

///

## V.    CONCLUSION

For all the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment in its entirety.

Dated:  November 26, 2019

LAW OFFICES OF RACHEL STEINBACK
LAW OFFICES OF CAROL A SOBEL
SCHONBRUN SEPLOW HARRIS
& HOFFMAN LLP
LAW OFFICE OF COLLEEN FLYNN
LAW OFFICE OF MATTHEW STRUGAR

By:  /s/ Catherine Sweetser
    Rachel Steinback
    Monique Amanda Alarcon
    Catherine E. Sweetser
    Kristina Harootun
    Colleen Flynn
    Matthew Strugar
    *Attorneys for Plaintiffs.*