Rachel Steinback, SBN 310700
LAW OFFICE OF RACHEL STEINBACK
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

Attorneys for Plaintiffs
Additional Counsel on Following Page

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA MARTINEZ;
ISAAC ANTONIO LOPEZ CASTILLO; JOSUE
VLADIMIR CORTEZ DIAZ; JOSUE MATEO
LEMUS CAMPOS; MARVIN JOSUE GRANDE
RODRIGUEZ; ALEXANDER ANTONIO
BURGOS MEJIA; LUIS PEÑA GARCIA;
JULIO CESAR BARAHONA CORNEJO, as
individuals,
                    PLAINTIFFS,
        v.

THE GEO GROUP, Inc., a Florida corpora-
tion; the CITY OF ADELANTO, a municipal
entity; GEO LIEUTENANT DURAN, sued in
her individual capacity; GEO LIEUTEN-
ANT DIAZ, sued in her individual capac-
ity; GEO SERGEANT CAMPOS, sued in his
individual capacity; SARAH JONES, sued in
her individual capacity; THE UNITED STATES
OF AMERICA; and DOES 1-10, individu-
als;

                    DEFENDANTS.

Case No.:  5:18-cv-01125-R-GJS

**DECLARATION OF PLAINTIFFS'
EXPERT WITNESS JEFFREY A.
SCHWARTZ, PH.D.**

*[Filed concurrently Plaintiffs' Opposi-
tion To Defendant [ ] Motion for Sum-
mary Judgment]*

1

Catherine Sweetser, SBN 271142
Kristina Harootun, SBN 308718
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN LLP
11543 W. Olympic Boulevard
Los Angeles, CA 90064
(t) 310-396-0731
(f) 310-399-7040
(e) csweetser@sshhlaw.com
(e) Kharootun@sshhlaw.com

Colleen Flynn, SBN 2324281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 213-252-9444
(f) 213-252-0091
(e) cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 323-696-2299
(e) matthew@matthewstrugar.com

## DECLARATION OF JEFFREY A. SCHWARTZ

I, Jeffrey A. Schwartz, declare under penalty of perjury as follows:

1.     My name is Jeffrey A. Schwartz. I have worked in the field of criminal justice and corrections for nearly fifty (50) years and I have served as an expert on law enforcement and corrections issues for more than 15 years. Over the course of my career, I have worked with nearly every state's Department of Corrections and with small, medium, and large jails and local departments of corrections. To my knowledge, I have done more work on major emergencies in prisons than anyone else in the United States. Among other things, I currently serve as a Federal Court Monitor reviewing progress on separate use of force consent decrees in the San Bernardino County jails and the Los Angeles County, California jails. I have drafted use of force policies for state and county correctional facilities, developed and presented training on use of force to correctional staff in state Departments of Corrections, county jails, and juvenile facilities, and have published articles on use of force.   I have a Ph.D. in Psychology with a focus on research methodology.  I can testify to the below based on my personal knowledge and expert opinion.

2.     I have reviewed discovery materials in this case including the video that was produced by GEO Group in this case, the reports written by the officers, the use of force policies at the facility, and the disciplinary hearing materials, after-action review report, and other post-incident materials.

3.     As I detailed in my report at pages 6 through 8, the After-Action Review identified several violations of policy, but nevertheless found them all to be within policy, including the use of hard restraints on the detainees, the major use of force ("OC", peppergas spray) without first notifying an administrator, and the punitive use of force.

4.     Furthermore, nowhere in the policy manual, training materials, or deposition testimony is there a definition of "rebellion" or "riot" (the terms used by Defendants to justify a major use of force). Considering the fact that GEO Group

1

permits the use of major – and even deadly – force in response to "riots" and "rebel-lions," (at GEO 01988, 02101), this constitutes a failure to train officers appropriately. The training did not cover what a major or minor disturbance is, and did not train officers on what a rebellion was. (McCusker Deposition at 46, 80-81). The facility only trained officers at the beginning of their tenure as officers and did not refresh them on the policies. I would never recommend including such a term as a justification for use of force without explaining to the officers during training what the term means.

5.      The facility also failed to do a refresher training on OC spray, which would presumably have covered the appropriate distance to keep from detainees and the appropriate decontamination procedure, as well as when its use is appropriate. Most facilities require refresher training on OC every year or every two years.

6.      In my opinion, the detainees did not pose a threat nor was there a major or serious disturbance at the point force was used.

7.      Attached to this declaration as "Exhibit A" is a copy of my October 14, 2019 expert report. I have reviewed the statements therein and I affirm the opinions stated there.

8.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this ___25^th___ day of November, 2019 at _Campbell_, California.

_Jeffrey A. Schwartz_
Jeffrey A. Schwartz, Ph.D.

# EXHIBIT A

# Jeffrey A. Schwartz, Ph.D.
## *1610 La Pradera Drive*
## *Campbell, California 95008*

*(408) 379-9400 ♦ FAX (408) 379-9410*
jasletra@aol.com

## Omar Martinez et al. v. The GEO Group, Inc., et al.

### October 14, 2019

I.  Overview

The Adelanto Detention Center (ADC) is the second largest US Immigration and Customs Enforcement (ICE) facility in the country, with approximately 2,000 detainees.  ADC is operated by the GEO Corporation (GEO), one of the largest private, for profit prison companies in the world.

Early in the morning on June 12, 2017, nine detainees at ADC from El Salvador sat at two tables in the dayroom of a low security housing unit and gave the officer on duty a written message saying that they were going to begin a hunger strike until they could talk with someone from ICE about conditions and issues at the Center.  Their listed grievances included high bail, used and soiled underwear and clothing, bad food and poor treatment by ADC staff.

The situation was reported to the on duty Shift Commander when the nine detainees refused to leave their tables and return to their bunks in the dormitory areas for count.  A Lieutenant responded to the area with several other officers.  The Lieutenant was carrying and waving a large canister of pepper spray (OC) as she walked up to the two tables and then walked around the dayroom area a few times.  The Lieutenant was angry and yelling at the detainees to go to their bunks but she did not speak any Spanish andthe detainees did not speak English.  Still, the detainees knew that they were expected to return to their bunks for count and understood that they were refusing to do so in order to talk with someone in authority about their grievances.

Different detainees and different staff report hearing different things but most of the staff directives, orders and ultimatums to the detainees were in English and the situation appears to have been loud and confusing.  It is clear that no one gave the detainees an opportunity to explain themselves or engage them in serious dialogue. Instead, less than ten minutes after the Lieutenant entered the housing unit, she sprayed one of the tables of detainees with OC and then told the Detention Officers to separate the detainees and take them out of the area.  She had called earlier for assistance from staff on the other side of the facility and a Sergeant entered, also carrying a large OC canister, and after minimal attempts to communicate with the detainees, he sprayed the individuals at the second table.

 When officers began to try to pull individual detainees away from the table, the detainees had linked arms in an effort to passively resist being moved from the tables.  After the OC spray, groups of two or three officers were able to remove individual detainees.  Some of the detainees were pushed against a wall in the dayroom area and handcuffed and then taken outside to a

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

recreation yard.  Other detainees were put on the floor to be handcuffed.  One detainee had his nose broken, a dental plate knocked out and a tooth broken off when his face was pushed into the wall.  At the time of his deposition, his broken tooth had not been replaced and he still needed surgery to repair his broken nose.  Another detainee has a knee injury that remains painful and troubling and he has had blood in his urine after the incident.  Several of the other detainees had cuts or bruises and most reported anxiety and other emotional issues as a result of the staff use of force.

After the nine detainees were in the recreation yard in handcuffs, they were taken to a small holding cell and from there they were taken to be showered, supposedly to decontaminate them and minimize the affects of the OC spray.  While cool or cold water may be effective as a decontaminate for OC (Lieutenant Diaz deposition, page 152, lines 18-24), hot water will activate the OC and make it more painful (Lieutenant Diaz deposition, page 155, lines 4-8).  Unfortunately, and inexplicably, the detainees were taken to a shower that was so hot that it was burning them.  The first few detainees taken into the shower individually began to scream and cry, causing the rest of the detainees to refuse to go into the shower and remain covered with OC.  One detainee actually fainted in the shower because of the OC and the hot water, testifying at his deposition that it was "far too much for me" (Grande Rodriguez deposition, page 112, lines 12-17).  He further explained that because of the OC he couldn't breath (Grande Rodriguez deposition, page 112, lines 23-page 113, line 4).

Following the incident, all nine detainees were given ten days in disciplinary segregation without any of them appearing at a disciplinary hearing.  The comment on the disciplinary record of each of the nine detainees, from the hearing officer, was "This kind of behavior will not be tolerated."  Among other punishments, the detainees were blocked from making phone calls to their attorneys during their time in disciplinary segregation (Pena Garcia deposition, page 57, line 24-page 58, line 10).  Phone calls to family members were also blocked (Pena Garcia deposition, page 60, line 25-page 61, line 7).

The Lieutenant who initially sprayed OC on the inmates was terminated less than two years after this incident for attempting to use OC spray on detainees locked in their cells and then lying about the situation in her report.  The Lieutenant's use of OC spray and Sergeant's use of OC spray against the nine detainees violated the facilities use of force policy and also violated the policy on hunger strikes.  Staff reports on the situation were grossly inadequate and in some cases not written by the person signing the report.  ADC, GEO and ICE failed to conduct any meaningful review of the situation, in direct violation of both GEO policy and ICE standards, further ratifying a use of force that was unnecessary and excessive, and done in callous disregard for the safety and well-being of the detainees that the staff had a duty to protect.  In addition to physical injuries, this incident was traumatic for many of detainees, who were locked up in a foreign country, understanding little and treated very badly, after escaping horrendous and life threatening situations in El Salvador.  One of the detainees left El Salvador when gangs killed his brother and threatened his life. He was trying to get to Florida to be with his two children and his wife but because of this incident he does not want to go there anymore (Rivera deposition, page 17, lines 9-24).  Another one of the detainees came to the United States after he and his fiancé were both beaten by gangs.  In short, the nine detainees were generally fragile and did not need or deserve to be treated badly by staff or to be subjected to unnecessary and unjustified force because they wanted someone to talk to them about terrible conditions of confinement.

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

## II.   Introduction and Background

My name is Jeffrey A. Schwartz, Ph.D., and my office is at 1610 La Pradera Drive in Campbell, California.  I am the president of Law Enforcement Training and Research Associates, Inc. (LETRA), a criminal justice training and consulting organization that has had offices in the San Francisco Bay area since its incorporation in June, 1972.  I have worked full time with law enforcement and correctional agencies across the United States and Canada for over 35 years, both as LETRA's president and as a private consultant.  The largest proportion of my work for the last 20 years has been working with prisons and jails and assisting them in applying national corrections standards to their operations.

I have worked with more than 40 of the 50 state departments of corrections and with small, medium and large jails and local departments of corrections.  During my career I have toured literally hundreds of prisons and jails.  I believe that I have done more work on major emergencies in jails and prisons than anyone else in the United States.  I have co-authored three book length monographs on preparing for and managing major emergencies in jails and prisons, and all three of those volumes have been published by the National Institute of Corrections (NIC), a branch of the US Department of Justice.  I have conducted Critical Incident Reviews (also called "After-Action Reports") following some of the most high profile emergencies and disasters in jails and prisons in the United States the last 40 years, including the riots in Camp Hill, Pennsylvania; the effects of Hurricanes Rita and Katrina on the Louisiana Department of Corrections; the riot and hostage taking in Deer Lodge, Montana; the hostage taking and rape of a Correctional Counselor at the Delaware Correctional Center; the riot at the prison in Lucasville, Ohio; and others.  I have also conducted detailed audits of emergency preparedness at a number prisons and jails across the United States and Canada and co-developed a unique system of emergency preparation and response that has been used in some form by over two thirds of the State Departments of Corrections in the country.  I have provided training on emergency preparedness and response to thousands of jail and prison staff, either by personally conducting that training or by training and certifying emergency preparedness instructors for various correctional agencies.  I was appointed as the Federal Court's security expert in the U.S. Virgin Islands and reviewed security in two correctional facilities there and then testified in a long-running class action and consent decree case.

My expert witness work and my consulting and training work has included a strong emphasis on use of force issues.  I have written and/or drafted use of force policies for state departments of corrections as well as county correctional facilities.  I have developed and presented training on use of force to correctional staff in a number of state Department of corrections, county jails and adolescent facilities.  I have trained and certified instructors in correctional agencies as trainers with a use of force training curriculum that I developed.  I have also reviewed use of force investigative and review procedures in many police and correctional agencies and the largest proportion of cases in which I have served as an expert has been use of force cases.  I have published six articles on use of force, listed in Appendix C to this report.  I am currently a Federal Court Monitor for the Los Angeles, CA, Jails in a matter that resulted in a consent decree arising out of a class action use of force lawsuit against those jails.  I have recently concluded work as an expert for the US Attorney's Office in the Southern District of New York (Manhattan) resulting in a consent decree between Plaintiffs and the New York City Department of Corrections that centers on use of force issues.  I evaluated use of force issues in the San Bernardino County, California, jails, worked with the Court and the Prison Law Office to develop a new use of force policy for that jail/system and

3

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

I currently serve as a Federal Court Monitor reviewing progress on a use of force consent decree there.

I have served as an expert on law enforcement and corrections issues for more than 15 years. In the last few years, expert work has constituted approximately 15% to 30% of my total professional time. I charge $250 per hour for consultation, document review and other preparation activities and $350 per hour for actual testimony at trial or in deposition. My compensation will not be affected by the outcome of this case. A copy of cases I have worked on as an expert is attached to this report as Appendix B. A copy of my fee schedule is attached to this report as Appendix C. Also, my recent publications are also attached to this report as Appendix D.

I was retained as an expert in this action in September, 2019, by Rachel Steinback, Esq., of the Law Office of Rachel Steinback, in Los Angeles, California; Catherine Sweetser, Esq., of Schonbrun Seplow Harris Hoffman, LLP, in Los Angeles, California; and Monique Alarcon, Esq., of the Law Office of Carol A. Sobel in Santa Monica, California.

A list of documents I reviewed for this case is attached to this report as Appendix E.

In addition to the documents listed in Appendix E, I also reviewed the American Correctional Association Jail Standards, "Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June, 2004; and the 2011 Operations Manual: ICE Performance-Based National Detention Standards (with 2016 revisions).

I am not a medical expert and I have not been asked nor have I attempted to form opinions about medical treatment issues in this case.

I have requested a tour of the Adelanto Detention Center but that has not yet occurred as this report is written.

Discovery in this case is ongoing and it is my understanding that depositions are not yet completed. I reserve the right to add to or change the opinions in this report if and when additional relevant information becomes available to me after the date of this report.

III.   Method

    A. The crux of this case is Plaintiffs' contention that Defendants had a duty to protect detainees in the ADC from known threats of harm, including harm from staff use of excessive and/or unnecessary force. Defendants argue that they fulfilled their duties to protect these Plaintiffs.

    B. Within contemporary American corrections there is well-established methodology for addressing the kinds of questions raised in this case. The first step is to determine the applicable duties of Defendants, looking to relevant law and regulations, to departmental policies and procedures, to professional standards and to widely accepted correctional standards and practices. The second step is to determine whether the various duties identified have been complied with or have been breached by examining the documents and other information available in the case as well as facts from other sources that might illuminate the Defendants' compliance or lack of compliance with the various duties identified. An additional step in this analysis is to examine the existing policies, procedures

4

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

and practices to determine whether they are wrongly formulated or insufficient. That is most often accomplished by comparing them to legal and regulatory requirements and/or to comparable policies, procedures and practices in use in other correctional agencies. An additional important step in this method is to, where possible, review the results of the policies, procedures and practices in question to determine whether they have been effective at accomplishing their objectives.

C.  The method summarized above is not exclusive to expert analysis of prisoner tort cases alleging failure to protect. It is also the general method used for auditing correctional institutions for accreditation, whether by the American Correctional Association (ACA) or by the National Commission on Correctional Health Care (NCCHC). It is also used as a central component in critical incident reviews (also called "after-action reports") following major crises or emergencies in jails or prisons. This consultant has used this method for critical incident reviews following a number of very high profile crises in correctional institutions and I have also used this methodology as the central approach on the occasions when I have been commissioned to evaluate the emergency readiness of a particular correctional agency or correctional facility.

D.  In addition to the method discussed above, the analysis of the record in this case must also reach the questions of whether it was reasonably predictable that the harm that occurred to Plaintiffs would have occurred if the various identified duties of the Defendants were not fulfilled, and whether Plaintiffs' injuries in this case were a direct result of the breach of those duties by the Defendants.

E.  The second method has to do with situations in which there are fundamental disagreements about what factually transpired. The first step in this procedure is to identify each action, behavioral procedure or other occurrence according to each side in the factual dispute (and it is possible that there are more than two sides). Then, each of these disputed steps, behaviors, actions, decisions, or the like must be analyzed against prevailing practices in the facility, specific agency policies and generally accepted correctional practices. They must also be analyzed for internal consistency. That is, from the standpoint of correctional policies, procedures and practices in the facility, as well as generally accepted correctional practices, are the various occurrences, decisions and behaviors described by Plaintiffs consistent with each other? Put another way, does Plaintiffs' story make sense, not because of the credibility or lack of credibility of the Plaintiffs, but because of what is known about prison policies, procedures and practices. Then the same analysis must also be performed with regard to the Defendants' story.

III.  Analysis and Opinion

A.  The duty to protect

1.  It is indisputable that the staff of correctional facilities have a broad and critically important duty to protect the individuals who are incarcerated within the facility. That duty to protect is reflected in state and federal law, in regulations, in correctional agency policies and procedures, and in long-standing correctional practices across American corrections.

