1

2

Rachel Steinback, SBN 310700
LAW OFFICE OF RACHEL STEINBACK
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

3

4

5

6

7

8

Attorneys for Plaintiffs
Additional Counsel on Following Page

9

10

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13

OMAR ARNOLDO RIVERA MARTINEZ;
ISAAC ANTONIO LOPEZ CASTILLO; JOSUE
VLADIMIR CORTEZ DIAZ; JOSUE MATEO
LEMUS CAMPOS; MARVIN JOSUE GRANDE
RODRIGUEZ; ALEXANDER ANTONIO BUR-
GOS MEJIA; LUIS PEÑA GARCIA; JULIO CE-
SAR BARAHONA CORNEJO, as individuals,
PLAINTIFFS,

v.

Case No.:   5:18-cv-01125-R-GJS

**DECLARATION OF DR. HOMER
VENTERS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

14

15

16

17

18

19

20

THE GEO GROUP, Inc., a Florida corpora-
tion; the CITY OF ADELANTO, a municipal
entity; GEO LIEUTENANT DURAN, sued in
her individual capacity; GEO LIEUTEN-
ANT DIAZ, sued in her individual capac-
ity; GEO SERGEANT CAMPOS, sued in his
individual capacity; SARAH JONES, sued in
her individual capacity; THE UNITED STATES
OF AMERICA; and DOES 1-10, individu-
als;

DEFENDANTS.

Date:       December 17, 2019
Time:       10:00 a.m.
Judge:      Hon. Sheri Pym

21

22

23

24

25

26

27

28

1

Catherine Sweetser, SBN 271142
Kristina Harootun, SBN 308718
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN LLP
11543 W. Olympic Boulevard
Los Angeles, CA 90064
(t) 310-396-0731
(f) 310-399-7040
(e) csweetser@sshhlaw.com
(e) Kharootun@sshhlaw.com

Colleen Flynn, SBN 2324281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 213-252-9444
(f) 213-252-0091
(e) cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 323-696-2299
(e) matthew@matthewstrugar.com

## DECLARATION OF HOMER VENTERS

I, Dr. Homer Venters, declare under penalty of perjury as follows:

1.      My name is Homer Venters.  I am a physician and epidemiologist with over a decade of experience in providing, improving and leading health services for the incarcerated. I worked for the New York City Jail Correctional Health Service from 2008 to 2017, first as the Deputy Medical Director and ultimately rising to hold the position of Chief Medical Officer, where I was responsible for all physical and mental health services across New York City's twelve jails, including the development and oversight of all health policies.  During those years I personally cared for over 100 patients following a use of force, I led the development of new security practices to reduce inmate injuries, and I conducted numerous trainings of security staff.  I have served as an expert on medical and corrections issues for the past three years and have testified before the U.S. House of Representatives regarding ICE detention conditions.  I can testify to the below based on my personal knowledge and expert opinion.

2.      I have reviewed discovery materials in this case including the video of the incident, the incident and after-action reports, the depositions of the officers, the policies in effect at the facility, the standards regarding use of force, and the medical records of the plaintiffs.

3.      Universally accepted protocol requires that a person subjected to OC should be stripped of any exposed clothing and decontaminated with cool or room temperature water, not hot water.  Having been exposed to OC numerous times in my work in the NYC jails, I can attest to the dramatic difference in either soothing or increasing pain from OC based on water temperature.  The GEO staff in this case did not follow the basic decontamination steps.  Instead, they forced the detainees, in their OC-exposed clothing, into hot showers.

4.      I have attached my report to this declaration.  I have reviewed my opinions and attest that they remain my expert opinions to which I can testify based on my knowledge and experience.

5.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this ___22___ day of November, 2019 at __NYC__ , New York.

_____
Homer Venters, M.D.

# EXHIBIT A

Rachel Steinback
Law Office of Rachel Steinback
P.O. Box 291253
Los Angeles, CA 90029

Re:   Martinez et al. v. GEO Group et al. (Case No. 5:18-cv-01125)

Ms. Steinback,

The following report is being presented per your request for my opinions on various issues relating to this matter.

## BACKGROUND AND QUALIFICATIONS

I, Homer Venters, am a physician and epidemiologist with over a decade of experience in providing, improving and leading health services for the incarcerated while reducing the risk of injury, death and use of force during incarceration. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research (focus on ICE Detention) at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. After my fellowship training, I became the Deputy Medical Director of the New York City Jail Correctional Health Service. This position included both direct care to persons held in New York City's twelve jails, as well as oversight of medical policies for their care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews. Part of my duties involved oversight of specialty care, radiology, clinical responses to injuries, hunger strikes, and development of standardized protocols for injury assessment and treatment. My duties also involved design and implementation of crisis intervention teams that included security and health staff, as well as alternatives in health and security practices that significantly reduced uses of force, injuries and other security incidents.

