Rachel Steinback, SBN 310700
Law Office of Rachel Steinback
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
Law Office of Carol Sobel
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*
*[Additional Counsel on Following Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA MARTINEZ; ISAAC ANTONIO LOPEZ CASTILLO; JOSUE VLADIMIR CORTEZ DIAZ; JOSUE MATEO LEMUS CAMPOS; MARVIN JOSUE GRANDE RODRIGUEZ; ALEXANDER ANTONIO BURGOS MEJIA; LUIS PEÑA GARCIA; JULIO CESAR BARAHONA CORNEJO, as individuals,

Plaintiffs,

v.

The GEO Group, Inc., a Florida corporation; the City of Adelanto, a municipal entity; GEO Lieutenant Diaz, sued in her individual capacity; GEO Sergeant Campos, sued in his individual capacity; Sarah Jones, sued in her individual capacity; The United States of America; Correct Care Solutions, Inc.; and DOES 1-10, individuals;

Defendants.

Case No. 5:18-cv-01125-SP
*Assigned to: Honorable Sheri Pym*

**PLAINTIFFS' GENUINE DISPUTES OF MATERIAL FACTS AND PLAINTIFFS' ADDITIONAL SEPARATE STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANTS THE GEO GROUP, INC. AND CITY OF ADELANTO'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

**<u>Hearing:</u>**
Date:        December 17, 2019
Time:        10:00 a.m.
Courtroom: 3

Catherine Sweetser, SBN 271142
Kristina Harootun, SBN 308718
Schonbrun Seplow Harris & Hoffman LLP
11543 W. Olympic Boulevard
Los Angeles, CA 90064
(t) 310-396-0731
(f) 310-399-7040
(e) csweetser@sshhlaw.com
(e) kharootun@sshhlaw.com

Colleen Flynn, SBN 2324281
Law Office of Colleen Flynn
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 213-252-9444
(f) 213-252-0091
(e) cflynn@yahoo.com

Matthew Strugar, SBN 232951
Law Office of Matthew Strugar
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 323-696-2299
(e) matthew@matthewstrugar.com

*Attorneys for Plaintiffs.*

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1 of the Central District of California, Plaintiffs hereby submit their response to Defendant's THE GEO GROUP, INC. and CITY OF ADELANTO's Statement of Uncontroverted Facts and their own Separate Statement of Facts in Opposition to Defendants THE GEO GROUP, INC. and CITY OF ADELANTO's Motion for Summary Judgment.

Plaintiffs refer to Defendants' Exhibits "A" through "M" as filed in their Appendix of Evidence, (Dkt. #108-2, #108-3, #111-2, and #111-3). Plaintiffs refer to Exhibits 1-52, attached to the Declaration of Monique A. Alarcon, filed concurrently with Plaintiffs' opposition to Defendants' Motion to Dismiss.

