Rachel Steinback, SBN 310700
Law Office of Rachel Steinback
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
Law Office of Carol Sobel
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*
*[Additional Counsel on Following Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA
MARTINEZ; ISAAC ANTONIO
LOPEZ CASTILLO; JOSUE
VLADIMIR CORTEZ DIAZ; JOSUE
MATEO LEMUS CAMPOS;
MARVIN JOSUE GRANDE
RODRIGUEZ; ALEXANDER
ANTONIO BURGOS MEJIA; LUIS
PEÑA GARCIA; JULIO CESAR
BARAHONA CORNEJO, as
individuals,

           Plaintiffs,

v.

The GEO Group, Inc., a Florida
corporation; the City of Adelanto, a
municipal entity; GEO Lieutenant Diaz,
sued in her individual capacity; GEO
Sergeant Campos, sued in his individual
capacity; Sarah Jones,  sued in her
individual capacity; The United States
of America; Correct Care Solutions,
Inc.; and DOES 1-10, individuals;

           Defendants.

Case No. 5:18-cv-01125-SP
*Assigned to: Honorable Sheri Pym*

**PLAINTIFFS' GENUINE DISPUTES OF MATERIAL FACTS AND PLAINTIFFS' ADDITIONAL SEPARATE STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANTS DIAZ AND CAMPOS' SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

**<u>Hearing:</u>**
Date:       December 17, 2019
Time:       10:00 a.m.
Courtroom: 3

Catherine Sweetser, SBN 271142
Kristina Harootun, SBN 308718
Schonbrun Seplow Harris & Hoffman LLP
11543 W. Olympic Boulevard
Los Angeles, CA 90064
(t) 310-396-0731
(f) 310-399-7040
(e) csweetser@sshhlaw.com
(e) kharootun@sshhlaw.com

Colleen Flynn, SBN 2324281
Law Office of Colleen Flynn
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 213-252-9444
(f) 213-252-0091
(e) cflynn@yahoo.com

Matthew Strugar, SBN 232951
Law Office of Matthew Strugar
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 323-696-2299
(e) matthew@matthewstrugar.com

*Attorneys for Plaintiffs.*

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1 of the Central District of California, Plaintiffs hereby submit their response to Defendants Diaz and Campos Statement of Uncontroverted Facts and their own Separate Statement of Facts in Opposition to Defendant Diaz and Campos's Motion for Summary Judgment.

Plaintiffs refer to Defendants' Exhibits "A" through "M" as filed in their Appendix of Evidence, (Dkt. #108-2, #108-3, #111-2, and #111-3).  Plaintiffs refer to Exhibits 1-52, attached to the Declaration of Monique A. Alarcon, filed concurrently with Plaintiffs' opposition to Defendants' Motion to Dismiss.

## RESPONSE TO DEFENDANTS'
## STATEMENT OF UNCONTROVERTED FACTS

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 1. | In May 2011, GEO entered into contract with U.S. Immigration & Customs Enforcement (ICE) for the detention and care of immigrant detainees at the Adelanto Detention Facility ("Facility"), which houses immigrant detainees, through an intergovernmental service agreement with the City. | Janecka Decl. ¶¶ 3, 5; Hart Decl. ¶¶ 3-6, 12; Ex. "L" [Agenda Report dated May 17, 2011]; Ex. "M" [2011 Service Agreement].<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* At that time it was a conflict of interest for GEO to contract with ICE directly. The City of Adelanto signed a contract with ICE and separately contracted with GEO to be the "pass through" for money between them. Ex. 12, Flores Dep. 97:4-14. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 2. | Thereafter, in June 2019, GEO directly contracted with ICE to manage and operate the Facility. | Janecka Decl. ¶ 3.<br><br>**PLAINTIFFS' RESPONSE**: *Undisputed.* |
| 3. | Irrespective of the change of parties to the contract, GEO has been solely responsible for the management and operations of the Facility since May 2011. | Janecka Decl. ¶ 3; Hart Decl. ¶¶ 3-6, 12.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* GEO was a subcontractor for the City of Adelanto. Ex. 12, Flores Dep. 36:23-37:2. The City of Adelanto, as service provider, was required to adopt a quality assurance surveillance plan. Ex. 12, Flores Dep. 39:2-5. City of Adelanto city council members and staff attended quarterly meetings at the facility where GEO gave them reports on their activities and provided a tour where they could observe detainees. Ex. 12, Flores Dep. 74:3-8, 75:3-12, 77:2-3. The Sheriff's Department would notify the City of Adelanto of any problems with the facility. Ex. 12, Flores Dep. 63:9-11, 64:3-9. The Attorney General's office |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | met with the City of Adelanto to discuss the facility, whether the performance-based national detention standards were being followed, and to discuss deficiencies in healthcare services. Ex. 12, Flores Dep. 44:13-20, 45:3-6, 45:9-15. |
| 4. | In June 2017, Plaintiffs were housed at the Adelanto Detention Facility ("Facility") that is operated and managed by The GEO Group, Inc. within a dorm. Upon being admitted, Plaintiffs were provided a detainee handbook that established the rules at the Facility, including the rules pertaining to the "count" procedures. | Diaz Decl. 12, Ex. "A" [Detainee Handbook]; Ex. "N" [Cornejo Depo.] at 22:18-23:1; Ex. "O" [Campos Depo.] at 38:18-41:19; Ex. "U" [Martinez Depo.] at 34:9-25.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, hearsay. *Disputed.* Defendants rely on Lt. Diaz's general statement that detainees are provided a copy of the detainee handbook when they arrive at the facility. Lt. Diaz, however, has no personal knowledge as to whether Plaintiffs received a copy of the detainee manual when they were processed at intake. Further, several Plaintiffs testified that they did not receive a handbook in their native language, Ex. 23, Castillo Dep. 27:19-28:22, or that they were told to sign |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | documents at intake without understanding what they were signing, Ex. 28, Mejia Dep. 24:3-25; Ex. 26, Diaz Dep. 16:10-17:9; Ex. 30, Rodriguez Dep. 20:14-21; Ex. 29, Garcia Dep. 20:20-23, 72:24-73:3 ("I am aware that you have to follow the rules, but if you don't know the rules, how would you respect them? That's why we asked for the documentation in our language, and that was not given to us."). |
| 5. | Irrespective of whether the Plaintiffs read the handbook, they all knew that there were multiple times throughout the day when they had to return to their bunks to be counted by GEO staff and that it was a direct order to return to their bunks. | Ex. "N" [Cornejo Depo.] at 22:18-23:1, 24:15-25:14; Ex. "O" [Campos Depo.] at 38:18-41:19, 42:8-21, 43:4-8, 44:8-45:17, 84:11-25, 104:8-18; Ex. "P" [Castillo Depo.] at 31:19-34:6, 67:9-68:9, 71:21-72:1; Ex. "Q" [Mejia Depo.] at 27:18-23, 29:21-30:8, 64:10- 66:10, 68:10-16; Ex. "R" [Rodriguez Depo.] at 38:20-:39:11, 48:7-14, 51:22-25, 92:2-14; Ex. "S" [Garcia Depo.] at 22:1-13, 38:11-14, 60:6-21; Ex. "T" [Diaz Depo] at 18:9-21, 46:5-20; Ex. "U" [Martinez Depo.] at 34:9-25, 37:7-22, 37:21-28:2. **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | *Disputed.* A detainee need not be present at their bunk in order to be identified during the procedure known as "count." Detainees can be identified by using their wristbands and comparing it to GEO's face-to-photo book. When detainees are counted in areas outside of the dorm, such as the recreation yard, detainees are simply asked to remain stationary and are counted. Further, officers use a method known as "out count" whenever a detainee is not present at their bunk during count. An "out count" is conducted when a detainee is out in the recreation yard playing sports, if a detainee is meeting with an attorney or in court, or if a detainee is working in the kitchen or as a cleaning member. Ex. 16, Lt. Diaz Dep. 61:11-23, 139:17-140:18; Ex. 18, Jindi Dep. 72:11-74:5. Moreover, during the incident giving rise to this lawsuit, LVN Jones testified she asked Lt. Diaz to "escort them or count them there [in the dayroom] or bring them to medical. She [Diaz] said no, they had to comply." Ex. 21, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Jones Dep.  98:18-21, 99:1-20. |
| 6. | This procedure was/is referred to as "count" and it is a critical time period at the Facility. In short, the officer assigned to the dorm will announce that it is time for count by using words to the effect of "get back to your bunks," "count time," or "rack up" approximately ten (10) minutes before the count to allow detainees time to prepare for count (e.g. use the restroom). When the detainee returns to his/her bunk for count, this is commonly referred to as "racking up for count." The entire count process takes approximately 30 to 45 minutes. If count is not completed within an hour, the Facility enters an "emergency count" and ICE then becomes involved. | Diaz Decl. ¶¶ 10-13, Ex. "A" [Detainee Handbook - OFFICIAL COUNTS]; Ex. "N" [Cornejo Depo.] at, 24:15-25:14; Ex. "Y" [GEO Martinez Depo.] at 63:20-64:19; Ex. "Z" [Reyes Depo.] at 164:10-24.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed.*  GEO's policy and practice of completing "count" at the facility involves two steps and requires that two officers be present in each dorm.  First, a dorm officer announces that it is time to "prepare for count" and detainees are given approximately ten minutes to return to their bunks.  When "count" is announced, detainees return to their bunks, however, the dorm officer does not begin count until a second "utility" officer arrives.  Once the utility officer arrives, the dorm officer begins counting the detainees while the utility officer stands in the dayroom section of the dorm and monitors.  Then, the two |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | officers switch and the utility officer begins counting.  Per GEO policy, the dorm officer cannot begin count until the utility officer is present in the dorm.  Ex. 18, Jindi Dep. 21:3-21, 22:10-23:16, 26:1-10;  Ex. 16, Lt. Diaz Dep. 302:24-303:12; Ex. 17, Gillon Dep. 62:11-24. Just prior to this incident, during the overnight shift that began on June 11, 2017 and ended on the morning of June 12, 2017, it took one hour and twenty-one minutes to clear count.  The evidence demonstrates that count was ultimately cleared without discrepancies or an emergency declaration.  No evidence indicates that ICE was notified of the delay.  Ex. 5, Logbook at GEO05199. Moreover, the count process in a single dorm did not take 30 to 40 minutes; two officers could count a single dorm in about 10 minutes.  Ex. 20, GEO Martinez Dep. 68:20-69:13, 137:13-138:18. LVN Jones testified she asked Lt. Diaz to "escort them or count them there or bring them to medical. She said no, they had to comply." Ex. 21, Jones Dep.  98:18-21, 99:1- |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 20. |
| 7. | The count procedure is important because it is the mechanism by which the Facility is able to determine whether a detainee has escaped from the Facility. | Diaz Decl. ¶¶ 10-13, Ex. "N" [Cornejo Depo.] at 22:18-23:1, 24:15-25:14; Ex. "Y" [GEO Martinez Depo.] at 63:20-64:19; Ex. "Z" [Reyes Depo.] at 164:10-24.<br><br>**PLAINTIFFS' RESPONSE**: *Undisputed.* |
| 8. | Plaintiffs also understood that failing to comply with orders would result in consequences. | Ex. "N" [Cornejo Depo.] at 22:18-23:1, 24:15-25:14; Ex. "O" [Campos Depo.] at 38:18-41:19, 42:8-21, 43:4-8, 44:8-45:17, 104:8-18; Ex. "P" [Castillo Depo.] at 31:19-34:6, 71:21-72:1; Ex. "Q" [Mejia Depo.] at 27:18-23, 29:21-30:8, 64:10- 66:10, 68:10-16; Ex. "R" [Rodriguez Depo.] at 38:20-:39:11, 48:7-14, 51:22-25, 92:2-14; Ex. "T" [Diaz Depo] at 18:9-21; Ex. "U" [Martinez Depo.] at 34:9-25, 37:7-22, 37:21-28:2.<br>**PLAINTIFFS' RESPONSE**:<br>*Objection.*  Lacks foundation, calls for speculation, hearsay, vague and ambiguous as to the term "consequences."<br>*Disputed.* Detainees cannot be expected to know how GEO officers will react to a hunger strike, especially when they are not given manuals in their |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | native language. Ex. 23, Castillo Dep. 27:19-28:22; Ex. 26, Diaz Dep. 16:10-17:9; Ex. 30, Rodriguez Dep. 20:14-21; Ex. 28, Mejia Dep. 24:3-25; Ex. 29, Garcia Dep. 20:20-23, 76:7-11, 72:24-73:3 ("I am aware that you have to follow the rules, but if you don't know the rules, how would you respect them? That's why we asked for the documentation in our language, and that was not given to us."). Plaintiffs never imagined the guards would react with force to their peaceful hunger strike. Ex. 26, Diaz Dep. 54:15-17. Even Officer Martinez was surprised at being ordered to use force; he had not expected to use force.  Ex. 20, GEO Martinez Dep. 90:5-25. LVN Jones testified she asked Lt. Diaz to "escort them or count them there or bring them to medical. She said no, they had to comply." Ex. 21, Jones Dep.  98:18-21, 99:1-20. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 9. | On or around June 11, 2017, Plaintiffs met and prepared a list of demands/grievances to present to GEO staff. Thereafter, on June 12, 2017, at around 6:22:24 a.m., Plaintiff Castillo gave the list of demands that was (1) written in Spanish and (2) did <u>not</u> mention that Plaintiffs were engaging in a "hunger strike" to the dorm officer, Officer Gillon, who Plaintiffs knew only spoke English and was unable to read the letter. | Ex. "F" [Video recording] at 6:22:24 a.m.; Ex. "N" [Cornejo Depo.] at 36:23-37:20, 42:3-16, 42:25-43:8, 50:8-13; Ex. "O" [Campos Depo.] 78:11-24, 80:9-20, 82:2-24, 84:11-25, 85:7-23; Ex. "P" [Castillo Depo.] at 72:2-10, 74:21-75:19, 73:7-19, 77:5-15 (acknowledging Officer Gillon was unable to read or understand the list of demands), 74:21-75:19; Ex. "Q" [Mejia Depo.] at 56:2-57:6, 61:7-62:25; Ex. "R" [Rodriguez Depo.] at 79:16-80:14, Ex. 1 [Copy of list of demands], 81:4-82:25 (translating the list of demands); Ex. "S" [Garcia Depo.] at 34:16-36:5; Ex. "T" [Diaz Depo] at 42:16-43:12, 50:19-51:25, 62:19-63:3; Ex. "V" [Gillon Depo] at 14:1-4, 86:11-20, 142:6-21. <br><br> **PLAINTIFFS' RESPONSE**: <br> *Objection.* Lacks foundation, calls for speculation. <br> *Disputed.* Defendants' proffered evidence does not support this contention. In fact, the evidence cited demonstrates that Plaintiff Castillo testified that the first page of the letter that Plaintiffs turned in to Officer |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Gillon explained Plaintiffs were beginning a peaceful hunger strike. Ex. 23, Castillo Dep. 73:1-8, 74:21-75:20. The second page of the letter consisted of Plaintiffs' list of grievances and issues they wanted to raise with ICE and GEO officials. Ex. 23, Castillo Dep. 73:20-74:25; Ex. 3, List of Grievances; Ex. F, [Video, Views C-2 and C-4] at 06:22:24 a.m. to 6:23:01 a.m. Plaintiff Diaz similarly testified that "another sheet of paper was also handed in with the names of the fellow detainees, but I don't know where that sheet of paper ended up. I don't know what the guard did with it… That's where all of our names were on. And that, if I'm not mistaken, that's where it said that we were starting a hunger strike." Ex. 26, Diaz Dep. 78:7-14. Furthermore, although Plaintiffs recognized  that Officer Gillon only spoke Spanish, they asked another detainee to translate for them, as was common practice at the facility -- and that detainee did. Ex. 16, Lt. Diaz Dep. 119:14-23; 312:18-313:5 |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | (English-speaking detainees regularly translated for non-English speaking detainees); Ex. 23, Castillo Dep. 74:21-75:20; Ex. 26, Diaz Dep. 41:21-42:3, 42:19-25; Ex. 30, Rodriguez Dep. 96:4-7 (African detainee informed officer they were going to start a hunger strike and wanted to speak to a superior to present their complaints); Ex. F, [Video, View C-4] at 06:24:29 a.m. to 06:27:31 a.m. (demonstrating various detainees approaching Officer Gillon and Plaintiff Rodriguez at the podium where they all appear to be reviewing the letter Plaintiffs gave to Officer Gillon). Officer Gillon himself testified that he learned of the hunger strike when Plaintiffs gave him their letter.  Ex. 17, Gillon Dep. 86:11-87:15, 87:25-88:2. Officer Gillon's General Incident Report, which he completed following the incident, confirms the same. Ex. 4, General Incident Reports at 1. ("On June 12, 2017, at approximately 0625 I officer R. Gillon received a letter from a detainee stating that their [sic] going on hunger strike/protest because |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | of ICE I then reported then letter to my supervisor.") |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 10. | The list of demands was presented of Officer Gillon after breakfast (the first meal that Plaintiffs missed, but did not inform anyone that they intentionally skipped) and immediately before count, which Plaintiffs knew routinely took place after breakfast. Since Officer Gillon does not speak Spanish, another detainee was asked to translate the list of demands (that did not mention a "hunger strike") to Officer Gillon. | Ex. "F" [Video recording] at 6:24 a.m.; Ex. "N" [Cornejo Depo.] at 42:3-16, 42:25-43:8; Ex. "O" [Campos Depo.] at 78:5-10, 84:11-25; Ex. "P" [Castillo Depo.] at 65:20-24, 67:9-68:9; Ex. "Q" [Mejia Depo.] at 55:19-20; Ex. "R" [Rodriguez Depo.] at 85:12-86:21, 95:9-7; Ex. "S" [Garcia Depo.] at 32:12-18; Ex. "T" [Diaz Depo] at 41:21-42:3, 42:16-43:12, 46:5-20, 52:21-53:10, 63:21-64:21; Ex. "U" [Martinez Depo.] at 72:17-73:8, 78:24-80:2. <br><br> **PLAINTIFFS' RESPONSE**: <br> *Objection.* Lacks foundation, calls for speculation, hearsay. *Disputed.* Plaintiffs returned their trays to the officers after breakfast without eating any of the food. Ex. 30, Rodriguez Dep. 91:15-21. Further, the video evidence demonstrates that Plaintiff Castillo walked up to Officer Gillon twice and handed him two separate pieces of paper. The first page of the letter explained Plaintiffs were beginning a peaceful hunger strike. Ex. 23, Castillo Dep. 73:1-8, 74:21-75:20. The second page of the letter consisted of Plaintiffs list of grievances and issues they |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | wanted to raise with ICE and GEO officials. Ex. 23, Castillo Dep. 73:20-74:25; Ex. 3, List of Grievances; Ex. F, [Video, Views C-2 and C-4] at 06:22:24 a.m. to 6:23:01 a.m. The video evidence demonstrates that Plaintiff Rodriguez, who did his best to communicate with Officer Gillon, used the assistance of an English-speaking detainee to translate their letter to Gillon.   Ex. 30, Rodriguez Dep. 96:4-7 (African detainee informed officer they were going to start a hunger strike and wanted to speak to a superior to present their complaints); Ex. F, [Video, View C-4] at 06:24:29 a.m. to 06:27:31 a.m. (demonstrating various detainees approaching Officer Gillon and Plaintiff Rodriguez at the podium where they all appear to be reviewing the letter Plaintiffs gave to Officer Gillon). |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 11. | At around 6:23 a.m., Plaintiff Castillo handed Officer Gillon a second piece of paper that listed Plaintiffs' names. Meanwhile, the other plaintiffs sat at two separate tables in the dayroom of the dorm to gain attention. | Ex. "F" [Video recording] at 6:23 a.m.; Ex. "N" [Cornejo Depo.] at 45:15-18, 55:2-7; Ex. "P" [Castillo Depo.] at 70:25-71:15; Ex. "R" [Rodriguez Depo.] at 148:20-24; Ex. "T" [Diaz Depo] at 63:4-16, 78:2-79:13 (stating second piece of paper was a list of names) **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation. *Disputed.* The first page of the letter explained that Plaintiffs were starting a peaceful hunger strike and were requesting to speak with ICE officials and GEO supervisors. Ex. 23, Castillo Dep. 73:1-8, 74:21-75:20. Plaintiff Diaz testified "another sheet of paper was also handed in with the names of the fellow detainees, but I don't know where that sheet of paper ended up. I don't know what the guard did with it… That's where all of our names were on. And that, if I'm not mistaken, that's where it said that we were starting a hunger strike." Ex. 26, Diaz Dep. 78:7-14. The second page of the letter consisted of Plaintiffs list of grievances and issues they wanted to raise with ICE and |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | GEO officials. Ex. 23, Castillo Dep. 73:20-74:25; Ex. F, [Video, Views C-2 and C-4] at 06:22:24 a.m. to 6:23:01 a.m. (demonstrating Plaintiff Castillo handing two sheets of paper to Officer Gillon). Plaintiffs' intentions were simply to be heard and get GEO officers' attention so that they could explain their concerns.  Ex. 25, Cornejo Dep. 45:6-18, 52:21-54:16. |
| 12. | At around 6:29:59 a.m., Officer Jindi arrived to the dorm to relieve Officer Gillon. Officer Gillon explained to Officer Jindi that he received papers and that "something" was going on. Officer Jindi instructed him to give the papers to Lt. Diaz. Thereafter, Officer Jindi announced that it was time for count and Plaintiffs chose to ignore the order. | Ex. "F" [Video recording] at 6:29:59 a.m.; Ex. "O" [Campos Depo.] at 175:6-20 ("I know that I wasn't complying with the rules."); Ex. "P" [Castillo Depo.] at 67:9-68:9, 78:7-79:4; Ex. "Q" [Mejia Depo.] at 67:22-68:1, 70:1-9; Ex. "R" [Rodriguez Depo.] at 92:2-14, 96:8-19; Ex. "S" [Garcia Depo.] at 38:11-14; Ex. "T" [Diaz Depo] at 46:5-20; Ex. "U" [Martinez Depo.] at 87:1-89:3; Ex. "V" [Gillon Depo] at 90:19-21, 157:8-11, 158:17-20; Ex. "X" [Jindi Depo.] at 35:9-14, 36:8-37:5, 37:8-19, 40:15-20, 58:23-25, 63:8-14. **PLAINTIFFS' RESPONSE**: *Objection*.  Lacks foundation, calls for speculation. *Disputed*. When Officer Jindi arrived to relieve Officer |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Gillon, she announced that it was time to "prep for count," meaning that Plaintiffs still had a 10-minute grace period to return to their bunks before count might begin.  Ex. 18, Jindi Dep. 38:18-39:3, 40:5-20.  In addition, there was no utility officer present at this time and, per GEO policy, Officer Jindi could not begin count. Ex. 18, Jindi Dep. 21:3-21, 60:10-61:21; Ex. 31, Jindi Dep. Exhibit 2 [Video still of view C-1 at 6:30:51 a.m.]; Ex. 17, Gillon Dep. 159:5-10; Ex. 16, Lt. Diaz Dep. 309:22-24; Ex. 20, GEO Martinez Dep. 34:25-35:4, 137:13-138:8 (assigned as the utility officer that would verify count on the day of the incident). Other detainees, not involved in the strike, continued to wander around the dayroom area as was normal during the prep for count period. Ex. 18, Jindi Dep. 38:18-39:3, 40:5-20; Ex. F, [Video, View C-3] at 06:32:58 (demonstrating that a detainee is in the shower when Lt. Diaz entered the dayroom). |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 13. | Officer Jindi had no information that there was an alleged hunger strike. Indeed, Plaintiffs admitted that they are guessing that Officer Gillon was informed and knew they were on a hunger strike. | Ex. "O" [Campos Depo.] at 85:7-23, 94:22-95:15; Ex. "Q" [Mejia Depo.] at 58:15-59:14, 60:11-14, 63:23-25, 67:8-11, 159:7-24 (admitting that the papers that were given to Officer Gillon did not mention the hunger strike, but he assumes that someone verbally told Officer Gillon); Ex. "R" [Rodriguez Depo.] at 95:9-7; Ex. "S" [Garcia Depo.] at 38:20-24; Ex. "T" [Diaz Depo] at 50:4-10, 73:7-14, 77:23-78:3; Ex. "U" [Martinez Depo.] at 78:24-80:2; Ex. "V" [Gillon Depo] at 92:25-93:3 (demonstrating that he was never told verbally of the hunger strike); Ex. "X" [Jindi Depo.] at 35:9-14, 36:8-37:5; Ex. "Y" [GEO Martinez Depo.] at 141:4-18.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Defendants' proffered evidence does not support the entirety of this contention. Officer Jindi merely testified that she did not think Officer Gillon mentioned a hunger strike. Ex. 18, Jindi Dep. 36:24-37:5. Further, Officer Gillon himself testified that he |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | learned of the hunger strike when Plaintiffs gave him their letter.  Ex. 17, Gillon Dep. 86:11-87:15, 87:25-88:2.  Officer Gillon's use General Incident Report, which he completed following the incident, confirms the same.  Ex. 4, General Incident Reports at 1.  Significantly, Lt. Diaz went straight to dorm 2-Charlie because she was told detainees were claiming a hunger strike.  Ex. 16, Lt. Diaz Dep. 195:6-196:5.  Plaintiff Castillo, the individual who handed Officer Gillon the letter that indicated Plaintiffs were beginning a peaceful hunger strike, testified that another detainee helped them translate the contents of the letter from English to Spanish.  Ex. 23, Castillo Dep. 72:19-73:19, 74:21-75:20; 75:6-20.  Similarly, Plaintiff Rodriguez who was at the podium with Plaintiff Castillo testified that the African detainee who translated for them informed the officer they were going to start a hunger strike and wanted to speak to a superior to present their complaints.  Ex. 30, Rodriguez Dep.  96:4- |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 7.<br>Plaintiffs had handed a paper to the officer in charge as to why they were doing the hunger strike. Ex. 24, Campos Dep. 95:8-9. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 14. | Officer Jindi used her radio and requested assistance because Plaintiffs were not returning to their bunks for count per her order – she did not communicate any additional information. In response to Officer Jindi's request, at around 6:32:51 a.m., Lt. Diaz arrived to the dorm with GEO officers, including Officer Gillon, Officer Martinez, and Officer Reyes, and LVN Jones. | Diaz Decl. ¶¶ 9, 14; Campos Decl. ¶ 4; Ex. "F" [Video recording] at 6:30:37 to 6:32:51 a.m.; Ex. "R" [Rodriguez Depo.] at 96:8-19; Ex. "S" [Garcia Depo.] at 38:15-19; Ex. "T" [Diaz Depo] at 53:8-24; Ex. "V" [Gillon Depo] at 97:15-24, 98:10-14; Ex. "W" [Jones Depo.] at 79:1-25, 80:25-81:5; Ex. "X" [Jindi Depo.] at 37:8-19, 40:15-20, 41:12-17, 41:22-42:9; Ex. "Y" [GEO Martinez Depo.] at 44:4-12; Ex. "Z" [Reyes Depo.] at 76:12-77:5, 77:6-14. **PLAINTIFFS' RESPONSE**: *Disputed*. Although Officer Jindi testified that she only communicated over her radio that Plaintiffs were refusing to return to their beds, Officer Gillon testified that he was aware of Plaintiffs announced hunger strike because of the letter they gave him, and he reported what he knew to the first watch supervisor (Lt. Diaz).  Ex. 17, Gillon Dep. 86:11-87:15, 87:25-88:2, 90:19-21, 91:4-11, 94:204, 94:12-95:22, 96:2-17, 97: 2-7. Further, Lt. Diaz testified that after her morning briefing, while she was in the watch commander's office, an |

