EXHIBIT 6



Nicole Ramos
Project Director
Border Rights Project

June 22, 2017

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch
245 Murray Lane, SW
Building 410, Mail Stop #0190
Washington, D.C. 20528

### RE: Omar Arnoldo Rivera Martinez (A#213-081-649)
### Josue Mateo Lemus Campos (A#213-078 -965)

Dear CRCL Compliance Branch Officer:

I represent Omar Rivera Martinez (A#213-081-649) and Josue Mateo Lemus Campos (A#213-078 -965), two Salvadoran asylum seekers now detained in the Adelanto Detention Facility. I write now to request that your office immediately investigate the brutal attack of these men committed by GEO guards on June 12, 2017. I am also requesting that your office immediately investigate the conduct of ICE officers at the facility, and the Los Angeles Field Office, with respect to their failures to respond to this attack, failures which have resulted in repeated violations of Mr. Rivera Martinez and Mr. Lemus Campos's basic rights. Finally, I am requesting that this office remedy these egregious violations by ensuring Mr. Rivera Martinez and Mr. Lemus Campos's immediate release from custody on humanitarian parole.

On June 12, 2017, Mr. Lemus Campos and Mr. Rivera Martinez, along with seven other asylum seekers, began a peaceful hunger strike. The purpose of this fast was to alert officials to their concerns over inhumane conditions and treatment at the facility. For this nonviolent action, the men were beaten, tortured, denied access to medical care, placed in segregation, and denied their right to private attorney-client communications. Even more troubling, GEO guards made statements to both counsel, and Mr. Rivera Martinez, linking the men's ability to receive medical care, or the ability to meet with counsel in private, to the fact that the men were under disciplinary sanction following the guards' savage attack.

*A Peaceful Hunger Strike*

On Monday June 12, 2017, Mr. Rivera Martinez and Mr. Lemus Campos, along with the seven other asylum seekers of the "Adelanto 9," began a hunger strike. On that date, between 5:30am

---

**P000190**

and 7am, the asylum seekers quietly took their seats at two tables in the dining area of the dormitory in which they also slept. As other detainees began to eat, the men chose to abstain, instead requesting to speak with an officer so that they might explain the reasons behind the hunger strike. The men had drafted a complaint letter and attempted to present their complaint to an official. However, every guard and administrator to whom the asylum seekers attempted to show their complaint simply refused to look at it.

After noting that the asylum seekers were refusing to eat, the GEO guards ordered the men to eat, or to return to their beds. The men again asked to speak with someone about their grievances, and indicated their intention to remain seated until someone spoke with them. The asylum seekers then linked arms.

### *Physical Abuse of the Asylum Seekers, Denial of Medical Care & Due Process*

While this attack involved several guards, the exact number which is unknown at this time (but is estimated to be between 6 and 10 guards), Mr. Rivera Martinez and Mr. Lemus Campos both recall a Caucasian female lieutenant began screaming at the group in English, and showering them with pepper spray. Shortly thereafter, other guards joined in the attack. Mr. Rivera Martinez noted the presence of an African American bearded male guard approximately 190cm tall, a Caucasian male guard approximately 170 cm in stature, and a Caucasian female guard with greenish-grey eyes. If provided a photo array of the guards assigned to the morning shift on June 12th, both Mr. Rivera Martinez and Mr. Lemus Campos can identify their attackers. This incident also occurred in front of numerous other detainees housed within the dormitory, many of whom could identify Mr. Lemus Campos and Mr. Rivera Martinez's attackers.

As the guards doused the group in pepper spray, the asylum seekers attempted to huddle together in order to shield their eyes from the painful chemicals. However, the guards broke their huddle, continuing to shower them with pepper spray in their faces, all over their bodies, including their genital area, soaking their clothing. At some point, the asylum seekers were handcuffed.

The men were then ordered to take a hot shower. At first, Mr. Rivera Martinez refused to shower. To force his compliance, a Caucasian female guard scratched Mr. Rivera Martinez all over his forearms, torso, and back. A Caucasian male guard then grabbed Mr. Rivera Martinez and slammed him face-first into a concrete wall, causing Mr. Rivera Martinez's nose to fracture, his upper right lateral cuspid tooth to break and fall out, and the crown on his bottom-left second bicuspid tooth to break and fall out. For his part, Mr. Lemus Campos experienced excruciating pain in his genital area where guards repeatedly sprayed him with pepper spray.

Both Mr. Rivera Martinez and Mr. Lemus Campos reported that the guards *forced* the men to bathe in hot water, as opposed to cool water, *for the purpose* of causing the asylum seekers *more* pain. Both men reported that the guards laughed as they showered because it was clear that the men were in severe pain. The fact that those responsible for their care and custody were now laughing at them, *after beating them like animals*, humiliated and terrified the men.

### *Injuries & the Refusal to Provide Medical Treatment*

During this attack, Mr. Rivera Martinez sustained approximately "30 separate scratch marks" on his body, "ranging in length from one to several inches." *See* Affidavit of Attorney Hussain



Nicole Ramos
Project Director
Border Rights Project

Turk.   His nose is "visibly fractured and off-set to the left side of his face by several millimeters." *See id.* He has bruising on his right wrist. These injuries were visible *five days after* the beating. *See id.*

Mr. Rivera Martinez and Mr. Lemus Campos have received no medical care apart from having their vital signs taken. Mr. Rivera Martinez has made *numerous* verbal and written requests for medical care from the guards. He has complained of extreme difficulty breathing as a result of his nose being fractured. However as of June 17, 2017, he still had not received medical care. Indeed, one guard told Mr. Rivera Martinez that he *would not* receive care because he was being punished.

It is particularly puzzling why Mr. Rivera Martinez has not received medical treatment to address his visibly obvious injuries given the fact that ICE officers took photographs of Mr. Rivera Martinez's mouth and face following the attack. ICE officers at the facility therefore have *direct knowledge* that Mr. Rivera Martinez was badly injured and needs medical attention, and have done *nothing* to ensure that he receives appropriate treatment. Mr. Rivera Martinez is *"now in so much pain that he cannot sleep,"* and is *"too afraid of further torture to ask for medical treatment."* See Affidavit of Hussain Turk.

### *Preventing Access to the Complaint Process*

Both Mr. Lemus Campos and Mr. Rivera Martinez have made *numerous* requests to be provided with complaint forms in order to report the guards' attack, and pursue an administrative grievance. However, the guards have repeatedly refused to provide copies of these forms. ICE officers have also failed miserably in their response to this attack. Despite ICE officers *conceding* that they had watched the recording of the beating, after which they determined that the GEO guards' actions violated the men's rights, and despite ICE officers making vague promises that the guards would be disciplined, Mr. Lemus Campos and Mr. Rivera Martinez have not been informed what consequences, *if any*, will be meted out to the perpetrators of their assault.

*However*, the men have been provided with paperwork indicating that the Adelanto facility has taken disciplinary action *against them*. Curiously enough, paperwork received by Mr. Rivera Martinez shows that he was transferred to solitary confinement for violating Rule 213 "Inciting a Group Demonstration" on June 12, 2017 (despite statements made to him and counsel that he had been placed in medical isolation for symptoms of varicella, i.e. chickenpox). The memorandum decision indicates that Mr. Rivera Martinez's punishment was to last 10

Nicole Ramos | Project Director | Al Otro Lado | Border Rights Project
511 E. San Ysidro Blvd. # 333 | San Ysidro, California 92173
664-526-0145 (MX) | 619-786-4866 (USA) | Fax 619-202-7752
nicole@alotrolado.org | alotrolado.org

**P000192**

consecutive days; that this punishment had been determined at an administrative hearing; and that Mr. Rivera Martinez was informed of his rights prior to the hearing. However Mr. Rivera Martinez does not recall attending any disciplinary hearing on that date, does not recall being advised of his right to retain counsel, and does not recall being provided documents in his native language such that he could understand the nature of the disciplinary charge against him.

*Moreover*, the combination of not knowing whether their attackers will be disciplined, and that they will be protected from future attacks, being denied access to the only avenue that they can raise concerns for their safety, while being isolated in segregated housing, creates a psychologically tortuous environment for Mr. Rivera Martinez and Mr. Lemus Campos. Because if the guards are permitted to viciously attack without consequences, and ICE officers are permitted to ignore their pleas for help, while the asylum seekers themselves are punished, their safety while in the care of the United States government is not a foregone conclusion.

### Orantes Violations

On Wednesday, June 14, 2017, I spoke with Lieutenant Otter at the Adelanto Facility regarding arranging a legal visit with Mr. Rivera Martinez. He advised that because Mr. Rivera Martinez was in "medical quarantine," I would not be permitted to visit with him. I then questioned Lieutenant Otter regarding arranging a legal call, to which he responded that Mr. Rivera Martinez could call me from the pay phone. I reminded Lieutenant Otter that Mr. Rivera Martinez, under *Orantes* has the right to private attorney-client communications with counsel, and that the facility would have to provide a way for that to take place either in-person, or via a non-monitored telephone line.

On Saturday June 17, 2017, Attorney Hussain Turk visited with Mr. Lemus Campus to gather more information regarding the attack. However, Officer T. Johnson informed Attorney Turk that he could not visit with Mr. Lemus Campus in a contact visitation room because Mr. Lemus Campos was being disciplined. Attorney Turk requested to be provided with this policy statement in writing but none was provided. Thus the meeting with Mr. Lemus Campos took place in no-contact visiting area with a glass partition and phone receiver. This meeting was not private as GEO guards were in the same room within earshot, making Mr. Lemus Campos visibly afraid to disclose information. Attorney Turk advised the guards that Mr. Lemus Campos was entitled to conduct meetings with legal counsel in private, but these requests were ignored.

Mr. Rivera Martinez and Mr. Lemus Campos were also threatened, that if they did not cease their hunger strike they would be sent to detention centers in other states. This threat to transfer Salvadoran asylum seekers out-of-state, away from counsel, is *also* an *Orantes* violation.

*Orantes* is clear. As Salvadoran asylum seekers, Mr. Lemus Campos and Mr. Rivera Martinez are *entitled* to conduct attorney-client meetings with legal counsel in a setting which ensures the *confidentiality* of those communications. That Mr. Rivera Martinez was under medical quarantine, which was *conveniently* imposed following the beating, still does not excuse the facility of its obligation to comply with *Orantes*. Further, that Mr. Lemus Campos is under a



Nicole Ramos
Project Director
Border Rights Project

disciplinary sanction, the appropriateness of itself which is dubious, should not impact his rights under the clearly established parameters of *Orantes*. The burden is upon ICE and the facility to make arrangements that ensure compliance with *Orantes*.

## Investigation & Action Steps Requested

Mr. Lemus Campos and Mr. Rivera Martinez request an immediate investigation into this savage assault of defenseless asylum seekers detained at the Adelanto Detention Facility. They further request that the GEO guards responsible be immediately terminated. They request that the ICE officers who failed to take action be disciplined, and that record of such disciplinary action be clearly noted in their personnel files.

Counsel further requests that Mr. Lemus Campos and Mr. Rivera Martinez be released immediately on humanitarian parole. Both Mr. Lemus Campos and Mr. Rivera Martinez have passed their credible fear interview, an interview they would not have otherwise had but for the last minute intervention of counsel, after *all* of the Border Patrol and ICE officers with whom the pair interacted *refused* to refer them for a credible fear interview. Despite the fact that both men repeatedly expressed that they were seeking asylum, officers ignored them, forcing them onto a plane to be deported, removing them from the plane *only after* learning that counsel had submitted her G-28 Notice of Attorney Representation.

The dramatic irony here is that these men *fled* El Salvador to escape violence, persecution, and the official corruption which allows such social epidemics to continue. They fled to the United States because it is believed that the United States is a nation where the rule of law can be trusted. However, what Mr. Lemus Campos and Mr. Rivera Martinez could not have anticipated was that they, guards, on the payroll of the U.S. government, would be permitted to abuse them, and that they would be tortured. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as…punishing him for an act he…has committed…. [and] when such pain or suffering is inflicted by…or with the consent or acquiescence of a public official or other person acting in an official capacity."

Here, nine asylum seekers drafted a letter, and tried to present it to officials who refused to read it. GEO guards, contracted by ICE, brutalized the men, for the offense of remaining seated. The guards gouged and bruised Mr. Rivera Martinez's arms and torso, smashed his head into a concrete wall, knocked out his crown and tooth, and broke his nose. The guards doused the men

P000194

in pepper spray, forced them to shower in hot water to increase their pain, and then laughed at them as they writhed helplessly. The guards continue to torture the men, refusing to provide medical treatment and cutting off their access to the complaint forms, the *only* avenue through which they can take action against the guards responsible for their attack. The failure to immediately investigate this matter *is* official acquiescence in the face of torture. Counsel urges this office to investigate, and take swift action to protect Mr. Lemus Campos, Mr. Rivera Martinez, and the other seven members of the Adelanto 9.

Respectfully,

Nicole Ramos

# EXHIBIT 7



## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: Barahona-Cornejo  First Name: Julio

Date of Birth: ▇▇▇▇▇▇  Detainee A Number: 213081651

Date of Incident: 6/12/17  Time: 0630  Location: E-2-C 184

Was it necessary to notify physician/provider? ☐ Yes ☒ No  Time Notified: NA

Name of Physician/Provider _____ NA _____  ☒ Use of Force

Type of Incident: ☒ Fighting  Other: OC spray

Explain:
VS: BP 150/88, SPO2 100%, HR 119.
Small abrasion on (L) abd, (L) elbow. No c/o pain. Denied any injury.

Injuries/Non-Injuries: _____

Head Area Examined: _____  ☐ Deferred

Face Area Examined: _____  ☐ Deferred

Chest Area Examined: _____  ☐ Deferred

Back Area Examined: _____  ☐ Deferred

Arms Area Examined: _____  ☐ Deferred

Legs Area Examined: _____  ☐ Deferred

Illustrate on the diagram position or place of injury, if any:

THIS INJURY IS: (CIRCLE ONE)

REPORTABLE   NON-REPORTABLE

Date of Exam: 6/2/17  Time: 0940  Signature/Stamp ___ S. Jones LVN

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

GEO 02243

CCS
CORRECT CARE
SOLUTIONS

## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: Lopez-Castillo    First Name: Isaac

Date of Birth: ___    Detainee A Number: 213081003

Date of Incident: 6/12/17    Time: 0630    Location: E2C52u

Was it necessary to notify physician/provider? [ ] Yes [X] No    Time Notified: NA

Name of Physician/Provider ___ NA    [X] Use of Force

Type of Incident: [X] Fighting    Other: OC-Spray

Explain: VS: 129/81, 93, 20, 99%. Abrasion on (R)
forearm, (1) neck. No acute distress. No injury to
report.

Injuries/Non-Injuries: ___ none

Head Area Examined: ___    [ ] Deferred

Face Area Examined: ___    [ ] Deferred

Chest Area Examined: ___    [ ] Deferred

Back Area Examined: ___    [ ] Deferred

Arms Area Examined: ___    [ ] Deferred

Legs Area Examined: ___    [ ] Deferred

Illustrate on the diagram position or place of injury, if any:

THIS INJURY IS: *(CIRCLE ONE)*

REPORTABLE    NON-REPORTABLE



Date of Exam: 6/12/17    Time: 0900    Signature/Stamp ___ S. Jones LVN

**GEO 01055**

△ CCS
CORRECT CARE
SOLUTIONS

## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: Rivera-Martinez   First Name: Omar

Date of Birth: ▮▮▮▮▮▮▮   Detainee A Number: 213081049

Date of Incident: 6/12/17   Time: 0630   Location: E2C 1L

Was it necessary to notify physician/provider? ☒ Yes  ☒ No   Time Notified: _____

Name of Physician/Provider Dr. Medrano   ☑ Use of Force

Type of Incident: ☐ Fighting   Other: OC Spray

Explain:
Crown knocked out on R upper teeth, c/o R shoulder pain
No distress noted.
0/10 pain, HR: 93, Resp 24, SpO2 100%.

Injuries/Non-Injuries: Crown dislodged from mouth

| | | |
|---|---|---|
| Head Area Examined: NONE | | ☐ Deferred |
| Face Area Examined: NONE | | ☐ Deferred |
| Chest Area Examined: NONE | | ☐ Deferred |
| Back Area Examined: NONE | | ☐ Deferred |
| Arms Area Examined: (R) shoulder c/o pain | | ☐ Deferred |
| Legs Area Examined: NONE | | ☐ Deferred |

Illustrate on the diagram position or place of injury, if any:

THIS INJURY IS: (CIRCLE ONE)

(REPORTABLE)   NON-REPORTABLE

Date of Exam: JUN 1 2 2017   Time: 0955   Signature/Stamp ___ J. Petersen, RN

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

GEO 02242



## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: _Burgos Mejia_      First Name: _Alexander_

Date of Birth: ▮▮▮▮▮▮▮▮      Detainee A Number: _213081704_

Date of Incident: _6/12/17_   Time: _0630_   Location: _E2C 27L_

Was it necessary to notify physician/provider?  ☐ Yes  ☒ No   Time Notified: _NA_

Name of Physician/Provider _NA_        ☒ Use of Force

Type of Incident: ☐ Fighting      Other: _OC spray_

Explain: _VS: 145/85, 107, 24, 100%. No injury to report_
_no acute distress._
_Arms irritated from OC spray_

Injuries/Non-Injuries: _NONE_

Head Area Examined: _____  ☐ Deferred

Face Area Examined: _____  ☐ Deferred

Chest Area Examined: _____  ☐ Deferred

Back Area Examined: _____  ☐ Deferred

Arms Area Examined: _____  ☐ Deferred

Legs Area Examined: _____  ☐ Deferred

Illustrate on the diagram position or place of injury, if any:

**THIS INJURY IS: (CIRCLE ONE)**

REPORTABLE    **NON-REPORTABLE**

Date of Exam: _6/12/17_   Time: _0900_   Signature/Stamp _Jones_ S. Jones LVN

**GEO 00874**

**CCS**
**CORRECT CARE SOLUTIONS**

## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: _Pena Garcia_   First Name: _Luis_

Date of Birth: ▮▮▮▮   Detainee A Number: _213078969_

Date of Incident: _6/12/17_   Time: _0630_   Location _E2C 68_

Was it necessary to notify physician/provider? ☐ Yes  ☒ No   Time Notified: _NA_

Name of Physician/Provider _NA_   ☒ Use of Force

Type of Incident: ☒ Fighting   Other: _OC spray_

Explain: _VS 134/85, 104, 20, 98/. (R)elbow, (L)knee
abrasion. Denied pain. No injury to report._

Injuries/Non-Injuries: _none_

| | |
|---|---|
| Head Area Examined: | ☐ Deferred |
| Face Area Examined: | ☐ Deferred |
| Chest Area Examined: | ☐ Deferred |
| Back Area Examined: | ☐ Deferred |
| Arms Area Examined: | ☐ Deferred |
| Legs Area Examined: | ☐ Deferred |

Illustrate on the diagram position or place of injury, if any:

