# EXHIBIT 26

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


OMAR ARNOLD RIVERA MARTINEZ; ISAAC )
ANTONIO LOPEZ CASTILLO; JOSUE      )
VLADIMIR CORTEZ DIAZ; JOSUE MATEO  )
LEMUS CAMPOS; MARVIN JOSUE GRANDE  )
RODRIGUEZ; ALEXANDER ANTONIO BURGOS )
MEJIA; LUIS PENA GARCIA; JULIO     )
CESAR BARAHONA CORNEJO, as         )
individuals,                       )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           )CASE NO. 5:18-cv-
                                   )         01125-R-GJS
                                   )
THE GEO GROUP, Inc., a Florida     )
corporation; the CITY OF ADELANTO, )
a municipal entity; GEO LIEUTENANT )
DURAN, sued in her individual      )
capacity; GEO SERGEANT CAMPOS,     )
sued in his individual capacity;   )
SARAH JONES, individual capacity;  )
THE UNITED STATES OF AMERICA; and  )
DOES 1-10, individuals             )
                                   )
          Defendants.              )
_____)


DEPOSITION OF JOSE BLADIMIR CORTEZ DIAZ

taken on

Monday, June 17, 2019


JESSICA R. MUNOZ
CSR 13823

1        A    No.  We were just made to sign some papers.

2        Q    Do you remember what those papers were?

3        A    No.

4        Q    Did you attend an orientation session?

5        A    No.

6        Q    Were you given the uniform?

7        A    Yes.

8        Q    And were you given undergarments?

9        A    Yes.

10       Q    Do you remember receiving a handbook from the

11  GEO Group?

12       A    No.

13       Q    Do you recall getting a handbook from

14  Immigrations and Custom Enforcement?

15       A    No.

16       MS. STROTTMAN:  I'm going to hand you an exhibit

17  that I'll mark as Exhibit 1.

18            (Exhibit 1 marked for identification and

19            is attached hereto.)

20  BY MS. STROTTMAN:

21       Q    Do you recognize this document?

22       A    Well, no.  With so many papers that I've

23  signed, I don't know what all of these...

24       Q    Okay.  Does that look like your signature on

25  the bottom?

16

1        A    Yes, that's my signature.

2        Q    And are those initials your initials?

3        A    Yes.

4        Q    Okay.  Does this refresh your memory as to

5   whether you received a handbook?

6        A    No.  Because when we went in, we were nervous

7   from the trip, from the transfer.  We didn't know what

8   was going on.  We just signed everything that was put on

9   the table in front of us.

10       Q    Do you remember if the documents you received

11  were in English or Spanish?

12       MS. FLYNN:   Objection.  Vague.

13       THE WITNESS:   I don't remember.

14  BY MS. STROTTMAN:

15       Q    Do you recall watching a video when you

16  arrived?

17       A    No.

18       Q    How many other people did you arrive with?

19       A    There were about 12 to 15 people, 12 to 15 of

20  us.

21       Q    Do you recall if the staff there mostly spoke

22  to you in English or Spanish?

23       A    Normally they always speak English.

24       Q    And how much of that did you understand?

25       A    Practically nothing.  Other fellow detainees

17

1      Q     On the day of the incident, was breakfast

2   provided?

3      A     We didn't take it.

4      Q     What time was breakfast?

5      A     Breakfast is between six and seven o'clock in

6   the morning.

7      Q     And can you -- do you normally go eat breakfast

8   anytime during that time period, or was there a specific

9   time?

10      A     The food just arrives, and they have us -- and

11   they have us get in line in order to receive the food.

12      Q     So did you get in line that day?

13      A     No.

14      Q     So instead of getting in line, what did you

15   do?

16      A     I went to go sit at the table.

17      Q     And do you know what time that was?

18      A     It was in between six and seven o'clock in the

19   morning during that period of time.  I don't know exactly

20   what hour.

21      Q     Did you tell anyone that you were not taking

22   breakfast?

23      A     It was -- when we sat down, we went and handed

24   the sheet to the officer.

25      Q     Who handed the sheet to the officer?

                                                          41

1        A     One of my fellow detainees took it to him,

2   where we were saying that we were doing a peaceful hunger

3   strike.

4        Q     Which detainee took it, the paper?

5        A     I don't recall.

6        Q     Did you go to the podium?

7        A     At some moment all of us in the group went

8   over, and then we sat down.

9        Q     Who -- how many is all of you went to the

10  podium?

11       A     There were nine of us that were doing this, but

12  I don't remember if all nine of us went over or if some

13  of us stayed behind.  I don't recall.

14       Q     Did you go up to the podium?

15       A     Yes.

16       Q     And did you say anything to the officer at the

17  podium?

18       A     No.

19       Q     You said that someone told the officer that you

20  were doing a peaceful hunger strike?

21       A     Yes.

22       Q     And who was that who said?

23       A     A fellow detainee from Haiti.  We went to look

24  for him to have him translate what we wanted to say to

25  him.

42

1          Q      So who was the person who spoke in Spanish that

2     was then translated by the Haitian immigrant.

3          A      A fellow detainee, Isaac.

4          Q      And it was Isaac who said, "That we are on a

5     peaceful hunger strike"?

6          A      He said that to the inmate from Haiti to have

7     him translate it to the officer.

8          Q      Do you remember what Isaac's exact words

9     were?

10         A      He said, "Tell him that we are handing him this

11    sheet of paper, that we're going to do a peaceful hunger

12    strike because we want to speak to an ICE officer."

13         Q      Do you know this Haitian detainee before?

14         A      He was a fellow detainee.  I would see him

15    around there.

16         Q      But you don't recall his name?

17         A      No.

18         Q      Whose idea was it for the hunger strike?

19         A      Well, all-of us.  In light of everything that

20    we were seeing that was going on at that center.

21         Q      When did you come up with this idea?

22         A      When we saw our bail amounts.

23         Q      Did you have meetings with the other eight

24    inmates to plan for this hunger strike?

25         A      We met in order to see what the -- what our

                                                              43

1    don't remember very well, but I think at 7:00 in the

2    morning.

3        Q    So it's after breakfast?

4        A    Yes.

5        Q    So you knew that after breakfast, you were

6    supposed to go back to your bed for count?

7        MS. FLYNN:   Objection.  Calls for speculation.

8        THE WITNESS:  Yes.  But since we were -- we wanted

9    to be heard, and we wanted to speak to an ICE officer.

10   That's why we did not return to our beds.

11   BY MS. STROTTMAN:

12       Q    So is count announced over the loud speaker?

13       A    The officer just says, "Count."

14       Q    And on June 12, 2017, did an officer call for

15   count?

16       A    Count time, yes.

17       Q    And you did not go back to your bed; is that

18   correct?

19       A    We did not go back because we wanted to see the

20   ICE officer.

21       Q    Is there a reason why you didn't ask to see an

22   ICE officer later in the day?

23       A    No.  Because we needed to be heard.  We had a

24   problem with -- a problem with the inefficiencies that

25   they had at the center for what we lacked.  And so we

46

1      A    Well, we were at the table.  The lady arrived,

2   and, well, she was yelling in English.  And she pulled

3   out the gas from -- the pepper gas, and she was hitting

4   it against the table.

5      Q    Did you understand anything she was saying?

6      A    No.

7      Q    Had you ever seen any officers use pepper spray

8   at Adelanto before this date?

9      A    No.

10     Q    When you were planning the hunger strike, had

11   you ever discussed the possibility that they may try to

12   remove you from the tables?

13     A    Well, we never imagined that because, well,

14   what they did to us, you don't even do that to an

15   animal.

16     Q    Did you ever imagine, though, that they would

17   ask you to leave the tables?

18     A    We did imagine that, but they didn't ask for

19   that.

20     Q    How do you know they didn't ask for that?

21     A    Well, they didn't say it in Spanish.  I don't

22   know if they said it in English.

23     Q    And what happened after the woman in the white

24   shirt came in and hit this pepper spray on the table?

25     A    Well, she continued yelling in English.  She

54

1    yelled several times.  She went around us, around the

2    table.  And after that she called on the radio and

3    requested -- they requested more guards.

4         Q    How do you know she requested more guards?

5         A    No.  What I mean is that she called on the

6    radio and more guards arrived, so that's why I'm saying

7    that she requested guards.

8         Q    And what happened after that?

9         A    Well, the guards stood around us, and they

10   started digging their nails behind into -- behind our

11   ears.  They were digging their nails into our hands right

12   here, as well (indicating).  And, well, all we did was

13   just hold hands, all of us, the whole group, and they

14   started forcing us -- using force.

15        Q    So while you were planning this hunger strike,

16   you didn't imagine that they would use any force?

17        A    Never.

18        MS. FLYNN:  For the record, when he was talking

19   about them -- I don't know what the exact word was, like

20   squeezing or pinching his hand between -- on the outside

21   and inside of the hand, between the thumb and the pointer

22   finger.

23        MS. STROTTMAN:  Okay.

24   BY MS. STROTTMAN:

25        Q    So where do you claim that they were -- can you

                                                          55

1    could not access personal e-mail?

2         A    No, ma'am.

3         Q    So the only e-mail, to your knowledge, that you

4    could access at work in the watch office was the GEO

5    e-mail?

6         A    Yes, ma'am.

7         Q    On the morning of June 12th, 2017, if you

8    recall, did you receive any memos or e-mails that you

9    needed to convey to your staff?

10        A    I don't recall.

11        Q    Do you recall whether anyone called off that

12   day?

13        A    I do not recall.

14        Q    After you got ready for shift, what is the next

15   thing you did that morning?

16        A    Went into shift briefing.  And, basically, let

17   everybody know they were -- where they were posted at

18   that day and anything that may have happened the night

19   before.

20        Q    Were shift briefings -- strike that.

21             Did you conduct a shift briefing at the

22   beginning of every shift?

23        A    Yes, ma'am.

24        Q    And that was throughout your time at Adelanto?

25        A    Yes, ma'am.

Page 56

1    Q    Okay.  And how long were they holding?

2    A    They would let go, and then they would pull us,

3    and they would apply pressure again several times.

4    Q    And do you know what officer that was?

5    A    No.

6    Q    Can you describe what other physical force you

7    claim that the officers used against you?

8    A    They also pinched us.  They would grab us here

9    from the sides of our ribs (indicating), and they would

10   pull our skin.

11   Q    Anything else?

12   A    That's all.

13   Q    And when you alleged that they were grabbing

14   your sides, was that to pull you away from the table?

15   A    With the same -- so they would grab us here and

16   apply pressure and pull us back, but with force

17   (indicating).

18   MS. FLYNN:  I want to put in an objection that calls

19   for speculation.

20   BY MS. STROTTMAN:

21   Q    When you say "here," I'm just trying to make

22   sure that we have this recorded, so you are pointing to

23   your --

24   A    On my side where my ribs are.

25   Q    So you've now described digging nails behind

57

1    your ear, pressure -- using force on your hands, and then

2    pulling, grabbing the sides of your ribs?

3         A    Yes.

4         Q    Okay.  And that's -- any other force that you

5    recall personally being used against you?

6         MS. FLYNN:  Objection.  Vague.

7         THE WITNESS:  That was before the pepper gas and the

8    pulling that they did on us.

9    BY MS. STROTTMAN:

10        Q    Okay.  And so do you claim you were sprayed

11   with pepper spray?

12        A    Yes.  Quite a lot on myself.

13        Q    Okay.  Where were you -- where do you claim

14   that you were sprayed?

15        A    First, she sprayed -- first, she sprayed the

16   table in general.  After that since we just put our face

17   down on the table, the lady started to -- one by one, she

18   would shake it and then go like this (indicating)

19   until -- and the guards were pulling us to remove us.

20        Q    What parts of your body do you claim were hit

21   with the pepper spray?

22        A    It wasn't hit.  It got into my face and my

23   mouth because when it hit me, I screamed out, and it went

24   into my mouth and into my eyes as well.

25        MS. FLYNN:  Did he say "me echo"?

58

1          THE INTERPRETER:  This is the interpreter speaking.

2     M-e space e-c-h-o, which is she sprayed me.

3     BY MS. STROTTMAN:

4          Q     Okay.  So what happened after you were

5     sprayed?

6          A     When she sprayed my face, I got up, and I was

7     screaming, and because I couldn't see -- so as I was

8     screaming, some more pepper gas went into my mouth.

9               The guards came over and grabbed me by my hands

10    and handcuffed me behind me, and pulled me out, took me

11    out.

12         Q     Do you allege that you were injured in any

13    other way while you were being pulled out?

14         A     Just my arms were hurting, this here

15    (indicating), because they were grabbing my hands and

16    pulling my hands back hard by force, and then they

17    handcuffed me.

18         Q     Did you hit the ground at any time?

19         A     No.

20         Q     Do you know how many officers were used to

21    remove you from the room?

22         MS. FLYNN:  Objection.  Vague.

23         THE WITNESS:  No, I don't know.  My eyes were

24    closed.

25    BY MS. STROTTMAN:

59

1    Q    So before the officer started using pepper

2  spray, could you see what the other inmates, who were not

3  at the table, were doing?

4    A    The fellow dorm inmates?

5    Q    Yes.

6    A    They were in their beds.

7    Q    Did you hear if they were saying anything or

8  shouting anything?

9    A    When they started spraying us with the gas,

10  they started yelling at them that what they were doing is

11  not correct, that it was not legal.  And the lady just

12  yelled at them too and threatened them with the spray

13  that if they -- she passed it at them like this

14  (indicating), like if she wanted to spray it at them,

15  throw it at them as well.

16    Q    Did she threaten them verbally?

17    A    She tell yelled at them in English.  And she

18  moved the container of pepper gas like this (indicating).

19    Q    Could you understand what she was saying in

20  English?

21    A    No.

22    Q    Before she started spraying you, did the

23  inmates in the dormitory say something?  Could you hear

24  them say anything?

25    A    No.  They were just watching.

60

1          MS. STROTTMAN:  Okay.  So it's 12:30 right now.  So

2     we can take our lunch break.

3               (Interruption in the proceedings.)

4          MS. STROTTMAN:  I'm going to show you the video of

5     the incident, and then I'm just going to show different

6     sections to see if you can help identify the different

7     individuals on the video; okay?  Are you able to see the

8     screen?

9          THE WITNESS:  Yes.

10         MS. STROTTMAN:  So currently we are looking at

11    camera angle East 2-C 2.  And the time on here is 6:22

12    a.m.

13         MS. FLYNN:  You said 6:22?

14         MS. STROTTMAN:  Yes.

15    BY MS. STROTTMAN:

16         Q    So do you recognize this view right here?

17         A    Yes.

18         Q    Okay.  And can you describe what this room

19    is?

20         A    That's the tank we are in.  For example, on

21    this side this is where my bed was at the at bottom.

22         Q    And "by this side," do you mean to the right

23    hand?

24         A    To the right, yes.

25         Q    And was your bunk on the bottom level?

                                                          61

1        MS. STROTTMAN:  You can answer.

2        THE WITNESS:  Well, like I said, that's what was

3   said verbally to the guard.

4   BY MS. STROTTMAN:

5        Q    Is there any reason why this wasn't written

6   down?

7        A    Really, another sheet of paper was also handed

8   in with the names of the fellow detainees, but I don't

9   know where that sheet of paper ended up.  I don't know

10  what the guard did with it.

11       Q    What did that sheet of paper say?

12       A    That's where all of our names were on.  And

13  that, if I'm not mistaken, that's where it said that we

14  were starting the hunger strike.

15       Q    Oh, so there's another paper?

16       A    There's another sheet of paper that was handed

17  to the guard.  I don't know.

18       Q    So there were three sheets of paper handed to

19  the guard?

20       MS. FLYNN:  Objection.  Misstates the testimony.

21  Lacks foundation.  Argumentative.

22       THE WITNESS:  That was the presentation of the sheet

23  of paper, but I don't know what they did with it.

24  BY MS. STROTTMAN:

25       Q    But I'm asking.  So the sheet of demands that

78

1    Q    Did the officers take -- did you have water
2  bottles at your table?
3    A    I don't recall.  I think so.  I don't remember,
4  but I think so,  yes.
5    Q    Was your plan to drink water during your hunger
6  strike?
7    A    Not on my part.  I don't know about my other
8  fellow detainees.
9    Q    Did anyone request a Spanish translator when
10  the officers were -- came to the table?
11    A    No.
12    Q    Why not?
13    MS. FLYNN:   Objection.  Calls for speculation.
14    THE WITNESS:  Because if people are going to work at
15  detention centers, it's obvious that these are going to
16  be migrants.  They're not going to speak English.  So the
17  people that need to work there need to speak both
18  languages.
19  BY MS. STROTTMAN:
20    Q    At 6:38 a.m., it appears that you are holding
21  hands; is that correct?
22    A    We held hands, yes.
23    Q    And why did you do that?
24    A    Because by then they were pulling on the other
25  fellow detainees.

81

1      Q     -- other than Officer Lacy?

2      A     Yes, ma'am.

3            MS. AGUADO:  Calls for speculation.  It's a

4      minor issue --

5      BY MS. STEINBACK:

6      Q     Based on your experience and understanding, and

7      you believe it looks like those are consistent with

8      Captain McCusker's handwriting?

9            MS. AGUADO:  Objection.  She's not an expert on

10     handwriting.

11           MS. STEINBACK:  I'm not calling her an expert.

12     I'm just saying based on her experience.

13           MS. AGUADO:  How can you say based on your

14     experience does a specific writing look like someone

15     else's?  It doesn't really make sense.

16           But you can go ahead and answer.

17           MS. STEINBACK:  Sure.  And if you could just

18     keep to proper objections, just so that --

19           MS. AGUADO:  Okay.

20           MS. STEINBACK:  -- we can keep this going, that

21     would be great.

22     BY MS. STEINBACK:

23     Q     So based on your experience, having read

24     Officer McCusker's -- Captain McCusker's handwriting,

25     you believe that the "Jane" and the "Lakeishia" were

Page 84

1    written by Captain McCusker?

2              MS. AGUADO:  Calls for speculation.

3              Go ahead.

4              THE WITNESS:  Unknown.  It's unknown who wrote

5    those in.

6    BY MS. STEINBACK:

7         Q    Sure.  But it looks like it might be Captain

8    McCusker's handwriting --

9              MS. AGUADO:  Objection.  Calls --

10   BY MS. STEINBACK:

11        Q    -- as with the other reports?

12             MS. AGUADO:  Calls for speculation.

13   BY MS. STEINBACK:

14        Q    I'm just asking for your opinion on what it

15   looks like.

16        A    It's unknown.

17        Q    Okay.  Sure.  I'm going to now give you

18   Plaintiffs' Exhibit 6, which is Bates stamped GEO 02270.

19             (Plaintiffs' Exhibit 6 was marked

20             for identification.)

21   BY MS. STEINBACK:

22        Q    Do you recognize this report?

23        A    Yeah.  General incident report.

24        Q    Did you review this report before today's

25   deposition?

```
 1        Q    Did you review this report before today's

 2   deposition?

 3        A    Yes, ma'am.

 4        Q    Is that your signature at the bottom of the

 5   page?

 6        A    Yes, ma'am.

 7        Q    Are there any notations or words on this

 8   document that were created by you?

 9        A    No, ma'am.

10        Q    And as with the other reports, does it appear

11   to you that, in the first box, the "use of force"

12   notation in the parenthetical was created by Captain

13   McCusker?

14        A    McCusker, yes, ma'am.

15        Q    Thank you.  Is there anything else on this

16   document that looks to you like it might have been added

17   by Captain McCusker?

18        A    No, ma'am.

19             MS. STEINBACK:  I'm going to tender to the

20   deponent Exhibit 8, which has Bates range GEO 02251

21   through GEO 2253.

22                  (Plaintiffs' Exhibit 8 was marked

23             for identification.)

24   BY MS. STEINBACK:

25        Q    Do you recognize this report?
```

1        A     Yeah.   General incident report.

2        Q     Did you review this report before today's

3    deposition?

4        A     Yes, ma'am.

5        Q     Okay.   Is that your signature at the bottom of

6    this page?

7        A     Yes, ma'am.

8        Q     Okay.   Are there any words or notations on this

9    document that you created?

10        A     No, ma'am.

11        Q     Are there any words or notations on this

12    document that appear to you to have been added by

13    Captain McCusker?

14        A     No, ma'am.

15        Q     Okay.   And this report was authored by a

16    sergeant, not an officer; is that correct?

17        A     Yes, ma'am.

18        Q     Was this a sergeant who you regularly

19    supervised?

20        A     No, ma'am.

21        Q     Had you ever supervised Sergeant Campos?

22        A     No, ma'am.

23        Q     Was this the first time you had ever met

24    Sergeant Campos?

25        A     No, ma'am.

Veritext Legal Solutions
866 299-5127

```
 1              THE WITNESS:  Unknown.  I do not know why.
 2    BY MS. STEINBACK:
 3        Q    So that was not the protocol, for Officer
 4    Lanuza to give it directly to the chief of security?
 5              MS. AGUADO:  Objection.  It's misstating her
 6    testimony.
 7              Go ahead.
 8              THE WITNESS:  Unknown why.
 9    BY MS. STEINBACK:
10        Q    Did it violate protocol, as you understood it
11    to exist at Adelanto --
12        A    No.
13        Q    -- for Officer Lanuza to give this directly to
14    Chief of Security Johnson?
15        A    No.
16        Q    What was the protocol for report reviews in
17    June of 2017?
18              MS. AGUADO:  Based on your understanding.
19              THE WITNESS:  Like I said, it's unknown why
20    this went to him.
21    BY MS. STEINBACK:
22        Q    Should it have gone to you first?
23        A    Unknown why it went to him.  I'm not sure why
24    it went to him first.
25        Q    Would you, based on your experience and your
```

Page 92

1    gas.  The showers that they had there were hot water, and

2    we were like that for around five days.

3           We needed to take the bed sheet off of the

4    mattress in order to be able to lay down and feel the

5    coolness because we felt the vapor that was burning our

6    body, or else we would just lay on the ground because

7    they weren't giving us anything.

8        Q    So how long -- you said -- you said you felt

9    the effects of the pepper spray for five days?

10       A    Between four to five days because every time

11   they would take us to the showers, the showers were hot.

12   They didn't give us anything to take it away.  My fellow

13   inmate Julio, he came the next day, and he was just

14   writhing around on the floor after the shower because he

15   couldn't handle it, and I was fanning him with a shirt.

16       Q    Did you give any statements during the

17   investigation?

18       MS. FLYNN:   Objection.  Vague.

19       THE WITNESS:  I don't recall.

20   BY MS. STROTTMAN:

21       Q    And this was your first hunger strike; is that

22   correct?

23       A    Yes.

24       Q    Do you claim that you had problems with the

25   phones after the incident on June 12th?

                                                        93

1      A     All numbers were blocked.

2      Q     Did you have problems calling people before the

3    incident?

4      A     Not before.  We would speak normally, but then

5    after that, all of the numbers were blocked.

6      Q     Who were you trying to call?

7      A     A friend and my sister in-law.

8      Q     Did you have -- did you have their phone

9    numbers?

10     A     I had them written down.  And, yes, the

11   number -- the call wasn't going out.  Remember it had

12   been blocked.  In fact, even my attorney's number was

13   blocked as well.

14     Q     I thought you said you didn't have your

15   sister-in-law's phone number?

16     A     Afterwards once I spoke to one of my friends,

17   he got me my sister in-law's number, but I didn't have

18   the numbers for the rest of my family.