5

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

2. The staff duty to protect detainees is not hard to understand. There are many ways in which detainees cannot protect themselves. In a fire, detainees locked in cells cannot evacuate themselves; either staff unlock doors and provide a path to safety or detainees may die of smoke inhalation. Similarly, a detainee who is acutely ill cannot take himself to an emergency room; either the staff provides that detainee with access to medical services or the results may be fatal. Detainees are dependent on staff for everything from showers to food; life safety may be the first of these dependencies.

3. The broad duty of staff to protect detainees applies whether the correctional facility in question is large or small, urban or rural, and also whether it is low security or a "super-max". It also applies whether the facility is public or private. This duty also applies whether the individuals in question are pre-trial or convicted and whether they are incarcerated pursuant to criminal justice statutes or ICE statutes.

4. Within the general duty to protect detainees, detention facility staff have a number of specific duties that are also long established and beyond debate. Thus, staff have a duty to protect detainees from illness and other health hazards, from suicide, from the results of mental illness and from violence from other inmates. One of the most specific and obvious duties in this regard is the staff responsibility to protect detainees from staff use of force that is unnecessary or excessive.

5. Importantly, Defendants do not dispute either their duty to protect detainees in general or their specific duty to protect detainees from unnecessary and/or excessive force by staff.

6. The duty to protect detainees at ADC from unnecessary and/or excessive use of force by staff is emphasized in the ADC and GEO policy on use of force (policy 10.2.15). That policy, at the top of page 5 (GEO 01990) states: "Staff members are subject to the above stated guidelines and procedures regarding the use of force continuum and are reminded that it is their responsibility and obligation to abide by the intent of the guidelines, which is to ensure the protection, safety and security of each and every person who enters the facility, including staff members and detainees and visitors. The purpose of these guidelines is to protect the physical well-being of everyone in this environment."

B. The ADC use of force policy and hunger policy

1. There is no question that detainees refusing to return to their bunks and announcing a hunger strike presents a problem for staff, and potentially a very serious problem.

2. Both the ADC use of force policy and the ADC hunger strike policy anticipate this kind of situation and provide direction for staff. Staff are also provided with training on both of those policies.

3. Unfortunately, there is ample evidence in this case that staff did not learn, understand or retain knowledge of these policies. In this incident, staff acted in direct violation of a number key provisions of these policies. A few simple examples will illustrate this point but they are only examples, there are many more. The document titled After-Action Review Report (GEO 02238), at the bottom of the first page, asks for the

names of participants in the review.  It specifies that the Warden or Acting Warden, Assistant Warden, Security Operations, Captain (sic) and the Health Services Administrator must be included in the review.  Instead, the review is apparently the product of three people including an ICE representative, an LVN and the Chief of Security.  As a second example, the use of force policy emphasizes the difference between a minor use of force and a major use of force and defines any use of chemical agents as a major use of force.  That was evidently unknown to both the Chief of Security at the facility and the ICE representative participating in the After-Action Review because that review classified this incident, in spite of the central role of OC spray, as a minor use of force (GEO 02238).  A third example is found on the second page of the use of force policy (Policy 10.2.15, GEO 01987).  The policy states, "During a use of force, hard restraints (for example, steel handcuffs and leg irons) shall be used only after soft restraints prove (or have previously proven) ineffective with a particular detainee.  Attempts to use soft restraints prior to hard restraints shall be documented in the use of force reports."  In this incident, there was no attempt to first use soft restraints and there is no documentation as similarly required by this policy.

4.  The GEO and ADC use of force policy (10.2.15) begins with a number of appropriate statements of philosophy and general approach.  Had these provisions been followed by staff in this incident, there would have been a much different outcome. The first paragraph of the policy states, "The GEO Group, Inc. ADC/ICE authorizes staff to use force only as a last alternative and after all other reasonable efforts to resolve a situation have failed.  When authorized, staff must use only that amount force necessary to gain control of the detainee.  The use of force, security equipment and restraint equipment is intended only as a control measure when absolutely necessary – these measures are not intended and will not be used a means of punishment."  In the instant situation, force was certainly not "absolutely necessary" and was not used "after all other reasonable efforts to resolve (the) situation (had) failed".  Lieutenant Diaz had options because there was no emergency, as she herself admitted in her deposition.  She could have called the Warden or one of the other top administrators at the facility.  She could have cleared the count and waited until ICE or ADC administrators arrived that morning.  She could have used a translator and actually listened to the nine detainees in an order to resolve the situation with dialogue.  Instead, she became angry, yelled at and threatened the detainees and then used the OC spray to punish them because they would not follow her commands.  That is a direct violation of another point on the same first page of use of force policy: "Under no circumstances shall staff use force to punish a detainee".

5.  The third paragraph of the policy, under "Procedural Guidelines" states, "The use of physical force is restricted to instances of justifiable self defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority."  In this situation, none of those four criteria applied and, as stated above, the force was not a last resort.

6.  Another provision on that same first page of the use of force policy reads, "Facility administrator approval is required for continued use of restraints, if they are considered necessary, after a detainee is under control."  Here, the detainees were all under control from the time they were placed on the ground in the exercise yard.  However, they were maintained in hard restraints while taken to a holding cell and then kept in

restraints as they were taken from the holding cell to the shower and then showered individually for fifteen to twenty minutes each.  (Juarez deposition, page 61, lines 5-8; page 71, lines 8-16).  There is no testimony from any of the detainees or any of the staff that these individuals were resistant after being sprayed and taken to the recreation yard but the facility administrator was not called for permission to keep the detainees in handcuffs, nor was any other administrator contacted.  All of this pertains to steel handcuffs although the policy states clearly that soft restraints should have been used first.

7.  On page 3 of the use of force policy, one of the bulleted points under "Major Use of Force" states in part, "Chemical agents are used only with authorization of the facility administrator or designee".  "Designee" is not defined but presumably refers to an Acting Warden or Administrative Officer of the day.  In this situation, Lieutenant Diaz and Sergeant Campos decided to use force without any authorization at the facility administrator level.

8.  On page 4 of the use of force policy (GEO 01989) there is a discussion of the difference between immediate and unplanned use of force and calculated use of force.  The policy emphasizes a strong preference for calculated use of force whenever possible: "Calculated use of force will be appropriate, for example, if a detainee is in a cell or in an area where the door is (or can be) secured, even where a detainee is verbalizing threats or brandishing a weapon, provided staff believe there is no immediate danger of the detainee hurting self or others."  In the incident on June 12, the situation is far from a detainee "verbalizing threats or brandishing a weapon" and the Lieutenant has testified under oath that there was no emergency, that the detainees were not yelling and were quiet, etc.

9.  There are a number of other, similar entreaties to staff in the use of force policy that emphasize the need to use calculated force rather than immediate force whenever possible.  A complete discussion and presentation of each of those provision of the policy would be lengthy and burdensome but a last example, found on page 4 of the policy, states: "Obviously, immediate (and unplanned) use of force by staff is required if a detainee is trying to self-inflict life threatening injuries, or is attacking a staff member or another detainee.  If those circumstances are not present, staff should ordinarily employ the principles of calculated use of force."  Those circumstances were not present in this situation.

10.  It is appropriate to consider the policy on hunger strikes (4.2., "Hunger Strikes", revised December, 2016) because Lieutenant Diaz had testified that she was informed that the detainees refusing to return to their bunks were declaring a hunger strike.  This policy begins, "This detention standard protects detainees' health and well-being by monitoring, counseling and providing appropriate treatment to any detainee who is on a hunger strike".  The second section of the policy is titled, "Expected Outcomes" and includes nine subsections.  The second of these states, "The ICE/ERO Field Office Director shall be immediately notified when a detainee is on a hunger strike, declared or otherwise".  The fifth outcome states, "Medical, mental health or hospital shall offer counseling regarding medical risks and detainees shall be encouraged to end the hunger strike or accept medical treatment".  The eighth expected outcome requires a record of interactions with the striking detainees.  The ninth states, "The facility shall provide

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

communication assistance to detainees with disabilities and detainees who are limited in their English proficiency".  Lieutenant Diaz knew that the nine detainees had declared a hunger strike (and that they had said so in writing) but failed to comply with any of these listed provisions of the hunger strike policy.

11. The use of force policy emphasizes the need to use confrontation avoidance procedures wherever possible.  GEO provides staff training on these confrontation avoidance procedures.  Officer Jindi at her deposition remembered the general principles of the confrontation avoidance training and de-escalation training.  She described it as "Talk to the detainee.  Calm him or her down.  See what's the problem.  How can we resolve the situation?  (Jindi deposition, page 77, lines 7-11).  Neither Lieutenant Diaz nor Sergeant Campos engaged in the confrontation avoidance procedures that are emphasized in the use of force policy and which are provided to staff in training.

12. With regard to the use of chemical agents specifically, the use of force policy (at page 9) states the facility administrator may authorize the use of chemical agents or non-lethal weapons, only when the situation is such that the detainee: …(three situations are described)".  Here, the policy does not authorize approval by the Facility Administrator's designee.  Toward the bottom of the same page, another paragraph begins, "Oleoresin Capsicum (OC) is intended to prevent injury to the subject involved, the staff involved and other persons present.  The governing factor in employing its use is the Facility Administrator's believe that its use is both **REASONABLE AND NECESSARY**.  (Emphasis in original).

13. Another section of the use of force policy requires that camcorders be available for use of force situations, that Shift Supervisors designate video operators on each shift; that planned uses of force are videotaped in their entirety; and that "when an immediate threat to the safety of the detainee, staff or others, or to property, requires an immediate response, the staff members have obligation to obtain a camera and begin recording the event as soon as feasible.  Once control of the situation has been obtained, staff should record information about injuries, a description of the circumstances that gave rise to the need for immediate use of force, and the identification of the detainees, staff and others involved."  None of that was done in this situation and the review of this situation did not identify or discuss this failure nor attempt to hold anyone accountable.

14. On page 13 of the use of force policy, several sections of the use of force policy speak to the requirement to conduct an After-Action Review of any use of force incident.  One of the key provisions requires, "Following any incident involving the use of force, whether calculated or immediate, and the application of restraints, if applicable the Facility administrator, Assistant Facility Administrator, Captain, Health Services Administrator and the Field Office Director's Designee shall meet and review the incident.  The review is to assess the reasonableness of the actions taken (e.g., if the force used was appropriate and in proportion to the detainee's actions).  They should gather relevant information, determine if policy was followed, and then complete an After-Action Report, recording the nature of their review and findings."  A subsequent section requires, "The Facility Administrator or Designee shall then personally attest by his or her signature that the review has taken place and the use of force was either

9

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

appropriate or inappropriate". None of that happened. The required individuals did not participate in the review, neither the Warden nor the Assistant Warden signed the review and the After-Action Review report itself (GEO 02238-02240) has no discussion or analysis. In addition to designating the incident as a "minor use of force" (wrongly) the review has some multiple choice items checked but the description of any extraordinary actions says N/A and the recommendations/results of the After-Action Review consists of a total of seven words ("Waited for staff", "Cleared yard before evacuated".)

C. The need to count

1. A "count" in a correctional facility is a basic and central element of facility security. Almost every correctional agency and correctional facility lists "Community safety" as its first objective. That means that prevention of escape is an overarching goal and that is why prisons, jails and detention centers are locked facilities with fences and other sophisticated security systems to ensure that the individuals being held are not released into the community by accident and cannot get out of the facility by escape attempts. Perhaps the most important security procedure is "count", in which the facility totals the number of individuals held on each living unit and in other locations and then confirms that the number of detainees in each location matches the facility records and that the total number of individuals held in the facility matches the facility records of the total population. In short, that no one has gone missing.

2. Count procedures vary from agency-to-agency but in general, most facilities conduct a formal count from three times to six times per day, usually on a fixed schedule. At count time, movement within the facility is stopped (or "frozen") and each living unit then determines the number of inmates or detainees by going bunk-to-bunk or cell-to-cell. The total for each living unit is then sent to a central location and compared with the facility records for that unit. When it is determined that each unit has confirmed the proper number of detainees or inmates for the unit and that the facility has confirmed the proper total number of inmate or detainees, it is declared that "the count has cleared" and detainee movement can continue.

3. Some counts record the number of individual in each location but an "ID count" actually checks the identified of each inmate by wristband or picture.

4. Individuals who cannot return to their living unit for count, perhaps because they are in the infirmary or at a community hospital or at some other location within or outside of the facility, are recorded by "out count".

5. Typically, it takes from 30 minutes to somewhat over an hour to clear count in a facility although there may be variation from those estimates based on the size and nature of the facility. At ADC, count typically cleared in less than an hour.

6. "2 Charlie" (2C East) at ADC, the unit where the incident in question occurred, has a capacity of approximately 100 detainees and consist of a two story dormitory area with bunks on both floors and then an adjoining single story dayroom with tables a fixed to the floor. Typically, staff would announce count time some ten minutes before the actual count was to begin and detainees would return to their bunks from telephones,

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

the dayroom, the bathroom, etc. Detainees were required to get on their bunks and stay there during count.

7. On June 12, 2017 at approximately 6:30 a.m. – which was the start of first shift – Lieutenant Diaz was notified that some detainees in 2 Charlie were refusing to return to their bunks for count. She was briefing the officers on the oncoming shift and she took some of those officers with her and went to the unit in question. She walked on to the unit waving a large canister of pepper gas (OC) and began walking around the dayroom of the unit and ordering the nine detainees at two adjacent tables in the dayroom to return to their bunks. Her orders were in English and most of the detainees spoke and understood only Spanish.

8. Lieutenant Diaz failed to establish any meaningful communication with the nine detainees, who were beginning a planned hunger strike in order to get someone in authority to talk with them about their several grievances, and in less then ten minutes after she entered the unit, Lieutenant Diaz sprayed the detainees with OC and directed the officers to physically remove the detainees from the tables where they were sitting with their heads down and their arms linked. Lieutenant Diaz provided three reasons why she used chemical agents so quickly. These were that she could not allow the count to be delayed; that the detainees could not be allowed to disobey orders; and that the situation was an emergency because the detainees were inciting a disturbance or riot.

9. Lieutenant Diaz testified that if the count did not clear, the Warden could get in trouble with ICE (Diaz deposition, page 230, line 1-page 231, line 2). She also testified that she could not do an out count "because you can't let them disobey orders" (Diaz deposition, page 227, line 25-page 229, line 5).

10. In fact, if there were good reasons to not force the detainees to return to their bunks or take other immediate action against them, the nine detainees could have been "out counted" in the dayroom. Lieutenant Diaz acknowledged in her deposition that they do use out count procedures when detainees are at medical, at court or off the unit for other reasons (Diaz deposition, page 139, line 17-page 140, line 18). She also acknowledged that the detainees had wristbands with their names and identification numbers (Diaz deposition, page 61, lines 1-23), so that the identities of the nine detainees not on their bunks and remaining in the dayroom could have been easily ascertained.

11. Officer Jindi, the first Shift Officer who was assigned to 2 Charlie that day, testified that detainees do not have to be at their bunks to be counted (Jindi deposition, page 73, lines 21-25). She also testified that detainees are sometimes counted in the yard by lining them up (Jindi deposition, page 72, lines 11-15).

12. Sergeant Campos was asked about the policy of moving detainees who are on hunger strike to medical and specifically whether detainees should be moved as soon as they allege a hunger strike. He answered, "Yes". He also testified that he did not hear anyone asking or telling the detainees to go to medical (Campos deposition, page 164, lines 9-20).

13. In summary, the need to clear count does not justify an otherwise unnecessary use of force in this situation.  The nine detainees could have been counted in the dayroom, they could have been asked to move to medical or to some other location where someone would talk with them and there were probably other alternatives.  Certainly, taking more time and establishing effective communication with these detainees was a reasonable and obvious option.  Once the Lieutenant and Sergeant sprayed the detainees with OC and then had officers drag the detainees off the unit, the rest of the unit had to be evacuated to the yard.  The count was still cleared in less than an hour and fifteen minutes.

D.  It was not an emergency situation

1. The third rationale described by Lieutenant Diaz as forcing the immediate use of force was that the nine detainees had created an emergency situation.  She testified that a detention officer came to her with a list of names and said there was a hunger strike and that detainees were refusing to "rack up" (return to their bunks) (Diaz deposition, page 187, lines 2-21).  Lieutenant Diaz went on to say that when she got to the housing unit, the detainees were inciting the dormitory although she did not know what they were saying (Diaz deposition, page 204, line 20-page 205, line 5).  Lieutenant Diaz also said that the detainees were yelling in Spanish for a long time (Diaz deposition, page 207, line 24-page 208, line 3), and that the other detainees were all yelling (Diaz deposition, page 209, lines 3-11).  The Lieutenant's attitude was evident in her testimony that the detainees, "were told and told and told" and that when they linked arms, they were getting out of control (Diaz deposition, page 212, lines 8-19).  Similarly, she acknowledged that she felt an immediate threat because the detainees would not comply (Diaz deposition, page 238, line 24-page 239, line 4).  Finally, Lieutenant Diaz also testified that the detention officers in the dormitories did not have control of the other detainees in 2 Charlie (Diaz deposition, page 225, lines 2-5).

2. There is a substantial amount of evidence that directly contradicts Lieutenant Diaz's conclusion that the situation was an emergency that required an immediate use of force.  The video of the situation clearly shows that the detainees on the top tier and lower tier are primarily going about their business.  Only a small number of the close to 100 detainees on the unit are at the walls between the dormitories and the dayroom unit, watching what is going on in the dayroom.  Both detainees and staff can be seen walking casually from the dayroom and in the dormitory areas.  There is no indication on the videotape of riot, disturbance or other concerted action by the other detainees.