I have led approximately 200 quality improvement projects for jail health services, approximately 40 of which have become peer-reviewed publications. In addition, I have led approximately 100 morbidity and mortality reviews of deaths or serious health incidents inside jail. I have testified before the U.S. House of Representatives regarding ICE detention conditions and received multiple public health awards and citation by the U.S. Supreme Court regarding the links between serious mental illness, solitary confinement and self-harm.

I have been responsible for the development and oversight of all health policies in the New York City jail system, including those relating to injury, as well as hospital transfer and the care and monitoring of patients. Included in these policies are the hunger strike and injury response policies and protocols. I have also personally cared for and evaluated more than

200 persons who were injured or were in the midst of a hunger strike. I have also been the primary health leader responsible for coordinating these health policies with policy makers in the NYC Department of Corrections and oversight agencies including the NYC Board of Correction and the U.S. Department of Justice.

I have conducted assessments of the health impact of weapons and policies for the Department of Correction and have conducted video review of numerous uses of force for joint analysis of opportunities for improvement and mechanism of injury. Specific policies I have been asked to collaborate on include overall use of force and specific policies pertaining to restraint, use of oleoresin capsicum spray and electrical conducive devices. I have also conducted approximately 50 trainings for security leadership and line staff both in facilities and at the training academy on these matters between 2008 and 2016.  De-escalation was also part of these trainings on use of force.

I have also received structured training on the forensic evaluation of torture survivors from Healthright International. The elements of this training include history taking, physical examination of orthopedic and other injuries and review of photographic evidence. I have completed approximately 80 evaluations of torture survivors using the Istanbul Protocol format, which is approved by the United Nations and utilized by almost all organizations conducting forensic evaluations of torture survivors.

In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff. In December 2018 I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services, a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. I also work as a medical expert in cases involving correctional health and I wrote a book on the health risks of jail (*Life and Death in Rikers Island*) which was published in 2019 by Johns Hopkins University Press. A copy of my curriculum vitae is attached to this report which includes my publications, a listing of cases in which I have been involved and a statement of my compensation.

**FACTS AND DATA CONSIDERED**

- Facility video of incident, 4 views, labelled T1-T4
- Complaint 5:18-cv-01125-R-GJS (Martinez et. al, vs. GEO Group et. al.)
- General Incident report, GEO Group, Inc., dated 6/12/17 at 06:30
- GEO Use of Force Policy, dated 5/13/19
- GEO Emergency Procedures ppt, dated 9/13/18
- Deposition of Rodrick Gillon
- Deposition of Giovanni Campos
- Deposition of Jane Lynn Diaz

- Deposition of LVN Sarah Jones
- Deposition of Gilbert Martinez
- Deposition of Rebecca Jindi
- ICE PBNDS (2011) regarding UOF, Hunger Strike
- NCCHS Standards regarding injury, hunger strike
- Medical records of Omar Rivera-Martinez
- Medical records of Julio Barahona-Cornejo
- Medical records of Jose Cortez-Diaz
- Medical records of Luis Pena-Garcia
- Medical records of Alexander Burgos-Mejia
- Medical records of Marvin Grande-Rodriguez
- Medical records of Josue Lemus-Campos
- Medical records of Isaac Lopez-Castillo
- SABRE OC Decontamination Protocol
- General Incident and After Action Reports from 6/12/17

## METHODOLOGY

The methods I employed to conduct analysis of this case involved several steps. This methodology is the same or similar to that which I utilize in my professional expert engagements, and which experts conducting this type of incident review routinely employ in their own work.1 First, I reviewed the video record of the incident in question from the multiple vantages provided. I then reviewed the medical records of each plaintiff and established a timeline based on those records, as well as the evidence of health services and health concerns of each of them relating to this incident. I then reviewed the available security documents relating to the use of force as well as depositions of parties involved. Next, I reviewed relevant policies of ICE and GEO to compare the actions of staff to the video records, staff reports and patient records to formulate my specific opinions, immediately below. Following that I provide the details of my incident review.

## OPINION

Based on the totality of my training, education, and experience in corrections, medicine, healthcare administration and epidemiology, as an administrator, practitioner, trainer, educator, and consultant, I have developed the following opinions to a reasonable degree of professional certainty.