## **RESPONSE TO DEFENDANTS'**
## **STATEMENT OF UNCONTROVERTED FACTS**

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 1. | In May 2011, GEO entered into contract with U.S. Immigration & Customs Enforcement (ICE) for the detention and care of immigrant detainees at the Adelanto Detention Facility ("Facility"), which houses immigrant detainees, through an intergovernmental service agreement with the City. | Janecka Decl. ¶ 3; Hart Decl. ¶¶ 3-6; Ex. "L" [Agenda Report dated May 17, 2011]; Ex. "M" [2011 Service Agreement]. **PLAINTIFFS' RESPONSE**: *Objection:* Assumes facts; the cited evidence does not support the proposition *Disputed.* At that time it was a conflict of interest for GEO to contract with ICE directly. The City of Adelanto was the only signatory to the IGSA with ICE. Ex. 12, Flores Dep. 97:4-14; Ex. 52, Intergovernmental Services |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Agreement. |
| 2. | It was clearly delineated in the aforementioned agreements that GEO would operate and manage the day-to-day operations at the Facility, and the City would not retain control of the operations. | Janecka Decl. ¶ 2; Hart Decl. ¶ 6, 12; Ex. "M" [2011 Service Agreement]. **PLAINTIFFS' RESPONSE**: *Objection*: Lacks Foundation; Assumes facts not in evidence; Vague and ambiguous as to the term "control" *Disputed.* The Service Agreement states that the City is entitled to perform periodic inspections. Ex. M at GEO 00661. Hart states "I visited facilities to discuss operations and assess whether it was being managed properly. I had open communication with the warden and if an issue came to my attention, I would speak to the warden to resolve the issue." Hart Decl. ¶ 9, 11. Thus, although the City delegated policymaking authority to the Warden, it relied on him to communicate issues and retained a right to inspect the facility. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 3. | Before entering into the May 2011 contract with GEO, the City thoroughly vetted GEO to ensure that it was capable of providing the services that were required of it (managing the day to day operations at the Facility, including the detention and care of immigrant detainees), which was consisted with the City's policy to thoroughly vet and research any agency, business, or corporation prior to committing to a contract with said agency, business, or corporation. | Hart Decl. ¶¶ 6-9. **PLAINTIFFS' RESPONSE**: *Objection*: Lacks Foundation; assumes facts not in evidence; Vague and ambiguous as to the term "thoroughly vetted" *Disputed*. The City did not thoroughly vet GEO or it would have known that GEO was not capable of providing constitutionally adequate services.  In October of 2010 the DOJ announced an investigation of a GEO facility for deliberate misconduct and inappropriate behavior with youth, the excessive use of force on youth, and deliberate indifference to the medical needs of youth. Dept. of Justice, 12-352, *Department of Justice Releases Investigative Findings on the Walnut Grove Youth Correctional Facility in Mississippi* (2012) *available at* https://www.justice.gov/opa/pr/department-justice-releases-investigative-findings-walnut-grove-youth-correctional-facility. During the 2011 year another GEO contract prison, D. Ray James, accounted for 155 of 526 (29 percent) of the assaults on staff in all contract prisons. Office of the Inspector General, 16-06, *Review of the Federal* |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | *Bureau of Prisons' Monitoring of Contract Prisons, 19* (Aug 2016) *available at https://oig.justice.gov/reports/2016/e1606.pdf.* In December 2008 and January 2009, the GEO operated Reeves County Detention Center had a riot on its Compound III and Compounds I and II, respectively. In an audit of the facility the OIG found that: "While low staffing levels alone were not the direct cause of the disturbances, they directly affected Security and Health Services functions. *Id.* at 2. |
| 4. | Additionally, the City was aware that GEO was already operating another facility in the City, and that GEO was one of the largest national companies that specialized in privatized corrections, detention, and mental health treatment. GEO had a long standing reputation and documented experience in operating private facilities. | Hart Decl. ¶¶ 7, 9.<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection*: Irrelevant, Assumes facts not in evidence; Confusing or misleading as to the term "reputation"; Vague and ambiguous as to the term "reputation"<br><br>*Disputed in part.* GEO has a history of failing to provide adequate security at its facilities. In October of 2010 the DOJ announced an investigation of a GEO facility for deliberate misconduct and inappropriate behavior with youth, the excessive use of force on youth, and deliberate indifference to |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | the medical needs of youth.https://www.justice.gov/opa/pr/department-justice-releases-investigative-findings-walnut-grove-youth-correctional-facility. During the 2011 year another GEO contract prison, D. Ray James, accounted for 155 of 526 (29 percent) of the assaults on staff in all contract prisons. Office of the Inspector General, 16-06, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons, 19* (Aug 2016) *available at https://oig.justice.gov/reports/2016/e1606.pdf.*  In December 2008 and January 2009, the GEO operated Reeves County Detention Center had a riot on its Compound III and Compounds I and II, respectively. In an audit of the facility the OIG found that: "While low staffing levels alone were not the direct cause of the disturbances, they directly affected Security and Health Services functions. Office of the Inspector General, 16-06, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons, 19* (Aug 2016) *available at https://oig.justice.gov/reports/2016/e1606.pdf.* |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 5. | Moreover, the City was aware that ICE was present at the Facility and, thus, overseeing the management and operations on daily basis. Also, the Nakamoto Group, a contractor hired by ICE to inspect its facilities, conducted inspections of the Facility and the City was notified of these inspections. | Hart Decl. ¶¶ 10, 11.<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Disputed in part.* In 2009 the Department of Homeland Security released a report that stated that ICE officers did not engage in onsite monitoring of detainees. Though ICE officers were present at facilities they were at facilities to manage individual detainees immigration issues and that independent contractors were primarily assigned the task of handling detainees and enforcing various policies. U.S. Dept. of Homeland Security, *Immigration and Customs Enforcement*: Immigration Detention Overview and Recommendations, 14-15 (Oct. 6, 2009) *available at* https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf. In fact, the same report found that for the forgoing reasons ICE supervision of its facilities was lacking and that ICE should place expert federal officers onsite to intercede. *Id*. at 3. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 6. | Since June 2019, GEO has directly contracted with ICE to manage and operate the Facility. Irrespective of the change of parties to the contract, GEO has been solely responsible for the management and operations of the Facility and, thus, GEO's policies and procedures have governed the operations at the Facility since 2011 – which was consistent with the City's understanding while the City contracted with GEO. | Janecka Decl. ¶ 3; Hart Decl. ¶¶ 3-6, 12.<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection*: Lacks Foundation; Assumes facts not in evidence; Vague and ambiguous as to the term "control"; Relevance, whether GEO and ICE contracted directly in 2019 has no bearing on Plaintiffs claims.<br><br>Undisputed that GEO's policies and procedures have governed operations at the facility. Undisputed that the City expected GEO to set policy for its detention facility and delegated to GEO the ability to do so. |
| 7. | When an officer is initially hired, he/she must complete pre-service training, which consists of 136-hours of training on various policies and procedures in a classroom setting. The policies and procedures are distilled into PowerPoint presentations, and there are a number of exams to evaluate the officer's knowledge of the policies and procedures. | McCusker Decl. ¶ 3; Diaz Decl. ¶ 3; Campos Decl. ¶ 2.<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection:* Vague as to what "policies and procedures"; Calls for speculation; assumes facts not in evidence.<br><br>*Disputed.* Sgt. Campos reported that he had "two to four weeks training" Ex. 14, Sgt. Campos Dep. 19:6-12; Gillon reported three weeks of training. Ex. 17, Gillon Dep. 14:14-23.  Juarez reports two weeks of |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | classroom training when arriving at the facility. Ex. 19, Juarez Dep. 14:16-23. Moreover, it is disputed that this training adequately covers policies and procedures, as set out in Plaintiffs' Statement of Uncontroverted Materials Facts. |
| 8. | Thereafter, officers are required to complete 40 hours of on-the-job training. Annually, officers are required to complete 40-hours of in-service training. | McCusker Decl. ¶ 4; Diaz Decl. ¶ 5; Campos Decl. ¶ 2. **PLAINTIFFS' RESPONSE**: *Undisputed* |
| 9. | Prior to being promoted to a supervisory position or assigned as a transportation officer (i.e. positions that permits an officer to use and carry chemical agents), an officer is required to complete additional training that builds on the pre-service training. | McCusker Decl. ¶ 5; Diaz Decl. ¶ 7; Campos Decl. ¶ 3. **PLAINTIFFS' RESPONSE**: *Undisputed.* |
| 10. | The additional training includes training specific to the use chemical agents (e.g. pepper spray or OC spray) and covers topics such as the use of force requirements that permit the use of chemical agents, the decontamination process, and the effects of chemical agents on the person. | McCusker Decl. ¶ 5; Diaz Decl. ¶ 7. **PLAINTIFFS' RESPONSE**: *Disputed.* Campos does not know the continuum of force; he believes that OC spray should be used if "you thought a detainee was out of control" Ex. 14, Sgt. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Campos Dep. 145:9-22; Campos reports not remembering the factors required to deploy OC spray; Ex. 14, Sgt. Campos Dep. 146:2-6. Diaz reports inciting a group demonstration and non-compliance with verbal commands was sufficient cause to use OC spray Ex. 16, Lt. Diaz Dep. 224:3-20; Campos also did not know that you needed to be five feet away when spraying according to the policy. Ex. 14, Sgt. Campos Dep. 16:10-12; 20-22. |
| 11. | The training includes instruction in a classroom setting and, then, direct exposure to chemical agents. Thereafter, supervisors are required to complete monthly training on various topics (e.g. completing evaluations and use of force report writing). | McCusker Decl. ¶ 5; ; Diaz Decl. ¶ 8. <br><br> **PLAINTIFFS' RESPONSE**: <br><br> *Undisputed* <br><br> *Disputed in part* as to the monthly refresher courses, as at the time of the incident Lieutenant Diaz was unfamiliar with report writing. Ex. 10, McCusker Dep. 46:9-25 (stating that he corrected the use of reports in this case). Moreover, Diaz had not had training on OC spray since becoming a supervisor. Ex. 16, Lt. Diaz Dep. 102:17-22. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 12. | During pre-service training, staff is made aware that if they fail to comply with GEO's policies and procedures, they will be disciplined. Depending on the severity of the infraction, the discipline could result in termination. | McCusker Decl. ¶ 11. **PLAINTIFFS' RESPONSE:** *Undisputed.* |
| 13. | With respect to GEO's policies, GEO creates is policies to be consistent with the Performance-Based National Detention Standards (standards created by ICE) that relate to the safety, security and conditions of confinement for detainees) and Peace Officer Standards and Training. | McCusker Decl. ¶ 6. **PLAINTIFFS' RESPONSE:** *Objection:* Lacks Foundation. Lack of Personal Knowledge. Calls for expert opinion. McCusker is not an expert on PBNDS, and even if he were an expert, no evidence has been proffered to show that McCusker was present when GEO's policies were created. *Disputed that the policies are consistent with other standards.* Plaintiffs' expert will testify that they are not. *See* Schwartz Decl., ¶ 6-7, Ex. A, Schwartz Expert Report at 18(J);19(k). The policies are not totally consistent. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 14. | For example, GEO teaches its officers to only force as a last alternative after all other reasonable efforts to resolve the situation have failed. Officers are trained to on the "Use-of-Force Continuum," which is a model used to illustrate the levels of force staff may use to gain control of a detainee. | McCusker Decl. ¶ 7; Diaz Decl. ¶ 6; Ex. "H" [GEO's Use of Force policy].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection.* Calls for speculation<br><br>*Disputed in part.* GEO does not adequately train its officers on "Use-of-Force Continuum". Sgt. Campos reports that he "do[es]n't remember the continuum." Ex. 14, Sgt. Campos Dep. 145:2-7.  Lt. Diaz stated that there was "nothing in our policy stating that we are not to deploy spray while they're in the segregation cells." Ex. 16, Lt. Diaz Dep. 13:4-7. Gillon reports that come along holds are presence and verbal commands. Ex. 17, Gillon Dep. 110:13-19. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 15. | The levels that are relevant to the Facility are as follows: (a) staff presence without action; (b) verbal commands; (c) soft techniques (techniques from which there is minimal chance of injury; e.g., grasping, empty-hand, "come-along" holds, using impact weapons for holds, pressure to pressure points, chemical agents); and (d) hard techniques (techniques where there is a greater possibility of injury; e.g., "take-downs" or striking using impact weapons, such as deploying chemical agents, expandable batons, straight batons, authorized less-lethal devices, and specialty impact weapons). | McCusker Decl. ¶ 7; Ex. "H" [GEO's Use of Force policy]. **PLAINTIFFS' RESPONSE**: *Disputed.* As to whether GEO employees are properly trained on use of force. GEO does not adequately train its officers on "Use-of-Force Continuum". Sgt. Campos reports that he "do[es]n't remember the continuum." Ex. 14, Sgt. Campos Dep. 145:2-7. Lt. Diaz stated that there was "nothing in our policy stating that we are not to deploy spray while they're in the segregation cells." Ex. 16, Lt. Diaz Dep. 13:4-7. Gillon reports that come along holds are presence and verbal commands. Ex. 17, Gillon Dep. 110:13-19. Ex. 14, Sgt. Campos Dep. 145:2-11. Campos only remembers that OC Spray may be used to "protect yourself, prevent injury to others, prevent injury to themselves [civil detainees]." |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 16. | Per GEO policy, the use of chemical agents is authorized when, in pertinent part, a detainee cannot be approached without danger to self or others and it is determined that a delay in bringing the situation under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage. | McCusker Decl. ¶ 8; Ex. "H" [GEO's Use of Force policy]. **PLAINTIFFS' RESPONSE**: *Disputed.* Defendants misstate the policy. GEO policy states that the Facility Administrator may authorize the use of chemical agents or non-lethal weapons, only when the situation is such that the detainee: Is armed and/or barricaded; or Cannot be approached without danger to self or others; and It is determined that a delay in bringing the situation under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage. Ex. H, GEO Use of Force Policy at GEO01994. |
| 17. | Officers are trained that chemical agents may be useful to control or quell a disturbance that is likely to develop into a serious disorder. | McCusker Decl. ¶ 8; Ex. "H" [GEO's Use of Force policy]. **PLAINTIFFS' RESPONSE**: *Objections:* Vague as to the term "trained." Lacks |