| Defs'<br>SUF<br>No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | officer brought her a list of names involving detainees that were claiming to be on a hunger strike. When Lt. Diaz arrived to the housing unit, officers there informed her that detainees were claiming a hunger strike.  Ex. 16, Lt. Diaz Dep. 187:2-9, 188:14-23, 189:12-21. |
| 15. | Before entering the dorm, in addition to the information that Lt. Diaz learned from Officer Jindi over the radio, she had the list of Plaintiffs' names that were written on the second piece of paper and was informed that Plaintiffs were *threatening* to start a hunger strike if their demands were not met. | Diaz Decl. ¶ 9; Ex. "V" [Gillon Depo] at 90:19-21, 157:8-11.<br>**PLAINTIFFS' RESPONSE**:<br>*Objection.*  Lacks foundation, vague as to term "threatening."<br>Disputed. Although Officer Gillon testified that he could not remember what he did with the letter, Lt. Diaz testified at her deposition that she entered the dorm with the letter which indicated the names of Plaintiffs "*claiming to be* on a hunger strike." Ex. 16, Lt. Diaz Dep. 321:17-19 (emphasis added).  The video evidence further demonstrates |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | that the letter consisted of two sheets of paper.  Ex. F, [Video, View C-3] at 06:33:65 a.m. and 06:35:48 a.m. (demonstrates Lt. Diaz handing papers to another GEO officer who later flips between the two sheets of paper). Moreover, Plaintiffs have testified that the letter consisted of both: (1) their names and their announced hunger strike; and (2) their list of grievances and reasons for beginning a hunger strike.  Ex. 23, Castillo Dep. 73:1-8, 74:21-75:20 |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 16. | When Lt. Diaz, the GEO officers, and LVN Jones arrived to the dorm at around 6:32 a.m., Plaintiffs were seated at two tables in the dayroom of the dorm and refused to go to their bunks for count. Then, Lt. Diaz asked Plaintiffs to go to their bunks for count in a stern tone. In response, Plaintiffs stated that they wanted to speak to ICE. Because Plaintiffs were not responding to Lt. Diaz commands (and in some cases, not even paying attention to her), she asked GEO officers to translate, which they did. | Ex. "F" [Video recording] at 6:32 to 6:33:09; Diaz Decl. ¶¶ 14-17; Ex. "N" [Cornejo Depo.] at 73:13-16; Ex. "O" [Campos Depo.] at 93:4-21; Ex. "P" [Castillo Depo.] at 78:7-79:4; Ex. "Q" [Mejia Depo.] at 67:22-68:1, 68:10-16, 70:1-9; Ex. "V" [Gillon Depo] at 98:24-99:2, 160:15-161:3; Ex. "W" [Jones Depo.] at 88:21-89:12, 93:11-22; Ex. "Y" [GEO Martinez Depo.] at 54:10-17; Ex. "Z" [Reyes Depo.] at 79:12-80:5, 86:9-20, 94:1-22.  **PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation, vague as to the term "stern." *Disputed.*  Plaintiffs provided GEO staff their letter explaining their announced hunger strike, their reasons for beginning one, and that they wanted to speak with ICE officials and GEO supervisors. Ex. 23, Castillo Dep. 72:19-73:19, 74:21-75:20; 75:6-20. While some Plaintiffs might have understood that Lt. Diaz was indicating they should return to their beds, Lt. Diaz entered the dorm and approached Plaintiffs while displaying a canister of OC |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | spray in a threatening manner and shouting in English.  Ex. 23, Castillo Dep. 79:21-80:9.  Lt. Diaz testified that when she got to the dorm the "dorm officer said they detainees won't rack up. They were on hunger strike." Ex. 16, Lt. Diaz Dep. 196:3-5.  LVN Jones testified that Lt. "Diaz just kept yelling and shaking her can [of OC spray]". Ex. 21, Jones Dep. 97:6-7.  Due to the hostility of the situation, Plaintiffs were afraid to get up from the tables. Ex. 30, Rodriguez Dep. 141:21-142:5, 142:13-21, 143:4-7;  Ex. 23, Castillo Dep. 144:3-18; Ex. 25, Cornejo Dep. 63:24-65:2.  Lt. Diaz's testimony demonstrates that she did not enter the room with the intent to understand Plaintiffs' concerns, rather she entered the dorm displaying the OC spray to prepare for something to "pop off."  Ex. 16, Lt. Diaz Dep. 319:2-24.  Although Defendants assert that Lt. Diaz asked officers to translate for her, while reviewing the incident video up to 06:37:47 a.m., Lt. Diaz testified that she had not yet |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | given the officers any directives.  Ex. 16, Lt. Diaz Dep. 335:18-336:25.  At 06:38:04 a.m., however, the video evidence demonstrates that officers began placing their hands on detainees at Table A.  Ex. F, [Video, View C-3] at 06:37:47 a.m to 06:38:04 a.m. Officer Martinez did not understand that force was about to be used and did not give a warning to that effect. Ex. 20, GEO Martinez Dep. 90:5-25 (Officer Martinez came to talk to the detainees and did not expect the use of force); 96:7-21 (Officer Martinez did not explain what pepper spray was or warn them that it could be used); Officer Reyes testified that he can "barely speak Spanish" and only "very rarely" spoke Spanish in the facility.  Ex. 16, Reyes Dep. 43:7-14. The other officers who were present did not speak Spanish. Ex. 17, Gillon Dep. 14:1-4; Ex. 16, Lt. Diaz Dep. 120:4-12, (Reyes and Martinez were the only officers involved in the confrontation avoidance who spoke Spanish). |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 17. | Throughout the incident, GEO Officers Martinez, who speaks Spanish fluently, and Reyes unsuccessfully tried to negotiate and reason with Plaintiffs. They explained that ICE was not present at the Facility; thus, Plaintiffs should return to their bunks for count and revisit their strike/protest after count, when ICE was present. But, Plaintiffs refused and repeated they wanted to see ICE. | Ex. "F" [Video recording] at 6:37:06 to 6:37:49, 6:43:17; Ex. "V" [Gillon Depo] at 163:21-25, 164:1-4; Ex. "Y" [GEO Martinez Depo.] at 13:6-12, 45:12-25, 46:21-47:4, 47:5-9, 60:7-61:13, 61:21-63:19, 65:4-18, 72:6-73:8, 94:23-95:8, 99:17-100:18; Ex. "Z" [Reyes Depo.] at 92:10-24, 147:13-18; 149:2-150:25, 164:7-25; 183:19-24.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Defendants rely on GEO officers' testimony explaining that they spoke to and negotiated with Plaintiffs in Spanish.  The officers themselves provided contradictory testimony. Officer Reyes testified that he does not speak Spanish, he spoke to Plaintiffs in English, and does not remember anyone speaking to them in Spanish. Ex. 16, Reyes Dep. 148:24-149:1, 150:17-25, 159:12-20.  Officer Reyes himself explained that he can "barely speak Spanish" and only "very rarely" spoke Spanish in the facility. Ex. 16, Reyes Dep. 43:7-14. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Officer Martinez did not understand that force was about to be used and did not give a warning to that effect. Ex. 20, GEO Martinez Dep. 90:5-25 (Officer Martinez came to talk to the detainees and did not expect the use of force); 96:7-21 (Officer Martinez did not explain what pepper spray was or warn them that it could be used); 62:2-63:19 (Officer Martinez only asked Plaintiffs what was going on and told them they needed to return to their bunks for count) Plaintiff Castillo testified that only one officer spoke to them in Spanish -- and that officer refused to listen to anything Plaintiffs said, refused to engage in any discussion whatsoever about what Plaintiffs were doing or why, and only said that Plaintiffs "did not want to do this." Ex. 23, Castillo Dep. 82:17-83:5. Plaintiff Campos does not recall any officers speaking to them in Spanish. Ex. 24, Campos Dep. 91:25-92:5, 94:1-3. GEO personnel did not respond to the hunger strike by trying to negotiate calmly with Plaintiffs in their native |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | language. Plaintiff Campos testified, Lt. Diaz "immediately started gassing us with the pepper, and then the officers were grabbing us… they did not act in a professional manner… we weren't fighting, we weren't breaking things,... we were just sitting down…. She didn't look for not even a mediator, someone who spoke Spanish." Ex. 24, Campos Dep. 92:8-24. Plaintiff Rodriguez testified he did not hear any orders, they spoke to them in English the whole time and "they just let the angry lady in white [Lt. Diaz] handle the problem." Ex. 30, Rodriguez Dep. 142:7-8, 144:14-18. Plaintiff Cortez testified that they asked the other detainee to translate for them and to, "[t]ell [the guard] that we are handing him this sheet of paper, that we're going to do a peaceful hunger strike because we want to speak to an ICE officer." Ex. 26, Diaz Dep. 43:10-13. Further, Plaintiffs explained that they wanted to speak with someone in charge, including GEO supervisors and ICE. Ex. 23, Castillo Dep. 73:1-6; Ex. 25, Cornejo Dep. 36:3-16. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 18. | Plaintiffs admitted that they knew Lt. Diaz and the responding GEO officers ordered them in English and Spanish to return to their bunks and/or leave the tables. They also understood that there would be consequences, including the use of OC spray, for their decision to ignore the commands | Ex. "N" [Cornejo Depo.] at 73:13-16; Ex. "P" [Castillo Depo.] at 78:7-79:4, 80:1-81:3, 82:17-83:20, 84:7-14, 84:18-25; Ex. "Q" [Mejia Depo.] at 70:1-71:25, 73:16-18; Ex. "R" [Rodriguez Depo.] at 97:2-16; Ex. "U" [Martinez Depo.] at 87:1-89:3. **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, vague as to the term "consequences." *Disputed.* Defendants' proffered evidence does not support the entirety of this contention. Plaintiffs maintain that the only thing that was said to them, and what they understood, was "cuenta" or "count" and that they "did not want to do this." Ex. 23, Castillo Dep. 82:17-83:5; Ex. 25, Cornejo Dep. 47:18-48:11; Ex. 26, Diaz Dep. 46:14-25. Further, given the hostile situation, Plaintiffs were afraid to get up from the tables for fear of provoking the officers. Ex. 30, Rodriguez Dep. 141:21-142:5, 142:13-21, 143:4-7; Ex. 23, Castillo Dep. 144:3-18; Ex. 25, Cornejo Dep. 63:24-65:2. Plaintiffs were shocked by the officers' reaction and scared that if they got up the other |

31

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Plaintiffs would be hurt worse. Ex. 24, Campos Dep. 92:3-93:3, 94:6-7, 96:6-17, 97:8-12, 103:11-20, 105:1-7; Ex. 30, Rodriguez Dep. 141:21-142:5, 142:13-21. Plaintiffs did not anticipate they would be attacked and pepper sprayed for remaining at the tables. Ex. 30, Rodriguez Dep. 94:2-7. While Plaintiff Castillo explained that he understood from Lt. Diaz's conduct that they might be pepper sprayed if they did not return to their beds, he tried to explain to the officer who said "you don't want to do this" what Plaintiffs' intentions were, but the officer refused to listen. Immediately after, the officers began assaulting Plaintiffs. Ex. 23, Castillo Dep. 84: 18-85:15, 142:24-143:7, 143:20-144:2. Plaintiffs never imagined the guards would react with force to their peaceful hunger strike. Ex. 26, Diaz Dep. 54:15-17. Plaintiff Campos testified, "I thought there would be consequences, but not like those that occurred to us. They went overboard." Ex. 24, Campos Dep. 104:16-18. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 19. | Significantly, Plaintiffs also admitted they had no intention of complying with the commands unless force was used as this would help them garner more attention for their strike. | Ex. "O" [Campos Depo.] at 97:5-12, 103:11-104:6; Ex. "T" [Diaz Depo] at 83:2-3 ("Because we were already there. We needed to fight for it, to struggle, to be heard.") **PLAINTIFFS' RESPONSE**: *Disputed.* Defendants' proffered evidence does not support this contention. Plaintiffs were shocked by the officers' reaction and scared that if they got up the other Plaintiffs would be hurt worse. Ex. 24, Campos Dep. 92:3-93:3, 94:6-7, 96:6-17, 97:8-12, 103:11-20, 105:1-7. Plaintiffs were scared to get up from the tables. Ex. 30, Rodriguez Dep. 141:21-142:5, 142:13-21; 143:4-7. Plaintiffs never imagined the guards would react with force to their peaceful hunger strike. Ex. 26, Diaz Dep. 54:15-17. Plaintiffs' main objective for their hunger strike was simply to be heard.  Ex. 25, Cornejo Dep. 41:11-16, 45:6-18. |
| 20. | Importantly, during the entire time that Plaintiffs ignored the commands from Lt. Diaz and GEO officers, at least one plaintiff admitted that they did not tell Lt. Diaz they were on a hunger strike. | Ex. "O" [Campos Depo.] at 94:22-95:15.