**THIS INJURY IS:** *(CIRCLE ONE)*

**REPORTABLE     NON-REPORTABLE**

Date of Exam: _6/12/17_   Time: _0900_   Signature/Stamp _S. Jones LVN_

**CCS**
CORRECT CARE
SOLUTIONS

# MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: Grande Rodriguez First Name: marvin

Date of Birth: ▉▉▉▉▉   Detainee A Number: 213077477

Date of Incident: 6/2/17   Time: 0030   Location: E2C33

Was it necessary to notify physician/provider? ☐ Yes ☒ No   Time Notified: NA

Name of Physician/Provider: NA   ☒ Use of Force

Type of Incident: ☒ Fighting   Other: OC Spray

Explain: VS: 144/72, 105, 20, 96%
No injury to report. ① ear abrasion, no acute
distress

Injuries/Non-Injuries: _____ none _____

Head Area Examined: _____   ☐ Deferred
Face Area Examined: _____   ☐ Deferred
Chest Area Examined: _____   ☐ Deferred
Back Area Examined: _____   ☐ Deferred
Arms Area Examined: _____   ☐ Deferred
Legs Area Examined: _____   ☐ Deferred

Illustrate on the diagram position or place of injury, if any:

THIS INJURY IS: (CIRCLE ONE)

REPORTABLE   NON-REPORTABLE

Date of Exam: 6/12/17   Time: 0900   Signature/Stamp: ___ Jones LVN

**GEO 01858**



## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: Cortez Diaz   First Name: Jose

Date of Birth: ▓▓▓▓   Detainee A Number: 213078 9163

Date of Incident: 6/12/17   Time: 0630   Location: E2C 23L

Was it necessary to notify physician/provider? ☐ Yes  ☒ No   Time Notified: NA

Name of Physician/Provider NA   ☒ Use of Force

Type of Incident: ☒ Fighting   Other: OC-Spray

Explain:
VS: 172/98, 128, Spo2-100%, R-24  No injury noted
Denied pain.
R ear abrasion

Injuries/Non-Injuries: NONE

Head Area Examined: NONE   ☐ Deferred

Face Area Examined: R ear/neck abrasion   ☐ Deferred

Chest Area Examined: none   ☐ Deferred

Back Area Examined: none   ☐ Deferred

Arms Area Examined: none   ☐ Deferred

Legs Area Examined: none   ☐ Deferred

Illustrate on the diagram position or place of injury, if any:

THIS INJURY IS: (CIRCLE ONE)

REPORTABLE   (NON-REPORTABLE)

Date of Exam: 6/12/17   Time: 0900   Signature/Stamp S. Jones LVN

GEO 01391



## MEDICAL REPORT ON INJURIES/NON-INJURIES

Last Name: _Lemus Campos_  First Name: _Josue_

Date of Birth: █████████  Detainee A Number: _213078965_

Date of Incident: _6/12/17_  Time: _0030_  Location: _E2C 38U_

Was it necessary to notify physician/provider? [ ] Yes  [X] No  Time Notified: _NA_

Name of Physician/Provider _NA_  [X] Use of Force

Type of Incident: [X] Fighting  Other: _OC Spray_

Explain: _VS 185/99, 124, 24, 100/ c/o Burning on skin_
_R/T OC spray. no acute distress noted. denied pain_

Injuries/Non-Injuries: _none_

Head Area Examined: _____  [ ] Deferred

Face Area Examined: _____  [ ] Deferred

Chest Area Examined: _____  [ ] Deferred

Back Area Examined: _____  [ ] Deferred

Arms Area Examined: _____  [ ] Deferred

Legs Area Examined: _____  [ ] Deferred

Illustrate on the diagram position or place of injury, if any:

THIS INJURY IS: (CIRCLE ONE)

REPORTABLE  (NON-REPORTABLE)

Date of Exam _6/12/17_  Time: _0900_  Signature/Stamp _____ S. Jones LVN

**GEO 00525**

# EXHIBIT 8

| <br>Corrections & Detention<br>**RESTRICTED** | Adelanto ICE Processing Center<br><br>**EMERGENCY PLANS MANUAL**<br>**HUNGER STRIKE RESPONSE PLAN** | **PLAN #15**<br><br>__EFFECTIVE:__<br>**09/25/2017** |
|---|---|---|

## I.  GENERAL SECTION

In the event of an identified emergency the following actions will take place in addition to more specific detail found in the contingency specific section.

- First responding will immediately report to the affected area/situation and attempt to defuse  or control the situation.

- The Shift Supervisor will immediately respond to assess the situation and evaluate the need for additional responders.

- Notifications will be made to command staff/ICE utilizing the roster for the specific emergency.

- In the event the primary route to the facility is impassable a secondary route will be used.

- The Medical department will be contacted for a list of detainees with special needs and procedures to be utilized in the event their internal or external movement is needed.

- In the event neighbors residing in close proximity to the facility must be notified of an emergency situation, the facility's Rapid Notify system will be activated.

## II.  OPERATIONAL OBJECTIVE

To have a plan that enables staff to work towards preventing unrest and maintain safety and security due to a mass hunger strike by detainees.

Emergency plans are located in the following areas:  Master Control Centers (East and West), Incident Command Center (Adelanto-East Administrations Conference Room), Deputy Administrator office and the Facility Administrator's office.

In the event emergency assistance is requested by another ICE/DRO facility, the Adelanto ICE Processing Center in cooperation with the requesting facility and ICE will determine the specific aid needed. Local resources to include supplies, transportation, temporary housing, personnel, and/or TDY staff will be evaluated and dispatched as necessary.

## III.  OPERATING PROCEDURE

### A.  Proactive Response

1.  All staff will be expected to quickly identify any detainee(s) who may use a hunger strike to resolve personal issues.

2.  Intelligence indicating the possibility or threat of a hunger strike will be passed on to the Facility Administrator and Health Service staff immediately.

3.  The detainee(s) involved will be interviewed to verify that the report is legitimate

**This plan is confidential.  Unauthorized plan disclosure is prohibited.**

- 1 -



| | Adelanto ICE Processing Center | PLAN #15 |
|---|---|---|
| Corrections & Detention ☆<br>**RESTRICTED** | **EMERGENCY PLANS MANUAL**<br>**HUNGER STRIKE RESPONSE PLAN** | **EFFECTIVE:**<br>09/25/2017 |

and if so, to determine the motivation for the hunger strike.

4. Security staff will evaluate the need to isolate the detainee(s) in question to eliminate the possibility of others joining in or becoming involved.

5. Health Services staff will evaluate the medical status of the detainee(s) in question to determine the health risks if the individual(s) does in fact refuse to eat for an extended period of time.

6. Staff will attempt to resolve the motivating issues before the hunger strike takes place or minimize the duration of the hunger strike.

7. The response to a hunger strike will be carefully measured to insure that detainees do not see a hunger strike or the threat of a hunger strike as a legitimate way of resolving issues with facility staff.

**B.   Initial Response**

1. Upon discovery of a hunger strike in progress, the on-duty Shift Supervisor will make the following notifications in the following order:

   a.   Facility Administrator
   b.   Deputy Administrator
   c. .  AFA-Security
   d.   Chief of Security
   e.   All on-duty staff to include medical response
   f.   Health Services Administrator (HSA)

   In the event that off-duty personnel are needed, the facility has an emergency recall system which is an automated call-up system.  This auto-dialer system will alert staff that their presence is required at the facility due to an emergency.

2. Staff will interview detainees who may have information concerning the food strike to identify the following issues:

   a.   Determine the identity of the detainee(s) involved.
   b.   Identify detainee(s) having close ties to the participant(s), (i.e. fellow inmate workers, etc.), for questioning.
   c.   Identify ring leaders or the individual who organized the activity (if it is a group hunger strike).
   d.   Determine the claimed or underlying reasons for the hunger strike.
   e.   Determine the length of time it has been in progress.

3. Information gathered during these interviews will be submitted to the Facility Administrator, HSA and senior Security supervisors.

4. A report of the incident will be passed through the Regional office to the Corporate Headquarters Operations and Health Services.

**This plan is confidential.  Unauthorized plan disclosure is prohibited.**

- 2 -

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

GEO 02011



| | Adelanto ICE Processing Center | PLAN #15 |
|---|---|---|
| Corrections & Detention | **EMERGENCY PLANS MANUAL**<br>**HUNGER STRIKE RESPONSE PLAN** | **EFFECTIVE:**<br>09/25/2017 |
| **RESTRICTED** | | |

5.  The Facility Administrator or designee will meet with both Security and Health Services personnel to determine a plan of action.

6.  The Facility Administrator will arrange a negotiation session with key leaders of the strike.  Only the Facility Administrator or the Contracting Officer's Representative (COR) can make any commitments or promises during negotiations.

7.  The participant(s) will be isolated from general population if possible in order to prevent the strike from spreading to other non-involved detainees.

    a.  The participants will be placed in the special medical in order to adequately monitor food intake and with the approval of the HSA.  The HSA will take into consideration the individual medical needs of the detainees.

    b.  If the number of participants is too large to be housed in the medical unit. The Shift Supervisor  will take the following actions:

        1)  Instruct Security staff to remove all food items from the affected housing unit(s).
        2)  Make the affected housing unit(s) a constant post and instruct the assigned Officer to make 15-minute entries in the permanent logbook.
        3)  Treat the affected housing unit(s) as a segregated area.
        4)  A second security staff member will be assigned to the effected unit(s).

8.  Ensure that meals are offered at regularly scheduled meal times.

9.  Assign an Officer the responsibility of recording which detainees are accepting meals in the logbook.

10. Officers offering the meals will submit a General Incident Report after each meal. The Officer will list the detainees who refused the meal, the total number of meals missed and the number of days the detainee has been on a hunger strike.  The report will be distributed in accordance with the Policy and Procedures on Incident Reports.

11. Verify with the Business Office the number of participants that purchased food items and the quantity of items purchased.  Specific purchasers and amounts purchased listed by dorm location.

12. The participant(s) will be reviewed by Health Services personnel on a daily basis to assess nutritional status and obtain a weight and/or urine specimen for analysis.

13. In the event that the hunger strike is of long duration (over 72 hours), nine consecutive missed meals and/or the HSA determines that the health of the participants could be affected, the Security staff will follow Medical department's directives.  If a detainee's health deteriorates serious, the individual will be transferred to an appropriate medical facility.

**This plan is confidential.  Unauthorized plan disclosure is prohibited.**

- 3 -

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

GEO 02012

|  Corrections & Detention <br> **RESTRICTED** | Adelanto ICE Processing Center <br><br> **EMERGENCY PLANS MANUAL** <br> **HUNGER STRIKE RESPONSE PLAN** | **PLAN #15** <br><br> <u>EFFECTIVE:</u> <br> 09/25/2017 |
|---|---|---|

**C.   <u>Post Emergency Procedures</u>**

- Segregating detainees involved in the incident (if applicable)
- Collect all written reports
- Seize, document, and preserve evidence
- Accountability (especially for staff, detainees, and sensitive equipment)
- Damage assessment and repair
- Injury treatment and documentation
- Coordinating legal actions/prosecutions
- Debriefing of staff involved and follow-up for additional analysis and implications for changes in policy or procedures
- General review and critique of the emergency operations and management with a follow-up agenda including but not limited to monitoring the facility climate and revising the emergency plan

1. A Serious Incident Report will be sent through the Regional Office to the Corporate Headquarters Operations staff, pursuant to Policy and Procedure.
2. The COTR will be notified pursuant to contractual requirements.
3. All staff that participated in the emergency response will be required to write a detailed report, prior to leaving the facility.
4. On-site management staff will conduct a preliminary out-briefing with those staff members who participated in the response, prior to their departure from the facility.
5. An initial report will be sent to the Corporate Headquarters Operations within twenty-four (24) hours.
6. A final report will be submitted to Corporate Headquarters Operations within five (5) working days after the incident.
7. This report will be used to conduct a final out-briefing with staff and the COTR.

**Unauthorized disclosure of this emergency plan is prohibited.  Staff may not discuss any aspect of a plan within the hearing of a detainee, visitor, or anyone else permitted access to the plan.**

<u>**This plan is confidential.  Unauthorized plan disclosure is prohibited.**</u>

- 4 -



| | Adelanto ICE Processing Center | PLAN #15 |
|---|---|---|
| **RESTRICTED** | **EMERGENCY PLANS MANUAL** **HUNGER STRIKE RESPONSE PLAN** | **EFFECTIVE:** 09/25/2017 |

## THIS EMERGENCY PLAN WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

**QUESTIONS/SUGGESTIONS REGARDING THIS EMERGENCY PLAN SHALL BE ADDRESSED TO THE AFA-SECURITY.**

_____
Facility Administrator

_____
AFA-Security

EFFECTIVE: **September 25, 2017**

Reviewed & Revised: September 2011
Reviewed & Revised: June 2012
Reviewed: April 2013
Reviewed: July 2013
Reviewed & Revised: August 2014
Reviewed: September 2015
Reviewed: September 2016
Reviewed & Revised: September 25, 2017
Reviewed: January 2018

This plan is confidential. Unauthorized plan disclosure is prohibited.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

GEO 02014

# EXHIBIT 9

```
 1               UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3
 4    _____
                                     )
 5    OMAR ARNOLDO RIVERA MARTINEZ,)
      et al.,                        )
 6                                   )
              Plaintiffs,            )
 7                                   )
          vs.                        )No.
 8                                   )5:18-cv-01125-R-GJS
      THE GEO GROUP, INC., et al., )
 9                                   )
              Defendants.            )
10    _____)
11
12
13               DEPOSITION OF BARRY BELT
14                  Ontario, California
15               Thursday, August 1, 2019
16
17
18
19
20
21
22    Reported by:
      RENEE A. PACHECO, RPR, CLR
23    CSR No. 11564
24    Job No. 3464725
25    PAGES 1 - 80
```

                                              Page 1

```
 1        A    I did not.
 2        Q    Did you meet with your counsel to prepare for
 3   this deposition today?
 4        A    A week or two ago, three weeks; something like
 5   that.
 6        Q    For how long did you meet?
 7        A    Maybe 20 minutes if that.
 8        Q    And that was --
 9        A    Rough estimate.
10        Q    And that was the only time you met?
11        A    Yes.
12        Q    Okay.  Did you speak to any witnesses or
13   individuals involved in the incident that took place on
14   June 12th, 2017?
15        A    I did not.
16        Q    Other than your attorney have you discussed
17   this case with anyone else?
18        A    No.
19        Q    Okay.  So I'm going to start off just asking
20   about your employment history.  Is GEO your current
21   employer right now?
22        A    It is.
23        Q    And how long have you been with GEO?
24        A    Since January of 2014.
25        Q    And what is your current title?
```

                                          Page 10

1      A   Security threat groups investigator,

2   intelligence investigator, and office of professional

3   responsibility investigator.

4      Q   And how long have you had these titles?

5      A   Since July of 2016.

6      Q   What happened was your title prior to that?

7      A   I started with GEO as a shift lieutenant.

8      Q   And you're a shift lieutenant until July of

9   2016?

10      A   There was a couple months in there where I did

11   some classification work in intake of new detainees.

12      Q   And since your employment with GEO have you

13   only worked at the Adelanto Detention Facility?

14      A   Yes.

15      Q   And can you tell me a little bit about your

16   responsibilities for your current job titles.  So

17   security threat group, what are your responsibilities

18   under that title?

19      A   The safety and security of all persons on site,

20   which would include staff, detainees, visitors, other

21   court personnel attorneys, the investigation of threats

22   between detainees and against staff and outside protest

23   threats.

24      Q   What about as investigator or does that overlap

25   with your security threat group title?

Page 11

1        A    No.

2        Q    Can I have you turn to the second page.  Do you

3   see the second paragraph?  Does that paragraph reference

4   you as Lieutenant Belt?

5        A    It does.

6        Q    And do you do you see the third paragraph, it

7   says that -- I will represent to you that this is a

8   letter from a detainee's counsel saying that she tried

9   to discuss a telephone block with you on her number.

10            And in this letter she states that your

11  department is within the facility is charged with

12  authority and responsibility of placing blocks on

13  detainee telephone accounts.

14            Is that part of your job responsibilities

15  currently?

16       A    To some degree, yes.

17       Q    And no one ever provided you with a copy of the

18  letter prior to today?

19       A    Not that I'm aware of, no.  In fact, I don't

20  even recall those conversations.

21       Q    I'm going to just play something very quickly.

22            (Audio played.)

23  BY MS. HAROOTUN:

24       Q    Was that your voice?

25       A    It appears to be.  And again, I have no

1    recollection of that call.

2         Q    No recollection?  Okay.

3         A    Absolutely none.

4         Q    Okay.  And do you know -- you said that your

5    department though has some responsibility over blocking

6    telephone numbers.  Do you know why you weren't

7    authorized to discuss a telephone blocking matter?

8              MS. AGUADO:  Objection; actually calls for

9    speculation.

10             THE DEPONENT:  I don't know.  GEO policy.

11   BY MS. HAROOTUN:

12        Q    And do you know if GEO staff had the ability to

13   block certain numbers at the facility?

14        A    General staff.  Define that.

15        Q    Well, which staff had the authority to block

16   numbers at the facility?

17        A    I am not aware of the full range.  I know that

18   I do.

19        Q    You have authority?

20        A    Correct.  And then, because it's not our

21   contract, it's managed by ICE and another company, there

22   was a period of time, and I don't know when, I don't

23   know the time frame, I don't know how many months it

24   lasted, but we could not block any numbers locally.  And

25   then all of a sudden we were able to do it again.  So I

                                              Page 14

```
 1   don't know.  And I don't know the time frames because I
 2   didn't track those measures.
 3        Q   So you said at one point the facility was not
 4   able to block local numbers?
 5        A   Correct.
 6        Q   And currently the facility has the ability to
 7   block local numbers?
 8        A   Correct.  I don't know if it's all numbers or
 9   just select numbers.  I don't know the extent.  Again,
10   it's not my contract.  It's not GEO's contract.
11        Q   But based on your knowledge you know that it's
12   local numbers that can be blocked?
13             MS. AGUADO:  Misstates his testimony.
14             THE DEPONENT:  Can you repeat the question.
15   BY MS. HAROOTUN:
16        Q   Based on your knowledge you know that local
17   numbers can currently be blocked; correct?
18        A   Yes.  There are numbers that can be blocked
19   from -- locally from the facility.
20        Q   Okay.  Is there any training or policy that the
21   GEO Group has on this on the ability to block telephone
22   numbers at Adelanto?
23        A   Not that I'm aware of, no.
24        Q   Do you know what the method is for blocking
25   calls?
```

1        A    Yes.

2        Q    How does one block a call?

3        A    It -- the number appears on the screen,

4    whatever number it happens to be.  And it allows the

5    user to either select block or the details of that

6    particular number, which would include call history and

7    things like that.  If a number is already blocked then

8    the option would allow you to unblock it.

9        Q    And under what circumstances is a GEO staff

10   member permitted to block numbers at the facility?

11       A    Again, I can't speak for regular staff.

12       Q    Or what is -- under what circumstances are you

13   permitted to block a number?

14       A    Security threats to the facility or staff or

15   detainees.

16       Q    Do you know where the screen is that appears

17   with the block -- that has the block numbers, you

18   mentioned a screen before?

19       A    It's within the program.  I'm not sure what

20   you're asking.

21       Q    You said there's a screen that appears with a

22   number and the call history?

23       A    It's all contained within the program that is

24   managed by this other company, third-party company.