19     Q     So what was your attorney's name that you tried

20   to call?

21     A     John "MacClure."

22     Q     And what was the name of your friend that you

23   were trying to call?

24     A     Alex.

25     Q     Is that Alex "Mensing"?

94

```
 1        A    Yes.

 2        Q    Was he part of an immigrant's rights group?

 3        A    Yes.  He was -- he supports migrant people, and

 4   he was supporting me to get me an attorney because I

 5   didn't have a way to pay for an attorney.

 6        MS. FLYNN:  We are going to take a quick break.

 7   Were you done with your answer?

 8        THE WITNESS:  Yes.

 9             (Interruption in the proceedings.)

10   BY MS. STROTTMAN:

11        Q    How did you meet Alex?

12        A    In Mexico.

13        Q    So you met him before you came to the United

14   States?

15        A    Yes.

16        Q    And how did you meet him in Mexico?

17        A    I got into a caravan, and he was already in

18   that caravan.

19        Q    Were you ever able to get a hold of Alex after

20   the incident by phone?

21        A    I was able to contact him afterwards because

22   there was just one phone number that they were not able

23   to block from a journalist, Pilar, from the La Opinion

24   newspaper.

25             And I called her to have her contact Alex as
```

95

1   calls to.  After the incident, all numbers were blocked.

2        Q    All numbers that you had previously called?

3        A    Yes.

4        Q    But not phone numbers that you had not called

5   before?

6        A    Uh-huh.

7        Q    Is that correct?

8        A    Yes.

9        Q    So were you ever able to reach your sister

10   in-law after the incident?

11        A    With her, it already stopped, and my brother

12   too.  She was going to be my sponsor, but then she said

13   that she couldn't help me.  She gave in, and she said she

14   could no longer help me.  And then I stopped bothering

15   her because she said that she couldn't.

16        Q    But my question was:  Were you able to call her

17   after the incident?

18        A    No.

19        Q    Were you able to call, in fact, John MacClure?

20        A    When he came out to visit me, I told him that

21   that number was blocked.  And, well, I don't know what he

22   did at Adelanto, but they unblocked his number.

23        Q    Anyone else, specifically, whose phone number

24   was blocked?

25        A    I no longer remember.

99

```
 1    answering.

 2            So during the time that you were a lieutenant

 3    at Adelanto, you never corrected -- made corrections to

 4    any of your officers' reports before giving them to your

 5    captains?

 6            MS. AGUADO:  Objection.  It's been asked and

 7    answered.  She's testified that she corrected spelling.

 8            You can go ahead and respond again.

 9            THE WITNESS:  Like I said, just correction to

10    their spelling.

11    BY MS. STEINBACK:

12       Q    Okay.  So you never had to correct, for

13    example, factual inaccuracies?

14       A    No, ma'am.

15       Q    So you feel like your officers did a pretty

16    good job reporting what had happened?

17       A    Yes, ma'am.

18       Q    Great.  And they included all the relevant

19    details?

20       A    Yes, ma'am.

21            MS. STEINBACK:  I'll tender to the deponent

22    what's been marked as Plaintiffs' Exhibit 11.  It's

23    Bates-stamped GEO 2236 and 2237.

24            (Plaintiffs' Exhibit 11 was marked

25            for identification.)
```

                                            Page 101

```
 1       Q    And by that, I mean, since you started working
 2   at Adelanto?
 3       A    Yes, ma'am.
 4       Q    How did -- were you told that you needed to
 5   fill out a use-of-force report?
 6       A    Yes, ma'am.
 7       Q    Who told you that?
 8       A    Captain McCusker.
 9       Q    Did you know that you were going to need to
10   fill out a use-of-force report before Captain
11   McCusker told you to do it?
12       A    I knew, but I didn't know how to fill it out.
13   So he assisted me with it.
14       Q    So did you go to Captain McCusker and say,
15   "Captain, I have to fill out a use-of-force report.  Can
16   you help me?" or how did it unfold?
17       A    No.  He came to the watch office to assist me.
18       Q    When was that?
19       A    Right after the incident.
20       Q    How did he know to come to the watch office to
21   find you?
22       A    Because I was in the watch office having my
23   officers write all this out and trying to find this on
24   the computer.  And he told me we had to do a use of
25   force.
```

Page 103

```
 1              So you printed it out, and then what happened?

 2     A     Then we filled it out.

 3     Q     So he filled it out with you?

 4     A     Yes, ma'am.

 5     Q     Had he been present for the incident?

 6              MS. AGUADO:  If you know.

 7              THE WITNESS:  I don't believe he was in the

 8     unit when this happened.  No, ma'am.

 9     BY MS. STEINBACK:

10     Q     Could you take the highlighter that I've given

11     you and highlight all of the words and notations on here

12     that you made.

13              (Witness complied.)

14     BY MS. STEINBACK:

15     Q     Okay.  If I may look at it?

16     A     There you go.

17     Q     Thank you.

18     A     You're welcome.

19     Q     Looking at this, it might have been easier to

20     just ask you to highlight what he did.

21              So just for the record, there are no highlights

22     on page 1 indicating that the deponent did not make any

23     of the marks on page 1, which is Bates-stamped GEO 2236.

24              I want to make sure that the record is

25     accurate.  So on page GEO 2237, you've highlighted, it
```

Page 106

1    looks like -- would it be correct to say all of the

2    officers written -- whose names are written under

3    Confrontation Avoidance?

4        A    Yeah.

5        Q    Okay.  You also highlighted the N/A under Force

6    Cell Team Members.

7        A    Uh-huh.

8        Q    And the next box, asking if the incident was

9    videotaped, it looks like you highlighted the wording

10   next to no.

11       A    Uh-huh.

12       Q    And could you read that for the record, the --

13   what you wrote on this.

14       A    Uh-huh.

15       Q    Thank you.

16       A    Okay.  "No video camera.  Recorder" -- they

17   recorded through our central control.  They had access

18   to their cameras in there.  That was it.  We didn't have

19   a video camera present.

20       Q    Okay.  So just -- in terms of the box that you

21   were just reading, do you mind just reading into the

22   record just so that we all know the exact words that you

23   wrote.

24       A    "No video camera."

25       Q    Okay.  What other -- are there any other words

                                              Page 107

```
1    in that box that you wrote?

2        A    Our recorder -- the recorder was through our

3    central control camera.

4        Q    So those are all the words that you wrote in

5    that box?

6        A    Yes, ma'am.

7        Q    Okay.  In the box below it, it looks like you

8    highlighted -- did you highlight everything in that box?

9        A    Yes, ma'am.

10       Q    Okay.  And if you could just read it for the

11   record so that we all know exactly what it is that you

12   wrote.

13       A    Let's see.  "Staff carry."  Let's see.  "R.

14   Gillon -- he had restraints.  G. Martinez, used physical

15   force by pulling the detainees apart that had locked

16   arms."

17       Q    What about above that?

18       A    Okay.  It says "Hard restraints used.  This is

19   what are" -- that's all it says.  I don't know what --

20       Q    Okay.

21       A    -- what that is.

22            And then Burks assisted to separating the

23   detainees.  Marmolejo assisted in restraining the

24   detainees with restraints.

25       Q    With hand restraints?
```

Page 108

# EXHIBIT 27

# ORIGINAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| OMAR ARNOLDO RIVERA MARTINEZ;<br>ISAAC ANTONIO LOPEZ CASTILLO;<br>JOSUE VLADIMIR CORTEZ DIAZ;<br>JOSUE MATEO LEMUS CAMPOS; MARVIN<br>JOSUE GRANDE RODRIGUEZ; ALEXANDER<br>ANTONIO BURGOS MEJIA; LUIS BARAHONA<br>CORNEJO, as individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>THE GEO GROUP, Inc., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) CASE NO. 5:18-cv-<br>)        01125-R-GJS<br>)<br>)<br>)<br>) |

WEBCAM DEPOSITION OF OMAR ARNOLDO RIVERA MARTINEZ

Taken on

Thursday, June 6, 2019

**NORMAN SCHALL & ASSOCIATES**
CERTIFIED SHORTHAND REPORTERS

REPORTED BY:

Amber Pilson, CSR 13992

1055 Wilshire Blvd., Suite 1503
Los Angeles, CA 90017
(800) 734-8838
(213) 481-3636 Fax
e-mail: SchallDepo@aol.com
www.SchallCourtReporters.com

Orange County • Inland Empire • San Diego County • Ventura County • Temecula

1       A.    Quite frankly, I just didn't want to be with

2    her.  I didn't want to be with her anymore.

3       Q.    So were you called to court for a criminal

4    accusation or for divorce?

5       A.    Yes, because of my wife.

6            MS. ALARCON:  Just wait until she finishes

7    translating before you answer.

8            THE WITNESS:  Yes.

9    BY MS. COLEMAN:

10      Q.    Were you convicted of any criminal charges?

11      A.    Yes.

12      Q.    What?

13      A.    Theft.

14      Q.    Is that theft or robbery?

15            MS. ALARCON:  Objection.  Lacks foundation;

16    calls for legal conclusion.

17            You can answer.

18            THE WITNESS:  Yes, I can answer, but it was not

19    robbery because had it been robbery, I would have gotten

20    many years.

21            MS. ALARCON:  If I can ask that the interpreter

22    translate the objection as well so the witness is aware

23    of what I said.

24            THE INTERPRETER:  I will do that.

25    //

9

1      A.   All right.

2      Q.   What did you see yourself doing on the video?

3      A.   I was sitting down.  Then I would stand up.

4      Q.   When you saw yourself sitting on the video,

5  where were you?

6      A.   Are you asking me about the place?

7      Q.   Yes.

8      A.   In Adelanto Detention Center in Central

9  California.

10     Q.   It's in Adelanto, isn't it?

11     A.   Yes.

12     Q.   When you saw yourself on the video, were you at

13  one of the tables in the dayroom?

14     A.   Yes, I was there.  Yes.

15     Q.   Which table were you at in the dayroom?

16     A.   The second one.

17     Q.   The second one from the bottom on the video?

18     A.   I was sitting at the second table.

19     Q.   What side of the table were you sitting at?

20     A.   I was sitting at the first seat of the second

21  table.

22     Q.   On the left or on the right?

23     A.   To my -- to my right hand.

24     Q.   Is that -- when you were watching the video,

25  were you on the right side of the table on the video?

13

```
 1        A.    No, ma'am.

 2        Q.    You said you asked an ICE officer.  Where was

 3   that?

 4        A.    In Adelanto, California.

 5        Q.    So were they all ICE officers?

 6        A.    No, ma'am.

 7        Q.    I asked you if you saw ICE and GEO officers,

 8   and you said "No."

 9        A.    Yes, ma'am, but ICE officers is one thing and

10   GEO officers another thing.

11        Q.    And Adelanto had both?

12        A.    Yes.

13        Q.    Could you tell the difference?

14        A.    Well, of course I did.

15        Q.    How?

16        A.    You want me to say something?

17        Q.    Yes.  How could you tell the difference between

18   ICE and GEO officers?

19        A.    Because the GEO officers are in uniform, and

20   the others are not.

21        Q.    What do the ICE officers wear?

22        A.    Just clothes like the ones we are in right now.

23        Q.    Jeans and a T shirt?

24        A.    Yes.  The types of pants that I'm wearing right

25   now.
```

46

```
 1        Q.    I'm sorry.  I can't see them.
 2              What type of pants are you wearing?
 3        A.    Jeans.
 4        Q.    Did you ever file a grievance related to the
 5   food at Adelanto?
 6        A.    Yes, ma'am.
 7        Q.    When?
 8        A.    On several occasions, I did that.
 9        Q.    In writing?
10        A.    Yes, ma'am, but we would do it as a group.
11        Q.    Like on the day of the incident?
12        A.    Yes.
13        Q.    Did you ever file a grievance by yourself about
14   the food?
15        A.    No, ma'am.
16        Q.    What was your complaint about the food?
17        A.    That the rice was hard; they were giving us
18   very little food sometimes; most of the time, the food
19   was not well cooked; sometimes the chicken would be
20   bloody; and the at the end, it was very little food.
21        Q.    Any other complaints about the food?
22        A.    No.
23        Q.    What did they feed you for breakfast usually?
24        A.    Piece of fruit.
25        Q.    Anything else?
```

47

```
 1        Q.    You said, "He, himself, sent me somewhere
 2   else."
 3              Who are you referring to?
 4        A.    Well, just to say, in other words, he said, "I
 5   don't want to help you with this case."
 6        Q.    That was the dentist right?
 7        A.    Also the ICE officer.  I put in a grievance and
 8   I explained it to him, and he says, "No, I don't want to
 9   help you with this either."
10        Q.    Was that in writing?
11        A.    Yes.
12        Q.    Did you ever have any problems with the medical
13   care not the dental care?
14        A.    Yes.  Quite frankly, the nurses they don't help
15   you out.  They just do whatever.  If you are sick, they
16   don't pay attention to you.  That's the truth because
17   they say to us, "You are immigrants that are coming to
18   our country."  Until we got to the point where we
19   demanded to see a doctor, but they don't send you until
20   whenever.
21        Q.    What do you mean "whenever"?
22        A.    If the nurse likes you, they're going to take
23   you in real quickly.  If not, they're just going to keep
24   you there waiting.
25        Q.    Did the nurse like you?
```

51

1    your body.

2         Q.    Okay.  We have two negatives there, so I want

3    to clarify this:  After you were pepper sprayed, how long

4    was it before you showered?

5         A.    Almost three weeks, ma'am.

6         Q.    You're saying you did not have a shower on the

7    day of the incident?

8         A.    No, ma'am.

9         Q.    Were you offered a shower after the incident?

10        A.    Yes, ma'am, but I didn't want to do that

11    because I could see my friends.

12        Q.    You could see them what?

13        A.    The water is hot and the gas -- the gas on your

14    body feels like you're dying.

15        Q.    That is what you heard?

16        A.    I saw it with my eyes that my friends showered

17    after the incident.  I would see my friends crinkle with

18    their bodies, and somebody said to me, "Don't shower."

19        Q.    Who told you that?

20        A.    My friend.

21        Q.    Do you know their name?

22        A.    Yes.

23        Q.    What was the name of your friend who told you

24    not shower?

25        A.    Julio.

                                                              55

1        Q.    Were you taken out of handcuffs to change?

2        A.    Yes, ma'am.  At the time of the incident, we

3   were handcuffed at all times.

4        Q.    When were you taken out of handcuffs?

5        A.    Just for me to take my clothes off.

6        Q.    And then were you put back in handcuffs?

7        A.    Yes, ma'am.

8        Q.    When were the handcuffs taken off next?

9        A.    At that point because they had put them

10   really -- it was like it was stuck.

11        Q.    It was tight?

12        A.    Yeah.

13        Q.    So they took the handcuffs off for you to

14   change and then put the handcuffs back on?

15        A.    Yes, ma'am.

16        Q.    Were the handcuffs put on loose or --

17        A.    No, ma'am.  We then asked them because they

18   were really tight.

19        Q.    The handcuffs were tight before you changed and

20   after?

21        A.    Yes, ma'am.

22        Q.    How long did you have the handcuffs on after

23   you changed?

24        A.    I don't remember ma'am.

25        Q.    Can you estimate?

59

```
 1        A.    No, ma'am.  I don't remember.

 2        Q.    Was it more than an hour?

 3        A.    No, ma'am.  It was more, but I don't remember.

 4        Q.    When you were put into a cell, were your

 5   handcuffs taken off?

 6        A.    No, ma'am, I was taken to the hole.

 7        Q.    Do you mean administrative segregation?

 8              MS. ALARCON:  Objection.  Calls for

 9   speculation; lacks foundation.

10              THE WITNESS:  Yes.  The cell for punishment,

11   but before that, a commander took my picture.

12   BY MS. COLEMAN:

13        Q.    Who took your picture?

14        A.    A commander.

15        Q.    What is a commander?

16        A.    A chief, a supervisor that gives orders in the

17   institution.

18        Q.    Were you seen by medical after the incident?

19        A.    Yes, ma'am.

20        Q.    Were you in handcuffs when you saw medical?

21        A.    Yes, ma'am.

22        Q.    Were the handcuffs in front or in back?

23        A.    We were taken like this, and then the officer

24   is grabbing us.

25        Q.    So you were handcuffed behind your back?
```

60

```
 1    speculation.

 2               THE WITNESS:  I don't know, ma'am.  The only

 3    thing I know is that you're locking all the time, and

 4    then you get about 15 minutes out in the yard, and that's

 5    it.  That's why we call it "the hole."

 6    BY MS. COLEMAN:

 7        Q.    You said "you're looking" all the time, or

 8    locked up?

 9        A.    Yes, ma'am.

10        Q.    You do not have to call me "ma'am" all the

11    time.

12        A.    Sorry.

13        Q.    Didn't you get an hour of exercise time per

14    day?

15        A.    We would only get 15 minutes or half an hour.

16    We were restricted about going out because of the strike.

17        Q.    Were you ever told you were put in

18    administrative segregation so that they could investigate

19    the incident?

20        A.    Yes, ma'am.

21        Q.    And you're saying you only got 15 minutes and

22    not one hour of yard time per day?

23               MS. ALARCON:  Objection.  Misstates his

24    testimony and calls for speculation.

25               THE WITNESS:  Ma'am, the only thing I know is
```

70

```
 1    that we were being punished.  I mean, we wanted to go out

 2    to the yard.  We didn't know whether we were going to get

 3    15 minutes or one hour or two hours because the officers,

 4    the ones that are watching over us -- keeping watch over

 5    us, they were restricting.

 6    BY MS. COLEMAN:

 7         Q.    What was restricted?

 8         A.    In going out, ma'am.

 9         Q.    You said the officers were restricted?

10         A.    They would tell us so, that we could not go

11    out.

12         Q.    I think my original question is whether you got

13    15 minutes or an hour.

14         A.    The truth of the matter is I don't know, ma'am.

15         Q.    How long were you in administrative

16    segregation?

17         A.    From administrative, we were punished for ten

18    days.

19         Q.    So you were in that unit for ten days?

20         A.    Yes.

21         Q.    And how long after that were you sent to Theo

22    Lacy?

23         A.    So this was in 2018, and it was -- not even two

24    months.  I don't remember very well.

25         Q.    So two months or so later, you were sent to
```

71

1    on June 12th.  I don't want to make a mistake, but it was

2    on a Monday, days before.

3        Q.    The day before?

4        A.    No, ma'am.

5        Q.    So how many days before did you and the other

6    eight talk about writing up your complaint?

7        A.    Quite frankly, a week before.  I'm not going to

8    lie.

9        Q.    And you guys talked about writing up your

10   complaints and your demands?

11       A.    Yes, ma'am.

12       Q.    What was the plan on the hunger strike?

13       A.    Quite frankly, it was a bail that had been set

14   for my friends was the detail that we were all talking

15   about, $50,000 bail -- 45, 40, 35, 30 -- and I was the

16   only one who -- for whom no bail had been set.

17       Q.    You had no bail, or it hadn't been set yet?

18       A.    I had not received the paperwork.  When the

19   paperwork was received, I was in segregation.

20       Q.    What was the amount of your bail?

21       A.    Nothing.  No bail was set.

22       Q.    Never?

23       A.    No.

24       Q.    Do you know why?

25       A.    I don't know.

74

```
 1    an officer should tell someone "motherfucker."
 2        Q.    Say that again?
 3        A.    I don't think that an officer that is working
 4    in a center, like a GEO, should say motherfuckers.
 5        Q.    Did you hear officers say that?
 6        A.    Many times.
 7        Q.    Did anyone say that to you?
 8        A.    Yes.
 9        Q.    I heard him laugh, but I didn't hear an answer.
10              Did he say yes?
11              THE INTERPRETER:  Yes.
12    BY MS. COLEMAN:
13        Q.    Any other mistreatment that you're referring
14    to?
15        A.    As I said -- no, just that.
16        Q.    What were the other issues for your group, the
17    other problems that you discussed?
18        A.    Well, the officers, whether they're men or
19    women working there, they would mistreat us.  They didn't
20    care.  They would just get a plastic bag, and they would
21    throw away everything that they would find.
22        Q.    During the cell inspections?
23              MS. ALARCON:  Objection.  Calls for
24    speculation.
25              THE WITNESS:  No, ma'am.
```

1    be paid of the bail?

2        A.    No, ma'am.  At that point, I didn't hear

3    anything like that.

4        Q.    You didn't hear anything -- you said you didn't

5    hear anything?

6        A.    No.

7            MS. COLEMAN:  I'm sorry.  Sometimes I can't

8    hear you, the translation.

9            THE INTERPRETER:  I'm sorry.  I'm trying to

10   speak into the microphone.

11           MS. COLEMAN:  I know you're facing towards him,

12   so.

13           THE INTERPRETER:  Okay.

14   BY MS. COLEMAN:

15       Q.    So when you talked with the group about writing

16   up your complaints, who ended up writing the letter?

17       A.    All together, ma'am.

18       Q.    Was it your writing on the letter?

19       A.    No, ma'am.

20       Q.    Whose writing was it?

21       A.    I don't know that, ma'am.

22       Q.    Did you agree with what was written?

23       A.    Yes, ma'am.

24       Q.    And who went to the podium to hand the letter

25   to the officer on the morning of June 12, 2017?

                                                          78

```
 1              THE WITNESS:  Yes.  She was a supervisor.  She
 2    oversees other officers that are there.
 3    BY MS. COLEMAN:
 4        Q.    Do you know her name?
 5        A.    No.
 6        Q.    Can you estimate how many officers were with
 7    her?
 8        A.    I don't know that, ma'am.
 9        Q.    I'm asking if you can estimate; not a
10    calculation.  I'm asking for an estimation.
11        A.    I cannot estimate.  I'm sorry.
12              MS. COLEMAN:  Is calcular to estimate?
13              THE INTERPRETER:  If you're asking the
14    interpreter, yes.
15    BY MS. COLEMAN:
16        Q.    Were there more than five officers?
17        A.    Quite frankly, I don't know.  I can't estimate.
18        Q.    How long ago did you see the video last?
19        A.    I just saw it yesterday.
20        Q.    When you saw the video, can you tell how many
21    officers were there?
22        A.    I did see the video, but I didn't pay attention
23    to the number of officers.
24        Q.    What happened after the officers came in and
25    the woman with the spray can?
```

90

1      A.    She approached me first.

2      Q.    And then what happened?

3      A.    She sprayed it on my face.

4      Q.    She sprayed pepper spray on your face?

5      A.    Yes.

6      Q.    How far away was she from your face?

7      A.    About this distance.  She stretched out her

8  arm, and then she sprayed.

9      Q.    How far was the pepper spray can or bottle from

10  your face?

11      A.    It was very close, ma'am.

12      Q.    How close?

13      A.    Ma'am, I'm telling you that it was very close.

14  I cannot tell you how many meters or what distance.

15      Q.    Well, you just made a hand motion when you

16  described how far away she was.

17            Can you do the same thing with how far away the

18  bottle was?

19      A.    I already told you that it was close.

20      Q.    Can you show us how close?

21      A.    Ma'am, I already told you that it was very

22  close, and I don't want to look back and remember the

23  woman who did that to me.  It's very hard.