3. Officer Jindi, the detention officer assigned to 2 Charlie for the morning shift, testified that she did not participate in pulling the detainees apart and that she calmed the other detainees and told them to get away from the wall and that they complied (Jindi deposition, page 51, line 10-page 52, line 2).  Sergeant Campos testified that during the incident, detainees were not moving between the bunk areas and the dayroom (Campos deposition, page 89, lines 16-18), and that the detainees were not destroying property (Campos deposition, page 89, lines 19-21).  While Sergeant Campos did testify that when he came into the unit, he heard swearing and screaming directed at staff, that is contradicted by testimony from other staff on the scene.  Neither Officer Reyes nor Officer Martinez described any type of serious problem with the other detainees.

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

Lieutenant Diaz acknowledged that she could have called higher ups (Diaz deposition, page 231, lines 1-12).  Importantly, when Lieutenant Diaz was shown the videotape at her deposition, she acknowledged walking away from the tables of detainees within her first minutes on the unit and agreed that it was not an emergency (Diaz deposition, page 323, lines 1-11).  In watching the next two minutes of video, Lieutenant Diaz acknowledged that a detention officer was on the second tier and that the detainees were getting on their bunks.  She recognized that she was on the radio and then walking away from the tables of detainees again.  After she had been in the unit approximately two minutes, she acknowledged that the detainees at the table were not shouting and were "real quiet" (Diaz deposition, page 327, lines 14-19).  Just after that the video showed the detention officer from the top tier walking casually down to the dayroom and she agreed that he would have called her if he thought the situation was a threat, and he did not (Diaz deposition, page 328, line 1-page 329, line 2).  The video next shows Lieutenant Diaz giving verbal commands and waving the OC canister at the detainees (Diaz deposition, page 335, lines 19-24).  Lieutenant Diaz acknowledges that she is not giving directions to her subordinate detention officers (Diaz deposition, page 336, lines 18-25), and that you cannot see in the video any detainees yelling at her or the staff from the tables and that some detainees have their heads down on the table (Diaz deposition, page 337, lines 2-11).

4.  At that point in reviewing the video, Lieutenant Diaz returned to her earlier position that there was rebellion or riot on the top tiers.  She was asked whether she sent detention officers to the top tiers and she said that she had not.  When she was asked why she didn't do that, she said that she did not know.  She was then asked if she would have sent detention officers if it was a legitimate security concern. She answered, "Yes" (Diaz deposition, page 348, lines 6-18).

E.  The detainees did not pose a threat to the staff

1.  Sergeant Campos reported that as staff were pulling detainees away from the tables and each other, they were swinging their arms and elbowing the staff in an assaultive manner.  Lieutenant Diaz testified that a single detainee swinging his arms or elbows at staff.  Those two recitations by the two supervisors are at odds with the testimony of the other officers on the scene and at odds with the testimony of the detainees.

2.  No officer reported being elbowed or otherwise hit or assaulted in any manner by any detainee.

3.  No staff member suffered any injury except for the staff member who needed treatment because of his exposure to OC.

4.  Lieutenant Diaz acknowledged that a situation becomes very different if a detainee strikes a detention officer.  That is a very serious situation and, as she noted, the detainee can then be arrested and charged with a new crime (Diaz deposition, page 160, line 13-page 162, line 8).  In fact, that is the situation in many correctional facilities. Inmates or detainees may resist passively or actively but when they cross the line and assault a staff member, that is the point at which new charges are filed and the individual may get an additional sentence.  In short, it would be extremely unusual for

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

an officer to be struck or otherwise assaulted and not report it. No officer did. It would also be most unusual if any detainee had assaulted any officer, for the disciplinary hearing not to be based on that charge, or that charge to at least be included in the disciplinary hearing. There were no such charges filed against any of these detainees.

5. Officer Reyes testified that he did not hear any detainee threatening anyone (Reyes deposition, page 130, lines 23-25). He also said that no one struck him (Reyes deposition, page 173, lines 19-22). Officer Martinez testified that no detainees struck him (Martinez deposition, page 79, lines 4-9). In describing how he moved at least three detainees, Officer Martinez said that none of the detainees struck him (Martinez deposition, page 109, Lines 17-21). He went on to say that he has no memory of any detainee throwing their arms back, as described by the supervisors (Martinez deposition, page 109, lines 22-page 110, line 1). Officer Gillon similarly testified that he was not injured and that no detainee struck him (Gillon deposition, page 175, lines 3-10).

F. Communicating with the protesting detainees

1. In this situation it was essential to try to communicate effectively with the nine detainees who were refusing to return to their bunks and had announced that they were beginning a hunger strike. That requirement is strongly articulated both in the hunger strike policy itself and in many places in the use of force policy as well.

2. Most of the detainees had no English. That was not unusual at ADC. The situation that was unusual for a correctional facility was that the living units were large, turnover was relatively frequent and staff assignments varied day-to-day and week-to-week. Thus, most staff did not know most of the detainees individually. That was true in this incident, in which only one of the staff members involved knew one of the detainees individually, but not well (Reyes deposition, page 46, line 3-page 49, line 23). Neither the Lieutenant nor the Sergeant, both of who used OC chemical agents on the group, knew any of the detainees individually. Further, most of the detainees had no English and most of the staff did not speak Spanish or had only a few words of Spanish. Lieutenant Diaz explained that the policy and practice was that when staff encountered a language barrier they could either use a hotline on the phone to get a translator or they would have some other staff member who was bilingual serve as a translator (Diaz deposition, page 63, lines 10-21). Both staff members and detainees also said that it was common for a bilingual detainee to translate even though that person might not be involved in the particular issue being discussed.

3. In this incident, Lieutenant Diaz testified that she was told that these detainees did not speak English and she thought that Officer Reyes had started talking with them (Diaz deposition, page 196, line 22-page 197, line 4). However, when Officer Reyes was asked whether he spoke Spanish at his deposition, he answered, "Very little". Lieutenant Diaz went on to say that she knew Officer Reyes spoke Spanish because she had heard him, but that she had never asked him to help her (Diaz deposition, page 120, lines 5-22). She was mistaken about his Spanish. She also said that she had asked Officer Martinez to translate for her but Officer Martinez did not come in to the area until halfway through the incident (Reyes deposition, page 148, lines 2-7). That means

14

that Officer Martinez was not there for most of the time that Lieutenant Diaz might have been communicating with the nine detainees. In addition to Officer Jindi and Lieutenant Diaz, Sergeant Campos was also not a Spanish speaker and Detention Officer Juarez testified that he had "A little bit of Spanish" (Juarez deposition, page 19, lines 18-20). All of this consistent with a view presented by the detainees that Lieutenant Diaz kept talking at them in English (Cornejo deposition, page 47, line 23-page 48, line 3) and that she was banging the gas canister on the table and yelling at them (Pena Garcia deposition, page 39, lines 15-20). The detainees were adamant that they did not understand any of what was being told to them or yelled at them and that they were given no chance to explain themselves or even to speak to the staff (Pena Garcia deposition, page 39, lines 2-9), (Grande Rodriguez deposition, page 139, line 22-page 140, line 11). The detainees also emphasized that they just wanted to speak with someone in authority and have their grievances heard (Cornejo deposition, page 41, lines 11-16), and that they could not talk to someone without the hunger strike because they would not get any attention (Cornejo deposition, page 52, lines 1-3).

4. The general lack of communication was born out by other staff. Officer Reyes testified that he knew the detainees were asking to speak to an ICE Officer (Reyes deposition, page 86, lines 5-16) and that he was trying to get the detainees to go to their bunks but that he was speaking in English (Reyes deposition, page 92, lines 6-11). Officer Reyes knew that Officer Martinez spoke Spanish but does not remember Officer Martinez doing so with these detainees (Reyes deposition, page 80, lines 12-25). When he was asked "Did you hear anyone else speaking to them?", he responded, "Just Lieutenant Diaz" (Reyes deposition, page 92, line 25-page 93, line 3). Officer Martinez was evidently able to begin to talk with the detainees in Spanish and found out that they wanted to speak to ICE and that they were protesting but Lieutenant Diaz was not participating in that conversation (Martinez deposition, page 47, lines 3-9; page 60, line 24-page 61, line 2; page 66, lines 22-24). Importantly, Officer Martinez, who was the only staff member effectively able to communicate with the nine detainees, did not realize that they had declared a hunger strike until days after the incident (Martinez deposition, page 140, line 22-page 141, line 18).

G. Detainee grievances

1. The reason the nine detainees decided to begin a hunger strike was that they believed it was the only way they could get someone in authority to talk to them about conditions and issues at ADC.

2. Their issues were not trivial. The first issue was bail and some of the detainees evidently had bail set at up to $50,000. They believed that unless something changed, they might never get out of the detention facility because there was no chance that their families could raise that kind of bail.

3. Drinking water was another issue. The detainees complained that the tap water smelled bad and they were afraid to drink it. Staff would bring containers of drinking water into the living unit but the five gallon container typically contain something like one gallon of water and it would be gone quickly with the approximately 100 detainees on the living unit. Then the detainees would ask for more water and the staff would

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

tell them that they would have to wait.

4.  Clothing, and particularly underwear was another serious issues for the detainees.  They complained that they only got underwear exchanged every ten days to two weeks and that when they got the exchange, the underwear they received was not only used but was soiled and did not appear to have been laundered.  As with a number of these grievances, I am not in a position to corroborate these grievances based on the case record.  I simply do not know the situation and I am reporting what the detainees have said under oath.

5.  Another serious concern for the detainees had to do with medical care.  The detainees said that there is a long wait for medical care and that some of the medical staff refuse to provide medical services and/or that you are not seen by medical until your condition is very serious.  An example may be helpful.  Mr. Rivera testified that he saw a doctor at ADC but the doctor said that he did not want to see him and sent him away.  Mr. Rivera testified that he then told an ICE officer and filed a grievance but the ICE officer also did not want to help and nothing happened (Rivera deposition, page 50, line1-page 51, line 11).

6.  Perhaps the most concerning of the detainee complaints had to do with their allegations that staff at ADC treated them badly and were unprofessional.  Mr. Rivera said in his deposition that he had been called a motherfucker by ADC officers on many occasions (Rivera deposition, page 76, lines 2-6).  Mr. Pena Garcia testified that he (and perhaps some of the other detainees) met with ICE in the days after this incident and that ICE promised improvements but that that did not happen (Pena Garcia deposition, page 52, lines 1-6; page 55, lines 9-11).  Mr. Grande Rodriguez testified that he only has a little English and that when he mispronounced words that the detention officers would laugh at him and that they also made fun of his name.  He added that the officers made fun of Chinese people, mocking their eyes (Grande Rodriguez deposition, page 77, line 17-page 79, line 10).  Mr. Grande Rodriguez also said that an ICE officer told him that if he didn't eat he could be deported and that his fiancé could also be deported (Grande Rodriguez deposition, page 118, line 16-page 119, line 3).

H.  The use of OC spray was improper and improperly documented

1.  Both Lieutenant Diaz and Sergeant Campos testified that they each used a one second burst of OC spray and Lieutenant Diaz further qualified that by saying that she sprayed the middle of one of the tables the detainees were sitting at rather than spraying the detainees themselves on either side of that table.  That testimony is inconsistent with much of the other evidence in this case.  The detainees each described themselves as either covered with OC spray or soaked with OC spray.  Some detainees said that they were sprayed two times and some detainees said that they were themselves sprayed three different times.  The amount of spray was sufficient that Officer Reyes, who was not sprayed directly, was having trouble breathing and could not see and had to be taken for medical attention (Reyes deposition, page 134, lines 8-13) (Reyes deposition, page 122, lines 1-9).  Officer Jindi testified that she had to go out to the yard so she could breath and that everyone was coughing.  After the nine detainees were taken to the recreation yard, the staff found that there was so much OC in the dormitory areas of the unit that they had to evacuate all of the staff and all of the detainees out of the

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

unit so that it could be decontaminated.

2. In corrections, as in police work, there is a well accepted procedure for determining how much OC has been used after it has been deployed. That procedure is to weigh the OC canisters (whether the small one-to-two ounce aerosol dispensers or the much larger Mark IX size canisters) when the OC is issued, and then to again weigh the canister after it has been used to determine how much of the content was deployed. This procedure is somewhat parallel to the situation with tasers, where questions also arise about how many taser shocks were administered, and for what duration. Taser deployment creates a digital record that can be downloaded after the taser use and will reflect the number and length of the taser discharges.

3. GEO and ADC have a requirement that only supervisors may carry tasers. They use Mark IX canisters, typically carried on their security belts. At the beginning of a shift, a supervisor checks out an OC canister from a locked safe. In the safe along with the OC canisters is a sign out log showing which canister has been checked out to which supervisor, and when. It is also policy that the canister should be weighed when checked out and then weighed again when checked back in (Diaz deposition, page 143, line 18-page 146, line 18). Unfortunately, Lieutenant Diaz does not remember whether or not she weighed her OC canister, as she was required to do by policy.

4. It is more surprising that GEO and ADC have been unable to find the record of OC canister checkouts and weights from this incident. Since that record was kept in a locked safe and since situations in which OC was used were rare at ADC, it is difficult to understand why that record would not have been quickly identified after the incident, and saved. If it did show the weight of Lieutenant Diaz's canister of OC before and after her shift on June 12, it would have answered the question of whether she was correct or the detainees were correct about how much OC she dispensed.

I. Detainees injuries

1. Mr. Rivera testified that he was sprayed in the face twice and that on one of those occasions he was pepper sprayed from approximately one foot from his face (Rivera deposition, page 14, lines 21-24; page 93, line 10-page 94, line 3). He said that two officers hit his face and head against the wall four times, breaking his nose, knocking out a dental plate and breaking off a tooth and crown (Rivera deposition, page 94, line 17-page 95, line 13). He went to say that he lost the dental plate that had gold crowns as part of it and replaced it with a dental place with white teeth instead of gold crowns. His broken nose continues to give him trouble breathing and he has been told that he needs surgery on his nose. At the time of his deposition, the tooth and crown that were broken were still missing from his mouth (Rivera deposition, page 98, line 10-page 102, line 16). Mr. Rivera testified that he cannot sleep normally because of his nose and that at the time of his deposition, it was still bleeding almost every day and was numb (Rivera deposition, page 121, line 18-page 125, line 17).

2. Julio Cornejo still had a knee injury at the time of his deposition. His knee tends to lock up and makes it difficult when he walks. It interferes with his ability to walk to the laundromat and to play with his child. (Cornejo deposition, page 109, line 19-page 110, line 19). Additionally, Mr. Cornejo said that his most serious injury was that when he

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

went to the bathroom, blood would come out (in his urine). (Cornejo deposition, page 103, lines 8-24). Mr. Cornejo also testified that at the time of the incident he was bleeding from his side but did not find out until he changed his clothes (Cornejo deposition, page 118, line 1-11). Mr. Cornejo added that the scrape on his side was from the edge of the table when the officer pulled him away from the table but that his knee was injured when he fell as they pulled him away (Cornejo deposition, page 130, line 13- page 131, line 1). When Mr. Cornejo was seen by a nurse after the incident, he asked for medicine for the pain, particularly for the burning on this face. A nurse refused to give him anything although he said that phlegm was coming out of him like water and he was having difficulty breathing (Cornejo deposition, page 119, line 18- page 120, line 5). Mr. Cornejo also said that he felt like his skin was coming off from the pain the OC (Cornejo deposition, page 70, line 16-page 71, line 5), and that the hot shower doubled his pain and he wanted to get out of the shower but staff held him in (Cornejo deposition, page 77, line 4-page 78, line 24). Finally, Mr. Cornejo testified that he will never forget this incident because of the pain of the spray and seeing his friends crying and feeling helpless (Cornejo deposition, page 111, lines 5-17).

3. Mr. Pena Garcia testified that he was blinded by the pepper gas but that he felt punches and felt himself being pushed and pulled (Pena Garcia deposition, page 45, lines 19-24). Mr. Grande Rodriguez testified that he was hit in the ribs seven to ten times in order to separate him from the other inmates and was then slammed against the wall (Grande Rodriguez deposition, page 102, line 4-14; page 107, line 21-page 108, line 13). Mr. Grande Rodriguez said that all of the detainees were soaked with pepper spray (Grande Rodriguez deposition, page 99, lines 17-24). He had said that he fainted in the shower because of the pepper gas and because he couldn't breath and that he also received bruises and scratches (Grande Rodriguez deposition, page 112, line 23- page 114, line 4).

4. In contrast to these detailed accounts of injuries and pain by the detainees, none of the officers involved reported seeing any injuries and none of the officers reported throwing punches, slamming any detainee into the wall, etc. Officer Martinez testified in some detail about removing three different detainees from the tables where they had been sitting. He said that he and other officers guided the detainees to the wall and denied pushing or shoving their faces into the wall and denied that any inmate head hit the wall. In fact, Officer Martinez testified that with two of the detainees, he thought it was their mid section that made contact with the wall. After reviewing literally many hundreds of use of force situations in which staff took detainees to a wall or placed detainees against a wall, I have seen that it is frequent that detainee's head or shoulders makes initial contact with the wall, and much less frequently the detainee's knees or feet, but it is most unusual to see a situation in which the detainee's mid-section makes contact with the wall first.

J. Detainee disciplinary hearings and sanctions

1. Each of the nine detainees was charged with inciting a riot, was found guilty and was given ten days in disciplinary segregation.