1. <u>GEO security staff used force in a manner that was inconsistent with GEO use of force policy and ICE standards on Use of Force.</u> Both the ICE PBNDS and GEO

---

1 I was part of numerous use of force incident reviews in my capacity as Chief Medical Officer, Assistant Commissioner and Medical Director and participated in a similar incident review process to the one I used in this case.

policies on use of force make clear that security staff should only use force when nonviolent methods have failed. GEO policy states that, "The use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority." The ICE PBNDS makes it clear that before proceeding with a planned use of force, security staff must attempt to de-escalate a situation, including, "Before authorizing the calculated use of force, the on-site ranking detention official, a designated health professional and others as appropriate shall assess the situation." Review of video from this incident reveals several clear elements that indicate force was not required when it was used.

    a. *Detainees were not posing a security threat to anyone.* The men seated at the tables were not threatening anyone and their actions were not placing anyone else in danger. Escalation of this incident occurred because of the actions of GEO security staff, with detainees not posing any threat to themselves or others seated at two tables. Only when security staff sprayed them with OC and started to pull them away from a seated position did any of the men swing their elbows, apparently to maintain their position seated at the table with interlocked arms. Deposition of security staff make clear that returning the detainees to their bunks for the purpose of the morning count was not an emergency because detainees were routinely held off the count or actually counted in multiple ways on a regular basis.

    b. *GEO staff did not exhaust the use of force continuum before using force. Their effort to de-escalate the conflict with detainees was minimal, at best, and fell below generally accepted de-escalation practices.* Both ICE and GEO policy make clear that before force can be used, whether through taking hold of a detainee, or using OC, there must be an attempt to de-escalate and resolve the situation through talking. Video review shows the supervisor primarily and brandishing the large OC canister. She repeatedly circles the tables where detainees are seated and appears to wave the OC canister at them while issuing commands, but there is no apparent effort by her to establish any dialogue with the detainees. In deposition testimony, the supervisor states that she was issuing orders to the detainees, and that her orders were translated into Spanish, but testimony from the other officers and reports of the plaintiffs do not bear this out. By not taking appropriate time or relying on translation in her verbal interactions with the plaintiffs, the supervisor skips the first and most effective tool in correctional conflict response: de-escalation. Instead, she appears to move directly to use of force.

    c. *Facial trauma sustained by plaintiffs during the incident would not have resulted from exposure to OC spray.* At least 4 of the detainees involved in this incident sustained injuries including abrasions. In several instances, injury reports and clinical records were marked as 'No injury' alongside obvious record of an injury occurring. These injuries may have occurred after the time when detainees are seen on video being removed from the common area and may represent further inappropriate use of force, which

could include being slammed against walls or other immovable surfaces after being restrained.

d. *Health staff were not notified or consulted about the planned use of force for consideration of special medical vulnerabilities.* ICE and GEO policies require that security staff consult with health staff before planned uses of force. ICE use of force policy mandates in the 'Confrontation Avoidance' section of this policy that "Before authorizing the calculated use of force, the on-site ranking detention official, a designated health professional and others as appropriate shall assess the situation. Taking into account the detainee's history and the circumstances of the immediate situation, they shall determine the appropriateness of using force." This policy is a correctional standard that allows for identification of people with medical or mental health concerns that could make them more vulnerable to injury or death during use of force, and also allows for health staff to attempt de-escalation in concert with security staff. Although a nurse was present in the housing area at the time of the use of force, there is no evidence that the nurse was consulted or was part of a plan to determine how to resolve the situation with the heath information of the detainees in mind and with the least amount of force necessary.

2. <u>GEO security staff violated GEO policy, ICE policies, and generally accepted correctional and healthcare policies and practices when they denied detainees exposed to OC spray access to basic health and decontamination care.</u> After exposure to OC, a person without obvious life-threatening injuries should be taken to an area where they can have their eyes washed or flushed, remove their clothes and shower, and put on new clothes and receive their injury evaluation. Based on the depositions of security staff, UOF reports and data from inmate medical records, it appears as if some of the detainees were taken to an intake area where they were placed in hot showers with their clothes on and without any access to eye wash/flush or changing their clothes. Medical staff did not document any efforts at eye wash/flush or other decontamination in their post-OC encounters with detainees. Consequently, it appears as if no efforts were made to flush or wash OC from the eyes of detainees, which would cause significant, unnecessary and predictable pain. In addition, relying on hot water as the primary method to wash off the OC would actually increase pain, which is why cool or room temperature water or cleansing solution is the universally recommended response. Having been exposed to OC numerous times in my work in the NYC jails, I can attest to the dramatic difference in either soothing or increasing pain from OC based on water/solution temperature. Additionally, a person in pain from OC exposure would be unlikely to expose their eyes to extremely hot water. The standard in correctional settings is to have either eye wash stands available for detainees after OC use, as the first step in decontamination before shower and clothes change, or portable eye wash kits ready for the same purpose. Many of the same manufacturers that provide security tools and weapons also provide decontamination kits and stands with this basic advice. For example, one major

security contractor of ICE and other Federal law enforcement agencies, Sabre, recommends the following steps for detainees after OC exposure:

    a)  Remove them from contaminated area.