13

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | foundation. *Disputed.* The officers deposed don't remember their training or incorrectly state when OC spray may be used to "quell" a disturbance.  Sgt. Campos reports that he do[es]n't know what "quell" is and that he"do[es]n't remember the continuum." Ex. 14, Sgt. Campos Dep. 145:2-11. Campos only remembers that OC Spray may be used to "protect yourself, prevent injury to others, prevent injury to themselves [civil detainees]." Ex. 14, Sgt. Campos Dep. 145:2-11. |
| 18. | Additionally, a detainee that has come into contact with a chemical agent will be decontaminated/cleaned as soon as reasonably possible by flushing the contaminated area with generous amounts of water for 5 to 10 minutes or until the irritation is gone. This can be done in a shower, for example. | McCusker Decl. ¶ 9; Ex. "H" [GEO's Use of Force policy]. **PLAINTIFFS' RESPONSE**:  *Objection:* Incomplete statement --this is not a direct copy of the policy but a summary and it is missing components  *Disputed* . The policy also states that "Anyone that is exposed directly to OC should, as soon as practicably possible be removed to fresh air and kept in an upright position |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
|  |  | until normal breathing returns." Ex. H, GEO's Use of Force Policy at GEO 01995. GEO Officers are not properly trained on how to decontaminate and to use cold or room temperature water to decontaminate. Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report] at pgs. 5-6. Ex. 19, Juarez Dep. 43:15-17; 45:7-46:13; Ex. 25, Cornejo Dep. 77:2-78:24, 80:9-13, 80:25-81:6; Ex. 30, Rodriguez Dep. 112:13-113:4; Ex. 23, Castillo Dep. 104:18-106:7; Decl. of Isaac Castillo ¶ 5-6. |
| 19. | Thereafter, the detainee is examined by the medical unit that is staffed by a third party contractor. In 2017, the third party contractor was Correction Care Solutions. | McCusker Decl. ¶ 9; Ex. "H" [GEO's Use of Force policy].<br><br>**PLAINTIFFS' RESPONSE:**<br><br>*Objection:* Incomplete statement--this is not a direct copy of the policy but a summary and it is missing components.<br><br>*Disputed .* Although there is a third party contractor, Officers  authorized to use OC spray are still trained on |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
|  |  | decontamination procedures and responsible for all necessary steps before detainees are under the control of any third party contractor. Ex. H, at GEO 01995; Ex. 21, Jones Dep. 151:18-25; 156:23-157:4 (describing how the Officers were going to take Plaintiffs to the showers) |
| 20. | Officers are trained to document all incidents involving the use of force, and the Shift Supervisor will complete a "Use of Force/Restraints Report" to document the use of force or chemical agents. | McCusker Decl. ¶ 10; Diaz Decl. ¶ 36; Ex. "B" [Use of Force Report dated June 12, 2017]; Ex. "H" [GEO's Use of Force policy].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Disputed*. The training on Use of Force reporting is deficient. Lt Diaz reports that she did not always file a use-of-force report after using OC spray. Ex. 16, Lt. Diaz Dep. 20:4-7. Sgt. Campos stated that he felt his own report insufficiently detailed the events.   Ex. 14, Sgt. Campos Dep. 153:12-20. Captain McCusker had to correct errors on the use of force reports. Ex. 10, McCusker Dep. 44:9-19. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 21. | Following any incident involving the use of force, per GEO policy, the Facility Administrator or the Facility Administrator's designee, Assistant Facility Administrator, Captain, Health Services Administrator and the Field Office Director's designee shall meet and review the incident. | Janecka Decl. ¶ 5; McCusker Decl. ¶ 10; Ex. "E" [After-Action Review Report Use of Force/Restraints related to the June 12, 2017, incident]; Ex. "F" [Video recording of incident reviewed at the after-action review]; Ex. "H" [GEO's Use of Force policy].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Undisputed.* |
| 22. | The review completed by supervisory staff is intended to (a) assess the reasonableness of the actions taken by staff (e.g., if the force used was appropriate and in proportion to the detainee's actions) and (b) confirm the actions conform to GEO's policies and procedures. The after-action review is documented in the form of a report, which demonstrates the items reviewed during the meeting. | Janecka Decl. ¶ 5; McCusker Decl. ¶ 11; Ex. "E" [After-Action Review Report Use of Force/Restraints related to the June 12, 2017, incident].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection*: Lacks foundation, calls for speculation. |
| 23. | Prior to the after-action review, per GEO policy, GEO staff will notify select GEO administrators and supervisors of the incident. Specifically, a serious incident report ("SIR") is prepared by a shift supervisor, and a notification of the SIR is transmitted to GEO administrators and supervisors (there is a distribution list that SIRs are automatically transmitted to). The notification is a means to prompt an administrator to review the SIR. | Janecka Decl. ¶ 8; Ex. "G" [SIR, Notification and Emails to GEO Corporate related to the June 12, 2017, incident].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Disputed* that Warden Janecka was not involved in sending the report to higher |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | ups. Ex. 11, Janecka Dep. 80:5-7. |
| 24. | Afterwards, an administrator will review the SIR to confirm that it contains all requisite information and, then, transmit the final version of the SIR to GEO corporate. This procedure is not only for documentation purposes, but it serves as another mechanism to review the reasonableness of the actions taken by staff and confirm the actions conform to GEO's policies and procedures. | Janecka Decl. ¶ 8; Ex. "G" [SIR, Notification and Emails to GEO Corporate related to the June 12, 2017, incident].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection*: Calls for speculation, vague as to term "administrator."<br><br>*Disputed.* When asked about the extent of his finalization of SIR, Janecka said "I initial every one. My secretary prints them, and once they get sent and transmitted into their database, my name appears on every one of them as being the Facility Administrator. So each one of them, my secretary brings them to me periodically, and I sign them." Ex. 11, Janecka Dep. 85:18-23.<br><br>Janecka stated that the GEO policy in 2017 was that SIR review was done to ensure the factual accounts are accurate. Janecka makes no statements as to policy and procedure review in regards to SIRs. Ex. 11, Janecka Dep. 83:17-84:6. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 25. | Pursuant to GEO policy, a detainee may be placed in administrative segregation when the detainee is awaiting an investigation or a hearing for a violation of facility rules. This is not a punitive measure. A written order shall be completed and approved by a Shift Supervisor before a detainee is placed in administrative segregation except in exigent circumstances. | McCusker Decl. ¶ 12; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]; Ex. "I" [GEO's Restrictive Housing Units policy] **PLAINTIFFS' RESPONSE**: *Disputed.* The administrative segregation policy is punitive.  Lt. Diaz testified that following the use of force and after the Plaintiffs were transported to medical, she observed Plaintiffs being transported out of medical once they were showered and provided new uniforms. Significantly, she testified that Plaintiffs were not acting belligerent and were calm.  Other than observing their calm demeanor, Lt. Diaz had no further interactions with Plaintiffs. Still, she determined that they should be placed in administrative segregation. Ex. 15, Lt. Diaz Dep. 274:17-21, 275:16-276:25, 277:12-17. |
| 26. | The Facility's rules are found within the handbook that is provided to detainees when they arrive at the Facility. | Diaz Decl. ¶ 13; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]. **PLAINTIFFS' RESPONSE**: *Objection*: Lacks foundation; assumes facts *Disputed*. Plaintiffs were not |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | given manuals in their native language. Ex. 28, Mejia Dep. 24:3-25; Ex. 26, Diaz Dep. 16:10-17:9; Ex. 30, Rodriguez Dep. 20:14-21; Ex. 29, Garcia Dep. 20:20-23, 76:7-11, 72:24-73:3 ("I am aware that you have to follow the rules, but if you don't know the rules, how would you respect them? That's why we asked for the documentation in our language, and that was not given to us."). Furthermore, some rules--such as the rule against three way calls--are only found within the detainee handbook but are not found within GEO's training materials. |
| 27. | A detainee may be placed in Disciplinary Segregation only after a finding by the Institution Disciplinary Panel (IDP) or equivalent that the detainee is guilty of a high level prohibited act or rule violation. | McCusker Decl. ¶ 13; Diaz Decl. ¶¶ 38-40; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]; Ex. "C" [Administrative Segregation Orders related to Plaintiffs]; Ex. "D" [Incident of Prohibited Acts and Notice of Charges related to Plaintiffs]; Ex. "I" [GEO's Restrictive Housing Units policy].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection*: Lacks Foundation; Assumes facts not in evidence;<br><br>*Disputed.* Plaintiffs were effectively already in Disciplinary Segregation. They were told that they |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | would be in segregation for a time period no shorter than a week and up to a month "while everything got cleared up" Ex. 30, Rodriguez Dep., 154:6-155:13; Ex. 28, Mejia Dep. Dep., 162:1-5.