**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, relevance. *Disputed:* Lt. Diaz went |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | straight to dorm 2-Charlie because she was told detainees were claiming a hunger strike.  Ex. 16, Lt. Diaz Dep. 195:6-25. Plaintiff Castillo, the individual who handed Officer Gillon the letter that indicated Plaintiffs were beginning a peaceful hunger strike, testified that another detainee helped them translate the contents of the letter from English to Spanish.  Ex. 23, Castillo Dep. 72:19-73:19, 74:21-75:20. Similarly, Plaintiff Rodriguez who was at the podium with Plaintiff Castillo testified that the African detainee who translated for them informed the officer they were going to start a hunger strike and wanted to speak to a superior to present their complaints. Ex. 30, Rodriguez Dep.  96:4-7. Plaintiffs had handed a paper to the officer in charge as to why they were doing the hunger strike. Ex. 24, Campos Dep. 95:8-9. LVN Jones testified that Lt. "Diaz just kept yelling and shaking her can [of OC spray]". Ex. 21, Jones Dep. 97:7. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 21. | After giving numerous commands, at around 6:38:01, four officers (including Officers Gillon, Reyes and Martinez) removed Plaintiffs Martinez and Rodriguez from Table A by pulling Plaintiffs Martinez and Rodriguez by their arms. | Diaz Decl. ¶ 18; Ex. "F" [Video recording] at 6:38:00 to 6:38:52; Ex. "V" [Gillon Depo] at 105:21-106:23, 110:1-6, 112:3-15, 113:2-5, 164:22-25, 166:6-24.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Plaintiff Martinez testified that Lt. Diaz approached him while he was seated at the table stretched out her arm, and sprayed him. Ex. 27, Martinez Dep. 90:24-91:11, 93:10-20. The officers grabbed Plaintiff Martinez and injured him while doing so. Ex. 27, Martinez Dep.9 4:15-95:5; Ex. 49, Turk Decl. The video evidence demonstrates most of this interaction, but the details are not captured by the grainy video footage and Plaintiffs Martinez and Rodriguez are largely obstructed by the officers. Ex. F, [Video, View C-3] at 06:38:01 a.m. to 06:38:38 a.m. Plaintiff Rodriguez, who was seated next to Plaintiff Martinez, likewise testified that Lt. Diaz initially sprayed the OC spray three or four times and that the officers hit |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | him in the ribs. Ex. 30, Rodriguez Dep. 145:24-25, 152:22-24. |
| 22. | Instead of complying, Plaintiffs Martinez and Rodriguez grabbed on to each other, which forced the officers to physically separate them. The officers separated the two plaintiffs at around 6:38:50 without striking, punching, or kicking them; the officers simply pulled them apart. | Diaz Decl. ¶¶ 18, 47; Ex. "F" [Video recording] at 6:38:01 to 6:38:52; Ex. "R" [Rodriguez Depo.] at 101:7-23, 102:4-19; Ex. "V" [Gillon Depo] at 167:6-16; Ex. "W" [Jones Depo.] at 110:11-21; Ex. "Y" [GEO Martinez Depo.] at 88:25-89:2.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection:* Lacks foundation, calls for speculation.<br>*Disputed.* After watching the video numerous times, Lt. Diaz testified that she sprayed Plaintiffs at table A while they were being restrained by officers, at her direction. After a break requested by Lt. Diaz's counsel, Lt. Diaz changed her testimony and instead stated that she did not spray any of the Plaintiffs at table A.  Ex. 16, Lt. Diaz Dep. Dep. 342:3-343:6, 343:16-347:23.  The video evidence demonstrates Lt. Diaz aims her OC spray at Plaintiffs while they were being restrained by the group of officers followed by Plaintiffs agonizing over the OC spray pain. Ex. F, [Video, Views C- |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 1 and C-3] at 6:38:04 to 6:38:28. Plaintiff Martinez's testimony confirms the same. Ex. 27, Martinez Dep. 90:24-91:11, 93:10-20. Plaintiff Rodriguez, who was seated next to Plaintiff Martinez, likewise testified that Lt. Diaz initially sprayed the OC spray three or four times and that the officers hit him in the ribs. Ex. 30, Rodriguez Dep. 145:24-25, 152:22-24. Plaintiffs Mejia and Castillo, who were sitting at table B, testified that Lt. Diaz sprayed Plaintiffs at Table A before sprayed them at Table B.  Ex. 28, Mejia Dep. 75:19-76:13. Ex. 23, Castillo Dep. 91:13-3. |
| 23. | Plaintiff Rodriguez was escorted out of the dorm by two officers without issue at around 6:39 a.m. While Plaintiff Rodriguez claims he was struck and sprayed with OC numerous times while in the dorm room, the uncontroverted video evidence and his alleged injuries demonstrates otherwise. | Diaz Decl. ¶¶ 18, 26, 47; Ex. "F" [Video recording] at 6:38:54 to 6:39; Ex. "R" [Rodriguez Depo.] at 98:11-21, 99:7-9, 101:7-23, 103:3-6, 105:2-11, 114:3-10, 152:12-24, 153:7-10; Ex. "W" [Jones Depo.] at 110:11-21.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation, improper conclusion. *Disputed:* Defendants admit this fact is disputed. Plaintiff |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Rodriguez testified that Diaz initially sprayed the OC spray three or four times. Ex. 30, Rodriguez Dep. 152:22-24. Lt Diaz's own testimony is inconsistent. Ex. 16, Lt. Diaz Dep. 342:3-343:6, 343:16-347:23. Plaintiff Rodriguez further testified that the officers hit him in the ribs. Ex. 30, Rodriguez Dep. 145:24-25. The officers also forced his arms up, injuring his shoulders. Ex. 30, Rodriguez Dep. 153:2-4. The officers pushed Plaintiff Rodriguez, making him hit a wall. Ex. 30, Rodriguez Dep. 109:24-110:7, 130:19-25. Plaintiff Rodriguez tried to communicate to the nurse that his ears and head were injured and he had scratches on his arm. Ex. 30, Rodriguez Dep. 176:17-20. The video evidence demonstrates most of this interaction, but the details are not captured by the grainy video footage and there is no video footage of Plaintiff Rodriguez in the hallway.  Ex. F, [Video, View C-3] at 06:38:01 a.m. to 06:38:38 a.m. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 24. | Additionally, Plaintiff Rodriguez claims that once he was outside the dorm room, unknown GEO personnel pushed him into a wall. Again, his injuries demonstrate otherwise. | Ex. "R" [Rodriguez Depo.] at 107:5-108:23, 114:3-10; Ex. "W" [Jones Depo.] at 163:20-24; SAC ¶ 11-12 (demonstrating Plaintiff Martinez allegedly lost his tooth). **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed:* Defendants admit this fact is disputed. Guards pushed Mr. Rodriguez, making him hit his face on a wall. Ex. 30, Rodriguez Dep. 109:24-110:7, 171:22-24, 172:8-12. Plaintiff Rodriguez tried to communicate to the nurse that his ears and head were injured and he had scratches on his arm. Ex. 30, Rodriguez Dep. 176:17-20. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 25. | Plaintiff Martinez, however, continued to actively resist after being separated from Plaintiff Rodriguez by digging his heels into the ground. As Officers Martinez and Gillon tried to escort him out past Table B, he grabbed on to Plaintiff Diaz, who was seated at Table B. The officers separated the two men by pulling Plaintiff Martinez off of Plaintiff Diaz. | Diaz Decl. ¶ 18; Ex. "F" [Video recording] at 6:38:55 to 6:39:07; Ex. "T" [Diaz Depo] at 83:17-23; Ex. "V" [Gillon Depo.] at 168:15-19; Ex. "U" [Martinez Depo.] at 89:10-91:19, 93:4-94:6, 94:11-95:5; Ex. "Y" [GEO Martinez Depo.] at 74:7-75:14, 75:22-76:1, 79:22-80:2, 80:6-21, 80:22-81:24, 84:2-85:16, 87:20-88:24, 88:25-89:2, 89:3-4; Ex. "W" [Jones Depo.] at 110:11-21. **PLAINTIFFS' RESPONSE**: *Objection*: Lacks foundation, calls for speculation, vague as to term "actively resist" *Disputed*. Defendants' proffered evidence does not support the entirety of this contention. No GEO officer testified that Plaintiff Martinez dug his heels into the ground. The officers merely testified that Plaintiff Martinez was resisting. Moreover, the citations to Plaintiff Diaz's and Nurse Jones's depositions do not support this contention. Nurse Jones consistently testified that she could not see how the guards handled Plaintiffs, that she could not clearly see what was happening, that she did |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | not remember any specific actions relating to Plaintiff Martinez, and that she was "paying more attention to the background with the other detainees." Jones Dep. 110:8-111:24. Officer Martinez, however, could not remember whether he or anyone else had given Plaintiff Martinez any verbal commands.  He also testified that he had not tried to use "pressure points" on Plaintiff Martinez before attempting to remove him from the table. Ex. 20, GEO Martinez Dep. 74:15-21, 75:13-76:7, 76:20-77:19, 78:2-7; Ex. 17, Gillon Dep. 164: 23-165:3, 166:22-167:1 (could not remember whether he gave more than one command to "get up" at this point).   Plaintiff Martinez was not striking or elbowing officers while they were using force on him.  Ex. 20, GEO Martinez Dep. 74:4-21. Plaintiff Martinez does not dispute that he tried to hold on to his friend because he could not see and was in pain from the OC spray.  Ex. 27, Martinez Dep. 102:1-5. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 26. | Plaintiff Martinez continued to resist and struggle the entire time the officers were trying to escort him out of the dorm, which is depicted on the video recording from 6:39:05-6:39:23 a.m. | Ex. "F" [Video recording] at 6:39:05 to 6:39:23. **PLAINTIFFS' RESPONSE**: *Objection.* Vague as to resist. *Disputed.* Plaintiff Martinez testified that after being sprayed with OC spray at close range, he was grabbed and mistreated by two officers as they drug him out of the dorm with his arms behind his back. The officers slammed him against the wall in the hallway, knocking out his tooth and dental crown. Ex. 27, Martinez Dep. 93:10-96:8, 99:19-100:17. Plaintiff Martinez's medical records demonstrate that immediately after the incident, he complained of a missing tooth and injured right shoulder. Ex. 7, Plaintiffs' Medical Reports at 3. At the time, he could not feel the pain in his nose due to the overwhelming burning sensation caused by the OC spray. Ex. 27, Martinez Dep.102:1-16. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 27. | While Plaintiff Martinez alleges he was sprayed while outside the dorm by a blonde woman and two other unknown GEO supervisors, the video demonstrates Lt. Diaz did not leave the dorm after Plaintiff Martinez was escorted out. | Diaz Decl. ¶¶ 20, 26; Ex. "F" [Video recording]; Ex. "U" [Martinez Depo.] at 105:9-107:24.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Calls for speculation.<br>*Disputed.* Defendants admit this fact is disputed and misstate Plaintiff Martinez's testimony. While Plaintiff Martinez testified that Lt. Diaz sprayed him in the hall all over his body, once he was taken out of the dorm, he could not clearly see who was deploying OC spray in this instance, but knew that Lt. Diaz had previously sprayed him. Ex. 27, Martinez Dep. 102:1-5 (testifying that after being sprayed, he was trying to open his eyes to see what was happening). |
| 28. | Additionally, there was no OC spray deployed outside of the dorm or while any plaintiff was restrained by an officer. | Ex. "U" [Martinez Depo.] at 105:9-107:24; Ex. "Y" [GEO Martinez Depo.] at 84:20-85:7; Ex. "Z" [Reyes Depo.] at 117:11-18.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Calls for speculation.<br>*Disputed.* Whether Lt. Diaz deployed OC spray while Plaintiffs Martinez and |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Rodriguez were restrained by a group of officers is a question of fact that is disputed by her own testimony. Ex. 16, Lt. Diaz Dep. Dep. 342:3-343:6, 343:16-347:23 (testifying that she sprayed Plaintiffs at table A while they were being restrained by officers, and later recanting her testimony after a break requested by Lt. Diaz's counsel). Ex. F, [Video, Views C-1 and C-3] at 6:38:04 to 6:38:28. |
| 29. | While the officers were escorting Plaintiffs Martinez and Rodriguez out of the dorm, Plaintiffs Cornejo, Castillo, Mejia, Diaz, and Campos (seated at Table B) interlocked their arms and tethered their feet around the legs of Table B to make it more difficult for the officers to remove them from the table – i.e. Plaintiffs were actively resisting – and Plaintiff Garcia moved from Table A to Table B and sat next to Plaintiff Campos. | Diaz Decl. ¶¶ 19- 20, 22; Ex. "F" [Video recording] at 6:39:32; Ex. "T" [Diaz Depo] at 81:20-25; Ex. "P" [Castillo Depo.] at 86:6-87:24; Ex. "V" [Gillon Depo] at 104:24-105:5.  **PLAINTIFFS' RESPONSE**: *Objection.* Calls for speculation, vague as to the term "tethered" *Disputed.* Plaintiffs seated at Table B only linked arms after Lt. Diaz sprayed the detainees at Table A, yelled at Plaintiffs in a threatening manner, and other GEO officers told Plaintiffs they "did not want to do this," and began assaulting Plaintiffs. Ex. 23, Castillo Dep. 82:17-83:5, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 86:13-87:24.; Ex. 26, Diaz Dep. 81:20-25.  In that moment, Plaintiffs felt that any movement would be considered provocation when all they wanted to do was explain their reasons for sitting at the table.  Ex. 23, Castillo Dep. 84: 18-85:15, 142:24-143:7, 143:20-144:2; Ex. 25, Cornejo Dep. 63:24-65:2. Plaintiff Cornejo testified that he decided to join hands with the other Plaintiffs because he heard that Plaintiffs at the other table sounded like they were in pain, he was afraid, and in that moment thought he might be deported.  Ex. 25, Cornejo Dep. 65:10-24. Although blinded by the pepper spray, Plaintiff Garcia testified, "[w]e were holding hands so I felt they were there." Ex. 29, Garcia Dep. 45:21-46:2 Plaintiff Mejia testified that "[after being sprayed] I just put up with it, and then the officers came and with my fellow detainees, we just crossed our arms because the officers started hitting us ..." Ex. 28, Mejia Dep. 76:12-77:4. |

45

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 30. | The dorm, during a period that is supposed to be very quiet, was in an uproar and completely out of control. | Diaz Decl. ¶ 21; Campos Decl. ¶ 6; Ex. "O" [Campos Depo.] at 90:11-91:22; Ex. "W" [Jones Depo.] at 103:20-104:10; Ex. "Y" [GEO Martinez Depo.] at 131:24-132:12, 133:1-18, 134:7-11. **PLAINTIFFS' RESPONSE**: *Objection.* Calls for speculation, vague and ambiguous as to the term "uproar" and "out of control". *Disputed.* Plaintiffs were passively sitting at the dayroom tables waiting to speak with someone about their hunger strike. The uncontroverted video evidence shows that the other detainees who were at their beds in the top and lower tiers were disinterested in Plaintiffs' presence at the tables. Ex. F, Video . It was not until the use of force began that the other detainees showed interest in the situation in the dayroom. Ex. 18, Jindi Dep. 53:3-14 (describing that the detainees on the top tiers were acting wild when Diaz sprayed); Ex. 25, Cornejo Dep. 62:11-15; Ex. 23, Castillo Dep. 81:23-82:6; Ex. 26, Diaz Dep. 60:9-25; Schwartz Decl. (incorporating Schwartz |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Report, at 12). Lt. Diaz herself testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Ex. 16, Lt. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Ex. 16, Lt. Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Ex. 16, Lt. Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Ex. 16, Lt. Diaz Dep. 348:11-18]. Nurse Jones was able to get many of the detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep.  116:23-117:7. Plaintiff Diaz testified that before Lt. Diaz started spraying Plaintiffs with OC spray, the other inmates in the dorm were not saying |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | anything and were just watching. Only after she started spraying did they start yelling that what the guards were doing was not correct. In response, Lt. Diaz threatened the other detainees with OC spray and yelled at them in English. Ex. 26, Plaintiff Diaz Dep. at 60:1-25 |
| 31. | Lt. Diaz determined that Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia were not going to comply with the verbal commands, they were actively resisting (interlocking arms), and they were causing the other detainees to become, likewise, out of control. | Diaz Decl. ¶ 23; McCusker Decl. ¶¶ 7-8; Ex. "H" [GEO's Use of Force policy]; Ex. "O" [Campos Depo.] at 103:11-104:6, 105:9-16.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, vague as to the term "out of control." *Disputed.* Plaintiffs were passively sitting at the dayroom tables waiting to speak with someone about their hunger strike. The uncontroverted video evidence shows that the other detainees who were at their beds in the top and lower tiers were disinterested in Plaintiffs presence at the tables. Ex. F, Video. It was not until the use of force began that the other |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | detainees showed interest in the situation in the dayroom. Ex. 18, Jindi Dep. 53:3-14 (describing that the detainees on the top tiers were acting wild when Diaz sprayed); Ex. 25, Cornejo Dep. 62:11-15; Ex. 23, Castillo Dep. 81:23-82:6; Schwartz Decl. (incorporating Schwartz Rept., at 12). Lt. Diaz herself testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Ex. 16, Lt. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Ex. 16, Lt. Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Ex. 16, Lt. Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Ex. 16, Lt. Diaz Dep. 348:11-18]. Out of fear and because they could not comprehend what was going on, Plaintiffs held hands when the guards were |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | pulling on them. Ex. 26, Diaz Dep. 81:20-25; Ex. 29, Garcia Dep. 39:17 ("We bow[ed] our heads and we held hands."). Officer Jindi testified that after Lt. Diaz sprayed, the detainees on the top tiers grew agitated and began coughing. Ex. 18, Jindi Dep. 53:3-14. Officer Jindi further testified that after she told the detainees to calm down and not make the situation worse, they complied with her orders. Ex. 18, Jindi Dep. 51:10-52:2. Nurse Jones was able to get many of the other detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep. 116:23-117:7. |
| 32. | She recognized that she needed to immediately regain control because the continued delay in resolving the confrontation was causing a major disturbance within the dorm and entire Facility. | Diaz Decl. ¶¶ 23-24; McCusker Decl. ¶¶ 7-8; Ex. "H" [GEO's Use of Force policy]; Ex. "Y" [GEO Martinez Depo.] at 68:20-69:4.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Lt. Diaz testified at her deposition that before the use of force, while Plaintiffs |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | were sitting quietly tables Lt. Diaz herself testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Ex. 16, Lt. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Ex. 16, Lt. Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Ex. 16, Lt. Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Ex. 16, Lt. Diaz Dep. 348:11-18].Lt. Diaz herself testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Ex. 16, Lt. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Ex. 16, Lt. Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 06:39:22, after the use of force began [Ex. 16, Lt. Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Ex. 16, Lt. Diaz Dep. 348:11-18]. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Diaz Dep. 348:11-18].. Officer Jindi testified that after Lt. Diaz sprayed, the detainees on the top tiers grew agitated and began coughing. Ex. 18, Jindi Dep. 53:3-14. Officer Jindi further testified that after she told the detainees to calm down and not make the situation worse, they complied with her orders. Ex. 18, Jindi Dep. 51:10-52:2. Nurse Jones was able to get |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | many of the other detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep.  116:23-117:7. |
| 33. | Thus, after trying to de-escalate the situation for more than 9 minutes, giving several warning that she planned to use OC spray, which Plaintiffs understood, and GEO officers unsuccessfully trying to pull plaintiffs away from the tables, Lt. Diaz deployed an extremely short burst of OC spray down the middle of Table B. | Diaz Decl. ¶¶ 23-25; Ex. "F" [Video recording] at 6:42:12; Ex. "Y" [GEO Martinez Depo.] at 95:17-25, 95:25-96:6, 97:9-11, 98:8-17, 98:18-21; Ex. "Z" [Reyes Depo.] at 91:6-10, 95:9-96:8, 98:2-23; Ex. "O" [Campos Depo.] at 97:25-98:18, 99:16-23,100:4-11; Ex. "Q" [Mejia Depo.] at 73:16-18, 76:7-15; Ex. "P" [Castillo Depo.] at 80:1-81:3, 84:7-14, 88:9-24, 94:21-95:1; Ex. "R" [Rodriguez Depo.] at 97:2-16; Ex. "V" [Gillon Depo] at 104:24-105:5.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.*  Lacks foundation, calls for speculation, vague and ambiguous as to the term "short burst".<br>*Disputed.*  Officer Martinez testified that as the detainees did not speak English, there was  "no way [Lt. Diaz could |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | talk to them." Ex. 20, GEO Martinez Dep. 71:6-9; 66:22-24 (Lt. Diaz did not participate in the conversation he had with the detainees); 96:7-21(Officer Martinez did not say anything to the detainees about pepper spray); 98:18-21 (same). By this time, Lt. Diaz had already deployed her OC spray prior to the officers pulling them away from the tables. Ex. 16, Lt. Diaz Dep. 342:3-343:6, 343:16-347:23. (testifying that she sprayed Plaintiffs at table A while they were being restrained by officers, and later recanting her testimony after a break requested by Lt. Diaz's counsel) Plaintiffs who were sprayed believe she deployed her OC spray three or four times. Ex. 30, Rodriguez Dep. 152:22-24. After that, Lt. Diaz deployed her spray towards Table B and sprayed "quite a lot" towards Plaintiff Diaz and the whole table. Ex. 26, Diaz Dep. 58:10-18. Lt. Diaz testified her can of OC spray was the "big MK-9. Big can." Ex. 16, Lt. Diaz Dep. 143:13. She further testified that the OC spray was |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | visible on the table.  Ex. 16, Lt. Diaz Dep. 252:13-22. |
| 34. | Lt. Diaz intentionally did not directly spray Plaintiffs Diaz, Campos, Cornejo, Castillo, Garcia and Mejia despite their contentions otherwise. | Diaz Decl. ¶¶  23-25; Ex. "F" [Video recording] at 6:42:21; Ex. "N" [Cornejo Depo.] at 71:10-12; Ex. "O" [Campos Depo.] at 97:25-98:18, 99:16-23,100:4-11; Ex. "P" [Castillo Depo.] at 89:25-90:18, 93:5-10; Ex. "Q" [Mejia Depo.] at 74:18-75:5, 76:7-15; Ex. "Y" [GEO Martinez Depo.] at 95:17-25, 95:25-96:6, 97:9-11   **PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed.* Defendants admit this fact is disputed. Lt. Diaz sprayed "quite a lot" on Plaintiff Diaz and she |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | sprayed the whole table. Ex. 26, Diaz Dep. 58:10-18. Plaintiff Castillo explained that Lt. Diaz sprayed him in the eyes and he yelled out "my eyes" and pepper spray entered his mouth.  Ex. 23, Castillo Dep. 89:15-90:8. |
| 35. | This was the only use of force that Lt. Diaz directly used. | Diaz Decl. ¶¶ 25-27; Ex. "X" [Jindi Depo.] at 49:24-50:23; Ex. "Y" [GEO Martinez Depo.] at 84:20-85:7, 98:3-5.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed.*  This contention is disputed by Lt. Diaz's own testimony.  By this time,  Lt. Diaz had already deployed her OC spray.  Ex. 16, Lt. Diaz Dep. Dep. 342:3-343:6, 343:16-347:23 (testifying that she sprayed Plaintiffs at table A while they were being restrained by officers, and later recanting her testimony after  a break requested by Lt. Diaz's counsel) Plaintiffs who were sprayed believe she deployed her OC |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | spray three or four times. Ex. 30, Rodriguez Dep. 152:22-24.<br>After that, Lt. Diaz deployed her spray towards Table A and sprayed "quite a lot" towards Plaintiff Diaz and the whole table. Ex. 26, Diaz Dep. 58:10-18. |
| 36. | Not only were Plaintiffs Diaz, Campos, Garcia, Cornejo, Castillo, and Mejia unfazed by Lt. Diaz's warnings, but they were similarly unfazed by the short burst of spray as they continued to remain seated at Table B with their arms interlocked and heads down on the table. | Diaz Decl. ¶ 27; Ex. "F" [Video recording] at 6:42:21 a.m.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation, vague and ambiguous as to the term unfazed.<br>*Disputed.* Plaintiffs describe themselves as having been in excruciating pain from the OC spray and attempted to protect themselves from the overwhelming fumes. Plaintiff Diaz screamed out when the OC spray hit him in the face and it went into his eyes and mouth as well. Ex. 26, Diaz Dep. 58:22-24. Plaintiff Castillo explained that Lt. Diaz sprayed him in the eyes and he yelled out "my eyes" and pepper spray entered his mouth. Ex. 23, Castillo Dep. 89:15-90:8. Plaintiff Cornejo testified that |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | he could not breathe, his eyes were watering, and felt as if his skin was peeling off.  Ex. 25, Cornejo Dep. 70:23-71:5. Plaintiff Mejia testified that after Lt. Diaz deployed her OC spray, he could not get up because the officers started grabbing and hitting him.  Ex. 28, Mejia Dep. 77:10-18. Lt. Diaz herself testified that in her experience, being sprayed with OC spray in the face and having it drip into your eyes, on a zero to 10 scale, is at a pain level of 10. Ex. 16, Lt. Diaz Dep. 149:10-150:8. |
| 37. | At 6:43:47, after trying to convince the remaining plaintiffs to comply, Officers Reyes and Martinez attempted to remove Plaintiff Garcia from the table by pulling on his arms. | Diaz Decl. ¶ 28; Ex. "F" [Video recording] at 6:43:47 – 6:44:09 a.m.; Ex. "S" [Garcia Depo.] at 45:3-14; Ex. "Y" [GEO Martinez Depo.] at 99:17-100:18, 101:6-102:22, 103:9-19; Ex. "Z" [Reyes Depo.] at 186:15-25.