25       Q    What's the name of that company?

Veritext Legal Solutions
866 299-5127

```
 1        A    Talton.

 2        Q    Okay.  And do you know what program it is?

 3        A    I don't.

 4        Q    So sorry.  Can I ask you again.  Under what

 5   circumstances would you be permitted to block calls to a

 6   certain number?

 7             MS. AGUADO:  Asked and answered, but go ahead

 8   and repeat.

 9             THE DEPONENT:  Under threats to the facility,

10   staff members, or detainees.

11   BY MS. HAROOTUN:

12        Q    And what's an example of a threat to the

13   facility staff member or detainee?

14        A    Incoming calls stating specific threats or

15   staff members receiving harassing phone numbers from a

16   number that I would have access to.  And certainly

17   detainees sometimes write to me and want numbers blocked

18   because they're getting harassed by a family member,

19   ex-family member, significant other, whatever.

20        Q    Is there any other circumstances where you

21   would block a number that wouldn't be threat-related and

22   also a request by a detainee?

23        A    Under ICE direction.

24        Q    Do you know under what circumstances typically

25   ICE directs you to block a number?
```

Page 17

1      Q    Where are those -- you said there's a screen,

2    correct, where you see the blocking?

3      A    Yes.

4      Q    And where are those screens located in the

5    facility?

6      A    Generally in my office it looks much like that

7    one there.

8      Q    So just a regular computer and it's in your

9    office?

10     A    That's one location I can access it, yes.

11     Q    Okay.  Is there any other location you can

12   access?

13     A    Anywhere within the facility I log in.

14     Q    Okay.  And where are computers located in the

15   facility?

16     A    I don't know the host of them.  I'm not MIS.

17     Q    Okay.  Do you know how detainees are given

18   instructions on how to operate the phone system?

19     A    My understanding is it's in their detainee

20   handbook.

21     Q    And have you ever seen copies of a sheet that

22   detainees are asked to sign when they enter the facility

23   that says they are not allowed to make three-way calls?

24     A    I don't recall the sheet.  I know that it's

25   explained that they cannot make three-way calls or

Page 19

1    Go ahead.

2          THE DEPONENT:   I have no idea.

3    BY MS. HAROOTUN:

4          Q    And is it your understanding that there's some

5    way for the facility to monitor whether a party on the

6    other end of the line calls someone else?

7          A    Yes.

8          Q    Do you know how they monitor that?

9          A    Yeah, I listen to the phone call.

10         Q    So that's the only way you would find out?

11         A    That's the only way I'm aware of.  I would

12   listen to the connection of the other party on the line

13   or the digits in the facilitator's phone being dialed

14   into that other phone link.

15         Q    What if the detainee was on a call with an

16   attorney and the attorney conferenced in someone, would

17   that call be monitored if the detainee was on a call

18   with an attorney?

19         A    We don't monitor attorney calls.

20         Q    So if monitoring the call is the only way to

21   know that someone is on a three-way call would there be

22   no way of knowing that an attorney call was a conference

23   call?

24         A    From my position, correct.  Again I don't

25   presume to know what Talton does with their business.

Page 21

```
 1    warden or ICE to go ahead with the block.  And they
 2    either concur or don't concur.
 3         Q    And are these -- the documentation of any
 4    restriction to phone access is that -- where is that
 5    kept?  Is that kept in the detainee's file?  Is it kept
 6    in some other system?
 7         A    It would be a copy of it or the original would
 8    be in my office.
 9         Q    So your office has all the documentation?
10         A    No.  I can't say -- again, "always" and "never"
11    are loaded terms.  I can't use those.
12         Q    But typically when there's documentation of any
13    restriction to a call?
14         A    No.  I can't even say that.  Again, I don't
15    presume to know why other people do or don't do things.
16    I can only speak for myself.
17         Q    So all your own documentation is in your
18    office?
19         A    There should be a copy in my office.
20         Q    Okay.  And it says here that even if a detainee
21    is under or within a special management unit their
22    telephone access for legal calls, courts, government
23    offices and embassies or consulates shall not be denied;
24    is that right?
25         A    Correct.
```

Page 29

1        Q    So under any circumstance would a detainee not

2    be prevented from contacting his or her attorney?

3        A    A lot of double negatives in there.  Can you

4    restate that?

5        Q    Sure.  Well, under any circumstance would a

6    detainee be prevented from contacting his or her

7    attorney, under any circumstance?

8        A    If the ICE -- I would guess if the attorney is

9    complicit in the safety and security issues at the

10   facility or in some kind of criminal endeavor then that

11   would be a cause to restrict that access because the

12   attorney would not be working in the interest of the

13   court for that purposes.

14       Q    How do you determine whether an attorney is

15   complicit?

16       A    I usually don't.  Talton does a lot of that.

17   If it's a situation where Talton already knows that it's

18   an attorney's office those are pre unrecorded.  Talton

19   does not record numbers that they know to be attorney's

20   offices or connected to attorneys.  So I wouldn't know

21   because there would be no recording.

22            Aside from that I would have to know that it

23   was, in fact, an attorney -- not just an attorney.

24   There are many different types of attorneys, but the

25   attorney was working on behalf of the detainee and

Page 30

1    earlier today, you don't recall whether that concerned

2    an internal protest and whether that could have been the

3    basis for blocking the phone number?

4        A    No.  I have no independent recollection of the

5    call, the substance of the call, or if and why numbers

6    were or were not blocked.  I don't know.

7        Q    Was it your understanding that you were

8    authorized to discuss the blocking of calls?

9        A    My understanding from my facility is that we

10   discussed nothing and route everything through ICE.

11   They're our client.  They're the ones authorized to make

12   comments and answer questions related to detainee care

13   and issues with the facility, all that.  Or somebody

14   within the regional or corporate office.  It's not my

15   place to comment on anything.

16       Q    You said that you're one of the people within

17   the facility that blocks numbers; correct?

18       A    Correct.

19       Q    And who else can block numbers?  Under what job

20   title do you have the ability to block numbers?

21       A    Again, I think I've answered that.  I don't

22   know.

23       Q    You don't know?

24       A    I don't know who would have that ability and

25   who would not.

Veritext Legal Solutions
866 299-5127

1    that they facilitate timing, dating, and the

2    expansiveness or inclusion of certain areas in that

3    hunger strike, if it's a hunger strike.

4        Q    And that circumstance their numbers would be --

5    they would have numbers associated with them blocked?

6        A    I can't speak for all circumstances, but that

7    would be a reasoning.

8        Q    So it would just be, if they were coordinating

9    a hunger strike, that would be grounds for blocking

10   numbers?

11       A    That could possibly be one.  And again, ICE

12   makes a determination on their own accord.  I don't

13   speak for ICE.

14       Q    But the GEO facility -- but the facility in

15   this case and GEO's policies, under those policies?

16       A    That could be a reasoning.  Whether it occurred

17   or not, I don't know.  I work directly for the facility

18   administrator.  He makes directions based on his accord.

19   I don't presume to question his judgment on things.  And

20   ICE, I know that he coordinates with ICE.  And they make

21   directions on their accord.  I don't speak for either

22   one of them.  I simply carry out their directives.

23       Q    So are there any other people in the threat

24   group that you're a part of, the security threat group?

25       A    Assigned to my position or similar type of

                                              Page 39

1    BY MS. HAROOTUN:

2        Q    But do you remember receiving any training on

3    the First Amendment while you were working with GEO

4    Group, you yourself?

5        A    Just what I've explained already.  I've been

6    pre-service and in-service.

7        Q    So you remember receiving that training?

8        A    I remember that an area of topic is in those

9    areas, yeah.  Do I remember the specifics of that

10   training, no.  Again, I don't teach that course.

11       Q    And who is the facility administrator?

12       A    Mr. Janica.

13       Q    And do you remember anything about the incident

14   in this case, the one that took place on June 12th,

15   2017?

16       A    No.

17       Q    And do you know if you were responsible for

18   blocking any number related to the detainees in this

19   case?

20       A    I do not.

21           MS. AGUADO:   Assumes facts and lacks foundation

22   about any numbers that were blocked.

23           Go ahead.

24           THE DEPONENT:   Yeah.   Again, I don't know if

25   detainee's numbers were blocked in this incident.   I

Page 41

```
 1    conclusion.
 2            THE DEPONENT:  I have no idea.  I'm not a
 3    constitutional scholar, nor am I medical personnel that
 4    would be able to judge their medical health or being
 5    able to do that.
 6    BY MS. HAROOTUN:
 7        Q    So if a detainee is deprived of any usually
 8    authorized items or activity is a report of the action
 9    forwarded to the facility administrator?
10        A    Define "deprived."
11        Q    So restricted phone access or blocking of
12    numbers?
13        A    Generally speaking, yes.  Can I speak for all
14    individuals, no.
15        Q    But you will report it to the facility
16    administrator?
17        A    I would ask for permission, authorization to do
18    that generally speaking.
19        Q    And is that done as a report to the
20    administrator or just orally?  How is that communicated?
21            MS. AGUADO:  Asked and answered.  But go ahead.
22            THE DEPONENT:  Yeah.  It would be a written
23    memo, maybe verbal.  There's different ways a message
24    can be transmitted.
25            ///
```

Page 43

1    BY MS. HAROOTUN:

2        Q    If it's verbal is there still a record made?

3        A    I don't know.  I can't speak for the facility

4    administrator or whoever else might verbally authorize

5    it.  I know that ICE generally does not provide any

6    written reports.

7        Q    So what information do you give the

8    administrator when you, let's say want to block a

9    number?

10       A    It would be the reasoning for or the necessity

11   for identifying the issues posed by the continued phone

12   calls, things of that nature.  Again, there's a list of

13   things that could possibly fit in that category.  I

14   can't speak for every single one of them.

15       Q    Did the administrator give you any criteria

16   that you have to meet?

17           MS. AGUADO:  To block a call?

18           MS. HAROOTUN:  Yes.

19           MS. AGUADO:  Asked and answered several times.

20           But go ahead.

21           THE DEPONENT:  In this instance or in general?

22   BY MS. HAROOTUN:

23       Q    What do you mean "in this instance?"

24       A    Well, I don't know what you're referring to.

25       Q    Just any criteria when -- you know, you said as

Page 44

1    that is a DHS agent.

2       Q    Is it typically ICE officers that are in the

3    facility?

4       A    It's all levels.  It's deportation officers.

5    It's supervisory detention deportation officers.  I see

6    the officer in charge, formally called the AFOD,

7    assistant field office director.  I see all levels.

8    Whether or not I interact with them, sometimes, not

9    always.

10      Q    And have you had any conversations with them

11   about phone access?

12      A    No.  That's not my job.

13      Q    So how do you decide whether an outside protest

14   is a threat to the facility?

15      A    I don't decide.  I simply write it up and

16   present it.

17      Q    You present it to the facility administrator?

18      A    That would be one source, yeah.

19      Q    What's another?

20      A    The assistant and deputy facility

21   administrators, chief of security.

22      Q    So before any blocking of phone numbers happens

23   you ses out whether there's that -- there's an outside

24   protest happening and you maybe say there's a threat,

25   and then you forward it along to someone else to make

Page  46

```
1    detainees on internal hunger strikes.  Some of it comes
2    from monitoring phone calls.  Some of it comes from
3    monitoring written measures from detainees.  There's a
4    number of different sources.  It's all combined and
5    sorted through and threats are identified or not.
6         Q    So do you write up every mention of an outside
7    protest?
8         A    I notify the warden, the facility
9    administrator, and -- well, pretty much from the chief
10   of security up and the captains if I have knowledge of a
11   protest that's going to occur.  Sometimes I'll hear it
12   from outside law enforcement.  Sometimes I'll hear it
13   from the detainees.  Sometimes I'll hear it from staff,
14   or social networking, whatever.  There's a number of
15   different sources.
16        Q    So are there situations where you're monitoring
17   a call, you suspect there's some protest happening on
18   the outside, do you have authority to go ahead and block
19   that number?
20             MS. AGUADO:  It's been asked and answered.
21             Go ahead.
22             THE DEPONENT:  It's kind of hypothetical.  I'm
23   not sure.
24   BY MS. HAROOTUN:
25        Q    Do you have authority on your own to block a
```

Page 48

1    number without getting approved by someone else, such as

2    the facility administrator or warden?

3         A    I suppose I could.  I don't.  I allow my boss

4    the courtesy of that knowledge and his decision-making.

5         Q    So then either all of the time or most of the

6    time you wait for your bosses decision on blocking the

7    number?

8         A    I suppose there are circumstances that could

9    evolve that are emergent in nature that might require

10   more drastic action.  I would not be able to specify

11   what you are talking about.

12        Q    You've never been in a situation where that

13   happened?

14        A    If I know -- I don't recall any situations

15   hearing them on the phones or anything that have been so

16   emergent that they're going to happen within the next

17   five minutes if I don't take some action.  Because

18   usually by the time I get to the phone calls they're

19   already recorded.

20             And it's a day, a week, or two weeks later when

21   I hear the call.  I don't live monitor as a general

22   activity.  I have a number of duties.

23        Q    So can you tell me more about your day-to-day

24   while we're on that subject.

25        A    No.  It's very full.  It goes in a number of

Page 49

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, Registered
 3    Professional Reporter, Certified Live Note Reporter, do
 4    hereby certify:
               That the foregoing proceedings were taken
 5    before me at the time and place herein set forth; that
 6    any witnesses in the foregoing proceedings, prior to
 7    testifying, were duly sworn; that a record of the
 8    proceedings was made by me using machine shorthand which
 9    was thereafter transcribed under my direction; that the
10    foregoing transcript is a true record of the testimony
11    given.
12              Further, that if the foregoing pertains to the
13    original transcript of a deposition in a Federal Case,
14    before completion of the proceedings, review of the
15    transcript [  ] was [  ] was not requested.
16    I further certify I am neither financially interested in
17    the action nor a relative or employee of any attorney or
18    party to this action.
19              IN WITNESS WHEREOF, I have this date subscribed
20    my name.
21    Dated: August 20, 2019
22
23
24
          RENEE A. PACHECO
25        CSR No. 11564 RPR, CLR
```

Page 80

# EXHIBIT 10

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    OMAR ARNOLDO RIVERA MARTINEZ;      )
      ISAAC ANTONIO LOPEZ CASTILLO;      )
 5    JOSUE VLADIMIR CORTEZ DIAZ; JOSUE  )
      MATEO LEMUS CAMPOS; MARVIN JOSUE   )
 6    GRANDE RODRIGUEZ; ALEXANDER        )
      ANTONIO BURGOS MEJIA; LUIS PENA    )
 7    GARCIA; JULIO CESAR BARAHONA       )
      CORNEJO, as individuals,          )
 8                                       )
                    Plaintiffs,          )
 9                                       )  CASE NO. 5:18-cv-01125-SP
                  vs.                    )
10                                       )
      THE GEO GROUP, INC., a Florida     )
11    corporation; THE CITY OF ADELANTO, )
      a municipal entity; GEO LIEUTENANT )
12    DURAN, sued in her individual      )
      capacity; GEO LIEUTENANT DIAZ,     )
13    sued in her individual capacity;   )
      GEO SERGEANT CAMPOS, sued in his   )
14    individual capacity; SARAH JONES,  )
      sued in her individual capacity;   )
15    THE UNITED STATES OF AMERICA; and  )
      DOES 1-10, individuals,            )
16                                       )
                    Defendants.          )
17    _____ )
18
19            DEPOSITION OF LEO MARVIN MC CUSKER
20                  ONTARIO, CALIFORNIA
21              WEDNESDAY, SEPTEMBER 4, 2019
22
23    REPORTED BY:
24    Carolyn Ann Peterson
      CSR No. 3195
25    Pages 1- 86
```

Page 1

```
 1        A    Chief of Security.
 2        Q    How long were you the Chief of Security at
 3   Adelanto?
 4        A    Approximately one year.
 5        Q    Before assuming that role, did you work at
 6   Adelanto?
 7        A    Yes, I did.
 8        Q    In what capacity?
 9        A    Captain.
10        Q    How long were you a Captain at Adelanto?
11        A    I believe three years.
12        Q    Prior to becoming a Captain, did you work at
13   Adelanto?
14        A    Yes, I did.
15        Q    In what capacity?
16        A    As a lieutenant?
17        Q    How long were you a lieutenant at Adelanto
18   Detention Center?
19        A    It would have been two years.
20        Q    Prior to becoming a lieutenant, did you work
21   at Adelanto?
22        A    No.
23        Q    Where did you work before starting your role
24   as a Lieutenant at Adelanto Detention Center?
25        A    I worked for the GEO Group in Phoenix,
```

Page 5

1        A       It covers -- I use the word "purpose" of the

2    OC being sprayed to disorient, to gain compliance, and

3    to gain those items, the pepper spray's action on the

4    body is to make it feel the effect of pepper -- or use

5    the term burning, although it's not literally burning,

6    but it's actually temporary.

7        Q       You said that the participants in the training

8    also would themselves be sprayed with the OC spray; is

9    that right?

10        A       That's correct.

11        Q       They were -- why was that done?

12        A       It's done to educate the user as to what to

13    expect.  The subject in the case of a real time use of

14    OC, to teach them what it is they are going to expose

15    this person to, for whatever reason whether or not you

16    think it's appropriate, because of how the individual

17    might act.  At least now you know what they are going to

18    experience, so you are better prepared to use it or not

19    use it.

20        Q       Have you yourself been sprayed with OC spray?

21        A       Yes, I have.

22        Q       I have heard testimony from a bunch of people

23    about how it feels to them.  How did it feel to you?

24        A       It burns.

25        Q       On a scale of zero to 10, where would you rank

Page 33

1   it?

2       A    I would rank it progressively over time

3   probably eight right now.  I factor in a big piece of

4   psychological into the affect of OC.  I know what it's

5   going to do, so if you were to spray me today, I'm

6   prepared mentally to know it's going to burn, and I

7   don't feel as I would 20 years ago when I was first

8   sprayed, and I see that over time with subjects that are

9   sprayed and it has no effect on -- or no outward effect.

10      Q    So you mean when you were first sprayed, you

11  didn't know what to expect, you didn't know how long it

12  was going to last, so the experience was more painful or

13  traumatic?

14      A    Correct.  Correct.  Your brain is telling you

15  this is not right, and everything is amplified, whatever

16  number of times.

17      Q    Okay.  As part of the lesson, you said that

18  participants also are taught the decontamination.  How

19  frequently are the participants taught the

20  decontamination in the lesson?

21      A    Well, let me give you the process.

22      Q    Thank you.

23      A    I'm the participant, I'm going to be sprayed.

24  I will be sprayed, and then I will have to perform a

25  series of tasks.  I will have to go from Point A to B

Page 34

1     that have been OC sprayed?

2          A     Yes.

3          Q     Where are they trained on that decontamination

4     process?

5          A     Training is part of the use-of-force lesson

6     plan discussing the decontamination as soon as possible

7     and shower.  Water is the preferred method of

8     decontamination.

9          Q     So is it fair to say that every officer that

10    works at Adelanto would have an understanding of how to

11    decontaminate someone who has been sprayed with OC

12    spray?

13         A     Yes, it is.

14         Q     Do the officers receive any training on the

15    temperature that the water should be when someone is

16    being decontaminated?

17         A     No, not in this lesson plan.

18         Q     Is there any training provided to officers as

19    to the impact of the water temperature on the sensation

20    someone feels after being OC sprayed?