24      Q.    I'm going to be asking you a lot of details

25  about this.  If you need to take a break before we get

91

```
 1            Okay.  So you had your forearm down on the
 2   table and your head?
 3        A.    Yes, I was like this.
 4        Q.    And your head was not all the way down on your
 5   arm but part way down?
 6        A.    Yes.  Like so.
 7        Q.    Okay.  So you're showing me the forehead a few
 8   inches away from your arm?
 9        A.    Yes.
10        Q.    And then she came up with the pepper spray, and
11   it was how far away from you?
12        A.    This distance, from here to there.
13        Q.    I can't say what you're pointing to.
14            Can you take the water bottle and put it where
15   the pepper spray was from you?
16            And your head was down a little bit?
17        A.    Yes.
18            MS. COLEMAN:  Okay.  So, Counsel, would we
19   estimate that about one foot away?
20            MS. ALARCON:  That's right.
21            MS. COLEMAN:  What did you say?
22            MS. ALARCON:  "That's right."
23   BY MS. COLEMAN:
24        Q.    And where did the pepper spray hit you?
25        A.    Here.
```

93

1        Q.    And you're pointing to your forehead and your

2    right eye?

3        A.    All over my face.

4        Q.    Did it land on your forehead and then drip

5    down?

6        A.    Yes.

7        Q.    Do you know how many seconds she sprayed?

8              MS. ALARCON:  Objection.  Vague as to which

9    time.

10   BY MS. COLEMAN:

11       Q.    The first time, if there was more than one, if

12   you know.

13       A.    I don't know.

14       Q.    Okay.  What happened next?

15       A.    The officers grabbed me to take me out, but

16   they were beating me.  They also --

17       Q.    How many officers grabbed you?

18       A.    Two of them took me out.

19       Q.    How did they grab you?

20       A.    From my shoulders and then turning me like so.

21       Q.    And you're showing us your arms behind your

22   back?

23       A.    Yes.

24       Q.    Were they holding you underneath your arms from

25   your armpit area?

94

```
1        A.    Yes, from here.

2        Q.    From here, where?

3        A.    From my arm, but really hard.

4        Q.    Were they holding your biceps?

5        A.    Yes.

6        Q.    Was there one officer on each arm?

7        A.    Yes, but they were mistreating me because they

8   wanted to take me outside.

9        Q.    How did they mistreat you?

10       A.    They took me to a hallway, and they hit me in

11   my face, and that's where they broke my nose.

12       Q.    How many officers hit you in the face?

13       A.    Two.  They did it against the wall.

14       Q.    So they pinned you against the wall?

15       A.    Yes.

16       Q.    They did not punch you?

17       A.    No.  They would do like this.

18       Q.    And when you said "like this," you were making

19   a motion of pushing you against the wall?

20       A.    Yes.  They pushed me against the wall.

21       Q.    One time or more than once?

22       A.    More than one time.

23       Q.    How many times?

24       A.    Perhaps some four times.

25       Q.    Where did your face hit?
```

95

1       A.    Against the wall.

2       Q.    What part of your face?

3       A.    Here.

4       Q.    You're pointing to the bridge of your nose?

5       A.    Yes.

6       Q.    All four times the same place?

7       A.    Yes.  That's where my crown came loose -- came

8    out.

9       Q.    Where did you have a crown?

10       A.    There's several.  Down there, and then these

11    ones here.

12       Q.    A crown normally is just one tooth.

13             Is that what you're referring to?

14       A.    I have more down here.

15       Q.    Was that a bridge?

16       A.    Yes.

17       Q.    Was that real teeth or false teeth in the

18    bridge?

19       A.    They are my teeth.

20       Q.    In the bridge, were there any false teeth?

21       A.    No, ma'am.

22       Q.    That's my understanding of a bridge, that,

23    normally, there's at least two teeth that aren't yours.

24             Can you explain to me what your understanding

25    is what you had on the lower teeth?

96

```
 1    side?

 2         A.    Yes.

 3         Q.    On the left side?

 4         A.    Yes.

 5         Q.    But you have all your other teeth except for

 6    one; right?

 7         A.    Yes.

 8         Q.    You just don't have the gold anymore?

 9         A.    Not anymore.  It got lost.  I don't know where

10    it is.

11         Q.    Have you seen it since the incident?

12         A.    No.

13         Q.    Why did you have gold in your mouth?

14         A.    Why did I have gold in my mouth?  I don't know.

15    I wanted to have that put in in my country.

16         Q.    You liked how it looked?

17         A.    Yes, and the military men likes things like

18    that.

19         Q.    Did any of your actual teeth break during the

20    incident?

21         A.    Yes, ma'am.  This one.

22         Q.    Which tooth?

23         A.    This one in the middle.

24         Q.    In the middle front?

25         A.    Yes, because I had two original of my own
```

99

1       Q.    How were you feeling?

2       A.    I was crying.  I was kind of trying to open my

3  eyes trying to see what was going on.

4       Q.    Do you mean crying, or were your eyes watering?

5       A.    My eyes were tearing because of the gas.

6       Q.    What about your nose?

7       A.    My nose, I couldn't feel my nose because the

8  gas was covering all my face.

9       Q.    How was your breathing?

10       A.    It's bad up to the present time.

11       Q.    You are having problems breathing right now?

12       A.    Yes, ma'am.

13       Q.    Have you gone to a doctor about it?

14       A.    Yes.  They took an X-ray, and the doctor said

15  that it was fractured, and then they sent me out and said

16  that they were going to do surgery on me.

17       Q.    On your nose?

18       A.    Yes, but, you know, said to me, "Don't go

19  because they're going to kill you," so then I got scared.

20       Q.    Who told you that?

21       A.    Who told me that?

22       Q.    Yes.

23       A.    An officer who watched the video and was not in

24  agreement with what the woman did.

25       Q.    What was that officer's name?

                                                          102

1       Q.     All over your body?

2       A.     Yes, ma'am.

3       Q.     What about your eyes?  How long did they bother

4    you?

5       A.     All the time, ma'am.

6       Q.     Ten days?

7       A.     Yes.

8       Q.     And afterwards, did they bother you?

9       A.     Yes, ma'am.  Yes, after the ten days, I was

10   showering three times a day, but that wasn't going away.

11      Q.     So after ten days, you did shower; right?

12      A.     I was showering three times a day so that it

13   would go away, but the soap was affecting me even more --

14   it was affecting me more.

15      Q.     How did the soap affect you?

16      A.     It burns.  It's like putting soap in your eyes.

17      Q.     Did you put soap in your eyes?

18      A.     I said it felt as when you put soap in your

19   eyes.

20      Q.     Were you using hot or cold water to shower?

21      A.     Hot, ma'am.  There's only hot water there.

22      Q.     There's only hot water to shower?

23      A.     Yes, ma'am.

24      Q.     Was it hot or warm?

25      A.     Hot.  Hot from the shower.

                                                          118

1    A.   I don't know, ma'am.  I'm not going to answer

2    that question.

3    Q.   You need to answer the question if you know the

4    answer.

5    A.   I don't know the answer, ma'am.

6    Q.   You don't know who the leader was?

7    A.   No, ma'am.

8    Q.   Out of the nine people, was there a leader?

9    A.   No, ma'am.

10   Q.   Everyone decided together?

11   A.   Yes, ma'am.

12   Q.   Did you have a hearing for your disciplinary

13   violation?

14   A.   I didn't have a date.  They carried that out

15   separately.

16   Q.   Did you go to a hearing?

17   A.   No, ma'am.  The officers made the determination

18   of the number of days I was going to be segregated.

19   Q.   Did you have an opportunity to make a

20   statement?

21   A.   No, ma'am.

22   Q.   Have you engaged in any other hunger strikes?

23        MS. ALARCON:  Objection.  Vague as to time.

24   BY MS. COLEMAN:

25   Q.   At Adelanto?

154

1      Q.    How often did you speak to her while you were

2   at Adelanto?

3      A.    I would always talk to her.

4      Q.    When you were in administrative segregation

5   after the incident, did you have any problems speaking to

6   her?

7      A.    Yes, ma'am.

8      Q.    Describe the problem.

9            MS. ALARCON:  Objection.  Misstates his

10   testimony.

11   BY MS. COLEMAN:

12      Q.    He said he had problems while he was in

13   administrative segregation talking to her.  I'm asking

14   him to describe what the problems were.

15            MS. ALARCON:  We can have the court reporter

16   read it back.  I understood that you asked whether he

17   spoke to her.

18            Do you mind reading it back?

19            (The record was read by the Court

20            Reporter as follows:

21            "Q  When you were in administrative

22            segregation after the incident, did you

23            have any problems speaking to her?")

24            MS. ALARCON:  You can answer.

25   //

157

```
 1    BY MS. COLEMAN:

 2         Q.    Go ahead.

 3         A.    Because they started blocking the phone

 4    numbers, yes, ma'am.

 5         Q.    They blocked what phone numbers?

 6         A.    My attorneys, my other attorney, my ex-wife,

 7    many attorneys, and my daughters.

 8         Q.    Why do you believe the numbers were blocked?

 9         A.    Because the machine would say you cannot make

10    that phone call.

11         Q.    Do you have to put in money?

12         A.    I always handled my own money when I was in

13    Adelanto.

14         Q.    I'm just asking if there could have been some

15    problem other than the number being blocked and reaching

16    them?

17         A.    Ma'am, they blocked those numbers and not until

18    I submitted a kite, but a long time passed before they

19    unblocked the numbers.

20         Q.    How much time passed before the numbers --

21    before you could call the numbers?

22         A.    They did not unblock the numbers.  They just

23    unblocked my ex, my daughters, and my attorney Nicole

24    Ramos.

25         Q.    They unblocked the numbers that you asked them
```

                                                          158

1    to unblock?

2        A.    Yes, but most of the numbers from my phone,

3    they did not.

4        Q.    Why did you have a second attorney?

5        A.    Because those are the people that have helped

6    me.

7        Q.    Were they both immigration attorneys?

8            MS. ALARCON:  If you know.

9            THE WITNESS:  I don't know, ma'am.

10   BY MS. COLEMAN:

11       Q.    So the other attorney, what was the other

12   attorney's name?

13       A.    Alex MENSEEN. [Phonetic.]

14       Q.    And you don't know if he was an immigration

15   attorney?

16       A.    No, ma'am.

17       Q.    Have you gone to doctors since your release

18   from Adelanto?

19       A.    No, ma'am.

20       Q.    Do you have any other injuries from the

21   incident that you haven't told us about?

22       A.    No, ma'am.

23       Q.    Did any doctors tell you that your injuries

24   would be permanent?

25       A.    No, ma'am.

159

1      Q.    That's because of the fracture in your nose

2   that you have labored breathing?

3      A.    Yes, ma'am.

4      Q.    And by fracture, do you mean a hard blow or do

5   you mean a broken nose?

6      A.    It's a broken nose, ma'am.

7      Q.    Have you had any injuries since June 2017?

8      A.    No, ma'am.

9      Q.    What kind of work do you do now?

10     A.    What type of work?

11     Q.    Yeah.  Do you work?

12     A.    Yes, ma'am.

13     Q.    What type of work?

14     A.    Lately, I've been a chef, but lately, the last

15   few days, I've had another type of work -- job.

16     Q.    What type?

17     A.    I've been receiving construction material,

18   writing it down in a book.

19     Q.    Do you have to load or unload things?

20     A.    No, ma'am.

21     Q.    Have you had any emotional distress from the

22   incident?

23     A.    Yes, ma'am.

24     Q.    Can you describe it?

25     A.    Yes, ma'am.  To think that the gas thing, that

161

 1    is to say, I've never lived through something like that

 2    before.

 3         Q.    The pepper spray and the incident was worse

 4    than anything you've gone through before?

 5              MS. ALARCON:  Objection.  Misstates his

 6    testimony.

 7              THE WITNESS:  Yes, ma'am.

 8    BY MS. COLEMAN:

 9         Q.    Did you ever see anything bad in the military?

10         A.    Yes, ma'am, but that is completely separate

11    from the case.

12         Q.    I'm asking -- but it's related to your

13    emotional distress, so when you were in the military, did

14    you ever go to some place where they had dead bodies, for

15    example?

16         A.    Oh, yes, ma'am.

17         Q.    And was that difficult to see?

18         A.    Oh, yes, ma'am.

19         Q.    Did you ever have to shoot anyone?

20         A.    I believe that shooting someone -- how could I

21    say that?  As far as I am concerned, that is a crime.

22    Only if I were to find someone robbing a bank.  How could

23    I explain this to you?  I can't.

24         Q.    If someone was committing a crime or trying to

25    hurt someone, it might be justified to shoot someone, but

                                                          162

1    administrative segregation, have you lost any sleep

2    because of the incident?

3         A.    If I have lost any sleep?

4         Q.    Yeah.

5         A.    Yes, ma'am.

6         Q.    Can you give me a little more detail?

7         A.    Thinking that somebody through gas in my eyes,

8    I never thought or imagined that something like this

9    would happen to me.

10        Q.    I'm asking about your lost sleep.

11              MS. ALARCON:  I'm going object as

12   argumentative.  The witness is describing his damages

13   related to his sleep.

14   BY MS. COLEMAN:

15        Q.    How has it affected your sleep?

16        A.    Ma'am, it's just that I keep thinking a lot

17   about how is it possible that they threw gas at me, at my

18   eyes?

19        Q.    How much did you used to sleep before the

20   incident per night on average?

21        A.    Well, before this happened to me, at

22   7:00 o'clock in the evening, I was already asleep.

23        Q.    And what time did you wake up?

24        A.    At 5:00 or 6:00 in the morning.

25        Q.    And was that your schedule at Adelanto before

165

1    the incident?

2        A.    Yes.  Yes, ma'am.  I would just get up to get

3    some food, and then I would go back to sleep.

4        Q.    Was that your schedule at Adelanto or in

5    El Salvador?

6        A.    That was my schedule in El Salvador.

7        Q.    And once you got to Adelanto, how was your

8    sleep?

9        A.    It was normal.  I would go to bed, and I would

10   go to sleep.

11       Q.    And you slept from 7:00 P.M. to 5:00 A.M. at

12   Adelanto?

13       A.    Maybe a little later.  Maybe at 9:00 because

14   there's so much noise that you can't go to sleep.

15       Q.    So you would go to sleep later than 7:00 P.M.?

16       A.    Yes, ma'am.

17       Q.    So how many hours of sleep a night would you

18   get?

19       A.    I slept a few seven hours, six hours.

20       Q.    Six to seven hours?

21       A.    Yes.

22       Q.    Okay.  Was it -- was it a little bit difficult

23   to sleep there because of the noise and the people?

24       A.    Yes, ma'am.

25       Q.    And then after the incident, how many hours a

166

1    night did you sleep?

2        A.    I couldn't sleep, ma'am.

3        Q.    At all?

4        A.    No, ma'am.  I would only sleep for about three

5    hours during the day.

6        Q.    And how long did that occur?

7        A.    Ma'am, since that happened, I just couldn't go

8    to sleep at night.

9        Q.    So, even now, you get three or four hours of

10   sleep a night?

11           MS. ALARCON:  Objection.  Misstates his

12   testimony.

13           THE WITNESS:  Nowadays, I'm going to go to

14   sleep at maybe 1:00 o'clock in the morning.

15   BY MS. COLEMAN:

16       Q.    And when do you wake up?

17       A.    At 6:20.

18       Q.    Okay.  So that's almost five hours of sleep.

19   Why do you go to sleep?

20           THE INTERPRETER:  I'm sorry.  Say that again?

21   BY MS. COLEMAN:

22       Q.    It's almost five hours of sleep; right?

23       A.    Sometimes.  Because sometimes I'm awake as late

24   as 3:00 o'clock.

25       Q.    Is that because of your job as a chef?

167

```
 1        A.    No, ma'am.

 2        Q.    Why are you awake so late?

 3              MS. ALARCON:  Objection.  It's been asked and

 4     answered.

 5              THE WITNESS:  I can't sleep, ma'am.

 6     BY MS. COLEMAN:

 7        Q.    Have you tried any medication?

 8        A.    No, ma'am, nor do I want to.

 9        Q.    Have you tried therapy or talking to anyone?

10        A.    No, ma'am.

11        Q.    Are there any other effects of the emotional

12     distress other than thinking about it and not being able

13     to sleep that you still have?

14        A.    No, ma'am.

15        Q.    Were you ever pepper sprayed directly in your

16     mouth?

17        A.    No, ma'am.

18        Q.    What about were you ever sprayed directly in

19     your nose?

20        A.    No, ma'am.

21        Q.    What about the groin?  Were you ever directly

22     sprayed in the groin?

23        A.    No, ma'am.

24        Q.    Were you ever slammed on the floor?

25        A.    No, ma'am.
```

168

```
 1   STATE OF CALIFORNIA  )
                          ) ss.
 2   COUNTY OF LOS ANGELES)

 3

 4          I, Amber Pilson, Certified Shorthand Reporter

 5   License No. 13992, for the State of California, do hereby

 6   certify:

 7          That, prior to being examined, the witness

 8   named in the foregoing deposition, to wit, OMAR ARNOLDO

 9   RIVERA MARTINEZ, was by me through the interpreter duly

10   sworn to testify to the truth, the whole truth, and

11   nothing but the truth;

12          That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to computer-aided transcription under

15   my direction;

16          That the foregoing transcript, as typed, is a

17   true record of the said proceedings.

18          I further certify that I am not interested in

19   the event of the action.

20

21          WITNESS my hand this 22nd day of June, 2019.

22

23          _____

24               Amber Pilson, CSR NO. 13992

25
```

186

# EXHIBIT 28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CLAIRFORNIA

| | |
|---|---|
| OMAR ARNOLDO RIVERA MARTINEZ; ISAAC ANTONIO LOPEZ CASTILLO; JOSUE VLADIMIR CORTEZ DIAZ; JOSUE MATEO LEMUS CAMPOS; MARVIN JOSUE GRANDE RODRIGUEZ; ALEXANDER ANTONIO BURGOS MEJIA; LUIS PENA GARCIA; JULIO CESAR BARAHONA CORNEJO, as individuals, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CASE NO. ) 5:18-cv-01125-R-GJS ) |
| THE GEO GROUP, Inc., a Florida corporation; the CITY OF ADELANTO, a municipal entity; GEO LIEUTENANT DURAN, sued in her individual capacity; GEO LIEUTENANT DIAZ, sued in her individual capacity; GEO SERGEANT CAMPOS, sued in his individual capacity; SARAH JONES, sued in her individual capacity; THE UNITED STATES OF AMERICA; and DOES 1-10, individuals, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION OF ALEXANDER ANTONIO BURGOS MEJIA

taken on

FRIDAY, MAY 17, 2019

EVELYN V. HERNANDEZ, CSR NO. 12615

```
 1    were you given any documents?

 2         A    Can you repeat the question.

 3         Q    When you arrived at this facility, were you given

 4    any documents?

 5         A    Only a bracelet.

 6         Q    Did you review any documents?

 7         A    I'm not sure.

 8         Q    For purposes of the record, this is bate stamped

 9    GEO 00921.  Do you recognize this document?

10         A    No.  Maybe it was given to me.  But it was not

11    given to me in Spanish.

12         Q    Is that your signature on the bottom?

13         A    Yes.

14         Q    Above your signature, is that English or Spanish?

15         A    Spanish.

16         Q    Okay.  Can you read Spanish?

17         A    Yes.

18         Q    So did you read this document?

19         A    No.

20         Q    You just signed it?

21         A    Yes, because the officer just gave you the

22    document and said, sign, sign, sign, and that was it.

23         Q    Okay.  So you never actually read this document,

24    you just signed it?

25         A    Correct.
```

1    Q    When the female came in, did she say anything to

2  you?

3    A    That I can remember, she spoke in English, and I

4  didn't understand anything.

5    Q    Even though you don't speak English, do you know

6  if she were giving you instructions to go to your bunk?

7    A    No.

8    Q    You don't know if she was giving you instructions?

9    A    No.

10   Q    Was she speaking to the people at your table

11 though?

12   A    She was talking in English.  She was screaming not

13 talking softly.

14   Q    Did you understand why she was screaming?

15   A    No.

16   Q    Did you think that maybe she was screaming because

17 you were not complying with the instructions to go to the

18 bunks?

19        MS. ALARCON:  Objection.  Calls for speculation.

20        THE WITNESS:  What was the question?

21 BY MS. AGUADO:

22   Q    When she was screaming, in your own head, did you

23 think maybe she's screaming because we're not complying

24 with the instruction to go back to our bunks?

25   A    Yes.

71

1     Q   How many times did she scream at you?

2     A   I don't remember.

3     Q   More than once?

4     A   I'm not sure.

5     Q   More than twice?

6     A   She was screaming and I didn't understand

7 anything.

8     Q   How long was she screaming?

9     A   I don't remember.

10     Q   More than a minute?

11     A   I'm not sure.

12     Q   You have no idea how long she was screaming?

13     A   No.

14     Q   And you don't know how many times she screamed?

15     A   No, because she started screaming and screaming.

16     Q   Okay.  Did anyone respond to her?  And by

17 "anyone," I mean, the people at your table.

18     A   No.

19     Q   Did anyone at the second table respond to her?

20     A   Not that I can remember.

21     Q   After she walked up to your table and started

22 screaming, what happened next?

23     A   She started spraying pepper gas.

24     Q   How long elapsed, how much time was it from the

25 time she walked up to your table to the time that she

72

1      A     Not that I remember.

2      Q     Have you been sprayed in the face before by OC

3   spray?

4      A     Could you be more specific with the question?

5      Q     How many times in your life have you been sprayed

6   by OC spray or pepper spray?

7      A     Only in Adelanto.

8      Q     Only this one time?

9      A     Correct.

10      Q     And you don't remember if you were sprayed

11   directly in the face?

12      A     I don't remember.

13      Q     It seems like a pretty significant event, right,

14   would you agree?

15            MS. ALARCON:  It's argumentative.

16            THE WITNESS:  What's the question?

17   BY MS. AGUADO:

18      Q     Did she spray you directly in the face?

19      A     Not that I remember.

20      Q     Okay.  Did she spray you directly in the mouth?

21      A     Not that I remember.

22      Q     Did she spray you directly in your nose?

23      A     I don't remember.

24      Q     Where did she spray you?

25      A     To be honest, I don't remember.

74

1     Q     Did she spray you in your groin?

2     A     I don't remember.

3     Q     Was your entire body soaked with spray?

4     A     I don't remember.  I had my face down and when I

5  felt the pepper gas, it was on my shoulders and my face.

6     Q     Why did you put your face down?

7     A     Because I saw that she started moving her hands

8  and the other ones were complaining.

9     Q     You saw that she was moving her hands, how was she

10  moving her hands?

11    A     When she hit on the table with the pepper gas.

12    Q     So when you saw her hit on the table with the

13  pepper gas, you put your face down?

14    A     Correct.

15    Q     So it was your understanding that she was going to

16  use the pepper gas; is that correct?

17         MS. ALARCON:  Misstates his testimony.

18         THE WITNESS:  What?

19  BY MS. AGUADO:

20    Q     Why did you put your face down?

21    A     Because when she hit the table, she started

22  spraying with the pepper gas.

23    Q     Was your head down before she started spraying

24  with the gas?

25    A     Which table?

                                                    75

1    Q    What table were you at?

2    A    The first one.

3    Q    Okay.  I'm talking about you.  So why would I be

4    talking about the second one?

5    A    Because she started spraying with the pepper gas

6    at the other table.

7    Q    I'm talking about why you put your head down.  Did

8    you put your head down at the first table, the only table

9    that your were at, before she sprayed?