2. From the case record, it does not appear that ADC followed acceptable procedure in these disciplinary hearings. Detainees had a right to appear at their hearing, with a

18

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

translator, and explain their actions.  Instead, each inmate received a visit from the same staff member who then purported to represent him at the disciplinary hearings.  That staff member provided the same one sentence explanation at each of the nine hearings and the hearing officer made the same finding and imposed the same sanctions in each of the nine cases, writing "This kind of behavior will not be tolerated".  The detainees did not understand that they were waving their right to appear and in some cases the record seems to reflect that the notice of hearing was not timely.

3.  When the detainees were sent to disciplinary segregation, they found that in addition to losing their contact visiting privileges, their phones had been blocked so that they were prevented from calling their attorneys.

K.  Staff training

1.  The most obvious training deficiency has to do with training on the use of force policy.  There are a number of indications in the case record that staff at ADC do not know the use of force policy or do not understand it.  The most blatant example is the After-Action Review Report (GEO 02238) in which the Chief of Security and the ICE representative both categorize this incident as a minor use of force when it is plainly and prominently explained in the use of force policy as a major use of force.  Lieutenant Diaz testified that although she had been trained on the use of force policy, she had not been tested on it and that when revisions to the policy were distributed, she sometimes read them and sometimes did not.  She also said that she was not required to write use of force reports and could instead substitute an email to the Captain.  Frontline officers were equally hazy about some of the specifics of the use of force policy in their testimony.

2.  Policy requires that in order to be issued OC spray or use OC spray, a staff member must be of supervisory rank and must have completed training on both the use of OC and decontamination procedures.  Lieutenant Diaz testified that she received that training when she was promoted to Lieutenant but that was evidently four years prior to her deposition and she did not indicate any training since then.  In most correctional agencies, remaining certified with OC requires refresher training every year or every two years.  Without Lieutenant Diaz's training records it is not possible to draw a firm conclusion but it may be that when she used the OC spray in June, 2017, she was no longer certified to use it.

3.  Lieutenant Diaz testified hot water will activate OC and make it more painful and that Detention Officers have been trained that decontamination showers should be cool or cold (Diaz deposition, page 158, lines 3-7).  Evidently, that training did not stay with the officers because that is not what happened in this case.

4.  Officer Martinez was specifically asked whether the use of OC constituted a major use of force.  He answered, "No" (Martinez deposition, page 157, lines 15-18).

L.  Officer reports were grossly inadequate

19

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

1. It is well accepted across American corrections, and across law enforcement for that matter, that any officer participating in a use of force or witnessing a use of force should write a detailed report describing the situation, the attempts to deescalate if any, the threat problem posed by the suspect, the specifics of the force that was used and much more. Staff reports are one of the primary ways in which staff are held accountable for complying with a use of force policy and they also provide the agency with information about potential problems with anything ranging from security equipment to written policy and procedures, to training. In this case, the situation was complex, ranging from the announced hunger strike and refusal to return to the dormitories to the communication or lack of it with the detainees; the OC spray by two different supervisors; the physical force used to remove detainees who had linked arms and were passively resisting officers who were trying to take them away from the tables; the placing of the detainees in handcuffs and the escorting of the detainees first to the recreation yard and placing them on the ground in the recreation yard and then subsequently moving the detainees to a holding cell; and then from the holding cell to showers; and then from the showers to a location their clothing was changed; and then finally moving the detainees to administrative segregation. Given that situation, one would expect lengthy, detailed reports. Instead, most of the officer reports were one to three sentences and contained no details. The reports do not say which officers moved which detainees, where or how individual detainees were placed in handcuffs, whether detainees fell, were taken to the floor, were placed on the wall, etc. The quality of these reports is abysmal. Even looking over all of the officer reports, it is not possible to tell who was engaged with which detainee, whether any detainees were injured, which detainees resisted in which ways, or to answer many other important questions about this incident. Some officers who were on scene and involved in the incident, such as Officer Jindi, did not write reports and no one followed up and asked them to write a report since it was obvious that they were there. There is even less information about where and how the detainees were moved from the recreation yard and to where, how they were showered or decontaminated, which detainees refused, and which detainees were checked by medical staff, where and how.

2. The only indication that anything was wrong with any of the reports came from Officer Reyes, who acknowledged that his report should have been more detailed (Reyes deposition, page 129, line 17-page 130, line 6). There is no indication that any administrator at ADC, at GEO or at ICE had any problem with these reports even though they provide almost no information about what actually happened in this situation.

3. In addition to the problems discussed directly above, there are integrity issues with the reports. Lieutenant Diaz testified that you don't have to complete a use of force report, you can just send an email to the Captain (Diaz deposition, page 22, lines 9-19). That is not policy and it flies in the face of accepted correctional practices.

4. Lieutenant Diaz also testified that she did not write the report signed by Chief Johnson with her name on it. In fact, she testified at her deposition that she had never seen that report before (Diaz deposition, page 74, line 4-page 75, line 13; GEO 02275). She went on to testify that all of the notations on the reports with her name, major and minor disturbances marked, use of force reports, etc. are actually in Captain McCusker's handwriting (GEO 02261). She said that she wrote none of that (Diaz

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

deposition, page 78, line 25-page 81, line 15).  Lieutenant Diaz was asked why reports from officers would go to Chief Johnson rather than to her, first.  She said that she did not know and testified that they should have gone to her first and that it was policy for the reports to go through her as the Lieutenant (Diaz deposition, page 92, line 22-page 95, line 12).  Lieutenant Diaz testified that GEO 02236 and 02237 is a report that she did with Captain McCusker.  She said that she had never filled out a use of force report before so he helped with it.  She acknowledged that Captain McCusker had not been in the unit for the incident and had not seen or participated in any of it (Diaz deposition, page 106, lines 5-8).

M.  Video recording

1. Today, most large and medium size jails, prisons and detention centers have fixed video security cameras that record in many locations in the facility.  These security recordings are typically stored for weeks or months before they are recorded over and when there is an incident the videotape from a particular camera or cameras can be downloaded and archived.  In this current incident, there is video from the living unit where the incident began, 2 Charlie, but there is no video of the detainees after they were taken to the yard, their escort to a holding cell or their escort to the showers.  There is similarly no video of them in the showers being decontaminated or, after that, receiving a change of clothing.  Some of the questions in this case might well be resolved if there was good video available of the rest of the incident, that is, video coverage of the detainees after they left 2 Charlie.

2. The use of force policy complies with typical practices across American corrections in that it requires that in a calculated or planned use of force, a camcorder must be used from the beginning to the end of the incident.  That can be particularly helpful since camcorder footage includes audio and security camera footage almost never does.  The policy also requires that in the event of the situation that is immediate force or where there is otherwise not adequate time to get a camcorder for the beginning of the incident, a camcorder should be brought to the incident scene and used as quickly as possible.  That is also in line with contemporary practices in other correctional agencies and facilities.  The policy at ADC requires that each Shift Commander identify two video operators. It also requires that camcorders be available for use and that the utility officer or officers designated and trained to use the camcorders bring that equipment to the scene of an incident as they respond.

3. In this incident, Lieutenant Diaz says that she forgot to ask for a camcorder.  The trained video operator on shift, Officer Martinez, went directly to 2 Charlie and did not stop to get a camcorder although he was trained to do that.  When Sergeant Campos arrived on scene, he could also see that no officer was using a camcorder and he could have corrected the problem to a great extent had he designated an officer to bring a camcorder to the scene.  There is no particular reason that there was no camcorder brought to the scene prior to the use of OC, because there were extra staff available and not all of the staff coming on shift had responded to that unit.  A camcorder would have recorded whether or not there were serious attempts at de-escalation and confrontation avoidance, it would have likely shown the length, number and duration of the OC spray used, it might well have shown how various detainees were put against the wall or taken to the floor, and by which staff, and much more.  There is no good

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

reason why two supervisors and a trained video operator all ignored the policy requiring a video camcorder except that that policy was treated as many others, casually and without serious consideration or consequences.

4.  Even after the use of force was over, a camcorder should have been used to document the placement of the detainees on the yard, their escort to a holding cell and particularly their decontamination and their medical assessment. None of that was done.

N.  After-Action Report (Critical Incident Review)

1.  It is axiomatic in corrections and in law enforcement that the more serious an incident, the more important it is to review and analyze it thoroughly and objectively. That holds true for "near misses" as well as for incidents that actually develop into serious situations. That kind of review is most often referred to as either a Critical Incident Review or an After-Action Report. Following the GEO and ADC terminology, the term "After-Action Report" will be used herein. Other reviews and investigations may look at accountability and culpability in a serious incident. The purpose of the After-Action Report is different and focused primarily upon potential lessons learned. In short, what does the current incident or situation reveal that may decrease risks or improve operations in the future.

2.  For ADC, for GEO and perhaps for ICE, the incident at the center of this litigation should have been a target rich environment for a comprehensive After-Action Review. Such a review should have raised important and rather obvious questions about staff training, about policy, about staff professionalism, about communication with non-English speaking detainees, and about some of the conditions of confinement at ADC. Instead, the After-Action Report produced nothing of value and to call it a "Whitewash" would be charitable.

3.  Between October, 2015 and June, 2018, the Inspector General of the Department of Homeland Security identified approximately fourteen thousand health and safety deficiencies in ICE detention facilities and imposed penalties exactly two times. So, perhaps nothing in this report should seem a surprise.

IV.  Summary and Conclusions

1.  The staff at ADC had a duty to protect detainees and specifically to protect them from staff uses of force that were unnecessary or excessive.

2.  It was predictable that if staff used unnecessary or excessive force, detainees might be likely to suffer injuries that could be permanent or serious.

3.  Staff failed to follow the ADC use of force policy and ADC hunger strike policy, instead subjecting nine detainees, the Plaintiffs in this lawsuit, to OC spray when that use of chemical agents was almost certainly unnecessary.

4.  After soaking the nine detainees with large amounts of OC, officers pushed detainees head first or face first into walls, or pushed them to the floors. One detainee suffered a

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

broken nose and other substantial injuries while a second detainee continues to deal with a knee that was injured by the force used upon him.  All the detainees suffered extreme pain from the large amounts of OC and then suffered additionally when they were given scalding hot showers which both burned the detainees and also exacerbated the effects of the OC, rather than decontaminated it.  One detainee fainted in the shower from the pain of the extremely hot water and the OC.

5. The ADC use of force policy requires the approval of the Facility Administrator for the use of chemical agents.  That was not done. The situation did not constitute an emergency, and the Supervisor first using OC on the detainees testified to that.

6. The staff failed to write adequate reports on the situation, failed to videotape the situation and failed to provide required due process to the detainees for their disciplinary hearings following this incident.  ADC failed to conduct any kind of reasonable review or investigation of this incident, including failing to complete an After-Action Report required by policy.

7. The detainees were then further punished improperly by having their phone access to their attorneys cut off for the ten days that they were sent to punitive segregation in the facility.

8. All the detainees wanted was the opportunity to talk with someone from ICE about their issues and conditions at ADC.  The was no good reason the Lieutenant responding to the situation could not have arranged for translation, taken her time and heard the inmates out.  Instead she chose to use chemical agents and physical force on the detainees unnecessarily, predictably resulting in great pain and serious injuries.  The Lieutenant, the Sergeant and some of the detention officers acted in callous disregard of the safety and well-being of the Plaintiffs.  Administrators at ADC and ICE could easily determine that policies had been ignored or violated but chose to ratify the dangerous actions of staff rather than mitigating the harm done to the nine detainees.

9.  It is my opinion that the evidence in the case file, and particularly the video footage, does not support a conclusion that a riot, major disturbance or insurrection was imminent, likely or even a significant possibility.

10. It is my opinion that both supervisors erred in resorting to force prematurely, while non-force options were viable and preferable.

11. It is my opinion that Lt. Diaz was required by policy to consult with the Facility Administrator prior to unilaterally deciding to use chemical agents.

12. It is my opinion that the nine detainees beginning a hunger strike did not pose a threat to staff.

13. It is my opinion that the injuries, pain and mental duress suffered by the nine detainees were a direct and proximate result of staff failures to follow policy, and that they were a predictable result of those staff failures.

14. It is my opinion that the force used on the detainees had more to do with punishing them than with achieving compliance with directives.

15. It is my opinion that the staff breached their duty to protect these detainees from staff use of force that was both unnecessary and excessive.

16. It is my opinion that the staff use of force reports and the after-action report in this case are so superficial as to be grossly incompetent.

17. All of my opinions in this case are to a reasonable degree of professional certainty.


End

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

# Appendix A

# Jeffrey A. Schwartz, Ph.D.

1610 La Pradera Drive                                                          (408) 379-9400 Office
Campbell,  CA  95008                    jasletra@aol.com                       (408) 379-9410  Fax

## SUMMARY

Thirty years experience in criminal justice management coupled with a psychology Ph.D. in research methodology.  Detailed, hands-on experience with police, prisons, jails, community corrections; adult and juvenile; local, state, federal and foreign correction agencies.  Development of innovative training programs and new approaches to training methodology.  Planning for "turnaround management" and culture change in troubled institutions and agencies.

## PROFESSIONAL EXPERIENCE

LETRA, Inc., Campbell, CA (1972 - present), A non-profit training and research organization, serving criminal justice and other governmental agencies, business and industry.

*Founder and Chief Executive Officer:*
All phases of corporate and fiscal management, supervision of professional staff, consultants. Policy development and procedures for emergency preparedness, use of force and conflict resolution. Design of new training programs and training of trainers.

RICHMOND POLICE DEPARTMENT, Richmond, CA (1968-1976)

*Administrative Consultant to the Chief of Police:*
Organizational development, research, program evaluation, new training programs and grants. Developed first generalist police crisis intervention training program in the U.S.. Planned and organized innovative department-wide juvenile diversion project, used as state model. National research on female and minority employment in policing.

PALO ALTO VETERAN'S HOSPITAL, Palo Alto, CA (1969-1971)

*Chief of Program Evaluation Unit:*
Founded, organized and managed new applied research unit in large medical/psychiatric teaching hospital.  Developed research and statistical strategies for evaluating effectiveness of clinical programs.  Served on Hospital Director's Executive staff.

## EDUCATION

| | | |
|---|---|---|
| 1960-1964 | Western Reserve University | B.A.  Chemistry and English Literature. |
| 1964-1965 | Toledo University | Graduate work:  Psychology |
| 1965-1968 | Denver University | M.A. & Ph.D. Experimental Psychology (Research Methods, Learning, Statistics) |
| 1968-1969 | Palo Alto Veteran's Hospital | Internship:  Clinical and Community Psychology |

## CORRECTIONS EXPERIENCE (representative sample)

<u>National Institute of Corrections</u>: Thirty years experience working with NIC.  Conducted two large national management training programs over three years.  Developed original curriculum, innovative training methodology, trained 500 managers from all areas of corrections from all 50 states in a residential 7-day, intense corrections-specific management skills training program.  Administrated all aspects of these projects.  Project Director for more than 10 major NIC grants / cooperative agreements; technical expert on more than 25 NIC technical assistance projects from all four NIC operating Divisions; authored 3 book length NIC publications.  Helped plan new NIC courses and evaluated NIC operating procedures.

<u>Shelby County, TN (Memphis) Jail</u>:  Comprehensive operational review of deeply troubled large jail system after Federal Court found the county in contempt of all five major elements of consent decree (2000).  Developed plan to cure contempt findings, drafted response to Civil Rights Division of US DOJ to avoid second1983 suit, worked on transformation of jail to direct supervision and on population management, use of force, inmate grievance system, management training and practices.  Achieved discharge from Federal Court supervision in 2005 and from DOJ supervision in 2009.

<u>California Youth Authority (CYA)</u>:  The development of Conflict Management and Crisis Intervention procedures in all Youth Authority institutions; training and procedures for the management of hostage situations; training of trainers.  LETRA's Crisis Intervention training program has been required by policy of all CYA institutional staff and in use for over 15 years, and LETRA's Emergency Preparedness course was in use state-wide for over ten years.

<u>Montana Department of Corrections (DOC)</u>:  After the maximum security unit riot and hostage situation at the Montana State Prison in Deer Lodge, in 1991, selected by NIC to head the seven person Administrative Inquiry Team commissioned to investigate the events leading to and surrounding the riot.  Coordinated the writing of the Inquiry Team Final Report ("Riot at Max") and managed extensive media contacts for the Inquiry Team.

<u>Michigan DOC, Hawaii DOC, Alaska DOC</u>:  Initiated state-wide training programs in each state on institutional crisis intervention.  All three State DOC's continued to provide this training to all or almost all institution staff for many years.

<u>Pennsylvania DOC</u>:  After Camp Hill riots, conducted assessment of Department's emergency response capacity, developed plan to increase preparedness including recommendations for specialized equipment, staff, etc.  Conducted administrative policy seminar, tailored emergency training curriculum to department's needs, trained cadre of mid-managers to deliver emergency preparedness training at all 16 institutions to both management and line/supervisory staff and developed format for new institutional emergency plans.

<u>Nebraska, Iowa, Wyoming, Oregon, Kentucky, North Carolina, Missouri, Kansas, Florida, Delaware, North Dakota, Hawaii, Nevada, Arkansas, Vermont and New Hampshire DOC's, the Omaha, Jacksonville, Greenville and Boise jail systems</u>: Emergency Preparedness. Typically began with security analysis and evaluation of existing emergency plans and procedures, review of emergency policies, leading to adaptation of LETRA's detailed, comprehensive and generic ("all risk") emergency system.  Provided Emergency Preparedness training for all staff at all institutions on new emergency system by training and certifying department instructors.