    b)  Assess potential medical concerns.

    c)  Reassure the subject that effects are temporary, and that you'll assist in providing relief.

    d)  Remove any contaminated clothing (if appropriate) and seal in plastic bag.

    e)  Soak cloth in cool, clean water and use to wipe subject's skin – but don't rub the eyes.

    f)  Flush eyes and skin with cool, clean water

    g)  Encourage subject to strobe eyes, creating natural tears, especially if no water source is available. Ask subject to close eyes tightly and then open widely, and repeat a number of times to produce a stream of tears. Don't use your hands to help subject open and close eyes.

These steps represent the standard in correctional practice and any security services that employs OC spray should have mechanisms in place to ensure that each of these steps is followed after OC exposure. Failure of GEO staff to follow these basic decontamination steps served to inflict prolonged pain on a person exposed to OC and also cause secondary contamination in the places they are held, including health clinics, intake pens and housing areas.

3. <u>GEO security staff violated GEO and ICE policies by responding with force instead of first notifying and involving health staff regarding a declared hunger strike.</u> In the ICE Hunger Strike policy, under the section on 'Initial Referral', the policy mandates that "Procedures for identifying and referring a detainee suspected or announced to be on a hunger strike to medical staff shall include obtaining from qualified medical personnel an assessment of whether the detainee's action is reasoned and deliberate, or the manifestation of a mental illness." Referring detainees who declare a hunger strike to medical staff is an essential first response, since in my experience treating numerous patients on hunger strikes, this step by detainees often reflects a conflict between the detainees and security staff, and health staff can often use the clinical assessment as a means to de-escalate this conflict. This step of initial evaluation was not possible because GEO staff resorted to a use of force. Depositions by security staff make clear that while some security staff were unaware of the hunger strike when they responded to the unit, the security supervisor was and had ample time to consider notification of health staff to discuss the hunger strike response before proceeding with a use of

force. Combined with the lack of any meaningful attempts to de-escalate the situation, the lack of notification of health staff about this hunger strike until after the use of force represents a missed opportunity for a peaceful resolution to the incident.

4. Plaintiffs' failure to seek medical care upon their release from ICE custody was typical of how formerly-incarcerated patients behave. My extensive experience in caring for injured patients, as well as in overseeing a discharge planning service in the NYC jail system, is that patients who leave custody commonly do not seek care – even when they have pressing medical and mental health problems. There are multiple reasons that patients give for not seeking care after release, most notably that they are more focused on pressing family, employment and legal demands and cannot find time to care for themselves. This problem is so commonplace that under my leadership, the New York City correctional health services developed teams of staff to provide transportation to medical appointments and to help with special and legal service needs, all as a means to increase the likelihood of continuing care. Having coordinated care for at least 50 patients leaving ICE custody, I am quite certain that the barriers to seeking care are even greater, given concerns about deportation and repeated detention.[2]

**INCIDENT REVIEW DETAILS**

Video. Review of the four video clips show in incident between 9 men seated at two tables and security staff, including one female staff member in a white shirt, apparently a supervisor, and 6-10 other staff members in blue shirts. The video clips start at time mark 9:15 am[3] and from the start of the clips, the men are observed sitting at two tables, four men at one, five at the second, talking and not otherwise moving. At approximately 9:32, the female security staffer in a white shirt approaches the tables waving a large OC device. She appears to be yelling at the tables as she is walking over and waving the OC dispenser and followed by 6-8 officers behind her who fan out behind her. She appears to put the OC dispensed down on the table in front of the men at the table and then walk off. There does not appear to be any effort to converse with the men at the table by the supervisor or other officers at this point. The supervisor returns shortly after (9:33) and has an interaction of approximately 20 seconds with one table, pointing to another are of the housing area before she uses her radio and walks around the tables while on her radio for another minute. No staff appear to be engaging with the men at the table at this time. The supervisor returns to one of the tables at 9:35 and appears to speak with the men

---

2 Diversion of patients with mental illness from court-ordered care to immigration detention.Venters H, Keller AS. Psychiatr Serv. 2012 Apr;63(4):377-9. And Medical advocacy on behalf of detained immigrants. Venters HD, Foote M, Keller AS. J Immigr Minor Health. 2011 Jun;13(3):625-8.