Plaintiffs were not given a hearing, instead, each inmate received a visit from the same staff member who then purported to represent him at the disciplinary hearings. Ex. 30, Rodriguez Dep., 157:13-19; Ex. 28, Mejia Dep. 155:14-20; Ex. 29 Garcia Dep. 56:2-8.

That staff member provided the same one sentence explanation at each of the nine hearings and the hearing officer made the same finding and imposed the same sanctions in each of the nine cases, writing "This kind of behavior will not be tolerated".  The detainees were given Ex. C, Administrative Segregation Orders related to Plaintiffs; Ex. D, Incident of Prohibited Acts and Notice of Charges related to Plaintiffs.

Plaintiffs were given segregation paperwork that had critical sections written in English. They did not understand that they were waiving their right to appear and in some cases the record seems to reflect that the notice of hearing was not timely. Ex. 2, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Administrative Segregation Orders related to Plaintiffs. |
| 28. | A written order detailing the reasons for placing the detainee is disciplinary segregation shall be completed and signed by the Disciplinary Hearing Officer before a detainee is placed in disciplinary segregation. A copy of the order shall be given to the detainee within 24 hours with limited exceptions. This procedure is followed to ensure detainees are given due process. | McCusker Decl. ¶ 13; Diaz Decl. ¶¶ 38-40; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]; Ex. "C" [Administrative Segregation Orders related to Plaintiffs]; Ex. "D" [Incident of Prohibited Acts and Notice of Charges related to Plaintiffs]; Ex. "I" [GEO's Restrictive Housing Units policy]. **PLAINTIFFS' RESPONSE**: *Disputed.* Plaintiffs were given segregation paperwork that had critical sections written in English. They did not understand that they were waving their right to appear and in some cases the record seems to reflect that the notice of hearing was not timely. Ex. 2, Administrative Segregation Notice and Orders for Plaintiffs. |
| 29. | Officers are trained that, and per GEO policy, detainees shall have reasonable and equitable access to telephones to maintain essential community and legal contacts, unless such access is controlled as part of the disciplinary or administrative segregation process. | McCusker Decl. ¶ 14; Ex. "J" [GEO's Communication policy]. **PLAINTIFFS' RESPONSE**: *Disputed.* Plaintiff Martinez testified that phone numbers for his |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | attorney, ex-wife, and daughters were blocked.  He submitted a grievance concerning the phone blocks, "but a long time passed before they unblocked the numbers" and not all phone numbers associated with people he communicated with were unblocked. Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, P000461, GEO00146 River Martinez kites re: Blocks at P000461, GEO00146; Ex. 45, Rivera Martinez recording re: Blocks at P000189.

Plaintiff Martinez's immigration attorney's efforts to contact GEO personnel and ICE officials regarding the phone blocks that interfered with Plaintiff Martinez's access to counsel similarly demonstrate that this issue was not immediately resolved.  Ex. 41, 52, Nicole Ramos Letter at P000158-163.

Plaintiff Castillo testified that he had problems contacting his mother, brother, and sister, as well as other individuals that were part of his support group because their phone numbers were blocked. Ex. 23, Castillo Dep. 112:23-113:19.

Although Plaintiff Castillo was able to contact individuals on his approved call list while in |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | segregation, once he was removed from segregation and was able to contact individuals outside of his approved list, those individuals' phone numbers were also blocked after he reported details about the use of force.  Ex. 23, Castillo Dep. 22:1-23:10. |
| 30. | Per GEO policy, the facility shall not restrict the number of calls a detainee places to his/her legal representatives, nor limit the duration of such calls by rule or automatic cut-off, *unless* necessary for security purposes or to maintain orderly and fair access to telephones. | Janecka Decl. ¶ 17; McCusker Decl. ¶ 14; Ex. "J" [GEO's Communication policy].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Disputed.*<br><br>Defendants' contention is unsupported by the proffered evidence. Plaintiff Martinez testified that phone numbers for his attorney, ex-wife, and daughters were blocked.  He submitted a grievance concerning the phone blocks, "but a long time passed before they unblocked the numbers" and not all phone numbers associated with people he communicated with were unblocked.  Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, P000461, GEO00146 River Martinez kites re. Blocks at P000461; Ex. 45, Rivera Martinez recording re: Blocks at P000189.<br><br>Plaintiff Martinez's |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | immigration attorney's efforts to contact GEO personnel and ICE officials regarding the phone blocks that interfered with Plaintiff Martinez's access to counsel similarly demonstrate that this issue was not immediately resolved.  Ex. 41, 52, Nicole Ramos Letter at P000158-163. |
| 31. | Under no circumstance is a detainee permitted to make or be involved in a "three-way" call, and detainees are made aware that three-way calls are prohibited when they arrive at the Facility. | Janecka Decl. ¶ 15; McCusker Decl. ¶ 14; Ex. "J" [GEO's Communication policy].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Objection.* Calls for speculation<br><br>*Disputed in part.* GEO's communication policy does not forbid three-way calls. Ex. J Policy and Procedure Manual: Detainee Access to Telephone at GEO 02003-02009.<br><br>However, the detainee handbook does state that there is a restriction on three way calls and provides no exception for the detainees' counsel. *See id.* |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 32. | Moreover, the only GEO personnel that can request to have a detainee's access restricted include the Security Threat Groups Investigator and the Intelligence Investigator. On occasion, the PREA investigator will work in conjunction with the Security Threat Groups Investigator to make a request. | Janecka Decl. ¶ 14; Diaz Decl. ¶ 46; Campos Decl. ¶ 19.<br><br>**PLAINTIFFS' RESPONSE**:<br><br>Objection: Lacks foundation; calls for speculation<br><br>*Undisputed.* |
| 33. | Per GEO policy and practice, the request is then submitted to the Facility Administrator, who can recommend the restriction to ICE. Ultimately, ICE determines whether a restriction will be placed on a detainees' access to the phones/calls. | Janecka Decl. ¶ 16.<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Undisputed.* |
| 34. | Per GEO policy, officers are also trained to identify any detainee who may use a hunger strike to resolve personal issues. Officers are instructed to attempt to negotiate with the individual or key leader in a group to discontinue the proposed Hunger Strike. | McCusker Decl. ¶ 15; Ex. "K" [GEO's Emergency Plans Manual].<br><br>**PLAINTIFFS' RESPONSE**:<br><br>*Disputed.* Lt. Diaz stated in her deposition that she was trained in GEO hunger strike policy and her first step was to speak to the group as a whole. Ex. 15, Lt. Diaz Dep. 198:23-24-199:1-8. Lt. Diaz did not identify the leader of the group nor attempt to negotiate but rather repeatedly told Plaintiffs that they needed to rack up. Ex. 15, Lt. Diaz Dep. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 202:20-23. Lt. Diaz's next step was to use force to separate the group. Ex. 15, Lt. Diaz Dep. 205:22-23. And, to spray the group with OC Spray, which she reported was GEO's policy for such strikes.  Ex. 15, Lt. Diaz Dep. 212:3-23.  Diaz reports that the Policy was to "stop the confrontation and disperse it" Ex. 15, Lt. Diaz Dep. 221:13-14.  After the event ICE watched the video, the warden watched the video, and others watched the video and all agreed that Diaz did nothing wrong, that she did what she was trained to do. Ex. 15, Lt. Diaz Dep. 232:3-7. |
| 35. | If negotiations fail, the detainee(s) are isolated from the General Population and placed in Medical. If the group is too large, the detainee(s) should be taken to an alternative housing unit or an area where food intake can be monitored. | McCusker Decl. ¶ 15; Ex. "K" [GEO's Emergency Plans Manual].  **PLAINTIFFS' RESPONSE**:  *Disputed.* Diaz's next step was to spray the group with OC Spray, which she reported was GEO's policy for such strikes.  Ex. 15, Lt. Diaz Dep. 212:3-23.  Diaz reports that the Policy was to "stop the confrontation and disperse it" Ex. 15, Lt. Diaz Dep. 221:13-14.  After the event ICE watched the video, the warden watched the video, and others watched the video and all agreed that Diaz did nothing wrong, that she did what she was trained to do. Ex. 15, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Lt. Diaz Dep. 232:3-7. |