**PLAINTIFFS' RESPONSE**: *Disputed:* Plaintiffs were unable to understand officers' commands. Plaintiffs were not given commands in Spanish. Ex. 23, Castillo Dep. 79:21-80:9, 144:3-18. Reyes does not speak Spanish, he spoke to Plaintiffs in English, and does not |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | remember anyone speaking to them in Spanish. Ex. 16, Reyes Dep. 148:24-149:1, 150:17-25, 159:12-20. Plaintiff Mejia testified that after Lt. Diaz deployed her OC spray, the officers began grabbing and hitting Plaintiffs at the table.  Ex. 28, Mejia Dep. 77:10-18. Plaintiffs not recall any officers speaking to them in Spanish. Ex. 24, Campos Dep. 91:25-92:5, 94:1-3; Ex. 30, Rodriguez Dep. 144:14-18. The officers pulled, pushed, and hit Plaintiff Garcia after he was blinded by the pepper spray. Ex. 29, Garcia Dep. 45:21-24. |
| 38. | As depicted in the video, Plaintiff Garcia lunged away from the Officers Reyes and Martinez towards the table, which prompted a third officer to assist. | Diaz Decl. ¶ 28; Ex. "F" [Video recording] at 6:43:47 – 6:44:09 a.m.; Ex. "S" [Garcia Depo.] at 45:3-14; Ex. "Y" [GEO Martinez Depo.] at 99:17-100:18, 101:6-102:22, 103:9-19; Ex. "Z" [Reyes Depo.] at 186:15-25.  **PLAINTIFFS' RESPONSE**:  *Objection.*  Lacks foundation, calls for speculation. *Disputed:* Plaintiff Garcia did not lunge away from the officers. The officers pulled, pushed, and hit Plaintiff Garcia after he was blinded by |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | the pepper spray and threw him against a wall, causing him to bang his head. Ex. 29, Garcia Dep. 45:21-24, 47:2-3. |
| 39. | While the three officers (including Officers Reyes and Martinez) struggled to remove Plaintiff Garcia, Plaintiff Campos grabbed on to Plaintiff Garcia and pushed the officers away from Garcia with his left hand/arm (at around 6:43:54). | Diaz Decl. ¶ 28; Ex. "F" [Video recording] at 6:43:47 – 6:44:09 a.m.; Ex. "S" [Garcia Depo.] at 45:3-14; Ex. "Y" [GEO Martinez Depo.] at 99:17-100:18, 101:6-102:22, 103:9-19; Ex. "Z" [Reyes Depo.] at 186:15-25.  **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Plaintiff Campos was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his face they grabbed him and threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2. The officers pulled, pushed, and hit Plaintiff Garcia after he was blinded by the pepper |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | spray. and threw him against a wall, causing him to bang his head. Ex. 29, Garcia Dep. 45:21-24, 47:2-3. |
| 40. | As a result, the officers had to separate Plaintiffs Garcia and Campos by pulling them apart. | Diaz Decl. ¶ 28; Ex. "F" [Video recording] at 6:43:47 – 6:44:09 a.m.; Ex. "S" [Garcia Depo.] at 45:3-14; Ex. "Y" [GEO Martinez Depo.] at 99:17-100:18, 101:6-102:22, 103:9-19; Ex. "Z" [Reyes Depo.] at 186:15-25.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation.<br>*Disputed.* Plaintiff Campos was scared and held onto the person next to him because he was "afraid that something would happen to him -- to all of us." Campos Dep. 105:1-7. Plaintiff Campos was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his |