21         A     No.

22         Q     And that's true both in the lesson that is

23    specific as to OC spray provided to the supervisors and

24    also in the new-hire service training?

25         A     No, the term "cool water" could be used.  I

```
 1    would to have read it to see exactly if it says cool

 2    water, but ideally it could can be cool rather, not

 3    required.

 4         Q    But there's no training on the -- for example,

 5    the effect of hot water on someone who has been OC

 6    sprayed?

 7         A    No.

 8         Q    In the pre-service training, are there any

 9    lessons or modules on detainees' constitutional rights?

10         A    Yes.

11         Q    Can you describe that module or modules?

12         A    The module entitled "Detainees' Rights" covers

13    the 4th Amendment search and seizure, 8th Amendment,

14    cruel and unusual punishment.  It touches on the right

15    to legal access to courts.  I think that's it.  14,

16    specific to ICE-related topics in the environment at

17    Adelanto, as opposed to criminal.  I think that's what

18    we cover.  Nothing else comes to mind.

19         Q    In that module or any of the other trainings,

20    are officers trained on detainees' rights to contact

21    their lawyers or communicate with their lawyers?

22         A    They are given information that affords the

23    detainees 24-hour access to phone systems to anyone they

24    want to call.

25         Q    There are times where Adelanto restricts
```

Page 38

1      Q      What training is provided to staff at

2    Adelanto, if any, on how to investigate an incident

3    involving the use of force?

4      A      The task of investigating a use of force is --

5    primarily a Captain or a Chief of Security reviews the

6    documents generated as a result of the use of force.

7    Documents would include the SIR, a general information

8    GIR report, but participants, a medical assessment

9    prepared by the medical people, review the video

10   available of the incident, correlate all that

11   information, and present it in a committee forum with

12   the Captain or Chief of Security, an ICE representative

13   and a medical representative.

14           All the paperwork is reviewed by those

15   individuals, and if the video is a factor, the video is

16   reviewed, a judgment is made as to whether the use of

17   force was justified or not.  That is the intention of

18   the committee.

19     Q      Among those documents, are there any documents

20   that contain detainees' statements about what happened

21   during the use of force?

22     A      No.

23     Q      Is there any training provided to the Captain

24   or the Chief of Security regarding how to assess the

25   information that is contained in the SIR, the GIR, the

Page 40

1        A      It would be situational.  There's nobody

2    saying you can only mark one, no, you can mark multiple,

3    yes.

4        Q      Part of the reason I ask that, there are two

5    boxes on this document that are crossed off the "major

6    disturbance" and the "minor disturbance" boxes.

7               Do you see that?

8        A      Yes, I do.

9        Q      Are those your initials next to the lines

10   crossing out those boxes?

11       A      Yes, they are.

12       Q      Why did you cross off these two boxes?

13       A      The term "disturbance" is the operative word,

14   if you will.  This incident is certainly considered a

15   use of force and was ultimately reported as such.  The

16   term "disturbance" could have a connotation of a riot,

17   for instance, as a worst case, and it wasn't felt that

18   that term "disturbance" accurately described the

19   incident.

20       Q      Where is the term disturbance defined, or if

21   you are an officer, how do you know what that means?

22       A      Typically, it's discussed amongst the

23   supervisors, the individuals and possibly administrators

24   as to the terminology to describe an incident.

25       Q      So is it fair to say that definition of the

Page 44

1    term sort of varies on a case by case basis?  Or what do
2    you mean?
3         A    I don't want to say it would vary.  The
4    incident in it's totality can be just a use-of-force
5    incident, such as this, with the detainees being pepper
6    sprayed.  If the term disturbance was going to be used,
7    it very likely would be coined as a disturbance by the
8    Facility Administrator before it was reported as a
9    facility disturbance.
10        Q    So I guess what I'm trying to understand, is
11   there a single definition of disturbance, or is it up to
12   interpretation and ultimately the decision of the
13   Facility Administrator?
14        A    Well, let me -- I don't have an answer.  I
15   can't cite the document that tells us what is or isn't a
16   disturbance, but there are documents that would identify
17   certain actions or incidents within the facility that
18   could be classified as a disturbance.
19        Q    Do you know where that document is?
20        A    It could be an attachment to the policy on
21   serious incident reports.  I don't know for a fact that
22   it is.
23        Q    Okay.  But there is a definition of major
24   disturbance and minor disturbance?
25             MS. AGUADO:  That misstates his testimony.  I

Page 45

1    think he explained something different, but go ahead.

2           THE WITNESS:  Well, I said, I can't cite the

3    actual document, but there is something that says what a

4    disturbance -- where you cross that threshold.

5    BY MS. STEINBACK:

6      Q    Does GEO train its officers on where that

7    threshold is crossed and what constitutes a disturbance?

8      A    No.

9      Q    Here did you make the decision ultimately that

10   it shouldn't be categorized as a major or minor

11   disturbance?

12     A    I don't recall whether I involved any other

13   persons in that decision, reading it today, I would not

14   change -- I would leave it as it is.  I wouldn't have

15   changed the disturbance.  I would have made the same

16   decision.

17     Q    Sitting here today, you still agree that it

18   was not a major or minor disturbance?

19     A    That is correct.

20     Q    What is the purpose of the "Subject" Box?

21          Maybe just to be more clear, so does it matter

22   whether you mark it as a major disturbance, a minor

23   disturbance or as here, under "Other use of force"?

24     A    It was a matter more in the area of our

25   categorizing it as an incident for documentation, number

Page 46

```
 1    spray, is a minor use of force?
 2         A    No.
 3         Q    Why not?
 4         A    The use-of-force criteria states that if OC or
 5    chemical weapons are utilized in use of force, then it's
 6    classified as a major use of force.
 7         Q    Is everyone in the facility trained on that?
 8         A    Yes.
 9         Q    Going further down, in the last box, it
10    states, "Reason For Use Of Force," and it has a variety
11    of categories.
12              Do you see that?
13         A    Yes.
14         Q    And in this document, the first category is
15    checked, which is "Confrontation avoidance proved
16    ineffective."
17              Do you see that?
18         A    Yes.
19         Q    Are staff at Adelanto trained on confrontation
20    avoidance?
21         A    Yes.
22         Q    Where do they receive training on
23    confrontation avoidance?
24         A    In the pre-service as a lesson or module.  I'm
25    uncertain if it's in in-service.
```

Page 51

1    they are -- the staff are trained in confrontation

2    avoidance, the reasons for it, and the techniques that

3    could be used to de-escalate a situation.

4         Q    And was that true in June of 2017 --

5         A    Yes.

6         Q    -- what you just described?

7         A    Yes.

8         Q    In the use-of-force training that has been

9    marked as Exhibit 2, there is a section on the use of

10   video cameras and the requirement that video cameras,

11   if possible, are used to document the force, correct?

12        A    Correct.

13        Q    And just to be clear, that's not an optional

14   policy, correct?

15        A    That's correct.  It's a directive policy that

16   the cameras be made available to the incident as soon as

17   practical.

18             MS. STEINBACK:  I'm going to hand you what I'm

19   marking as Exhibit 5.

20             (Whereupon Exhibit 5 was marked for

21             identification by the Court Reporter

22             And is attached hereto.)

23             MS. STEINBACK:  For the record, I just handed

24   to the deponent Exhibit 5, Bates-stamped 002238 through

25   02240.

Page 54

1       Q     So, for example, what would the discussion --

2    just looking at the next one, disturbance/riot, what

3    would the discussion around that have been?

4       A     It's going to be dependent on the instructor,

5    how the instructor relays personal experiences, for

6    instance, on disturbance/riot, they are not really

7    synonomous, although it seems to me they used it in that

8    context, but there would be, again, an explanation, not

9    Screen 3, a definition, an explanation of what would be

10   considered a disturbance or a riot.

11      Q     I know we already discussed disturbance.  Is

12   there a definition of a riot, or what a riot is?

13      A     I don't know that it's written by definition.

14      Q     Is there training on what a riot is or what

15   staff is supposed to classify what is a riot?

16      A     This training would be that.

17      Q     So the discussion, which can vary depending on

18   who the instructor is?

19      A     That's possible, yes.

20      Q     Would the same be true for hostage situation?

21      A     We have a class module that is hostage

22   situations, so it's further defined on its own merit.

23      Q     So of the list here, can you identify for me

24   which have a further module that helps define what the

25   situation is, just starting at the top.  Is there a

                                                    Page 62

```
1    further module or training on bomb threat?

2         A    No.

3         Q    Is there a further module or training on

4    disturbance/riot?

5         A    No.

6         Q    Escape?

7         A    Yes.

8         Q    Hostage situation?

9         A    (No audible response.)

10        Q    "Yes"?

11        A    Yes.

12        Q    Hunger strike?

13        A    No.

14        Q    Work stoppage or other job action?

15        A    No.

16        Q    Manmade disasters?

17        A    No.

18        Q    Immediate release of inmates from locked areas

19   including use of manual backup systems?

20        A    No.

21        Q    Evacuation of inmates, staff or visitors?

22        A    Not a specific module, but it's covered in

23   other topics, to include emergency situations.  We would

24   discuss that in the disturbance or riot, for instance,

25   what we are going to do as an after action or during the
```

Page 63

```
 1    action try to evacuate.
 2         Q    Okay.  Death?
 3         A    No.
 4         Q    Medical emergency?
 5         A    Medical has modules that discuss Code Blue,
 6    yes.
 7         Q    All right.  Back to -- turning to the next
 8    page is medical emergency.  It's my understanding you
 9    are also here to testify on detainee complaints
10    regarding the showers and water at Adelanto.
11              During your time at Adelanto, have you heard
12    detainee complaints about the temperature of the water
13    in the showers?
14         A    Yes, I have.
15         Q    How recently have you heard those complaints?
16         A    Not within the past year.  It's difficult to
17    say.  Several months back, I might have heard something
18    about temperature.
19         Q    I know it's very specific to ask -- do you
20    remember hearing any complaints about the temperature of
21    the water in the shower in June of 2014?
22         A    No, I don't remember that.
23         Q    When -- for the incident that you recall, did
24    you recall hearing any complaints about -- what were the
25    complaints?
```

Page 64

1     A     I have heard both no hot water and hot water

2     too hot.  I have heard both.

3     Q     Have those been in specific areas within the

4     facility or throughout the facility?

5     A     They would have been in specific areas.

6     Q     Do you remember what specific area you heard

7     those complaints about?

8     A     I do not.

9     Q     Were those complaints conveyed to you orally

10    or in writing?

11    A     Orally.

12    Q     Did the detainees come up to report the

13    complaints, or did you overhear it, for example, if you

14    were walking through an area in the facility?

15    A     They would have approached me directly during

16    us casually passing.  And that as -- the Captain, in

17    their eyes, is the guy that fixes everything, that's why

18    it would even be brought up to me.

19    Q     Okay.  When those complaints were made to you,

20    did you document them anywhere?

21    A     Yes.

22    Q     Where did you document them?

23    A     They are documented in the form of a repair

24    order request or work order request.

25    Q     Did you follow up to see what happened with

Page 65

1        Q     And it sounds, as you described it, that was

2    an issue with more than one staff member.

3        A     It's happened on occasion as to the extreme of

4    the remedial training over the same two year period of

5    time, probably half a dozen people have gotten that

6    training.

7        Q     Are there any other topics that have been the

8    subject of coaching to more than one individual, like

9    any other common issues?

10       A     I'm sure there have been, but none come to

11   mind.  Count procedures is one that came to mind because

12   it's rather significant, even more significant than the

13   other one I mentioned with the logbook entries.

14             Logbook entry retraining, somebody putting

15   their opinion in the logbook rather than just the facts,

16   not the end-all to the day, but something that needs to

17   be addressed with the individual.

18       Q     And the reason the count procedure is so

19   important is because that's the mechanism by which you

20   ensure that no one has absconded from the facility?

21       A     Correct.

22       Q     Did you communicate in any way with anyone

23   outside of GEO about the June 12, 2017 hunger strike?

24       A     Anyone outside of GEO?

25       Q     Yes.

                                              Page 73

```
1        Q     So your understanding is based on an account

2    that someone else created to describe what happened that

3    day?

4        A     Yes.

5        Q     You don't have any firsthand knowledge?

6        A     No.

7        Q     Did you ever go speak to any of the men to

8    either confirm or dispute their accounts?

9        A     I don't recall talking to any of them.

10       Q     In your experience at Adelanto, how many

11   hunger strikes, to your knowledge, have been declared?

12       A     I couldn't put a number on it.  Many.

13       Q     Can you estimate?

14       A     It's not routine, but it's not uncommon that a

15   detainee will, as a lever to whatever end, say, "I'm

16   going on a hunger strike."  And that could happen

17   sometime -- in 12 months, could happen maybe six times.

18       Q     And the reason for declaring the hunger --

19   strike that.

20             GEO trained its staff to take the declaration

21   seriously, right?

22       A     Yes.

23       Q     Because there could be serious consequences if

24   someone goes on a hunger strike?

25       A     There could be.
```

Page 76

```
 1              MS. STEINBACK:  Back on.
 2       Q    You previously testified to some retraining
 3   that you do of individual staff following grievances.
 4   And I don't know if I asked this, but in case I didn't,
 5   have there been any changes to the general trainings as
 6   a result of grievances or other detainee complaints?
 7       A    No.
 8       Q    Okay.  I know we have also discussed some
 9   terms, including disturbance and riot.  Another term
10   that we have seen used is rebellion.  Is there a single
11   definition of what a rebellion is for inmate or detainee
12   situation?
13       A    That term, "rebellion," I have never used it
14   in my work history.
15       Q    In your entire work history?
16       A    Right.
17       Q    Why is that?
18       A    I think the term rebellion is synonymous with
19   either riot or disturbance and just is not used.
20              To me it's an archaic word.
21       Q    Have you ever been in a situation that you
22   would categorize as a rebellion in your professional
23   setting?
24       A    I likely could have used the word rebellion --
25   that's the group that were rebelling against the
```

Page 80

1    particular meal that they received -- something in that

2    context, but I have never used the word.

3         Q    Okay.  I would use the connotation of

4    rebellion as something slightly more than rebelling

5    against or expressing distaste for a meal.

6              Would that be fair to say?

7         A    It could be.  I just don't use it.  In

8    thinking about it, having been asked, I would see a

9    country rebellion occurring, but not in the context of a

10   facility detainee or inmate facility, I haven't heard

11   that.

12        Q    Is it fair to say in all the training that you

13   have both done and sat through, you have not been

14   trained on rebellions?

15        A    When I do that specific course, I use -- I say

16   the word rebellion.  I say disturbance, riot or

17   rebellion, because it's written on there.  I don't

18   elaborate on it.

19        Q    Have you ever seen any officers use the term

20   rebellion to describe --

21        A    Not that I recall.

22        Q    You described the grievance process and your

23   work with the grievance coordinator when you were the

24   Chief of Security.

25              I just have a few more questions.

                                            Page 81

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, CAROLYN ANN PETERSON, Certified Shorthand

 4      Reporter, do hereby certify:

 5           That prior to being examined, the witness in

 6      the foregoing proceeding was by me duly sworn to testify

 7      to the truth, the whole truth, and nothing but the

 8      truth.

 9           That said proceedings were taken before me at

10      the time and place therein set forth and were taken down

11      by me stenographically at the time and place therein

12      named and thereafter reduced to computerized

13      transcription under my direction and supervision;

14           I further certify that I am neither counsel

15      for nor related to any party in said proceedings, nor in

16      any way interested in the outcome thereof.

17           IN WITNESS WHEREOF, I have hereunto subscribed

18      my name this date:  SEPTEMBER 25, 2019.

19

20

21

22

             CAROLYN ANN PETERSON, CSR 3195

23

24

25

                                              Page  86
```

# EXHIBIT 11

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2               FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4
     OMAR ARNOLDO RIVERA MARTINEZ;        )
 5   ISAAC ANTONIO LOPEZ CASTILLO;        )
     JOSUE VLADIMIR CORTEZ DIAZ; JOSUE    )
 6   MATEO LEMUS CAMPOS; MARVIN JOSUE     )
     GRANDE RODRIGUEZ; ALEXANDER          )
 7   ANTONIO BURGOS MEJIA; LUIS PENA      )
     GARCIA; JULIO CESAR BARAHONA         )
 8   CORNEJO, as individuals,            )
                                          )
 9               Plaintiffs,              )
                                          )  CASE NO. 5:18-cv-01125-SP
10               vs.                      )
                                          )
11   THE GEO GROUP, INC., a Florida       )
     corporation; THE CITY OF ADELANTO,  )
12   a municipal entity; GEO LIEUTENANT  )
     DURAN, sued in her individual        )
13   capacity; GEO LIEUTENANT DIAZ,       )
     sued in her individual capacity;    )
14   GEO SERGEANT CAMPOS, sued in his     )
     individual capacity; SARAH JONES,   )
15   sued in her individual capacity;    )
     THE UNITED STATES OF AMERICA; and    )
16   DOES 1-10, individuals,             )
                                          )
17               Defendants.              )
     _____)
18
19               DEPOSITION OF JAMES JANECKA
20                  ONTARIO, CALIFORNIA
21              WEDNESDAY, SEPTEMBER 4, 2019
22
23   REPORTED BY:
24   Carolyn Ann Peterson
     CSR No. 3195
25   Pages 1- 112
```

Page 1

```
 1    whole facility or just portions of it?

 2         A    Portions at a time.

 3         Q    How did you decide where to walk through when

 4    you would do your walk-through?

 5         A    It depends where I was at the time.  Just try

 6    to hit different areas, living areas and different

 7    departments on different days.

 8         Q    When you did a walk-through, would you carry

 9    any kind of notebook or material with you so you can

10    document if someone told you something you want to

11    remember?

12         A    Sometimes carried little three-by-five cards.

13         Q    Just cards?

14         A    Yes.

15         Q    Yes?

16         A    Yes.

17         Q    During those walk-throughs in June of 2017, if

18    a detainee did make a complaint to you verbally, would

19    you document it?

20         A    Not necessarily.

21         Q    How would you make the decision in June of

22    2007 whether or not to document a complaint that a

23    detainee made to you?

24         A    It would be if it was an urgent matter, if it

25    was something that was what I would consider a serious
```

Page 32

1    matter versus something that could easily be taken care

2    of right on the spot.

3         Q    What would you do with the information that

4    the detainees gave you when they made their complaints

5    to you?

6         A    If it was something that a certain department

7    needed to maybe give me some information or provide to

8    the detainee, I would contact that department or that

9    individual.

10        Q    How would you contact them telephonically,

11   e-mail, some other way?

12        A    Majority is telephonically.

13        Q    So there were telephones at Adelanto?

14        A    Yes.

15        Q    Were telephones the primary way that you

16   communicated with people at Adelanto that weren't in the

17   direct vicinity of where you were?  I'm talking about

18   June of 2017.

19        A    Yes.

20        Q    Other than contacting people via telephone,

21   would you communicate with them in any other way?  For

22   example, written or walking up to them to have a

23   conversation about it?

24        A    Sometimes personally face-to-face, sometimes

25   e-mail.