10    A    Before she started spraying me, yes.

11    Q    Why did you put your head down?

12    A    Because I saw that she was spraying with pepper

13    gas and the other detainees were screaming.

14    Q    So you knew there was pepper gas in that can?

15    A    Yes.

16    Q    After you felt the gas on your shoulders and face,

17    what happened next?

18    A    Would you be more specific with the question,

19    please?

20    Q    What did you do next, after you were sprayed,

21    after you felt the gas on your shoulder and face?

22    A    What I did was just put up with it, and then the

23    officers came and with my fellow detainees, we just crossed

24    our arms because the officers started hitting us on our

25    sides and our ribs, and then they started hitting me behind

76

1   my ear.  They also twisted my arm backwards and pulled me

2   to take me out and before leaving the tank, they threw me

3   up against the wall and I hit the right side of my face and

4   I twisted my neck.

5        Q    Before the woman sprayed, it was your

6   understanding that you were supposed to go to your bunk,

7   correct?

8             MS. ALARCON:  Asked and answered.

9             THE WITNESS:  Yes.

10  BY MS. AGUADO:

11       Q    After she sprayed, why didn't you get up and go to

12  your bunk?

13       A    Can you repeat the question?

14       Q    After she sprayed and you felt it on your

15  shoulders and face, why didn't you get up and go to your

16  bunk?

17       A    Because the officer started grabbing us and

18  hitting us in order to remove us.

19       Q    How many officers hit you?

20       A    I don't remember.

21       Q    More than one?

22       A    I don't know.

23       Q    And where were you hit?

24       A    In my ribs.

25       Q    Which side, left side or right side?

                                                          77

```
 1        A     Right side.

 2        Q     Were you hit anywhere else?

 3        A     Behind my ear.

 4        Q     Which side of your head?

 5        A     Right.

 6        Q     How many times were you hit in the ribs?

 7        A     I don't remember.

 8        Q     More than once?

 9        A     Yes.

10        Q     More than twice?

11        A     I don't remember.

12        Q     More than three times?

13        A     I'm not sure.

14        Q     How many times were you hit on the ear on the

15   right side?

16        A     I don't remember.

17        Q     More than once?

18        A     I'm not sure.

19        Q     Were you hit in the ear?

20              MS. ALARCON:  It's been asked and answered.

21              THE WITNESS:  Yes.

22   BY MS. AGUADO:

23        Q     So at least once?

24        A     Several times.

25        Q     Twice?
```

1      A     I don't remember.

2      Q     But you know it was several times?

3      A     Correct.

4      Q     Were you hit anywhere else?

5      A     When they threw me against the wall, they hit my

6   face.

7   BY MS. AGUADO:

8      Q     I said, "hit."  Were you hit anywhere else?

9      A     The hits on my ribs, my ear, and when they twisted

10  me and they were pulling on me.

11     Q     Was it the same officer that hit your rib on the

12  right side that hit your ear on the right side?

13     A     I don't remember.

14     Q     Do you know if there were more than one officer

15  that hit you?

16          MS. ALARCON:  Objection.  It's been asked and

17  answered.

18          THE WITNESS:  I don't remember.

19  BY MS. AGUADO:

20     Q     As you sit here today, you can only remember at

21  least one time that you were hit in the ribs on the right

22  side; is that correct?

23     A     No, because it was several times.

24     Q     But you can only remember one specific time?

25     A     Not that I remember.

79

1      Q     Do you know if the officers were trying to put on

2  some sort of handcuffs or some kind of restraints?

3           MS. ALARCON:  Objection.  Calls for speculation.

4           THE WITNESS:  Can you start again.

5  BY MS. AGUADO:

6      Q     After you got up from the table and your arm was

7  behind your back, were they trying to put handcuffs on you?

8           MS. ALARCON:  Objection.  Calls for speculation.

9           THE WITNESS:  I was handcuffed after the whole

10 thing was over.

11 BY MS. AGUADO:

12     Q     After you were taken out of the tank?

13     A     No.  After I was hit.

14     Q     You said that you were only hit while you were

15 seated.  So at what point were you handcuffed?

16     A     After I was thrown against the wall.

17     Q     How many officers threw you against the wall?

18     A     I don't remember.

19     Q     When you say that you were thrown against the

20 wall, did they push you, did they actually pick you up and

21 throw you, what do you mean?

22     A     They pulled my arm out and they pushed me against

23 the wall.

24     Q     Which arm?

25     A     The right one.

                                                        81

1    Q    What was your left arm doing at this time?

2    A    I just had it just normally.

3    Q    At the present time was your left arm behind your

4  back?

5    A    I don't remember.

6    Q    When you stood up from the table, when you got up

7  from the table and the officers were walking you out, were

8  you complying with them?

9    A    When they took me out, I was already handcuffed.

10    Q    From the time you got up from the table to the

11  time you went to the wall, were you complying with the

12  officers?

13    A    Correct.

14    Q    You were doing exactly what they wanted you to do?

15    A    Yes.

16    Q    Were you resisting in any way?

17    A    At no time.

18    Q    So you said that they put your arm up and pushed

19  you against the wall?

20    A    Correct.

21    Q    Did your feet lift the ground?

22    A    No.

23    Q    What side of your face touched the wall?

24    A    The right side.

25    Q    How long were you against the wall for?

1      A     I'm not sure.

2      Q     After your face touched the wall, what happened?

3      A     They handcuffed me.

4      Q     What happened next?

5      A     They took me to the area where it was the

6   recreation area where we could play soccer and they made me

7   sit down on the floor while they were checking the other

8   ones.

9      Q     Was there an officer near you when you were in the

10  recreation yard during this time?

11     A     Yes.

12     Q     Did you say anything to him?

13     A     No, not that I remember.

14     Q     How long were you in the recreation yard for?

15     A     What was the question?

16     Q     How long were you in the recreation yard for?

17     A     I don't remember.

18     Q     Who else was with you aside from the officer?

19     A     I don't remember.

20     Q     Were there any other detainees with you?

21     A     Yes.

22     Q     How many?

23     A     I don't remember.

24     Q     More than one?

25     A     I don't remember.

83

```
 1        A    Right.

 2        Q    Were there any officers with you in the room?

 3        A    No.

 4        Q    Were you handcuffed at that time?

 5        A    Yes.

 6        Q    When the nurse took your blood pressure, were your

 7   handcuffs taken off?

 8        A    No.

 9        Q    So you mentioned that you went to a second room?

10        A    Correct.

11        Q    How far was that from the first room that you were

12   in?

13        A    Actually, I don't remember.

14        Q    The second room that you were in, was anyone in

15   there with you?

16        A    Yes.

17        Q    Who was with you?

18        A    The same people who were with me in the previous

19   room.

20        Q    Were there any officers with you?

21        A    No.

22        Q    How long were you in the second room for?

23        A    In the other room, I don't remember because they

24   wet the other guys and they took us to the room.

25        Q    When you say, "they wet the other guys," what do
```

                                                              87

1  you mean?

2      A      They through some hot water.  They took them to

3  the showers and soaked them in hot water.

4      Q      How many other guys?  You said, the other guys,

5  how many other guys were taken to the shower?

6      A      I don't remember.

7      Q      More than one?

8      A      Yes.

9      Q      More than two?

10     A      Yes.

11     Q      More than three?

12     A      I don't remember.

13     Q      How do you know they were taken to the showers?

14     A      Because they told me.

15     Q      Did you see them in showers?

16     A      I saw them all soaked.

17     Q      Did you see them in a shower?

18     A      In the showers when I was just walking by.  I was

19  walking by and I saw that they were crying.  I moved away.

20     Q      So when you went from the first room to the second

21  room, did you walk by the showers?

22     A      Walk by the showers?  No.  It was a room that had

23  showers.

24     Q      Did the second room have showers in it?

25     A      No.

88

1      A     When I took a shower myself?

2      Q     So between the first room and the second room, at

3  some POINT, did you go in a shower?

4      A     Between the first and the second room?

5      Q     Yes.  You were put in a shower?

6      A     Yes, they took me to the shower.

7      Q     After the first room?

8      A     After the first room.

9      Q     So from the first room, you walked to a shower; is

10  that correct?

11     A     Correct.

12     Q     How long were you in the shower?

13     A     I just faked that I was putting water on me and I

14  left.

15     Q     Why did you fake that?

16     A     Because when I put some water on my face it burned

17  even more.

18     Q     So you pretended like you were putting water on

19  yourself?

20     A     I didn't say, I pretended.  I started putting some

21  water on because it started burning, I stopped doing it.

22     Q     Where was it burning?

23     A     In my face and my shoulder and arm.

24     Q     Which arm?

25     A     My right arm.

1      Q      What did you talk about?

2      A      About the pain each one of us was experiencing.

3      Q      What did you say about your pain?

4      A      That it was also burning.

5      Q      Did you say anything else?

6      A      I don't remember.

7      Q      Where was it burning?

8      A      My arm, my right shoulder, and my face.

9      Q      You mentioned the other detainees were talking

10     about their pains as well, correct?

11     A      Correct.

12     Q      Do you remember if Isaac said anything about his

13     pain?

14     A      I mean, he didn't talk that much.  He was crying

15     just as Mateo was.

16     Q      Did he say any part of his body was hurting?

17     A      Which person?

18     Q      Isaac.

19     A      Isaac, his face.

20     Q      Did he say anything else was hurting?

21     A      Back of the arm.  But I don't remember which arm.

22     Q      Which table was Mateo sitting at, the first or the

23     second?  You were at the first?

24     A      Yes.  I don't remember.

25     Q      Was he sitting at your table?

93

1     Q.  How frequently do you have knee injury -- or

2  like issues with your knee?

3     A.  More than anything in the morning, when it's

4  very cold, and when I go to the store, it hurts.

5     Q.  Are you claiming any emotional injuries in this

6  case?

7     A.  Yes, because what I lived there, I will never

8  forget.  I will never forget seeing the faces of my

9  friends, seeing them crying, and that they put pepper

10  spray on me.  I had never lived that, not even in my

11  country.  All of that, I don't know how I feel whenever

12  I think back of that moment.

13         To remember that, every time I think about it,

14  I remember that they would cry and -- and you felt

15  helpless because we couldn't really do anything, anyone

16  there, and I believe it was a very difficult time in my

17  life.

18     Q.  You said that pepper spray is something that

19  you didn't even see in your own country.

20         Are you claiming that this incident was more

21  traumatizing than what you saw in El Salvador?

22         MS. SWEETSER:  Objection, argumentative and

23  vague.

24  BY MS. STROTTMAN:

25     Q.  You can answer.

                                                    111

1       A    Lately, yes.

2       Q    I know you said earlier where it was located, but

3   what city is the clinic in?

4       A    I don't remember.  Maybe Carson.  I don't

5   remember.

6       Q    Is it the same city where you live?

7       A    No.

8       Q    What city do you live in?

9       A    In Long Beach.

10      Q    Me too.  We're neighbors.  Do you drive currently?

11      A    No.

12      Q    Are you on any special diets recommended by your

13  doctor?

14      A    Diet, yes.  They gave me a diet but I don't follow

15  it.

16      Q    Me either.  What are the perimeters of the diet?

17      A    The nutritionist told me to try to eat healthy and

18  less fat because the doctor recommended that.

19      Q    So the purpose of the diet is weight loss; is that

20  correct?

21      A    Correct.  That's what I believe.

22      Q    Do you have any sort of medical training?

23      A    I don't understand.

24      Q    Are you a doctor?

25      A    No.

1  detainees that went to go talk to the officer tell the

2  officer that you were on a hunger strike?

3       A    No.

4       Q    Okay.  While you were in segregation, did anyone

5  come and interview you, related to the incident?

6            MS. ALARCON:  Objection as to when he was in

7  segregation.  Vague as to when he was in segregation.

8            THE WITNESS:  Can you repeat the question.

9  BY MS. AGUADO:

10      Q    While you were in segregation, did anyone

11 interview you related to the incident?

12      A    I don't remember.

13      Q    A day after the incident, June 13, do you remember

14 talking to anyone about the incident?

15      A    I don't remember.

16      Q    So you don't remember telling anyone a summary of

17 the events?

18      A    I don't remember.

19      Q    At some point, was there a hearing related to the

20 incident?

21      A    Not as far as I know.

22      Q    Was there ever a time that you had to discuss the

23 incident with people?

24      A    Which kind of people?

25      Q    You tell me.

                                                          161

1   agents wouldn't pay attention to anything that you told

2   them regarding the care that you were receiving while you

3   were at the facility?

4        A    Because they didn't pay attention to us.

5        Q    Can you provide me with an example where they

6   wouldn't pay attention to you, before June 12?

7        A    Which officer?

8        Q    ICE agents.

9        A    I don't remember.

10       Q    Do you have a recollection of expressing your

11  concerns or complaints about the medical care at Adelanto

12  Detention Facility to anybody that worked at Adelanto

13  Detention Facility?

14       A    Before or after?

15       Q    At any time.

16       A    On the kites.

17       Q    Did you write down your complaints about medical

18  care on the kites and send that to the medical department?

19       A    On the kite and on the medical paper.

20       Q    So on the kite and the medical paper, are those

21  two separate things?

22       A    They are different ones.  Sometimes, they didn't

23  have the medical forms so they said that it was all right

24  to send it through the kite.

25       Q    I'm going to move on.  So right now, I'm talking

191

1     Q     Do you know her name?

2     A     I forgot it.

3     Q     And you told her that you knew your actions were

4     wrong?

5     A     Correct.

6     Q     Did you tell anybody else that?

7     A     I don't remember.

8     Q     Do you know who Omar Martinez is?

9     A     Yes.

10    Q     Do you talk to him regularly?

11    A     No.

12    Q     Have you seen him since you left the facility?

13    A     No.

14    Q     Did you only talk to him while you were at the

15    facility?

16    A     I only heard an audio.

17    Q     You heard an audio of him?

18    A     Yes.

19    Q     When did you hear an audio of him?

20    A     Approximately two weeks ago.

21    Q     Were you with your attorneys when you heard the

22    audio?

23    A     No.

24    Q     Was it a voice mail message?

25    A     It was a personal message.

                                                        163

# EXHIBIT 29

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| OMAR ARNOLDO RIVERA MARTINEZ; | Case No: |
| ISAAC ANTONIO LOPEZ CASTILLO; | 5:18-cv-01125-R-GJS |
| JOSUE VLADIMIR CORTEZ DIAZ; | Hon. Manuel L. Real |
| JOSUE MATEO LEMUS CAMPOS; | |
| MARVIN JOSUE GRANDE RODRIGUEZ; | |
| ALEXANDER ANTONIO BURGOS MEJIA; | |
| LUIS PENA GARCIA; | |
| JULIO CESAR BARAHONA CORNEJO, | |
| as individuals, | |
| Plaintiffs, | |
| vs. | |
| THE GEO GROUP, Inc., a Florida | |
| corporation; the CITY OF ADELANTO, | |
| a municipal entity; GEO LIEUTENANT | |
| DURAN, sued in her individual | |
| capacity; GEO LIEUTENANT DIAZ, sued | |
| in her individual capacity; GEO SERGEANT | |
| CAMPOS, sued in his individual capacity; | |
| SARAH JONES, sued in her individual | |
| Capacity; THE UNITED STATES OF AMERICA | DEPONENT: |
| and DOES 1-10, individuals, | LUIS PENA GARCIA |
| Defendants. | Taken: June 4, 2019 |

1

1   A   Yes.

2   Q   And does this indicate that you received a detainee

3       book in Spanish?

4   A   It says that I saw a video.  You said a manual.  A

5       manual is -- a handbook is in paper.

6   Q   Okay.  Doesn't this document talk both about a manual

7       and a video?

8   A   Could you repeat it?  I don't understand.

9   Q   Does this document reference both the video and the

10      manual?

11  A   No.  The video didn't have the rules.  Just about some

12      rights, like the right to an attorney and things like

13      that.

14  Q   Do you see the line where you first have your initials?

15  A   Yes.

16  Q   Could you tell me what that line says?

17  A   No.

18  Q   Could you read that to me, that line where your

19      initials are?

20  A   One says:  I verify that I received the manual/handbook

21      of ICE and GEO, but the manual was in English.

22  Q   Did you ever request the manual in Spanish?

23  A   No.  I had no idea what a handbook/manual was.

24  Q   But you received the manual in English; is that

25      correct?

                                                            20

1    Q    But did you ever give this to anyone else?

2    A    Not that I remember.

3    Q    So going back to what happened after breakfast, after

4         the first officer pepper sprayed you --

5    A    Yes.

6    Q    -- what happened after that?

7    A    As I said, more officers arrived, and they start

8         submitting us -- subjugating us.

9    Q    Sorry, what did you say happened?

10   A    They started subjugating, pulling us, pushing us for us

11        to get up from the table.  Another officer arrived in

12        white that -- they were the superiors, and he arrived

13        with another pepper gas tank, and he started spraying

14        us as well.

15   Q    Were you personally pepper sprayed by the second

16        officer?

17   A    I don't remember.  I really don't remember who sprayed

18        me.

19   Q    Do you claim you were injured by any of the officers

20        who were pulling you from the table?

21   A    Yes, but I cannot say it was this officer, because I

22        was blinded by the pepper spray.  At that moment I

23        couldn't distinguish who was -- I just felt the pulls,

24        the pushes, and the blows.

25   Q    While this was going on, could you see the other

                                                           45

1   Q    How so?

2   A    I had marks in my body when they grabbed me, and when

3        they pushed me against the wall, I banged my head.  And

4        even when I was being taken outside, knowing that I

5        couldn't see, in the hallway, they, once again, pushed

6        me against the wall.

7   Q    What areas did you have marks on your body?

8   A    The head.  The face was red due to the spray.  I had

9        scratches right here in the neck.  I had red here due

10       to the blows in the ribs.

11  Q    Anything else?

12  A    That I remember, no.

13  Q    Were you escorted out of the dorm by an officer?

14             MS. FLYNN:  Objection, vague.

15             THE WITNESS:  I wasn't escorted.  I was

16       pushed.

17  BY MS. STROTTMAN:

18  Q    Were you pushed out of the dorm by an officer?

19  A    Yes.

20  Q    Where did they take you outside?

21  A    To the patio or yard.

22             THE INTERPRETER:  The interpreter would like

23       to say patio, slash, yard.

24  BY MS. STROTTMAN:

25  Q    How long were you out in the yard area?

                                                        47

```
 1   A    Very briefly.  They were able to get the group of us

 2        out of there.  We were handcuffed and on the floor, and

 3        they opened another door and got the detainees out,

 4        because the smell of the pepper spray was very strong.

 5        And after that, we were separated from the group --

 6        from the other detainees, and we were placed in a

 7        smaller room.  A medic arrived there just to take our

 8        blood pressure --

 9                  THE INTERPRETER:  No, correction.  The

10        interpreter wants to correct that.  Pulse.

11   A    Then they took us to a smaller room that had showers,

12        and they made some of the members of the group take

13        showers with hot water.

14   BY MS. STROTTMAN:

15   Q    Did you take a shower?

16   A    No, no.  I heard the scream from the others from the

17        burn, and they said that we shouldn't take showers, the

18        rest of us.  They started pushing us all, because they

19        wanted us to take -- that we take the shower with the

20        water, but we refused and started moving backwards.

21                  After that, they took us to a room that was a

22        little bit bigger, and we were there for a good -- for

23        a long time handcuffed, and they started taking us

24        little by little, and they started changing our

25        uniform.  They gave us an orange uniform, and they said
```

48

1    BY MS. STROTTMAN:

2    Q    What did you tell GEO during your disciplinary hearing?

3    A    It wasn't a hearing.  It was an officer, and he arrived

4         to make -- to ask me questions.  That's it.

5    Q    And what questions did he ask you?

6    A    I don't remember exactly.

7    Q    Do you remember what you told this officer?

8    A    I don't remember.

9    Q    Do you recall telling the officer that your actions

10        were wrong?

11   A    What do you mean by wrong?

12   Q    That you understood that you were breaking rules, but

13        you were just trying to talk to someone?

14             MS. FLYNN:  Objection, argumentative.  Vague.

15             THE WITNESS:  We weren't following anybody,

16        because nobody was giving us an order.  We talked among

17        us, and we only wanted to talk.  After the aggression,

18        we didn't know what was correct to say, because we were

19        nervous, and if we -- if we were punished because we

20        expressed ourselves, what will happen if we did it

21        again?

22   BY MS. STROTTMAN:

23   Q    You received discipline?

24             MS. FLYNN:  Wait.  I didn't understand that.

25

                                                              56

```
 1   BY MS. STROTTMAN:
 2   Q    You received discipline from this incident; is that
 3        correct?
 4                  MS. FLYNN:  Objection, vague.
 5                  THE WITNESS:  Does discipline mean going to
 6        segregation?
 7   BY MS. STROTTMAN:
 8   Q    Well, you went to segregation; is that correct?
 9   A    Yes.
10   Q    And they took away your commissary; is that correct?
11   A    Yes, commissary.
12   Q    How long were you restricted from commissary?
13   A    Still they took us to the tanks.  The entire time we
14        were in segregation.
15   Q    How long was that?
16   A    Ten days.
17   Q    So you also had no contact visits for ten days; is that
18        correct?
19   A    Yes.
20   Q    Did you receive any other form of punishment?
21                  MS. FLYNN:  Objection, vague.
22                  THE WITNESS:  Form of punishment like what?
23   BY MS. STROTTMAN:
24   Q    That's what I'm asking you.
25   A    Like what kind of punishment?  They took the commissary
```

57

```
 1        the days I spent there.  The yard they took me to was a
 2        cage, not a yard.  To talk to the attorneys -- they
 3        blocked the numbers for the attorneys.  We didn't have
 4        any freedoms -- the same freedoms to call.  We -- they
 5        will only lend you a phone for a shorter time.
 6   Q    Let's talk about your phone calls.  Can you describe
 7        the problems that you had with the phone calls after
 8        this?
 9   A    I tried to call my attorney, and the call would not go
10        through.
11   Q    What was the name of your attorney?
12               MS. FLYNN:  Objection, vague.
13               THE WITNESS:  That's with respect to my other
14        case.
15   BY MS. STROTTMAN:
16   Q    I'm just trying to figure out the number that you claim
17        was blocked.  Can you identify your attorney's name?
18   A    They blocked several numbers, but the one that I called
19        most frequently was my attorney, Mark.
20   Q    So they blocked -- you claim they blocked your
21        attorney's phone number?
22   A    Yes, the numbers.
23   Q    Who else's phone numbers did they block?
24   A    Family.
25   Q    Can you be specific which family members?
```

58

1   A   No.

2   Q   Anyone else other than your attorney and family?

3   A   No.  Those were the only numbers I called.

4   Q   In one of your documents -- I can't remember if it was

5       the Complaint, but it said that you had issues calling

6       Alex Messing.

7   A   That's another number they blocked.

8   Q   Who is this person?

9   A   Another attorney.

10  Q   Who is Ramon?

11  A   Another of the attorneys that were supporting us in the

12      asylum cases.

13  Q   Was this the first time you had problems contacting

14      your attorney?

15  A   Yes.

16  Q   How do you know these phone calls were blocked?

17  A   Because I made the phone call and it wouldn't go

18      through.

19  Q   So which phones were you calling from?

20  A   The one that the GEO company has.

21  Q   Was it in the segregation unit?

22  A   Yes.  Also, when we were sent to the tanks, those were

23      blocked.