Hawaii DOC:  Created new Use of Force policy, then developed curriculum to train all staff to new policy. Prepared Department staff as instructors so Department would be self-sufficient. Achieved substantial reduction in allegations of improper use of force. Similarly adapted LETRA's model use of force policy and training for state DOC's in Oregon, New Mexico, Shelby Co. Jail.

Correctional Services of Canada:  Crisis Intervention and Conflict Resolution work at Stony Mountain Penitentiary following riot and murder of two staff members.  Developed Conflict Resolution program (in English and French) for all Regions of Penitentiary Service.  Revised and expanded emergency policies governing crisis management at all Federal institutions in Canada.

## POLICE CONSULTATION EXPERIENCE (representative sample)

FBI National Academy, Quantico, Virginia:  Presented two seminars on Domestic Crisis Intervention to police executives from largest 50 police departments in U.S.  LETRA was the first outside group (non-FBI) to be invited to present an entire course at the FBI Academy.

Richmond, California, Police Department:  Developed new 40-hour training program for generalist patrol officers on child and juvenile issues.  Course ranged from gangs to drug abuse to battered and neglected children.  All uniformed officers and detective trained within one calendar year.

Sacramento, California, Police Department and Sheriff's Office:  Long-term project to train trainers in Crisis Intervention.  Over 1500 patrol officers trained in LETRA's Domestic Crisis Intervention during an 18 month period.  Evaluation showed 40% reduction of officer injuries, reduction in time spent on disputes. Similar projects in Rochester, NY; San Jose, CA; and other police agencies.

## COLLEGE/UNIVERSITY TEACHING EXPERIENCE

Denver University, San Francisco State University, San Jose City College, University of California at Santa Cruz, Guest Lecturer at Stanford Law School.  Psychology courses taught: Learning, Theory of Measurement, Educational Psychology, Introductory Statistics. Criminal justice courses:  Correctional Management, Police Supervisory Training, Training for Trainers, etc.

## EXPERT WITNESS (Plaintiff and defense-side experience)

Use of Force (Police and Corrections); Operation of Correctional Facilities; Failure to Protect (Staff Sexual Misconduct with Offenders; Suicide; etc.); Emergency Preparedness and Emergency Response (Prisons and Jails); Crisis Intervention (Police, Probation, Parole, Jails and Prisons)

Currently a Federal Court Monitor On a Los Angeles Jails class action consent decree on use of force; Also Federal Court Monitor, use of force consent decree, San Bernardino County Jails.

Class Action and related cases: Corrections expert in class action by Southern Poverty Law Center and Special Litigation Section of DOJ resulting in 2013 Consent Decree against New Orleans Jails; Corrections expert for Manhattan U.S. Attorney's Office in CRIPA investigation of adolescent conditions, Rikers Island; Invited testimony before Citizens' Commission on Jail Violence (CCJV), Los Angeles Jails; Federal Court security expert, consent decree on conditions, Virgin Islands Jails;

## CRITICAL INCIDENT REVIEWS ("after-action reports")

Camp Hill (PA) riots; Hurricanes Katrina and Rita and the LA DOC; Hostage taking at Delaware Correctional Center; "Riot at Max" at Montana State Prism; Wyoming Penitentiary carbon monoxide poisonings; Southern Ohio Correctional Facility (Lucasville) riot.

## AWARDS, PUBLICATIONS AND INVITED ADDRESSES

NDEA Fellow in Graduate Psychology.  Presented invited addresses at ACA, APPA, AJA, CPPCA, IACP meetings, State Correctional Associations.  Published numerous articles and chapters on corrections, research methodology, police science and psychology.  Authored or co-authored more than 15 training texts, three book length NIC publications early NIC programmed learning course.

## PROFESSIONAL ORGANIZATIONS  (current and former)

American Correctional Association; American Probation and Parole Association; American Jail Association; California Probation, Parole and Corrections Association; American Psychological Association; International Association of Chiefs of Police

## COMMUNITY INVOLVEMENT

Elected Trustee, West Valley-Mission Community College District, three terms.  Served as President of Governing Board 1984-85 and 2005-2006.  The District serves over 25,000 students, with more than 1000 employees and a budget of over $100 million dollars per year.

Member, Bd. of Directors, former President of large homeowners' association in Saratoga,  CA.

Vice Chair,  Board of Directors (1988 - 1995), Women's Housing Connection, which was the only homeless shelter in Santa Clara County exclusively for women and women with young children.

Co-founder and Director (1986-2009), Visa Technologies (later Momar Industries), a computer supply and flexible packaging company with over  $10M in sales, annually.

Volunteer Mediator, Child Find, Inc., A national organization that attempts to locate missing children, reconcile run-away children and juveniles with their families, and prevent child abduction.

## ADDITIONAL SKILLS AND EXPERIENCE

Budget and Personnel Management:  As President of a College Board of Trustees, oversaw a budget in excess of $100M/year with approximately 1000 professional and support staff.  Oversaw private corporate budget (Visa Technologies) in excess of $10M/year with 65 employees.  Extensive experience teaching leadership development, personnel administration, budget and fiscal control and other management topics to criminal justice managers.

Media Relations and Public Speaking:  Extensive media experience in community activities as well as with criminal justice work. Frequent public speaking in a wide variety of contexts.

Legislative Liaison and Policy Analysis:  Substantial experience working with local legislative delegations, testifying before legislation bodies, analyzing and drafting policy and regulations.

Special Consultant to the California Assembly:  (1) Investigation and hearings leading to resignation of Insurance Commissioner Charles Quackenbush.   (2) Investigation and hearings on the state of California contract for Oracle software.

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

# Appendix B

# Jeffrey A. Schwartz, Ph.D.

1610 La Pradera Dr.
Campbell, CA 95008
jasletra@aol.com
Office: 408-379-9400
Fax: 408-379-9410

## LIST OF CASES (May 28, 2019)

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Piszker v. Wackenhut Corrections and Raymond Andrews<br><br>Case No. 97-16397 | Court of Common Pleas Delaware County Civil Trial Division | Defense<br><br>Sean Halpin @ Reed Smith Shaw & McClay 2500 One Liberty Plaza 1650 Market St. Philadelphia, PA 19103 Office: 215-851-8100 | Couple sued private corporation running Delaware County Jail for injuries received from an inmate who had escaped from the jail. | Case settled. | Wrote report. |
| Mahar v. City of Reed City, et al.<br><br>Case No. 1:98CV178 | U.S. District Court Western District of Michigan, Southern Division | Plaintiffs<br><br>Diane Goller Dilley, Murkowski & Goller, PLLC 1000 Trust Building 40 Pearl Street, NW Grand Rapids, MI 49503 Office: 616-4598383 | Resident sued Reed City Police Department for unlawful arrest resulting in injuries.  Arrest was made pursuant to a littering citation. | Case settled. | Wrote report, deposed. |
| Gonzalez v. New Mexico Department of Corrections, et al. | 13th Judicial District Court, County of Valencia, New Mexico | Defense<br><br>Timothy S. Hale Riley, Shane & Hale 4101 Indian School Rd. NE Albuquerque, NM 87110 Office: 505-883-5030 | Correctional officer sued State Department of Corrections for injuries resulting from his participation in an emergency preparedness drill. | Ruling for Defense. | Wrote report. |
| Jeffers v. James Gomez, et al.<br><br>Case No. CIV S-97-1335 | U.S. District Court Eastern District | Plaintiff<br>John Houston Scott The Scott Law Firm 1375 Sutter Suite 222 San Francisco, Ca 94109 Office: 415-561-9600 | Inmate shot during disturbance at new Folsom Prison, CA DOC. | Case settled. | Wrote report. |
| Leitner v. Santa Clara County | | Defense<br><br>Doug Allen | Personnel Board disciplinary action against staff over death of mentally disturbed inmate in County Jail. | Judgment for Defense. | Reviewed records and videotapes, consulted with Defense attorneys, wrote report. |

2

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| White v. City of Big Rapids, MI, et al.<br><br>Case No. 1:94-CV-296 | U.S. District Court Western District of Michigan, Southern Division | Plaintiffs<br><br>Dianne Goller Dilley, Murkwski & Goller, PLLC<br>1000 Trust Building<br>40 Pearl St. NW<br>Grand Rapids, MI 49503<br>Office: 616-459-8383 | Plaintiffs sued City of Big Rapids MI, a public safety director and two police officers for unlawful arrest, excessive force and civil rights violations because of a broken arm and other injuries that plaintiff sustained pursuant to a police traffic stop. | Case settled. | Wrote report, deposed. |
| Sandoval v. Terhune, et al.<br><br>Case No. C99-20027 | U.S. District Court Northern Division | Plaintiffs<br><br>Lawrence Knapp<br>215 Dorris Plaza<br>Stockton, CA 95204<br>Office: 209-946-4440 | Inmate shot by CA Department of Corrections officer during an altercation among inmates in recreation yard. | Case settled. | Review of documents. |
| Ford v. Terhune, et al.<br><br>Case No. CIVS991234 | U.S. District Court Eastern District | Plaintiff<br><br>John Houston Scott<br>The Scott Law Firm<br>1375 Sutter Suite 222<br>San Francisco, CA 94109<br>Office: 415-561-9600 | Gay inmate attacked and killed by cellmate in maximum security mental health unit. | Case settled. | Reviewed documents, wrote report. |
| Klink v. City of Newman, et al.<br><br>Case No. F-99-6360 | U.S. District Court Eastern District Fresno Division | Plaintiff<br><br>Jeff Klink<br>9976 Falcon Meadow Dr.<br>Elk Grove, CA 95624<br>Office: 916-686-1488 | Mentally disturbed individual, on amphetamines, shot and killed by Newman policy officer while threatening officer with a shovel. | Case settled. | Reviewed documents, wrote report. |
| Perez v. Terhune, et al.<br><br>Case No. C99-20117 | U.S. District Court Eastern District San Jose Division | Plaintiff<br><br>John Houston Scott<br>The Scott Law Firm<br>1375 Sutter Suite 222<br>San Francisco, CA 94109<br>Office: 415-561-9600 | Inmate shot by correctional officer during fight with another inmate on Administrative Segregation exercise yard at Salinas Valley State Prison, CA. | Case settled. | Reviewed documents, wrote report. |
| Little v. Shelby County.<br><br>Case No. 96-252-M1A | U.S. Federal District Court.<br>Western District | Defense<br>Shelby County (Memphis)<br><br>Kathleen Spruill<br>Shelby County Attorney's Office<br><br>Donnie Wilson, Chief County Attorney | 1983 conditions of confinement case focusing on inmate on inmate violence in county jail. Consent decree entered 1997, county found in contempt 12/00. | Defendants released from court supervision in 2005. | Hired 03/01 as consultant to assist county in improving jail conditions, meeting terms of consent decree. Testified in court as expert for county. Then served as Court expert. |

3

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Torrez v. Terhune<br><br>Case No. 02AS00716 | Superior Court of the State of California IN and for County of Sacramento | Plaintiff<br><br>Roger Naghash<br>4400 Mac Arthur Blvd.<br>Suite 900<br>Newport Beach, CA 92660<br><br>Office: 9499955-1000 | Shooting death of inmate Torrez during a fight between Hispanic and Asian inmates at High Desert State Prison. | Case settled | Reviewed documents, wrote report. |
| Mack v. Oakland PD<br><br>Case No. C-00-4599-CAL | U.S. District Court Northern District of California | Plaintiff<br>Rodney Mack, et al.<br>John Burris, Esq.<br>1212 Broadway Street,<br>Suite 1200<br>Oakland, CA 94612<br>Office: 5510-839-5200 | Allegations of police misconduct. Over 100 criminal defendants wrongly sentenced. | Stipulated settlement agreement approved by court. | Review documents, drafted consent decree, wrote report (Referred to as "The Riders" case. |
| Xavier v. San Francisco Police Department | U.S. District Court Northern District of California | Plaintiff<br><br>Harriet Ross, Esq.<br>One Sansome Street<br>Suite 2000<br>San Francisco, CA | Allegations of excessive force while incarcerated in San Francisco jail. | Judgment in favor of defendant. | Wrote report, deposed, testified. |
| Duran v. State of California<br><br>Case No. GIC 753709 | California Superior Court County of San Diego | Plaintiff<br><br>John Houston Scott<br>The Scott Law Firm<br>1375 Sutter Suite 222<br>San Francisco, CA 94109<br>Office: 415-561-9600 | Inmate stabbed in kitchen of CDC prison. | Case settled. | Reviewed documents. |
| Karr v. Roseville PD | | Plaintiff<br><br>Jeff Klink<br>9976 Falcon Meadow Dr.<br>Elk Grove, CA 95624<br>Office: 916-686-1488 | Wrongful death claim for the shooting of mentally disturbed man living in a storage unit. | Case settled. | Reviewed documents, wrote report. |
| Fernandez v. San Francisco Police Department | | Plaintiff<br>Andrew Schwartz<br>Casper, Meadows & Schwartz<br>2121 N. California Blvd. Ste. 1020<br>Walnut Creek, Ca 94560<br>Office: 925-947-1147 | Plaintiff was inmate in County jail. Deputy had sexual relationship with Plaintiff in jail. | Judgment for defense. | Reviewed documents, prepared declaration. |

4

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Sheppard v. San Francisco Police Department<br><br>Case No. C 01-3424-PJH | United States District Court Northern District of California | Plaintiff<br><br>Harriet Ross<br>One Embarcadero Center<br>Ste. 500<br>San Francisco, CA 94111 | Excessive force claim pursuant to arrest. | Judgment for Defense. | Reviewed documents, wrote report. |
| ILWU v. OPD Crowd Control Case | | Plaintiff<br><br>James Chanin<br>3050 Shattuck Ave.<br>Berkeley, CA 94705<br>Office: 510-848-4752 | Claim against Oakland PD for shooting people with multiple baton rounds, sting ball grenades, etc. during anti-war demonstration. | $4.5 million dollar settlement to Plaintiff Scott Olsen. | Assisting in preparation of model crowd control policy pursuant to seeking a consent decree. |
| Agredano v. County of San Bernardino<br><br>SCVSS 098984 | San Bernardino Superior Court | Plaintiff<br><br>David Martinez, Esq.<br>Robins, Kaplan, Miller & Ciresi, LLP<br>2049 Century Park E., Ste 3400 Los Angeles, CA 90067 Office: 310-552-0130<br>Fax: 310-229-5800 | Inmate with long mental health and suicidal history hung himself from the top bunk. Inmate's family sued for failure to provide adequate medical care. | Case settled. | Reviewed documents. |
| Watson v. Livermore PD<br><br>Case No. C-02-2830-WHA | United States District Court Northern District of California | Defense<br>John L. Burris, Esq./State Bar #69888<br>Law Offices of John L. Burris<br>7677 Oakport St. Ste 1120<br>Oakland, CA 94621<br>Office: 510-839-5200 | Claim of racial profiling by African American couple driving through Livermore. | Case settled. | Wrote curriculum for policy training regarding "minority issues with policy", per settlement agreement. |
| White v. Brown<br><br>Case No. CIV F-02-5939 OWW SMS | United States District Court Eastern District of California | Plaintiff<br><br>Stephen Horvath, Esq.<br>200 East Del Mar Blvd. Ste 202<br>Pasadena, Ca 91105 | Civil rights case brought by family of inmate who died after a staff use of force against him at Corcoran State Prison in California. | Case settled. | |
| Adam Burke v. Garfield County Sheriff's Department, et al.<br><br>Case No. 08-cv-00140 | U.S. District Court District of Colorado | Plaintiff<br>Andrea L. Blanscet<br>Irwin & Boesen, PC<br>501 S. Cherry St. Ste 500<br>Denver, CO 80246<br>Office: 303-322-2531 | Mr. Burke sued alleging that while he was in the Garfield County Jail, he was subject to excessive force including being shot in the testicles with a pepper ball gun, placed in a restraint chair and injured permanently. | | Reviewed documents, wrote report. |

5

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Anditon v. Priest & Lamarque<br><br>Case No. C02-3703 MMC | U.S. District Court Northern District of California | Plaintiff<br>Bill Orrick, Esq.<br>Coblentz, Patch, Duffy & Bass<br>2049 1 Ferry Bldg, Ste 200<br>San Francisco, Ca 94111<br>Office: 415-752-6809<br>Office: 415-772-5712 | Mental health inmate at California's Salinas Valley State Prison sued for excessive force after he was sprayed with OC and then injured by baton strikes from officers. | Case settled. | Reviewed documents, wrote report. |
| Freeman v. Alameda County<br><br>Case No. C04-1698 SI | U.S. District Court Northern District of California | Plaintiff<br>Frank S. Moore<br>1374 Pacific Ave<br>San Francisco, Ca 94109<br>Office: 415-292-6091 | Suit alleged deliberate indifferences and failure to protect after homeless, mental health inmate was beaten to death by his cellmate in the Santa Rita (Alameda Co.) CA, jail. | Case settled. | Reviewed documents and consulted. |
| Cingle, Guardian for Luethke v. Nebraska<br><br>Case No. BC295053 | District Court of Lancaster County, Nebraska | Defense<br>Assistant Attorney General<br>Stephanie Caldwell<br>2115 State Capitol<br>Lincoln, NE 68509<br>Office: 402-471-2862 | Inmate was beaten to death in a multiple occupancy cell at Diagnostic and Reception Facility in Nebraska. | Judgment for defense. | Wrote report, deposed; testified at trial. |
| Gavira v. LA County Sheriff<br><br>Case No. BC2955053 | LASC – Central District | Defense<br>Timothy J. Kral<br>Manning & Marder, Kass, Ellrod, Ramirez, LA California Office:<br>213-624-6900<br>Fax: 213-624-6999 | Family members sued for negligence, deliberate indifference in the failure to provide medical/mental health treatment and for excessive force in the suicide by hanging of a jail inmate. | Settled. | Reviewed documents. |
| Porras & Grigsby, et al. v. Los Angeles County<br><br>Case No. CV04-1229 ABC | USDC CV04-1229 RGK (RNBX) | Defense<br>Timothy J. Kral<br>Manning & Marder, Kass, Ellrod, Ramires<br>801 S. Figueroa Ste. 15<br>Los Angeles, Ca 90017<br>Office: 213-624-6900<br>Fax: 213-624-6999 | 1983 class action suit; deliberate indifference providing medical services; general failure to provide inmates access to adequate medical services and 14th and 18th amendment violations regarding health care, sanitation and access to council. | Settled. | Reviewed documents. |
| Ferrel v. City of Santa Rosa<br><br>Case No. SCV 237557 | Superior Court of the State of California | Plaintiff<br>Eric G. Young<br>141 Stony Circle Ste. 202<br>Santa Rosa, Ca 95401<br>Office: 707-575-5005 | Plaintiff alleges excessive and unnecessary force by Santa Rosa Police Department. | Case settled. | Reviewed documents, deposed. |