3 This time represents the video timestamp. Incident reports indicate the true time to be approximately 6 am.

seated there for 10-20 seconds and again walks away. One officer approaches the other table at this time and begins speaking with the men there for approximately one minute while the supervisor paces around the tables, occasionally raising the OC dispenser toward the men. At 9:37, all of the officers walk away from the table followed by the supervisor. One officer stays and speaks with the men at the table for approximately one minute before the supervisor and other officers return. At 9:38, the supervisor appears to wave the OC dispenser around and the men at the tables lock arms as the supervisor sprays the OC at the men at one table. She appears to spray the OC at two men on one side of a table who the other security staff then pick up and pull away from the table onto the ground. The supervisor appears to wave the OC dispenser at other men near their beds who are watching the incident and they appear to quickly move away. The supervisor then approaches the men on the ground who are being held by security staff and appears to spray them a second and possibly third time with OC before they are led/dragged away and she again brandishes the OC dispenser at men who are watching, but not part of the incident. The supervisor then approaches the other table (9:39) and sprays one of the men with the OC dispenser as officers grab the man being sprayed and pull him away.  Based on this review, I do not have any doubts that the supervisor both brandished and sprayed the OC. As she follows, she points the OC dispenser at the two men remaining at the first table, though it is unclear if she sprayed them. At this point the two men leave their table and join the four at the other table. Officers and the supervisor return to the table and lead one of the men away at 9:40 without apparent difficulty or OC use. Over the following several minutes, the supervisor circles the table, occasionally approaching and either brandishing or spraying the OC canister. Men at the table are taken one by one, dragged or pulled away by officers. At 9:27, the two remaining men are pulled to the ground by several officers each and after being restrained, dragged away. During this incident, no efforts to strike or push any officer is seen on the part of the men being subject to uses of force, although one instance of a detainee elbowing an officer is noted once the efforts to restrain and remove detainees started.

UOF report. The use of force report includes the names of the following 9 men as being involved, Omar Rivera-Martinez, Julio Barahona-Cornejo, Jose Cortez-Diaz, Julio Valadares-Jimenez, Luis Pena-Garcia, Alexander Burgos-Mejia, Marvin Grande-Rodriguez, Josue Lemus-Campos and Isaac Lopez-Castillo. This report indicates that a letter declaring a hunger strike was received at 06:25 that am and given to a supervisor at 06:30. This report indicates that the writer later responded to a 'disturbance' involving the same detainees, who were seated at tables and refusing to move. According to the report, when the detainees refused to comply with orders to move, they were sprayed with pepper spray. The supervisor's assessment section of this form is blank, though there is an illegible supervisor signature. The next page in this file is a Correct Care 'Medical Report on Injuries/Non-Injuries' form for Rodrick Gillon that indicates no injuries. This exam is documented as occurring at 09:00 am and the incident at 06:30 am.

Medical records; Omar Rivera-Martinez. A UOF report is included in the medical records file which indicates that at 06:30 on 6/12/17, commands were given by security staff for Mr. Rivera-Martinez and others to disperse from the table they were seated at and after multiple commands, OC was used along with physical force to remove them. No mention is made of any de-escalation attempts or of any hunger strike document, demands or protocol. No mention is made of what language was used to communicate by either the officers of supervisor with the detainees and deposition testimony of the officers suggest that no translation was conducted when she issued her commands. Standard correctional practice would involve attempts to de-escalate after initial commands were not followed, especially when no threat of violence was evident. Standard correctional practice would also include documentation as to whether or not verbal communication occurred in Spanish and who acted as translator.  According to the UOF report, after OC exposure, detainees were taken to medical intake for decontamination and medical evaluation. There is no indication of how Mr. Rivera-Martinez came to sustain facial trauma during this UOF.

A nursing encounter is present from 11 am for Mr. Rivera-Martinez that includes 'Vitals post pepper spray' as an encounter reason. No blood pressure, physical examination or other information is documented. A notation is made by RN Holmgren after the incomplete vital signs indicates that the patient is cleared for general population. No mention is made of clothes change, eye or face irrigation or presence of irritation, or other effects of OC exposure.