## PLAINTIFFS' ADDITIONAL AFFIRMATIVE STATEMENT OF FACTS AS TO DEFENDANTS GEO AND CITY

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 1. | The City of Adelanto entered into a contract (the Intergovernmental Services Agreement, or IGSA) with Immigration and Customs Enforcement (ICE) to house detainees at a city-run detention facility. | Ex. M, [GEO and Adelanto MOU] at 2. |
| 2. | In May 2011, the City of Adelanto entered into a contract with the Geo Group, Inc., a private detention company, to run the Adelanto facility. | Ex. L, [Agenda Report dated May 17, 2011]; Ex. "M" [2011 Service Agreement]. |
| 3. | In May 2011, it was against the federal governments' conflict of interest rules for GEO to contract with ICE directly. | Ex. 12, Flores Dep. 97:4-14. |
| 4. | The Services Contract delegates the "obligations and responsibilities of the City [as though they] were fully rewritten here as applying to GEO." | Ex. M, [GEO and Adelanto MOU] |
| 5. | The Services Contract gives the Geo | Ex. M, [GEO and Adelanto |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | Group the right to make policies for the facility. | MOU] |
| 6. | The City had basic obligations under California law that it had to follow in any City detention facility, namely California Building Code Title 24- Minimum Standards for Local Detention Facilities. | Cal. Code Regs. tit. 24, § 1231.3.4 *available at* http://www.bscc.ca.gov/wp-content/uploads/Adult-Title-24-Min-Standards-for-Local-Detention-Facilities-2013.pdf |
| 7. | On June 12, 2017, Plaintiffs were being held in the Adelanto Detention Facility. Plaintiffs had many complaints about the conditions there. Plaintiffs decided, as a group, they would begin a hunger strike until a GEO or ICE supervisor would address their complaints, and they wrote out a two-page letter in Spanish that explained this. | Ex. 23, Castillo Dep. 63:10-13, 74:21-75:20, 76:12-25; Ex. 25, Cornejo Dep. 52:25-54:16; |
| 8. | Plaintiffs gave this letter to the dorm officer, Officer Gillon, and used other detainees to translate and explain to him that they were participating in a peaceful hunger strike. | Ex. 17, Gillon Dep. 86:11-87:15, 87:25-88:2. |
| 9. | When he was relieved by Officer Jindi at 6:30 that morning, he took the letter to Lieutenant Diaz. | Ex. 17, Gillon Dep. 90:19-21, 90:25-91:11; [Ex. F, [Video, Views C-2 and C-3] at 06:33:22 a.m. to 6:33:29 a.m. |
| 10. | In response, Lieutenant Diaz yelled at the detainees in English, stopped the only Spanish speaking officer from negotiating | Ex. 27, Martinez Dep. 70:10-25-71:21-25;74:1-6; 76:20-25. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | with the detainees after two minutes; ordered the use of force against the detainees; pepper sprayed the detainees; and in short escalated the situation and used force punitively. | |
| 11. | Lieutenant Diaz ordered the use of force against the detainees after five minutes of her arriving on the scene. | Ex. 27, Martinez Dep. 51:18-25, 76:20-25 |
| 12. | Lieutenant Diaz also called another supervisor, Sergeant Campos, over from the other side of the facility. | Ex. 16, Lt. Diaz Dep. 214:9-11; Ex. 14, Sgt. Campos Dep. 74:9-25 |
| 13. | Sergeant Campos, when he arrived, ordered the officers to push a detainee against the wall, then ordered officers to step away from the detainees where they were sitting at the table, and sprayed the remaining detainees at extremely close range as they sat peacefully at the table. | Ex. 14, Sgt. Campos Dep. 89:16-25-90:1-5; Ex. F, [Video, Views C-1, C3 and C-4] at 06:46:10 a.m. to 6:47:19 a.m. |
| 14. | The detainees were hurt both by the use of force against them and by the pepper spray.  They were then further hurt when the officers failed to decontaminate them properly. | Ex. 27, Martinez Dep. 94:15-95:5; Ex. 49, Decl. of Hussain Turk; Ex. 30, Rodriguez Dep. 145:24-25, 152:22-24;  Ex. F, [Video, Views C-1 and C-3] at 6:38:04 to 6:38:28; Ex. 27, Martinez Dep. 90:24-91:11, 93:10-20; Ex. 28, Mejia Dep. 75:19-76:13.  Ex. 23, Castillo Dep. 91:13-3; Ex. 29, Garcia Dep. 45:21-24; 47:2-3. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 15. | The officers waited at least 2 ½ hours to decontaminate Plaintiffs. | Ex. 7, [All Plaintiffs' Med Report on Injuries]; Ex. 21, Jones Dep. (confidential) 176:11-15, 177:18-25, 205:25-206:3. |
| 16. | The officers put them into hot showers fully clothed and still handcuffed, which exacerbated the effects of the pepper spray, creating an extremely painful burning sensation. | Ex. 23, Castillo Dep. 105:1-19. Ex. 26, Diaz Dep. 84:13-85:12; 87:11-88:10; 93:8-15.<br>Ex. 24, Campos Dep. 99:16-100:12; 118:20-119:4<br>Ex. 28, Mejia Dep. 88:13-19.<br>Ex. 25, Cornejo Dep. 77:4-78:24; 80:5-21; 81:7-14<br>Ex. 30, Rodriguez Dep. 113:12-22; 162:13-163-2; 163:9-12. |
| 17. | Under Title 24 - Minimum Standards for Local Detention Facilities, the City is required under California law to ensure hot, cold, and tempered showers. | Cal. Code Regs. tit. 24, § 1231.3.4 *available at* http://www.bscc.ca.gov/wp-content/uploads/Adult-Title-24-Min-Standards-for-Local-Detention-Facilities-2013.pdf |
| 18. | The showers were set to a single temperature and it was not possible to have only cold or cool water come out of the showers. | Ex. 27, Martinez Dep. 118:20-25; Decl. of Martinez ¶ 4, Decl. of Castillo ¶ 4. |