61

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | face they grabbed him and threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2. Plaintiff Garcia was also blinded by the OC spray. He had marks on his body from where the officers grabbed him, punched him in the ribs, scratched him and pushed him into a wall, causing him to bang his head, all while he was blind from the OC spray. Ex. 29, Garcia Dep. 47:2-10. |
| 41. | Eventually, Officers Reyes and Martinez were able to gain control of Plaintiff Garcia and escort him out of the dorm. | Diaz Decl. ¶ 28; Ex. "F" [Video recording] at 6:43:47 – 6:44:09 a.m.; Ex. "S" [Garcia Depo.] at 45:3-14; Ex. "Y" [GEO Martinez Depo.] at 99:17-100:18, 101:6-102:22, 103:9-19; Ex. "Z" [Reyes Depo.] at 186:15-25.<br><br>**PLAINTIFFS' RESPONSE**: *Disputed*. The officers pulled, pushed, and hit Plaintiff Garcia after he was blinded by the pepper spray. Ex. 29, Garcia Dep. 45:21-24. The officers pushed him into a wall, causing him to bang his head. Ex. 29, Garcia Dep. 47:2-3. Garcia had marks on his body from where the officers grabbed him, punched him in the ribs, scratched him and, all |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | while he was blind from the OC spray. Ex. 29, Garcia Dep. 47:2-10. |
| 42. | Meanwhile, Lt. Diaz realized the situation was completely out of control (Plaintiffs were interlocking arms and refusing to comply, and the other detainees were also yelling and acting in a rowdy manner), so she called for additional assistance. | Diaz Decl. ¶ 27; Campos Decl. ¶¶ 4-5; Ex. "R" [Rodriguez Depo.] at 100:22-24 [acknowledged other detainees in dorm were yelling]; Ex. "W" [Jones Depo.] at 103:20-104:10; Ex. "X" [Jindi Depo.] at 46:8-47:2; Ex. "Y" [GEO Martinez Depo.] at 131:24-132:12, 133:1-18.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* When reviewing the incident video at her deposition, Lt. Diaz asserted there was a rebellion or riot happening with the detainees in the top tier, but also conceded that at no point did she order GEO officers to the tiers to address those detainees -- which she |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | acknowledged she would have done if there was a legitimate security concern.  Ex. 16, Lt. Diaz Dep. 348:6-21; Schwartz Decl. (incorporating Schwartz Report, at 13). Officer Jindi testified that after Lt. Diaz deployed OC spray, the detainees on the top tiers grew agitated and began coughing.  Ex. 18, Jindi Dep. 53:3-14.  Officer Jindi further testified that after she told the detainees to calm down and not make the situation worse, they complied with her orders.  Ex. 18, Jindi Dep. 51:10-52:2. Nurse Jones was able to get many of the other detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep.  116:23-117:7. |
| 43. | Next, at around 6:45:58, officers attempted to pull Plaintiff Mejia from the table. To do so, the officers tried to unlink Plaintiffs Mejia's arms from Plaintiff Castillo. | Diaz Decl. ¶ 29; Ex. "F" [Video recording] at 6:45:58-6:46:18; Ex. "Q" [Mejia Depo.] at 76:20-77:4, 77:23-78:5; Ex. "V" [Gillon Depo] at 170:14-16, 170:23-117:3. **PLAINTIFFS' RESPONSE**: *Objection.*  Calls for speculation. *Disputed.* Plaintiff Mejia testified that after Lt. Diaz |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | deployed OC spray onto his face and shoulders, all he could do was put up with the pain and the officers began hitting him on his ribs and behind his ears, twisting his arms backwards, and threw him against the wall.  Ex. 28, Mejia Dep. 76:16-77:4, 77:10-79:13.<br>Plaintiff Castillo similarly described that two officers tried to pull him off the table; one did so by punching him in the ribs with closed fists and the other pulled him by his arm and shirt.  A third officer leaned over the other side of the table and dug her nails in the back of his ears.  Ex. 23, Castillo Dep. 88:12-10. |
| 44. | Despite Plaintiff Mejia resisting (which he denies) the officers are able to remove Plaintiffs Mejia from the table at around 6:46:18 without using any force. | Diaz Decl. ¶¶ 29, 47; Ex. "F" [Video recording] at 6:45:58-6:46:18; Ex. "Q" [Mejia Depo.] at 82:10-20; Ex. "V" [Gillon Depo] at 170:14-16, 170:23-117:3.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.*  Lacks foundation, calls for speculation, vague and ambiguous as to the term "resisting"<br>*Disputed.* Defendants' admit this fact is disputed.  Officer Martinez testified that he did not remember whether |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Plaintiff Mejia threw his hands back that day. Ex. 20, GEO Martinez Dep. 109:14-110:1. <br> Plaintiff Mejia testified that after Lt. Diaz deployed OC spray onto his face and shoulders, all he could do was put up with the pain and the officers began hitting him on his ribs and behind his ears and twisting his arms backwards. When they removed him from the table, the officers threw him against the wall. Ex. 28, Mejia Dep. 76:16-77:4, 77:10-79:13. |
| 45. | Additionally, while Plaintiff Mejia stated he was hit an unknown amount of times by unknown officers and thrown against a wall, the video evidence demonstrates that he was *not*. The officers only pulled him from the table and, thereafter, struggled to gain control of him while he was resisting the entire time. | Diaz Decl. ¶ 47; Ex. "F" [Video recording] at 6:45:58-6:46:18; Ex. "Q" [Mejia Depo.] at 35:24-37:13, 76:20-77:4, 77:14-22, 77:23-78:5, 78:6-79:3, 79:11-18, 80:9-19; 82:10-20, 109:22-110:15, 110:16-20. <br><br> **PLAINTIFFS' RESPONSE**: <br> *Objection.* Lacks foundation, calls for speculation. <br> *Disputed.* Defendants' admit this fact is disputed. Plaintiff Mejia testified that after he was beaten by the officers at the table, he was not resisting but the officers threw him against a wall where the right side of his face hit the wall. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | The video evidence demonstrates Plaintiff Mejia was shoved into the wall by two officers, as well as Sgt. Campos when he entered the dorm.   Ex. F, [Video, Views C-1 and C-3] at 6:46:18 to 6:46:22;  Ex. 28, Mejia Dep. 81:17-82:24. Officer Martinez further testified that Sgt. Campos gave him the directive to "guide" Plaintiff Mejia towards the wall, and could not remember whether Plaintiff Mejia was throwing his arms back, but did remember that Plaintiff Mejia never struck him. GEO Martinez Dep. 107:19-25, 108:1-109:1. |
| 46. | As the officers were trying to walk Plaintiff Mejia out of the dorm, at around 6:46:18, Sgt. Campos responded to Lt. Diaz's call and entered the dorm. | Diaz Decl. ¶ 30; Campos Decl. ¶¶ 4-6; Ex. "F" [Video recording] at 6:46:18; Ex. "X" [Jindi Depo.] at 47:6-11. **PLAINTIFFS' RESPONSE**: *Disputed.*  Plaintiffs do not dispute that Sgt. Campos responded to Lt. Diaz's call for assistance and had no knowledge of anything else that was happening in the dorm.  Ex. 14, Sgt. Campos Dep. 74:2-75:5, 77:23-25, 79:25-80:24; Lt. Diaz Dep. 224:3-8. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Plaintiffs dispute that Plaintiff Mejia was walked out of the dorm.  The video evidence, as well as Plaintiff Mejia's testimony, demonstrates Plaintiff Mejia was shoved into the wall by two officers, as well as Sgt. Campos immediately as he entered the dorm.   Ex. F, [Video, Views C-1 and C-3] at 6:46:18 to 6:46:22;  Ex. 28, Mejia Dep. 81:17-82:24. |
| 47. | Sgt. Campos immediately assisted the two officers, including Officer Martinez, that were struggling to remove Plaintiff Mejia, who was being combative. | Diaz Decl. ¶ 31; Campos Decl. ¶ 7; Ex. "F" [Video recording] at 6:46:18-6:46:24; Ex. "Y" [GEO Martinez Depo.] at 107:19-109:16; Ex. "Z" [Reyes Depo.] at 110:3-111:4.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation, vague and ambiguous as to the term "combative." *Disputed.*  Plaintiff Mejia testified that he was not resisting the officers. Ex. 28, Mejia Dep. 81:17-82:24. Officer Martinez further testified that Sgt. Campos gave him the directive to "guide" Plaintiff Mejia towards the wall, and could not remember whether Plaintiff Mejia was throwing |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | his arms back, but did remember that Plaintiff Mejia never struck him. GEO Martinez Dep. 107:19-25, 108:1-109:1. Sergeant Campos himself testified that he did not understand what was going on and immediately "guided" Plaintiff Mejia into the wall. Ex. 14, Sgt. Campos Dep. 89:22-89:12. As explained by Dr. Schwartz, in use of force situations where staff take detainees to a wall, a detainee's head or shoulders frequently make initial contact with the wall. Schwartz Decl. (incorporating Schwartz Report, at 18). |
| 48. | Namely, even though Plaintiff Mejia had his arms behind his back and there was an officer on each of his arms, he, nevertheless, resisted and tried to run from the officers. The two officers had not gained his compliance despite their efforts. | Campos Decl. ¶ 7; Ex. "Y" [GEO Martinez Depo.] at 107:19-109:16, 110:3-9; Ex. "F" [Video recording] at 6:46:18-6:46:24. **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Defendants' proffered evidence does not support this contention. Officer Martinez never testified that Plaintiff Mejia tried to run from him. Indeed, Officer Martinez testified that nothing about Plaintiff Mejia |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | stood out to him. He testified that there was no further incident with Plaintiff Mejia in the hallway or when he was placed in the recreation yard. Ex. 20, GEO Martinez Dep. 110:10-111:1. |
| 49. | Thus, Sgt. Campos guided the group to the wall because this would allow the officers to secure Plaintiff Mejia's arms so he could be escorted out without injury. | Campos Decl. ¶¶ 7-8; Ex. "Y" [GEO Martinez Depo.] at 107:19-109:16, 110:3-9; Ex. "F" [Video recording] at 6:46:18-6:46:24.  **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Sergeant Campos himself testified that he did not understand what was going on and immediately "guided" Plaintiff Mejia into the wall. Ex. 14, Sgt. Campos Dep. 89:22-89:12, 95:15-96:4, 96:22-97:11. Sgt. Campos further testified that Plaintiff Mejia was handcuffed in this moment. Ex. 14, Sgt. Campos Dep. 99: 21-100:12. As explained by Dr. Schwartz, in use of force situations where staff take detainees to a wall, a detainee's head or shoulders frequently make initial contact with the wall. Schwartz Decl. (incorporating Schwartz |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Report, at 18). |
| 50. | While Sgt. Campos assisted the officers with Plaintiff Mejia, others officers continued to try to break up Plaintiffs Diaz, Campos, Cornejo, and Castillo by untangling their arms, but the plaintiffs resisted and refused to be removed from Table B. | Diaz Decl. ¶ 31; Campos Decl. ¶ 9; Ex. "F" [Video recording] at 6:46:24. **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Sgt. Campos testified that Plaintiffs had unlinked their arms. Ex. 14, Sgt. Campos Dep. 124:5-7, and could not remember if their arms were linked while he was spraying them with OC spray. Ex. 14, Sgt. Campos Dep. 124:11-18. After Lt. Diaz sprayed the table Plaintiffs put their faces down on the table to avoid being sprayed further. Then the guards started pulling on them to remove them. After Plaintiff Diaz was sprayed in the face with OC spray he got up screaming, blinded by the spray that had gone into his eyes and mouth. Ex. 26, Diaz Dep. 58:15-59:8. Plaintiff Campos was scared and held onto the person next to him because he was "afraid that something would happen to him -- to all of us." Campos Dep. 105:1-7. Plaintiff Campos was in pain and blinded by the OC spray. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | He was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his face they grabbed him and threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2. Plaintiff Castillo was being pulled by two officers, one of which hit him in the ribs, and a third officer who reached across the table and dug her nails behind her ears.  Ex. 23, Castillo Dep. 88:12-89:10, 89:15-24. Plaintiff Cornejo was being pulled by the officers, but did not understand why.  Ex. 25, Cornejo Dep. 68:21-69:14. |
| 51. | Eventually, the three officers were able to pull Castillo away from the table without using any force. | Diaz Decl. ¶¶ 31, 47; Campos Decl. ¶ 17; Ex. "V" [Gillon Depo] at 171:4-20; Ex. "F" [Video recording] at 6:46:24-6:46:33. **PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation, vague and ambiguous as to the phrase "using any force." *Disputed*. Plaintiff Castillo testified that he was being pulled by two officers, one of which hit him in the ribs, and a third officer who reached |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | across the table and dug her nails behind her ears. Ex. 23, Castillo Dep. 88:12-89:10, 89:15-24. The video evidence demonstrates most of this interaction, but the details are not captured by the grainy video footage and Plaintiff Castillo is largely obstructed by the officers and other Plaintiffs at the table. Ex. F, [Video, View C-3] at 06:46:23 a.m. to 06:46:36 a.m. |
| 52. | While Plaintiff Castillo makes various allegations about being punched and states that he was slammed against glass, the video evidence demonstrates otherwise. | Diaz Decl. ¶¶ 31, 47; Campos Decl. ¶ 17; Ex. "F" [Video recording] at 6:46:24-6:46:33; Ex. "P" [Castillo Depo.] at 89:3-8, 89:15-24, 94:7-9; Ex. "V" [Gillon Depo] at 171:4-20.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Defendants admit this fact is disputed. The video evidence does not capture most of this interaction, but some grainy footage depicts what Plaintiff Castillo described. Ex. F, [Video, View C-3] at 06:46:23 a.m. to 06:46:54 a.m. Plaintiff Castillo testified that after he was carried away from the table he was taken near the stair railing and was thrown |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | against the glass by the telephone area, where he injured his face.  Ex. 23, Castillo Dep. 96:8-96:21. |
| 53. | Sgt. Campos then walked toward Table B where officers were trying to grab Plaintiffs Diaz, Campos, and Cornejo's arms to separate them (the remaining plaintiffs still had their arms interlocked.) | Diaz Decl. ¶ 32; Campos Decl. ¶ 9; Ex. "F" [Video recording] at 6:46:33-6:46:44. **PLAINTIFFS' RESPONSE**: *Objection.*  Calls for speculation. *Disputed*.  This is disputed by Sgt. Campos's own testimony. Sgt. Campos testified that when he walked over to the table, Plaintiffs had unlinked their arms and did not link them again until after he deployed OC spray against them. Ex. 14, Sgt. Campos Dep. 124:5-7, 124:19-24. Moreover, the GEO guards were were not simply "trying to grab Plaintiffs' arums." Plaintiff Campos testified that the guards were using their nails to scratch him. Ex. 24, Campos Dep. 115:13-14. Plaintiff Diaz testified that the guards were digging their nails behind his ears, digging their nails into his hand, squeezing painfully between his thumb and pointer finger, and pinching and pulling the skin on the Plaintiffs' sides near their ribs. Ex. 26, Diaz |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Dep.  55:9-56:5, 57:6-10. |
| 54. | Plaintiffs Diaz, Campos, and Cornejo grabbed on to each other to prevent the officers from gaining their compliance. In turn, the officers struggled to separate them. | Campos Decl. ¶ 9; Diaz Decl. ¶ 31; Ex. "F" [Video recording] at 6:46:18-6:46:44.<br><br>**PLAINTIFFS' RESPONSE**:<br> *Objection.*  Lacks foundation, calls for speculation, vague and ambiguous as to the term "struggled."<br>*Disputed*. This is disputed by Sgt. Campos's own testimony. Sgt. Campos testified that when he walked over to the table, Plaintiffs had unlinked their arms and did not link them again until after he deployed OC spray against them. Ex. 14, Sgt. Campos Dep. 124:5-7, 124:19-24. Plaintiff Cornejo joined hands with the other Plaintiffs because the Plaintiffs at the other table sounded like they were in pain and he was afraid, and also because in that moment he thought he might be deported.  Ex. 25, Cornejo Dep. 65:10-24. Plaintiff Campos was scared and held onto the person next to him because he was "afraid that something would happen to him -- to all of us." Campos Dep. 105:1-7. Moreover, Plaintiff Campos |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | testified that the guards were using their nails to scratch him. Ex. 24, Campos Dep. 115:13-14. Plaintiff Diaz testified that the guards were digging their nails behind his ears, digging their nails into his hand, squeezing painfully between his thumb and pointer finger, and pinching and pulling the skin on the Plaintiffs' sides near their ribs. Ex. 26, Diaz Dep.  55:9-56:5, 57:6-10. |
| 55. | Plaintiff Cornejo admitted that the officers were trying to separate them "from the hands" and Plaintiff Campos acknowledged the officers tried to separate them one by one. | Ex. "N" [Cornejo Depo.] at 68:21-22; Ex. "O" [Campos Depo.] at 107:12-15.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed*. While the guards were trying to pull Plaintiff Cornejo, they hit his abdomen on the side of the table, and then threw him on the ground, causing him to hit the side of the table and bleed from his abdomen, and injure his knee. Ex. 25, Cornejo Dep. 73:25-74:14. Plaintiff Campos was scared and held onto the person next to him because he was "afraid that something would happen to him -- to all of us." Campos Dep. 105:1-7. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | The guards also used their nails to scratch Plaintiff Campos. Ex. 24, Campos Dep. 115:13-14. Plaintiff Campos was in pain and blinded by the OC spray. He was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his face they grabbed him and threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2. |
| 56. | Sgt. Campos determined that any further delay in bringing this situation under control would result in a major disturbance and further serious disorder within the dorm. | Campos Decl. ¶ 10; McCusker Decl. ¶¶ 7-8; Ex. "H" [GEO's Use of Force policy].<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Calls for speculation. *Disputed.* When Sgt. Campos arrived at 2-Charlie he knew nothing about what was happening there. Ex. 14, Sgt. Campos Dep. 74:2-75:5, 77:23-25, 79:25-80:24.After Sgt. Campos entered the dayroom, he made no effort to learn anything: he did not talk to any officers or get any information about what was happening. Instead, within a minute of entering the room, he started deploying OC spray |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | on Plaintiffs. Ex. 14, Sgt. Campos Dep. 104:11-14, 105:22-25, 106:5-8. The uncontroverted video evidence shows that the other detainees who were at their beds in the top and lower tiers were disinterested in Plaintiffs' presence at the tables, Ex. F, Video, and it was not until the use of force began that the other detainees began responding in any way to what was happening in the dayroom.  Ex. 18, Jindi Dep. 53:3-14; Ex. 25, Cornejo Dep. 62:11-15; Ex. 23, Castillo Dep. 81:23-82:6; Ex. 26, Diaz Dep. 60:9-25;  Decl. of Schwartz (incorporating Schwartz Report at 17). Lt. Diaz herself testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Ex. 16, Lt. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Ex. 16, Lt. Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Ex. 16, Lt. Diaz |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Ex. 16, Lt. Diaz Dep. 348:11-18]. Finally, Officer Jindi testified that after the initial OC sprays by Lt. Diaz, she told the detainees to calm down and not make the situation worse, they complied with her orders. Ex. 18, Jindi Dep. 51:10-52:2. Nurse Jones was able to get many of the other detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep.  116:23-117:7. |
| 57. | As such, he determined that it was reasonable under the circumstances to deploy OC spray | Campos Decl. ¶ 10; McCusker Decl. ¶¶ 7-8; Ex. "H" [GEO's Use of Force policy]. **PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed*. When Sgt. Campos arrived at 2-Charlie he knew nothing about what was happening there. Ex. 14, Sgt. Campos Dep. 74:2-75:5, 77:23-25, 79:25-80:24.After Sgt. Campos entered the dayroom, he made no effort to learn anything: he did not talk |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | to any officers or get any information about what was happening. Instead, within a minute of entering the room, he started deploying OC spray on Plaintiffs. Ex. 14, Sgt. Campos Dep. 104:11-14, 105:22-25, 106:5-8. The uncontroverted video evidence shows that the other detainees who were at their beds in the top and lower tiers were disinterested in Plaintiffs' presence at the tables, Ex. F, Video, and it was not until the use of force began that the other detainees began responding in any way to what was happening in the dayroom.  Ex. 18, Jindi Dep. 53:3-14; Ex. 25, Cornejo Dep. 62:11-15; Ex. 23, Castillo Dep. 81:23-82:6; Ex. 26, Diaz Dep. 60:9-25;  Decl. of Schwartz (incorporating Expert Report, at 12). Additionally, Lt. Diaz testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Diaz Dep. 348:11-18].<br><br>Finally, Officer Jindi testified that after the initial OC sprays by Lt. Diaz, she told the detainees to calm down and not make the situation worse, they complied with her orders. Ex. 18, Jindi Dep. 51:10-52:2. Nurse Jones was able to get many of the other detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep.  116:23-117:7. |
| 58. | He instructed the officers to move away from the table, yelled, "OC spray warning," and commanded the plaintiffs at the table to stop resisting. | Campos Decl. ¶ 10.<br><br>**PLAINTIFFS' RESPONSE**: *Disputed*. Sgt. Campos made the determination that he should deploy OC spray because Plaintiffs at Table B were being combative and elbowing officers.  Ex. 14, Sgt. Campos Dep. 114:5-15. Sgt. Campos yelled "OC spray |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | warning" without telling Plaintiffs what that meant or what they needed to do to avoid being sprayed. Ex. 14, Sgt. Campos Dep. 109:4-20. There were multiple commands being given by multiple officers at the same time. St. Campos does not remember any given in Spanish, including whether he himself gave commands in Spanish. Ex. 14, Sgt. Campos Dep. 86:20-24, 107:22-108:6, 111:18-21. Sgt. Campos testified that Plaintiffs had unlinked their arms. Ex. 14, Sgt. Campos Dep. 124:5-7, and could not remember if their arms were linked while he was spraying them with OC spray. Ex. 14, Sgt. Campos Dep. 124:11-18 ("They're huddled together. You can't tell. I don't know.") Sgt. Campos only waiting 3-5 seconds after yelling at Plaintiffs before he started spraying them with OC spray. Ex. 14, Sgt. Campos Dep. 111:12-14. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 59. | Based on the video recording, at around 6:46:46 a.m. to 6:46:47 a.m., Sgt. Campos deployed OC spray in the direction of Plaintiffs Diaz, Campos, and Cornejo, who had their arms interlocked and were huddled together across the table. | Campos Decl. ¶ 11; Diaz Decl. ¶ 32. Campos Decl. ¶ 11; Ex. "F" [Video recording] at 6:46:46-6:46:47; Ex. "T" [Diaz Depo] at 83:17-23. <br><br> **PLAINTIFFS' RESPONSE**: *Disputed.* Sgt. Campos testified that he directly sprayed at Plaintiff Cornejo because he was the first detainee that he observed elbowing an officer. Ex. 14, Sgt. Campos Dep. 113:23-114:14. He further testified that Plaintiffs had unlinked their arms. Ex. 14, Sgt. Campos Dep. 124:5-7, and could not remember if their arms were linked while he was spraying them with OC spray. Ex. 14, Sgt. Campos Dep. 124:11-18 ("They're huddled together. You can't tell. I don't know.") There were multiple commands being given by multiple officers at the same time. St. Campos doesn't remember any given in Spanish. Ex. 14, Sgt. Campos Dep. 107:22-108:6. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 60. | Then, he moved to the opposite end of the table and deployed a second extremely short burst of OC spray towards Plaintiffs Diaz and Campos. | Campos Decl. ¶ 11; Diaz Decl. ¶ 32; Ex. "F" [Video recording] at 6:46:47-6:46:52.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, vague and ambiguous as to the term "extremely short burst." *Disputed.* Sgt. Campos testified that he went around the table to deploy OC spray at Plaintiffs again because he "had not made contact with them." Ex. 14, Sgt. Campos Dep. 115:1-11. He also testified that he did so because they were striking the officers that were attempting to secure them. Ex. 14, Sgt. Campos Dep. 115:19-25. The uncontroverted video evidence shows otherwise. Ex. F [Video] at 06:46:50 a.m. to 06:46:52 a.m. Moreover, Plaintiff Mejia recalls Plaintiff Campos crying from the burning pain that he felt on his face, chest, and intimate parts while they were in a holding cell following this incident. Ex. 28, Mejia Dep. 93:12-94:8. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 61. | At 6:46:56, one officer grabbed Plaintiff Campos and Plaintiff Campos fell to the ground. The same officer then picked up Plaintiff Campos and quickly placed him against a wall to gain control of Plaintiff Campos. | Ex. "F" [Video recording] at 6:46:56-6:47:27; Ex. "O" [Campos Depo.] at 108:3-13,112:13-113:6, 113:20-23, 202:20-24, 205:25-206:3.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Calls for speculation, vague and ambiguous as to the term "placed".<br>*Disputed.* Plaintiff Campos was in pain and blinded by the OC spray. He was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his face they grabbed him and threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2.<br>The officer violently put Plaintiff Campos against the wall, bending Campos' right arm and injuring his shoulder. Ex. 24, Campos Dep. 108:3-12. |
| 62. | Plaintiff Campos then returned to the table. Immediately thereafter, a different officer tried to pull Plaintiff Campos from the table, but Plaintiff Campos continued to refuse to stand up (despite having just demonstrated he could walk). Two officers lifted Plaintiff Campos to take him out and, eventually, Plaintiff | Ex. "F" [Video recording] at 6:47:27-6:47:57.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation.<br>Plaintiff Campos was in pain and blinded by the OC spray. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
|  | Campos stood up on his own to exit the dorm. | He was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his face they grabbed him and threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2.<br>An officer violently put Plaintiff Campos against the wall, bending Campos' right arm and injuring his shoulder. Ex. 24, Campos Dep. 108:3-12.<br>One officer grabbed his stomach and one grabbed one of his feet and they made him hop on one foot. Ex. 24, Campos Dep. 108:15-19. |
| 63. | Plaintiff Campos admitted that he was never struck, kicked, or punched during the entire incident, and he admits that he was never "brutally beaten" as alleged in his operative complaint. | Ex. "O" [Campos Depo.] at 111:5-113:6, 113:8-18, 113:24-114:7, 114:24-115:20, 205:13-18.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation.<br>*Disputed.* Plaintiff Campos was in pain and blinded by the OC spray. He was trying to use his hands to wipe the OC spray from his face as the officers were grabbing at his hands. Instead of allowing Plaintiff Campos to wipe his face they grabbed him and |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | threw him to the ground. Ex. 24, Campos Dep. 106:20-107:2. An officer violently put Plaintiff Campos against the wall, bending Campos' right arm and injuring his shoulder. Ex. 24, Campos Dep. 108:3-12. One officer grabbed his stomach and one grabbed one of his feet and they made him hop on one foot. Ex. 24, Campos Dep. 108:15-19. |
| 64. | At 6:47:01, Plaintiff Diaz was escorted out of the dorm by an officer without issue. | Ex. "F" [Video recording] at 6:47:01-6:47:24; Ex. "T" [Diaz Depo] at 59:4-11.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Calls for speculation. *Disputed.* After Plaintiff Diaz was sprayed in the face with OC spray he got up screaming, blinded by the spray that had gone into his eyes and mouth. Ex. 26, Diaz Dep. 58:15-59:8. Plaintiff Diaz was injured as he was being pulled out: his arms were hurting from having his arms pulled back hard before he was handcuffed. Ex. 26, Diaz Dep. 59:12-17. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 65. | At most, Plaintiff Diaz alleges that the officers "pinched" him, pulled on his arms in an effort to separate him from the other plaintiffs, and applied pressure behind his ears; but admitted that no one ever punched him. | Ex. "T" [Diaz Depo] at 56:7-25, 57:6-58:3, 83:21-23; Ex. "Y" [GEO Martinez Depo.] at 77:14-78:1 (explaining that after presence and verbal commands fail to gain the detainee's compliance, pressure points can be utilized and that there is a pressure point behind the ear).<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed:* GEO guards dug their nails behind Plaintiff Diaz' ears, dug their nails into his hand, squeezing between the thumb and pointer finger, and pinched/pulled the skin on his sides near his ribs. Ex. 26, Diaz Dep. 55:9-56:5, 57:6-10. After Plaintiff Diaz was sprayed in the face with OC spray he got up screaming, blinded by the spray that had gone into his eyes and mouth. Ex. 26, Diaz Dep. 58:15-59:8. Plaintiff Diaz was injured as he was being pulled out: his arms were hurting from having his arms pulled back hard before he was handcuffed. Ex. 26, Diaz Dep. 59:12-17. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 66. | Sgt. Campos returned to the table and despite having deployed OC spray, Plaintiff Cornejo was still actively resisting the officers, including Officer Martinez. | Campos Decl. ¶¶ 13-14; Ex. "F" [Video recording] at 6:47:09-6:47:54; Ex. "Y" [GEO Martinez Depo.] at 113:7-114:12, 115:11-117:19<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation, vague as to "actively resisting."<br>*Disputed.* The video evidence demonstrates that Plaintiff Cornejo was merely sitting at the table, trying to clean his face with his shirt and protect himself from the overwhelming amount of pepper spray that Sgt. Campos had just directly sprayed on him. Ex. F, Video 6:47:09-6:47:24. |
| 67. | Plaintiff Cornejo wrapped his legs to the table, which required three officers to try to remove him. | Campos Decl. ¶ 14; Ex. "F" [Video recording] at 6:47:09-6:47:54; Ex. "Y" [GEO Martinez Depo.] at 113:7-114:12, 115:11-117:19.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation.<br>*Disputed.* Defendants' proffered evidence does not support the entirety of this contention. Officer Martinez testified that Plaintiff Cornejo was resisting and somehow ended up on the floor. Ex. 20, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | GEO Martinez Dep. 114:1-25. The video evidence demonstrates that Plaintiff Cornejo was merely sitting at the table, overcome by the pepper spray that Sgt. Campos had just directly sprayed on him, then was taken to the ground by three officers.  Ex. F, Video at 6:47:09 to 6:47:56. |