                                          Page 33

```
 1        A    I don't have a written schedule that tells me

 2    my hours, when I get there and when I go home.

 3        Q    Oh, okay.  That's a nice gig.

 4             I'm sure when you are not there, you also have

 5    to be reachable because you are the Warden, correct?

 6        A    Correct.

 7        Q    In terms of being reachable, how are you

 8    reachable when you are not at Adelanto?

 9        A    My cell phone, my home phone.

10        Q    Have there been instances since you have been

11    Warden at Adelanto that you have been called either on

12    your cell phone or home phone before or after hours?

13        A    Yes.

14        Q    Would you say that is infrequent, a normal

15    occurrence, or frequent?

16        A    It's periodically.

17        Q    Can you just give me an example of the types

18    of things that the staff will call you for when you are

19    not at the facility?

20        A    It would have to do with some sort of serious

21    incident.

22        Q    If there's a serious incident that happens

23    when you are not at the facility, are staff required to

24    contact you as the Warden?

25        A    Depending on the level of the severity, yes.
```

```
 1        Q    If there's an incident that is going to
 2   ultimately require use of force, and you are not at
 3   Adelanto -- by use of force, I'm specifically referring
 4   to the use of pepper spray -- are staff required to
 5   contact you even though you are not at the facility?
 6             MS. AGUADO:  Objection, incomplete
 7   hypothetical.
 8             THE WITNESS:  It depends if it's an immediate
 9   or calculated use of force.
10   BY MS. STEINBACK:
11        Q    Can you tell me the difference between those
12   two?
13        A    Yes.
14        Q    What is that?
15        A    Immediate use of force is if an incident
16   happens right in front of you, verbal commands are not
17   effective at the moment and are not appropriate due to
18   the need to protect yourself or others.
19             And a calculated use of force can be in an
20   area that you have time to make a notification.
21        Q    So if a staff member is in a situation where
22   they have time to make a notification, they are required
23   to contact you, even if you are off duty at home?
24             MS. AGUADO:  Incomplete hypothetical.
25             Go ahead.
```

                                                    Page 60

```
 1    you have time to make the notification, but if that
 2    individual was to start making gestures or it appears
 3    that it's imminent, that's it's going to happen, then
 4    you can initiate the use of force with OC spray as to
 5    protect self-harm, prior to making any notification.
 6         Q    In that situation where you need to initiate
 7    before making a notification, at what point are the
 8    staff required to contact you to let you know this has
 9    occurred?
10         A    Typically I get a phone call from the
11    Administrative Duty Officer within an hour or two of
12    the incident.
13         Q    What is an Administrative Duty Officer?
14         A    Its an individual that carries the
15    administrative duty through the weekends and after
16    hours, they are the first contact.
17         Q    Is that individual at Adelanto?
18         A    Yes.
19         Q    So is there always an Administrative Duty
20    Officer at Adelanto?
21         A    Yes.
22         Q    Is that person's function essentially to be
23    your surrogate when you are not there?
24         A    Yes.
25         Q    In June of 2017, do you know, was there one
```

Page 62

```
 1    resources that are at the facility.
 2        Q    Have you -- since you began your tenure at
 3    Adelanto, have there been any rebellions?
 4        A    No.
 5        Q    Since you began your tenure at Adelanto
 6    Detention Center, have there been any riots?
 7        A    No.
 8        Q    Since you began your tenure at Adelanto
 9    Detention Center, have there been any attempted
10    rebellions?
11        A    Can you be more specific?
12        Q    Sure.  I have seen in a number of policy
13    documents reference to rebellions and riots or attempted
14    rebellions and riots, so actually maybe I need to ask
15    you, what does that mean?  What is an attempted
16    rebellion?
17        A    If you are referring to the emergency plan, it
18    would be a major -- a large group of individuals that
19    were there would rebel or try to maybe overtake an area
20    of the institution.  So no, there has not been any.
21        Q    Okay.  In June of 2017, you previously said
22    that you were required to report serious incidents to
23    ICE, correct?
24        A    Correct.
25        Q    When there was a use of force -- strike that.
```

Page 68

1                     Did a use of force constitute a serious

2       incident that would be -- you would be required to

3       report to ICE in June of 2017?

4            A    Yes.

5            Q    Is that true for all uses of force?

6            A    Yes.

7            Q    How do you report those uses of force to ICE?

8       By that, what documentation would you relay to ICE?

9            A    Could be an e-mail, could be verbal -- and ICE

10      is involved with the after-action review.

11           Q    What was the purpose of reporting use of force

12      to ICE, if you know?

13           A    It's a contractual requirement.

14           Q    It was your understanding that ICE would then

15      do something with that information?

16               MS. AGUADO:   Objection, calls for speculation.

17               THE WITNESS:   I don't know ICE's processes.   I

18      don't get involved if they have reporting requirements

19      and what their timeframes are.   I'm not familiar with

20      their processes.

21      BY MS. STEINBACK:

22           Q    Okay.   Is it fair to say you don't know why

23      you gave the documentation or reported the information

24      to ICE, other than because it was contractually required

25      of you?

                                                 Page 69

1              Is this an e-mail that was sent by you.

2      Correct?

3          A    It's part of the SIR System, Serious Incident

4      Report System.

5          Q    So was this e-mail automatically generated by

6      the SIR System?

7          A    Yes.

8          Q    So is it accurate to say this e-mail, like the

9      e-mail marked as Exhibit 4, was sent to the individuals

10     according to the SIR?

11         A    This is the initial entry by whoever entered

12     it.  I'm talking Exhibit 4.

13         Q    Okay.

14         A    It appears that Leo McCusker entered the

15     initial serious incident, okay, and this is where I

16     actually transmitted formally to corporate.  It's a

17     two-step process.

18         Q    And this is how it was done routinely in June

19     of 2017?

20         A    Yes.

21         Q    It's the use of force process?

22         A    Yes.

23         Q    Before transmitting the SIR to corporate, did

24     you review the information that was inputted to that SIR

25     in any way?

Page 80

1           Is this an e-mail that was sent by you.

2     Correct?

3           A     It's part of the SIR System, Serious Incident

4     Report System.

5           Q     So was this e-mail automatically generated by

6     the SIR System?

7           A     Yes.

8           Q     So is it accurate to say this e-mail, like the

9     e-mail marked as Exhibit 4, was sent to the individuals

10    according to the SIR?

11          A     This is the initial entry by whoever entered

12    it.  I'm talking Exhibit 4.

13          Q     Okay.

14          A     It appears that Leo McCusker entered the

15    initial serious incident, okay, and this is where I

16    actually transmitted formally to corporate.  It's a

17    two-step process.

18          Q     And this is how it was done routinely in June

19    of 2017?

20          A     Yes.

21          Q     It's the use of force process?

22          A     Yes.

23          Q     Before transmitting the SIR to corporate, did

24    you review the information that was inputted to that SIR

25    in any way?

                                                    Page 80

```
1        A    Yes.

2        Q    What was that review?

3        A    I looked at the narrative of the SIR.  If I

4    need any clarification or further information, I'll ask

5    for it before I transmit it.

6        Q    And once its finalized, and you feel that its

7    ready, then you transmit it to corporate?
```

```
8        A    Myself or one of the other administrators.

9             MS. STEINBACK:  I'm handing the deponent a

10   document that has been marked Exhibit 6, which is

11   Bates-stamped GEO 02226 through 02233.

12             (Whereupon Exhibit 6 was marked for

13             identification by the Court Reporter

14             And is attached hereto.)

15   BY MS. STEINBACK:

16        Q    Is this the serious incident report that you

17   have been discussing throughout your testimony?

18        A    Yes.

19        Q    Is this a template created by GEO Corporate?

20        A    Yes.

21        Q    Who is supposed to -- according to GEO's

22   policies and practices, who is supposed to input the

23   information into the SIR?

24        A    It starts with the shift supervisor level.

25        Q    So the shift supervisor is the first one who
```

Page 81

```
 1    is supposed to input information about this serious

 2    incident into this report?

 3         A    Yes.

 4         Q    What information is the shift supervisor

 5    required to input into the report in order to make it a

 6    complete and accurate report?

 7         A    The narrative, the type of incident,

 8    participants, the date, the time that the client was

 9    notified, and then some of the details of the actual

10    incident.

11         Q    Would it be accurate to say that the shift

12    supervisor should go through each of the categories of

13    information in this template, and if it applies to the

14    incident, should input information responsive to the

15    category into his report?

16         A    Yes, if they have got the information.

17         Q    And that's incorporated within GEO's policies

18    and practices?

19         A    Yes.

20         Q    And that's for purposes to generate a complete

21    and accurate report, correct?

22         A    Yes.

23         Q    So, for example, I'm just looking at the page,

24    Bates-stamped at the bottom GEO 02229.  For example, if

25    an inmate had escaped during the course of this serious
```

Page 82

```
 1    incident, the shift supervisor would be required to
 2    input information under escape information, correct?
 3         A    Yes.
 4         Q    Similarly, underneath that, if there was
 5    exposure information, the shift supervisor would be
 6    required to input that information into the report?
 7         A    Yes.
 8         Q    After the shift supervisor has input
 9    information into this report, what happens to it?
10         A    It goes to a review mode.  The notification --
11    once they enter the information, there's a notification
12    that goes out to the distribution list.  And I can go
13    back to Exhibit 4 -- that is the initial notification,
14    so it's there for review, and then it will be
15    transmitted by one of the Administrators -- myself or
16    one of the other Administrators.
17         Q    After that initial notification to the list,
18    that is contained in Exhibit 4, are the individuals on
19    that list permitted to go in and review this serious
20    incident report to make sure the information that's
21    needed to be in there is in there?
22         A    As Facility Administrator, other individuals
23    that are in that distribution list, I don't know their
24    accesses.
25         Q    Are the administrators of the facility
```

Page 83

```
 1        A     Correct.

 2        Q     Does that indicate that it has been

 3   transmitted?

 4        A     It's status was.  It's transmitted, yes.

 5        Q     But that doesn't indicate who it is that

 6   transmitted the documents?

 7        A     No.

 8        Q     Should there be a category in this form that

 9   states who transmitted the document?

10        A     Not that I know of.

11        Q     So looking at this report, its not possible to

12   tell who finalized and signed off on the report?

13        A     Not that I can tell.

14        Q     Are those your initials on the first page over

15   your e-mail address?

16        A     Yes.

17        Q     Why did you initial it?

18        A     I initial every one.  My secretary prints

19   them, and once they get sent and transmitted into their

20   database, my name appears on every one of them as being

21   the Facility Administrator.  So each one of them, my

22   secretary brings them to me periodically, and I sign

23   them.

24        Q     What happens with the document after you sign

25   it?
```

1  Q Other than meeting the 14-day physical

2 examination requirement, what other medical care issues

3 have been brought to your attention as being not

4 compliant with PBNDS?

5  A I don't remember specifically.  There were a

6 couple issues with meetings, sick calls, timelines, and

7 I don't remember the specifics of all the findings.

8  Q If the facility is not compliant with the

9 PBNDS, is it your ultimate responsibility to ensure that

10 it gets into compliance, because you are the Warden?

11  A Ultimately, yes.

12  Q Other than ICE's inspection of Adelanto, have

13 there been any other scheduled or unscheduled

14 inspections from outside entities at Adelanto since you

15 have been the Warden?

16  A Yes.

17  Q What other outside entities have performed

18 scheduled inspections at Adelanto?

19  A We had Civil Rights, Civil Liberties,

20 Disability Rights of California, Office of Detention

21 Oversight, Office of Inspector General, ICE Health

22 Services Core.  We have had Nakamoto Group -- there's

23 been several.

24   MS. AGUADO:  For purpose of this deposition,

25 just limit it to certain inspections of certain

Page 93

1   up the privacy curtains, much to the detainees

2   disagreement, but that's been enforced, and that's no

3   longer allowed, and we no longer restrain detainees on a

4   routine basis in the disciplinary side of special

5   management, strictly on a case-by-case basis if someone

6   is acting out.

7        Q    Have you made any other changes in response to

8   the OIG report?

9        A    I don't recall each specific finding at this

10  time, so I don't want to misspeak if we made other

11  changes.

12       Q    When you say, "We made changes," are you

13  talking about specifically at Adelanto, or did GEO

14  Corporate make those changes?

15       A    Specifically at Adelanto.

16       Q    Who is the person authorized to make those

17  changes at Adelanto?  Was it you?

18       A    Me.  Me in coordination with ICE.

19       Q    On the GEO side, it would be because you are

20  the final decision-maker at Adelanto for GEO, correct?

21       A    Correct.

22            MS. STEINBACK:  Can we go off the record a

23  minute?

24            MS. AGUADO:  Sure.

25            (Short recess was taken.)

Page 102

```
 1        Q    So you don't recall whether you wait 72 hours
 2   and then at that point create the SIR?
 3        A    I don't recall.
 4        Q    Okay.  But at some point, you create an SIR
 5   when the hunger strike has been verified?
 6        A    Correct.
 7        Q    You would send -- would you send that in the
 8   same use of force report through the SIR database?
 9        A    Correct.
10        Q    And then the e-mail notification, just like
11   with the use-of-force SIR?
12        A    Correct.
13        Q    Other than reporting a hunger strike to ICE,
14   would you also be required to report it to the City of
15   Adelanto?
16        A    No.
17        Q    And to be clear, in June of 2017, were you
18   required to report any serious incident to the City of
19   Adelanto?
20        A    I have never been required to.
21        Q    In June of 2017, were you required to report
22   anything about the facility to the City of Adelanto?
23        A    No.
24        Q    You already testified that the City of
25   Adelanto did not perform any inspections of Adelanto
```

Page 107

1    during your tenure as Warden.

2         Did they ever come over for meetings?

3    A    Periodically.

4    Q    What was the purpose of those meetings?

5    A    A few of the city council members would attend

6    our quarterly Community Advisory Board Meetings.

7    Q    What is the Community Advisory Board Meeting?

8    A    They are comprised of individuals from the

9    community.  Some of them are -- we have local government

10   officials, some are local business owners, or some are

11   editors in the area, and there's general meeting to

12   discuss what goes on in all of our different areas.

13   Q    Are those meetings run by the GEO Group?

14   A    Yes.

15   Q    What's the purpose of those meetings?

16   A    Its for community relations.

17   Q    So it's not like the City in attending the

18   meetings had the ability to approve or deny something

19   that GEO was doing at Adelanto?

20   A    No.

21   Q    They are basically information-sharing

22   meetings, would that be fair to say --

23   A    Yes.

24   Q    -- that were open to the community?

25   A    Yes.

Page 108

# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   OMAR ARNOLDO RIVERA MARTINEZ,  ) NO. 5:18-cv-01125
     et al.,                       )              R-GJS
 5                                 )
                    Plaintiffs,    )
 6                                 )
                                   )
         v.                        )
 7                                 )
     THE GEO GROUP, INC., et al.,  )
 8                                 )
                    Defendants.    )
 9   _____)

10

11

12

13            DEPOSITION OF JESSIE FLORES

14               Riverside, California

15               Friday, June 28, 2019

16

17

18

19

20

21

22   Reported by:

23   Heidi Hummel-Grant

24   CSR No. 12556

25   PAGES 1 - 114
```

CERTIFIED TRANSCRIPT

Page 1

```
 1      A    I'm sorry.                                    10:00

 2      Q    Sorry.  Go ahead.  Complete your answer?

 3      A    I've been in this capacity ever since.

 4      Q    When did that happen?

 5      A    August of 2018.                               10:00

 6      Q    And is your current status still interim City

 7   manager, or have you been appointed more permanently

 8   now?

 9      A    Yes, I've been appointed more permanently.

10      Q    When did that happen?                          10:01

11      A    November of 2018.

12      Q    Is one of your current job duties liaising with

13   GEO Group?

14      A    No.

15      Q    Is one of your current job duties inspecting the   10:01

16   Adelanto Detention Facility?

17      A    No.

18      Q    Is there someone at the City responsible for

19   inspecting the Adelanto Detention Facility?

20      A    No.                                           10:02

21      Q    Is there someone at the City responsible for

22   liaising with the GEO Group?

23      A    No.

24      Q    Does the GEO Group ever communicate with you?

25      A    Yes.                                          10:02
```

Page 15

```
 1    knowledge or dates on the contract?                    10:31

 2        THE WITNESS:  Dates on the contract.

 3            Well, they both appear to have the same dates.

 4        MS. SWEETSER:

 5        Q   Is one --                                       10:31

 6        A   Correction one's 17th and 27th, sorry.

 7        Q   So it looks like the services contract was

 8    entered into and then the MOU was entered into; is that

 9    correct?

10        A   Yes.                                            10:31

11        Q   Have you spoken with Mr. Hart about this

12    correct?

13        A   No.

14        Q   Is it your understanding that at the time the

15    City entered into this contract it had already executed  10:32

16    an intergovernmental services agreement with ICE?

17        A   I don't know.

18        Q   Is there someone at the City who would know?

19        A   No.

20        Q   And that's because Mr. Hart left the City?      10:32

21        A   Yes.

22        Q   Just looking at the face of the contract there's

23    a number of whereas provisions at the front.  It looks

24    like the contract is specifying that GEO Group would act

25    as a subcontractor for the City.                        10:32
```

Page 36

```
 1        A    Yes.                                          10:36

 2        Q    This contract further required that the service

 3   provider adopt a quality assurance surveillance plan; is

 4   that right?

 5        A    Yes.                                          10:36

 6        Q    And when the contract refers to the service

 7   provider, they're referring to the City of Adelanto; is

 8   that correct?

 9        A    Yes.

10        Q    In your role as the City manager have you ever  10:36

11   had contact with the ICE contracting officer's technical

12   representative?

13        A    No.

14        Q    Do you know if your predecessors in your

15   position ever had contact with the contracting officer's  10:36

16   technical representative?

17        A    I don't.

18        Q    Do you know if there's any procedure or process

19   at the City to get in touch with COTR, which I'll

20   represent to you is the contracting officer's technical  10:37

21   representative?

22        A    For ICE?

23        Q    For ICE.

24        A    No.

25        Q    Do you have the contact information for that   10:37
```

Page 39

```
 1        A    No.                                           10:38

 2        Q    Did any employee of the City of Adelanto review

 3   documents such as post logs, policies and records of

 4   corrective action created by GEO Group?

 5        A    No.                                           10:39

 6        Q    Was there any mechanism in place at the City to

 7   ensure that GEO was creating this documentation?

 8        A    We contracted with GEO to provide all of these

 9   services for the City of Adelanto.

10        Q    So if they didn't provide these documents, they    10:39

11   would be in breach of the contract the City had with

12   them; correct?

13        A    I don't know.

14        MS. AGUADO:  Objection, belated, to legal

15    conclusion.                                           10:39

16          But go ahead, which you already did.

17        MS. SWEETSER:

18        Q    Was it your understanding that the contract

19   required GEO Group to create such documentation?

20        A    It's my understanding that we contracted with    10:39

21   GEO to maintain all documentations, policies, procedure

22   and oversee the facility on behalf of the City.

23        Q    Do you know if when Ms. Herrera visited the

24   facility if she looked at documentation?

25        MS. AGUADO:  Assumes facts.  Lacks foundation.    10:40
```

Page 41

```
 1        A    Federal, state and local.                    10:43

 2        Q    Which federal agencies do you know frequent the

 3   facility?