24              MS. FLYNN:  When you're done with this

25      section on phones, do you want to take a lunch break?

59

1  Q     Where were the phones that you would normally call your

2        attorneys?

3              MS. FLYNN:   Objection, vague.

4              THE WITNESS:   In the tanks.   In the

5        dormitory.

6  BY MS. STROTTMAN:

7  Q     When you refer to the tank, what does that mean?

8  A     That's what they referred -- what they called the

9        dormitories.

10  Q     So after June 12, you claim that your phone calls were

11        blocked to your attorneys; is that correct?

12  A     Yes.

13  Q     Were you calling from the same phones that you used

14        before June 12?

15  A     It's the same phone line.   Different dorms, but same

16        line -- telephone line.

17  Q     What's the call-out procedure to make a phone call at

18        Adelanto?

19  A     First, you have to punch in the number you have in the

20        card or with the commissary number, then dial a pin,

21        and then you dial the phone number.

22  Q     Do you know if it's the same procedure when you're in

23        administrative segregation?

24  A     Yes.

25  Q     Were you able to call anyone in administrative

                                                        63

1       segregation?

2    A    No, not that I remember.

3    Q    After you were in administrative segregation for ten

4        days, you went back to your dorm; is that correct?

5    A    I was returned to another dorm.

6    Q    After you were returned to the other dorm, were you

7        able to make any phone calls?

8    A    Yes, but not to my attorneys.

9    Q    So who were you able to speak to?

10   A    When they arrive for visits, they gave me a different

11        number.

12   Q    Who came to visit?

13   A    Mark.

14   Q    Is Mark your attorney?

15   A    Yes.

16   Q    So when he came to visit, they gave you another number

17        to call him?

18   A    Yes, another phone number.

19   Q    And you were able to reach him; is that correct?

20   A    Yes, but it was a new number, not the number they had

21        blocked.

22   Q    So Mark gave you a new phone number to call; is that

23        correct?

24   A    Yes.

25   Q    Were you able to call anyone other than Mark's new

64

1    phone number?

2  A    Yes.

3  Q    Who else were you able to call?

4  A    Some of my family members.

5  Q    Did you have problems with blocked phone calls?

6              MS. FLYNN:  Objection, vague.  Asked and

7        answered.

8              THE WITNESS:  Yes.

9  BY MS. STROTTMAN:

10 Q    My question was how long did the problems with your

11       blocked phone numbers last?

12 A    The numbers that were blocked were never unblocked.

13 Q    Did you complain to anyone about having issues calling

14       your attorneys?

15 A    I don't remember, but what I remember were some kites.

16 Q    What was the last part?  You remember --

17 A    I just remember we sent a kite.

18 Q    What did your kite say?

19 A    That I couldn't call those numbers.

20             MS. FLYNN:  Just for the record, there is a

21       lot that -- you're cutting out, and we're reading your

22       lips.

23             MS. STROTTMAN:  I'll speak louder and see if

24       that helps at all.

25             MS. FLYNN:  Yes, let's try that.

65

```
 1   Q    For example, do you have problems sleeping?

 2   A    Yes.

 3   Q    How frequently do you have problems sleeping because of

 4        this incident?

 5   A    Many, because I stay thinking about what happened.

 6   Q    Have you ever taken any medications for your emotional

 7        distress?

 8   A    As I said, I cannot self-medicate.

 9   Q    I'm not going to go into the details about when you

10        were living in El Salvador, but do you have emotional

11        distress from violence in El Salvador?

12   A    No.  It's just that that is very different.  One is the

13        fear to be detained again, and another is the fear to

14        lose your life.

15   Q    So the fear of losing your life, what is that from?

16   A    From El Salvador.  But I came to this country trying

17        not to be in fear and looking for freedom, and the

18        first thing they do is to arrest me, and then they

19        abuse the rights that I think I have here.  Like, the

20        freedom of expression.

21   Q    Do you believe the freedom of expression means that you

22        did not have to follow the rules at Adelanto?

23             MS. FLYNN:  Objection, vague.  Argumentative.

24             THE WITNESS:  I am aware that you have to

25        follow the rules, but if you don't know the rules, how
```

72

1   A     No, I treat them -- all of them the same.

2   Q     You don't recall whose idea it was to go on a hunger

3         strike on June 12?

4                 MS. FLYNN:  Objection, asked and answered.

5                 THE WITNESS:  No.

6   BY MS. STROTTMAN:

7   Q     Did anyone -- before June 12, did anyone express fears

8         that a hunger strike could lead to punishment?

9                 MS. FLYNN:  Objection, vague.

10                THE WITNESS:  No, nobody knew that we could

11        be punished for expressing ourselves.

12                MS. STROTTMAN:  I think I'm almost done with

13        my questions.  Judy, do you have any questions?

14                MS. TISHKOFF:  Yes, I have a few.  Do you

15        want me to go ahead or --

16                MS. STROTTMAN:  Sure.

17                     E X A M I N A T I O N

18  BY MS. TISHKOFF:

19  Q     Mr. Garcia, my name is Judy Tishkoff, and I represent

20        Sarah Jones in this case.  Do you know who Sarah Jones

21        is?

22  A     No.

23  Q     Do you remember -- strike that.

24                Do you remember a nurse taking your vital

25        signs shortly after the incident occurred?

                                                        76

# EXHIBIT 30

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA MARTINEZ;  )
ISAAC ANTONIO LOPEZ CASTILLO;  )
JOSUE VLADIMIR CORTEZ DIAZ;  )
JOSUE MATEO LEMUS CAMPOS;  )
MARVIN JOSUE GRANDE  )
RODRIGUEZ; ALEXANDER ANTONIO  )
BURGOS MEJIA; LUIS PENA  )
GARCIA; JULIO CESAR BARAHONA  )
CORNEJO, as individuals  )
  )
               Plaintiffs,  )
  )
       vs.  )  CASE NO.
  )  5:18-cv-01125-R-GJS
THE GEO GROUP, Inc., a  )
Florida  corporation; the  )
CITY OF ADELANTO, a municipal  )
entity; GEO LIEUTENANT DURAN,  )
sued in her individual  )
capacity; GEO LIEUTENANT  )
DIAZ, sued in her individual  )
capacity; GEO SERGEANT  )
CAMPOS, sued in his  )
individual capacity; SARAH  )
JONES, sued in her individual  )
capacity; THE UNITED STATES  )
OF AMERICA, and DOES 1-10,  )
individuals,  )
  )
               Defendants.  )
_____)

WEBCAM DEPOSITION OF MARVIN JOSUE GRANDE RODRIGUEZ

TAKEN ON

THURSDAY, MAY 30, 2019

KIMBERLY E. LEPINS, CSR NO. 9592, RPR

1    Q.  Did they listen to your heart?

2    A.  Yes.

3    Q.  Or your lungs?

4    A.  Yes.

5    Q.  Did they weigh you?

6    A.  Yes.

7    Q.  And they gave you clothes?

8    A.  Yes.

9    Q.  Did they tell you about rules?

10       MS. FLYNN:  Objection, vague.

11       THE WITNESS:  No, it was in a book that they

12   provided the rules.

13   BY MS. COLEMAN:

14   Q.  They gave you a book about rules?

15   A.  Yes.

16   Q.  In English or Spanish?

17   A.  It was in English.

18   Q.  Did they give it to you in Spanish also?

19   A.  As I recall, they didn't have it in Spanish.  I

20   was told that I was going to be given one in Spanish

21   afterwards but it never happened.

22   Q.  Did you ever read anyone else's book in

23   Spanish?

24   A.  No.

25   Q.  I'm going to mark as Exhibit 1 the Detention

20

1        A.   No.

2        Q.   Did you take a tray with food?

3        A.   Yes.  And then we returned it but we did not

4   touch the food.

5        Q.   Why did you take a tray?

6        A.   Because we had all lined up.  The officer would

7   come and wake us up.  When he would see us laying there,

8   he would get us up and have us all stand up in line.

9        Q.   But you could refuse to take the food, right?

10       A.   Correct, we just took it and set it down on the

11  table.

12       Q.   Why did you take the food?

13       A.   I don't know.

14       Q.   Had you decided to do a hunger strike before

15  the breakfast?

16       A.   Correct.

17       Q.   So you could have told him we're not eating,

18  right?

19            MS. FLYNN:  Objection.

20            THE WITNESS:  Correct, but we couldn't

21  communicate with the officer.

22  BY MS. COLEMAN:

23       Q.   Isn't no the same in English and Spanish?

24            MS. FLYNN:  Objection, argumentative.

25            THE WITNESS:  Yes, I understand, but I decided

                                                    86

1    to take it but not eat it.

2    BY MS. COLEMAN:

3         Q.   And everyone else did the same?

4              MS. FLYNN:   Objection, vague.

5              THE WITNESS:   I don't remember.   I just

6    remember what I did.

7    BY MS. COLEMAN:

8         Q.   Had you talked with the -- with the other

9    compatriots the night before about doing a hunger strike

10   with all of you?

11        A.   Yes.

12        Q.   And what was the plan?

13        A.   To speak to -- to an officer and expose --

14   explain to him the things that we were -- our concerns,

15   one of the superior officers.

16        Q.   Had you decided how many days you would do the

17   strike?

18        A.   Three days.

19        Q.   You decided that the night before?

20        A.   Based on what we had seen and what was going

21   on, yes.

22        Q.   When was this letter given to an official?   And

23   I'm referring to Exhibit 4.

24        A.   This was on the day of the incident, in the

25   morning.

87

1          THE WITNESS:  I don't remember that too well.

2     They would just say it was time to pick up the plates.

3     I don't know how long it would take.

4     BY MS. COLEMAN:

5          Q.  You don't know how long it would take for what?

6          A.  For breakfast.  Usually my calculation or

7     estimate was that it was 15 or 20 minutes after picking

8     up the plates.

9          Q.  Okay.

10          And that morning, did you put your plate away?

11          A.  No.

12          Q.  You stayed at the table with your plate?

13          A.  I returned it.

14          Q.  The plate?

15          A.  Yes, I just took it and I put it separately on

16     another table apart.  I didn't have breakfast.

17          Q.  I understand you didn't eat.  What did you do

18     with the plate?

19          A.  I returned it to the officer.

20          Q.  And then you sat back down at the table?

21          A.  Yes.

22          Q.  And normally after that time that you returned

23     the plate, you had 15 or 20 minutes before count, right?

24          A.  That was my estimate.  I don't actually know

25     how much time it was but that's how much I would

91

1    Q.   Aren't there eight plaintiffs?  There's eight

2  people here, correct?

3    A.   I suppose.

4    Q.   Who is the other person that is not listed

5  there?

6    A.   Those of us that were left.  At the beginning

7  there were nine of us, but then one of them was deported

8  so that left eight of us there.

9    Q.   That left eight of you in the lawsuit?

10    A.   Yes.  I never knew the name of the other -- of

11  the other participant.

12    Q.   And the nine of you decided the night before

13  not to go back to your bed for count?

14    A.   I don't remember too well.  I think so.

15    Q.   And you had decided to do a hunger strike for

16  three days?

17    A.   Correct.

18    Q.   Since you knew that when the officer yelled for

19  count, that was an order, did you know that there would

20  be consequences for not obeying the order?

21         MS. FLYNN:  Objection, vague, compound, calls

22  for speculation.

23         THE WITNESS:  Could you please repeat the

24  question.

25

94

BY MS. COLEMAN:

    Q.  Did you know that you would be in trouble for not going back to your bed for count?

      MS. FLYNN:  Objection, vague, calls for speculation.

      THE WITNESS:  I just had an idea; I didn't know much.

BY MS. COLEMAN:

    Q.  Did you tell the lady who came or any other -- or any officers that you were not going to return to your bunk?

    A.  I never really spoke to the officers the whole time.  It was always the African who would translate, the one who would speak Spanish to the officers.

    Q.  Was he going to participate in the strike, too, or just translate?

    A.  No, just translate.

    Q.  Do you -- is it your -- do you believe that the African man told any officer or the sergeant who came that you guys would not be returning to your beds?

      MS. FLYNN:  Objection, calls for speculation.

      THE WITNESS:  Well, I think so.

BY MS. COLEMAN:

    Q.  Why -- why do you think so?

    A.  Well, because they just returned him to his bed

95

1    and they left us there in a day room.

2         Q.   Did you hear anyone tell the officers or the

3    sergeant why you weren't going back to your bed?

4         A.   According to what the African told them, is

5    because we were going to start a hunger strike and

6    because we wanted to speak to one of the superior agents

7    to present our complaints to that person.

8         Q.   Did you hear any officers telling you to go to

9    your bed for count?

10        A.   Yes.

11        Q.   And you chose to ignore those commands, right?

12             MS. FLYNN:  Objection, argumentative.

13             THE WITNESS:  Yes, due to the reason that we

14   wanted to speak to a superior or a sergeant.

15   BY MS. COLEMAN:

16        Q.   What happened next?

17        A.   The officer used his radio.  I imagine that

18   that's when he called the lady and a bunch of guards

19   appeared.

20        Q.   Did the lady that you described as mad show up

21   before the other officers?

22             MS. FLYNN:  Objection, vague.

23             THE WITNESS:  They showed up almost at about

24   the same time.

25

96

1      A      Uh-huh.

2      Q      Okay.

3      A      "Reyes, restraints, helping to pull detainees

4   apart."

5      Q      Okay.

6      A      And then they were in violation -- the

7   detainees were -- it just says "Violation 213, engaging

8   or inciting a group demonstration."

9      Q      I believe it looks like "engaging in or

10  inciting a group demonstration."

11     A      Uh-huh.

12     Q      Okay.  The box below it, where it says "Staff

13  Injuries," there's an X next to No.  Did you place that

14  X?

15            MS. AGUADO:  If you know.

16            THE WITNESS:  I don't recall.

17  BY MS. STEINBACK:

18     Q      Okay.  And the box below that, it looks like

19  you highlighted everything.  Could you also just read

20  literally what you wrote there into --

21     A      Okay.  Well --

22     Q      -- the record.

23     A      -- except for this part.  I didn't write that.

24     Q      Okay.

25     A      It just says, "Detention Officer A. Reyes, OC

                                                Page 109

1    correct?

2         A.   Correct.   They set me on my feet; they pushed

3    me again, and that's when I hit against the wall.   Then

4    they had me laying down.

5         Q.   So your face hit the wall twice and then you

6    laid down?

7         A.   Correct.

8         Q.   Were you bleeding?

9         A.   No.

10        Q.   How did you get down to the ground?

11        A.   The officers demanded that I lay down.

12        Q.   And you were able to get down?

13        A.   Yes, but they helped me.   They pushed me and

14   then they set me -- they set me into a flat position on

15   the ground.

16        Q.   Were you still handcuffed?

17        A.   Correct.

18        Q.   Did they give you any commands?

19        A.   No.   There were officers that remained there

20   watching us to make sure that none of us got up or

21   anything.

22        Q.   I'm sorry, were you handcuffed or no?

23        A.   Yes, I was handcuffed.

24        Q.   Did they loosen the handcuffs?

25        A.   No.

110

1        Q.   For medical?

2        A.   Yes, they came -- I don't know if it was for

3   medical, but they came and took our blood pressure and

4   to take note of the blows and the scratches that we had.

5        Q.   Did you see medical staff?

6        A.   Yes, a nurse that took our blood pressure and

7   our names.

8        Q.   Do you know the name of the nurse?

9        A.   No.

10        Q.   Male or female?

11        A.   Female.

12        Q.   Did she do anything else with you?

13        A.   I don't know if that's the same nurse that took

14   me to the showers but after that, we were taken to the

15   showers where we were bathed with hot water.  When they

16   were bathing us, I fainted because of the -- the gas and

17   the heat of the water.  It was far too much for me.

18        Q.   Were you handcuffed while you were in the

19   shower?

20        A.   I was handcuffed the whole time.

21        Q.   So you couldn't adjust the water yourself?

22        A.   No.

23        Q.   Before you were brought to the shower, were you

24   medically examined?

25             MS. FLYNN:  Objection, vague.

112

1          THE WITNESS:  I don't remember if it was at the

2    beginning or if it was after the shower but I was --

3    what I remember is that I fainted in the shower because

4    the gas wouldn't let me breathe.

5    BY MS. COLEMAN:

6          Q.  What happened after the shower?

7          A.  After the shower, we were again taken to the

8    room where we were waiting to be transferred to

9    segregation, I think, or some other place.  I don't

10   know.

11         Q.  Were you seen by medical there?

12              MS. FLYNN:  Objection, vague.

13              THE WITNESS:  Before we were taken out of the

14   unit where everything happened, we were seen by medical.

15   BY MS. COLEMAN:

16         Q.  Was that a nurse or doctor that saw you?

17              MS. FLYNN:  Objection, calls for speculation.

18              THE WITNESS:  I think it was the same woman who

19   took me to the shower.

20   BY MS. COLEMAN:

21         Q.  And you thought she was a nurse before, right?

22         A.  I suppose, yes.

23         Q.  And what did she do after the shower?

24         A.  She took my blood pressure again.  They

25   re-examined the -- behind my ears.  I was evaluated for

                                                        113

1       A       No, ma'am.

2       Q       So why is there a watch commander?

3       A       That's just what they call us, the watch

4  commanders.   They call all the lieutenants watch

5  commanders.

6       Q       Okay.   So it's interchangeable?

7       A       Yes.

8       Q       Okay.   So when you said you spoke with a watch

9  commander on June 12th, was that the lieutenant who

10 replaced you for --

11      A       Yes, ma'am.

12      Q       -- second shift?

13              Thank you.   You've got to let her finish.

14              MS. AGUADO:   Can we take a short break?

15              MS. STEINBACK:   Sure.

16              (Recess was taken from 1:25 p.m. to 2:05 p.m.)

17              MS. STEINBACK:   Back on the record.

18 BY MS. STEINBACK:

19      Q       Ms. Diaz, during the break, did you review any

20 documents?

21      A       No.

22      Q       Did you have any conversations other than those

23 with your attorney?

24      A       No.

25      Q       Before the break, we were talking about the

                                          Page 130

1  worse manner.

2  BY MS. COLEMAN:

3      Q.  At 6:34:52, we see the woman with the pepper

4  spray walking away, right?

5          MS. FLYNN:  Objection, vague.

6          THE WITNESS:  I don't know.  Maybe, could be;

7  could not.  I don't know what her intentions were.

8  BY MS. COLEMAN:

9      Q.  Okay.  If we rewind to 6:34:01, she's standing

10  between the two tables, looks like, with a pepper spray

11  in her hand, right?

12      A.  I'm not able to make out if that's spray or if

13  that's some other device.

14      Q.  Is that the angry woman in white walking

15  around?

16      A.  Correct.

17      Q.  So now at 6:34:47 on the video, she's four

18  tables away from you with your back to your table,

19  right?

20      A.  Correct.

21      Q.  So at that time, couldn't you have gotten up

22  from your table and walked back to your bed?

23          MS. FLYNN:  Objection, vague, calls for

24  speculation, lacks foundation, argumentative.

25          THE WITNESS:  The truth is I couldn't tell you

                                                        141

1  for the same reason.  I don't know if the officers might

2  act against me.  I don't know how they could act or how

3  they would have acted in that moment, if they were to

4  consider that I was a danger were I to get up at that

5  moment or not.

6       Q.  Were they giving you any orders?

7       A.  I didn't hear any orders.  They just let the

8  angry lady in white handle the problem.

9       Q.  Did you understand that they just wanted you to

10 go back to your beds and wait for count?

11       MS. FLYNN:  Objection, vague, compound, calls

12 for speculation.

13       THE WITNESS:  I understand the question but

14 like I said, I don't know how they would have acted at

15 the moment were we to have gotten up.

16 BY MS. COLEMAN:

17       Q.  Why do you think that they would have perceived

18 you as a threat?

19       A.  Because it was a very tense moment and any of

20 them could have imagined that we may -- could have acted

21 in a manner that was something against them.

22       Q.  Are you speculating?

23       A.  No, I'm just --

24       Q.  But you don't know?

25       A.  I'm just imagining what could have happened at

                                                        142

1   that moment.

2        Q.  You don't know what was in their minds, right?

3             MS. FLYNN:  Objection, argumentative.

4             THE WITNESS:  Correct.  I couldn't read their

5   minds but, however, it was a very tense environment.

6   One as well as the other could both expect the worse;

7   however we remained passive the whole time.

8   BY MS. COLEMAN:

9        Q.  But you locked arms, right?

10            MS. FLYNN:  Objection, argumentative.

11            THE WITNESS:  Yes, when they started using

12   force.

13   BY MS. COLEMAN:

14        Q.  Didn't you lock arms before they tried to pull

15   you out from the table?

16        A.  I don't recall.

17        Q.  You knew it was time for count, right?

18            MS. FLYNN:  Objection, argumentative.

19            THE WITNESS:  Yes.

20   BY MS. COLEMAN:

21        Q.  When these officers were walking around, were

22   they giving any orders?

23        A.  I don't know.  The truth is, I don't know.

24   They were speaking to each other amongst themselves.

25        Q.  At 6:37:06, it looks like there's a few of them

143

1    at your table, right?

2        A.   Correct.

3        Q.   Were they saying anything to you?

4        A.   I don't know what they were saying.

5        Q.   At the end of the table between the first and

6    second table, was that a supervisor at 6:37:19?

7             MS. FLYNN:  Objection, calls for speculation.

8             THE WITNESS:  I don't know.  It looks like an

9    officer.

10   BY MS. COLEMAN:

11       Q.   He was trying to talk to you guys; do you

12   remember that?

13            MS. FLYNN:  Objection, calls for speculation.

14            THE WITNESS:  Regarding that, they were

15   speaking to us in English the whole time.  I was never

16   able to understand what they were saying.  Since I speak

17   very little English, I was never able to understand them

18   and they speak very quickly.

19   BY MS. COLEMAN:

20       Q.   You didn't hear any words like count?

21       A.   Not at that moment.

22       Q.   At 6:38:12 here on the video, it looks like the

23   officers are kind of around your table?

24            MS. FLYNN:  Objection, vague.

25            THE WITNESS:  From --

144

1        Q.   Do you know who that person is who is being

2   restrained by two officers and then looks like the

3   sergeant in the white blouse that is right next to them?

4        A.   No.

5        Q.   And we're -- just for the record, we're at

6   6:39:07.

7        A.   The truth is, I don't know who they might be.

8   What's more, I don't know what happened at what times on

9   the video since I didn't have a watch to check what was

10  happening.

11       Q.   At 6:39:33, are you still in the room?

12       A.   No.  By that time, according to the video, they

13  had already taken me away.

14       Q.   Do you recognize any of the people standing on

15  the second tier?

16       A.   No.  Most of them are from an African origin.

17  I don't know them.  I -- I wasn't there for too long.

18       Q.   Then on the floor we see the woman with the

19  white blouse standing, right?

20       A.   Correct.

21       Q.   Do you know the other people standing, are they

22  officers?

23       A.   I don't know the name of any of the officers

24  nor the faces.  Aside from that, you can't manage to

25  make it out.  I don't know.