6

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Baker v. State of Nebraska<br><br>Docket No. 1044 545 | District Court of Douglas County, Nebraska | Defense<br>Ms. Maureen Hannon, Ms. Stephanie A. Caldwell, Assistant Attorneys General<br>2115 State Capitol<br>Lincoln, NE 68509 | Couple sued state for negligence after inmate escaped and invaded their home, injured them. | Case settled in 2008. | Wrote report. |
| Harris v. Grams, et al.<br><br>Case No. 07-CV-678 | United States District Court for the Western District of Wisconsin | Plaintiff<br>Pamela McGillivray and Carlos Pabellon<br>Garvey, McNeil & McGillivray, S.C.<br>634 W. Main St. Ste 101<br>Madison, WI 53703<br>Office: 608-256-1003 | Inmate sued for deliberate indifference in denying medical treatment and for retaliation. | Settled. | Reviewed documents, wrote report, deposed. |
| Trina S. Garcia v. Zavares, et al.<br><br>Case No. 1:08-CV-02780 | U.S. District Court, District of Colorado | Plaintiff<br>Andrea L. Blanscet<br>Irwin & Boesen<br>501 S. Cherry St. Ste 500<br>Denver, CO 80246<br>Office: 303-322-2531 | Ms. Garcia was an inmate in the CO DOC who was coerced into sex by a male staff member who was supervising her and was also having sex with at lease three other female inmates. | | Reviewed documents, wrote report. |
| David Ramirez v. County of Los Angeles, et al.<br><br>Case No. CV-08-2813 | U.S. District Court Central District of California, Western Division | Plaintiff<br>Navid Sulimani & Adam J. Rottenberg<br>Proskauer Rose, LLP<br>2049 Century Park East Ste. 3200<br>Los Angeles, CA 90067<br>Office: 310-284-4541 | Mr. Ramirez was an inmate at Men's Central Jail and sued for injuries as a result of "serial extraction" of segregation unit. | Verdict for Defense. | Reviewed documents; wrote report; deposed; testified at trial. |
| Troy Short v. AJ Trujillo, et al.<br><br>Case No. 08-CV-02209 | U.S. District Court, District of Colorado | Plaintiff<br>Jared B. Briant & Spencer B. Ross<br>Faegre & Benson, LLP<br>1700 Lincoln St. Ste 3200<br>Denver, CO 80203<br>Office: 303-607-3500 | Mr. Short was an inmate in the CO DOC and was harassed, threatened and beaten by gang related inmates. He sued for failure to protect him. | Case settled. | Reviewed documents, wrote report, deposed. |
| Shannon Bastedenbeck v. Zavaras, et al.<br><br>Case No. 08-CV001841 | U.S. District Court District of Colorado | Plaintiff<br>Andrea L. Blanscet<br>Irwin & Boesen<br>501 S. Cherry St. Ste 500<br>Denver, CO 80246<br>Office: 303-322-2531 | Ms. Bastedenbeck was an inmate in the CO DOC and was coerced into sexual relation by a Lieutenant. She sued Department Administrators and Supervisors for damages. | | Reviewed documents, wrote report. |

7

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Oscar Garay, Jr., by Kelly Sue Garay v. Hamblen County Tennessee

Case No. 2:11-CV-00128 | U.S. District Court Eastern District of Tennessee | Plaintiff
Robert Bates
Law Offices of Tony Seaton
118 E. Watauga Ave.
Johnson City, TN 37601
Office: 423-282-1041 | Mr. Garay died as a result of a seizure while in a restraint chair in the Hamblen County Jail. His estate sued for failure to provide medication, medical treatment and for other causes. | Case settled. | Reviewed documents, wrote initial and supplemental report, deposed. |
| Jeffrey Marshall v. Deputy Castro, et al.

Case No. S:04-1657 | U.S. District Court Eastern District of California | Plaintiff
Scotia J. Hicks, Yelitza V. Dunham & Craig Crockett
Winston & Strawn, LLP
101 California St.
San Francisco, CA 94111
Office: 415-591-1000 | Mr. Marshall sued for unnecessary and excessive force on the part of Deputies in the Solano County, Ca Jail. | Case settled. | Reviewed documents, wrote initial and supplemental report, deposed. |
| Laura Lobozzo v. Colorado Department of Corrections, et al.

Case No. 08-CV-01829 | U.S. District Court Western District of Michigan, Southern Division | Plaintiff
Andrea L. Blanscet
Irwin & Boesen
501 S. Cherry St. Ste 500
Denver, CO 80246
Office: 303-322-2531 | Laura Lobozzo was threatened and coerced into a sexual relationship by a male correctional officer while she was an inmate in the CO DOC.  She sued for damages. | | Reviewed documents, wrote report. |
| Estate of John Ketchapaw v. County of Ottawa, et al.

Case No. 1:10-cv-320 | U.S. District Court Western District of Michigan, Southern Division | Plaintiff
Neal J. Wilensky
Kaechele & Wilensky, PC
6500 Centurion, Ste 230
Lansing, MI 48917
Office: 517-853-1940 | John Ketchapaw committed suicide. Plaintiff sued for damages based on Defendants alleged failure to appropriately screen Mr. Ketchapaw for suicide risk and to take appropriate preventative actions. | Case settled. | Reviewed documents, wrote report. |
| Don Antoine v. County of Sacramento

Case No. 2:06-CV-01349 | U.S. District Court Eastern District of California | Plaintiff
John Houston Scott
The Scott Law Firm
1375 Sutter St. Ste 222
San Francisco, CA 94109
Office: 415-561-9600 | Mr. Antoine sued for damages alleging that several deputies had entered his cell, used excessive force, seriously injured him and then chained his handcuffs and leg shackles to the toilet drain grate in the cell floor and left him. | On appeal. | Wrote report; deposed; testified at trial. |

8

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Anthony Ferrel, et al. v. City of Santa Rosa, et al.<br><br>Case No. SCV-237557 | Superior Court State of California County of Sonoma | Plaintiff | Plaintiff and family members sued alleging that City of Santa Rosa police officers used excessive force in tasering, beating and pointing firearms at Mr. Ferrel and family members. | Case settled. | Reviewed documents, wrote report, deposed. |
| Krenn v. County of Santa Clara, et al.<br><br>Case No. C07-2295 | U.S. District Court Northern District of California | Defense David Sheuerman of Sheuerman, Martini & Tabari, PC 1033 Willow St. San Jose, CA 95125 Office: 408-288-9700 | Andrew Martinez, a frequent mental health inmate in the Santa Clara County Jail, committed suicide in the jail in May 2006. His mother subsequently sued for failure to prevent the suicide. | Case settled. | Reviewed documents, wrote report. |
| Snyder & Santoro v. City and County of San Francisco<br><br>Case No. 03-04927 | U.S. District Court Northern District of California | Plaintiff John Houston Scott The Scott Law Firm 1375 Sutter St. Ste 222 San Francisco, CA 94109 Office: 415-561-9600 | Mr. Snyder and Mr. Santoro alleged that they were walking out of a restaurant when two off duty SF police officers savagely beat them because they were gay.  (Case referred to in SF as "Fajita – gate".) | Case settled. | Provided declaration on police Early Warning Systems, Progressive Discipline Systems, Effective Police Supervision, etc. |
| Daniel Duran v. State of California, et al.<br><br>Case No. GIC753709 | State of California San Diego Superior Court | Plaintiff Suzie Moore Law Offices of Suzie Moore 1901 First Ave. Ste 227 San Diego, CA 92101 Office: 619-231-9490 | Mr. Duran sued after he was attacked and stabbed repeatedly by several other inmates at Centinela State Prison. | Case settled. | Reviewed documents, wrote report, deposed. |
| Lynette Frary (Carmignani) v. County of Marin (City of Novato)<br><br>Case No. C-12-3928-MEJ | United States District Court Northern District of California | Plaintiff David L. Fiol, Attorney at Law Brent, Fiol, & Nolan LLP Two Embarcadero Center, 18th Floor San Francisco, CA 94111 | Inmate died in custody from opiate overdose resulting from ingesting morphine pills prior to booking. | Settled | Received documents |
| Lawrence Carty v. John Dejongh (US Virgin Islands)<br><br>Case No. 94-78 | District Court of the Virgin Islands Division of St. Thomas and St. John | Appointed by Federal Court as the Court's Security Expert. The Honorable Judge Stanley S. Brotman. | Long-standing consent decree over conditions of confinement at two jails on St. Thomas, USVI. | Consent Decree ongoing | Conducted security audit, wrote report, testified on two occasions at Federal Court hearings in USVI. |

9

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| LaShawn Jones, et al., v. Marlins Gusman, Sheriff, Orleans Parish, et al.<br><br>Case No. 2:12-cv-00859 | United States District Court Eastern District of Louisiana | Plaintiff<br>Katie Schwartzman<br>Director, Louisiana Office<br>Southern Poverty Law Center<br>1055 St. Charles Ave., Suite 505<br>New Orleans, LA 70130 | Class action suit over conditions of confinement in the New Orleans jails, jointly litigated by Southern Poverty Law Center and Special Litigation Section of Civil Rights Division of US DOJ. | Consent decree entered. | Conducted security audit of New Orleans jail facilities, wrote report, testified at hearing over consent decree. |
| Nathaniel L. Jackson v. Perry Phelps<br><br>Case No. 10-919-SLR | United States District Court District of Delaware | Plaintiff<br>Erika Caesar<br>Young Conawa Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801 | Inmate alleges cruel and unusual punishment for being placed in full restraints, left in cell for 24 hours in underpants as punishment for flooding cell. | Settled | Wrote report, deposed. |
| Ronald E. Johnson v. Douglas Weber<br><br>Case No. CIV-12-4084 | United States District Court District of South Dakota Southern Division | Plaintiff<br>John Burke<br>Thomas Braun Bernard & Burke, LLP<br>4200 Beach Drive Suite 1<br>Rapid City, SD 57702 | Civil Rights suit by wife of Correctional Officer who was beaten to death in an escape attempt by two inmates at South Dakota state prison. | Dismissed pursuant to Defense motion. | Wrote report, deposed. |
| Aleshia Cyrese Henderson v. Stanley Glanz, Sheriff<br><br>Case No. 12-cv-68-TCK-FHm | United States District Court Northern District of Oklahoma | Defense<br>Guy Fortney, Esq.<br>Corbin Brewster, Esq.<br>Law Offices of Brewster & DeAngelis, P.L.L.C.<br>2617 East 21st Street<br>Tulsa, OK 74114 | Female inmate sues Sheriff for damages after she alleged rape by male inmate in medical area of jail. | Settled | Wrote report, deposed. |
| LaDona Poore v. Stanley Glanz, Sheriff<br><br>Case No. 11-cv-797-CVE-TLW | United States District Court Northern District of Oklahoma | Defense<br>Guy Fortney, Esq.<br>Corbin Brewster, Esq.<br>Law Offices of Brewster & DeAngelis, P.L.L.C.<br>2617 East 21st Street<br>Tulsa, OK 74114 | Former adolescent female inmate sues Sheriff alleging rape and other sexual assaults by male correctional officer. | $25,000 verdict for Plaintiff.  On appeal. | Wrote report, deposed. |
| Linsey Dawn Shaver v. Stanley Glanz, Sheriff<br><br>Case No. 12-Cv-234-CVE-PJC | United States District Court Northern District of Oklahoma | Defense<br>Guy Fortney, Esq.<br>Corbin Brewster, Esq.<br>Law Offices of Brewster & DeAngelis, P.L.L.C.<br>2617 East 21st Street<br>Tulsa, OK 74114 | Female adolescent inmate sues Sheriff alleging sexual misconduct by male correctional officer in medical area of jail. | Pending | Wrote report. |
| Jeffrey Trevillion v. Stanley Glanz, Sheriff<br><br>Case No. 12-CV-146-JHP-TLW | United States District Court Northern District of Oklahoma | Defense<br>Guy Fortney, Esq.<br>Corbin Brewster, Esq.<br>Law Offices of Brewster & DeAngelis, P.L.L.C.<br>2617 East 21st Street<br>Tulsa, OK 74114 | Male inmate sues Sheriff over failure to provide wheel chair, excessive use of force and failure to provide medications. | Settled | Reviewed documents |

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| CRIPA Investigation of Violence Issues Effecting Male Adolescent Inmates on Rikers Island<br><br>Case No. 11-Cv-5845 | United States District Court Southern District of New York | Plaintiff<br>Emily A. Daughtry<br>Jeffrey K. Powell<br>Assistant United States Attorneys<br>US Department of Justice<br>Southern District of New York<br>86 Chambers St.<br>New York, NY 10007 | CRIPA investigation of staff use of force and inmate-on-inmate violence involving male adolescent inmates on Rikers Island. | Formal agreement reached under Federal Court Supervision | Reported to US Attorney's Office following assessment of condition for juveniles on Rikers. Participated in drafting/negotiating consent decree. |
| Marvin Hunter v. Jerome Wilen,<br><br>Case No. | United States District Court Western District of Washington at Tacoma | Plaintiff<br>Fred Diamondstone<br>1218 Third Ave., Suite 1000<br>Seattle, WA 98101 | Inmate in Washington DOC has filed suits in State and Federal Court alleging he was assaulted by prison gang because Department wrongfully published information that he was a confidential informant then refused him protective custody or transfer. | Settled | Wrote report, deposed. |
| Michael Miceli v. Marlin Gusman, Sheriff<br><br>Case No. 09-8078 | United States District Court Eastern District of Louisiana | Plaintiff<br>Mary E. Howell<br>316 S. Dorgenois St.<br>New Orleans, LA 70119 | Suicidal female inmate died in custody as a result of being placed in 5-point restraints on her back for 4 hours and staff using force to hold her down. | Settled | Received documents |
| Margaret Goetzee Nagle and John Eric Goetzee v. Marlin Gusman, Sheriff<br><br>Case No. 12-1910 | United States District Court Eastern District of Louisiana | Plaintiff<br>Mary E. Howell<br>316 S. Dorgenois St.<br>New Orleans, LA 70119 | Widow of Coast Guard Commander sues Sheriff, Sheriff's employees, after her husband commits suicide on the tenth floor, mental health unit of the House of Detention. | Settled | Wrote report, deposed. |
| Jesse Goode v. County of Genesee<br><br>Case No. 12-10340 | United States District Court Eastern District of Michigan Southern Division | Plaintiff<br>Neal Wilensky<br>6005 W. St. Joseph, Suite 303<br>Lansing, Michigan 48917 | Inmate died as a result of opiate overdose ingested while in custody in the Genesee County Jail. | Settled | Wrote report, deposed. |
| Thomas Gould v. Board of County Commissioners of Major County<br><br>Case No. CIV-11-290-M | United States District Court Western District of Oklahoma | Plaintiff<br>Michael E. Grant<br>Musser, Kouri, Bentwood & Grant<br>114 E. Sheridan, Suite 102<br>Oklahoma City, OK 73104 | Wife arrested for possession when went to visit her husband in jail. Wife subsequently committed suicide by hanging in jail. | Dismissed pursuant to Defense motion. | Wrote report, deposed. |