Another nursing encounter is present approximately one hour later at 12:14 pm, with a full set of vital signs. This note includes that Mr. Rivera-Martinez reports he was shoved against a wall and that he lost a crown or tooth and that he has right shoulder and arm pain. The note includes that Mr. Rivera-Martinez has limited ROM (presumably his shoulder) but no apparent deformity. This encounter indicates that Mr. Rivera-Martinez is not cleared for RHU and that Dr. Medrano has been informed. No mention is made of clothes change, eye or face irrigation or presence of irritation, or other effects of OC exposure.

An encounter with Dr. Medrano is documented at approximately the same time (signed at approximately 8:30 am 6/13/17). This encounter notes that Mr. Rivera-Martinez has pain in his shoulder and a missing tooth without active bleeding. The examination in this encounter includes "FROM as tested with handcuffs." No mention is made of clothes change, eye or face irrigation or presence of irritation, or other effects of OC exposure. Dr. Medrano also filled out a paper injury form that indicted the injury to Mr. Rivera-Martinez's tooth and shoulder. No mention is made of clothes change, eye or face irrigation or presence of irritation, or other effects of OC exposure.

A refusal is present for x-ray, anatomical site unspecified.

Another encounter is documented with Dr. Medrano on 6/13/17 re hunger strike, in which laboratory tests are ordered, Ensure supplementation ordered and a document on starvation given to Mr. Rivera-Martinez, unclear if in Spanish or English.

A hunger strike encounter is also documented on the same day with the psychologist, Dr. Deulen and another note from the same day indicates that a starvation sheet in Spanish was offered to Mr. Rivera-Martinez. Dental encounter on 6/14/17 after the initial incident indicate missing tooth #7 and that the materials needed for Mr. Rivera-Martinez's bridge work are not available.

Sick call slip from 6/14/17 indicates that Mr. Rivera-Martinez is requesting an x-ray.

In a nursing encounter on 6/16/17, Mr. Rivera-Martinez reports being struck in the face by another detainee and thinking his nose was fractured and requests an x-ray, which was ordered by Dr. Medrano.

In a subsequent encounter with Dr. Deulen on 7/6/17 for hunger strike, Mr. Rivera-Martinez reports feeling traumatized from the use of force and also believing that his nose had been broken. The psychologist records that Mr. Rivera-Martinez affect is hostile but does not inquire about the trauma in terms of impact on sleep, mood, socialization or what the symptoms associated with the trauma are.

An RHU Clinical Segregation Data Checklists are present from 6/14/17, 6/21/17. This form includes multiple references to mental health services being received by Mr. Rivera-Martinez but does not include any diagnosis of mental health problem aside from being on hunger strike.

A security order for 10 days of segregation is present, with the reason given of inciting a demonstration.

Staff IDP representatives policy, designated as M. Magero

<u>Medical records of Julio Barahona-Cornejo.</u> An OC spray encounter is present for 6/12/17, vital signs include heart rate elevated to 105 but there is no mention of OC decontamination, irrigation of eyes, change of clothes. The injury form filled out at this time includes mention of an elbow abrasion that is not mentioned in the clinical encounter and also includes documentation of tachycardia to 119.

A hunger strike encounter 6/13/17 is present with Dr. Medrano and where the heart rate is still elevated to 105, without any comment or assessment of tachycardia. No mention of the reason for tachycardia is given and in the cardiac exam, Dr. Medrano documents a regular rate. In the assessment, Dr. Medrano indicates more frequent encounters will be provided for any signs of dehydration.

Hunger strike encounters are also present 6/13/17 and 6/14/17 with Dr. Dueler when he is recorded as ending his hunger strike.

Medical records of Jose Cortez-Diaz. Mr. Cortez-Diaz, who is under treatment by the health service for hypertension with an ACE inhibitor, has an OC spray encounter on 6/12/17. This encounter includes vital signs taken at 12:30 pm and an abnormal heart rate of 123, elevated blood pressure of 172/98 and elevated respiratory rate of 24. This encounter includes the following assessments, "Baseline and Stable-Yes", "Is it necessary to notify physician/provider-No", "No injury noted. Right ear abrasion", "Cleared for RHU" There is no mention of OC decontamination, irrigation of eyes, change of clothes. A right ear abrasion is noted as the only injury in this encounter as well as the injury form. Another encounter the same day is documented for "BP Check" without any vital signs being recorded or other evidence that Mr. Cortez-Diaz was assessed.

Hunger strike encounter 6/13/17, indicates the patient reporting that security staff yelled at them the day before in English "She shouted at us in English and we didn't understand." Dr. Harris records "I explain to him that hunger strikes are dangerous for his health and are very unlikely to work. I know you're telling me the truth but maybe it will do something for others who will receive better treatment."