31

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 19. | The facility had previously received complaints about the showers being too hot, and those complaints were reviewed by command-level staff at the facility, including Captain McCusker. | Ex. 10, McCusker Dep. 64:11-65:2. |
| 20. | Pepper spray should be decontaminated using cool or cold water. | Ex. McCusker Decl. ¶ 9, Venters Decl. ¶ 3, Ex. 16, Reyes Dep. 140:3-8 |
| 21. | Using warm or hot water on pepper spray can increase the burning sensation and further hurt detainees. | Venters Decl. ¶ 3; Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report] at pg. 5. |
| 22. | Captain McCusker classifies the pain from OC spray to be an 8 out of 10 and that the first time being exposed is the most painful and traumatic | Ex. 10, McCusker Dep. 33:20-34:16. |
| 23. | The detainees were subjected to excessive force when they were decontaminated in a manner that hurt them. | Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report] at pgs. 5-6; Ex. 19, Juarez Dep. 43:15-17; 45:7-46:13; Ex. 25, Cornejo Dep. 77:2-78:24, 80:9-13, 80:25-81:6; Ex. 30, Rodriguez Dep. 112:13-113:4; Ex. 23, Castillo Dep. 104:18-106:7; Castillo Decl. ¶¶ 4-5. |
| 24. | The detainees complained to the officers at the time that the showers were burning them. | Ex. 16, Lt. Diaz Dep. 283:1-5. |
| 25. | GEO employees do not receive training on the temperature the water should be when | Ex. 10, McCusker Dep. 37:14-21. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | someone is being decontaminated | |
| 26. | GEO employees do not receive training on the effect of hot water on someone who has been OC sprayed. | Ex. 10, McCusker Dep. 38:4-7. |
| 27. | None of the officers were subjected to hot water decontamination. | Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report]; Ex. 16, Lt. Diaz Dep. 153:25-154:10, 154: 21-155:11, 155:24-156:3, 158:3-13 (explaining that GEO officers are trained that hot showers will exacerbate OC spray pain and clothing with OC spray should be removed). Ex. 16, Lt. Diaz Dep. 152: 18-24 (eyes were flushed with cold water and a fan was used to relieve the stinging sensation during OC spray training).  Ex. 19, Juarez Dep. 18:6 (use cold water), 79:22-80:19 (immediate eye flush), 41:14-24 (attended by medical staff); Ex. 16, Reyes Dep. 125:11-25 (attended by nurse in medical dept., eyes flushed, provided water and soap to wash with), 138:7-18, 139:10-20 (sent for off-site medical evaluation by a doctor) Ex. 16, Reyes Dep. 125:11-25, 138:7-18, |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 139:10-20; |
| 28. | Warden Janecka was the final policymaker on the policies at the facility, including at the time of the incident.  He has the power to implement policy and practices in Adelanto on GEO Group agents' use of force, and was responsible for managing the day to day operations. | Ex. 11, Janecka Dep. 102:12–21, (Warden Janecka is the "final decision-maker at Adelanto [Detention Center] for GEO." ). |
| 29. | The Warden had the ultimate responsibility for conditions in the facility; he made the decision whether to address complaints or not. | Ex. 11, Janecka Dep. 32:21-33:9 93:8-11. |
| 30. | No one at the City has done a review of GEO's policies during the relevant time period | Ex. 13, Langill Dep. 56:21-24 (Q: During the time that you have been Compliance Administrator has the City of Adelanto come into the facility to do any sort of review of the policies -- A: No."); Ex. 12, Flores Dep.100:8-21 |
| 31. | The Facility Administrator referred to in the contracts and policies is the Warden. The Facility Administrator is supposed to pre-approve the use of pepper spray under | Ex. 11, Janecka Dep. 60:1-19; Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report] at 4. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | the policies. | |
| 32. | Gillon saw the Warden arrive at the facility after the incident around 7:21. It is undisputed that the Warden arrived at Adelanto Detention Facility shortly after the incident; that he went to 2-Charlie (the site of the incident); and that he discussed what had happened with the officers. | Ex. 17, Gillon Dep. 174:2-14, Ex. F, [Video] at 7:21:26 a.m. |
| 33. | Officer Reyes also saw the Warden arrive and speak with Diaz and some other officers.  At the time, the pepper spray in the unit was still strong, and it was prior to the evacuation of the detainees from the unit. After they evacuated the detainees, they had to air out the unit. | Ex. 16, Reyes Dep. 122:1-123:8; Ex. 18, Jindi Dep. 54:10-55:14. |
| 34. | Before they evacuated the unit, Officer Jindi had to step out to the yard to catch her breath, because she was coughing and she felt burning from the amount of pepper spray in the room. | Ex. 18, Jindi Dep. 55:18-24 |
| 35. | The Warden initials "every" serious incident report—including for the June 12, 2017 incident—and the Warden's "name appears on every one of [the serious incident reports] as being the Facility Administrator." | Ex. 11, Janecka Dep. 82:23–24, 85:18-23. |