| 68. | His refusal to stand up forced the officers to carry him out of the dorm. | Campos Decl. ¶ 14, Ex. "F" [Video recording] at 6:47:09-6:47:54; Ex. "Y" [GEO Martinez Depo.] at 113:7-114:12, 115:11-117:19.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation, vague and ambiguous as to "forced." *Disputed*. Plaintiff Cornejo never refused to stand up, he simply remained calm, tried to wipe his face from the OC spray that Sgt. Campos had just deployed directly at him, kept his head down, and never raised his arms. Ex. 25, Cornjeo Dep. 72:8-16;  Ex. F, Video at 6:47:09 to 6:47:56. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 69. | While Plaintiff Cornejo alleges that the officers hit him on the edge of the table, the video demonstrates that, instead, beginning at around 6:47:09, Cornejo grabbed the table to prevent the officers from removing him. | Ex. "F" [Video recording] at 6:47:09-6:47:54; Ex. "N" [Cornejo Depo.] at 73:19-74:14<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, not responsive to Plaintiffs statement that he was struck. *Disputed.* Defendants admit this fact is disputed. The proffered evidence does not support the contention that Plaintiff Cornejo "grabbed the table to prevent the officers from removing him." Plaintiff Cornejo testified that he never refused to get up. Rather, he simply kept his head down the entire time. Ex. 25, Cornjeo Dep. 72:8-16. He further testified that after being sprayed, the officers then threw him on the ground, causing him to hit the side of the table and bleed from his abdomen and injured his knee. Ex. 25, Cornejo Dep. 73:25-74:14. Moreover, officers grabbed Plaintiff Cornejo by his hands and feet, carried him out of the dayroom, and threw him on the ground in the recreation yard. Ex. 25, Cornejo Dep. 63:9-21. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 70. | By 6:48:19, Plaintiffs had been taken out of the dorm – i.e. 16 minutes after Diaz had initially entered in an effort to quell the disturbance caused by Plaintiffs. | Diaz Decl. ¶ 31.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation.<br>*Disputed.* Plaintiffs dispute that they were removed from the dorm by 06:48:19 a.m. The video evidence demonstrates that up to approximately 06:48:39 a.m., at least one Plaintiff is still in the dorm being restrained by a group of officers. Plaintiffs further dispute that they caused a disturbance. |
| 71. | Medical staff was present throughout the entire incident in the dorm and confirmed that the GEO officers did not strike Plaintiffs. | Ex. "V" [Gillon Depo] at 165:4-9; Ex. "W" [Jones Depo.] at 101:23-25, 110:11-21, 114:4-10, 117:8-13, 120:25-121:8, 124:14-25.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation, vague and ambiguous as to the term "present."<br>*Disputed.* Defendants' citations to Nurse Jones's deposition do not in any way support what Defendants contend. To the contrary: Nurse Jones consistently testified that she could not see how the guards handled Plaintiffs, that she could not clearly see what was |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | happening, that she did not remember any specific actions relating to the Plaintiffs, and that she was "paying more attention to the background with the other detainees [in the bunks]." Ex. 21, Jones Dep. 110:8-112:1. She reiterated this every time she was questioned. Ex. 21, Jones Dep. 113:17-25; 114:1-3; 119:1-18; 121:9-24; 122:3-11; 128:17-129:2; 130:2-10; 137:10-138:5. |
| 72. | Additionally, throughout the entire incident, Plaintiffs' failure to comply with commands prompted the other detainees in the dorm to become disruptive and ignore the commands to return to their bunks, which Plaintiffs acknowledged was a direct result of their conduct. | *See* Ex. "O" [Campos Depo.] at 90:11-91:22; Ex. "W" [Jones Depo.] at 103:20-104:10; Ex. "Y" [GEO Martinez Depo.] at 131:24-132:12, 133:1-18, 134:7-11. **PLAINTIFFS' RESPONSE**: *Objection*. Lacks foundation, calls for speculation. *Disputed*. Defendants' proffered evidence does not support the entirety of this contention. Nurse Jones described that the other detainees who were at their bunks did not start yelling until the use of force. Prior to that, they were only "visually observing and some were making noises." Ex. 21, Jones Dep. 103:25-104:10. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Lt. Diaz herself testified at her deposition that before the use of force, while Plaintiffs were sitting quietly tables [Ex. 16, Lt. Diaz Dep. 327:14-19], there was nothing of concern happening in the bunks and the situation was completely under control [Ex. 16, Lt. Diaz Dep. 328:1-329:11, 331:7-9, 335:6-17]. The first mention Lt. Diaz makes at her deposition about detainees yelling is at approximately 06:39:22, after the use of force began [Ex. 16, Lt. Diaz Dep. 347:25-348:10], but even then, Diaz did not consider the situation to present a security concern and no other officer did either [Ex. 16, Lt. Diaz Dep. 348:11-18]. Indeed, Nurse Jones was able to get many of the detainees to calm down just by asking. She asked a detainee who spoke many languages to tell the others to calm down. He did and the majority of the detainees complied. Ex. 21, Jones Dep.  116:23-117:7. Similarly, Officer Jindi testified that after Lt. Diaz sprayed, the detainees on the top tiers grew agitated and began coughing.  Ex. 18, Jindi Dep. 53:3-14.  She further |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | testified that after she told the detainees to calm down and not make the situation worse, they complied with her orders. Ex. 18, Jindi Dep. 51:10-52:2. Plaintiffs only heard the other detainees in the dorm shout after OC spray was dispersed in the dorm.   Ex. 23, Castillo Dep. 81:23-82:6. |
| 73. | Also, while Officer Jindi was present during the incident, she was not involved in any use of force. | Ex. "X" [Jindi Depo.] at 50:24-51:4, 51:10-16, 52:3-5, 69:1-4.<br><br>**PLAINTIFFS' RESPONSE**: *Undisputed.* |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 74. | After each plaintiff was removed from the dorm, they were taken to the recreation yard where they were handcuffed (if they had not already been handcuffed inside the dorm) and Officer Gillon, Officer Martinez, Officer Reyes, Sgt. Campos, and Lt. Diaz had no further contact with them. | Ex. "N" [Cornejo Depo.] at 76:9-78:6; Ex. "O" [Campos Depo.] 116:2-6; Ex. "P" [Castillo Depo.] at 95:8-21, 96:5-11; Ex. "Q" [Mejia Depo.] at 81:19-25, 83:2-11; Ex. "R" [Rodriguez Depo.] at 108:15-23; Ex. "T" [Diaz Depo] at 84:8-23; Ex. "U" [Martinez Depo.] at 100:14-24; Ex. "V" [Gillon Depo] at 118:22-119:5, 113:23-25, 114:7-10; Ex. "Y" [GEO Martinez Depo.] at 84:17-19, 85:21-23, 87:1-9, 93:11-17, 110:10-19; 117:24-118:3, 118:18-119:1; Ex. "Z" [Reyes Depo.] at 117:19-118:13, 119:1-20; Campos Decl. ¶ 14; Diaz Decl. ¶ 31.<br><br>**PLAINTIFFS' RESPONSE**:<br> *Objection.* Lacks foundation, calls for speculation.<br>*Disputed.* Plaintiffs admit that Officers Gillon, Martinez, Reyes, and Sgt. Campos had no further contact with Plaintiffs.<br>Plaintiffs dispute that Lt. Diaz had no further contact with them.  After Plaintiffs were taken to a holding cell, Lt. Diaz observed Plaintiffs being transported while handcuffed and, at approximately 3:00 p.m. and did, without seeking |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | the approval of the Facility Administrator.  Ex. 16, Lt. Diaz Dep. 277:12-17, 277:25-278:23.  Additionally, Lt. Diaz issued orders placing Plaintiffs in administrative segregation. Ex. 2, Plaintiffs' Segregation Orders. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 75. | Thereafter, they were transported from the recreation yard to another room where Plaintiffs admitted they were seen by medical staff. | Ex. "N" [Cornejo Depo.] at 78:25-79:2; Ex. "O" [Campos Depo.] at 119:6-19, 129:16-23; Ex. "P" [Castillo Depo.] at 101:13-103:6, 103:22-3; Ex. "Q" [Mejia Depo.] at 39:4-10, 84:3-24; Ex. "R" [Rodriguez Depo.] at 111:6-112:7, 113:18-114:2; Ex. "S" [Garcia Depo.] at 47:25-48:13; Ex. "T" [Diaz Depo] at 89:8-13; Ex. "U" [Martinez Depo.] at 60:18-19, 126:4-19; Ex. "W" [Jones Depo.] at 143:14-144:25, 149:2-21 [after a use of force incident, medical is required to take the detainee's vitals and review a questionnaire], 153:8-154:24 [responded to intake to evaluate Plaintiffs after they were cleared to see medical], 155:23-156:12, 163:20-24 [recalled that only one plaintiff had a specific complaint], 174:15-175:5.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Calls for speculation. *Disputed.* LVN Jones was not able to see Plaintiffs until after they were cleared by security. Ex. 21, Jones Dep. 144:5-8. LVN Jones did not help Plaintiffs decontaminate from |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | the OC spray, she only saw them to clear them to be placed in the restricted housing unit (RHU clearance). LVN Jones provided no treatment for Plaintiffs' injuries, all she did was check their vital signs, give a general health assessment and fill out of the body incident sheet. Ex. 21, Jones Dep. 144:14-22. Moreover, LVN Jones did not see Plaintiffs until she medically cleared approximately 80 detainees in the recreation yard.  Ex. 21, Jones Dep.  130:19-131:25, 138:19-139:7.  Plaintiffs were forced to wait at least 2 ½ hours after they were exposed to OC spray before they received any sort of medical examination. Ex. 7, Medical Reports; Ex. 21, Jones Dep. 176:11-15, 177:18-25, 205:25-206:3. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 76. | Additionally, all Plaintiffs were decontaminated (placed in showers to rinse off the OC spray with water) and provided new uniforms. | Diaz Decl. ¶¶ 34-35; McCusker Decl. ¶ 9; Ex. "H" [GEO's Use of Force policy]; Ex. "N" [Cornejo Depo.] at 76:9-78:6, 78:25-79:2, 82:14-17; Ex. "O" [Campos Depo.] at 119:6-19, 129:16-23, 130:13-17; Ex. "P" [Castillo Depo.] at 104:18-105:9; Ex. "Q" [Mejia Depo.] at 86:18-22, 87:22-88:19, 90:2-8, 91:16-92:4, 96:24-97:14; Ex. "R" [Rodriguez Depo.] at 163:9-164:8 [estimated that a half an hour after the incident he was decontaminated and in a new uniform]; Ex. "S" [Garcia Depo.] at 48:15-25; Ex. "T" [Diaz Depo] at 86:12-22; Ex. "U" [Martinez Depo.] at 55:6-11; 58:2-5, 58:14-19, 104:6-18, 108:11-25<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* The manner in which Plaintiffs were decontaminated, i.e. handcuffed, in their pepper spray-drenched clothing, and with hot water, is not the accepted practice of OC spray decontamination. Decl. of Venters (incorporating Expert Report at 5-6); Ex. 16, Lt. Diaz Dep. 153:25-154:10, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
|  |  | 154: 21-155:11, 155:24-156:3, 158:3-13 (explaining that GEO officers are trained that hot showers will exacerbate OC spray pain and clothing with OC spray should be removed). Additionally, some Plaintiffs, after recognizing that some of their friends were in extreme pain, refused to shower in the hot water. Ex. 27, Martinez Dep. 55:6-25; Ex. 28, Mejia Dep. 90:9-92:4; Ex. 29, Garcia Dep. 48:15-20 ("I heard the scream from the others from the burn, and they said we shouldn't take showers, the rest of us."). |
| 77. | While Plaintiffs claim the decontamination process was intended to further their injuries, it was not. Water, which is the method used at the Facility for decontamination purposes, does reactivate the tingling sensation caused by the OC spray; however, it is necessary to remove the spray. | McCusker Decl. ¶ 9; Diaz Decl. ¶ 8; Ex. "H" [GEO's Use of Force policy]. **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation, vague and ambiguous as to the term "tingling sensation" *Disputed.* The manner in which Plaintiffs were decontaminated, i.e. handcuffed, in their pepper spray-drenched clothing, and with hot water, is not the accepted practice of OC spray decontamination. Decl. of Venters (incorporating Expert |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Report at 5-6); Ex. 16, Lt. Diaz Dep. 153:25-154:10, 154: 21-155:11, 155:24-156:3, 158:3-13 (explaining that GEO officers are trained that hot showers will exacerbate OC spray pain and clothing with OC spray should be removed). Further, GEO officers who are OC sprayed during training at the Facility are decontaminated in accordance with accepted practices, unlike the decontamination Plaintiffs received in this instance. Ex. 16, Lt. Diaz Dep. 152: 18-24 (eyes were flushed with cold water and a fan was used to relieve the stinging sensation during OC spray training). GEO officers exposed to OC spay during the incident were decontaminated in accordance with accepted practices, unlike the decontamination Plaintiffs received. Ex. 19, Juarez Dep. 18:6 (use cold water), 79:22-80:19 (immediate eye flush), 41:14-24 (attended by medical staff); Ex. 16, Reyes Dep. 125:11-25 (attended by nurse in medical dept., eyes flushed, provided water and soap to wash with), 138:7-18, 139:10-20 (sent for |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | off-site medical evaluation by a doctor) Importantly, GEO Officer Reyes, who only vicariously came into contact with the OC spray that was deployed on Plaintiffs, was decontaminated significantly different than Plaintiffs were. Officer Reyes had his eyes flushed with cold water in the eyewash station that was available in the same decontamination area that Plaintiffs were in. He was also transported to an off-site urgent care for further assessment. Ex. 21, Jones Dep. 171:17-173:16, 175:16-176:5; Ex. 16, Reyes Dep. 125:11-25, 138:7-18, 139:10-20. Plaintiffs who were placed in the showers testified that they were agonizing over the overwhelming pain while showering but the officers did not stop. Ex. 25, Cornejo Dep. 77:2-78:24, 80:9-13, 80:25-81:6 ("at the moment when I was showering, because they put me in like this, my head in like this (indicating), where the -- where the showerhead was, and I was telling them to stop because only my head was in like this (indicating) and I was |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | having a hard time breathing. And he wouldn't stop from keeping my head in like this (indicating), and I felt the water very hot."). |
| 78. | After Plaintiffs were decontaminated and seen by medical staff, they were taken to administrative segregation. | McCusker Decl. ¶¶ 9, 12; Ex. "H" [GEO's Use of Force policy]; Ex. "A" [Detainee Handbook –"Disciplinary Segregation"]; Ex. "I" [GEO's Restrictive Housing Units policy]; Ex. "O" [Campos Depo.] at 133:1-134:7; Ex. "Q" [Mejia Depo.] at 97:21-98:4; Ex. "R" [Rodriguez Depo.] at 113:6-14; Ex. "S" [Garcia Depo.] at 50:11-15, 55:21-56:8<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.* Lacks foundation, calls for speculation, vague as to "decontaminated" vague as to "seen"<br>*Disputed.* As stated above in response to contentions 76 & 77, Plaintiffs were not appropriately decontaminated. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 79. | Plaintiffs were informed that there was an investigation as a result of their conduct and a potential for discipline. | McCusker Decl. ¶ 13; Diaz Decl. ¶¶ 38-40; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]; Ex. "C" [Administrative Segregation Orders related to Plaintiffs]; Ex. "D" [Incident of Prohibited Acts and Notice of Charges related to Plaintiffs]; Ex. "I" [GEO's Restrictive Housing Units policy]; Ex. "N" [Cornejo Depo.] at 87:7-19; Ex. "O" [Campos Depo.] at 133:1-134:7; Ex. "P" [Castillo Depo.] at 111:6-24; Ex. "Q" [Mejia Depo.] at 98:9-99:13, 156:10-21; Ex. "R" [Rodriguez Depo.] at 153:13-154:19; Ex. "S" [Garcia Depo.] at 50:11-15, 55:21-56:8; Ex. "U" [Martinez Depo.] at 70:17-20.<br><br>**PLAINTIFFS' RESPONSE**: *Undisputed.* |
| 80. | Plaintiff Mejia admitted that he was given the opportunity to express that he did not feel he had done anything wrong (however, at his deposition he acknowledged that his actions were wrong). | Ex. "Q" [Mejia Depo.] at 99:23-100:6, 101:14-102:5, 162:6-163:5.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Vague as to "opportunity", vague as to "wrong"<br>*Disputed.* Defendants' proffered evidence does not support this contention. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Plaintiff acknowledged that he made a statement to that effect to a GEO officer at which time the officer also told him that GEO's actions were wrong, but Plaintiff did not reaffirm any admission or specify which action. *Id.* 162:6-163:5. |
| 81. | Later, they were informed that the outcome of the investigation related to their failure to follow commands and engage in a group demonstration mandated they would be disciplined. | McCusker Decl. ¶ 13; Diaz Decl. ¶¶ 37-40; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]; Ex. "C" [Administrative Segregation Orders related to Plaintiffs]; Ex. "D" [Incident of Prohibited Acts and Notice of Charges related to Plaintiffs]; Ex. "I" [GEO's Restrictive Housing Units policy]; Ex. "N" [Cornejo Depo.] at 88:7-89-20, 91:8-92:6; Ex. "O" [Campos Depo.] at 177:11-16; Ex. "S" [Garcia Depo.] at 50:11-15, 55:21-56:8; Ex. "T" [Diaz Depo] at 136:6-11.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Undisputed*. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 82. | Pursuant to GEO policy and procedure, it is appropriate to place detainees in administrative segregation during a pending investigation and, thereafter, segregation if guilt is established – which is the case here (Plaintiffs were found in violation of Rule 213, which prohibits inciting or engaging in group demonstrations). A detainee can only be placed in disciplinary segregation after a finding by the Institution Disciplinary Panel or equivalent that the detainee is guilty of a rule violation. | McCusker Decl. ¶ 12; Diaz Decl. ¶¶ 37-40; Ex. "A" [Detainee Handbook – "Disciplinary Segregation"]; Ex. "C" [Administrative Segregation Orders related to Plaintiffs]; Ex. "D" [Incident of Prohibited Acts and Notice of Charges related to Plaintiffs]; Ex. "I" [GEO's Restrictive Housing Units policy].  **PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* GEO policy and procedure provides that administrative segregation is meant to serve a non-punitive purpose and should only be used to ensure "the safety of detainees or others … or the security or good order of the facility." Even when a disciplinary investigation is pending, pre-disciplinary-hearing detention should be ordered only as necessary to prevent further rule violation(s) or to protect the security and orderly operation of the facility. Ex. I, GEO Restrictive Housing Unit Policy at GEO01972. Lt. Diaz testified that following the use of force and |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | after the Plaintiffs were transported to medical, she observed Plaintiffs being transported out of medical once they were showered and provided new uniforms. Significantly, she testified that Plaintiffs were not acting belligerent and were calm. Other than observing their calm demeanor, Lt. Diaz had no further interactions with Plaintiffs.  Still, she determined that they should be placed in administrative segregation. Ex. 16, Lt. Diaz Dep. 274:17-21, 275:16-276:25, 277:12-17. |
| 83. | While in segregation, Plaintiffs were provided medical care, checked on by GEO staff, and given access to showers and phones. | Ex. "P" [Castillo Depo.] at 108:6-13; Ex. "Q" [Mejia Depo.] at 103:1-22; Ex. "S" [Garcia Depo.] at 67:8-11; Ex. "U" [Martinez Depo.] at 151:6-10; 151:21-152:2  **PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed.* Plaintiffs do not dispute that they were given access to showers while in segregation.  Plaintiffs dispute that they had meaningful access to phones, as the evidence demonstrates that various phone numbers that Plaintiffs contacted were |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | blocked following the incident. Ex. 29, Garcia Dep. 57:2-58:4, 58:6-22, 59:59:4-23, 63:10-12, 63:25-64:2; Ex. 24, Campos Dep. 147:15-21, 148:9-11, 148:15-25; Ex. 26, Diaz Dep. 93:24-95:5; Ex. 23, Castillo Dep. 112:23-113:19; Ex. 25, Cornejo Dep. 94:4-11, 94:16-95:11, 97:2-6, 97:21-98:6, 99:11-13, 100:11-13; Ex. 41, Nicole Ramos Letters. Plaintiffs further dispute that they were provided adequate medical care and checked on by GEO staff.  Even when Plaintiffs were seen by medical because of their declared a hunger strike, they were not given medical treatment for the injuries sustained during the use of force.  Ex. 23, Castillo Dep. 138:6-16. |
| 84. | Plaintiff Campos admitted that he had no issues contacting his attorney while in segregation, and stated that he only had an issue reaching his attorney for *one* day; yet, he never informed GEO of the alleged issue. | Ex. "O" [Campos Depo.] 141:9-12, 142:15-18, 145:9-24, 146:13-17, 202:21-203:12, 204:1-11.<br><br>**PLAINTIFFS' RESPONSE**: *Disputed*. Plaintiff Campos testified that while he was not blocked from calling his attorney in segregation, he was blocked from calling his attorney while he was in the tank -- and that when he asked |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | another detainee to dial his (Campos's) attorney's number, that detainee also received a message saying the phone number had been blocked. Ex. 24, Campos Dep. 141:15-142:5. The only way Plaintiff Campos was able to relay information to his attorney was by calling his uncle, who would pass on information to his attorney. Ex. 24, Campos Dep. 143:22-144:19. |
| | | Plaintiff Campos testified that he spent one day trying (unsuccessfully) to contact his attorney, but that it was an additional three to five days that he was not able to reach her, and that it was only once she sent someone from her office to visit him in-person at the Facility that he could communicate directly with his legal team.  Ex. 24, Campos Dep. 147:15-21, 148:9-11, 148:15-25. |
| | | Plaintiff Campos's immigration attorney's efforts to contact GEO personnel and ICE officials regarding the phone blocks that interfered with Plaintiff Campos's access to counsel similarly demonstrate that this issue was not immediately resolved. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Ex. 41, Nicole Ramos Letter; Ex. 51, Nicole Ramos Emails. |
| 85. | Plaintiff Garcia claimed that he was not permitted to contact his attorney after the incident; yet, he was permitted to visit with his attorney. | Ex. "S" [Garcia Depo.] at 58:6-59:23, 64:6-65:4.<br><br>**PLAINTIFFS' RESPONSE**: *Disputed*. Plaintiff Garcia testified that was blocked from calling his attorney and his entire legal team for the entire time he was in segregation (ten days), during which he was also not allowed any visits. Ex. 29, Garcia Dep. 57:2-58:4, 58:6-22, 59:4-23, 63:25-64:2. His calls to his attorney remained blocked even after he was returned to the dormitory and was able to make calls to other phone numbers. Ex. 29, Garcia Dep. 64:7-8. It was not until after his attorney visited and obtained a new phone number that Plaintiff Garcia was able to make telephone calls to his attorney from the Facility. Ex. 29, Garcia Dep. 64:16-21. GEO never unblocked his calls to his attorney's original number. Ex. 29, Garcia Dep. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 65:10-12. |
| 86. | After the visit, Plaintiff Garcia's attorney gave him a new number to call and he was able to contact his attorney. | Ex. "S" [Garcia Depo.] at 58:6-59:23, 64:6-65:4.<br><br>**PLAINTIFFS' RESPONSE**: *Undisputed*. |
| 87. | Plaintiff Diaz stated that he had an issue contact his attorney; however, once his attorney spoke to GEO staff about the issue (since Diaz never raised the issue with GEO), the issue was resolved. | Ex. "T" [Diaz Depo] at 94:19-21, 99:19-22, 100:1-3.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed*. Plaintiff Diaz stated that immediately after the June 12, 2017 incident, he was blocked from calling his attorney and all of his other previously-dialed numbers, including his family and an immigration advocate who was assisting him with his immigration case. Ex. 26, Diaz Dep. 93:24-95:5. Plaintiff Diaz further testified that he was blocked from speaking with his attorney until his attorney to visit him at Adelanto in-person, and that the issue was resolved |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | sometime thereafter. Ex. 26, Diaz Dep. 99:19-22. |
| 88. | Plaintiff Martinez claimed that GEO staff restricted his ability to contact his attorney and as soon as he raised the issue to GEO staff, the issue was resolved. | Ex. "U" [Martinez Depo.] at 156:16-158:7, 158:14-159:3<br><br>**PLAINTIFFS' RESPONSE**: *Objection.* Lacks foundation, calls for speculation. *Disputed.* Defendants' contention is unsupported by the proffered evidence. Plaintiff Martinez testified that phone numbers for his attorney, his ex-wife, and his daughters were blocked. He submitted a grievance concerning the phone blocks, "but a long time passed before they unblocked the numbers" and not all phone numbers associated with people he communicated with were unblocked. Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, Martinez Grievances; Ex. 44, Martinez Audio Recording. Plaintiff Martinez's immigration attorney's efforts to contact GEO personnel and ICE officials regarding the phone blocks that interfered |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | with Plaintiff Martinez's access to counsel similarly demonstrate that this issue was not immediately resolved. Ex. 41, Nicole Ramos Letter; Ex. 51, Nicole Ramos Emails. |
| 89. | Plaintiffs Cornejo and Castillo admitted that they did not have issues contacting their attorneys. | Ex. "N" [Cornejo Depo.] at 94:4-95:11, 97:2-17 (stating he only had issues contacting his friend after the incident), 98:2-6, 100:1-4, 100:11-21; Ex. "P" [Castillo Depo.] 22:1-8 [permitted to make calls while in segregation to persons on his "approved call list"], 112:15-113:5.<br><br>**PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed.*  Defendants' proffered evidence does not support the entirety of this contention.  Plaintiff Castillo simply testified that, at the time of his deposition, he could not remember whether he had problems contacting his immigration attorney.  He further testified that he had problems contacting his mother, brother, and sister, as well as other individuals that were part of his support group because their phone numbers were blocked.  Ex. 23, |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | Castillo Dep. 112:23-113:19. Although Plaintiff Castillo was able to contact individuals on his approved call list while in segregation, once he was removed from segregation and was able to contact individuals outside of his approved list, those individuals' phone numbers were also blocked after he reported details about the use of force. Ex. 23, Castillo Dep. 22:1-23:10. Similarly, Plaintiff Cornejo only clarified who his immigration attorney is and that his friend Alex's phone number was blocked, but he could not remember what other phone numbers were blocked following the use of force. Ex. 25, Cornejo Dep. 94:4-11, 94:16-95:11, 97:2-6, 97:21-98:6, 99:11-13, 100:11-13. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 90. | Plaintiffs Cornejo, Campos, Castillo, and Rodriguez admitted that they never filed grievances or complaints to GEO about mistreatment or the use of force incident. | Ex. "N" [Cornejo Depo.] at 35:20-22; Ex. "O" [Campos Depo.] at 18:23-19:19, 66:5-20, 138:5-12; Ex. "P" [Castillo Depo.] at 61:11-62:6 [complained to ICE about mistreatment by GEO guards but never filed complaint or grievance to GEO], 110:25-111:2; Ex. "R" [Rodriguez Depo.] at 66:11-12, 127:18-21.<br><br>**PLAINTIFFS' RESPONSE**:. *Disputed.* The American Civil Liberties Union submitted a complaint on behalf of Plaintiffs with Gabriel Valdez, the assistant field office director at Adelanto Detention Center. The letter detailed the assault, retaliation, and phone blocks. Ex. 48, ACLU letter. Moreover, Plaintiff Castillo filed a grievance regarding the incident with ICE. Ex. 50, Plaintiffs' Grievances to ICE, at GEO00916. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 91. | Plaintiff Mejia claims that he filed a complaint/grievance; yet, he has no recollection as to what the subject matter of the complaint/grievance. | Ex. "Q" [Mejia Depo.] at 48:1-25, 50:11-16<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.*  Lacks foundation, calls for speculation.<br>*Disputed.*  The American Civil Liberties Union submitted a complaint on behalf of Plaintiffs with Gabriel Valdez, the assistant field office director at Adelanto Detention Center. The letter detailed the assault, retaliation, and phone blocks. Ex. 48, ACLU letter. Moreover, Plaintiff Mejia filed a grievance with ICE regarding the GEO officer's use of force.  Ex. 50, Plaintiffs' Grievances to ICE, at GEO01088. |
| 92. | GEO officers do *not* have access to detainee complaints/grievance and, thus, have no means of determining which detainees have filed complaints/grievances. | Diaz Decl. ¶¶ 43-45; Ex. "V" [Gillon Depo] at 24:6-11; Ex. "Z" [Reyes Depo.] at 47:4-10; Diaz Decl. ¶ 42.<br><br>**PLAINTIFFS' RESPONSE**:<br>*Objection.*  Lacks foundation, relevance.<br>*Disputed.* When Officer Gillon was relieved from his post as dorm officer, he reported the letter that Plaintiffs gave him to his supervisor, Lt. Diaz.  Gillon Dep. 90:19-21, 90:25-91:11. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | The letter contained the grievances that Plaintiffs tried to raise with GEO and ICE supervisors. Ex. 23, Castillo Dep. 73:20-74:25; Ex. 3, List of Grievances.  Lt. Diaz received this letter and rather than address Plaintiffs' grievances, she deployed OC spray on them.  Ex. 16, Lt. Diaz Dep. 187:2-9. |
| 93. | Also, GEO personnel can only *recommend* to ICE that a detainee have his/her access to the phones/restricted, but ICE has to make the final decision. | Janecka Decl. ¶¶ 14-17; McCusker Decl. ¶ 14; Diaz Decl. ¶ 46; Campos Decl. ¶ 19; Ex. "J" [GEO's Communication policy].  **PLAINTIFFS' RESPONSE**: *Objection.*  Lacks foundation, calls for speculation. *Disputed*. When two Plaintiffs' immigration attorney attempted to contact the GEO group regarding these phone blocks, GEO Officer Barry Belt responded to Plaintiffs' attorney and explained that he was not authorized to speak with her regarding the phone block, and suggested that she contact the warden or the chief counsel's office.  Ex. 42, Lt. Belt Voicemail; Ex. 51, Attorney Nicole Ramos Emails. |