 4        A    Well, we've had a number of legislatures and

 5   county representatives attend -- attend meetings at the    10:43

 6   detention center and tour the facility, all the way from

 7   Dianne Feinstein's representatives to our state

 8   assemblyman, our senate, senators themselves and/or

 9   their representatives.

10        Q    Besides elected officials and their staff, are  10:44

11   there other federal agencies you're aware of inspecting

12   the facility?

13        A    Yes, the attorney general's office it's my

14   understanding is there on a regular basis.

15        Q    How did you reach that understanding?          10:44

16        A    They -- the attorney general's office has

17   visited the City of Adelanto and has made that clear to

18   us.

19        Q    Did they meet with you to discuss the facility?

20        A    Yes.                                            10:44

21        Q    Did they discuss the quality of training at the

22   facility?

23        A    I don't remember.

24        Q    Did they discuss generally whether the

25   performance-based national detention standards are being  10:45
```

Page 44

```
 1    followed at the facility?                              10:45

 2         A    I'm sorry?

 3         Q    Did the AG's office discuss with City officials

 4    whether the performance-based national detention

 5    standards were being followed?                         10:45

 6         A    Yes.

 7         Q    And what do you remember them saying about that?

 8         A    I don't remember.

 9         Q    Do you remember any deficiencies they

10    identified?                                            10:45

11         A    Yes.

12         Q    What were those.

13         A    I believe there were healthcare issues that they

14    were concerned about, the inmates not receiving adequate

15    healthcare services.   That's what comes to mind.      10:45

16         Q    Do you remember when that meeting took place?

17         A    January, February of this year, 2019.

18         Q    Was there an OIG report being discussed?

19         A    Yes.

20         Q    When did the OIG report first come to your      10:46

21    attention?

22         A    Beginning of this year.

23         Q    Did you discuss corrective actions that could be

24    taken at the facility?

25         MS. AGUADO:   Objection.  This is irrelevant.  It has  10:46
```

Page 45

```
 1        THE WITNESS:  No.                              10:47

 2        MS. TISHKOFF:  It's irrelevant.

 3        MS. SWEETSER:

 4        Q    Your answer was no?

 5        A    My answer was no.                          10:48

 6        Q    How many meetings did you have with the attorney

 7   general's office about the OIG report?

 8        A    Two.

 9        Q    Were they both in January and February of 2019?

10        A    Yes.                                       10:48

11        Q    At those meetings did you discuss whether

12   detainees had previously raised concerns about the

13   medical care?

14        A    Yes.

15        Q    What did you discuss about that?           10:48

16        A    There was no discussion.  It was just brought to

17   our attention what the complaint was.

18        Q    Did you look at anything such as a grievance log

19   for the facility?

20        A    No.                                        10:49

21        MS. AGUADO:  Assumes facts.  Lacks foundation.

22        Go ahead.  You've already answered.

23        MS. SWEETSER:

24        Q    Did you look at any past grievances that had

25   been presented from the facility?                    10:49
```

Page 47

```
 1    discussed, were there any other meetings you had with        10:54

 2    the attorney general or their office about the facility?

 3         A    No.

 4         Q    Were there are any other federal agencies that

 5    have requested to meet with City officials about the         10:54

 6    facility?

 7         A    No.

 8         Q    You said you haven't met before with the COTR

 9    for the facility; correct?

10         A    Correct.                                            10:54

11         Q    Do you know if the people you met with from the

12    attorney general's office, what their department was?

13         A    No.

14         Q    And going back to what we were talking about,

15    annual meetings with local, state and federal officials,     10:55

16    was there any annual meeting with the City officials to

17    discuss the execution of contract by GEO?

18         A    No.

19         Q    Was there any kind of quality control review of

20    how GEO was performing under the contract?                   10:55

21         MS. AGUADO:  Objection.  It's vague.  Ambiguous.

22              Go ahead.

23         THE WITNESS:  What's the question, I'm sorry?

24         MS. SWEETSER:

25         Q    Was there any kind of review or quality control    10:55
```

Page 51

```
 1    plan by the City to assess how GEO was performing the        10:55

 2    contract?

 3        A    GEO performed all of -- we hired GEO to perform

 4    all of those tasks, duties or responsibilities on our

 5    behalf.  The City of Adelanto's behalf.                      10:56

 6        Q    Was there any kind of quality control or

 7    assessment by the City of how the -- whether the

 8    performance was happening?

 9        A    We relied on GEO to perform all of those

10    responsibilities on our behalf.                             10:56

11        Q    So the City didn't have any mechanism to assess

12    whether they were performing it in accordance with the

13    terms?

14        A    I don't know.

15        Q    As far as you're aware there was no such           10:56

16    mechanism?

17        MS. AGUADO:  And aside from what he's already

18     discussed the federal agencies giving notice of issues

19     or something more specific?

20        MS. SWEETSER:  I'm asking about City mechanisms.         10:56

21        Q    As far as you're aware was there any City

22    assessment or quality control mechanism to determine

23    whether GEO was performing the contract the way -- in

24    complying with the terms?

25        A    No, we relied on GEO for -- to oversee the         10:57
```

Page 52

```
 1    detention center or behalf of the City of Adelanto.        10:57
 2        Q    Did any City employee ever review training
 3    documents from the GEO Group?
 4        MS. AGUADO:  Calls for speculation.
 5            If you know.                                        10:57
 6        THE WITNESS:  No.  Actually, I don't know.
 7        MS. SWEETSER:
 8        Q    You're not aware of any such --
 9        A    I'm not.
10        Q    Did any City employee ever review training        10:57
11    documents from Correct Care Solutions?
12        MS. AGUADO:  Lacks foundation.  Assumes facts.
13     Calls for speculation.
14        THE WITNESS:  I don't know.
15        MS. SWEETSER:                                           10:58
16        Q    You're not aware of any such review?
17        A    I'm not.
18        Q    Are you aware that at some point GEO Group
19    subcontracted its healthcare at the facility?
20        A    That's my understanding.                          10:58
21        Q    Did the City have any say in whether or not that
22    healthcare was subcontracted?
23        A    No.
24        Q    There's no provision in the contract that you're
25    aware of that would limit subcontracting by the            10:58
```

Page 53

```
 1        Q   Do you know under this agreement did the       11:26

 2    San Bernardino Sheriff's Department have an obligation

 3    to make City employees aware of problems at the

 4    facility?

 5        MS. AGUADO:  The agreement between the City and the    11:26

 6     police department or the sheriff's department?  Is that

 7     what you're talking about?

 8        MS. SWEETSER:  Yes.

 9        Q   Did the sheriff's department have an obligation

10    to notify the City of problems with the facility?         11:26

11        A   I'm sure they --

12        MS. AGUADO:  What category does that fall under?  I

13     don't believe there's a category related to agreements

14     between the City and the San Bernardino County

15     Sheriff's Department.                                    11:27

16        MS. SWEETSER:  So let me ask it a different way.

17        Q   I understand that you had a memorandum of

18    understanding with the GEO Group about the provision of

19    sheriff's department services; is that correct?

20        A   Yes.                                              11:27

21        Q   And that's what's reflected in Exhibit 10?

22        A   Where are you looking now?

23        Q   Just in general is this a memorandum that

24    reflects an agreement about the provision of

25    San Bernardino Sheriff's Department's services --         11:27
```

Page 63

```
 1        A    Yes.                                           11:27

 2        Q    -- at the facility?

 3             Do you know if there was any obligation under

 4   this agreement that the sheriff's department notify the

 5   City of any problems at the facility?                    11:27

 6        A    I don't know if there was an obligation, but the

 7   sheriff's department is very responsible.  And if there

 8   was an incident that rose to that level, I'm certain

 9   that they would report that to us.

10        Q    Have you reviewed anything in this case, any    11:28

11   incident reports, by the sheriff's department?

12        A    No.

13        Q    Have you seen any incident reports transmitted

14   about the facility to the City?

15        MS. AGUADO:  Lacks foundation.  Assumes facts that   11:28

16    any reports would be transmitted if there was any

17    issues to record on.

18             But go ahead.

19        THE WITNESS:  I'm sorry, question?

20        MS. SWEETSER:                                        11:28

21        Q    Have you ever seen any incident reports about

22   the facility transmitted to the City by the sheriff's

23   department?

24        A    No.

25        Q    Was it your understanding that under this MOU -- 11:29
```

Page 64

```
 1   were discussed?                                         11:44

 2      A   No.

 3      Q   What was what -- what is a quarterly meeting?

 4      A   There's -- they give reports as to -- they give

 5   a report on their activities at the detention center.  I  11:44

 6   don't remember the specifics.  There was a guest speaker

 7   from within GEO.  And then there was a tour shortly

 8   thereafter -- this was a couple of years ago.

 9      Q   Was it in 2017?

10      A   I think so.  '17.  Could have -- it could have   11:45

11   been early '18.  I don't remember.  It was during

12   Elliott's term as City manager.  Or just during the time

13   he was City manager.

14      Q   When you say you heard them give reports on

15   their activities, what activities were they discussing?  11:45

16      A   I don't remember.

17      Q   Were they discussing the -- the food provided to

18   detainees?

19      A   No.  No.

20      Q   Sorry.  Go ahead.                                11:45

21      A   I was going to say although they did serve food

22   cooked by the detainees.  I don't recall what the topic

23   was.  We did take a tour of the facility shortly

24   thereafter, the entire crew.  There was representation

25   from local level, state, federal, county.  And shortly   11:46
```

Page 74

```
 1    thereafter we all took a tour of the facility.  That's        11:46
 2    all I recall.
 3        Q   And when you say it was a quarterly meeting, did
 4    they have meetings like this at the facility four times
 5    a year?                                                        11:46
 6        A   I believe it's one of the same ones.  I haven't
 7    been to one since then.  There was one just yesterday.
 8    I couldn't make it.  So we had our members of our City
 9    Council attend that meeting.  There were three Council
10    members that attended yesterday's quarterly meeting.          11:46
11    All of our Council members are involved in these
12    quarterly meetings.
13        Q   Is there a particular person at GEO Group who
14    organizes the meeting?
15        A   I don't know.                                         11:47
16        Q   Do you get emails about these meetings?
17        A   Yes.
18        Q   Do the emails come from GEO Group?
19        A   It's a quarterly invitation that is sent to our
20    office from one of the GEO representatives.  It could         11:47
21    possibly be their executive staff.
22        Q   Do you know if -- at the meeting you attended
23    who the guest speaker was?
24        A   (Indicating.)
25        Q   Do you remember -- I'm sorry, you have to give        11:47
```

Page 75

```
 1        Q    Does it involve -- excuse me.                    11:49

 2             Does it involve observing any detainees?

 3        A    Yes.

 4        Q    On the tour you were on, do you remember what

 5   you were seeing detainees doing?                           11:49

 6        A    Interacting with each other.

 7        Q    Do you go into the dormitories on the tour?

 8        A    Not into the dormitory, but there's a glass that

 9   separates the hallway from the dorm.  Or a wall with

10   windows.                                                   11:49

11        Q    Do you know about how long the quarterly meeting

12   usually lasts?

13        A    Over --

14        MS. AGUADO:  He said he only went to one.  So I

15    guess the one meeting he went to.                         11:49

16        THE WITNESS:  The one meeting I went to was over an

17    hour.  Correct.  The one meeting I went to was over an

18    hour.  The meeting was an hour, and then it concluded

19    with a tour of the facility.  So I'm just going to

20    guess approximately two hours.                            11:50

21        MS. SWEETSER:

22        Q    Are all Council members always invited to these

23   meetings?

24        A    Yes.  They're all part of the existing board,

25   the quarterly meeting board.  And they also have access    11:50
```

Page 77

```
 1        Q   When you referred to the contract as a          12:23

 2   pass-through before, what were you referring to passing

 3   through?

 4        A   My understanding is that at the time when the

 5   City wanted to contract or contractual agreement with    12:23

 6   GEO, shortly thereafter GEO went into contract with ICE.

 7   However, at that time it was a conflict of interest for

 8   Geo to bill ICE directly.  So there was an agreement at

 9   that time as the City being the pass-through for the

10   revenues received either between GEO and ICE or ICE GEO.  12:23

11        Q   So would ICE pay the City the bed day rate and

12   the City would then pay that rate to GEO?

13        A   I believe so.  I believe that was the contract

14   agreed upon back in 2010 or '11.

15        Q   And then GEO would pay the 1.1 million in fees   12:24

16   that we mentioned before?  Fees and taxes to the City?

17        A   Yeah.  And I don't know if those were the exact

18   fees.  I don't recall what numbers those are.

19        Q   You just had an estimate it was around 1.1?

20        A   That's -- yes.  Could be less.  Could be more.   12:24

21        Q   And under this contract from 2011 there was a

22   certain minimum staffing at the facility; is that right?

23        A   Yes.

24        Q   Did the City do anything to ensure that the

25   minimum number of staff were at the facility?           12:25
```

Page 97

```
 1        Q   Are there any agencies you know of visiting the    12:28

 2    facility that we haven't already discussed?

 3        A   No.

 4        MS. SWEETSER:  Can we go off the record?

 5        THE REPORTER:  We're off the record.                    12:29

 6            (A recess is taken.)

 7        MS. SWEETSER:

 8        Q   Have you ever reviewed any policy manual that

 9    GEO produced to you?

10        A   No.                                                 12:44

11        Q   Do you know whether the City maintains records

12    of the current policy manuals at the facility?

13        A   Yes.

14        Q   Who maintains those records?

15        A   That would be the City clerk.                       12:44

16        Q   How are -- what City employees reviewed those

17    manuals?

18        A   We have records.  We just -- I don't know who

19    reviews them.

20        Q   Do you know if anyone has reviewed them?            12:44

21        A   I don't know.

22        Q   Is there any annual or quarterly meeting where

23    the City goes over the policy manuals with GEO?

24        A   I don't know.

25        Q   During your time at the City has there been such    12:45
```

Page 100

```
1              Certification of Court Reporter

2                     Federal Jurat

3

4         I, the undersigned, a Certified Shorthand

5    Reporter of the State of California do hereby certify:

6              That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand, which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14             That before completion of the deposition a

15   review of the transcript was requested.

16             I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any of the parties.

19             IN WITNESS WHEREOF, I hereby subscribe my name

20   this 13th day of July, 2019.

21

22

23

24        Heidi Hummel-Grant

25        Certified Shorthand Reporter No. 12556
```

Page 114

EXHIBIT 13

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4
      OMAR ARNOLDO RIVERA MARTINEZ;      )
 5    ISAAC ANTONIO LOPEZ CASTILLO;      )
      JOSUE VLADIMIR CORTEZ DIAZ; JOSUE  )
 6    MATEO LEMUS CAMPOS; MARVIN JOSUE   )
      GRANDE RODRIGUEZ; ALEXANDER        )
 7    ANTONIO BURGOS MEJIA; LUIS PENA    )
      GARCIA; JULIO CESAR BARAHONA       )
 8    CORNEJO, as individuals,          )
                                         )
 9              Plaintiffs,              )
                                         )  CASE NO. 5:18-cv-01125-SP
10              vs.                      )
                                         )
11    THE GEO GROUP, INC., a Florida     )
      corporation; THE CITY OF ADELANTO, )
12    a municipal entity; GEO LIEUTENANT )
      DURAN, sued in her individual      )
13    capacity; GEO LIEUTENANT DIAZ,     )
      sued in her individual capacity;   )
14    GEO SERGEANT CAMPOS, sued in his   )
      individual capacity; SARAH JONES,  )
15    sued in her individual capacity;   )
      THE UNITED STATES OF AMERICA; and  )
16    DOES 1-10, individuals,            )
                                         )
17              Defendants.              )
      _____)
18
19
20              DEPOSITION OF JOANNE LANGILL
21               SAN BERNARDINO, CALIFORNIA
22               THURSDAY, AUGUST 29, 2019
23    REPORTED BY:
24    Carolyn Ann Peterson
      CSR No. 3195
25    Pages 1 -84
```

Page 1

1        A     Yes.

2        Q     Okay.  Thank you.

3              Did you discuss this deposition with anyone

4     other than your attorney?

5        A     No.

6        Q     Did you meet with your attorney to prepare for

7     the deposition?

8        A     Yes.

9        Q     Without telling me anything that you

10    discussed, how long did you meet with your attorney?

11       A     Probably about 10, 15 minutes.

12       Q     Was that today?

13       A     No.

14       Q     So that was some occasion prior to today?

15       A     Yes.

16       Q     You did not discuss this deposition with

17    anyone currently at GEO?

18       A     No.

19       Q     No one at Adelanto?

20       A     No.

21       Q     How long have you been the Compliance

22    Administrator at Adelanto?

23       A     It would be four years.

24       Q     What are your responsibilities as the

25    Compliance Administrator?

1          Q      Has there ever been a description that you

2     have observed as the Compliance Administrator where a

3     review was done of an after-action report and a

4     different conclusion was reached as to the propriety

5     report of use-of-force?

6          A      No.

7          Q      Other than the Chief of Security, who exactly

8     is responsible for reviewing the file before sending it

9     out to ICE?

10         A      The Facility Administrator.

11         Q      And I think you said the Facility

12    Administrator gives it to the Chief of Security, whoever

13    does the final review before giving it to ICE; is that

14    correct?

15         A      Yes.

16         Q      During the time that you have been Compliance

17    Administrator, has the City of Adelanto at any point

18    come into the facility for purposes of conducting an

19    audit?

20         A      No.

21         Q      During the time that you have been Compliance

22    Administrator has the City of Adelanto come into the

23    facility to do any sort of review of the policies --

24         A      No.

25         Q      -- that are governing the facility?

Page 56

```
 1        A     No.

 2        Q     To your knowledge, does the City of

 3   Adelanto -- strike that.

 4              To your knowledge, has GEO provided the City

 5   of Adelanto with their policies and procedures manual?

 6        A     I do not know that.

 7        Q     Has anyone from the City of Adelanto ever

 8   contacted you about any of the policies governing

 9   Adelanto?

10        A     No.

11        Q     Has anyone at the City of Adelanto ever

12   contacted you in your capacity as the Compliance

13   Administrator for any purpose?

14        A     No.

15        Q     And you have been the Compliance Administrator

16   for four years?

17        A     Yes. Yes.

18        Q     Are you aware of whether the City of Adelanto

19   has come to do a walk-through at any point in the

20   facility prior to you being the Compliance

21   Administrator?

22        A     I don't know.

23        Q     I'm going to represent to you that the City of

24   Adelanto has stated that a representative of the city

25   went to Adelanto in October of 2012 or November of 2012.
```

Page 57

1     of a rebellion, riot or disturbance, and when all of the

2     followings conditions exist."

3            What is a rebellion for purposes of this

4     policy?

5        A    That I'm not sure.  That was already put in

6     there before I came in.

7        Q    Has anyone ever come to you to ask what or how

8     to define that word "rebellion" in this policy?

9        A    No.

10       Q    Is there a definition of rebellion for

11    purposes of this policy?

12       A    No.

13       Q    Looking right next to the word "rebellion,"

14    the next word is "riot."  What is a riot for purposes of

15    this policy?

16       A    That's usually when it's more than, let's say,

17    five detainees or on the housing unit being involved in

18    some type of disturbance of the facility, like fights

19    going on.

20       Q    And when you say type of disturbance for the

21    facility like fights, what other things would be the

22    type of disturbance that would constitute a riot?