146

```
 1        Q    Were you in pain during that time?

 2        A    The tingling, yes.  Pain, yes.

 3        Q    Did you -- on that day, did you have any cuts

 4    on your face?

 5        A    No.

 6        Q    Did you experience any coughing as a result of

 7    the OC spray?

 8        A    Just -- I would say a little bit.  It wasn't a

 9    lot for me.  So it wasn't that bad for me when I got

10    sprayed.

11        Q    Were there other people that it was worse for

12    who were in your group?

13             MS. AGUADO:  Calls for speculation.

14             THE WITNESS:  I don't know that because once I

15    got sprayed, I was done.  So everybody else that was in

16    that group, I don't know how they reacted to the spray.

17    BY MS. STEINBACK:

18        Q    And when you said that they flushed your eyes

19    with water, was it cold water?  Hot water?

20        A    Cold water.

21        Q    Did they do anything else to decontaminate your

22    face?

23        A    No.  Just cold water, and then we sat in front

24    of fans until the stinging sensation went away.

25        Q    Did sitting in front of a fan help relieve the
```

                                              Page 152

1    pain?

2        A    Temporary.

3        Q    How long did the pain last for you?

4        A    Well, for me, as long as I didn't put my face

5    back in water again, I was okay.  When I got home that

6    night and got up and took a shower again, it activated

7    the spray again.  The stinging of the spray in my eyes.

8        Q    When you took the shower, was it hot water or

9    cold water?

10       A    Cold water.

11       Q    So even cold water activated --

12       A    Yes, ma'am.

13       Q    How long did that go on for?

14       A    I'm going to say probably -- just probably till

15   the end of that next day.

16       Q    Did you do anything else -- and by that, I

17   mean, use creams, any other manner of decontamination

18   between the time that you were sprayed and when the pain

19   went away?

20       A    No, ma'am.

21       Q    Other than what you've described, did you

22   receive any other training on how to use OC spray at

23   Adelanto?

24       A    No, ma'am.

25       Q    Did you -- other than going through

                                        Page 153

1    everything got cleared up.

2        Q.   What were they trying to clear up?

3            MS. FLYNN:  Objection, vague, calls for

4    speculation.

5    BY MS. COLEMAN:

6        Q.   If you know.

7        A.   I don't have knowledge as to what they were

8    investigating but the officer in charge, I remember her

9    words clearly.  When she told me that it hadn't been

10   our -- she was accepting her fault in the matter but

11   also saying that we had also been wrong.

12       Q.   And who was that?

13       A.   She introduced herself as Officer Duran.  And

14   her words were clear.  She mentioned, I know that we did

15   not act in a correct manner but you did not comply with

16   an order.  That's why we're expecting you to be in here

17   between one to two weeks.  Those were her words.

18       Q.   In Spanish?

19       A.   Correct.

20       Q.   I handed you earlier Exhibit 3.  Can you turn

21   to page 2801.

22       A.   (Witness complies.)

23            Correct.

24       Q.   Is that your signature?

25       A.   Yes.

154

1    wanted to sign anything, then my signature wouldn't be

2    on here.

3         MS. FLYNN:  By here, he's referring to the

4    previous page, 2801.

5         THE WITNESS:  Correct.

6    BY MS. COLEMAN:

7        Q.  And you signed page 2801?

8        A.  Correct, I don't recall the other one.

9        Q.  Did you have a hearing?

10        MS. FLYNN:  Objection, vague.

11        THE WITNESS:  Hearing for what?  I don't

12    understand that question.

13    BY MS. COLEMAN:

14        Q.  Did you have a hearing to determine if you had

15    engaged in or incited a group demonstration?

16        A.  I don't remember that hearing.

17        Q.  While you were in segregation, you were still

18    being -- you were still able to take showers every day,

19    right?

20        A.  Correct, but due to the chemicals in the gas, I

21    was not able to take the shower.  I wasn't able to

22    breathe.  I couldn't take my shower.

23        Q.  For how many days?

24        A.  I don't recall, but over two weeks went by.  I

25    would shower but not in the affected areas.

                                                    157

1      Q.   What were the affected areas?

2      A.   From my belly button to my head.

3      Q.   How was your -- how was your torso affected by

4  pepper spray?

5           MS. FLYNN:  Objection, vague.

6           THE WITNESS:  As I said at the beginning, when

7  they first took me to shower, that's when the spray came

8  down to the lower parts of -- to the other parts of my

9  body.

10          MS. FLYNN:  I don't know if you know that they

11  were in their jail clothes which had the pepper spray on

12  them.  They were washed in their clothes when they took

13  their showers.

14          THE WITNESS:  We did have our uniforms on.  In

15  fact, when they transferred us to the segregation unit,

16  but the white shirt that we had on all the time was

17  soaked with the pepper spray, and so that's what caused

18  it to go all the way inside.

19          My neck area, my ears, my arms, they turned

20  white and swollen due to the chemicals.

21          We requested medical assistance, some kind of

22  cream, some kind of painkiller.

23          MS. FLYNN:  I want to clarify the

24  interpretation.  Can you ask him again what color his

25  skin turned.

                                              158

1   from your viewpoint.

2        A.   Correct.  I mentioned this previously, before

3   watching the video.  I did mention that I received

4   pepper spray.  I didn't mention how many times.  But I

5   do know at that moment what was mainly affected was my

6   arms, my face, and my head.

7            Due to the fact that I was under the effects of

8   gas, I was not able to notice that my shirt was full of

9   the gas.

10       Q.   When you got -- was there anywhere else you

11  were sprayed?

12       A.   No.

13       Q.   Okay.  So then you were brought to the shower.

14  Were your clothes taken off?

15       A.   No.  I was handcuffed with the same uniform,

16  black and blue color uniform.

17       Q.   And what happened when you were put in the

18  shower?

19       A.   With the water, the smell of the gas

20  intensified and that caused me to faint.  I forgot to

21  mention in that part that the shower area was very

22  small.

23            At the moment I fainted, I remember that I hit

24  my head against the wall.  And I'm able to remember that

25  I felt the hands of the nurse or the officer that took

                                                      162

1   me there that held me and tried to get me up when I

2   fainted.

3        Q.   How do you know you hit your head on the wall

4   when you fainted?

5        A.   After that, I felt the sudden pain and kind of

6   like a small bump to the back of my head.

7        Q.   Was it bleeding?

8        A.   No.

9        Q.   When were you able to get out of those clothes?

10       A.   After I was taken out of the shower, we were

11   transferred from the room from which we were going to be

12   taken to another zone.

13            After that, I remember that we were asked to

14   change clothes, change our clothes.  We were given some

15   orange-colored clothing.

16            I also remember that they wanted us to change

17   our clothes with our handcuffs on.  After that, another

18   officer wearing a white shirt came in and he was able

19   to -- to check our handcuffs, and he was able to notice

20   the marks on our wrists, which were very red.  And he's

21   the one that made our handcuffs more comfortable before

22   transferring us to the next place.

23            And he removed our handcuffs so that we could

24   change and then he put them back on.

25       Q.   So that's when you were able to change?

163

1    that deposition about my job.

2        Q    Okay.  So you read it after the incident and

3    then again while you were on paid leave?

4        A    Yes, ma'am.

5        Q    Okay.  And when you read those policies, did

6    you, in fact, see that you had violated a written

7    policy?

8        A    No.

9        Q    Did you consider contesting your firing?

10           MS. AGUADO:  I'm not really sure how that's

11   relevant.

12           But you can answer yes or no or if you haven't

13   decided yet.

14           THE WITNESS:  Unknown at this time.

15   BY MS. STEINBACK:

16       Q    Okay.  Did you have any responsibility for the

17   handling of detainee grievances in your capacity as

18   lieutenant?

19       A    No.

20       Q    Did you ever have occasion to see detainee

21   grievances while you worked at Adelanto?

22       A    A few.

23       Q    Under what circumstances did you see those

24   grievances?

25       A    When the grievance coordinator would come in

Page 171

```
 1    and explain to me that one of the officers had done
 2    something, and then they just brought it in, pretty much
 3    let me know what the grievance was, and then -- then the
 4    grievance coordinator would talk to that detainee, and
 5    then they would try to get it dropped.  Because some of
 6    the grievances were frivolous grievances from the
 7    detainee.
 8        Q    So the grievance coordinator, to your
 9    knowledge, would go to the detainee to see if they would
10    drop the grievance?
11        A    Yes, ma'am.
12        Q    In June of 2017, who was the grievance
13    coordinator, if you remember?
14        A    Ms. Woelke.  I don't remember her first name,
15    but it's Ms. Woelke.  I think it's W-o-e-l-k-e,
16    Ms. Woelke.
17        Q    While you were working at Adelanto up to and
18    including the time of the incident, did you ever hear
19    any detainee complaints about the food at Adelanto?
20        A    Yes.
21        Q    What complaints did you hear?
22        A    The food wasn't good.  That's pretty much what
23    they said, the food wasn't good.  From reading this
24    report, our staff used to eat the food there too.
25        Q    So your staff ate the same food as the --
```

Page 172

1    Q    In -- on June 12th of 2017, to your knowledge,

2    were there zip ties in central control?

3    A    Not to my knowledge.  I think the only time we

4    had zip ties were -- they were in our medical bags when

5    we would transport detainees out to the hospitals.  But

6    they weren't inside -- like I said, the detainees didn't

7    have -- they didn't have access to that area at all, to

8    even go up that far into the institution.

9    Q    Where is central command with respect to the

10   day room that was --

11   A    At the front of the institution.

12   Q    How far is that?

13   A    It's -- let's see.  You come in -- central

14   controls were in the very front, in the very front.  So

15   they are nowhere near the housing units.  They're up in

16   the very front when you first walk in.

17   Q    How long would it take to walk from central

18   control to the -- to the East housing units?

19   A    Walking, probably about 10, 15 minutes.

20   Running, probably a lot faster.  Yeah, about -- probably

21   five minutes, if they're running, to get to the central

22   control for any equipment.

23   Q    In watching the video, it looks like there are

24   windows on sort of what looks like maybe a second floor

25   overlooking a day room.  Do you know what I'm talking

Page 176

1      <u>REPORTER'S COPY CERTIFICATE</u>

2

3

4          I, KIMBERLY E. LEPINS, Certified Shorthand

5   Reporter for the State of California, hereby certify:

6          THAT the foregoing is a true and correct copy

7   of the original record of the testimony given by the

8   witness and of all objections made at the time of the

9   examination, to the best of my ability.

10          I FURTHER CERTIFY that I am in no way

11   interested in the outcome of said action.

12          IN WITNESS WHEREOF, I have hereunto subscribed

13   my hand this 2nd day of June, 2019.

14

15

16   _____

17   KIMBERLY E. LEPINS
     Certified Shorthand Reporter
18   Certificate No. 9592

19

20

21

22

23

24

25

                                                      186

# EXHIBIT 31



| Device name | : DVR-670-16A000 | Date and time | : 6/12/2017 6:30:51 AM (GMT -07:00) |
|---|---|---|---|
| MAC address | : 00:00:00:00:00:00 | Events | : None |
| Camera name | : East-2-C-1 | Image size | : 704 (h) x 480 (v) |

**EXHIBIT 2**

**WIT: Rebecca Jindi**
**DATE: 6/14/2019**

C. Rybicki CSR No. 13481

# EXHIBIT 32

Rachel Steinback, SBN 310700
LAW OFFICE OF RACHEL STEINBACK
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*

*[Additional Counsel on Following Page]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA MARTINEZ; ISAAC ANTONIO LOPEZ CASTILLO; JOSUE VLADIMIR CORTEZ DIAZ; JOSUE MATEO LEMUS CAMPOS; MARVIN JOSUE GRANDE RODRIGUEZ; ALEXANDER ANTONIO BURGOS MEJIA; LUIS PEÑA GARCIA; JULIO CESAR BARAHONA CORNEJO, as individuals,

Plaintiffs,

v.

THE GEO GROUP, Inc., a Florida corporation; the CITY OF ADELANTO, a municipal entity; GEO LIEUTENANT DURAN, sued in her individual capacity; GEO LIEUTENANT DIAZ, sued in her individual capacity;  GEO SERGEANT CAMPOS, sued in his individual capacity; SARAH JONES, sued in her individual capacity; THE UNITED STATES OF AMERICA; and DOES 1-10, individuals,

Defendants.

Case No. 5:18-cv-01125-R-GJS

**PLAINTIFF LUIS PEÑA GARCIA's RESPONSES TO DEFENDANT THE GEO GROUP, INC.'S INTERROGATORIES, SET ONE**

1   responses at a later date.  Subject to those objections, Plaintiff responds as follows:

2     Plaintiff's physical injuries have healed, although his trauma and emotional

3   distress persist.

4

5   **INTERROGATORY NO. 10:**

6     If you contend that you will require any future health care treatment as a

7   result of the incident that is the subject of this litigation, please identify all medical

8   providers and/or witnesses who support your contention.

9   **RESPONSE TO INTERROGATORY NO. 10:**

10     Plaintiff incorporates his general objections. Plaintiff further objects that this

11   interrogatory calls for expert disclosures and conclusions prior to the time for

12   expert disclosures.  Subject to those objections, Plaintiff responds as follows:

13     Plaintiff has not seen medical providers since leaving the detention center.

14   Plaintiff reserves the right to supplement this response at a later date.

15

16   **INTERROGATORY NO. 11:**

17     If you contend that you sustained emotional injuries as a result of the incident

18   that is the subject of this litigation, please describe the nature of the emotional

19   distress or psychological injury, the date and time when it was first experienced,

20   and the name and address of every psychiatrist, counselor, therapist, psychologist,

21   or social worker from whom he sought or obtained assistance.

22   **RESPONSE TO INTERROGATORY NO. 11:**

23     Plaintiff incorporates his general objections. Plaintiff further objects to this

24   interrogatory to the extent it calls for information that will be the subject of expert

25   disclosures.  Plaintiff further objects that he is claiming only garden variety

26   emotional distress and thus the information sought in this interrogatory is not

27   proportional to the needs of the case.  Subject to those objections, Plaintiff responds

28   as follows: Plaintiff felt angry and distressed at the treatment of the detainees.  He

1   had expected the United States to be a land of freedom and was shocked and

2   appalled at the brutal treatment.  In segregation he felt stressed and alone and was

3   not allowed to communicate with anyone or access the phone.  He still thinks of it

4   frequently and it brings back his feelings of distress.  Plaintiff has nightmares and

5   often has problems sleeping.  He gets feelings of his heart racing or pounding

6   sometimes, and he is afraid of being detained again.  Plaintiff has not seen a mental

7   health professional regarding this incident.  He asked for one in the facility but was

8   not provided access to a psychologist.

9

10  **INTERROGATORY NO. 12:**

11      Please identify, by name, address, and reason for treatment, all health care

12  providers who have provided you with treatment of any kind since the incident that

13  is the subject of this litigation.

14  **RESPONSE TO INTERROGATORY NO. 12:**

15      Plaintiff incorporates his general objections.  Plaintiff further objects to this

16  interrogatory on the ground of relevance, as overly broad and unduly burdensome,

17  and to the extent it interrogatory calls for private and confidential medical

18  information.  Plaintiff objects to providing records of medical treatment unrelated

19  to the injuries suffered in the incident.  Plaintiff further objects that the records of

20  his medical treatment in the facility are more readily available to Defendant than to

21  Plaintifff. Subject to those objections, Plaintiff responds as follows:

22      Plaintiff has not seen any medical professionals regarding this incident since

23  he was released from the facility.

24

25  **INTERROGATORY NO. 13:**

26      Please identify, by health care provider, date of service, amount of charges,

27  amounts paid, and amount all special damages for health care treatment that you

28  contend are attributable to the incident that is the subject of this litigation.

1    secondary, and perhaps irrelevant and trivial details."). *See also Safeco of America*

2    *v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130

3    F.R.D. 424, 427–28 (N.D. Cal. 1989) (same). Plaintiff further objects that this

4    interrogatory is compound, overly broad and vague and ambiguous.  Plaintiff

5    further objects on the ground that this interrogatory calls for a legal conclusion and

6    on the ground that the information requested is in the possession of the Defendants.

7    Further, the depositions of the defendant officers and other witnesses have not been

8    completed and therefore this interrogatory is premature.

9         Discovery is ongoing and Plaintiff objects that the request is premature.

10

11

12   Dated: February 8, 2019          LAW OFFICE OF RACHEL STEINBACK
                                       LAW OFFICE OF CAROL A. SOBEL
13                                     SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
14                                     LAW OFFICE OF CYNTHIA ANDERSON-BARKER
                                       LAW OFFICE OF MATTHEW STRUGAR
15                                     LAW OFFICE OF COLLEEN FLYNN

16

17                                     By: /s/ Catherine Sweetser
18                                         *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 33

Rachel Steinback, SBN 310700
LAW OFFICE OF RACHEL STEINBACK
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*

*[Additional Counsel on Following Page]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA MARTINEZ; ISAAC ANTONIO LOPEZ CASTILLO; JOSUE VLADIMIR CORTEZ DIAZ; JOSUE MATEO LEMUS CAMPOS; MARVIN JOSUE GRANDE RODRIGUEZ; ALEXANDER ANTONIO BURGOS MEJIA; LUIS PEÑA GARCIA; JULIO CESAR BARAHONA CORNEJO, as individuals,

Plaintiffs,

v.

THE GEO GROUP, Inc., a Florida corporation; the CITY OF ADELANTO, a municipal entity; GEO LIEUTENANT DURAN, sued in her individual capacity; GEO LIEUTENANT DIAZ, sued in her individual capacity;  GEO SERGEANT CAMPOS, sued in his individual capacity; SARAH JONES, sued in her individual capacity; THE UNITED STATES OF AMERICA; and DOES 1-10, individuals,

Defendants.

Case No. 5:18-cv-01125-R-GJS

**PLAINTIFF ALEXANDER ANTONIO BURGOS MEJIA'S RESPONSES TO DEFENDANT THE GEO GROUP, INC.'S INTERROGATORIES, SET ONE**

1    **INTERROGATORY NO. 11:**

2          If you contend that you sustained emotional injuries as a result of the incident

3    that is the subject of this litigation, please describe the nature of the emotional

4    distress or psychological injury, the date and time when it was first experienced,

5    and the name and address of every psychiatrist, counselor, therapist, psychologist,

6    or social worker from whom he sought or obtained assistance.

7    **RESPONSE TO INTERROGATORY NO. 11:**

8          Plaintiff incorporates his general objections. Plaintiff further objects to this

9    interrogatory to the extent it calls for information that will be the subject of expert

10   disclosures.  Plaintiff further objects that he is claiming only garden variety

11   emotional distress and thus the information sought in this interrogatory is not

12   proportional to the needs of the case.  Subject to those objections, Plaintiff responds

13   as follows: Mr. Mejia still has emotional distress to this day.  He suffers from

14   anxiety and worries that if he were detained he would be physically attacked again.

15   He thinks about this every day.   Mr. Mejia also saw a therapist at St. Mary Medical

16   Center- Trauma Recovery Center in Long Beach.  Mr. Mejia has also been working

17   with a loss and trauma support group at Comunidades con Poder para el Cambio in

18   Long Beach.

19

20   **INTERROGATORY NO. 12:**

21         Please identify, by name, address, and reason for treatment, all health care

22   providers who have provided you with treatment of any kind since the incident that

23   is the subject of this litigation.

24   **RESPONSE TO INTERROGATORY NO. 12:**

25         Plaintiff incorporates his general objections.  Plaintiff further objects to this

26   interrogatory on the ground of relevance, as overly broad and unduly burdensome,

27   and to the extent it interrogatory calls for private and confidential medical

28   information.  Plaintiff objects to providing records of medical treatment unrelated

1    Plaintiff also notes that there is a list of demands that was given to the guards

2  and incorporates that list by reference.  A copy of that list has been provided at

3  P000199-200.

4

5  **INTERROGATORY NO. 25:**

6    Please state all facts in support of your conspiracy claim.

7  **RESPONSE TO INTERROGATORY NO. 25:**

8    Plaintiff incorporates his general objections. Plaintiff objects to this

9  interrogatory to the extent that it calls for all facts about Plaintiffs' claims.  "State

10  all facts" interrogatories of this kind are unduly burdensome, harassing, overly

11  broad, and an improper use of the discovery process.  *See IBP, Inc. v. Mercantile*

12  *Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) (providing "every fact" could

13  require "laborious, time consuming analysis, search and description of incidental,

14  secondary, and perhaps irrelevant and trivial details.").  *See also Safeco of America*

15  *v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130

16  F.R.D. 424, 427–28 (N.D. Cal. 1989) (same). Plaintiff further objects that this

17  interrogatory is compound, overly broad and vague and ambiguous.  Plaintiff

18  further objects on the ground that this interrogatory calls for a legal conclusion and

19  on the ground that the information requested is in the possession of the Defendants.

20  Further, the depositions of the defendant officers and other witnesses have not been

21  completed and therefore this interrogatory is premature.

22    Discovery is ongoing and Plaintiff objects that the request is premature.

23

24

25  Dated: February 8, 2019        LAW OFFICE OF RACHEL STEINBACK

26                     LAW OFFICE OF CAROL A. SOBEL
                     SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

27                     LAW OFFICE OF CYNTHIA ANDERSON-BARKER
                     LAW OFFICE OF MATTHEW STRUGAR

28

1

2

LAW OFFICE OF COLLEEN FLYNN

3

4

By: /s/ Catherine Sweetser
        *Attorneys for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Alexander Antonio Burgos Mejia, am a Plaintiff in the within action.  I am familiar with the contents of **Plaintiff Alexander Antonio Burgos Mejia's Responses to Defendant GEO GROUP, INC.'s Request for Interrogatories, Set One**.  It is true of my own knowledge except as to matters which are stated on information and believe, and as to those I believe them to be true.

I declare under penalty of perjury under the laws the State of California that the foregoing is true and correct.

Executed on February _13_, 2019, in _Long beach_, California.

_Antonio Burgos_
Alexander Antonio Burgos Mejia

# EXHIBIT 34

1  Rachel Steinback, SBN 310700
2  LAW OFFICE OF RACHEL STEINBACK
   P.O. Box 291253
3  Los Angeles, CA 90029
4  (t) 213-537-5370
   (f) 213-232-4003
5  (e) steinbacklaw@gmail.com
6
7  *Attorneys for Plaintiffs.*
8  *[Additional Counsel on Following Page]*

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA

11 OMAR ARNOLDO RIVERA
   MARTINEZ; ISAAC ANTONIO
12 LOPEZ CASTILLO; JOSUE
   VLADIMIR CORTEZ DIAZ; JOSUE
13 MATEO LEMUS CAMPOS;
   MARVIN JOSUE GRANDE
14 RODRIGUEZ; ALEXANDER
   ANTONIO BURGOS MEJIA; LUIS
15 PEÑA GARCIA; JULIO CESAR
   BARAHONA CORNEJO, as
16 individuals,

17              Plaintiffs,

18 v.

19 THE GEO GROUP, Inc., a Florida
   corporation; the CITY OF
20 ADELANTO, a municipal entity; GEO
   LIEUTENANT DURAN, sued in her
21 individual capacity; GEO
   LIEUTENANT DIAZ, sued in her
22 individual capacity;  GEO
   SERGEANT CAMPOS, sued in his
23 individual capacity; SARAH JONES,
   sued in her individual capacity; THE
24 UNITED STATES OF AMERICA;
   and DOES 1-10, individuals,

25              Defendants.
26

Case No. 5:18-cv-01125-R-GJS

**PLAINTIFF OMAR
ARNOLDO RIVERA MARTINEZ'S
RESPONSES TO
DEFENDANT THE GEO GROUP,
INC.'S INTERROGATORIES, SET
ONE**

27
28

1  its frequency, and its duration.