11

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Phillip Morris, Jr. v. R. A. White, et al.<br><br>Case No. CV-08-02823-DOC (SSx) | United States District Court Central District of California | Plaintiff<br>Katherine A. Rykken<br>Latham & Watkins, LLP<br>355 South Grand Ave<br>Los Angeles, CA 90071 | Inmate in California Department of Corrections sued alleging excessive force by staff after inmate ran from two officers and across exercise yard. | Settled | Wrote report. |
| Cook County<br><br>Case No. 13 CV 8752 | United States District Court<br><br>Northern District of Illinois | Plaintiff<br>Sheila Bedi, Esq.<br>David Shapiro, Esq.'<br>McCarther Justice Center, Northwestern University Law School | A class action suit against the Cook County Jails focusing on staff use of force and inmate-on-inmate violence. | Case dismissed on motion by circuit court. | Wrote report; deposed testified at hearing. |
| Pickens v Management Training Corp | In The United States District Court For the Southern District of Mississippi Northern Division | Plaintiff<br>Yancy B. Burns<br>Burns & Associates, PLLC<br>P.O. Box 16409<br>Jackson, MS 39236 | Inmate lost one eye after stabbed and beaten in riot/gang war at private prison is MS. | Settled | Wrote report |
| Rosales v State of Nebraska<br><br>Case No. CI 13-717 | District Court of Lancaster County, Nebraska | Defense<br>Bijan Koohmaraie<br>Assistant Attorney General<br>Nebraska Department of Justice<br>2115 State Capitol<br>Lincoln, Nebraska 68509 | Plaintiff suffered brain damage as result of assault by another inmate.  Plaintiff sued state for failure to protect. | Verdict for Defense | Testified at trial. |
| Christopher Shapard v. John Attea, et al.<br><br>Case No. 08-CV-6146 (CJS) | United States District Court Western District of New York | Plaintiff<br>Luke X. Flynn-Fitzsimmons<br>Paul, Weiss, Rifkind, Wharton & Garrison, LLP<br>1285 Avenue of the Americas<br>New York, NY 10019 | Plaintiff was inmate at Wende Correctional Facility in N.Y. DOC. Plaintiff alleges that three correctional officers beat him as retaliation. | Verdict for Defense | Wrote report; deposed. |
| Anthony Josta v. Woodbury County<br><br>Case No. 13-97-0060 | In The United States Disctrist Court Northern District of Iowa Western Division | Plaintiff<br>John f. Carroll, RN, JD<br>Attorney<br>2809 S. 160th Street, Suite 409<br>Omaha, NE 68130 | Plaintiff died due to alcohol withdrawal while he was in the Woodbury County, Iowa, Jail. | Settled | Wrote report. |
| Anita Arrington-Bey, Administration of the Estate of Omar K. Arrington-Bey<br>v. City of Bedford Heights, et al.<br><br>Case No. 1:14-CV-02514 | Court of Common Pleas<br>Cuyahoga County, Ohio | Plaintiff<br>Jacqueline Green<br>Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, OH 44113 | Plaintiff died in custody in the Bedford Heights, Ohio, jail following his placement in a restraint chair after he assaulted two officers in the jail. | Settled | Wrote report, deposed. |
| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |

12

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Kelly Conrad Green v. Corizon Health, Inc.<br><br>Case No. 42 USC 1983 | United States District Court for the District of Oregon Eugene Division | Plaintiff<br>Elden M. Rosenthal<br>121 S.W. Salmon St, Suite 1090<br>Portland, OR 97204 | Plaintiff sued for failure to protect and failure to provide adequate medical services after he sustained permanent injuries. | Settled | Reviewed documents. |
| Farris v. Island County<br><br>Case No. 15-I05352 | Case settled before filing | Plaintiff<br>Rebecca J. Roe<br>Schroeter Goldmark Bender<br>810 Third Avenue, Suite 500 Seattle, WA 98104 | Inmate died of dehydration and malnutrition while in custody for 11days in the Island County, WA Jail. | Settled | Reviewed documents. |
| Meirs v. Ottawa County<br><br>Case No. 1:15-cv-00866 | United States District Court Western District of Michigan | Plaintiff<br>Steven T. Budaj<br>Goodman & Hurwitz, PC.<br>1394 E. Jefferson Ave. Detroit, MI 48207 | Inmate committed suicide while in custody in Ottawa County, MI, jail. | Verdict for defense | Wrote report; deposed; testified at trial. |
| Brian Otero v. Thomas J. Dart, Sheriff of Cook County<br><br>Case No. 1:12-dv-03148 | United States District Court for the Northern District of Illinois – Eastern Division | Plaintiff<br>Jacie Zolna, Esq.<br>Myron M. Cherry & Associates, LLC<br>30 North La Salle St., Suite 2300<br>Chicago, Illinois 60602 | Class action suit alleging male prisoners in Cook County Jail held unnecessarily, endangered and treated differently than female prisoners after "not guilty" verdict. | Settled | Wrote report; deposed. |
| Glover v. Jayson Vest, et al.<br><br>Case No. CIV-14-936-F | In the United States District Court for the Western District of Oklahoma | Plaintiff<br>Rachel S. Fields<br>Atkinson, Haskins, Nellis, Brittingham, Gladd & Fiasco, P.C.<br>525 South Main<br>Tulsa, OK 74103 | Staff sexual misconduct. Rape of female inmate in Harmon Co., OK jail by Deputy Chief of Police of Hollis, OK Police Department. | Jury award of 6.5 million dollars to Plaintiff | |
| Wilmer Catalan-Ramirez v. Ricardo Wong, Field Office Director, Chicago, U.S. Immigration and Customs Enforcement, et al. | District Court for the Northern District of Illinois Easter Division | Plaintiff<br><br>Sheila Bedi, Esq.<br>David Shapiro, Esq.'<br>McCarther Justice Center, Northwestern University Law School | Handicapped Plaintiff was being transported in restraints without a seatbelt. | | Testified by phone at Preliminary hearing |
| Donnie Ray Brown, et al. v. Conmed Healthcare Management, Inc., et al.<br><br>Case No. 6:14-cv-01620-TC | United States District Court District of Oregon Eugene Division | Plaintiffs<br><br>Benjamin W. Haile Attorney at Law<br>P.O. Box 2581<br>Portland, OR 97208 | Failure to provide medical treatment. Inmate in Coos Bay County, OR, jail died after failure to treat him for a perforated ulcer and peritonitis. | Settled | Wrote report and supplemental report. |
| Matthew Allen v. State of Oregon, et al.,<br><br>Case No. 3:11-CV-0218-PK | United States District Court District Court of Oregon Portland Division | Plaintiffs<br><br>Benjamin W. Haile Attorney at Law<br>P.O. Box 2581<br>Portland, OR 97208 | Failure to protect (inmate-on-inmate gangs). Inmate in OR State Prison beaten by former gang after requesting protection. | Settled after state stipulated to liability on all three counts. | Reviewed documents. |

13

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Chris Blevins, et al. v. Marlin N. Gusman and Orleans Parish Sheriff's Office<br><br>Case No. 2013-04979 | Civil District for the Parish of Orleans State of Louisiana | Plaintiff<br>Suzette Bagneris<br>The Bagneris Firm, LLC<br>4919 Canal Street, Suite 104<br>New Orleans, Louisiana 70119 | Failure to protect (inmate-on-inmate gangs). Male inmate stabbed to death in New Orleans Parish jails. | Settled | Reviewed documents. |
| Hamilton v. Correctional Health Care Management, Inc, et.al.<br><br>Case No. CIV-09-544-M | In the United States District Court for the Western District of Oklahoma | Plaintiff<br>Venessa Brentwood Durbin, Larimore & Bialick<br>920 N. Harvey<br>Oklahoma City, OK 73102 | Failure to provide medical treatment. Inmate died after staff use of force, lengthy time in restraint chair at the Oklahoma County Detention Center | Settled. | Wrote report; deposed. |
| The Estate of Joice Howard v. County of Genesee, et al.<br><br>Case No. 14-12350 | **Cannot find Complaint** | Plaintiff<br>Neal Wilensky<br>6005 W. St. Joseph, Suite 303<br>Lansing, Michigan 48917 | Failure to provide medical treatment. Female inmate in Genessee Co., MI, jail had high blood pressure and gran malseizures. Got no medication and died. | Settled | Wrote report. |
| Katka v. State of Montana, el. al.<br><br>Case No. BDV-2009-1163 | Montana First Judicial District Court Lewis and Clark County | Plaintiff<br>Andree Larose<br>Morrison, Motl & Sherwood, PLLP<br>401 N. Last Chance Gulch<br>Helena, MT 59601 | Juvenile held in high security at Montana State Prison. Conditions of confinement, failure to provide treatment. | Settled | Wrote report. |
| James Joshua Mayfield, et al. v. Orozco et al.<br><br>Case No. 2:13-CV-02499-JAM-AC | United States District Court Eastern District of California, Sacramento Division | Plaintiff<br>Josh Piovia-Scott<br>Hadsell Stormer Renick, LLP<br>128 North Fair Oaks Avenue<br>Pasadena, CA 91103 | Failure to protect (suicide attempt). | Settled. | Wrote report. |
| James Merchant v. Woodbury County, et al.<br><br>Case No. 7C16-CV-4111 | | Plaintiff<br>John F. Carroll<br>Watson & Carroll PC LLO<br>2809 S. 160th Street, Suite 409<br>Omaha, NE 68130-1755 | Failure to provide medical treatment at the Woodbury Co., IA, jail. Inmate's stroke-like symptoms disregarded, inmate suffered permanent and profound impairment. | Settled | Wrote report. |
| Glenda Millington v. Corrections Corporation of American, et.al.<br><br>Case No. 10-CIV-650-L | The United States District Court for the Western District of Oklahoma | Plaintiff<br>Steven J. Terrill<br>Bryan & Terrill Law, PLLC<br>401 S. Boston, Suite 2201<br>Tulsa, OK 74103 | Failure to protect inmate-on-inmate gangs. Inmate at Cinnarron, private prison in Oklahoma, badly beaten in gang incident. Permanent, serious brain damage. | Settled | Wrote report and declaration; deposed. |
| Williams v. Williams, et al. | In the United States District Court for the Central District | Plaintiff<br>Leila Azari<br>Latham & Watkins, | Inmate in L.A. Co. jails, at IRC, was in wheel chair and alleged | Settled. | Wrote report; deposed; retained as rebuttal witness. |

14

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Case No. CV08-7958-JVS | of California | LLP<br>355 South Grand Ave<br>Los Angeles, CA 90071 | unnecessary staff use of force | | |
| People of the State of New York v. Anthony Criscuolo<br><br>Case No. 2055-2013 | Supreme Court of the State of New York County of Bronx | Plaintiff<br>Steven A. Metcalf II, Esq.<br>The Metcalf Law Firm, PLLC<br>11 Broadway, Suite 615<br>New York, New York 10004 | Motion to set aside. Guilty plea as a result of pre-trial conditions. | | Took case pro bono; provided declaration. |
| Jon Watson v. Cumberland County, et al.<br><br>Case No. 1:16-cv-06578-JHR-AMD | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Law Offices of Conrad Benedetto<br>*Conrad Benedetto*<br>323 East Front Street<br>Media, Pa. 19063 | Suicide in the Cumberland County New Jersey Jail | Pending | Wrote report; deposed. |
| David Hennis v. Cumberland County, et al.<br><br>Case No. 1:16-cv-04216 | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Law Offices of Conrad Benedetto<br>*Conrad Benedetto*<br>323 East Front Street<br>Media, Pa. 19063 | Suicide in the Cumberland County New Jersey Jail | Pending | Wrote report |
| Alissa Allen v. Cumberland County, et al.<br><br>Case No. 1:15-CV-06273-JBS-AMD | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Law Offices of Conrad Benedetto<br>*Conrad Benedetto*<br>323 East Front Street<br>Media, Pa. 19063 | Suicide in the Cumberland County New Jersey Jail | Pending | Wrote report. |
| Estate of Megan Moore, et al, v. Cumberland County<br><br>Case No. 17-cv-2839-RBK-KMW | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Law Offices of Conrad Benedetto<br>*Conrad Benedetto*<br>323 East Front Street<br>Media, Pa. 19063 | Suicide in the Cumberland County New Jersey Jail | Pending | Reviewed documents. |
| Estate of David Conroy et al, v. Cumberland County<br><br>Case No. 1:17-cv-07183-RBK-AMD | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Law Offices of Conrad Benedetto<br>*Conrad Benedetto*<br>323 East Front Street<br>Media, Pa. 19063 | Suicide in the Cumberland County New Jersey Jail | Pending | Reviewed documents. |
| (Johnson, Lamar) Adrienne Lewis, by and on behalf of the minor child Liya Alexandria Johnson v. East Baton Rouge Parish, et al.<br>Case No. 16-352-JWD-RLB | United States District Court Middle District of Louisiana | Plaintiff<br>The Claiborne Firm, P.C.<br>David J. Utter, Esq.<br>410 E. Bay Street<br>Savannah, GA 31401 | Suicide in the East Baton Rouge Parish Jail | Settled | Wrote report. |

| Case Name & Number | Court | Retained By | Summary of Case | Disposition | Participation |
|---|---|---|---|---|---|
| Jonathan Fano v. East Baton Rouge Parish, et al.<br><br>Case No. 3:17-cv-00656-SDD-EWD | United States District Court Middle District of Louisiana | Plaintiff<br>The Claiborne Firm, P.C.<br>David J. Utter, Esq.<br>410 E. Bay Street<br>Savannah, GA 31401 | Suicide in the East Baton Rouge Parish Jail by mentally ill male inmate. | Pending | Reviewed documents. |
| Frazier, Tayo<br><br>Case No. 16-cv-2364 | United States District Court for the Central District of Illinois Urbana Division | Plaintiff<br>Shayla Maatuka<br>Dodd & Maatuka<br>303 S. Mattis Ave, Suite 201<br>Champaign, IL 61821 | Failure to provide medical services to female inmate going through withdrawal in Champaign Co. Jail. Inmate died. | Pending | Wrote report; deposed. |
| Cordell Johnson v. Correctional Corporation of America, et al.<br><br>Case No. CIV-16-1061-R | In the United States District Court for the Western District of Oklahoma | Plaintiff<br>Bryan & Terrill<br>Spencer Bryan<br>Steven Terrill<br>9 East Fourth Street, Suite 307<br>Tulsa, Oklahoma 74103 | Failure to protect Inmate-on-inmate gang fight/riot in Cimmaron CCA operated private prison in OK. Inmate stabbed and permanent injuries. | Settled | Wrote report |
| Steve Tiffee, as Special Administrator for the Estate of Kyle Tiffee v. Corrections Corporation of America, et al.<br><br>Case No. CJ-2016-378 | In the District Court for Payne County State of Oklahoma | Plaintiff<br>Bryan & Terrill<br>Spencer Bryan<br>Steven Terrill<br>9 East Fourth Street, Suite 307<br>Tulsa, Oklahoma 74103 | Failure to protect. Inmate stabbed seriously injured in riot/gang war at Cimarron CCA operated prison in OK. | Pending | Reviewed documents. |
| Tyson Christian v. Willamette Community Health Solutions<br><br>Case No. 6:17-cv-00885-AA | United States District Court For the District of Oregon Eugene Division | Plaintiff<br>Patrick D. Angel<br>Angel Law PC 6960 SW Varns Street, Suite 110 Portland, OR 97223<br>John T. Devlin<br>Devlin Law, P.C.<br>1212 SE Spokane Street Portland, OR 97202 | Failure to protect alcoholic inmate found unresponsive on floor of jail cell; died. | Settled | Reviewed documents. |
| Jacob Parenti v. County of Monterey; Sheriff Scott Miller<br><br>Case No. 5:14-cv-05481 | United States District Court Northern District of California | Plaintiff<br>Joshua Piovia-Scott, Esq.<br>Hadsell Stormer & Renick, LLP<br>128 North Fair Oaks Avenue<br>Pasadena, CA 91103 | Failure to provide medical care, negligence and wrongful death | Settled | Wrote report; deposed. |
| Estate of Laura Semprevivo, et al, v. Cumberland County<br><br>Case No. 17-cv-2839-RBK-KMW | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Conrad Benedetto<br>Attorney at Law<br>Law Offices of Conrad J. Benedetto<br>1615 S. Broad Street<br>Philadelphia, PA 19148 | Suicide in the Cumberland County, New Jersey Jail | Pending | |

16

| | | | | | |
|---|---|---|---|---|---|
| Madaline Pitkin v. Corizon Health, Inc.<br><br>Case No. 3:16-cv-02235-AA | United States District Court District of Oregon – Portland Division | Plaintiff<br>John Coletti<br>Paulson Coletti<br>1022 NW Marshal, Ste. 450<br>Portland, OR 97209 | Failure to provide appropriate medical care to young female inmate undergoing withdrawal in the Washington County Oregon Jail | Settled for 10 million dollars. | Wrote reports. |
| Rocky Stewart v. Coos County Jail | Complaint not yet filed. | John T. Devlin<br>Devlin Law, P.C.<br>1212 SE Spokane Street Portland, OR 97202 | Failure to provide appropriate medical care | | Reviewed documents |
| Abdiwali Musse v. William Hayes, et al.<br><br>Case No. C18-1736-JCC | United States District Court Western District of Washington at Seattle | Plaintiff<br>Jay Krulewitch<br>2611 N.E. 113th Street, Suite 300<br>Seattle, WA 98125 | Inmate in King Co. Jail attacked and seriously injured while he slept in congregate cell. | Pending | |
| Markist Webb v. Management & Training Corporation<br><br>Case No. 15-CV-029-LE-C | In the Circuit Court of Leake County, Mississippi | Plaintiff<br>S. Todd Jeffreys, Esq.<br>Povall & Jeffreys, P.A.<br>P.O. Box 1199<br>215 North Pearman Ave.<br>Cleveland, MS 38732 | Inmate seriously injured in riot/gang war at privately run proson (Walnut Grove) in MS. | Settled | Reviewed documents. |
| Christopher Thomas Woolverton v. Barry Martin, et al.<br><br>Case No. 2:15-cv-00314-J | United States District Court for the Northern District of Texas Amarillo Division | Plaintiff<br>Ben Haile<br>Attorney at Law<br>P.O. Box 2581<br>Portland, OR 97208 | Fatal abuse of seriously mentally ill inmate who also suffered from medical significant problems, in a Texas State Prison. | Pending | Wrote report; provided declaration. |
| Anthony Huff v. Garfield County Sheriff's Office | | David Donchin, Esq.<br>Durbin, Larimod & Bialick, PC<br>Oklahoma City, Oklahoma | | | |
| Robert W. Lewis v. Cumberland County, et al.<br><br>Case No. 1:16-cv-03503 | In the United States District Court for the District of New Jersey Camden Vicinage | Plaintiff<br>Law Offices of Conrad Benedetto<br>*Conrad Benedetto*<br>323 East Front Street<br>Media, Pa. 19063 | Suicide in the Cumberland County New Jersey Jail | Pending | Wrote report; deposed. |

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

# Appendix C

# Jeffrey A. Schwartz, Ph.D.
## *1610 La Pradera Drive*
## *Campbell, California 95008*

*(408) 379-9400 ♦ FAX (408) 379-9410*
jasletra@aol.com

## *Expert Witness Fee Schedule (01/10/19)*

1.  Document review and other case preparation: $325 per hour

2.  Testimony at deposition or trial: $425 per hour (Minimum charge $1,700 or 4 hours per day)

3.  Airfare, car rental, meals and incidentals on travel status, and other case expenses: Cost reimbursable

4.  Retainer: Agreed to on case by case basis, typically $2,500

5.  Initial case review, typically up to 4 hours: No charge if not retained or if case declined.  Charged at case preparation rate if retained and case accepted.