Multiple hunger strike encounters are documented between 6/13/17 and 6/26/17.

An encounter with Dr. Medrano 6/27/17, states no longer on hunger strike.

An encounter with Dr. Harris 6/27/17, indicates no distress, hunger strike ongoing.

GEO staff member Madero is designated as IDP rep

Medical records of Luis Pena-Garcia. An OC spray encounter is present for 6/12/17 at 12:23, vital signs include heart rate elevated to 104 but there is no mention of OC decontamination, irrigation of eyes, change of clothes. The injury form filled out at this time includes mention of right elbow and left knee abrasions that are not mentioned in the clinical encounter and also includes documentation of tachycardia to 104. A second encounter approximately one hour later does include mention of the abrasions, and the vital signs are more elevated, with blood pressure of 150/88 and heart rate at 119. This encounter includes the following assessments "Baseline and Stable-Yes", "Is it necessary to notify physician/provider-No", "Cleared for RHU" There is no mention of OC decontamination, irrigation of eyes, change of clothes.

A hunger strike encounters are present 6/13/17 with Dr. Harris as well as 6/13/17 and 6/14/17 with Dr. Medrano when he is recorded as ending his hunger strike.

Medical records of Alexander Burgos-Mejia. An OC spray encounter is present for 6/12/17 at 12:44, vital signs include heart rate elevated to 107 and respiratory rate elevated to 24. The encounter does not include any mention of OC decontamination, irrigation of eyes, change of clothes. This encounter includes the following assessments "Baseline and Stable-Yes", "Is it necessary to notify physician/provider-No", "Cleared for RHU". No explanation or assessment of the abnormal vital signs is documented. The

injury form filled out at this time documents heart rate of 107 and respiratory rate of 24 as well as irritation of the arms due to OC exposure.

A hunger strike encounters are present 6/13/17 with Dr. Harris where the assessments include "adjustment disorder mixed with and depression." No mention is made of placement in solitary confinement and the treatment includes CBT. Hunger strike encounters are also present with Dr. Medrano on the same day and Dr. Chavira the following day when the hunger strike is ended.

Medical records of Marvin Grande-Rodriguez. An OC spray encounter is present for 6/12/17 at 12:11, vital signs include heart rate elevated to 105 and blood pressure elevated to 144/72. An abrasion to the left ear is also noted. The encounter does not include any mention of OC decontamination, irrigation of eyes, change of clothes. This encounter includes the following assessments "Baseline and Stable-Yes", "Is it necessary to notify physician/provider-No", "Cleared for RHU". No explanation or assessment of the abnormal vital signs is documented. The injury form filled out at this time documents the abnormal vital signs and ear abrasion.

Hunger strike encounters are present 6/13/17 with Dr. Medrano and Dr. Chavira.

Dr. Deulen and on 6/14/17 when the patient is documented as ending the hunger strike.

Medical records of Josue Lemus-Campos. An OC spray encounter is present for 6/12/17 at 12:59, vital signs include heart rate of 124, blood pressure of 185/99 and respiratory rate of 24. The encounter mentions burning of the skin from OC exposure but does not does not include any mention of OC decontamination, irrigation of eyes, change of clothes. This encounter includes the following assessments "Baseline and Stable-Yes", "Is it necessary to notify physician/provider-No", "No apparent distress", "RHU Cleared". No explanation or assessment of the abnormal vital signs is documented. The injury form filled out at this time documents heart rate of 124, blood pressure of 185/99 and respiratory rate of 24 as well as "c/o burning on skin" because of OC exposure and concludes "no acute distress noted".

A hunger strike encounters is present 6/13/17 in which Dr. Deulen characterizes the patient in the following manner "appears to be proleptic in that he believes that he has [sic] going to get a high bond." Dr. Deulen further includes in the treatment section of the encounter "Discussed with him about the hazards of not eating and also following the established process for immigration in this country."

Hunger strike encounters were also present with Dr. Medrano on the same day and 6/14/17 when the patient is documented as ending the hunger strike.

Medical records of Isaac Lopez-Castillo. An OC spray encounter is present for 6/12/17 at 1:08 PM, vital signs within normal limits. The physical examination is also free of any findings but the assessment section includes "No injury noted. Right forearm and left neck to have abrasion with no open skin. Cleared for RHU." The encounter does not

include any mention of OC decontamination, irrigation of eyes, change of clothes. The injury form filled out at this time documents the same two abrasions and documents injuries as "None."

A hunger strike encounter is present 6/13/17 in which Dr. Deulen's only treatment documentation is "Discussed wisdom of strategy." Hunger strike encounters were also present with Dr. Medrano on the same day and Dr. Harris on 6/14/17 when the patient is documented as ending the hunger strike.