35

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 36. | The Warden reviews the serious incident report and asks for clarification if necessary before approving and transmitting it to corporate. | Ex. 11, Janecka Dep. 80:11-81:8. |
| 37. | After the event Warden Janecka and others watched the video from the surveillance camera on the use of force. | Ex. 16, Lt. Diaz Dep. 232:3-7 |
| 38. | On June 12, 2017 and June 13, 2017, the Warden reviewed and approved the use of pepper spray against peaceful, hunger-striking plaintiffs at close range on June 12, 2017, agreeing that Lt. Diaz acted according to protocol. | Ex. 16, Lt. Diaz Dep. 231:23–234:1 |
| 39. | The Warden received notice of the use of force and was contractually required to report the use of force to ICE. The Warden also reviewed the Serious Incident Report. | Ex. 11, Janecka Dep. 69:1-20; 81:1-7. |
| 40. | The officers were provided two to three weeks of classroom training when they started at Geo Group. | McCusker Decl. ¶ 3; Ex. 14, Sgt. Campos Dep. 19:6-12; Ex. 17, Gillon Dep. 14:14-23; Ex. 19, Juarez Dep. 14:16-23. |
| 41. | The supervising officers were also supposed to be trained in additional topics such as use of OC spray and the use of force requirements that permit the use of chemical agents. | McCusker Decl. ¶ 5, Ex. 14, Sgt. Campos Dep. 145:6-23-146:2-7 |
| 42. | GEO has failed to train its officers to act | Ex. 14, Sgt. Campos Dep. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
|  | according to the continuum of force. | 145:2-7; Ex. 16, Lt. Diaz Dep. 13:4-7. Ex. 17, Gillon Dep. 110:13-19 (did not know what come along holds are). |
| 43. | GEO's use of force policy states that the Facility Administrator may authorize the use of chemical agents or non-lethal weapons, only when the situation is such that the detainee:<br>(1)  Is armed and/or barricaded; or<br>(2) Cannot be approached without danger to self or others; and<br>(3)  It is determined that a delay in bringing bringing the situation under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage | Ex. "H" [GEO's Use of Force policy]. |
| 44. | Nurse Jones testified, and the video shows, that on the day in question when the spray was deployed, Plaintiffs were sitting still and could be easily counted. | Ex. 21, Jones Dep. 98:5-25; 99:1-9; 86:1-8; Ex. F, [Video, Views C-3 and C-4] at 06:19:23 a.m. to 6:32:43 a.m. |
| 45. | Under the policy, there must be a major disturbance in order for spray to be deployed. | Schwartz Decl. ¶ 4; Decl. of Jeffery A. Schwartz ¶ 7, Ex. A, [Schwartz Expert Report] at 9; Ex. H [GEO's Use of Force Policy] |
| 46. | The video shows clearly that there was no major disturbance at the time force was | Ex. F, [Video] at 06:34:45 a.m. to 6:38:03a.m. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | deployed. | |
| 47. | GEO Group permits the use of major – and even deadly – force in response to "riots" and "rebellions." | Ex. H, [GEO Use of Force Policy]; Schwartz Dec.¶ 4 |
| 48. | Pepper spray is a major use of force. | Ex. H, [GEO Use of Force Policy] (No. 10.2.15), at 3(Sec. A(1)(a)) |
| 49. | The detainees did not pose a threat nor was there a major or serious disturbance at the point force was used. | Schwartz Dec.¶¶4, 6. |
| 50. | Captain McCusker felt that the term "disturbance" did not accurately describe the incident in this case. | Ex. 10, McCusker Dep. 44:9-19 ("The term 'disturbance' could have a connotation of a riot, for instance as a worst case, and it wasn't felt that the term 'disturbance' accurately described the incident.") |
| 51. | There is no document that defines the term "disturbance". | Ex. 10, McCusker Dep. 45:10-18 |
| 52. | GEO employees are not trained on when a disturbance occurs. | Ex. 10, McCusker Dep. 46:6-8 (Q: Does GEO train its officers on where that threshold is crossed and what constitutes a disturbance? A: No.) |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | |
| 53. | GEO does not have further module trainings to help define: "Hunger strike" and "disturbance/riot". But has further module trainings to define terms like "escape" and "hostage situation". | Ex. 10, McCusker Dep. 62:23-63:20 |
| 54. | GEO does not elaborate on terms like disturbance, riot, or rebellion in trainings. | Ex. 10, McCusker Dep. 81:12-18 ("I say disturbance, riot or rebellion, because it's written on there. I don't elaborate on it."). |
| 55. | In most facilities, a refresher course in OC spray use is required each year. | Decl. of Jeffery A. Schwartz ¶ 7, Ex. A [Schwartz Expert Report] at at 19 |
| 56. | Geo Group did not refresh the OC training but only trained its employees when they moved to a supervisor level. | Decl. of Jeffery A. Schwartz ¶ 7, Ex. A [Schwartz Expert Report] at at 19 |
| 57. | GEO has had to retrain staff on count procedures and logbook entries a significant number of times. Retraining on count procedures is even more common than logbook entry procedures. | Ex. 10, McCusker Dep. 73:7-21 |
| 58. | GEO has not made any changes to their general trainings even after needing to retrain individual staff following detainee grievances. | Ex. 10, McCusker Dep. 80:2-7 |
| 59. | Lt. Diaz stated that a rebellion was | Ex. 16, Lt. Diaz Dep. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | occurring that warranted a major use of force under Geo Group's policy. | 348:6-18 |
| 60. | Sgt. Campos never received any training on what a "rebellion" was, although he was aware that it appeared in the use of force policy documents. | Ex. 14, Sgt. Campos Dep. 81:17-82:2. |
| 61. | There is no definition of the term "rebellion" in the GEO Use of Force Policy. | Ex. 13, Langill Dep. 60:10-12. |
| 62. | Sgt. Campos believed that when even a small group gave "no compliance", that was a rebellion. | Ex. 14, Sgt. Campos Dep. 141:22-142:3, 142:10-18. |
| 63. | This definition of rebellion was consistent with the one given by Officer Reyes, who also said that a rebellion was when "the detainees were just not wanting to comply." Reyes testified that the officers were not trained on the term rebellion. | Ex. 16, Reyes Dep. 166: 21-25; 167:1-6. |
| 64. | The Warden gave the correct definition, on which the officers were not trained: that a large group of individuals would try to overtake an area of the institution; and explained that this was not a rebellion and there had not been any rebellions in the facility. | Ex. 11, Janecka Dep. 68:12-20. |
| 65. | The record is unclear as to whether GEO employees receive in-service training on confrontation avoidance | Ex. 10, McCusker Dep. 51:22-25. |
| 66. | Campos also reports not remembering the factors required to deploy OC spray. | Ex. 14, Sgt. Campos Dep. 145:9-22; 146:2-6. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 67. | Diaz reports inciting a group demonstration and non compliance with verbal commands was sufficient cause to use OC spray. | Ex. 16, Lt. Diaz Dep. 224:3-20. |
| 68. | The record is unclear as to what extent GEO teaches the "Use-of-Force Continuum" to its officer. Sgt. Campos reports that he "do[es]n't remember the continuum." | Ex. 14, Sgt. Campos Dep. 145:2-7. |
| 69. | Once OC Spray is deployed "Anyone that is exposed directly to OC should, as soon as practicably possible be removed to fresh air and kept in an upright position until normal breathing returns." | Ex. H, [GEO's Use of Force Policy] at 10. |
| 70. | Plaintiffs were left in a holding cells without a shower and with their contaminated clothing on as they were called one-by-one to come up to the holding cells door to have their vitals checked. | Ex. 21, Jones Dep. 153:7-23. |
| 71. | GEO officers did not know the policy on decontamination and, as a result, Plaintiffs were left in their contaminated clothes for a prolonged period of time, at least three hours.  Rather all eight plaintiffs were left soaking with OC Spray in a small holding cell. | Ex. 19, Juarez Dep. 30:2-6; Ex. 23, Castillo Dep. 101:16-20;102:5-21. |
| 72. | All staff authorized to use OC spray receive training not only in its use, but also in the decontamination of individuals exposed to it. This training must be documented in the staff training record. | Ex. H, [GEO's Use of Force Policy] at 10. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 73. | It would be within the GEO policy to have GEO staff take the detainees directly to shower themselves. | Ex. 16, Lt. Diaz Dep. 156:11-15. |
| 74. | The manner in which Plaintiffs were decontaminated, i.e. fully clothed and with hot water, is not the accepted practice of OC spray decontamination. | Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report] at 5; Ex. 16, Lt. Diaz Dep. 153:25-154:10, 154: 21-155:11, 155:24-156:3, 158:3-13 (explaining that GEO officers are trained that hot showers will exacerbate OC spray pain and clothing with OC spray should be removed). |
| 75. | After Plaintiffs were placed in segregation, GEO staff blocked telephone numbers that Plaintiffs regularly contacted, including attorneys, family, friends, and advocates. | Ex. 41, [Nicole Ramos Letters]; Ex. 42, [Lt. Belt Voicemail]; Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, [Omar kites re. Blocks]; Ex. 44, [Omar recording re. Blocks]; Ex. 26, Diaz Dep. 93:24-95:5, 99:19-22; Ex. 23, Castillo Dep. 22:1-23:10, 112:23-113:19; Ex., 45 [List of blocked numbers for Plaintiff Lopez Castillo]; Ex. 25, Cornejo Dep. 94:4-11, 94:16-95:11, 97:2-6, 97:21-98:6, 99:11-13, 100:11-13. |
| 76. | The person at GEO who is in charge of monitoring calls for security threats is the | Ex. 9, Belt. Dep. 10:25-11:3; 21:8-9; 29:12-22; |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | security threat groups investigator, Mr. Barry Belt.  He listens to the detainees' calls, which are recorded. | 21:8-9 ("Do you know how they monitor that?" "Yeah, I listen to the phone call.") |
| 77. | Mr. Belt has the power to place blocks on numbers from his computer at the facility.  His computer runs a program from third party phone provider Talton that shows each number and the call history. | Ex. 9, Belt Dep. 13:6-16; 14:15-18; 15:16-19; 16:21-17:1; 19:4-10; 34:16-18. |
| 78. | Mr. Belt has the power to block a number if he determines it comprises a security threat to the facility or staff or detainees. | Ex. 9, Belt Dep. 16:12-15. |
| 79. | Even an attorney can be blocked if GEO determines that the attorney "is complicit in the safety and security issues at the facility". | Ex. 9, Belt Dep. 30:5-13. |
| 80. | If the detainees were coordinating a hunger strike, that would be grounds for blocking the numbers. | Ex. 9, Belt Dep. 39:8-22. |
| 81. | Belt works directly for the facility administrator, Warden Janecka, who directs him whether or not to block numbers.  He always sends his request to the Warden and waits for approval before blocking the number. | Ex. 9, Belt Dep. 39:8-22; 41:11-12; 43:7-24; 46:13-18; 48:25-49:4. |
| 82. | Belt writes up the details of the calls he listens to that he finds relevant, including "the reasoning or the necessity for identifying the issues posed by the continued phone call", and gives that to the Warden to make the ultimate decision. | Ex. 9, Belt Dep. 44:7-14; 46:13-18. |
| 83. | GEO requested phone numbers to be | Ex. 23, Castillo Dec. 6; Ex. |