| Defs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 94. | After the use of force incident, the incident was reviewed by supervisory staff and it was determined that the force was determined that the use of force was reasonable and appropriate. | Diaz Decl. ¶¶ 36, 47; Campos Decl. ¶ 17; Janecka Decl. ¶¶ 5-8; McCusker Decl. ¶¶ 10-11; Ex. "B" [Use of Force Report dated June 12, 2017]; Ex. "E" [After-Action Review Report Use of Force/Restraints related to the June 12, 2017, incident]; Ex. "F" [Video recording of incident reviewed at the after-action review]; Ex. "G" [SIR, Notification and Emails to GEO Corporate related to the June 12, 2017, incident]; Ex. "H" [GEO's Use of Force policy]; Ex. "Z" [Reyes Depo.] at 123:3-8.<br><br>**PLAINTIFFS' RESPONSE**: *Undisputed.* |

## PLAINTIFFS' ADDITIONAL AFFIRMATIVE STATEMENT OF FACTS AS TO DEFENDANTS DIAZ AND CAMPOS

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 1. | Plaintiffs, eight asylum seekers from Central America, arrived at Adelanto Detention Facility in May 2017. | Ex. 47, Plaintiffs' ICE Detention Orders. |
| 2. | After enduring more than a month of degrading conditions and being deprived | Ex. 23, Castillo Dep. 63:10-13, 74:21-75:20, 76:12-25; |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | of basic human needs, Plaintiffs decided, as a group, they would begin a hunger strike until a GEO or ICE supervisor would address their complaints, and they wrote out a two-page letter in Spanish that explained this. | Ex. 25, Cornejo Dep. 52:25-54:16; |
| 3. | The first page of the letter explained that Plaintiffs were starting a peaceful hunger strike and were requesting to speak with ICE officials and GEO supervisors. | Ex. 23, Castillo Dep. 73:1-8, 74:21-75:20. |
| 4. | The second page of the letter consisted of Plaintiffs list of grievances and issues they wanted to raise with ICE and GEO officials. | Ex. 23, Castillo Dep. 73:20-74:25; Ex. 3, List of Grievances. |
| 5. | On the morning of June 12, 2017, they presented their letter to Officer Gillon, the dorm officer, who was stationed at the podium in the dayroom. | Ex. 23, Castillo Dep. 73:1-8, 73:20-75:20 ; Ex. F, [Video, Views C-2 and C-4] at 06:22:24 a.m. to 6:23:01 a.m. |
| 6. | Because Plaintiffs only speak Spanish, they asked other detainees to translate for them with the Officer Gillon. | Ex. 30, Rodriguez Dep. 95:9-22. |
| 7. | Plaintiffs, through the detainee-interpreter, told Officer Gillon that they were on a hunger strike when they presented him with the letter. | Ex. 17, Gillon Dep. 86:11-87:15, 87:25-88:2. |
| 8. | At approximately 6:29:59 a.m., Officer Jindi arrived to the dorm to relieve Officer Gillon. | Ex. 18, Jindi Dep. 58:23-25. |
| 9. | When Officer Gillon was relieved from | Ex. 17, Gillon Dep. 90:19- |

| Pltfs' SUF No. | UNCONTROVERTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | his post as dorm officer, he reported the letter that Plaintiffs gave him to his supervisor, Lt. Diaz. | 21, 90:25-91:11. |
| 10. | Lt. Diaz was the First Watch supervisor on the morning of June 12, 2017. | Ex. 17, Gillon Dep. 91:6-8; Ex. 18, Jindi Dep. 35:4-8. |
| 11. | At approximately 6:32:57 a.m., Lt. Diaz entered 2-Charlie with a group of officers and medical staff, waiving a canister of OC Spray in her hand. | Ex. F, [Video, View C-1] at 6:32:57 a.m.; Ex. 18, Jindi Dep. 63:18-64:5, 64:17-23, 65:5-9; Ex. 16, Lt. Diaz Dep. 319:2-14. |
| 12. | GEO policy requires its officers to keep their OC canisters holstered unless a situation has arisen that requires its use. | Ex. 16, Lt. Diaz Dep. 319:15-22. |
| 13. | No GEO Group policy permits the use of OC spray in response to a hunger strike. | Ex. 8, GEO Group Hunger Strike Response Plan (No. 15) at 2-3 (Sec. B); Ex. H, GEO Group Use of Force Policy (No. 10.2.15) at 9 (Sec. II(G)). |
| 14. | GEO policy categorizes the deployment of chemical agents (i.e., OC spray) as a "Major Use of Force." | Ex. H, GEO Group Use of Force Policy (No. 10.2.15) at 3. |
| 15. | Unless "immediate use" is necessary, GEO policy requires an officer to obtain authorization from the Facility Administrator (or his designee) before using OC spray in the Facility. | Ex. H, GEO Group Use of Force Policy (No. 10.2.15) at 3 & 9 (Sec. II(G)); Ex. 1, GEO Group Use of Force Training Presentation, Slide 32. |
| 16. | A facility supervisor, or "Administrator of | Ex. 16, Lt. Diaz Dep. |

| | | | |
|---|---|---|---|
| | | the Day" is always available on-call. | 268:10-269:10; Ex. 11, Janecka Dep. 59:7-60:20. |
| | 17. | In addition, an Administrative Duty Officer - an individual who carried the administrative duties through the weekends and after hours - was always stationed at the Facility. | Ex. 11, Janecka Dep.62:13-24. |
| | 18. | Pursuant to GEO policy, the Facility Administrator may authorize the use of OC spray only when the situation is such that the detainee: (1) is armed and/or barricaded, or (2) cannot be approached without danger to self or others; and (3) it is determined that a delay in bringing the situation under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage. | Ex. H, GEO Group Use of Force Policy (No. 10-2.15) at 9 (Sec. II(G)). |
| | 19. | GEO policy specifically sets forth that the use of OC spray is "not to be taken lightly" and that each and every staff member present must ensure that all other stages of the continuum-of-force have been "***fully*** exhausted" before making a decision to use the chemical agent. | Ex. H, GEO Group Use of Force Policy (No. 10.2.15) at 10 (Sec. II(G)(3) (emphasis in original)). |
| | 20. | GEO policy requires the staff member deploying the OC spray to (1) verbally warn the detainee that they will be spraying, and (2) warn the detainee about the effects of the chemical agent. | Ex. H, GEO Group Use of Force Policy (No. 10-2.15) at 9 (Sec. II(G)). |
| | 21. | Officers must stand at least five feet away from the target detainee(s) when they are deploying OC spray. | Ex. 1, GEO Group Use of Force Training Presentation, Slide 35. |
| | 22. | Lt. Diaz and Sgt. Campos both deployed OC spray in the dayroom of 2-Charlie on the morning of June 12, 2017. | Defendants' Exhibit "G" [Serious Incident Report, notification and emails to |

| | | |
|---|---|---|
| | | GEO Corporate] at 7, 9. |
| 23. | Lt. Diaz did not contact the Facility Administrator (or his designee) to receive authorization before using OC spray on June 12, 2017. | Ex. 16, Lt. Diaz Dep. 219:4-220:7. |
| 24. | Sgt. Campos did not contact the Facility Administrator (or his designee) to receive authorization before using OC spray on June 12, 2017.  He deployed the spray within a minute of entering the room. | Ex. 14, Sgt. Campos Dep. 51:18-20, 51:25-52:3. |
| 25. | No GEO staff member present on June 12, 2017 ever warned Plaintiffs about the effects of the chemical agent prior to Lt. Diaz's deployment of the OC spray. | Ex. 20, GEO Martinez Dep. 90:5-25, 96:7-21; Ex. 28, Mejia Dep.72:14-23; Ex. 25, Cornejo Dep. 47:18-48:11; Ex. 23, Castillo Dep. 82:17-83:5, 84:4-6, 84:18-85:15, 142:24-143:7, 142:24-143:7;  Ex. 27, Martinez Dep. 90:24-91:11. |
| 26. | There is no evidence that Plaintiffs had ever seen OC spray deployed at the Facility before June 12, 2017. | Ex. 20, GEO Martinez Dep. 96:7-21. |
| 27. | Before June 12, 2017, none of the Plaintiffs had ever been sprayed with OC spray at the Facility. | Ex. 28, Mejia Dep 74:5-8. |
| 28. | Lt. Diaz deployed her OC spray at Plaintiffs from a distance of approximately one foot. | Ex. 27, Martinez Dep. 93:10-20; Ex. F, [Video, Views C-3 and C-1] at 06:37:24 a.m. to 6:38:15 a.m. |
| 29. | Sgt. Campos deployed his OC spray at Plaintiffs from very close range, less than five feet away. | Ex. F, [Video, View C-3] at 06:46:45 a.m. to 6:47:23 a.m. |

| 30. | Sgt. Campos was not aware that spraying at three feet was out of policy and was trained that he could spray at three to five feet. | Ex. 14, Sgt. Campos Dep. 16:10-12; 20-22. |
|---|---|---|
| 31. | In fact, Sgt. Campos moved around the table to get closer to the detainees and deploy spray against the detainees. | Ex. 14, Sgt. Campos Dep. 115:15-24. |

| 32. | Medical staff arrived at the same time as Lt. Diaz in case the situation escalated and there was a need for a medical evaluation. | Ex. 18, Jindi Dep. 65:10-23; Ex. 21, Jones Dep. 85:2-22, 87:6-11; Ex. F, [Video, View C-4] at 06:32:52 a.m. to 6:33:07 a.m. |

| 33. | Officer Jindi announced that it was time to prepare for count at 6:30 a.m. | Ex. 5, Logbook at 3. Ex. 18, Jindi Dep. 40:6-16. |
|---|---|---|
| 34. | From the time Officer Jindi announced prep for count, Plaintiffs had a 10-minute grace period to return to their bunks before count might begin.  During that time, as seen in the video, other detainees were still wandering around the dorm and at least one detainee was in the showers. | Ex. 18, Jindi Dep. 40:17-20; Ex. F, [Video, View C-3] at 06:32:58. |

| 35. | Per GEO policy, the dorm officer cannot begin count until the utility officer is present in the dorm. | Ex.18, Jindi Dep. 21:3-21; Ex. 16, Lt. Diaz Dep. 302:24-303:12. |

| 36. | Although Lt. Diaz was told multiple times that Plaintiffs announced they were going on a hunger strike, she never considered calling medical staff. | Ex. 16, Lt. Diaz Dep. 201:24-202:16. |
|---|---|---|
| 37. | When Lt. Diaz entered the dorm, she was carrying a copy of Plaintiffs' letter.  In | Ex. 16, Lt. Diaz Dep. 321:17-19 Ex. F, [Video, |

| | | | |
|---|---|---|---|
| | | addition, Plaintiffs had copies of their written demands on the table in front of them. | Views C-2 and C-3] at 06:33:22 a.m. to 6:33:29 a.m. |
| | 38. | Lt. Diaz entered the dorm with her OC spray canister in her right hand. | Ex. 16, Lt. Diaz Dep. 319:2-24. |
| | 39. | Lt. Diaz immediately began yelling at the detainees in English. | Ex. 21, Jones Dep. 98:6-99:6; Ex. 16, Reyes Dep. 80:7-11; Ex. 28, Mejia Dep. 71:5-15. |
| | 40. | Lt. Diaz does not speak any Spanish. | Ex. 16, Lt. Diaz Dep. 39:12-13; Ex. 20, GEO Martinez Dep. 71:6-9. |
| | 41. | Only one officer was present who spoke any Spanish to the detainees the morning of June 12, 2017, Officer Martinez. | Ex. 20, GEO Martinez Dep. 13:10-12, 46:18-47:7; Ex. 16, Reyes Dep. 43:7-14, 181:23-182:6, 183:25-184:6. |
| | 42. | Officer Martinez did not translate for Lt. Diaz, but simply told the detainees to go back to their bunks. | Ex. 20, GEO Martinez Dep. 61:1-63:19; Ex. 16, Reyes Dep., 80:7-81:8; Ex. 23, Castillo Dep. 82:17-83:5; 84:4-6, 84:18-85:15, 142:24-143:7, 143:20-144:2; Ex. 14, Sgt. Campos Dep. 91:25-92:5, 94:1-3; Ex. 30, Rodriguez Dep. 142:7-8, 144:14-18. |
| | 43. | Due to the hostility of the situation, Plaintiffs were afraid to get up from the tables where they were seated. | Ex. 30, Rodriguez Dep. 141:21-142:5, 142:13-21, 143:4-7; Ex. 23, Castillo Dep. 144:3-18; Ex. 25, Cornejo Dep. 63:24-65:2. |
| | 44. | Pursuant to GEO policy and practice, no GEO officer would have laid hands on | Ex. 16, Lt. Diaz Dep. 336:8-13; Ex. 20, GEO |

| | | | |
|---|---|---|---|
| | | Plaintiffs on June 12, 2017 without Lt. Diaz's specific directive. | Martinez Dep. 76:20-23, 78:13-15, 90:16-22. |
| | 45. | When Lt. Diaz ordered Officer Martinez to use force against Plaintiffs on June 12, 2017, he was surprised and had not expected the command. | Ex. 20, GEO Martinez Dep. 90:5-25. |
| | 46. | When Lt. Diaz ordered the GEO officers to use force on Plaintiffs, Plaintiffs posed no threat to themselves or others. | Decl. of Schwartz ¶¶ 6, 7 (incorporating Expert Report). |
| | 47. | When Lt. Diaz ordered the GEO officers to use force on Plaintiffs, there was no major or serious disturbance within 2-Charlie. | Decl. of Schwartz ¶¶ 6, 7 (incorporating Expert Report); Ex. 10, McCusker Dep. 42:22-44:19, 46:17-19. |
| | 48. | When Lt. Diaz deployed OC spray at Plaintiffs, Plaintiffs posed no threat to themselves or others. | Decl. of Schwartz ¶¶ 6, 7 (incorporating Expert Report). |
| | 49. | When Lt. Diaz first deployed OC spray at Plaintiffs, there was no major or serious disturbance within 2-Charlie. | Decl. of Schwartz ¶¶ 6, 7 (incorporating Expert Report); Ex. 10, McCusker Dep. 42:22-44:19, 46:17-19. |
| | 50. | There was no justification under GEO policy, the PNBS, or generally accepted correctional practices for Lt. Diaz or Sgt. Campos to deploy OC spray at Plaintiffs. | Decl. of Schwartz ¶¶ 6, 7 (incorporating Expert Report). |
| | 51. | Officer Reyes testified that he and his partner were able to get detainees away from the table using pressure points and by pulling them. | Ex. 16, Reyes Dep. 168:6-11, 168:21-169:1. |
| | 52. | The uncontroverted video evidence shows that Plaintiffs only began to link arms once force was used on them by the GEO officers. | Ex. F, [Video, Views C-1 and C-3] at 06:37:55 a.m. to 6:38:13 a.m. |

| 53. | Plaintiffs were shocked by the GEO officers' reaction and scared that if they got up the other Plaintiffs would be more drastically punished. | Ex. 24, Campos Dep. 92:3-93:3, 94:6-7, 96:6-17, 97:8-12, 103:11-20, 105:1-7. |
|---|---|---|
| 54. | Plaintiff Martinez testified that Lt. Diaz approached him while he was seated at the table, stretched out her arm, and sprayed him. | Ex. 27, Martinez Dep. 90:24-91:11, 93:10-20. |
| 55. | GEO officers grabbed Plaintiff Martinez and injured him while doing so. | Ex. 27, Martinez Dep. 94:15-95:5; Ex. 49, Decl. of Hussain Turk (documenting Plaintiff Martinez's injuries after the incident). |
| 56. | Plaintiff Rodriguez, who was seated next to Plaintiff Martinez, likewise testified that Lt. Diaz initially sprayed the OC spray three or four times. | Ex. 30, Rodriguez Dep. 145:24-25, 152:12-24. |
| 57. | The video evidence shows Lt. Diaz aiming her OC canister at Plaintiffs while they were being restrained by the group of officers, and Plaintiffs visibly responding to the OC spray. | Ex. F, [Video, Views C-1 and C-3] at 6:38:04 to 6:38:28; Ex. 27, Martinez Dep. 90:24-91:11, 93:10-20; Ex. 28, Mejia Dep. 75:19-76:13.  Ex. 23, Castillo Dep. 91:13-3; Ex. 30, Rodriguez Dep. 152:12-24. |
| 58. | GEO officers hit Plaintiff Rodriguez in the ribs. | Ex. 30, Rodriguez Dep. 145:24-25. |
| 59. | After handcuffing Plaintiff Rodriguez, GEO officers forcefully lifted Plaintiff Rodriguez's arms up behind his back, injuring his shoulders. | Ex. 30, Rodriguez Dep. 153:2-4. |
| 60. | After handcuffing Plaintiff Rodriguez, GEO officers walked him to the basketball court. While en route, they twice pushed | Ex. 30, Rodriguez Dep. 109:24-110:7, 130:19-25, 171:22-24, 172:8-12. |

| | | | |
|---|---|---|---|
| | | him forward, causing his face to slam into the wall. | |
| | 61. | When Plaintiff Rodriguez was finally seen by a medical professional after the incident, he tried to communicate to the nurse that his ears and head were injured and he had scratches on his arm. | Ex. 30, Rodriguez Dep. 176:17-20. |
| | 62. | Nurse Jones only noted that he had an abrasion on his left ear. | Ex. 7, Medical Reports at 6. |
| | 63. | Plaintiff Martinez's nose was broken as a result of the incident. | Ex. 22, Medrano Dep. 93:9-15. |
| | 64. | After being sprayed with OC spray at close range, Plaintiff Martinez was grabbed and mistreated by two officers as they dragged him out of the dorm with his arms behind his back. The officers slammed him against the wall in the hallway, knocking out his tooth and dental crown. | Ex. 27, Martinez Dep. 93:10-96:8, 99:19-100:17. |
| | 65. | Officer Martinez could not remember whether he or anyone else had given Plaintiff Martinez any verbal commands. | Ex. 20, GEO Martinez Dep. 74:15-21, 75:13-76:7, 76:20-77:19, 78:2-7; Ex. 17, Gillon Dep. 164: 23-165:3, 166:22-167:1 (could not remember whether he gave more than one command to "get up" at this point). |
| | 66. | Officer Martinez also testified that he had not tried to use "pressure points" on Plaintiff Martinez before attempting to remove him from the table. | Ex. 20, GEO Martinez Dep. 74:15-21, 75:13-76:7, 76:20-77:19, 78:2-7; Ex. 17, Gillon Dep. 164: 23-165:3, 166:22-2 (could not remember whether he gave more than one command to "get up" at this point). |

| | | |
|---|---|---|
| 67. | Plaintiffs were unable to understand the GEO officers' commands. Plaintiffs were not given commands in Spanish. | Ex. 23, Castillo Dep. 79:21-80:9, 144:3-18; Ex. 24, Campos Dep. 91:25-92:5, 94:1-3; Ex. 30, Rodriguez Dep. 144:14-18. |
| 68. | After the incident, Sgt. Campos falsely reported that he observed Plaintiffs "being combative" and "striking staff with elbows" as a partial justification for his use of OC spray. Lt. Diaz did not document that in any reports, but testified to that effect at her deposition. That claim is not supported by any evidence, including any of the reports authored by the GEO officers involved in the incident. | Ex. 4, General Incident Reports at 10; Ex. 16, Lt. Diaz Dep. 254:10-258:9. |
| 69. | Plaintiffs deny having struck or elbowed any GEO officers at any time. | Ex. 27, Martinez Dep. 74:4-21. |
| 70. | An assault on an officer by a detainee is an incredibly serious offense. It would most certainly result in discipline at the Facility, if not an arrest by the San Bernardino County Sheriff's Office and the imposition of criminal charges. | Ex. 16, Lt. Diaz Dep. 160:13-162:8, 254:10-258:9; Decl. of Schwartz (incorporating Expert Report at 13-14). |
| 71. | No Plaintiff was written up for, or disciplined for, an assault on an officer. | Ex. 2, Plaintiffs' Segregation Orders. |
| 72. | When Plaintiff Martinez was being dragged away from the tables, he tried to hold on to his friend because he could not see and was in pain from the OC spray. | Ex. 27, Martinez Dep. 102:1-5. |
| 73. | Plaintiff Martinez's medical records demonstrate that immediately after the incident, he complained of a missing tooth and injured right shoulder. | Ex. 7, Medical Reports at 3. |
| 74. | At the time, Plaintiff Martinez could not | Ex. 27, Martinez Dep. |

| | | | |
|---|---|---|---|
| | | feel the pain in his nose due to the overwhelming burning sensation caused by the OC spray. | 102:1-16. |
| | 75. | GEO officers pulled, pushed, and hit Plaintiff Garcia - including in the ribs - after he was blinded by the OC spray, and they pushed him against a wall, causing him to bang his head.  He was also pushed against a wall a second time in the hallway, after being handcuffed. | Ex. 29, Garcia Dep. 45:19-24; 47:1-10. |
| | 76. | Plaintiff Garcia had marks on his body from the GEO officers' use of force. | Ex. 29, Garcia Dep. 47:2-10. |
| | 77. | GEO officers threw Plaintiff Campos to the ground after he was subjected to OC spray and prevented him from using his hands to try to wipe the OC spray from his face. | Ex. 24, Campos Dep. 106:20-107:2; Ex. F, [Video, Views  C-1 and C-3] at 6:47:09 to 6:47:56. |
| | 78. | One GEO officer violently put Plaintiff Campos against the wall, bending Campos's right arm and injuring his shoulder. | Ex. 24, Campos Dep. 108:3-12. |
| | 79. | A second GEO officer grabbed Plaintiff Campos's stomach and a third grabbed one of his feet, forcing him to hop on one foot. | Ex. 24, Campos Dep. 108:15-19. |
| | 80. | Lt. Diaz deployed OC onto Plaintiff Mejia's face and shoulders. | Ex. 28, Mejia Dep. 76:16-77:4, 77:10-79:13. |
| | 81. | After Lt. Diaz deployed OC spray onto Plaintiff Mejia, GEO officers hit him on his ribs and behind his ears and twisted his arms backwards painfully before taking him away from the table. | Ex. 28, Mejia Dep. 76:16-77:4, 77:10-79:13. |
| | 82. | Two GEO officers and Sgt. Campos | Ex. F, [Video, Views C-1 |