23       A    Usually it's fights for the most part.

24       Q    Is there anything else that you can think of

25    other than fights?

Veritext Legal Solutions
866 299-5127

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4          I, CAROLYN ANN PETERSON, Certified Shorthand
 5     Reporter, do hereby certify:
 6            That prior to being examined, the witness in
 7     the foregoing proceeding was by me duly sworn to testify
 8     to the truth, the whole truth, and nothing but the
 9     truth.  That said proceedings were taken before me at
10     the time and place therein set forth and were taken down
11     by me stenographically at the time and place therein
12     named and thereafter reduced to computerized
13     transcription under my direction and supervision;
14            I further certify that I am neither counsel
15     for nor related to any party in said proceedings, nor in
16     any way interested in the outcome thereof.
17            IN WITNESS WHEREOF, I have hereunto subscribed
18     my name this date: September 19, 2019.
19
20
21
22
       CAROLYN ANN PETERSON, CSR 3195
23
24
25
                                              Page  84
```

EXHIBIT 14

```
1                UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
3
4    OMAR ARNOLDO RIVERA MARTINEZ;     )
     ISAAC ANTONIO LOPEZ CASTILLO;     )
5    JOSUE VLADIMIR CORTEZ DIAZ; JOSUE )
     MATEO LEMUS CAMPOS; MARVIN JOSUE  )
6    GRANDE RODRIGUEZ; ALEXANDER ANTONIO)
     BURGOS MEJIA; LUIS PEÑA GARCIA;    )
7    JULIO CESAR BARAHONA CORNEJO, AS   )
     INDIVIDUALS,                       )
8                                       )
                     PLAINTIFFS,        )  CASE NO.:
9                                       )
                  VS.                   )  5:18-CV-01125-R-GJS
10                                      )
     THE GEO GROUP, INC., A FLORIDA     )
11   CORPORATION; THE CITY OF ADELANTO, )
     A MUNICIPAL ENTITY; GEO LIEUTENANT )
12   DURAN, SUED IN HER INDIVIDUAL      )
     CAPACITY; GEO LIEUTENANT DIAZ,     )
13   SUED IN HER INDIVIDUAL CAPACITY;   )
     GEO SERGEANT CAMPOS, SUED IN HIS   )
14   INDIVIDUAL CAPACITY; SARAH JONES,  )
     SUED IN HER INDIVIDUAL CAPACITY;   )
15   THE UNITED STATES OF AMERICA; AND  )
     DOES 1-10, INDIVIDUALS;            )
16                                      )
                     DEFENDANTS.        )
17   _____)
18
19
20        DEPOSITION OF SERGEANT GIOVANNI CAMPOS
21              WEDNESDAY, MAY 8, 2019
22
23   JOB NO.:  3295952
24   REPORTED BY CARLA J. AMBRIZ, CSR NO. 12504
25   PAGES 1 - 189
```

CERTIFIED TRANSCRIPT

Page 1

1      Q     Do you remember if any of the updates were
2    about OC spray?
3      A     Yes.  We had a refresher.
4      Q     So thinking back to your time in the military,
5    when you were getting these updates on OC spray and you
6    had training on OC spray, were you trained there was a
7    safe distance at which to deploy OC spray?
8      A     Yes.
9      Q     What was that distance?
10     A     It depends if you have -- it depends how close
11   they are to you and what's going on.  Typically, three
12   to five feet.
13     Q     So three to five feet would be the usual rule;
14   is that right?
15     A     Yes.
16     Q     When you say it depends how close they are to
17   you, do you mean if the person is approaching you, you
18   might end up spraying them at a closer --
19     A     Yes.
20     Q     But if they're not approaching you, you would
21   try and spray from three to five feet; is that right?
22     A     Yes.
23     Q     Were you taught restraint holds while you were
24   in the military?
25     A     Yes.

Page 16

```
 1              MS. AGUADO:   Compared to what?

 2    BY MS. SWEETSER:

 3        Q    Compared to the Maglite job you were working?

 4        A    Yes.

 5        Q    When you first started at the facility, did you

 6    have training there?

 7        A    Yes.

 8        Q    How long was that?

 9        A    I remember two to four weeks.

10        Q    And then after -- after you started at the

11    facility, was there additional training over the course

12    of the time you were working there?

13        A    There's annual refresher.

14        Q    How long is the annual refresher at the

15    facility?

16        A    One week, 40 hours.

17        Q    When you started at the facility, did you --

18    what level did you start at?

19        A    Officer.

20        Q    And at some point, did you get promoted to

21    sergeant?

22        A    Yes.

23        Q    When was that?

24        A    Five years after being there.

25        Q    Was that in 2017?
```

Page 19

1    If you have other information you want to --

2            MS. AGUADO:  But it still didn't happen after

3    hours.  Or maybe you need to define after hours.  If

4    you're talking about in the evening, it didn't happen in

5    the evening, so I don't think we need to go down this

6    road.

7            MS. SWEETSER:  Why don't I rephrase.

8    BY MS. SWEETSER:

9        Q    Do you know whether Lieutenant Diaz had a way

10   to reach the warden when he was not at the facility?

11       A    Yes.

12       Q    Do you know whether she reached out to the

13   warden that morning?

14       A    Typically, you have to when something happens.

15       Q    Did she tell you, that morning, that she was

16   going to reach out to or contact the warden?

17       A    I don't know.

18       Q    Did you ask Lieutenant Withers to contact the

19   warden?

20       A    No.

21       Q    And is it your training and understanding that

22   the facility administrator should be contacted prior to

23   the use of OC spray?

24       A    No.

25       Q    That's not something that you were trained to

Page 51

1   do?

2        A    Once you're certified, you don't need

3   authorization.

4        Q    Is there someone in the facility called a

5   security supervisor?

6        A    No.

7        Q    Were you certified in the use of OC spray?

8        A    Yes.

9        Q    When did that happen?

10        A    At GEO?

11        Q    Yes, at GEO.

12        A    A few months before.  May, maybe.

13        Q    So was it at the time of your promotion to

14   sergeant?

15        A    Yes.  When you get promoted, you do it.

16        Q    So once you're certified and promoted to

17   sergeant, you don't have to contact someone else for

18   approval before using OC spray; is that right?

19        A    No, you don't.

20        Q    Before you were promoted to sergeant, did you

21   have any other promotions within the GEO Group?

22        A    No.

23        Q    When you were first promoted to sergeant, was

24   there a specific place you were assigned in the

25   facility?

Page 52

1      A      Yes.

2      Q      And what type of assistance was requested?

3      A      They really don't say much info on the radio,

4   because anything can happen.  So you just call for

5   someone to come over.

6      Q      Did they call for officers to respond from the

7   West facility specifically?

8      A      No.

9      Q      Did they call for all officers to respond?

10     A      She called for a supervisor.

11     Q      Was that the first call or the second call?

12     A      Second call.

13     Q      So on the first call, was there any -- I mean,

14  what -- what was it your understanding the call was

15  asking for?  What type of assistance?

16     A      "We need backup at East."

17     Q      Did she say "backup at East" or at "East

18  2-Charlie" specifically?

19     A      Well, typically, you would say where.  So yeah,

20  East 2-Charlie.

21     Q      Was there any -- was that all the information

22  relayed in the call?

23     A      Yeah.  The second one was just asking for a

24  supervisor, and then time lapsed, and they called again.

25  Sounded really urgent.  You can tell by the voice.  And

Page 74

1    at the moment, I needed to send everyone out on their

2    hospital runs. I couldn't hold that up, because that's

3    medical care for detainees. So I finished there. Me

4    and Withers could not both go. We cannot leave our

5    facility without a supervisor. So I went.

6        Q    Okay. So there was one call while you were at

7    the armory --

8        A    There were several.

9        Q    -- that called for assistance?

10       A    Yes.

11       Q    Then time lapsed, and then a second call came

12    in for a supervisor; is that right?

13       A    Yes.

14       Q    And then further time lapsed. You couldn't

15    respond because you had to provide medical care to the

16    detainees; is that right?

17       A    I was assigning firearms so they can take

18    detainees.

19       Q    And then a third call came in for a supervisor;

20    is that right?

21       A    Yes.

22       Q    At that point of the third call, were you done

23    assigning the firearms?

24       A    Yes. I rushed it, and I responded.

25       Q    Did you talk to Lieutenant Withers to tell him

Page 75

1      Q     When you talked to him to tell him you were

2   going to respond, did he tell you anything about what

3   communication he had with them?

4           MS. AGUADO:  Mischaracterizes testimony.

5           THE WITNESS:  No.

6   BY MS. SWEETSER:

7      Q     Is it just your speculation that Withers called

8   over there, or do you know?

9      A     What do you mean?

10     Q     Well, you said that Withers called over there

11  to find out what was going on after the radio call.  Do

12  you know that personally, or you're just assuming that

13  that would have happened?

14     A     I'm assuming, because there was no other radio

15  communication.

16     Q     So Withers didn't say anything to you about

17  communication he had with the facility; is that right?

18     A     No.

19     Q     So during the second call, you were still

20  assigning firearms, but by the time of the third call,

21  you were done assigning the firearms; is that right?

22     A     Yes.

23     Q     Did you radio over to the East to see what was

24  happening before you responded?

25     A     No.

Page 77

1      Q     Besides calling Withers to alert him that you

2   were going and then calling the perimeter patrol, did

3   you call anyone else on the radio to tell them that you

4   were going to East?

5      A     No.   There's no one there.

6      Q     There's no one where?

7      A     Only supervisors there were me and him.

8      Q     How long did it take the perimeter patrol to

9   respond to your call?

10     A     A few seconds.

11     Q     How long did it take them to drive you over to

12  the other facility?

13     A     Less than two minutes.

14     Q     When you arrived at East, was there a

15  particular door of East that you arrived at?

16     A     The front door.

17     Q     And when you go in the front door of East,

18  where is 2-Charlie located relative to the front door?

19     A     You walk down the hallway.   You make a right.

20  You walk down another hallway.   You make a left.   You

21  walk down another hallway.   You open the yard.   You run

22  through the yard.   And then you get to the 2-Pod.   You

23  open a door.   You go down the hallway.   Then another

24  door opens, and you're in 2-Charlie.

25     Q     When you arrived at the facility -- well, while

Page 79

1    you were riding with the perimeter patrol, did they tell

2    you anything about what was going on at East facility?

3         A    No.

4              MS. AGUADO:   Assumes facts that they would

5    know.

6              Go ahead.

7              THE WITNESS:   No.

8    BY MS. SWEETSER:

9         Q    Did Lieutenant Withers tell you anything about

10   what was going on at 2-Charlie?

11        A    No.

12        Q    Between arriving at the front door and going to

13   the door of 2-Charlie, did you encounter anyone else who

14   told you what was going on?

15        A    No.

16        Q    Did you hear any radio calls -- from the third

17   call that we talked about calling for a supervisor to

18   when you arrived at the door of 2-Charlie, did you hear

19   any other radio calls?

20        A    I don't remember.

21        Q    Is it fair to say that, when you arrived at the

22   door of 2-Charlie, all you knew was that someone had

23   radioed from assistance -- for assistance from there?

24        A    Yes.

25        Q    And when you entered, did -- what -- what did

Page 80

1    you see happening there?

2         A    Count starts at 6:15.  That's when they prep.

3    It could be 6:10 or 6:15, but it's prior to 6:30.  So,

4    typically, every day, it would be silent during count.

5    When I walked in, everyone was standing up.  People were

6    yelling.  Everyone was swearing at everybody.  All

7    detainees were yelling at officers in Spanish and

8    English.  It looked like -- like a rebellion.  What I

9    saw was that everyone was just going against the

10   officers.

11        Q    So when you say it looked like a rebellion, is

12   that something that you were trained to recognize?

13        A    I would just say I just recognized what it is.

14        Q    So you were not trained on what a rebellion is;

15   is that right?

16        A    No.

17        Q    Have you seen the word "rebellion" in any

18   policy documents?

19        A    Yes.

20        Q    What policy documents are those?

21        A    I don't know.

22        Q    Were they policy documents you reviewed for

23   today?

24        A    It could have been.

25        Q    But you didn't receive on any -- any -- you

                                                    Page 81

```
 1    didn't receive any training on what a rebellion was?

 2        A    No.

 3        Q    And when you say detainees were yelling at

 4    officers, were the detainees in the bunks yelling?

 5        A    In the bunks.

 6        Q    What did you hear them yelling?

 7        A    It was in Spanish.  People were talking really

 8    fast.  I don't know what they were saying.

 9        Q    Did you hear anyone yelling in English?

10        A    Detainees?

11        Q    Detainees, yes.

12        A    Yes.

13        Q    What were the detainees yelling in English?

14        A    It sounded like a bunch of cuss words.

15        Q    Did you hear any detainees yelling at the

16    officers to stop?

17        A    No.

18        Q    Where were the detainees in the bunks when

19    you -- when you entered and saw detainees yelling from

20    the bunks, where were -- where were those detainees?

21        A    All four tiers had some standing up.

22        Q    Were there any officers in the bunk areas when

23    you entered?

24        A    I don't know.

25        Q    Did you hear the detainees who were in the
```

Page 82

1      A      Directives, yes.

2      Q      And it was very loud in there; correct?

3      A      Yeah.

4      Q      Could you tell which officers were giving which

5   directives?

6      A      No.

7      Q      And -- but there were multiple officers giving

8   commands at the same time; is that right?

9      A      Yeah.

10     Q      Were the commands you heard in English?

11     A      I don't remember.

12     Q      Do you remember if you heard any commands in

13  Spanish?

14     A      Typically, if they're not answering in English,

15  they're going to try Spanish, if you speak Spanish.

16     Q      Well, typically, but I'm asking at the moment

17  you entered the room, did you hear anyone -- any of the

18  officers --

19     A      I heard a lot of Spanish and English, yes.

20     Q      Did you hear any of the officers giving

21  commands in Spanish when you entered the room?

22     A      I don't know.

23     Q      You don't remember that?

24     A      I don't remember.

25     Q      You said it takes about an hour to complete the

Page 86

```
 1            MS. AGUADO:  It's vague as to where these
 2   officers were standing in the bunk area.
 3            THE WITNESS:  Where would they be?
 4   BY MS. SWEETSER:
 5       Q    Is there a part of the bunk area where you
 6   cannot see into the day room?
 7       A    Only if your bunk is next to the wall.
 8       Q    Well, if the officers were standing in the bunk
 9   area, is there a place in the bunk area where the
10   officers wouldn't be able to look out into the day room?
11       A    I don't know.
12       Q    In your experience in 2-Charlie, did you --
13   were you able to see into the day room from the bunk
14   area?
15       A    Yes.
16       Q    When you entered 2-Charlie, did you see
17   detainees moving between the bunk area and the day room?
18       A    No.
19       Q    Did it look to you like any detainees were
20   destroying property?
21       A    No.
22       Q    What's the first thing you did when you entered
23   2-Charlie?
24       A    When I entered, I saw what I saw, as I
25   described, and there was -- there was officers escorting
```

Page 89

1    the detainee out.  And the detainee was being combative.

2    He was resistive.  It looked like he was trying to --

3    trying to run from them.  So I just guided them towards

4    the wall.  I told them to gain control before they

5    proceed with moving.

6              At that point, I still didn't know what was

7    going on because it was really loud.  Then I saw that

8    there was detainees in the day room tables.  And I saw

9    officers attempting to secure them, and the detainees

10   were elbowing them.  They were swerving their bodies

11   side to side.  They were just not letting the officers

12   secure them.

13       Q    Hang on.  I know you have a whole story to

14   tell, but I want to just break it down thing by thing so

15   we can get through it in an orderly fashion.  So hang on

16   just a sec.

17              Let's start with the first thing you said.  You

18   saw officers escorting a detainee out?

19       A    Yes.

20       Q    How were the officers located relative to that

21   detainee?

22       A    One on each arm.

23       Q    Were their hands underneath the detainees arms?

24   Were they holding onto his triceps?  How were they

25   located?

Page 90

```
 1              MS. AGUADO:  If you recall.

 2              THE WITNESS:  I don't know.

 3   BY MS. SWEETSER:

 4        Q    And you said you thought the detainee was

 5   trying to run away?

 6        A    He was not walking with the officers.  He

 7   was -- I don't know how to explain it.  He was making

 8   them -- he was trying to walk the officers, basically.

 9        Q    What -- I'm sorry.  What does that mean?

10        A    Yeah, I don't know how to explain it.  He was

11   trying to get out of their grasp.

12        Q    Was he going too fast for them?

13        A    The detainee?

14        Q    Yes.

15        A    Yeah.

16        Q    So the first thing you saw was the officers had

17   this detainee by the arms, and he was trying to go

18   faster than they were going; is that right?

19        A    Yeah, but he was being -- he was swerving side

20   to side.  Their hands were behind their backs.  So he

21   was, like, elbowing the officers.

22        Q    When you say he was swerving from side to

23   side --

24        A    Yeah, swerving his body.

25        Q    How big was this detainee?
```

Veritext Legal Solutions
866 299-5127

```
 1      A     Yes.
 2      Q     And then once the front of his body was against
 3   the wall, you expected them to take his arms in a
 4   different way?
 5            MS. AGUADO:  Objection.  Misstates his
 6   testimony.
 7            Go ahead.
 8            THE WITNESS:  Just secure -- I just expected
 9   them to be able to secure him properly.
10   BY MS. SWEETSER:
11      Q     What did you mean by that, to secure him
12   properly?
13      A     To have him close to them so that he can't run,
14   he can't elbow the officers.
15      Q     So did you think they weren't holding him
16   properly because they were too far from the -- he was
17   too far from them?
18      A     He wasn't -- they had no control of him.
19      Q     And holding him closer would allow them to gain
20   control?
21      A     Yes.
22      Q     And why did you expect them to use the wall to
23   do that?
24      A     Because the detainee was running forward.  It's
25   also to prevent injuries to him, because he could trip,
```

Page 94

```
1    and they would all fall.
2        Q    Did you watch them as they were placing him on
3    the wall?
4        A    Yes.  I guided them to the wall.
5        Q    And did you watch them secure his arms in a
6    different way?
7        A    No, because there was something else going on.
8            MS. AGUADO:  Can we take a short break?  We're
9    at the two-hour mark.
10           MS. SWEETSER:  Sure.
11           THE WITNESS:  Thank you.
12           (Recess was taken from 12:17 p.m. to 1:04 p.m.)
13           MS. SWEETSER:  Back on the record.
14   BY MS. SWEETSER:
15       Q    Before the lunch break, we were discussing how
16   you ordered two officers to place the detainee on the
17   wall; is that right?
18       A    I just guided them.
19       Q    And you -- you verbally said to them, "Put him
20   on the wall"; right?
21       A    To, yes, gain control.
22       Q    Did you say "gain control of him"?
23       A    To gain control of him.
24       Q    So you said, "Put him on the wall to gain
25   control of him"?
```

Page 95

```
 1       A      Yes.

 2       Q      Do you remember saying anything else to them at

 3   that time?

 4       A      No.

 5       Q      Did they say anything to you about what was

 6   going on at that time?   Those two officers?

 7       A      I don't remember.

 8       Q      Do you remember which officers those were?

 9       A      No, I don't.

10       Q      Do you remember if it was two male officers or

11   a male and female officer?