2  **RESPONSE TO INTERROGATORY NO. 9:**

3      Plaintiff's nose is still injured, and he gets nose bleeds almost every day. In

4  the morning he wakes up with dry blood in and around his nose.  It also makes it

5  difficult for him to breathe and to sleep.  His nose is still fractured and visibly

6  crooked.

7

8  **INTERROGATORY NO. 10:**

9      If you contend that you will require any future health care treatment as a

10  result of the incident that is the subject of this litigation, please identify all medical

11  providers and/or witnesses who support your contention.

12  **RESPONSE TO INTERROGATORY NO. 10:**

13      Plaintiff incorporates his general objections. Plaintiff further objects that this

14  interrogatory calls for expert disclosures and conclusions prior to the time for

15  expert disclosures.  Subject to those objections, Plaintiff responds as follows:

16      He will need surgery or some other medical treatment to repair his nose.

17  Plaintiff reserves the right to supplement this response at a later date.

18

19  **INTERROGATORY NO. 11:**

20      If you contend that you sustained emotional injuries as a result of the incident

21  that is the subject of this litigation, please describe the nature of the emotional

22  distress or psychological injury, the date and time when it was first experienced,

23  and the name and address of every psychiatrist, counselor, therapist, psychologist,

24  or social worker from whom he sought or obtained assistance.

25  **RESPONSE TO INTERROGATORY NO. 11:**

26      Plaintiff incorporates his general objections. Plaintiff further objects to this

27  interrogatory to the extent it calls for information that will be the subject of expert

28  disclosures.  Plaintiff further objects that he is claiming only garden variety

1   emotional distress and thus the information sought in this interrogatory is not

2   proportional to the needs of the case.  Subject to those objections, Plaintiff responds

3   as follows:  Plaintiff experienced emotional distress when he was harmed by the

4   guards during the incident and while he was restricted in the segregation unit.

5   During his hunger strike he briefly spoke with a psychologist at Adelanto.  After he

6   was released from segregation he experienced further emotional distress after he

7   was erroneously identified as the leader who incited a group demonstration and was

8   elevated to red jump suit and placed in a higher security ward.  This ward housed

9   the violent gang members that he fled from when he left El Salvador.  He feared for

10  his life and asked to see a psychologist at Adelanto.  He explained that he feared for

11  his safety and he was later transferred to protective custody.  He thinks about the

12  incident frequently and fears being detained by any agency ever again. Plaintiff has

13  not seen a mental health professional regarding this incident since the psychologist

14  he saw in the facility.

15

16  **INTERROGATORY NO. 12:**

17        Please identify, by name, address, and reason for treatment, all health care

18  providers who have provided you with treatment of any kind since the incident that

19  is the subject of this litigation.

20  **RESPONSE TO INTERROGATORY NO. 12:**

21        Plaintiff incorporates his general objections.  Plaintiff further objects to this

22  interrogatory on the ground of relevance, as overly broad and unduly burdensome,

23  and to the extent it interrogatory calls for private and confidential medical

24  information.  Plaintiff objects to providing records of medical treatment unrelated

25  to the injuries suffered in the incident.  Plaintiff further objects that the records of

26  his medical treatment in the facility are more readily available to Defendant than to

27  Plaintiff. Subject to those objections, Plaintiff responds as follows:

28        Plaintiff saw a dentist in Ahuachapan, El Salvador who replaced his front

1    P000199-200.

2

3    **INTERROGATORY NO. 25:**

4        Please state all facts in support of your conspiracy claim.

5    **RESPONSE TO INTERROGATORY NO. 25:**

6        Plaintiff incorporates his general objections. Plaintiff objects to this

7    interrogatory to the extent that it calls for all facts about Plaintiffs' claims. "State

8    all facts" interrogatories of this kind are unduly burdensome, harassing, overly

9    broad, and an improper use of the discovery process. *See IBP, Inc. v. Mercantile*

10   *Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) (providing "every fact" could

11   require "laborious, time consuming analysis, search and description of incidental,

12   secondary, and perhaps irrelevant and trivial details."). *See also Safeco of America*

13   *v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130

14   F.R.D. 424, 427–28 (N.D. Cal. 1989) (same). Plaintiff further objects that this

15   interrogatory is compound, overly broad and vague and ambiguous.  Plaintiff

16   further objects on the ground that this interrogatory calls for a legal conclusion and

17   on the ground that the information requested is in the possession of the Defendants.

18   Further, the depositions of the defendant officers and other witnesses have not been

19   completed and therefore this interrogatory is premature.

20        Discovery is ongoing and Plaintiff objects that the request is premature.

21

22   Dated: February 8, 2019          LAW OFFICE OF RACHEL STEINBACK
                                       LAW OFFICE OF CAROL A. SOBEL
23                                     SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
24                                     LAW OFFICE OF CYNTHIA ANDERSON-BARKER
                                       LAW OFFICE OF MATTHEW STRUGAR
25                                     LAW OFFICE OF COLLEEN FLYNN

26

27
                                       By:  /s/ Catherine Sweetser
28                                          *Attorneys for Plaintiffs*

**VERIFICATION**

I, Omar Arnoldo Rivera Martinez, am a Plaintiff in the within action.  I am familiar with the contents of **Plaintiff Omar Arnoldo Rivera Martinez's Responses to Defendant GEO GROUP, INC.'s Request for Interrogatories, Set One**.  It is true of my own knowledge except as to matters which are stated on information and believe, and as to those I believe them to be true.

I declare under penalty of perjury under the laws the State of California that the foregoing is true and correct.

Executed on February 13, 2019, in _____Tijuana_____, Mexico.

_____
Omar Arnoldo Rivera Martinez

# EXHIBIT 35

1   Rachel Steinback, SBN 310700          Carol A. Sobel, SBN 84483
2   LAW OFFICE OF RACHEL STEINBACK        Monique A. Alarcon, SBN 311650
    P.O. Box 291253                       Avnet S. Chattha, SBN 316545
3   Los Angeles, CA 90029                 LAW OFFICE OF CAROL SOBEL
4   (t) 213-537-5370                      725 Arizona Avenue, Suite 300
    (f) 213-232-4003                      Santa Monica, CA 90401
5   (e) steinbacklaw@gmail.com            (t) 310-393-3055
                                          (e) carolsobel@aol.com
6                                         (e) monique.alarcon8@gmail.com
7   *Attorneys for Plaintiffs.*           (e) avneet.chattha7@gmail.com

8   *[Additional Counsel on Following Page]*

9                  UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11  OMAR ARNOLDO RIVERA               Case No. 5:18-cv-01125-R-GJS
    MARTINEZ; ISAAC ANTONIO
12  LOPEZ CASTILLO; JOSUE             **PLAINTIFF MARVIN
    VLADIMIR CORTEZ DIAZ; JOSUE       JOSUE GRANDE RODRIGUEZ's
13  MATEO LEMUS CAMPOS;               RESPONSES TO DEFENDANT
    MARVIN JOSUE GRANDE               THE GEO GROUP, INC.'S
14  RODRIGUEZ; ALEXANDER              INTERROGATORIES, SET ONE**
    ANTONIO BURGOS MEJIA; LUIS
15  PEÑA GARCIA; JULIO CESAR
    BARAHONA CORNEJO, as
16  individuals,

17               Plaintiffs,

18  v.

19  THE GEO GROUP, Inc., a Florida
    corporation; the CITY OF
20  ADELANTO, a municipal entity; GEO
    LIEUTENANT DURAN, sued in her
21  individual capacity; GEO
    LIEUTENANT DIAZ, sued in her
22  individual capacity;  GEO
    SERGEANT CAMPOS, sued in his
23  individual capacity; SARAH JONES,
    sued in her individual capacity; THE
24  UNITED STATES OF AMERICA;
    and DOES 1-10, individuals,
25
                 Defendants.
26

27

28

**INTERROGATORY NO. 10:**

If you contend that you will require any future health care treatment as a result of the incident that is the subject of this litigation, please identify all medical providers and/or witnesses who support your contention.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates his general objections. Plaintiff further objects that this interrogatory calls for expert disclosures and conclusions prior to the time for expert disclosures.  Subject to those objections, Plaintiff responds as follows:

Plaintiff reserves the right to supplement this response at a later date.

**INTERROGATORY NO. 11:**

If you contend that you sustained emotional injuries as a result of the incident that is the subject of this litigation, please describe the nature of the emotional distress or psychological injury, the date and time when it was first experienced, and the name and address of every psychiatrist, counselor, therapist, psychologist, or social worker from whom he sought or obtained assistance.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates his general objections. Plaintiff further objects to this interrogatory to the extent it calls for information that will be the subject of expert disclosures.  Plaintiff further objects that he is claiming only garden variety emotional distress and thus the information sought in this interrogatory is not proportional to the needs of the case.  Subject to those objections, Plaintiff responds as follows: Plaintiff has difficulty sleeping and stress and anxiety from the assault and use of force against him.  He also has ongoing headaches and feelings of desperation. Plaintiff has not seen a mental health professional regarding this incident since the psychologist he saw in the facility.

1   ignored for one or two days.

2         Plaintiff also notes that there is a list of demands that was given to the guards

3   and incorporates that list by reference.  A copy of that list has been provided at

4   P000199-200.

5

6

7   **INTERROGATORY NO. 25:**

8         Please state all facts in support of your conspiracy claim.

9   **RESPONSE TO INTERROGATORY NO. 25:**

10        Plaintiff incorporates his general objections. Plaintiff objects to this

11  interrogatory to the extent that it calls for all facts about Plaintiffs' claims.  "State

12  all facts" interrogatories of this kind are unduly burdensome, harassing, overly

13  broad, and an improper use of the discovery process.  *See IBP, Inc. v. Mercantile*

14  *Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) (providing "every fact" could

15  require "laborious, time consuming analysis, search and description of incidental,

16  secondary, and perhaps irrelevant and trivial details.").  *See also Safeco of America*

17  *v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130

18  F.R.D. 424, 427–28 (N.D. Cal. 1989) (same). Plaintiff further objects that this

19  interrogatory is compound, overly broad and vague and ambiguous.  Plaintiff

20  further objects on the ground that this interrogatory calls for a legal conclusion and

21  on the ground that the information requested is in the possession of the Defendants.

22  Further, the depositions of the defendant officers and other witnesses have not been

23  completed and therefore this interrogatory is premature.

24        Discovery is ongoing and Plaintiff objects that the request is premature.

25

26

27  Dated: February 8, 2019         LAW OFFICE OF RACHEL STEINBACK

28                                  LAW OFFICE OF CAROL A. SOBEL

SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
LAW OFFICE OF CYNTHIA ANDERSON-BARKER
LAW OFFICE OF MATTHEW STRUGAR
LAW OFFICE OF COLLEEN FLYNN


By: /s/ Catherine Sweetser
     *Attorneys for Plaintiffs*

## **VERIFICATION**

I, Marvin Grande Rodriguez, am a Plaintiff in the within action.  I am familiar with the contents of **Plaintiff Marvin Grande Rodriguez's Responses to Defendant GEO GROUP, INC.'s Request for Interrogatories, Set One**.  It is true of my own knowledge except as to matters which are stated on information and believe, and as to those I believe them to be true.

I declare under penalty of perjury under the laws the State of California that the foregoing is true and correct.

Executed on May 30, 2019, in Oakland, California.


_____
Marvin Grande Rodriguez

# EXHIBIT 36

Rachel Steinback, SBN 310700
LAW OFFICE OF RACHEL STEINBACK
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*

*[Additional Counsel on Following Page]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA
MARTINEZ; ISAAC ANTONIO
LOPEZ CASTILLO; JOSUE
VLADIMIR CORTEZ DIAZ; JOSUE
MATEO LEMUS CAMPOS;
MARVIN JOSUE GRANDE
RODRIGUEZ; ALEXANDER
ANTONIO BURGOS MEJIA; LUIS
PEÑA GARCIA; JULIO CESAR
BARAHONA CORNEJO, as
individuals,

Plaintiffs,

v.

THE GEO GROUP, Inc., a Florida
corporation; the CITY OF
ADELANTO, a municipal entity; GEO
LIEUTENANT DURAN, sued in her
individual capacity; GEO
LIEUTENANT DIAZ, sued in her
individual capacity;  GEO
SERGEANT CAMPOS, sued in his
individual capacity; SARAH JONES,
sued in her individual capacity; THE
UNITED STATES OF AMERICA;
and DOES 1-10, individuals,

Defendants.

Case No. 5:18-cv-01125-R-GJS

**PLAINTIFF ISAAC ANTONIO
LOPEZ CASTILLO'S RESPONSES
TO DEFENDANT THE GEO
GROUP, INC.'S
INTERROGATORIES, SET ONE**

1   **INTERROGATORY NO. 9:**

2       Identify any injuries you contend you still have, which you attribute to the

3   incident which gave rise to this action, including a description of its present status,

4   its frequency, and its duration.

5   **RESPONSE TO INTERROGATORY NO. 9:**

6       Plaintiff still has back pain.  It ranges from his neck to the middle of his back

7   and is at a scale of 6 on the pain scale almost daily.  He feels more pain when he

8   walks or stands for long periods of time.

9

10   **INTERROGATORY NO. 10:**

11       If you contend that you will require any future health care treatment as a

12   result of the incident that is the subject of this litigation, please identify all medical

13   providers and/or witnesses who support your contention.

14   **RESPONSE TO INTERROGATORY NO. 10:**

15       Plaintiff incorporates his general objections. Plaintiff further objects that this

16   interrogatory calls for expert disclosures and conclusions prior to the time for

17   expert disclosures.  Subject to those objections, Plaintiff responds as follows:

18       Plaintiff reserves the right to supplement this response at a later date.

19

20   **INTERROGATORY NO. 11:**

21       If you contend that you sustained emotional injuries as a result of the incident

22   that is the subject of this litigation, please describe the nature of the emotional

23   distress or psychological injury, the date and time when it was first experienced,

24   and the name and address of every psychiatrist, counselor, therapist, psychologist,

25   or social worker from whom he sought or obtained assistance.

26   **RESPONSE TO INTERROGATORY NO. 11:**

27       Plaintiff incorporates his general objections. Plaintiff further objects to this

28   interrogatory to the extent it calls for information that will be the subject of expert

disclosures.  Plaintiff further objects that he is claiming only garden variety
emotional distress and thus the information sought in this interrogatory is not
proportional to the needs of the case.  Subject to those objections, Plaintiff responds
as follows:  Isaac feels anxious and afraid whenever he sees someone in uniform, as
it brings back memories of when he was detained and he fears going back.  His
heart races, he feels faint, and he freezes.  While detained at Adelanto, Plaintiff was
seen by a psychologist before the incident for anxiety and panic attacks he suffered
when confined in small places.  Plaintiff also saw the psychologist after the incident
for an evaluation during his ongoing hunger strike.  Plaintiff has not seen a mental
health professional regarding this incident since the psychologist he saw in the
facility.

**INTERROGATORY NO. 12:**

Please identify, by name, address, and reason for treatment, all health care
providers who have provided you with treatment of any kind since the incident that
is the subject of this litigation.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates his general objections.  Plaintiff further objects to this
interrogatory on the ground of relevance, as overly broad and unduly burdensome,
and to the extent it interrogatory calls for private and confidential medical
information.  Plaintiff objects to providing records of medical treatment unrelated
to the injuries suffered in the incident.  Plaintiff further objects that the records of
his medical treatment in the facility are more readily available to Defendant than to
Plaintifff. Subject to those objections, Plaintiff responds as follows:

Plaintiff has not seen any providers since leaving the facility.  Plaintiff did
see providers in the facility, and Defendant has those records equally available to
them.

1  interrogatory to the extent that it calls for all facts about Plaintiffs' claims.  "State

2  all facts" interrogatories of this kind are unduly burdensome, harassing, overly

3  broad, and an improper use of the discovery process.  *See IBP, Inc. v. Mercantile*

4  *Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) (providing "every fact" could

5  require "laborious, time consuming analysis, search and description of incidental,

6  secondary, and perhaps irrelevant and trivial details.").  *See also Safeco of America*

7  *v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130

8  F.R.D. 424, 427–28 (N.D. Cal. 1989) (same). Plaintiff further objects that this

9  interrogatory is compound, overly broad and vague and ambiguous.  Plaintiff

10  further objects on the ground that this interrogatory calls for a legal conclusion and

11  on the ground that the information requested is in the possession of the Defendants.

12  Further, the depositions of the defendant officers and other witnesses have not been

13  completed and therefore this interrogatory is premature.

14       Discovery is ongoing and Plaintiff objects that the request is premature.

15

16

17  Dated: February 8, 2019          LAW OFFICE OF RACHEL STEINBACK

18                                   LAW OFFICE OF CAROL A. SOBEL
                                     SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

19                                   LAW OFFICE OF CYNTHIA ANDERSON-BARKER

20                                   LAW OFFICE OF MATTHEW STRUGAR
                                     LAW OFFICE OF COLLEEN FLYNN

21

22                                   By: /s/ Catherine Sweetser

23                                        *Attorneys for Plaintiffs*

24

25

26

27

28

## VERIFICATION

I, Isaac Antonio Lopez Castillo, am a Plaintiff in the within action.  I am familiar with the contents of **Plaintiff Isaac Antonio Lopez Castillo's Responses to Defendant GEO GROUP, INC.'s** ~~Request for Production of Documents~~ *Interrogatories*, **Set One**.  It is true of my own knowledge except as to matters which are stated on information and believe, and as to those I believe them to be true.

I declare under penalty of perjury under the laws the State of California that the foregoing is true and correct.

Executed on ~~January~~ February 8, 2019, in Los Angeles, California.

_____
Isaac Antonio Lopez Castillo

# EXHIBIT 37

1   Rachel Steinback, SBN 310700
2   LAW OFFICE OF RACHEL STEINBACK
    P.O. Box 291253
3   Los Angeles, CA 90029
4   (t) 213-537-5370
    (f) 213-232-4003
5   (e) steinbacklaw@gmail.com

    Carol A. Sobel, SBN 84483
    Monique A. Alarcon, SBN 311650
    LAW OFFICE OF CAROL SOBEL
    725 Arizona Avenue, Suite 300
    Santa Monica, CA 90401
    (t) 310-393-3055
    (e) carolsobel@aol.com
    (e) monique.alarcon8@gmail.com

6
7   *Attorneys for Plaintiffs.*

8   *[Additional Counsel on Following Page]*

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11   OMAR ARNOLDO RIVERA              Case No. 5:18-cv-01125-R-GJS
     MARTINEZ; ISAAC ANTONIO
12   LOPEZ CASTILLO; JOSUE           **PLAINTIFF JOSUE MATEO**
     VLADIMIR CORTEZ DIAZ; JOSUE     **LEMUS CAMPOS' RESPONSE TO**
13   MATEO LEMUS CAMPOS;             **DEFENDANT THE GEO GROUP,**
     MARVIN JOSUE GRANDE             **INC.'S INTERROGATORIES, SET**
14   RODRIGUEZ; ALEXANDER            **ONE**
     ANTONIO BURGOS MEJIA; LUIS
15   PEÑA GARCIA; JULIO CESAR
     BARAHONA CORNEJO, as
16   individuals,

17                 Plaintiffs,

18   v.

19   THE GEO GROUP, Inc., a Florida
     corporation; the CITY OF
20   ADELANTO, a municipal entity; GEO
     LIEUTENANT DURAN, sued in her
21   individual capacity; GEO
     LIEUTENANT DIAZ, sued in her
22   individual capacity;  GEO
     SERGEANT CAMPOS, sued in his
23   individual capacity; SARAH JONES,
     sued in her individual capacity; THE
24   UNITED STATES OF AMERICA;
     and DOES 1-10, individuals,
25
                   Defendants.
26

27

28

1  **INTERROGATORY NO. 10:**

2      If you contend that you will require any future health care treatment as a

3  result of the incident that is the subject of this litigation, please identify all medical

4  providers and/or witnesses who support your contention.

5  **RESPONSE TO INTERROGATORY NO. 10:**

6      Plaintiff incorporates his general objections. Plaintiff further objects that this

7  interrogatory calls for expert disclosures and conclusions prior to the time for

8  expert disclosures.  Subject to those objections, Plaintiff responds as follows:

9  Plaintiff is still suffering from emotional distress due to the incident and from

10  headaches. Plaintiff objects that it is premature to identify experts at this time.

11

12  **INTERROGATORY NO. 11:**

13      If you contend that you sustained emotional injuries as a result of the incident

14  that is the subject of this litigation, please describe the nature of the emotional

15  distress or psychological injury, the date and time when it was first experienced,

16  and the name and address of every psychiatrist, counselor, therapist, psychologist,

17  or social worker from whom he sought or obtained assistance.

18  **RESPONSE TO INTERROGATORY NO. 11:**

19      Plaintiff incorporates his general objections. Plaintiff further objects to this

20  interrogatory to the extent it calls for information that will be the subject of expert

21  disclosures.  Plaintiff further objects that he is claiming only garden variety

22  emotional distress and thus the information sought in this interrogatory is not

23  proportional to the needs of the case.  Subject to those objections, Plaintiff responds

24  as follows: Plaintiff is suffering from stress and anxiety due to the incident; he has

25  trauma from the incident and fears being detained again.  He has also had

26  headaches stemming from the incident. Plaintiff has not seen a mental health

27  professional regarding this incident since the psychologist he saw in the facility.

28

1

2

3   Dated: February 8, 2019

                     LAW OFFICE OF RACHEL STEINBACK

4                        LAW OFFICE OF CAROL A. SOBEL

                     SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

5                        LAW OFFICE OF CYNTHIA ANDERSON-BARKER

                     LAW OFFICE OF MATTHEW STRUGAR

6                        LAW OFFICE OF COLLEEN FLYNN

7

8                        By:  /s/ Catherine Sweetser

9                               *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **VERIFICATION**

2

3      I, Mateo Lemus Campos, am a Plaintiff in the within action.  I am familiar

4    with the contents of **Mateo Lemus Campos' Responses to Defendant GEO**

5    **GROUP, INC.'s Request for Interrogatories, Set One**.  It is true of my own

6    knowledge except as to matters which are stated on information and believe, and as

7    to those I believe them to be true.

8

9      I declare under penalty of perjury under the laws the State of California that

10   the foregoing is true and correct.

11

12      Executed on April 28, 2019, in Los Angeles, California.

13

14      _____

15      Mateo Lemus Campos

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 38

1   Rachel Steinback, SBN 310700                  Carol A. Sobel, SBN 84483
2   LAW OFFICE OF RACHEL STEINBACK               Monique A. Alarcon, SBN 311650
    P.O. Box 291253                              LAW OFFICE OF CAROL SOBEL
3   Los Angeles, CA 90029                        725 Arizona Avenue, Suite 300
4   (t) 213-537-5370                             Santa Monica, CA 90401
    (f) 213-232-4003                             (t) 310-393-3055
5   (e) steinbacklaw@gmail.com                   (e) carolsobel@aol.com
6                                                (e) monique.alarcon8@gmail.com

    *Attorneys for Plaintiffs.*
7
8   *[Additional Counsel on Following Page]*

9                  UNITED STATES DISTRICT COURT
10                CENTRAL DISTRICT OF CALIFORNIA

11  OMAR ARNOLDO RIVERA                  Case No. 5:18-cv-01125-R-GJS
    MARTINEZ; ISAAC ANTONIO
12  LOPEZ CASTILLO; JOSUE               **PLAINTIFF JULIO CESAR**
    VLADIMIR CORTEZ DIAZ; JOSUE         **BARAHONA CORNEJO**
13  MATEO LEMUS CAMPOS;                 **RESPONSE TO DEFENDANT THE**
    MARVIN JOSUE GRANDE                 **GEO GROUP, INC.'S**
14  RODRIGUEZ; ALEXANDER                **INTERROGATORIES, SET ONE**
    ANTONIO BURGOS MEJIA; LUIS
15  PEÑA GARCIA; JULIO CESAR
    BARAHONA CORNEJO, as
16  individuals,

17              Plaintiffs,

18  v.