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwarz; October 14, 2019.

# Appendix D

# Recent Publications
## Jeffrey A. Schwartz

1.  A note on "Verbal and Non-verbal Indicators to Assault"; Corrections.com; May, 2009.
2.  "Planning for the Last Disaster; Correctional Facilities and Emergency Preparedness; Journal of Emergency Management; Volume 7, #1; January/February, 2009.
3.  Reducing Exposure in Use of Force Litigation; Corrections Today; June, 2009.
4.  "The Force Continuum: Is It Worth Keeping? Part 1; Bill Collins, Jeffrey A. Schwartz and Donald Leach; Correctional Law Reporter; December/January, 2011.
5.  "The Force Continuum: Is It Worth Keeping? Part II"; Bill Collins, Jeffrey A. Schwartz and Donald Leach; Correctional Law Reporter; April/May, 2011.
6.  "Come and Get Me! The Best and Worst in Cell Extractions"; American Jails; July/August, 2009.
7.  Turn Around in a Good Jail; Gary Raney and Jeffrey A. Schwartz; American Jails; January/February, 2008.
8.  "Fixing Use of Force Problems"; American Jails, January/February, 2010.
9.  "A Guide to Preparing for and Responding to Jail Emergencies"; Jeffrey A. Schwartz, Ph.D. and Cynthia Barry, Ph.D.; a book-length monograph published by the National Institute of Corrections; 2009.

Appendix E

# List of Documents for Rivera Case

1. GEO Group Use of Force (Bates Stamped GEO 02083).
2. Rivera various video segments (on thumb drive).
3. After-Action Review Report Use of Force/Restraints dated June 12, 2017 (Bates Stamped GEO 02238).  2 pgs.
4. Second Amended Complaint Case No. 5:18-cv-01125-SP.  31 pgs.
5. Exhibit 4: Marked in the deposition of Anthony Reyes Civil Action No. 5:18-cv-01125-R-GJS dated April 30, 2019.  5 pgs.
6. Deposition of Anthony Reyes Civil Action No. 5:18-cv-01125-R-GJS dated April 30, 2019. (Condensed).  82 pgs.
7. Webcam Deposition of Isaac Antonio Lopez Castillo Civil Action No. 5:18-cv-01125-R-GJS dated July 23, 2019.  148 pgs.
8. Deposition of James Janecka Case No. 5:18-cv-01125-SP dated September 4, 2019.  41 pgs.
9. Deposition of Leo Marvin MC Cusker Case No. 5:18-cv-01125-SP dated September 4, 2019.  43 pgs.
10. Exhibit 2: General Incident Report from R. Gillon dated June 12, 2017.  2 pgs.
11. Deposition of Rodrick Gillon Civil Action No. 5:18-cv-01125-R-GJS dated May 13, 2019.  73 pgs.
12. 4.2 Hunger Strikes.  4 pgs.
13. Policy and Procedure Manual Chapter: Security Title: Use of Force No. 10.2.15.  17 pgs.
14. 2.8 Population Counts.  4 pgs.
15. 2.15 Use of Force and Restraints.  14 pgs.
16. Deposition of Lieutenant Jane Lynn Diaz Civil Action No. 5:18-cv-01125-R-GJS dated May 9, 2019.  147 pgs.
17. Exhibit 11: Use of Force/Restraints Report of Lt. Jane Diaz dated June 12, 2017.  2 pgs.
18. Deposition of Officer Frankie Juarez Civil Action No. 5:18-cv-01125-R-GJS dated August 26, 2019 (Condensed).  107 pgs.
19. Exhibit 2: General Incident Report of F. Juarez dated June 12, 2017.  3 pgs.
20. Deposition of Officer Gilbert Martinez Civil Action No. 5:18-cv-01125-R-GJS dated June 14, 2019.  67 pgs.
21. Exhibit 4: General Incident Report of G. Martinez dated June 12, 2017.  3 pgs.
22. Deposition of Officer Rebecca Jindi Civil Action No. 5:18-cv-01125-R-GJS dated June 14, 2019.  38 pgs.
23. Deposition of Sergeant Giovanni Campos Civil Action No. 5:18-cv-01125-R-GJS dated May 8, 2019.  78 pgs.
24. Exhibit 12: General Incident Report of Giovanni Campos dated June 12, 2017.  4 pgs.
25. Incident Summary – SIR035317 dated June 12, 2017.  8 pgs.
26. General Incident Report of Alvaro Lanuza dated June 12, 2017 (Bates Stamped GEO 02255).  2 pgs.
27. General Incident Report of Lakeisha Lacy dated June 12, 2017 (Bates Stamped GEO 02264).  2 pgs.
28. General Incident Report of F. Juarez dated June 12, 2017 (Bates Stamped GEO 02258).  2 pgs.
29. General Incident Report of R. Gillon dated June 12, 2017 (Bates Stamped GEO 02275).  2 pgs.
30. General Incident Report of Lt. Jane Diaz dated June 12, 2017 (Bates Stamped GEO 02236).  2 pgs.
31. General Incident Report of Lt. Jane Diaz dated June 12, 2017 (Bates Stamped GEO 02261).  2 pgs.
32. General Incident Report of Lt. Jane Diaz dated June 12, 2017 (Bates Stamped GEO 02267).  2 pgs.
33. General Incident Report of J. Charmelejo dated June 12, 2017 (Bates Stamped GEO 02270).  2 pgs.

34. General Incident Report of Giovanni Campos dated June 12, 2017 (Bates Stamped GEO 02251). 3 pgs.
35. General Incident Report of A. Burks dated June 12, 2017 (Bates Stamped GEO 02272).  2 pgs.
36. Segregation/R.H.U. Detention 30 Minute Check for Omar Rivera-Martinez dated June 17, 2017 (Bates Stamped GEO 00186).  1 pg.
37. Memorandum: from Lt. R. Duran Re: Disciplinary Segregation Order for Omar Rivera-Martinez dated June 15, 2017 (Bates Stamped GEO 00164).  1 pg.
38. Administrative Segregation Review for Omar Rivera-Martinez from Lt. Duran dated June 14, 2017 (Bates Stamped GEO 00167).  1 pg.
39. Notice of Institution Disciplinary Panel Hearing for Omar Rivera-Martinez dated June 12, 2017 (Bates Stamped GEO 000172 – GEO 000177).  6 pgs.
40. Institution Disciplinary Panel Report for Omar Rivera-Martinez dated June 12, 2017 (Bates Stamped GEO 000178 – GEO 000179.  2 pgs.
41. Administrative Segregation Review for Josue Lemus-Campos dated June 19, 2017 (Bates Stamped GEO 000526 – GEO 000527.  2 pgs.
42. Incident of Prohibited Acts and Notice of Charges of Josue Lemus-Campos dated June 12, 2017 (Bates Stamped GEO 000528 – GEO 000529).  2 pgs.
43. Investigation Report for Josue Lemus-Campos dated June 13, 2017 (Bates Stamped GEO 00530). 1 pg.
44. Unit Disciplinary Committee Report of Findings and Actions for Josue Lemus-Campos dated June 14, 2017 (Bates Stamped GEO 00531).  1 pg.
45. Notice of Institution Disciplinary Panel Hearing of Josue Lemus-Campos dated June 14, 2017 (Bates Stamped GEO 00532 – GEO 00535).  4 pgs.
46. Memorandum from IDP Chairperson Re: IDP Staff Representatives dated June 14, 2017 (Bates Stamped GEO 00536 – GEO 00537).  2 pgs.
47. Institution Disciplinary Panel Report for Josue Lemus-Campos dated June 12, 2017 (Bates Stamped GEO 00538 – GEO 00539).  2 pgs.
48. Segregation Housing Unit Housing Record for Josue Lemus-Campos dated received June 12, 2017 dated released June 21, 2017 (Bates Stamped GEO 00540 – GEO 00551).  12 pgs.
49. Adelanto Detention Facility Special Management Unit Cell Inspection Form for Josue Lemus-Campos dated June 12, 2017 (Bates Stamped GEO 00552).  1 pg.
50. Administrative Segregation Review for Alexander Burgos-Mejia dated June 19, 2017 (Bates Stamped GEO 00963).  1 pg.
51. Administrative Segregation Review for Alexander Burgos-Mejia dated June 15, 2017 (Bates Stamped GEO 00964).  1 pg.
52. Administrative Segregation Review for Alexander Burgos-Mejia dated June 14, 2017 (Bates Stamped GEO 00965).  1 pg.
53. Incident of Prohibited Acts and Notice of Charges for Alexander Burgos-Mejia dated June 12, 2017 (Bates Stamped GEO 00966 – GEO 00967).  2 pgs.
54. Investigative Report for Alexander Burgos-Mejia dated June 12, 2017 (Bates Stamped GEO 00968).  1 pg.
55. Unit Disciplinary Committee Report of Findings and Actions for Alexander Burgos-Mejia dated June 12, 2017 (Bates Stamped GEO 0969).  1 pg.
56. Notice of Institution Disciplinary Panel Hearing of Alexander Burgos-Mejia dated June 14, 2017 (Bates Stamped 00970 – GEO 00975).  6 pgs.
57. Institution Disciplinary Panel Report for Alexander Burgos-Mejia dated June 13, 2017 (Bates Stamped GEO 00976 – GEO 00977).  2 pgs.
58. Administrative Segregation Review for Isaac Lopez-Castillo dated June 19, 2017 (Bates Stamped GEO01121).  1 pg.

2

59. Administrative Segregation Review for Isaac Lopez-Castillo dated June 14, 2017 (Bates Stamped GEO 01122).  1 pg.
60. Incident of Prohibited Acts and Notice of Charges for Isaac Lopez-Castillo dated June 12, 2017 (Bates Stamped GEO 01123).  1 pg.
61. Investigation Report for Isaac Lopez-Castillo dated June 13, 2017 (Bates Stamped GEO 01125).  1 pg.
62. Unit Disciplinary Committee Report of Findings and Actions of Isaac Lopez-Castillo dated June 12, 2017 (Bates Stamped GEO 01126).  1 pg.
63. Notice of Institution Disciplinary Panel Hearing of Isaac Lopez-Castillo dated June 14, 2017 (Bates Stamped GEO 01127 – GEO 01132).  6 pgs.
64. Institution Disciplinary Panel Report for Isaac Lopez-Castillo dated June 12, 2017 (Bates Stamped GEO 01133 - GEO 01134).  2 pgs.
65. Memorandum from Lt. R. Duran To: COS J. Johnson Re: Disciplinary Segregation Order dated June 15, 2017 (Bates Stamped GEO 01389).  1 pg.
66. Memorandum from Lt. J. Diaz To: Chief Johnson Re: Administrative Segregation Order dated June 12, 2017 (Bates Stamped GEO 01390).  1 pg.
67. Medical Report on Injuries/Non-Injuries for Jose Cortez-Diaz dated June 12, 2017 (Bates Stamped GEO 01391).  1 pg.
68. Detention Standards Review: DHS Inspector General: Internet Search.
69. Administrative Segregation Review for Jose Cortez-Diaz dated June 19, 2017 (Bates Stamped GEO 01392).  1 pg.
70. Administrative Segregation Review for Jose Cortez-Diaz dated June 14, 2017 (Bates Stamped GEO 01393).  1 pg.
71. Incident of Prohibited Acts and Notice of Charges for Jose Cortez-Diaz dated June 12, 2017 (Bates Stamped GEO 01394 – GEO 01395).  2 pgs.
72. Investigation Report for Jose Cortez-Diaz dated June 12, 2017 (Bates Stamped GEO 01396).  1 pg.
73. Unit Disciplinary Committee Report and Findings and Actions for Jose Cortez-Diaz dated June 12, 2017 (Bates Stamped GEO 01397).  1 pg.
74. Notice of Institution Disciplinary Panel Hearing for Jose Cortez-Diaz dated June 14, 2017 (Bates Stamped GEO 01398 – GEO 01403).  6 pgs.
75. Institution Disciplinary Panel Report for Jose Cortez-Diaz dated June 12, 2017 (Bates Stamped GEO 01404).  1 pg.
76. Administrative Segregation Review for Jose Cortez-Diaz dated June 14, 2017 (Bates Stamped GEO 01538).  1 pg.
77. Incident of Prohibited Acts and Notice of Charges for Julio Barahuna-Cornejo dated June 12, 2017 (Bates Stamped GEO 01539).  1 pg.
78. Investigation Report for Julio Barahuna-Cornejo dated June 12, 2017 (Bates Stamped 01541).  1 pg.
79. Unit Disciplinary Committee Report and Findings and Actions for Julio Barahuna-Cornejo dated June 12, 2017 (Bates Stamped GEO 01542).  1 pg.
80. Institution Disciplinary Panel Report for Julio Barahuna-Cornejo dated June 12, 2017 (Bates Stamped GEO 01549 – GEO 01550).  2 pgs.
81. Segregation Housing Unit Housing Record for Lois Pena-Garcia date received June 12, 2017 released June 21, 2017 (Bates Stamped GEO 01759 – GEO 01771).  13 pgs.
82. Detainee Personal Property Inventory Form Receipt for Lois Pena-Garcia dated June 12, 2017 (Bates Stamped GEO 01772).  1 pg.
83. Segregation Housing Unit Housing Record for Grande-Rodriguez date received June 12, 2017 dated released June 21, 2017 (Bates Stamped GEO 01933 – GEO 01945).  13 pgs.

84. Notice of Institution Disciplinary Panel Hearing Rivera-Martinez dated June 12, 2017 (Bates Stamped P000450 – P000453).  4 pgs.

85. Memorandum From: Lt. R. Duran To: COS J. Johnson Re: Disciplinary Segregation Order dated June 15, 2017 (Bates Stamped P000455).  1 pg.

86. Institution Disciplinary Panel Report for Rivera-Martinez dated June 12, 2017 (Bates Stamped P000457 – P000458).  2 pgs.

87. Policy and Procedure Manual Chapter: Security Title: Use of Force No. 10.2.15.  17 pgs.

88. 2.8 Population Counts PBNDS 2011.  4 pgs.

89. 2.15 Use of Force and Restraints PBNDS 2011.  14 pgs.

90. 4.2 Hunger Strikes PBNDS 2011.  4 pgs.

91. 4 Videos.

92. After-Action Review Report Use of Force/Restraints Incident Report No. SIR035317 (Bates Stamped GEO 02238 – GEO 02240).  3 pgs.

93. General Incident Report for A. Burks dated June 12, 2017 (Bates Stamped GEO 02272 – GEO 02273).  2 pgs.

94. General Incident Report for Giovanni Campos dated June 12, 2017 (Bates Stamped GEO 02251 – GEO 02253).  3 pgs.

95. General Incident Report for R. Gillon dated June 12, 2017 (Bates Stamped GEO 02275 – GEO 02276).  2 pgs.

96. General Incident Report for F. Juarez dated June 12, 2017 (Bates Stamped GEO 02258 – GEO 02259).  2 pgs.

97. General Incident Report for Lakeisha Lacy dated June 12, 2017 (Bates Stamped GEO 02264 – GEO 02265).  2 pgs.

98. General Incident Report for Alvaro Lanuza dated June 12, 2017 (Bates Stamped GEO 02255 – GEO 02256).  2 pgs.

99. General Incident Report for J. Marmoleho dated June 12, 2016 (Bates Stamped GEO 02270 – GEO 00227).  2 pgs.

100.     General Incident Report for G. Martinez dated June 12, 2017 (Bates Stamped GEO 02267 – GEO 002268).  2 pgs.

101. General Incident Report for A. Reyes dated June 12, 2017 (Bates Stamped GEO 02261 – GEO 02262).  2 pgs.

102. SIR035317 Janecka dated June 12, 2017 (Bates Stamped GEO 02226 – GEO 02233).  8 pgs.

103. Use of Force/Restraints submitted by Lt. Jane Diaz dated June 12, 2017 (Bates Stamped GEO 02236 – GEO 02237).  2 pgs.

104. Plaintiffs' Second Amended Complaint Case No. 5:18-cv-01125-SP filed August 15, 2019.  31 pgs.

105. Training Presentation – use of Force dated November 2014 (Bates Stamped GEO 02083 – GEO 02158).  76 pgs.

Omar Martinez et al. v. The GEO Group, Inc., et al.; Jeffrey A. Schwartz; October 14, 2019.

Signed in Campbell, CA

Jeffrey A. Schwartz, Ph.D.
October 14, 2019

28