**SUMMARY**

Based on my education, training and experience, GEO staff improperly and unnecessarily escalated a situation that was not obviously (or even inherently) dangerous, causing unnecessary harm to detainees in this case. The lack of any apparent de-escalation efforts by the security staff, particularly by the supervisor who appeared to dramatically escalate the likelihood of force being used, represents a clear deviation from generally accepted correctional standards, GEO policies and ICE PBNDS. GEO security staff faced no imminent or apparent threat of violence from the men seated at the table, and while their refusal to move could have interrupted the operations of security staff, there is no indication that it posed an immediate threat of violence that would necessitate forgoing efforts to de-escalate the conflict. In addition to an absence of de-escalation efforts, the security staff engaged in this planned use of force instead of contacting health staff for their assistance in responding to a hunger strike, also a violation of GEO policies. Finally, the placement of people with OC exposure into hot showers and denial of other care for OC exposure represents an intentional infliction of pain and suffering, since immediate eye wash/flush is required to address the most painful aspect of OC exposure, and prompt change of clothes is also required. These actions represent gross deviations from generally accepted correctional practices.

Homer Venters, MD, MS                                          10/14/2019

# Vitae
# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050

hventers@gmail.com, Phone: 646-734-5994

_____

HEALTH ADMINISTRATOR          PHYSICIAN          EPIDEMIOLOGIST

## *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Leader in design and implementation of health and security practices to reduce injury and death.

## *Professional Experience*

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-present.

- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Conduct trainings for correctional staff on injury response and reduction.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Medical/Forensic Expert**, 3/2016-present

- Provide expert input, review and testimony regarding health care, quality improvement, electronic health records and data analysis in detention settings.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.

- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.

- Develop and support sexual violence capacity development with physicians, nurses and judges.
- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.

- Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
- Developed new models of mental health and security practices that significantly lowered morbidity and other adverse events, including de-escalation.
- Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
- Reduced overall mortality in the nation's second largest jail system.
- Increased operating budget from $140 million to $160 million.
- Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.

- Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
- Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
- Led development of new security practices aimed at reducing injury and death.  This included training on how to avoid striking inmates' heads during use of force to reduce brain injuries.
- Increased operating budget of health service from $115 million to $140 million.
- Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
- Personally cared for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.

- Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
- Developed new protocols to identify and report on injuries and sexual assault among patients.
- Conducted numerous trainings of security staff on traumatic brain injury, head trauma and injury avoidance and behavioral health.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and
    Mental Hygiene, 11/08-12/09.

- o   Developed training program with Montefiore Social internal medicine residency program.
- o   Directed and delivered health services in 2 jails.
- o   Conducted trainings of security staff on communicable diseases, substance withdrawal and
    injury prevention.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## Education and Training

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009

Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert      Einstein
    University7/2004- 5/2007.

**M.D.,** University of Illinois, Urbana, 12/2003.

**M.S.** Biology, University of Illinois, Urbana, 6/03.

**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure

Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## Media

<u>TV</u>

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya.
7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria, Iraq. 4/17/18.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep*. 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care*. 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health*. 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health*. 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health*. 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health*. 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved*. 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons

Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the New York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:    Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional

Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails and prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston

MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arrestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Individual*

**Co-Principal Investigator,** Immigration Detention Health Resource Project (IDHR). Langeloth Foundation (Project 1917). January 1 2013-January 31 2017 (initial grant 2011-2013). Total grant amount $300,611.

**Principal Investigator, Investigation of testosterone levels, depression and mental status as these variables associate with HIV dementia. Carle Hospital, Urbana Illinois, total Costs $1,500 (2003).**

**Principal Investigator,** Pro-Inflammatory Cytokine Expression during Pediatric HIV-Encephalopathy in Togo, West Africa. Elizabeth Glaser Pediatric AIDS Research Foundation, total Costs $5,000 (2000-2001).

## *Grants: Program*

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## *Teaching*

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## *Other Health & Human Rights Activities*

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.

> *-Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
>
> *-Secondary Project;* Malaria Prevention.

*Books*

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## Testimony and Op-Ed Columns

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

*Membership in Professional Organizations*

**American Public Health Association**

*Foreign Language Proficiency*

**French**     Fluent

**Ewe**      Conversant

*Prior Testimony and Deposition*

<u>Court testimony</u>

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

<u>Depositions</u>

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs
10/30/17

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as
City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

# Fee Schedule

Case review, reports, testimony $500/hour.