43

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | blocked after Plaintiffs discussed the hunger strike and how they were subjected to excessive force with outside parties such as Nicole Ramos, one of the Plaintiffs' immigration attorneys and from advocacy organizations like CLUE (Clergy and Laity United for Economic Justice) and Pueblos Sin Fronteras. | 41, [Nicole Ramos Letters]; Ex. 42, [Lt. Belt Voicemail]; Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, [Omar kites re. Blocks]; Ex. 44, P [Omar recording]; Ex. 26, Diaz Dep. 93:24-95:5, 99:19-22; Ex. 23, Castillo Dep. 22:1-23:10, 112:23-113:19; Ex., 45, [List of blocked numbers (Castillo)]; Ex. 25, Cornejo Dep. 94:4-11, 94:16-95:11, 97:2-6, 97:21-98:6, 99:11-13, 100:11-13 |
| 84. | Plaintiff Castillo testified that he had problems contacting his mother, brother, and sister, as well as other individuals that were part of his support group because their phone numbers were blocked. Although Plaintiff Castillo was able to contact individuals on his approved call list while in segregation, once he was removed from segregation and was able to contact individuals outside of his approved list, those individuals' phone numbers were also blocked after he reported details about the use of force. | Ex. 23, Castillo Dep. 22:1-23:10; 112:23-113:19; |
| 85. | Plaintiff Martinez also became unable to speak with his immigration attorney after Plaintiff Martinez told her what had happened and she filed a grievance about it. Her number was blocked and he could | Ex. 41, [Nicole Ramos Letters]; |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
|  | not call her. |  |
| 86. | Plaintiff Martinez testified that phone numbers for his attorney, ex-wife, and daughters were blocked.  He submitted a grievance concerning the phone blocks, "but a long time passed before they unblocked the numbers" and not all phone numbers associated with people he communicated with were unblocked. | Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, [Omar kites re. Blocks]; Ex. 44, [Omar recording re. Blocks] |
| 87. | Captain McCusker was Captain at the time of the hunger strike. | Ex. 10, McCusker Dep. 5:5-11 |
| 88. | The Captain was a policymaker at the facility and reviewed documents generated as a result of the use of force; like the Warden, he also found the use of force was in policy. | Ex. 10, McCusker Dep. 40:4-18;44:10-19; Ex. B General Incident Report [GEO2272]; Ex. E, After Action Review Report [GEO 02238] |
| 89. | Captain McCusker assisted Lieutenant Diaz in completing the use of force reports. | Ex. 16, Lt. Diaz Dep. 106:1-4 |
| 90. | Captain McCusker crossed off the notations on the use of force report that said the hunger strike in this case was not a disturbance. | Ex. 10, McCusker Dep. 44:4-19. |
| 91. | If the video review had been done carefully, it would have been determined that the officers used excessive force. "[R]eview of video from this incident reveals several clear elements that indicate force was not required when it was used." | Decl. of Homer Venters ¶ 4, Ex. A [Dr. Venters Expert Report] at 4. |
| 92. | Officers had a practice of not accurately | Ex. 16, Lt. Diaz Dep. 20:4- |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | filling out use of force reports.  Lt Diaz reports that she did not always file a use-of-force report after using OC spray. Campos stated that he felt his own report insufficiently detailed the events. | 7. Sgt. Ex. 14, Sgt. Campos Dep. 153:12-20. |
| 93. | The City Manager had open communication with the Warden and if an issue came to the City Manager's attention the City Manager would speak with the Warden about it. The City Manager also was able to attend quarterly meetings at the Facility. | Hart Decl. ¶ 9. |
| 94. | The City is entitled to perform periodic inspections. | Ex. M, at GEO 00661 (GEO and Adelanto MOU) |
| 95. | Moreover, the city at all times had the ability to receive regular reports from GEO as to the facility and attend key GEO meetings. | Hart Decl. ¶ 9. |
| 96. | There have been so many hunger strikes at the Adelanto Facility that GEO's Person Most Knowledgeable could not "put a number on it." | Ex. 10, McCusker Dep. 76:10-25 |
| 97. | The City was aware of the Office of Inspector General Report that detailed serious problems at the Adelanto Detention Facility, | Ex. 12, Flores Dep. 47:6-17 |
| 98. | After the Inspector General Report the City did not look at the grievance log, the City lists no affirmative actions it took, only that City representatives met with the attorney general's office twice, but even | Ex. 12, Flores Dep. 47:6-20. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | then the meeting were designed to bring the issues to the City's attention--there was no discussion | |
| 99. | GEO would forward correspondence between GEO and ICE to the city.  GEO personnel would also attend city council meetings. | Hart Decl. ¶ 11. |
| 100. | During his tenure as Warden, Janecka did not recall a single inspection of the facility by the City of Adelanto. | Ex. 11, Janecka Dep. 107:24-108:2 |
| 101. | As part of her duties as Compliance Administrator for GEO, Person Most Knowledgeable Joanne Langill conducts walk-throughs and coordinates audits at Adelanto Detention Facility | Ex. 13, Langill Dep. 10:24-11:6 |
| 102. | During her tenure as Compliance Administrator, the City of Adelanto has never conducted an audit of the facility or contacted Ms. Langill. | Ex. 13, Langill Dep. 56:16-20; *Id.* at 57:11-14. |
| 103. | According to the person most knowledgeable and current City Manager at Adelanto, there is no person in the City responsible for inspecting GEO's facility. | Ex. 12, Flores Dep. 15:15-20 (June 28, 2019). |
| 104. | Adelanto did not review GEO's policies. As the PMK explained, "we contracted with GEO to maintain all documentations, policies, procedure and oversee the facility on behalf of the City." He added, "We relied on GEO to perform all . . . responsibilities on our behalf" and "we | Ex. 12, Flores Dep. 41:2-22;. 51:25-53:1. |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | relied on GEO for-- to oversee the detention center". | |
| 105. | Sgt. Campos deployed his OC spray at Plaintiffs from very close range, less than five feet away. | Ex. F, [Video, View C-3] at 06:46:37 a.m. to 6:47:03 a.m. |
| 106. | Sgt. Campos was not aware that spraying at three feet was out of policy and was trained that he could spray at three to five feet. | Ex. 14, Sgt. Campos Dep. 16:10-12; 20-22. |

Dated:  November 26, 2019          LAW OFFICES OF RACHEL STEINBACK
                                   LAW OFFICES OF CAROL A SOBEL
                                   SCHONBRUN SEPLOW HARRIS
                                   & HOFFMAN LLP
                                   LAW OFFICE OF COLLEEN FLYNN
                                   LAW OFFICE OF MATTHEW STRUGAR

                                   By:  /s/ Catherine E. Sweester
                                        Rachel Steinback
                                        Monique Amanda Alarcon
                                        Catherine E. Sweetser
                                        Colleen Flynn
                                        Matthew Strugar
                                        *Attorneys for Plaintiffs.*