| | | | |
|---|---|---|---|
| | | shoved Plaintiff Mejia into a wall, where the right side of his face hit the wall. | and C-3] at 6:46:18 to 6:46:22;  Ex. 28, Mejia Dep. 81:17-82:24. |
| | 83. | In removing Plaintiff Castillo from the table, two GEO officers punched him in the ribs with closed fists and a third GEO officer leaned over the other side of the table and dug her nails in the back of his ears. | Ex. 23, Castillo Dep. 88:12-89:10, 89:15-24. |
| | 84. | After Plaintiff Castillo was carried away from the table, he was taken near the stair railing and thrown against glass, injuring his face. | Ex. 23, Castillo Dep. 96:8-96:21; Ex. F, [Video, View C-3] at 06:46:23 a.m. to 06:46:54 a.m.. |
| | 85. | The officers did not tell Plaintiff Cornejo why they were pulling him or what they wanted him to do in response. | Ex. 25, Cornejo Dep. 68:16-69:14. |
| | 86. | Plaintiff Cornejo was not resisting and was merely sitting at the table, trying to clean his face with his shirt and protect himself from the overwhelming amount of pepper spray that Sgt. Campos had just directly sprayed on him. | Ex. F, [Video, View C-1, C-3, and C-4] 6:47:09-6:47:24. |
| | 87. | While GEO guards were pulling at Plaintiff Cornejo, they hit his abdomen against the table edge multiple times and then threw him on the ground, causing him to bleed from his abdomen and injuring his knee and shoulder. | Ex. 25, Cornejo Dep. 73:25-75:11. |
| | 88. | After Plaintiff Diaz was sprayed in the face with OC spray he got up screaming, blinded by the spray that had gone into his eyes and mouth. | Ex. 26, Diaz Dep. 58:15-59:8. |
| | 89. | GEO guards dug their nails behind Plaintiff Diaz's ears, dug their nails into his hand, squeezed painfully between his | Ex. 26, Diaz Dep.  55:9-56:5, 57:6-10. |

| | | thumb and pointer finger, and pinched and pulled the skin on his sides near his ribs. | |
|---|---|---|---|
| | 90. | GEO officers injured Plaintiff Diaz as they removed him from the table, hurting his arms before handcuffing him. | Ex. 26, Diaz Dep. 59:12-17. |
| | 91. | All Plaintiffs were handcuffed and taken to the recreation yard. | Lt. Diaz Dep. 237:14-17, 238:6-10; Ex. 23, Castillo Dep. 95:8-96:21, 102:1-6; Ex. 28, Mejia Dep. 83:2-3 |
| | 92. | GEO policy states that hard restraints (i.e., steel handcuffs) shall be used only after soft restraints prove (or have previously proven) ineffective. | Ex. H, GEO Group Use of Force Policy (No. 10.2.15), at 1 (Sec. II(A)(8). |
| | 93. | GEO policy requires staff to document their attempt(s) to use soft restraints prior to hard restraints in a use of force report. | Ex. H, GEO Group Use of Force Policy (No. 10.2.15), at 2 (Sec. II(A)(13). |
| | 94. | On June 12, 2017, Lt. Diaz directed the GEO officers to handcuff Plaintiffs without first directing them to use soft restraints. | Lt. Diaz Dep. 237:14-17, 238:6-10; Ex. 23, Castillo Dep. 95:8-96:21, 102:1-6; Ex. 28, Mejia Dep. 83:2-3. |
| | 95. | The Use of Force report Lt. Diaz authored regarding the June 12, 2017 force incident made no mention of any attempt by any staff member to use soft restraints. | Ex. B, Diaz Use of Force Report. |
| | 96. | GEO policy requires the Facility Administrator's approval for the continued use of restraints (i.e., handcuffs), if they are considered necessary, after a detainee is under control. | Ex. H, GEO Group Use of Force Policy (No. 10.2.15), at 2 (Sec. II(A)(13). |
| | 97. | GEO policy and practice requires that handcuffs be removed from a detainee as soon as the imminent danger is over. | Ex. 16, Lt. Diaz Dep. 244:10-13. |

| 98. | Following the incident in the dayroom, Plaintiffs were kept in handcuffs for several hours, including while they were undisputedly "under control" in a cell, without any GEO staff member seeking the Facility Administrator's approval. | Ex. 23, Castillo Dep. 102:13-103:6, 104:18-105:10; Ex. 28, Mejia Dep. 87:4-8; Ex. 25, Cornejo Dep. 75:12-15; 75:23-25, Ex. 27, Martinez Dep. 59:1-60:11; Ex. 29, Garcia Dep. 48:21-25; Ex. 30, Rodriguez Dep. 112:12-22; Ex. 24, Campos Dep. 127:16-19. |
|---|---|---|
| 99. | Not only did Lt. Diaz not seek the Facility Administrator's approval to keep Plaintiffs handcuffed after they were undisputedly "under control," but she also did not monitor whether or when Plaintiffs' handcuffs were removed. | Ex. 16, Lt. Diaz Dep. 244:10-18, 258:16-259:14; 274:17-21, 275:16-276:25, 277:12-17, 277:25-278:23. |
| 100. | Plaintiffs were kept in handcuffs until at least 3:00PM or 3:30PM. | Ex. 16, Lt. Diaz Dep. 277:25-278:12. |
| 101. | On June 12, 2017, GEO policy required that its staff videotape all calculated use of force incidents. | Ex. H, GEO Use of Force Policy (No. 10.2.15), at 12 (Sec. II(J)(3)); Ex. 1, GEO Use of Force Training Presentation, Slides 44-56; Ex. 10, McCusker Dep. 54:8-17. |
| 102. | On June 12, 2017, GEO policy required that its staff videotape all spontaneous or unanticipated use of force incidents as soon as possible and specifically set forth that once control of the situation had been obtained, staff were to record information about injuries, a description of the circumstances that gave rise to the need for immediate use of force, and the identification of the detainees, staff and others involved. | Ex. H, GEO Use of Force Policy (No. 10.2.15), at 12-13 (Sec. II(J)(3)); Ex. 1, GEO Use of Force Training Presentation, Slides 44-56; Ex. 10, McCusker Dep. 54:8-17. |

| 103. | On June 12, 2017, GEO required two staff members (at a minimum) to be designated as "camera operators" on their shift. | Ex. H, GEO Use of Force Policy (No. 10.2.15), at 15 ("Video Taping Procedures"); Ex. 1, GEO Use of Force Training Presentation, Slide 47. |
|---|---|---|
| 104. | On June 12, 2017, GEO required staff to request video equipment "any time an employee expects a confrontational situation." | Ex. 1, GEO Use of Force Training Presentation, Slide 47. |
| 105. | On June 12, 2017, GEO required staff to request video equipment "as soon as possible after an unexpected confrontational situation arises." | Ex. 1, GEO Use of Force Training Presentation, Slide 47. |
| 106. | At no time on June 12, 2017, did Lt. Diaz request video equipment or direct any of the officers she designated as camera operators to record anything relating to Plaintiffs or the use of force. | Ex. 16, Lt. Diaz Dep. 241:13-15; Ex. 20, GEO Martinez Dep. 35: 25-34:11, 41:14-21. |
| 107. | Lt. Diaz's reasons for not directing a camera operator to record the incident on June 12, 2017 -- because it was an "emergency" and because there were surveillance cameras in the facility that may have recorded what occurred -- are not supported by any GEO policy or training. | Ex. 16, Lt. Diaz Dep. 241:13-242:17; Ex. H, GEO Use of Force Policy (No. 10.2.15), at 12-13 (Sec. II(J)(3)); Ex. 1, GEO Use of Force Training Presentation, Slides 44-56; Ex. 10, McCusker Dep. 54:8-17. |
| 108. | Lt. Diaz stated that a rebellion was occurring that warranted a major use of force under Geo Group's policy. | Ex. 16, Lt. Diaz Dep. 348:6-18. |
| 109. | Sgt. Campos believed that when even a small group gave "no compliance", that was a rebellion. | Ex. 14, Sgt. Campos Dep. 141:22-142:3, 142:10-18. |
| 110. | Sgt. Campos never received any training | Ex.14, Sgt. Campos Dep. |

| | | |
|---|---|---|
| | on what a "rebellion" was. | 81:24-82:2. |

| | | |
|---|---|---|
| 111. | After Plaintiffs were taken out of the day room, GEO staff found that there was so much OC spray in the dormitory areas – comprising four large rooms adjacent to the day room, spanning two stories and two wings – that they had to evacuate all staff and detainees so that it could be decontaminated. | Ex. 18, Jindi Dep. 54:10-21. |
| 112. | The detainees who were not involved in the use of force and who were simply in the dormitory area during the incident were also examined by medical staff when they were evacuated to the yard. | Ex. 18, Jindi Dep. 56:6-12; Ex. 4, General Incident Reports at 2. |
| 113. | Those 90 detainees were counted in the recreation yard, the count cleared without issue, and Plaintiffs were "out counted." | Ex. 4, General Incident Reports at 2; Ex. 5, Logbook at 3. |
| 114. | Officer Jindi testified that she had to go out to the yard so she could breathe and further testified that "everyone was coughing." | Ex. 18, Jindi Dep. 52:18-23, 55:18-24. |
| 115. | On June 12, 2017, GEO required that following the use of a chemical agent, the exposed detainee(s) had to receive a medical examination "as soon as possible after the chemical agent has been used, but not to exceed one hour after the first exposure." | Ex. 1, GEO Use of Force Training Presentation, Slide 51. |
| 116. | On June 12, 2017, all Plaintiffs were forced to wait at least 2 ½ hours (and some more than 3 hours) after they were exposed to OC spray before they received any sort of medical examination. | Ex. 7, Medical Reports; Ex. 21, Jones Dep. 176:11-15, 177:18-25, 205:25-206:3. |
| 117. | Plaintiffs, nine men, were placed in a cell | Ex. 23, Castillo Dep. |

| | | |
|---|---|---|
| | with a sign indicating a maximum occupancy of three (3) while they waited to be seen by medical staff. | 101:16-20, 102:5-21. |
| 118. | Plaintiffs were forced to shower in hot water, while fully clothed and drenched in pepper spray, and handcuffed, contrary to accepted practices. | Decl. of Venters (incorporating Expert Report at 5-6).  Ex. 19, Juarez Dep. 43:15-17; 45:7-46:13; Ex. 25, Cornejo Dep. 77:2-78:24, 80:9-13, 80:25-81:6; Ex. 30, Rodriguez Dep. 112:13-113:4; Ex. 23, Castillo Dep. 104:18-106:7; Decl. of Castillo ¶ 4. |
| 119. | Some Plaintiffs, after seeing the extreme pain their friends were suffering in the hot water, refused to shower. | Ex. 27, Martinez Dep. 55:6-25; Ex. 28, Mejia Dep. 90:9-92:4; Ex. 29, Garcia Dep. 48:15-20. |
| 120. | Plaintiffs were not given new clothing to wear until after they were seen by medical staff and after they were taken to the showers on June 12, 2017. | Ex. 23, Castillo Dep. 104:18-106:7; Ex. 25, Cornejo Dep. 81:15-82:17; Ex. 24, Campos Dep. 128:7-10; Ex. 30, Rodriguez Dep. 158:15-18, 162:13-16; Ex. 29, Garcia Dep. 48:16-25; Ex. 26, Diaz Dep. 88:14-21. |
| 121. | At Lt. Diaz's deposition, she was shown the video evidence and given the opportunity to identify when she deployed OC spray. She identified three times when she either possibly sprayed Plaintiffs or definitively stated she did. She first testified that it was possible that she deployed OC spray between approximately 06:38:41-45, before ultimately concluding she did not recall. | Ex. 16, Lt. Diaz Dep. 342:4-23, 343:23-345:25, 346:1-15, 353:3-12. |

| | | |
|---|---|---|
| | She next testified definitively that she sprayed the table where Plaintiffs were sitting at 06:39:21. Immediately after that testimony, her counsel took a break and, upon their return, Lt. Diaz asked to "revise" her testimony to state that she did not deploy OC spray at that time. Lt. Diaz then testified that the "one time" she sprayed the Plaintiffs was at 06:42:25. | |
| 122. | Lt. Diaz and Sgt. Campos were required, per GEO policy, to weigh their OC canisters every shift upon retrieving them from the safe where they were kept and before returning them to the safe at the end of every shift, and to record the weights on a log. | Ex. 16, Lt. Diaz Dep. 143:7-144, 146:8-19, 147:8-12; Decl. of Schwartz (incorporating Expert Report at 17). |
| 123. | The document logging the weight of each canister were maintained in the same, secured safe as the canisters. | Ex. 16, Lt. Diaz Dep. 146:8-19. |
| 124. | The safe containing the OC spray canisters and the weight log was in the watch commander's office and required a code to open. | Ex. 16, Lt. Diaz Dep. 145:10-20. |
| 125. | Lt. Diaz carried OC spray on her at all times when she worked shifts at Adelanto Detention Facility. | Ex. 16, Lt. Diaz Dep. 145:7-9. |
| 126. | Lt. Diaz did not weigh the OC canisters every day, only "frequently". | Ex. 16, Lt. Diaz Dep. 145:7-146:4. |
| 127. | Lt. Diaz does not recall whether she weighed the OC canister that she checked out on the morning of June 12, 2017. | Ex. 16, Lt. Diaz Dep. 146:5-7. |
| 128. | GEO has not been able to find the log documenting the weights of the OC canisters Lt. Diaz or Sgt. Campos used on June 12, 2017. | Ex. 40, GEO's Supplemental Response to Plaintiffs' Request for Production No. 79. |

| | | |
|---|---|---|
| 129. | As required by GEO, the officers that were involved in the June 12, 2017 incident wrote General Incident Reports, including all relevant details. | Ex. 16, Lt. Diaz Dep. 101:2-20; Ex. 4, General Incident Reports. |
| 130. | Officer Gillon's General Incident Report, which he completed following the incident, confirms that he learned of the hunger strike when Plaintiffs gave him their letter. | Ex. 4, General Incident Reports at 1. |
| 131. | Lt. Diaz signed an order placing Plaintiffs in administrative segregation. | Ex. 16, Lt. Diaz Dep. 243:10-20, 262:11-263:17; Ex. 2, Plaintiffs' Segregation Orders. |
| 132. | Plaintiffs were not given an opportunity to be present at their disciplinary hearings. Instead, Plaintiffs remained in "administrative" segregation and were later informed of the outcome of the investigation, including the order that they remain in disciplinary segregation for 10 days. | Ex. 27, Martinez Dep. 154:12-21; Ex. 28, Mejia Dep. 161:19-163:5; Ex. 23, Castillo Dep. 111:25-112:5 (unaware of any disciplinary hearing and could not recall attending one); Ex. 25, Cornejo Dep. 86:19-20, 87:5-19, 88:12-89:9, (spoke to an officer about a disciplinary investigation, but not during a hearing) Ex. 26, Diaz Dep. 92:14-23; Ex. 29, Garcia Dep. 56:2-4; Ex. 30, Rodriguez Dep. 157:9-16. |
| 133. | After Plaintiffs were placed in segregation, GEO staff blocked telephone numbers that Plaintiffs regularly contacted, including attorneys, family, friends, and advocates. | Ex. 41, Nicole Ramos Letter; Ex. 42, Belt Voicemail; Ex. 27, Martinez Dep. 157:4-8, 158:2-159:3; Ex. 43, Martinez Kites; Ex. 44, Martinez Audio Recording; |

| | | |
|---|---|---|
| | | Ex. 26, Diaz Dep. 93:24-95:5, 99:19-22; Ex. 23, Castillo Dep. 22:1-23:10, 112:23-113:19; Ex. 45, Blocked Numbers; Ex. 25, Cornejo Dep. 94:4-11, 94:16-95:11, 97:2-6, 97:21-98:6, 99:11-13, 100:11-13. |
| 134. | Just prior to this incident, during the overnight shift that began on June 11, 2017 and ended on the morning of June 12, 2017, it took one hour and twenty-one minutes to clear count at the Facility. The evidence demonstrates that count was ultimately cleared without discrepancies or an emergency declaration. No evidence indicates that ICE was notified of the delay. | Ex. 5, Logbook at GEO05199. |
| 135. | Plaintiff Castillo now feels nervous whenever he sees law enforcement officers or someone in uniform, his heart races, he feels faint, and it brings back memories of when he was detained and mistreated by GEO officers. | Ex. 23, Castillo Dep. 117:6-19; Ex. 36, Castillo Resp., Interrogatory No. 11. |
| 136. | Plaintiff Castillo continues to have nightmares that cause him to lose sleep. | Ex. 23, Castillo Dep. 117:21-118:15, 120:19-23, 121:1-14. |
| 137. | Plaintiff Castillo feels that he is not able to engage in certain hobbies like he did before, such as walking or driving peacefully, without fearing law enforcement or people that represent the law, like GEO officers. | Ex. 23, Castillo Dep. 123:21-25, 124:8-21. |
| 138. | To this day, Plaintiff Cornejo remembers seeing and hearing his friends crying in pain from this incident and recalls feeling | Ex. 25, Cornejo Dep. 111:5-112:3; Ex. 38, Cornejo Resp., Interrogatory No. 11. |

| | | | |
|---|---|---|---|
| | | helpless and defenseless. | |
| | 139. | Plaintiff Cornejo recalls this being a very difficult time in his life and he thinks about this often.  It is very upsetting and the memories come back to him repeatedly and frequently. | Ex. 25, Cornejo Dep. 111:5-111:23; Ex. 38, Cornejo Resp., Interrogatory No. 11. |
| | 140. | Following the incident, Plaintiff Campos felt traumatized, afraid, and depressed. | Ex. 24, Campos Dep. 170:22-171:8, 177:1-23. |
| | 141. | While detained at Adelanto after the incident, Plaintiff Campos would feel nervous every time he saw GEO officers. He would start shaking and his hands would start to sweat. | Ex. 24, Campos Dep. 181:10-18. |
| | 142. | Plaintiff Campos continues to suffer from stress and anxiety as a result of this incident, which causes him headaches. The stress and anxiety cause him headaches. | Ex. 24, Campos Dep. 170:22-171:8, 176:9-25; Ex. 37, Campos Resp., Interrogatory No. 11. |
| | 143. | Plaintiff Campos also continues to feel depressed as a result of this incident and no a daily basis, he struggles sleeping at night. | Ex. 24, Campos Dep. 178:9-22. |
| | 144. | Plaintiff Diaz has recurring nightmares as a result of this incident which cause him to wake up screaming and feeling scared. | Ex. 26, Diaz Dep. 101: 9-14, 103:10-12. |
| | 145. | Plaintiff Diaz also suffers from headaches as a result of this incident. | Ex. 26, Diaz Dep. 101: 9-14. |
| | 146. | Plaintiff Mejia suffers from anxiety as a result of this incident and on a daily basis, he worries that if he were detained he would be physically attacked again. | Ex. 33, Mejia Resp., Interrogatory No. 11. |
| | 147. | Plaintiff Martinez experienced emotional distress when he was harmed by the guards during the incident and while he | Ex. 27, Martinez Dep. 161:21-162:2, Ex. 34, Martinez Resp., |

| | | |
|---|---|---|
| | was restricted in the segregation unit. | Interrogatory No. 11. |
| 148. | Plaintiff Martinez continues to think about this incident frequently and fears that he will be detained again. | Ex. 34, Martinez Resp., Interrogatory No. 11. |
| 149. | Plaintiff Martinez has had difficulty sleeping because he lies awake at night thinking about this incident. | Ex. 27, Martinez Dep. 165:1-168-5. |
| 150. | Plaintiff Garcia felt angry and distressed after the incident. | Ex. 32, Garcia Resp., Interrogatory No. 11. |
| 151. | Plaintiff Garcia felt alone while he was in segregation and was shocked by the brutal treatment that he received during the incident because he thought the United States was the land of freedom. | Ex. 32, Garcia Resp., Interrogatory No. 11. |
| 152. | Plaintiff Garcia still things about this incident frequently which cause him nightmares and difficulty sleeping. | Ex. 29, Garcia Dep. 72:1-4; Ex. 32, Garcia Resp., Interrogatory No. 11. |
| 153. | When he thinks of this incident, Plaintiff Garcia's heart starts racing and he feels afraid of being detained again. | Ex. 32, Garcia Resp., Interrogatory No. 11. |
| 154. | Plaintiff Rodriguez has difficulty sleeping, and continues to suffer from stress and anxiety as a result of this incident. | Ex. 35, Rodriguez Resp., Interrogatory No. 11. |
| 155. | Plaintiff Rodriguez has ongoing headaches and feelings of depression. | Ex. 35, Rodriguez Resp., Interrogatory No. 11. |

///

///

///

///

///

1

2 Dated:  November 26, 2019       LAW OFFICES OF RACHEL STEINBACK

3                                LAW OFFICES OF CAROL A SOBEL
                               SCHONBRUN SEPLOW HARRIS

4                                & HOFFMAN LLP
                               LAW OFFICE OF COLLEEN FLYNN

5                                LAW OFFICE OF MATTHEW STRUGAR

6                              By:  /s/ Catherine E. Sweester

7                                   Rachel Steinback
                                  Monique Amanda Alarcon

8                                   Catherine E. Sweetser
                                  Colleen Flynn

9                                   Matthew Strugar
                                *Attorneys for Plaintiffs.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28