12       A      I think it was two males.

13       Q      And then I believe you said before they took

14   ahold of his arms in a different way, your attention was

15   drawn elsewhere; is that right?

16       A      Yes.

17       Q      Where was it drawn to?

18       A      A day room table.

19       Q      Was the table directly behind where they were

20   placing him on the wall?

21       A      Kind of catty-corner.

22       Q      Did you use your pepper spray at the time you

23   were talking to them?

24       A      Talking to who?

25       Q      To the -- when you gave that command to place
```

Page 96

```
 1    him on the wall, were you using pepper spray at all at

 2    that time?

 3         A    No.

 4         Q    Had you deployed any pepper spray at that time?

 5         A    No.

 6         Q    Could you tell whether pepper spray had been

 7    used in the room you were in?

 8         A    No.

 9         Q    So you didn't smell anything or feel anything

10    that would indicate pepper spray had been used?

11         A    No.

12         Q    I'm going to show you Exhibit 4.

13              (Plaintiffs' Exhibit 4 was marked

14              for identification.)

15    BY MS. SWEETSER:

16         Q    Do you recognize yourself as one of the people

17    depicted in this exhibit?

18         A    It looks like me.

19         Q    Where are you located in this exhibit?

20         A    Towards the entrance.

21         Q    Does this exhibit show you entering at

22    6:46 a.m.?

23         A    That's what it says here, yes.

24         Q    And does this depict the scene as you remember

25    it when you entered?
```

Page 97

```
 1    who were housed in 2-Charlie at that time?

 2        A    No.

 3        Q    You don't remember knowing any of them?

 4        A    No.

 5        Q    Do you know if the facility has a policy that

 6    you cannot pepper spray a detainee who's being

 7    restrained?

 8        A    Yes.

 9        Q    It does have that policy?

10        A    Once they are restrained, not being restrained.

11        Q    So if a detainee is being held by the arms, for

12    example, it would be out of policy to pepper spray that

13    detainee?

14             MS. AGUADO:   Objection.   Incomplete

15    hypothetical.

16             THE WITNESS:   It depends what they are doing.

17    If they're being held by their arms, it's probably

18    because they're striking the officers, which is what I

19    saw.

20    BY MS. SWEETSER:

21        Q    Well, let's talk about the first detainee you

22    said was looking like he was walking too fast; correct?

23             MS. AGUADO:   Objection.   That mischaracterizes

24    his testimony.

25             THE WITNESS:   It looked like he was trying to
```

Page 99

```
 1    get out of their grasp.
 2    BY MS. SWEETSER:
 3        Q    Did you consider pepper spraying him?
 4        A    No.
 5        Q    Would it have been in policy for you to pepper
 6    spray him?
 7        A    No.
 8        Q    Why not?
 9        A    He was handcuffed.
10        Q    So it's out of policy to pepper spray detainees
11    that are handcuffed?
12        A    Yes.
13        Q    I'm going to show you Exhibit 5.
14                  (Plaintiffs' Exhibit 5 was marked
15             for identification.)
16    BY MS. SWEETSER:
17        Q    Is this -- in Exhibit 5 does that depict you
18    interacting with the officers in the manner you just
19    described?
20        A    Can't tell.
21        Q    But do you see yourself in this exhibit?
22        A    Standing, yes.
23        Q    And does it appear that you're interacting with
24    some officers there?
25        A    I can't tell where I'm looking at.
```

                                                    Page 100

```
 1        Q     Well, if you look at the timestamp on Exhibit 4
 2   and on Exhibit 6, and you said Exhibit 4 depicts you
 3   entering the room; is that right?
 4        A     Yes.
 5        Q     And then you deployed your pepper spray in
 6   Exhibit 6; is that right?
 7        A     Yes.
 8        Q     Are those two exhibits less than a minute
 9   apart?
10        A     Yes, they are.
11        Q     So does that refresh your recollection that you
12   deployed your pepper spray within the first minute of
13   entering the room?
14        A     Yes.
15        Q     Do you know which detainee you were spraying at
16   this -- in this exhibit?
17        A     Yes.  Whoever's on this side.
18        Q     And you're pointing to the upper left; is that
19   right?
20        A     The bottom right.
21        Q     So you're --
22        A     Well, whichever way you see it.  I don't know.
23        Q     That's all right.  So, like, from your
24   perspective, right?  You're looking at it -- on your
25   left -- is the detainee you're spraying on the left-hand
```

Page 104

```
 1    side of the table?

 2         A    Yes.

 3         Q    Okay.  And you're standing on the left-hand

 4    side of the table; is that right?

 5         A    Yes.

 6         Q    What do you remember being the reason that you

 7    sprayed this particular detainee?

 8         A    Well, the situation here has already escalated.

 9    Since the time that it was called, now that I'm seeing

10    the time here, a lot of time has lapsed.  And I know

11    that they've already exhausted all the attempts to gain

12    compliance.  And what I saw was detainees assaulting

13    staff.  So I told the officers, "Step away," to prevent

14    further injuries to both detainees and staff.

15         Q    So you said the -- the situation escalated from

16    the time assistance was first called; is that right?

17         A    Yes.  And from what I saw when I got there.

18         Q    How did you know the situation had escalated

19    from when assistance was called?

20         A    Because of how loud it was, and everyone was

21    combative.

22         Q    Did anyone tell you, prior to 6:46:46, the time

23    stamp on Exhibit 6, did anyone tell you prior to that

24    what had happened to get to this point?

25         A    No.
```

Page 105

```
 1        Q    Besides guiding the officers to the wall, prior
 2   to deploying your pepper spray, did you have any
 3   communication with any other officers?
 4        A    I told them to step away.
 5        Q    Did you have anyone give you any information
 6   about what was going on?
 7             MS. AGUADO:  Asked and answered.
 8             THE WITNESS:  No.  I could see it.
 9   BY MS. SWEETSER:
10        Q    Did you see this particular detainee on the
11   left-hand side of the table elbowing an officer?
12        A    Yes.
13        Q    Prior to deploying your pepper spray, you saw
14   that?
15        A    Yes.
16        Q    Do you know which officer was elbowed?
17        A    I don't know.
18        Q    Do you know how many officers were standing
19   near that detainee when you ordered them away?
20        A    No, I don't.
21        Q    Do you know how many officers were around the
22   table in general when you ordered the officers to step
23   back?
24        A    No, I don't.
25        Q    Did you give any other orders before telling
```

Page 106

1    the officers to step away?

2         A    I always give directives.  So my recollection

3    was -- I already know that I would have given directives

4    for them to comply, and if they didn't, then it would

5    lead to something else.

6         Q    I'm sorry.  Could you clarify that?  So you

7    know that you would have already given directives to

8    comply --

9         A    I always give directives.  You can't just

10   expect someone to do something without asking them.

11        Q    You mean the detainees?

12        A    Yes.

13        Q    Did you hear -- between telling the officers to

14   guide that detainee to the wall and deploying your

15   pepper spray, did you hear the other officers giving

16   commands to the detainees?

17        A    Yes.

18        Q    What did you hear them say?

19             MS. AGUADO:  If you recall.

20             THE WITNESS:  I don't recall.

21   BY MS. SWEETSER:

22        Q    You said before you had heard some commands as

23   you entered the room.  Were the same commands still

24   being given?

25        A    Yes.

                                              Page 107

1      Q      So there were still multiple commands being

2    given by multiple officers?

3      A      By staff, yes.

4      Q      Did you hear any commands being given in

5    Spanish?

6      A      I don't remember.

7      Q      Do you remember anything that, prior to

8    deploying the pepper spray, the detainees at the table

9    were saying?

10     A      No.

11     Q      Could you tell what was being said by detainees

12   at the table as opposed to detainees yelling from their

13   bunks?

14     A      Yeah.  I was close enough, but I don't know

15   what they were saying.

16     Q      Do you remember whether they were saying

17   anything at that time?

18     A      No, I don't.

19     Q      In this picture, Exhibit 6, that you have in

20   front of you, are all the people who are standing up

21   officers?

22     A      It's not clear enough.  I can't tell.

23     Q      Do you think some of the people standing up

24   around the table could be detainees?

25            MS. AGUADO:  Asked and answered.

                                                Page 108

1          If you can tell.

2          THE WITNESS:  I don't know.  No, I don't know.

3     BY MS. SWEETSER:

4     Q    Prior to deploying your pepper spray, did you

5     give any commands to the detainees yourself?

6     A    Yes.

7     Q    What did you say?

8     A    You just yell out "OC spray."

9     Q    Is that telling the officers to step away,

10    would you just say "OC spray" and they would know to

11    step away?

12    A    My command was for them to step away, as said

13    earlier.  And then before you deploy OC, you say "OC

14    warning," "OC spray warning."

15    Q    And when you're saying "OC spray warning" --

16    A    That's for everybody.

17    Q    -- do you give a command to do something?

18    A    No.  They were already refusing all commands

19    from everybody.  At this point it was combative.  They

20    were not complying.

21    Q    So you didn't give any commands for the

22    detainees to do anything because, in your opinion, they

23    were not going to comply?

24    MS. AGUADO:  Objection.  That mischaracterizes

25    his testimony.

Page 109

1     Q     So you were instructing them to guide the

2  detainee to the wall at that time?

3     A     It could be.  I don't know.

4     Q     And then 20 seconds later -- or 23 seconds

5  later, at 6:46:46, you're deploying your spray; correct?

6     A     Yes.  It shows here.

7     Q     So in that time you assessed that the detainees

8  were not following commands at the table; correct?

9     A     Yes.

10    Q     And you gave them a command to stop resisting?

11    A     Yes.

12    Q     When -- about how long before deploying the

13 pepper spray did you give that command?

14    A     Three to five seconds.

15    Q     Was it before or after asking the officers to

16 step away?

17    A     I don't know.

18    Q     Did you give the command in English or in

19 Spanish?

20    A     I don't know.  If they speak Spanish, I would

21 have done it in Spanish.

22    Q     Did you know --

23    A     When detainees respond in Spanish, I speak

24 Spanish to them.

25    Q     And you didn't --

Page 111

1      Q      Would it show a pause between when the officers

2    stepped away and when you began spraying?

3           MS. AGUADO:   I think the video would speak for

4    itself, whether or not it shows a pause.

5           THE WITNESS:   Yeah.   I don't know.

6    BY MS. SWEETSER:

7      Q      If you gave a command to the detainees and then

8    waited for them to comply, you would expect to see a

9    pause between two events; correct?

10     A      What do you mean?

11     Q      You said you gave a command, and you waited at

12   least three seconds for them to comply; is that right?

13     A      No.   I don't know.   I don't remember.

14     Q      You don't remember doing that?

15     A      I don't remember if there's a pause or a

16   waiting period.

17     Q      But you don't remember waiting for them to

18   comply after giving the command?

19     A      I remember they didn't comply before or after.

20     Q      But do you remember if you gave a command and

21   then waited to see if they would comply?

22     A      I don't remember.

23     Q      Did you determine that you should deploy pepper

24   spray at a particular detainee at this time?

25     A      Yes.

Page 113

1     Q    Which detainee was that?

2     A    Whichever one I got first.

3     Q    The left-hand --

4     A    I don't know their names, yeah.

5     Q    Okay.  And why did you decide that the

6 left-hand detainee should be pepper sprayed first?

7     A    That's the one that was being combative that I

8 seen first.

9     Q    And when you say being combative, you mean you

10 thought he was elbowing an officer?

11     A    Yes.

12     Q    So that's why you chose to deploy pepper spray

13 against him first?

14     A    Yes.

15     Q    I'm going to show you an Exhibit 7.

16           (Plaintiffs' Exhibit 7 was marked

17         for identification.)

18 BY MS. SWEETSER:

19     Q    This is an Exhibit, 6:46:52.  Does this exhibit

20 depict you deploying pepper spray?

21     A    You can't tell.

22     Q    Do you see a person at the bottom of the table

23 deploying pepper spray from that position in this

24 exhibit?

25     A    It just looks like I'm standing there.

Page 114

1      Q    Do you know whether you ever deployed pepper

2  spray from the bottom of the table?  Do you remember

3  that?

4      A    I did.

5      Q    Do you know about -- was that the next position

6  you moved to after deploying it in the left-hand side?

7      A    Yes.  I went around the table.

8      Q    Is there a particular detainee you were

9  spraying when you moved to the bottom of the table?

10     A    Yes.  The other detainees that it didn't make

11 contact with.

12     Q    And are you -- you pointed at the picture.  Are

13 you gesturing at the right-hand side of the table?

14     A    Yes.

15     Q    So you moved to the bottom of the table to

16 spray the detainees on the right-hand side of the table;

17 is that right?

18     A    Yeah.

19     Q    And what made you decide to spray the detainees

20 on the right-hand side?

21     A    I only got one over here.  All of these that

22 were on the table were striking the officers that were

23 attempting to secure them.  And I went around so I can

24 control this side also, and I deployed OC spray there.

25     Q    After you deployed the OC spray against the

                                              Page  115

```
 1        A    I don't.

 2        Q    Okay.  You remember them throwing their arms

 3   back at some point?

 4        A    Yes.

 5        Q    In order to do that, they had to unlink their

 6   arms?

 7        A    Yes.

 8        Q    And you don't remember if that was prior to the

 9   deployment of the pepper sprayer or after?

10        A    No, I don't.

11        Q    Do you remember if the detainees had linked

12   arms while you were deploying the pepper spray?

13             MS. AGUADO:  Let's take a look at the exhibits.

14   BY MS. SWEETSER:

15        Q    Yes.  Feel free to look at the exhibits in

16   front of you.

17        A    They're huddled together.  You can't tell.  I

18   don't know.

19        Q    Do you have any personal recollection of

20   whether they had linked arms when you were pepper

21   spraying them?

22        A    I believe it was after I sprayed that they

23   locked arms, which is another sign that they were not

24   going to comply.

25        Q    Did you deploy -- besides the time that we
```

Page 124

 1      Q     Do you remember yourself using any come-along

 2    holds that day?

 3      A     No.

 4      Q     You were trained that force can never be used

 5    to impose punishment; is that right?

 6      A     That's correct.

 7      Q     Force is only used as a last resort; is that

 8    right?

 9      A     Yes.

10      Q     And you were trained that only the minimum

11    amount of force necessary should be used; correct?

12      A     Yes.

13      Q     Were you given two different use-of-force

14    policies or just one use-of-force policy manual?

15      A     What do you mean?

16      Q     Were there multiple manuals that you had or

17    just one policy manual dealing with use of force?

18      A     One.

19      Q     Were you trained that you're allowed to use

20    force to maintain or regain order?

21      A     Yes.

22      Q     You used the word "rebellion" previously.  Can

23    you tell me your understanding of that term?

24      A     It's -- my understanding, it's just when you're

25    going to get no compliance out of the population, and

Page 141

```
 1    they're against you.
 2        Q    When you say "out of the population," do you
 3    mean out of the detainees in the unit as a whole?
 4        A    Yes.
 5             MS. AGUADO:  Can we take a short break?
 6             MS. SWEETSER:  Sure.
 7             (Recess was taken from 2:06 p.m. to 2:12 p.m.)
 8             MS. SWEETSER:  Back on the record.
 9    BY MS. SWEETSER:
10        Q    So before we took the break, we were talking
11    about rebellions.  And you said that a rebellion is
12    where the entire population of the unit is against you;
13    is that correct?
14        A    It can be like a group or -- a small group or
15    the whole unit.
16        Q    GEO trained you that you can use deadly force
17    in a rebellion; correct?
18        A    No, not that I recall.
19        Q    What do you recall being trained is the
20    appropriate response in a rebellion?
21        A    It depends what's going on.  You have to
22    maintain control of the unit.  It was -- it was getting
23    out of hand there.
24        Q    Did you think the entire population of the unit
25    was against you?
```

Page 142

```
 1    depends what's presented to you.
 2        Q    So it doesn't -- there's no -- you weren't
 3    trained that restraining holds are a lower level of
 4    force than pepper spray?
 5        A    I don't remember the continuum.
 6        Q    Were you trained that you could use pepper
 7    spray to quell a disturbance?
 8        A    What's "quell"?
 9        Q    Is "quell" a term that your training documents
10    used?
11        A    I don't know what "quell" is.
12        Q    Okay.  Were you trained that you could use
13    pepper spray to enforce compliance with your orders?
14        A    To regain control.
15        Q    When you say "regain control," what do you
16    mean?
17        A    When it's out of control.
18        Q    So if you --
19        A    There's many different ways.
20        Q    If you thought a detainee was out of control,
21    that is when pepper spray should be used; is that right?
22        A    If there's also a present danger, like self- --
23    self-harm or harm of others.
24        Q    What were all the factors you were given in
25    evaluating whether to deploy your pepper spray?
```

Page 145

```
 1        A    Can you say it again.

 2        Q    What were all the factors you were told to

 3   consider in deploying your pepper spray?

 4        A    I don't remember.  But I know it's protect

 5   yourself, prevent injury to others, prevent injury to

 6   themselves.

 7        Q    Have you yourself ever been pepper sprayed?

 8        A    Yes.

 9        Q    When was that?

10        A    2007, 2015 --

11        Q    Is it part of --

12        A    -- 2017, 2018.

13        Q    In 2007, was that part of your training --

14        A    In the Marines.

15        Q    In 2015, was that also part of training?

16        A    I think that was when I -- no, I don't

17   remember.  I don't think 2015.

18        Q    That one didn't happen?

19        A    No, I don't think so.

20        Q    Okay.  In 2017, was that part of your training

21   at GEO Group?

22        A    When I got promoted, yes.

23        Q    And in 2018, was that part of your training in

24   San Bernardino?

25        A    Yes.
```

                                          Page 146

```
 1                    (Plaintiffs' Exhibit 12 was marked

 2              for identification.)

 3   BY MS. SWEETSER:

 4       Q    Is this a report that you wrote?

 5       A    Yeah, it appears to be.

 6       Q    Did you complete -- did you attach the last two

 7   pages to this report, or did you just write the first

 8   two pages?

 9       A    I just did this page.

10       Q    Okay.  So you just do the first two pages; is

11   that right?

12       A    Yeah.

13       Q    Is there anything in this report that, as you

14   sit here today, you think is inaccurate or you would

15   have written differently today?

16       A    No.  I would have added more details.

17       Q    What details would you have added?

18       A    All the noncompliance.

19       Q    What noncompliance did you not include in this

20   report?

21       A    No, I think it's fine.

22       Q    As you review it, now you think you included

23   all of the noncompliance you saw that day?

24       A    Yes.

25       Q    Did you report any injuries after writing this
```

                                          Page 153

```
 1    STATE OF CALIFORNIA              )

 2    COUNTY OF SAN BERNARDINO         )   ss.

 3

 4         I, Carla J. Ambriz, CSR No. 12504, in and for the

 5    State of California, do hereby certify:

 6         That prior to being examined, the witness named

 7    in the foregoing deposition was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing but

 9    the truth;

10         That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction,

13    and the same is a true, correct, and complete transcript

14    of said proceedings;

15         That if the foregoing pertains to the original

16    transcript of a deposition in a Federal Case, before

17    completion of the proceedings, review of the transcript

18    {   } was {   } was not required.

19         I further certify that I am not interested in

20    the event of the action.

21         Witness my hand this 21st day of May, 2019.

22

23

24

25         Carla J. Ambriz, CSR No. 12504
```

Page 189