19  THE GEO GROUP, Inc., a Florida
    corporation; the CITY OF
20  ADELANTO, a municipal entity; GEO
    LIEUTENANT DURAN, sued in her
21  individual capacity; GEO
    LIEUTENANT DIAZ, sued in her
22  individual capacity;   GEO
    SERGEANT CAMPOS, sued in his
23  individual capacity; SARAH JONES,
    sued in her individual capacity; THE
24  UNITED STATES OF AMERICA;
    and DOES 1-10, individuals,
25
26              Defendants.

27
28

1   **RESPONSE TO INTERROGATORY NO. 9:**

2       Plaintiff still suffers from knee pain in the cold or while walking.

3

4   **INTERROGATORY NO. 10:**

5       If you contend that you will require any future health care treatment as a

6   result of the incident that is the subject of this litigation, please identify all medical

7   providers and/or witnesses who support your contention.

8   **RESPONSE TO INTERROGATORY NO. 10:**

9       Plaintiff incorporates his general objections. Plaintiff further objects that this

10  interrogatory calls for expert disclosures and conclusions prior to the time for

11  expert disclosures.  Subject to those objections, Plaintiff responds as follows:

12      Plaintiff intends to see a doctor for his knee but has not yet done so.

13

14  **INTERROGATORY NO. 11:**

15      If you contend that you sustained emotional injuries as a result of the incident

16  that is the subject of this litigation, please describe the nature of the emotional

17  distress or psychological injury, the date and time when it was first experienced,

18  and the name and address of every psychiatrist, counselor, therapist, psychologist,

19  or social worker from whom he sought or obtained assistance.

20  **RESPONSE TO INTERROGATORY NO. 11:**

21      Plaintiff incorporates his general objections. Plaintiff further objects to this

22  interrogatory to the extent it calls for information that will be the subject of expert

23  disclosures.  Plaintiff further objects that he is claiming only garden variety

24  emotional distress and thus the information sought in this interrogatory is not

25  proportional to the needs of the case.  Subject to those objections, Plaintiff responds

26  as follows: Plaintiff still has emotional distress from the incident; he thinks of it

27  often and it is very upsetting.  He remembers the pain clearly and being defenseless,

28  and seeing and hearing his friends their pain.  The memories come back to him

1   repeatedly and frequently. Plaintiff has not seen a mental health professional

2   regarding this incident since the psychologist he saw in the facility.

3

4   **INTERROGATORY NO. 12:**

5        Please identify, by name, address, and reason for treatment, all health care

6   providers who have provided you with treatment of any kind since the incident that

7   is the subject of this litigation.

8   **RESPONSE TO INTERROGATORY NO. 12:**

9        Plaintiff incorporates his general objections.  Plaintiff further objects to this

10  interrogatory on the ground of relevance, as overly broad and unduly burdensome,

11  and to the extent it interrogatory calls for private and confidential medical

12  information.  Plaintiff objects to providing records of medical treatment unrelated

13  to the injuries suffered in the incident.  Plaintiff further objects that the records of

14  his medical treatment in the facility are more readily available to Defendant than to

15  Plaintifff. Subject to those objections, Plaintiff responds as follows:

16       Plaintiff has not seen a medical professional regarding this incident since he

17  left the facility.

18

19  **INTERROGATORY NO. 13:**

20       Please identify, by health care provider, date of service, amount of charges,

21  amounts paid, and amount all special damages for health care treatment that you

22  contend are attributable to the incident that is the subject of this litigation.

23  **RESPONSE TO INTERROGATORY NO. 13:**

24       Plaintiff incorporates his general objections. Plaintiff further objects that this

25  interrogatory calls for expert disclosures and conclusions prior to the time for

26  expert disclosures.  Discovery is ongoing and Plaintiff may supplement these

27  responses at a later date.  Subject to those objections, Plaintiff responds as follows:

28

1

Dated: February 8, 2019

LAW OFFICE OF RACHEL STEINBACK

2

LAW OFFICE OF CAROL A. SOBEL
SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

3

LAW OFFICE OF CYNTHIA ANDERSON-BARKER

4

LAW OFFICE OF MATTHEW STRUGAR
LAW OFFICE OF COLLEEN FLYNN

5

6

By:  /s/ Catherine Sweetser

7

*Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>VERIFICATION</u>

I, Julio Cesar Barahona Cornejo, am a Plaintiff in the within action.  I am familiar with the contents of **Plaintiff Julio Cesar Barahona Cornejo's Responses to Defendant GEO GROUP, INC.'s Request for Interrogatories, Set One**.  It is true of my own knowledge except as to matters which are stated on information and believe, and as to those I believe them to be true.

I declare under penalty of perjury under the laws the State of California that the foregoing is true and correct.

Executed on ~~January~~ February 8 2019, in _Miraloma_ , California.

_[signature]_

Julio Cesar Barahona Cornejo

EXHIBIT 39

1  Rachel Steinback, SBN 310700
2  LAW OFFICE OF RACHEL STEINBACK
   P.O. Box 291253
3  Los Angeles, CA 90029
4  (t) 213-537-5370
   (f) 213-232-4003
5  (e) steinbacklaw@gmail.com
6
   *Attorneys for Plaintiffs.*
7
8  *[Additional Counsel on Following Page]*

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
LAW OFFICE OF CAROL SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11  OMAR ARNOLDO RIVERA
    MARTINEZ; ISAAC ANTONIO
12  LOPEZ CASTILLO; JOSUE
    VLADIMIR CORTEZ DIAZ; JOSUE
13  MATEO LEMUS CAMPOS;
    MARVIN JOSUE GRANDE
14  RODRIGUEZ; ALEXANDER
    ANTONIO BURGOS MEJIA; LUIS
15  PEÑA GARCIA; JULIO CESAR
    BARAHONA CORNEJO, as
16  individuals,

17             Plaintiffs,

18  v.

19  THE GEO GROUP, Inc., a Florida
    corporation; the CITY OF
20  ADELANTO, a municipal entity; GEO
    LIEUTENANT DURAN, sued in her
21  individual capacity; GEO
    LIEUTENANT DIAZ, sued in her
22  individual capacity;  GEO
    SERGEANT CAMPOS, sued in his
23  individual capacity; SARAH JONES,
    sued in her individual capacity; THE
24  UNITED STATES OF AMERICA;
    and DOES 1-10, individuals,
25
               Defendants.
26

Case No. 5:18-cv-01125-R-GJS

**PLAINTIFF JOSUE
VLADIMIR CORTEZ DIAZ'
RESPONSES TO
DEFENDANT THE GEO GROUP,
INC.'S INTERROGATORIES, SET
ONE**

27
28

1  **INTERROGATORY NO. 9:**

2      Identify any injuries you contend you still have, which you attribute to the

3  incident which gave rise to this action, including a description of its present status,

4  its frequency, and its duration.

5  **RESPONSE TO INTERROGATORY NO. 9:**

6      Plaintiff still has headaches once or twice a week and nightmares about the

7  incident roughly twice a month.  The headaches sometimes are severe enough to

8  make him nauseous.

9

10  **INTERROGATORY NO. 10:**

11      If you contend that you will require any future health care treatment as a

12  result of the incident that is the subject of this litigation, please identify all medical

13  providers and/or witnesses who support your contention.

14  **RESPONSE TO INTERROGATORY NO. 10:**

15      Plaintiff incorporates his general objections. Plaintiff further objects that this

16  interrogatory calls for expert disclosures and conclusions prior to the time for

17  expert disclosures.  Subject to those objections, Plaintiff responds as follows:

18      Plaintiff reserves the right to update this response at a later date.

19

20  **INTERROGATORY NO. 11:**

21      If you contend that you sustained emotional injuries as a result of the incident

22  that is the subject of this litigation, please describe the nature of the emotional

23  distress or psychological injury, the date and time when it was first experienced,

24  and the name and address of every psychiatrist, counselor, therapist, psychologist,

25  or social worker from whom he sought or obtained assistance.

26  **RESPONSE TO INTERROGATORY NO. 11:**

27      Plaintiff incorporates his general objections. Plaintiff further objects to this

28  interrogatory to the extent it calls for information that will be the subject of expert

1    disclosures.  Plaintiff further objects that he is claiming only garden variety

2    emotional distress and thus the information sought in this interrogatory is not

3    proportional to the needs of the case.  Subject to those objections, Plaintiff responds

4    as follows: Plaintiff has not seen a mental health professional regarding this

5    incident since the psychologist he saw in the facility. Plaintiff saw the psychologist

6    multiple times in the facility.

7

8    **INTERROGATORY NO. 12:**

9        Please identify, by name, address, and reason for treatment, all health care

10   providers who have provided you with treatment of any kind since the incident that

11   is the subject of this litigation.

12   **RESPONSE TO INTERROGATORY NO. 12:**

13       Plaintiff incorporates his general objections.  Plaintiff further objects to this

14   interrogatory on the ground of relevance, as overly broad and unduly burdensome,

15   and to the extent it interrogatory calls for private and confidential medical

16   information.  Plaintiff objects to providing records of medical treatment unrelated

17   to the injuries suffered in the incident.  Plaintiff further objects that the records of

18   his medical treatment in the facility are more readily available to Defendant than to

19   Plaintifff. Subject to those objections, Plaintiff responds as follows:

20       Plaintiff has not obtained health care treatment outside the facility.

21

22   **INTERROGATORY NO. 13:**

23       Please identify, by health care provider, date of service, amount of charges,

24   amounts paid, and amount all special damages for health care treatment that you

25   contend are attributable to the incident that is the subject of this litigation.

26   **RESPONSE TO INTERROGATORY NO. 13:**

27       Plaintiff incorporates his general objections. Plaintiff further objects that this

28   interrogatory calls for expert disclosures and conclusions prior to the time for

1    Further, the depositions of the defendant officers and other witnesses have not been

2    completed and therefore this interrogatory is premature.

3       Discovery is ongoing and Plaintiff objects that the request is premature.

4

5

6    Dated: February 8, 2019       LAW OFFICE OF RACHEL STEINBACK

                                        LAW OFFICE OF CAROL A. SOBEL

7                                      SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

8                                      LAW OFFICE OF CYNTHIA ANDERSON-BARKER

                                        LAW OFFICE OF MATTHEW STRUGAR

9                                      LAW OFFICE OF COLLEEN FLYNN

10

11                          By:  /s/ Catherine Sweetser

12                               *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

## **VERIFICATION**

3      I, José Bladimir Cortéz Diaz, am a Plaintiff in the within action.  I am
4  familiar with the contents of **Plaintiff José Bladimir Cortéz Diaz's Responses to**
5  **Defendant GEO GROUP, INC.'s Request for Interrogatories, Set One.**  It is
6  true of my own knowledge except as to matters which are stated on information and
7  believe, and as to those I believe them to be true.

8

9      I declare under penalty of perjury under the laws the State of California that
10  the foregoing is true and correct.

11

12      Executed on February 23, 2019, in Fillmore, California.

13
14
15                          José Bladimir Cortéz Diaz

16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 40

1   Susan E. Coleman (SBN 171832)
    E-mail:  scoleman@bwslaw.com
2   Kristina Doan Strottman (SBN 268188)
    E-mail:  kstrottman@bwslaw.com
3   Carmen M. Aguado (SBN 291941)
    E-mail:  caguado@bwslaw.com
4   BURKE, WILLIAMS & SORENSEN, LLP
    444 South Flower Street, Suite 2400
5   Los Angeles, CA  90071-2953
    Tel:  213.236.0600      Fax:  213.236.2700
6
7   Attorneys for Defendants
    THE GEO GROUP, INC., DIAZ, CAMPOS, CITY
    OF ADELANTO and DURAN
8

RECEIVED
JUL 1 2 2019

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  OMAR ARNOLDO RIVERA              Case No. 5:18-cv-01125-R-GJS
    MARTINEZ; ISAAC ANTONIO
13  LOPEZ CASTILLO; JOSUE            **DEFENDANT GEO GROUP, INC.'S**
    VLADIMIR CORTEZ DIAZ; JOSUE      **SUPPLEMENTAL RESPONSES TO**
14  MATEO LEMUS CAMPOS;              **PLAINTIFFS' REQUEST FOR**
    MARVIN JOSUE GRANDE              **PRODUCTION OF DOCUMENTS,**
15  RODRIGUEZ; ALEXANDER             **SET FOUR**
    ANTONIO BURGOS MEJIA; LUIS
16  PENA GARCIA; JULIO CESAR         Judge:     Honorable R. Gary Klausner
    BARAHONA CORNEJO, as
17  individuals,

18                Plaintiffs,

19  v.

20  THE GEO GROUP, Inc., a Florida
    corporation; the CITY OF
21  ADELANTO, a municipal entity; GEO
    LIEUTENANT DURAN, sued in her
22  individual capacity; GEO
    LIEUTENANT DIAZ, sued in her
23  individual capacity;   GEO
    SERGEANT CAMPOS, sued in his
24  individual capacity; SARAH JONES,
    sued in her individual capacity; THE
25  UNITED STATES OF AMERICA;
    and DOES 1-10, individuals,
26
27                Defendants.

28  ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4815-5943-4651 v1
05788-0035

- 1 -

5:18-CV-01125-R-GJS
GEO GROUP'S SUPP RESPONSES TO
PLAINTIFFS' REQUEST FOR PRODUCTION, SET

1    Except for explicit facts admitted herein, no admissions of any nature

2    whatsoever are implied or should be inferred.  The defendants reserve the right to

3    refer to, conduct discovery with reference to, or offer into evidence at trial any and

4    all such witnesses, facts and evidence, notwithstanding the absence of reference to

5    such witnesses, facts and evidence in these responses.  Finally, because some of

6    these responses may have been ascertained by defendants' attorneys and

7    investigators, defendants may not have personal knowledge of the information from

8    which such responses were derived.

9    This preliminary statement is incorporated into each of the responses set

10   forth below.   Defendants' investigation of this matter is continuing and they,

11   accordingly, reserve the right to update, or amend, this response as further and/or

12   more specific information is acquired and also reserves the right to supplement this

13   response at a later time.

14   **REQUEST NO. 79:**

15   Any and all documents and/or records relating to daily logs and/or

16   summaries and/or volume measurements of each OC Spray canister carried by

17   Lieutenant Diaz and/or Sergeant Campos from May 12, 2017 to June 13, 2017.

18   **RESPONSE TO REQUEST NO. 79:**

19   Objections:  This request is vague and ambiguous as to the terms "records

20   related to daily logs," "summaries," and "volume measurements," and overbroad as

21   to time and scope.  This request seeks information which is irrelevant and unlikely

22   to lead to the discovery of admissible evidence.  This request assumes facts not in

23   evidence and, thus, lacks foundation. This request is harassing, unduly burdensome

24   and oppressive. This request is compound.

25   Subject to and without waiving the foregoing objections, Defendant responds

26   as follows: To the extent that there are responsive, non-privileged documents from

27   June 12, 2017, related to the OC spray canisters carried by Lt. Diaz and Sgt.

28   Campos during the incident, Defendant will produce them.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4815-5943-4651 v1
05788-0035

- 3 -

5:18-CV-01125-R-GJS
GEO GROUP'S SUPP RESPONSES TO
PLAINTIFFS' REQUEST FOR PRODUCTION,

1   **SUPPLEMENTAL RESPONSE TO REQUEST NO. 79:**

2       Objections:  This request is vague and ambiguous as to the terms "records

3   related to daily logs," "summaries," and "volume measurements," and overbroad as

4   to time and scope.  This request seeks information which is irrelevant and unlikely

5   to lead to the discovery of admissible evidence.  This request assumes facts not in

6   evidence and, thus, lacks foundation. This request is harassing, unduly burdensome

7   and oppressive. This request is compound.

8       Subject to and without waiving the foregoing objections, Defendant responds

9   as follows: After diligent search and a reasonable inquiry were made in an effort to

10  comply with this demand, Defendant GEO was unable to locate any responsive

11  materials.

12  **REQUEST NO. 80:**

13      Any and all documents and/or records relating to each Lieutenant's (also

14  known as "watch commander" or "shift supervisor") end-of-shift reports that are

15  completed at the end of each shift and saved in GEO Group's records from May 12,

16  2017 to July 12, 2017.

17  **RESPONSE TO REQUEST NO. 80:**

18      Objections:  This request is vague and ambiguous, and overbroad as to time

19  and scope.  This request seeks information which is irrelevant and unlikely to lead

20  to the discovery of admissible evidence.  This request assumes facts not in evidence

21  and, thus, lacks foundation.

22      Subject to and without waiving the foregoing objections, Defendant responds

23  as follows: To the extent that there are responsive, non-privileged "end-of-shift

24  reports" dated June 12, 2017, that are related to the incident, Defendant will

25  produce them.

26  ///

27  ///

28  ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4815-5943-4651 v1
05788-0035

- 4 -

5:18-CV-01125-R-GJS
GEO GROUP'S SUPP RESPONSES TO
PLAINTIFFS' REQUEST FOR PRODUCTION,

1   Subject to and without waiving the foregoing objections, Defendant responds

2   as follows: Defendant GEO refers Plaintiffs to Bates stamp nos.: GEO 05199-

3   05207, which consists of non-privileged "communications between dorm officers

4   and Command Staff regarding daily logs taken at the 'East 2-C' dorm at Adelanto

5   Processing Center" dated June 12, 2017.

6

7   Dated:  July 10, 2019          BURKE, WILLIAMS & SORENSEN, LLP

8

9   By: _____
            Susan E. Coleman
10          Kristina Doan Strottman
            Carmen M. Aguado

11
    Attorneys for Defendants
12  THE GEO GROUP, INC., DIAZ,
    CAMPOS, CITY OF ADELANTO and
13  DURAN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4815-5943-4651 v1
05788-0035

- 8 -

5:18-CV-01125-R-GJS
GEO GROUP'S SUPP RESPONSES TO
PLAINTIFFS' REQUEST FOR PRODUCTION,

# EXHIBIT 41



OTRO
LADO

Nicole Ramos
Project Director
Border Rights Project

July 5, 2017

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch
245 Murray Lane, SW
Building 410, Mail Stop #0190
Washington, D.C. 20528

**RE: Omar Arnoldo Rivera Martinez (A#213-081-649)**
**Josue Mateo Lemus Campos (A#213-078 -965)**

Dear CRCL Compliance Branch Officer:

I represent Omar Rivera Martinez and Josue Mateo Lemus Campos, two Salvadoran asylum seekers now detained in the Adelanto Detention Facility. I write now to request that your office *immediately* investigate unlawful retaliation taken against my clients, subsequent to my filing of two Civil Rights Civil Liberties complaints with your office on June 22, 2017.

*Background*

Since filing two Civil Rights complaints against the Adelanto Detention Facility and ICE, counsel's telephone number has been blocked, thus preventing Mr. Rivera Martinez and Mr. Lemus Campos from communicating with counsel. This block took effect on or around June 30, 2017. Counsel learned of the block only after Mr. Rivera Martinez contacted another member of the legal advocacy team. Attached please find a recording of Mr. Rivera Martinez's statement regarding the block.

*Steps Taken By Counsel to Resolve the Problem & Response of the Institutional*

On July 1, 2017, counsel contacted TelMate, the company that provides payphone service to the Adelanto Detention Facility. After speaking with a TelMate representative, counsel learned that the block placed on counsel's telephone number originated with the institution.

---

Nicole Ramos | Project Director | Al Otro Lado | Border Rights Project
511 E. San Ysidro Blvd. # 333 | San Ysidro, California 92173
664-526-0145 (MX) | 619-786-4866 (USA) | Fax 619-202-7752
nicole@alotrolado.org | alotrolado.org



Nicole Ramos
Project Director
Border Rights Project

Following, counsel contacted the Adelanto Detention Facility, and was advised that the only reason that the facility would place a block on counsel's telephone number would be if counsel had initiated a three-way conference call with a third party. However, counsel advised the attending officer that counsel is aware of the rule against three-way telephone calls, and had, at no point, initiated such a call. Counsel was then advised to contact the facility on Monday and to speak with someone in the security department.

On Monday, July 3, 2017, counsel spoke with Lieutenant Belt of the Adelanto Detention Facility regarding the block. Lieutenant Belt advised counsel that the facility would investigate the block, and that someone would respond to counsel's complaint regarding this issue.

Later, on July 3, 2017, counsel received a voicemail message from Lieutenant Belt stating that he was not *authorized* to discuss this matter further, and that counsel must seek resolution by contacting ICE, the Office of Chief Counsel, or the Warden's Office. This response is particularly perplexing given that Lieutenant Belt's department within the facility is charged with the authority and responsibility of placing blocks on detainee telephone accounts.

On July 5, 2017, counsel left a voicemail for Lieutenant Belt to clarify the facility's position regarding its inability to respond to counsel's request for information. As of the time of this filing, counsel has not received a response.

Following, counsel contacted the Adelanto Detention Facility and requested to speak with the warden or the warden's assistant. "Joanne" who declined to provide her full name, but did indicate that she worked for the warden, advised that no one at the facility could respond to counsel's inquiry, and that counsel must contact ICE. Counsel explained to "Joanne" that, per Telmate, the block originated with the facility. However, "Joanne" was clear— that any block on counsel's telephone number must be resolved through ICE.

Following, counsel emailed Assistant Field Office Director, Gabriel Valdez and Deportation Officer, Chris Barth, regarding the block on counsel's telephone number. As of the time of this filing counsel has not received any response to counsel's inquiry and request to remove the block.

*Investigation & Action Steps Requested*

This interference with attorney-client communication is unacceptable, and violates the *Orantes* injunction. Under *Orantes*, ICE is required to ensure the privacy of attorney-client

P000159



Nicole Ramos
Project Director
Border Rights Project

communications, to refrain from taking measures which impede access to counsel, and to ensure adequate telephone access to counsel. Mr. Rivera Martinez and Mr. Lemus Campos have been blocked from contacting counsel for *six days*.

Counsel requests immediate action; specifically that ICE and Adelanto Detention Facility be directed to immediately remove the block on counsel's telephone number, and to desist in further retaliatory conduct. Counsel further requests immediate investigation into the facility's decision to block counsel's phone number. It is concerning that this action comes *after* counsel filed a Civil Rights complaint against ICE and the facility in connection with an attack of Mr. Rivera Martinez and Mr. Lemus Campos by GEO guards on June 12, 2017. Finally, counsel requests that Mr. Rivera Martinez and Mr. Lemus Campos be released immediately on humanitarian parole. Both continue to face retaliation, and are not safe in detention, particularly now that access to counsel has been blocked.

Respectfully,

Nicole Ramos

Nicole Ramos | Project Director | Al Otro Lado | Border Rights Project
511 E. San Ysidro Blvd. # 333 | San Ysidro, California 92173
664-526-0145 (MX) | 619-786-4866 (USA) | Fax 619-202-7752
nicole@alotrolado.org | alotrolado.org

P000160