UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA MARTINEZ, et al.,

          Plaintiffs,

    v.

THE GEO GROUP, INC., et al.

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. ED CV 18-1125-SP

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**

## I.

## INTRODUCTION

On May 25, 2018, plaintiffs Omar Arnoldo Rivera Martinez, Isaac Antonio Lopez Castillo, Josue Vladimir Cortez Diaz, Josue Mateo Lemus Campos, Marvin Josue Grande Rodriguez, Alexander Antonio Burgos Mejia, Luis Pena Garcia, and Julio Cesar Barahona Cornejo filed a civil rights complaint pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). On August 15, 2019, plaintiffs filed the operative Second Amended Complaint ("SAC") based on constitutional violations that allegedly occurred while plaintiffs, refugees from El Salvador and Honduras, were

1

detained at the Adelanto Processing Center in Adelanto, California.  The SAC
names as defendants the GEO Group, Inc. ("GEO Group"), the City of Adelanto,
GEO Lieutenant Jane Diaz, GEO Sergeant Giovanni Campos, Sarah Jones, and
Correct Care Solutions, Inc.  Plaintiffs reached a settlement with defendants Sarah
Jones and Correct Care Solutions, Inc., and these defendants were dismissed with
prejudice on August 28, 2019, and October 17, 2019, respectively.  Thus,
defendant GEO Group, City of Adelanto, Diaz, and Campos remain.

Plaintiffs asserted ten causes of action in the SAC, one of which, the ninth,
was dismissed in accordance with a stipulation on December 9, 2019.  Of the nine
claims remaining, three allege various federal civil rights violations under 42
U.S.C. § 1983 and *Bivens*:  (1) defendants retaliated against plaintiffs for
exercising their First Amendment rights; (2) defendants used excessive force on
plaintiffs in violation of the Fourth and Fourteenth Amendments; and (3)
defendants violated plaintiffs' due process rights in violation of the Fifth and
Fourteenth Amendments.  Plaintiffs also raise six claims under state law: (1)
battery against all defendants; (2) assault against all defendants; (3) negligent
hiring, training, and supervision against defendants GEO Group and City; (4)
intentional infliction of emotional distress against all defendants; (5) violations of
the California Civil Code § 52.1 (Bane Act) against all defendants; and (6)
negligence and failure to provide medical care against all defendants.

Defendants GEO Group and City of Adelanto filed a motion for summary
judgment on November 12, 2019 ("GEO/City MSJ").  Defendants' motion is
supported by the declarations of defense counsel Carmen Aguado ("Aguado
Decl."), Adelanto Facility Administrator James Janecka ("Janecka Decl."),
Adelanto Training Administrator Leo McCusker ("McCusker Decl."), Lieutenant
Jane Diaz ("Lt. Diaz Decl."), Sergeant Giovanni Campos ("Sgt. Campos Decl."),
Adelanto City Manager James Hart ("Hart Decl."), exhibits, and a Separate

Statement of Uncontroverted Facts and Conclusions of Law ("GEO/City Separate Statement").

On the same day, defendants Diaz and Campos filed a separate motion for summary judgment ("Diaz/Campos MSJ").  Defendant Diaz and Campos's motion is supported by the same declarations as the summary judgment motion filed by defendants GEO Group and City, as well as additional exhibits, and a Separate Statement of Uncontroverted Facts and Conclusions of Law ("Diaz/Campos Separate Statement").

Plaintiffs filed their Oppositions to both summary judgment motions on November 26, 2019 ("Opp. to GEO/City", "Opp. to Diaz/Campos").  Plaintiffs' Oppositions are supported by the declaration of plaintiffs' expert Jeffrey Schwartz ("Schwartz Decl."), plaintiffs' expert Dr. Homer Venters ("Venters Decl."), plaintiff Castillo ("Castillo Decl."), plaintiff Rivera Martinez ("Rivera Martinez Decl."), plaintiffs' counsel Monique Alarcon ("Alarcon Decl."), and two Statements of Genuine Disputes of Material Fact ("Pls.' Statement re GEO/City", "Pls.' Statement re Diaz/Campos").

On December 6, 2019, defendants filed Replies to plaintiffs' Oppositions ("GEO/City Reply," "Diaz/Campos Reply").  Defendants' Replies are supported by the supplemental declaration of defense counsel Carmen Aguado ("Aguado Supp. Decl."), exhibits, evidentiary objections, and two Objections and Responses to Plaintiffs' Additional Material Facts ("GEO/City Objections and Responses," "Diaz/Campos Objections and Responses").

On December 17, 2019, the court held a hearing on defendants' summary judgment motions and ordered that the parties file any supplemental briefing on or before December 20, 2019.  On December 20, 2019, the parties submitted supplemental briefs ("Pls.' Supp. Brief"; "Defs.' Supp. Brief").

For the reasons that follow, the court finds defendants are entitled to

summary judgment on the federal civil rights claims, and defendant City of
Adelanto is entitled to summary judgment on all claims.  In all other respects, the
motions are denied.

## II.

## ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

Plaintiffs are eight refugees from El Salvador and Honduras who arrived at
the southern border of the United States in May 2017 seeking safety and political
asylum.  SAC at 3-4.  Plaintiffs left their home countries for various reasons,
including gang violence, death threats for exposing corruption, and persecution on
the basis of sexual orientation.  *Id.*  After admission to the United States, plaintiffs
were taken into custody and transported to Adelanto ICE Processing Center
("Adelanto").  *Id.* at 4.  Adelanto is a government facility for political asylum
seekers and other alien detainees.  *Id.*  Plaintiffs maintain Adelanto's inhabitants
are largely law-abiding foreign nationals seeking safety and refuge, but conditions
at Adelanto mirror those of the worst prisons in the United States, and numerous
abuses have been documented at the facility.  *Id.*  Defendant GEO Group is a
private company that contracted with the City of Adelanto to provide guards and
security personnel at the facility.  *Id.* at 9.  Defendant City acted as the service
provider of detention services for the U.S. Department of Homeland Security,
Immigration and Customs Enforcement ("ICE") and was paid with federal funds to
provide security and other services at the detention center.  *Id.* at 10.  Defendants
Diaz and Campos are employees of GEO Group.  *Id.*

Upon arriving at Adelanto, plaintiffs were subjected to inhumane conditions,
including being given unwashed and dirty underwear, nearly inedible meals, no
reliable access to clean, safe drinking water, and having their belongings regularly
thrown away.  *Id.* at 5.  Plaintiffs were mistreated, degraded, and humiliated by
staff, and their communications with their families, attorneys, and advocates were

severely limited.  *Id.*  Plaintiffs were also given impossibly high bond amounts that were well beyond their limited financial means.  *Id.*

On June 12, 2017, plaintiffs began a peaceful hunger strike to call attention to the conditions of confinement at Adelanto.  *Id.* at 12.  At breakfast that morning, plaintiffs sat at two tables in the East Alpha facility and presented a four-page, handwritten letter detailing their concerns.  *Id.*  Plaintiffs do not indicate who this letter was presented to.  *Id.*  The letter explained that the hunger strike would remain peaceful, and asked ICE to remedy the inhumane conditions that plaintiffs were being subjected to.  *Id.*  Because plaintiffs are monolingual Spanish speakers, another detainee translated for plaintiffs and informed the GEO guards present that plaintiffs wanted to speak with an ICE agent who spoke Spanish.  *Id.*  The GEO guards did not inform ICE of the hunger strike, and instead ordered all detainees back to their beds for morning count.  *Id.*  Plaintiffs remained seated, linked arms, and reiterated their request to speak with ICE officials.  *Id.*  The GEO guards became upset and called for backup, at which point approximately ten additional GEO guards arrived.  *Id.*  Defendant Diaz arrived wearing a white-shirt uniform that indicated that she was a supervisor.  *Id.*  Defendant Diaz began yelling at the detainees in English, and displayed a canister of pepper spray that she slammed on the table repeatedly while continuing to yell incomprehensibly at plaintiffs in English. *Id.* at 12-13.  Defendant Diaz then emptied the entire canister of pepper spray on plaintiffs at close range directly in their faces, mouths, scalps, and groins. *Id.* at 13.  Plaintiffs screamed from the pain while defendant Diaz sprayed them, and when plaintiffs lowered their heads to the table trying to shield their faces, defendant Diaz sprayed their scalps.  *Id.*

After plaintiffs were drenched in pepper spray, other GEO guards began pulling plaintiffs up from the tables.  *Id.*  The guards hit plaintiffs in their ribs, dug their nails behind plaintiffs' ears and down their arm, pushed their knuckles into

1  plaintiffs' necks and backs, and twisted their arms.  *Id.*

2          Shortly thereafter, a second supervisor, defendant Campos, arrived wearing

3  a white-shirt uniform indicating that he was a supervisor.  *Id.*  Like defendant Diaz,

4  defendant Campos began yelling at plaintiffs in English while displaying a canister

5  of pepper spray.  *Id.*  Defendant Campos then emptied the entire canister of pepper

6  spray on plaintiffs, spraying them at close range directly in their faces, mouths, and

7  scalps.  *Id.*

8          In total, defendants Diaz and Campos emptied two canisters of pepper spray

9  on plaintiffs.  *Id.*  Guards then handcuffed plaintiffs and used force on them even

10 though plaintiffs were not resisting in any way.  *Id.*  GEO guards slammed

11 plaintiffs against concrete walls and onto the floors, and dragged them out of the

12 East Alpha facility in handcuffs.  *Id.*  Plaintiffs, who were drenched in pepper

13 spray and handcuffed, were taken out onto the yard, some carried by hands and

14 feet, and thrown onto the ground.  *Id.* at 14.  So much pepper spray was used that

15 evacuation of the entire East Alpha unit was necessary.  *Id.*

16         Plaintiffs were left out in the yard for approximately 20 to 30 minutes while

17 drenched in pepper spray.  *Id.*  Plaintiffs were then taken to a holding cell in the

18 West building where they were held for approximately one hour.  *Id.*  The pepper

19 spray fumes emanating from their clothes and bodies overwhelmed the small space

20 in which plaintiffs were confined, suffocating plaintiffs.  *Id.*  Although plaintiffs

21 cried out in pain, GEO guards responded by laughing at them.  *Id.*

22         While plaintiffs were in this holding cell, two nurses arrived.  *Id.*  The

23 pepper spray fumes were so intolerable that nurse Jones asked that the room be

24 ventilated before she approached plaintiffs.  *Id.*  Despite plaintiffs' pleas for

25 medical treatment and attention, only their vitals were checked before the nurses

26 left the cell.  *Id.*

27         After approximately one and a half hours passed, five of the plaintiffs were

28

forced to shower in scalding hot water while still handcuffed and fully clothed in their pepper spray-drenched clothing. *Id.* The hot water exacerbated the pepper spray burns and increased the fumes. *Id.* Those plaintiffs who were forced to shower screamed out and twisted in pain with their hands still cuffed behind their backs. *Id.* At least one plaintiff fainted in the shower as a result of the pain. *Id.* The other three plaintiffs refused to go into the shower after hearing their friends screaming in pain. *Id.*

Plaintiffs were then taken back to the holding cell where they were not permitted to remove their pepper-sprayed clothing. *Id.* The pain was so unbearable that plaintiffs rolled on the ground to mitigate the burning sensation and begged for something to soothe the pain. *Id.* at 14-15. Neither GEO Group nor ICE staff provided medical attention. *Id.* at 15.

After nearly an hour, plaintiffs were finally given dry uniforms. *Id.* Plaintiffs' security level was elevated as punishment for participating in the hunger strike. *Id.* Plaintiffs were immediately placed in segregation and separated into pairs. *Id.* Plaintiffs were told they would remain in segregation for 10 days as punishment for participating in the hunger strike. *Id.* While in segregation, plaintiffs were forced to spend 23 hours per day in their cells. *Id.* Plaintiffs' showers were limited, their phone calls were restricted, and they were denied access to the law library or commissary. *Id.* Plaintiffs made numerous requests for medical care to treat their injuries, such as for burn cream, to have their scratches and wounds cleaned, and for x-rays of their more severe injuries. *Id.* All of these requests were ignored. *Id.*

Before plaintiffs' hunger strike reached the 72-hour mark, plaintiffs were placed in a room where they met with approximately five ICE agents, some of whom spoke Spanish. *Id.* The ICE agents threatened plaintiffs with continued isolation in segregation and deportation if plaintiffs did not end their hunger strike,

1   and also threatened to inform plaintiffs' immigration judges of their hunger strike.

2   *Id.*  Plaintiffs believe the ICE agents made these threats with the intent to adversely

3   affect plaintiffs' immigration cases.  *Id.* at 15.  Plaintiffs agreed to end the hunger

4   strike, but they continued to be held in segregation.  *Id.*

5        On June 22, 2017, an immigration lawyer representing two of the plaintiffs

6   filed a complaint against GEO Group and ICE with the U.S. Department of

7   Homeland Security's Office for Civil Rights and Civil Liberties compliance

8   branch.  *Id.*  The complaint was filed on behalf of all plaintiffs, recounted the June

9   12 incident, and demanded that the matter be investigated and immediate action

10  taken to protect plaintiffs.  *Id.*  After the civil rights complaint was filed, on or

11  about June 30, 2017, officials from Adelanto placed a block on telephone numbers

12  that plaintiffs regularly contacted.  *Id.*  The telephone block restricted plaintiffs

13  from communicating with their immigration attorneys and other advocacy groups

14  helping raise bond money and gathering documentation to support plaintiffs'

15  asylum claims.  *Id.*  Plaintiffs believe approximately 20 different phone numbers

16  associated with plaintiffs were blocked.  *Id.*

17       Plaintiffs suffered various injuries from the June 12, 2017 incident,

18  including a loss of a tooth, a broken nose, scratches, bruises, cuts, burns from the

19  pepper spray and hot water, and other pain.  *Id.* at 5-9.

**III.**

**STANDARD OF REVIEW**

22       Under Federal Rule of Civil Procedure 56(a), summary judgment is

23  appropriate "if the movant shows that there is no genuine dispute as to any material

24  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

25  56(a).  A dispute about a material fact is "genuine" only if there is a sufficient

26  evidentiary basis on which a "reasonable jury could return a verdict for the non-

27  moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

28

8

2505, 91 L. Ed. 2d 202 (1986); *see also Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (citation omitted) ("Where the record taken as a whole would not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial").  A factual dispute is "material" only if it might affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. at 248. All reasonable inferences that may be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  At the summary judgment stage, the court's function is not to weigh the evidence or determine the truth of the matter but, rather, to determine whether there is any genuine issue for trial.  *Anderson*, 477 U.S. at 249; *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc).

The moving party bears the initial burden of informing the court of the basis of its motion and identifying admissible evidence it believes demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party satisfies its initial burden, Rule 56 requires the party opposing the motion to respond by making a "showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of [his] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon conclusory allegations or pleadings unsupported by factual data, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

1    In determining any motion for summary judgment, the court may assume
2  that the material facts as claimed and adequately supported by the moving party are
3  admitted to exist without controversy except to the extent that such material facts
4  are (a) included in the "Statement of Genuine Disputes" and (b) controverted by
5  declaration or other written evidence filed in opposition to the motion.  Local Rule
6  56-3.  If a party fails to properly support an assertion of fact or fails to properly
7  address another party's assertion of fact, the court may consider the fact undisputed
8  for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).

9                                           **IV.**

10                    **UNDISPUTED AND DISPUTED FACTS**

11    Defendants GEO Group and City filed a Separate Statement of
12  Uncontroverted Facts and Conclusions of Law with their Motion for Summary
13  Judgment ("GEO/City Separate Statement").  The Separate Statement lists 35 facts
14  that defendants assert are uncontroverted, with citations to supporting evidence.
15  On November 26, 2019, plaintiffs filed a Statement of Genuine Disputes along
16  with their opposition to defendant GEO Group and City's motion ("Pls.' Statement
17  re GEO/City").  In addition to disputing many of defendants' asserted facts,
18  plaintiffs asserted an additional 106 facts of their own.  On December 6, 2019,
19  defendants GEO Group and City filed their objections and response to plaintiffs'
20  Statement ("GEO/City Objections and Response").

21    Defendants Diaz and Campos also filed a Separate Statement of
22  Uncontroverted Facts and Conclusions of Law with their Motion for Summary
23  Judgment ("Diaz/Campos Separate Statement").  Defendants' Separate Statement
24  lists 94 facts that defendants Diaz and Campos assert are uncontroverted, with
25  citations to supporting evidence.  On November 26, 2019, plaintiffs filed a
26  Statement of Genuine Disputes (and an additional 155 of their own asserted facts)
27  along with their Opposition to defendant Diaz and Campos's motion ("Pls.'

28

1   Statement re Diaz/Campos").  On December 6, 2019, defendants Diaz and Campos

2   filed their objections and response to plaintiffs' Statement ("Diaz/City Objections

3   and Response").

4          The court does not address each of the asserted facts herein, but only those

5   material to its decision.  All facts recounted are undisputed unless otherwise stated.

6   Plaintiffs assert numerous objections to defendants' facts and supporting evidence

7   on the grounds that they are irrelevant or misstate the facts; defendants assert

8   numerous objections to plaintiffs' evidence as well.  In its consideration of

9   defendants' motion, the court has considered only admissible, material, and

10  relevant evidence.  The objections are therefore generally overruled for purposes of

11  these motions to the extent there is supporting evidence in the record.

12  **A.    Facts Pertaining to Defendants City and GEO Group**

13          The first purported uncontroverted fact posited by defendants GEO Group

14  and City is that in May 2011, defendant GEO Group entered into a contract with

15  ICE for the detention and care of immigrant detainees at Adelanto through an

16  Intergovernmental Services Agreement ("IGSA") with defendant City.  Janecka

17  Decl. ¶ 3; Hart Decl. ¶¶ 3-6; GEO/City MSJ, Ex. L (Agenda Report dated May 17,

18  2011); GEO/City MSJ, Ex. M (2011 Service Agreement between defendants City

19  and GEO Group ("2011 Service Agreement")).  That GEO Group contracted with

20  ICE by virtue of the City's IGSA with ICE is anything but uncontroverted.  Indeed,

21  the evidence defendants cite for their ostensible uncontroverted fact establishes the

22  opposite is in fact uncontroverted:  that GEO Group contracted with only the City,

23  not with ICE.[1]  *See* GEO/City MSJ, Ex. L ("Essentially, the agreement is between

24  _____

25      [1]    As plaintiffs pointed out, that GEO Group does not contract directly with
26  ICE is a fact defendant GEO Group has seen fit to acknowledge in at least one
     other case in this court.  *See Novoa v. The GEO Group, Inc.*, No. ED CV 17-2514,
27  dkt. 45 at 6 ("GEO denies it contracts with ICE to operate the Adelanto Facility.
28  ICE contracts with the City of Adelanto for operation of the Adelanto Facility . . .

1    the City of Adelanto and the Federal Government and the City then contracts with

2    GEO to operate the facility pursuant to the guidelines in the IGSA."), Ex. M.

3    Although neither side submitted the entire IGSA, plaintiffs did provide the

4    signature page showing the IGSA is between ICE and the City of Adelanto, with

5    no indication GEO Group was a party to the agreement.  Ex. 52 (IGSA excerpt).

6    ICE and GEO Group could not contract directly because "at that time it was a

7    conflict of interest for GEO to bill ICE directly."  Opp. to GEO/City, Ex. 12 at 97.

8         Although GEO Group and ICE did not directly contract with respect to the

9    Adelanto facility, the 2011 Service Agreement between defendants GEO Group

10   and City provided that GEO Group would operate and manage the day-to-day

11   operations at Adelanto, and the City would not retain control of these operations.

12   Janecka Decl. ¶ 2; Hart Decl. ¶¶ 6, 12; 2011 Service Agreement.  Plaintiffs dispute

13   this in part, pointing out the City remained entitled to perform periodic inspections

14   under the 2011 Service Agreement and the City Manager had open

15   communications with the Warden and was able to attend quarterly meetings at the

16   Adelanto facility.  Hart Decl. ¶¶ 9, 11; 2011 Service Agreement at 3.  Defendant

17   City did not in fact have a practice of conducting inspections or audits, and instead

18   relied on GEO Group to oversee the facility.  Opp. to GEO/City, Ex. 11 at 107-08,

19   Ex. 12 at 41, 51-53, Ex. 13 at 56-57.  Plaintiffs maintain defendant City was

20   obligated to comply with California Building Code Title 24 in any City detention

21   facility, but as defendants correctly point out, there is no evidence those

22   regulations applied to the Adelanto facility.

23        Before entering into the 2011 Service Agreement with defendant GEO

24   Group, defendant City vetted GEO Group to ensure that it was capable of

25   providing the services required.  Hart Decl. ¶¶ 6-9.  Plaintiffs contend defendant

26   City did not thoroughly vet defendant GEO Group, or it would have known GEO

27

28   with GEO serving as the City's subcontractor.").

1 Group had been investigated for various abuses, citing reports published by the

2 U.S. Department of Justice.

3       Defendant City was aware that ICE was present at Adelanto and was

4 overseeing the management and daily operations.  Hart Decl. ¶¶ 10-11.  A third-

5 party contractor hired by ICE conducted inspections of Adelanto and notified

6 defendant City of these inspections.  *Id.*  Plaintiffs dispute the extent to which ICE

7 was involved at Adelanto.  Since June 2019, defendant GEO Group has directly

8 contracted with ICE to manage and operate Adelanto.  But irrespective of this

9 change in contract, defendant GEO Group has been solely responsible for

10 managing and operating Adelanto, and its policies and procedures have governed

11 operations since 2011.  Janecka Decl. ¶ 3; Hart Decl. ¶¶ 3-6, 12.

12       When an officer is hired, he or she must complete 136 hours of training on

13 various policies and procedures, and there are a number of exams to evaluate the

14 officer's knowledge.  McCusker Decl. ¶ 3; Lt. Diaz Decl. ¶ 3; Sgt. Campos Decl.

15 ¶ 2.  Plaintiffs dispute the amount of training officers receive, citing to depositions

16 in which various GEO Group officers reported having a range of two to four weeks

17 of training, and disputes that the training itself adequately covered policies and

18 procedures.  Opp. to GEO/City, Ex. 14 (Deposition of Sergeant Giovanni Campos

19 ("Sgt. Campos Depo.")) at 19; Ex. 17 (Deposition of Officer Rodrick Gillon

20 ("Officer Gillon Depo.")) at 14; Ex. 19 (Deposition of Officer Frankie Juarez

21 ("Officer Juarez Depo.")) at 14.  Officers are then required to complete 40 hours of

22 on-the-job training and 40 hours of in-service training.  McCusker Decl. ¶ 4; Lt.

23 Diaz Decl. ¶ 5; Sgt. Campos Decl. ¶ 2.

24       Before being promoted to a supervisory position or assigned as a

25 transportation officer, which are positions that allow an officer to use or carry

26 chemical agents, an officer is required to complete additional training that builds

27 on their pre-service training.  McCusker Decl. ¶ 5; Lt. Diaz Decl. ¶ 7; Sgt. Campos

28

Decl. ¶ 3.  The additional training includes training specific to the use of chemical agents such as pepper spray, and covers topics including the use of force requirements governing the use of chemical agents, the decontamination process, and the effects of chemical agents on a person.  McCusker Decl. ¶ 5; Lt. Diaz Decl. ¶ 7.  Plaintiffs dispute the extent of this additional training, and cite various gaps in defendant Diaz's and Campos's knowledge about the use of force and chemical agents.  Sgt. Campos Depo. at 16, 20, 145-46; Opp. to GEO/City, Ex. 16 (Deposition of defendant Diaz ("Lt. Diaz Depo.")) at 224.

Defendant GEO Group trains its officers to use force only as a last alternative after all other reasonable efforts to resolve the situation have failed, and officers are trained on the "Use-of-Force Continuum," which is a model used to illustrate the levels of force staff may use to gain control of a detainee.  *Id.* ¶ 7; Lt. Diaz Decl. ¶ 6; GEO/City MSJ, Ex. H ("GEO Group's Use of Force Policy").  Plaintiffs dispute the adequacy of the training, citing various gaps in officers' knowledge on the use of force.  Sgt. Campos Depo. at 145; Lt. Diaz Depo. at 13; Officer Gillon Depo. at 110.  There are four levels in the use-of-force continuum: (a) staff presence without action; (b) verbal commands; (c) soft techniques (techniques from which there is a minimal chance of injury such as grasping, empty-hand, "come-along" holds, using impact weapons for holds, pressure to pressure points, and chemical agents); and (d) hard techniques (techniques where there is a greater possibility of injury such as "take-downs," striking using impact weapons, deploying chemical agents, expandable batons, straight batons, authorized less-lethal devices, and specialty impact weapons).  McCusker Decl. ¶ 7; GEO Group's Use of Force Policy.  Plaintiffs dispute whether defendant GEO Group's employees are properly trained on the use-of-force continuum, and cites various gaps in their knowledge.  Sgt. Campos Depo. at 145; Lt. Diaz Depo. at 13; Officer Gillon Depo. at 110.

Per GEO Group policy, the use of chemical agents is authorized when a detainee cannot be approached without danger to self or others and it is determined that a delay in bringing the situation under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage.  McCusker Decl. ¶ 8; GEO Group's Use of Force Policy. Plaintiffs contend defendants misstate the policy, and that the use of chemical weapons is also authorized when a detainee is armed and/or barricaded.  GEO Group's Use of Force Policy at 9.  Officers are trained that chemical agents may be useful to control or quell a disturbance that is likely to develop into serious disorder.  McCusker Decl. ¶ 8; GEO Group's Use of Force Policy.  Plaintiffs dispute this, and contend officers either do not remember their training or incorrectly state when chemical agents may be used.  Sgt. Campos Depo. at 145.

A detainee who has come into contact with a chemical agent will be decontaminated/cleaned as soon as reasonably possible by flushing the contaminated area with generous amounts of water for 5 to 10 minutes or until the irritation is gone.  McCusker Decl. ¶ 9; GEO Group's Use of Force Policy.  The decontaminated/cleaning can be done in a shower.  *Id.*  Plaintiffs contend GEO Group officers are not properly trained on how to decontaminate, and to use cold or room temperature water to decontaminate.  GEO Group's Use of Force Policy at 10; Dr. Venters Decl. ¶ 4, Ex. A at 5-6; Officer Juarez Depo. at 43, 45, 46; Opp. to GEO/City, Ex. 25 (Deposition of plaintiff Cornejo ("Cornejo Depo.")) at 77, 80-81, Ex. 30 (Deposition of plaintiff Rodriguez ("Rodriguez Depo.")) at 112-113, Ex. 23 (Deposition of plaintiff Castillo ("Castillo Depo.")) at 104-106; Castillo Decl. ¶¶ 5-6.  Thereafter, the detainee is examined by the medical unit that is staffed by a third-party contractor (in 2017, Correct Care Solutions).  McCusker Decl. ¶ 9; GEO Group's Use of Force Policy.  Plaintiffs contend GEO Group officers are still trained on decontamination procedures and are responsible for all

1   necessary steps before detainees are under the control of any third-party contractor.
2   GEO Group's Use of Force Policy at 10; Opp. to GEO/City, Ex. 21 (Deposition of
3   Sarah Jones ("Jones Depo.")) at 151, 156-57.

4          After any incident involving the use of force, GEO Group policy requires the
5   Facility Administrator or the Facility Administrator's designee, Assistant Facility
6   Administrator, Captain, Health Services Administrator, and the Field Office
7   Director's designee shall meet and review the incident.  Janecka Decl. ¶ 5;
8   McCusker Decl. ¶ 10; GEO/City MSJ, Ex. E (After-Action Review of 6/12/17 Use
9   of Force Report), Ex. F (Video Recording of the Incident); GEO Group Use of
10  Force Policy.  The review completed by supervisory staff is documented in the
11  form of a report, and is intended to: (a) assess the reasonableness of the actions
12  taken by staff; and (b) confirm the actions conform to GEO Group's policies and
13  procedures.  Janecka Decl. ¶ 5; McCusker Decl. ¶ 11; After-Action Review of
14  6/12/17 Use of Force Report.

15         Under GEO Group policy, a detainee may be placed in administrative
16  segregation when the detainee is awaiting an investigation or hearing for a
17  violation of facility rules.  McCusker Decl. ¶ 12; GEO/City MSJ, Ex. A (Detainee
18  Handbook), Ex. I (GEO Group's Restrictive Housing Units Policy).  Placement in
19  administrative segregation is not a punitive measure, and a Shift Supervisor will
20  complete and approve a written order before a detainee is placed in administrative
21  segregation except in exigent circumstances.  *Id.*  Plaintiffs dispute whether being
22  placed in administrative segregation is punitive, and cite defendant Diaz's
23  testimony that plaintiffs were placed in such segregation even when they were
24  calm.  Lt. Diaz Depo. at 274-77.

25         Adelanto's rules are found within a handbook that is provided to detainees
26  when they arrive at the facility.  Lt. Diaz Decl. ¶ 13; GEO/City MSJ, Ex. A
27  (Detainee Handbook).  Plaintiffs contend they were not provided handbooks in
28

16

1  their native language, and that some rules that exist in the detainee handbook are

2  not covered in GEO Group's training materials.  Mejia Depo. at 24; Cortez Diaz

3  Depo. at 16-17; Rodriguez Depo. at 20-21; Garcia Depo. at 20, 72-73, 76.  A

4  detainee may only be placed in disciplinary segregation after a finding by the

5  Institution Disciplinary Panel or equivalent body that the detainee is guilty of a

6  high-level prohibited act or rule violation.  McCusker Decl. ¶ 13; Lt. Diaz Decl.

7  ¶¶ 38-40; GEO/City MSJ, Ex. A (Detainee Handbook), Ex. C (Plaintiffs'

8  Administrative Segregation Orders), Ex. D (Plaintiffs' Incident of Prohibited Acts

9  and Notice of Charges), Ex. I (GEO Group's Restrictive Housing Units Policy).

10  Plaintiffs dispute this, and maintain they were effectively in disciplinary

11  segregation directly after the incident and the hearings they were given were

12  inadequate.  Rodriguez Depo. at 154-55, 157; Mejia Depo. at 155, 162; Garcia

13  Depo. at 56.  A disciplinary hearing officer completes and signs a written order

14  detailing the reasons for placing the detainee in disciplinary segregation before a

15  detainee is placed in disciplinary segregation, and a copy of the order is given to

16  the detainee within 24 hours with limited exceptions.  McCusker Decl. ¶ 13; Lt.

17  Diaz Decl. ¶¶ 38-40; GEO/City MSJ, Ex. A (Detainee Handbook), Ex. C

18  (Plaintiffs' Administrative Segregation Orders), Ex. D (Plaintiffs' Incident of

19  Prohibited Acts and Notice of Charges), Ex. I (GEO Group's Restrictive Housing

20  Units Policy).  Plaintiffs contend critical sections of the paperwork provided to

21  plaintiffs were in English, they did not understand they were waiving their right to

22  appear, and for some plaintiffs, the notice of hearing may not have been timely.

23  Opp. to GEO/City, Ex. 2.

24      Officers are trained per GEO Group policy that detainees have reasonable

25  and equitable access to telephones to maintain essential community and legal

26  contacts unless access is controlled as part of the disciplinary or administrative

27  segregation process.  McCusker Decl. ¶ 14; GEO/City MSJ, Ex. J (GEO Group's

28

1   Communication Policy).  Plaintiffs dispute this and maintain they had various

2   issues contacting family members and legal counsel by phone.  Opp. to GEO/City,

3   Ex. 27 (Deposition of plaintiff Rivera Martinez ("Rivera Martinez Depo.")) at 157-

4   59; Opp. to GEO/City, Exs. 41, 43, 45, and 52; Castillo Depo. at 22-23, 112-13.

5   GEO Group policy provides that a facility may not restrict the number of calls a

6   detainee can make to his or her legal counsel, the duration of such calls, or use an

7   automatic cut-off unless necessary for security purposes or to maintain orderly and

8   fair access to telephones.  Janecka Decl. ¶ 17; McCusker Decl. ¶ 14; GEO/City

9   MSJ,  Ex. J (GEO Group's Communication Policy).  Plaintiffs contend their calls

10  were, in fact, restricted, and plaintiff Martinez's counsel tried to contact GEO

11  Group and ICE officials about phone blocks.  Rivera Martinez Depo. at 157-59,

12  Opp. to GEO/City, Exs. 41, 43, 45, and 52.  Only some GEO Group personnel,

13  such as the Security Threat Groups Investigator, can request to have a detainee's

14  phone access restricted.  Janecka Decl. ¶ 14; Lt. Diaz Decl. ¶ 46; Sgt. Campos

15  Decl. ¶ 19.  GEO Group policy provides that such a request must be submitted to

16  the Facility Administrator, who can recommend the restriction to ICE.  Janecka

17  Decl. ¶ 16.  ICE ultimately decides whether a restriction will be placed on a

18  detainee's access to phones.  *Id.*

19          Per GEO Group policy, officers are trained to identify a detainee who may

20  use a hunger strike to resolve issues, and officers are instructed to try to negotiate

21  with individuals or leaders to end hunger strikes.  McCusker Decl. ¶ 15; GEO/City

22  MSJ, Ex. K (GEO Group's Emergency Plans Manual).  Plaintiffs dispute whether

23  GEO Group officers are trained to communicate with individuals or leaders to end

24  hunger strikes, and cite defendant Diaz's testimony in which she stated that she

25  approached plaintiffs as a group and then used force.  Lt. Diaz Depo. at 198-99,

26  202, 205, 212-13, 221, 232.  If negotiations regarding a hunger strike fail, a

27  detainee is isolated from the general population and placed in medical.  McCusker

28

1  Decl. ¶ 15; GEO/City MSJ, Ex. K (GEO Group's Emergency Plans Manual).  If

2  the group is too large, detainees are taken to an alternative housing unit or area

3  where food intake can be monitored.  *Id.*  Plaintiffs dispute this, and contend

4  defendant Diaz's response to plaintiffs' hunger strike did not follow these steps.

5  Lt. Diaz Depo. at 212, 221, 232.

6  **B.    Facts Pertaining to Defendants Diaz and Campos**

7  In June 2017, plaintiffs were housed at a dorm within Adelanto, and upon

8  being admitted, plaintiffs were provided a detainee handbook that established rules

9  at Adelanto including those pertaining to "count" procedures.  Lt. Diaz Decl. ¶ 12;

10  Diaz/Campos MSJ, Ex. A (Detainee Handbook); Cornejo Depo. at 22-23; Lemus

11  Campos Depo. at 38-41; Rivera Martinez Depo. at 34.  Plaintiffs contend

12  defendant Diaz has no personal knowledge as to whether plaintiffs received a copy

13  of the detainee manual, and several plaintiffs have testified that they did not

14  receive a handbook in their native language or that they were told to sign

15  documents at intake that they did not understand.  Castillo Depo. at 27-28; Mejia

16  Depo. at 24; Cortez Diaz Depo. at 16; Rodriguez Depo. at 20; Garcia Depo. at 20,

17  72-73.

18  Regardless of whether plaintiffs read the detainee handbook, they knew

19  there were multiple times throughout the day when they had to return to their

20  bunks to be counted by GEO Group staff, and that it was a direct order to return to

21  their bunks.  Cornejo Depo. at 22-25; Lemus Campos Depo. at 38-45, 84, 104;

22  Castillo Depo. at 31-34, 67-68, 71-72; Mejia Depo. at 27, 29-30, 64-66, 68;

23  Rodriguez Depo. at 38-39, 48, 51, 92; Garcia Depo. at 22, 38, 60; Cortez Diaz

24  Depo. at 18, 46; Rivera Martinez Depo. at 34, 37-38.  Plaintiffs contend detainees

25  do not necessarily need to be present at their bunks to be counted, and nurse Jones

26  asked defendant Diaz to count the detainees in the dayroom or at Medical, and

27  defendant Diaz refused.  Lt. Diaz Depo. at 61, 139-40; Opp. to Diaz/Campos, Ex.

28

1  18 (Deposition of Officer Rebecca Jindi ("Officer Jindi Depo.") at 72-74; Jones

2  Depo. at 98-99.

3          The count procedure is a critical time at the facility, and involves the officer

4  assigned to the dorm announcing that it is time for count by using words to the

5  effect of "get back to your bunks," "count time," or "rack up" and giving detainees

6  approximately ten minutes to prepare for count.  Lt. Diaz Decl. ¶¶ 10-13,

7  Diaz/Campos MSJ, Ex. A (Detainee Handbook), Ex. Y (Deposition of Officer

8  Martinez ("Officer Martinez Depo.")) at 63-64, Ex. Z (Deposition of Officer Reyes

9  ("Officer Reyes Depo.")) at 164; Cornejo Depo. at 22-25.  When a detainee returns

10 to his or her bunk for count, this is commonly referred to as "racking up for count."

11 *Id.*  The entire count process takes approximately 30 to 45 minutes, and if count is

12 not completed within an hour, the facility enters an "emergency count" that then

13 involves ICE.  *Id.*  Plaintiffs dispute these facts about the count process, and

14 contend the process cannot be performed by a single officer, does not take as long

15 as defendants maintain it does, and there have been prior instances where count

16 took longer than an hour but ICE was not notified.  Officer Jindi Depo. at 21-23,

17 26; Lt. Diaz Depo. at 302-03; Officer Gillon Depo. at 62; Opp. to Diaz/Campos,

18 Ex. 5 (Dorm Officer Logbook) at GEO 05199; Officer Martinez Depo. at 68-69,

19 137-38; Jones Depo. at 98-99.  The count procedure is important because it is how

20 the facility determines whether a detainee has escaped.  Lt. Diaz Decl. ¶¶ 10-13;

21 Cornejo Depo. at 22-25; Officer Martinez Depo. at 63-64; Officer Reyes Depo. at

22 164.

23          Plaintiffs understood that failing to comply with orders would result in

24 consequences.  Cornejo Depo. at 22-25; Lemus Campos Depo. at 38-45; Mejia

25 Depo. at 27, 29-30, 64-66, 68; Rodriguez Depo. at 38-39, 48, 51, 92; Cortez Diaz

26 Depo. at 18; Rivera Martinez Depo. at 34, 37.  Plaintiffs dispute this on the ground

27 that they never expected guards would react with force to their peaceful hunger

28

strike, especially when they were not given manuals in their native language, and
at least one officer testified that he had not expected to use force.  Castillo Depo. at
27-28; Cortez Diaz Depo. at 16-17, 54; Rodriguez Depo. at 20; Mejia Depo. at 24-
25; Garcia Depo. at 20, 72-73, 76; Officer Martinez Depo. at 90.

On or around June 11, 2017, plaintiffs met and prepared a list of demands
and grievances to present to GEO Group staff.  Diaz/Campos MSJ, Ex. F (Incident
Video) at 6:22:24; Cornejo Depo. at 36-37, 42-43, 50; Lemus Campos Depo. at 78,
80, 82, 84-85; Castillo Depo. at 72-75, 77; Mejia Depo. at 56-57, 61-62; Rodriguez
Depo. at 79-82; Garcia Depo. at 34-36; Cortez Diaz Depo. at 42-43, 50-51, 62-63;
Officer Gillon Depo. at 14, 86, 142.  On June 12, 2017, plaintiff Castillo gave this
list, which was written in Spanish, to the dorm officer, Officer Gillon, who
plaintiffs knew did not speak Spanish.  Castillo Depo. at 72-75.  Plaintiffs dispute
this, and contend the letter explained they were beginning a peaceful hunger strike,
and Officer Gillon understood this because plaintiffs had asked another detainee to
translate on their behalf.  Castillo Depo. at 73-75; Opp. to Diaz/Campos, Exs. 3
(List of Grievances) and 4 (General Incident Report); Incident Video at 6:22:24-
6:23:01, 6:24:29-6:27:31; Cortez Diaz Depo. at 41-42, 78; Lt. Diaz Depo. at 119,
312-313; Rodriguez Depo. at 96; Officer Gillon Depo. at 86-88.  Plaintiffs
presented their list of demands to Officer Gillon after breakfast and immediately
before count, and another detainee was asked to translate the list of demands
written in Spanish to Officer Gillon.  Incident Video at 6:24; Cornejo Depo. at 42-
43, 50; Lemus Campos Depo. at 78, 84; Castillo Depo. at 65, 67; Mejia Depo. at
55; Rodriguez Depo. at 86, 95; Garcia Depo. at 41-43, 46, 52-53, 63-64; Cortez
Diaz Depo. at 42-43, 50-51, 62-63; Rivera Martinez Depo. at 72-73, 78-80.  The
parties dispute the extent to which Officer Gillon understood that plaintiffs were
undertaking a hunger strike; plaintiffs maintain their letter explicitly stated this and
Officer Gillon had full knowledge of the hunger strike.  Rodriguez Depo. at 91, 96;

21

1  Castillo Depo. at 73-75; Opp. to Diaz/Campos, Ex. 3 (List of Grievances); Incident

2  Video at 6:22:24-6:23:01, 6:24:29-6:27:31.

3  At around 6:23 a.m., plaintiff Castillo handed Officer Gillon a second piece

4  of paper that listed plaintiffs' names while other plaintiffs sat at two tables in the

5  day room.  Incident Video at 6:23; Cornejo Depo. at 45, 55; Castillo Depo. at 70-

6  71; Rodriguez Depo. at 148; Cortez Diaz Depo. at 63, 78-79.  Plaintiffs contend

7  they handed Officer Gillon two sheets of paper – one explaining that they were

8  starting a peaceful hunger strike and listing their names, and another listing their

9  grievances – and maintain their intention was only to get GEO officers' attention

10  so they could explain their concerns.  Castillo Depo. at 73-75; Incident Video at

11  6:22:24-6:23:01; Cornejo Depo. at 45, 52-54.

12  At around 6:29 a.m., Officer Jindi arrived to the dorm to relieve Officer

13  Gillon, and Officer Gillon explained to Officer Jindi that "something" was going

14  on.  Incident Video at 6:29:59; Lemus Campos Depo. at 175; Castillo Depo. at 67-

15  68, 78-79; Mejia Depo. at 67-68, 70; Rodriguez Depo. at 92, 96; Garcia Depo. at

16  38; Cortez Diaz Depo. at 46; Rivera Martinez Depo. at 87-89; Officer Gillon Depo.

17  at 90, 157-58; Officer Jindi Depo. at 35-37, 40, 58, 63.  Officer Jindi instructed

18  Officer Gillon to give the papers to defendant Diaz, and thereafter, Officer Jindi

19  announced that it was time for count – an order that plaintiffs ignored.  *Id.*

20  Plaintiffs dispute this, and contend Officer Jindi announced it was time to "prep for

21  count," which meant that plaintiffs still had a 10-minute grace period, the second

22  officer required for count to begin had not yet arrived, and other detainees

23  continued to wander around the dayroom in the meantime.  Officer Jindi Depo. at

24  21, 38-40, 60-61; Incident Video at 6:30:51, 6:32:58; Officer Gillon Depo. at 159;

25  Lt. Diaz Depo. at 309; Officer Martinez Depo. at 34-35, 137-38.  Officer Jindi had

26  no information there was an alleged hunger strike.  Officer Jindi Depo. at 35-37.

27  Plaintiffs dispute this fact on the grounds that Officer Jindi merely testified that she

28

1    did not think Officer Gillon mentioned a hunger strike, and contend Officer Gillon

2    and defendant Diaz were well aware of the hunger strike.  Officer Jindi Depo. at

3    36-37; Officer Gillon Depo. at 86-88; Diaz/Campos MSJ, Ex. 1 (General Incident

4    Report) at 1; Lt. Diaz Depo. at 195-96; Castillo Depo. at 72-75; Rodriguez Depo.

5    at 96; Lemus Campos Depo. at 95.

6         Officer Jindi requested assistance because plaintiffs were not returning to

7    their bunks for count per her order, and did not communicate any additional

8    information to other officers.  Lt. Diaz Decl. ¶¶ 9, 14; Sgt. Campos Decl. ¶ 4;

9    Incident Video at 6:30:37-6:32:51; Rodriguez Depo. at 96; Garcia Depo. at 38;

10   Cortez Diaz Depo. at 53; Officer Gillon Depo. at 97-98; Jones Depo. at 79-81;

11   Officer Jindi Depo. at 37, 40-42; Officer Martinez Depo. at 44; Officer Reyes

12   Depo. at 76-77.  In response to Officer Jindi's request, defendant Diaz arrived at

13   the dorm with Officers Gillon, Martinez, Reyes, and nurse Jones at around 6:32

14   a.m.  *Id.*  Plaintiffs contend Officer Gillon was aware of the hunger strike and

15   reported it to the first watch supervisor – here, defendant Diaz – and defendant

16   Diaz similarly testified an officer brought her a list of names involving detainees

17   claiming to be on a hunger strike.  Officer Gillon Depo. at 86-87, 90-91, 94-97; Lt.

18   Diaz Depo. at 187-89.  Before entering the dorm, in addition to the information

19   that she had learned from Officer Jindi over the radio, defendant Diaz had a list of

20   plaintiffs' names and knew that plaintiffs were threatening to start a hunger strike

21   if their demands were not met.  Lt. Diaz Decl. ¶ 9; Officer Gillon Depo. at 90, 157.

22   Plaintiffs contend the letter claimed they were presently on a hunger strike, and the

23   letter consisted of two sheets of paper – one listing their names and announcing

24   hunger strike, and another listing their grievances and reasons for beginning the

25   strike.  Lt. Diaz Depo. at 321; Castillo Depo. at 73-74.

26        When defendant Diaz, the GEO Group officers, and nurse Jones arrived at

27   the dorm around 6:32 a.m., plaintiffs were seated at two tables in the day room and

28

1  refused to go to their bunks for count.  Incident Video at 6:32-6:33:09; Lt. Diaz

2  Decl. ¶¶ 14-17; Cornejo Depo. at 73; Lemus Campos Depo. at 93; Castillo Depo. at

3  78-79; Mejia Depo. at 67-68, 70; Officer Gillon Depo. at 98-99, 160-61; Jones

4  Depo. at 88-89, 93; Officer Martinez Depo. at 54; Officer Reyes Depo. at 79-80,

5  86, 94.  When defendant Diaz asked plaintiffs to go to their bunks for count,

6  plaintiffs responded that they wanted to speak to ICE.  *Id.*  Because plaintiffs were

7  not responding to her commands and some plaintiffs did not appear to be paying

8  attention to her, defendant Diaz asked GEO Group officers to translate, which they

9  did.  *Id.*  Plaintiffs contend they told GEO Group staff that they wanted to speak

10  with ICE officials and GEO supervisors.  Castillo Depo. at 72-75.  Plaintiffs also

11  maintain they were afraid to get up from the tables, defendant Diaz's testimony

12  that she gave directives to other officers before they began placing their hands on

13  plaintiffs is contradicted by the incident video, and the only officers involved who

14  spoke Spanish did not issue pepper spray warnings to plaintiffs.  Rodriguez Depo.

15  at 141-44; Castillo Depo. at 144; Cornejo Depo. at 63-65; Lt. Diaz Depo. at 120,

16  319, 335; Incident Video at 6:37:47-6:38:04; Officer Martinez Depo. at 90, 96;

17  Officer Reyes Depo. at 43; Officer Gillon Depo. at 14.

18         Throughout the incident, Officer Martinez, who speaks Spanish fluently, and

19  Officer Reyes unsuccessfully tried to negotiate and reason with plaintiffs, but

20  plaintiffs refused to return to their bunks for count and to revisit their hunger strike

21  when ICE was present.  Incident Video at 6:37:06-6:37:49, 6:43:17; Officer Gillon

22  Depo. at 163-64; Officer Martinez Depo. at 13, 45-47, 60-63, 65, 72-73, 94-95, 99-

23  100; Officer Reyes Depo. at 92, 147, 149-150, 164, 183.  Plaintiffs contend Officer

24  Reyes testified that he can "barely speak Spanish" and Officer Martinez did not

25  explicitly give plaintiffs any warnings about pepper spray.  Officer Reyes Depo. at

26  43, 148-50, 159; Officer Martinez Depo. at 62-63, 90, 96.  Plaintiffs maintain GEO

27  Group officers did not attempt to negotiate calmly with them before using force,

28

1   and the only officer who spoke Spanish refused to listen to plaintiffs.  Castillo

2   Depo. at 73, 82-83; Lemus Campos Depo. at 91-92, 94; Rodriguez Depo. at 142,

3   144; Cortez Diaz Depo. at 43; Cornejo Depo. at 36.

4        Defendants maintain plaintiffs knew defendant Diaz and the other officers

5   ordered them to return to their bunks and/or leave the tables in English and

6   Spanish, and knew there would be consequences, including the use of pepper

7   spray, for ignoring commands.  Cornejo Depo. at 73; Castillo Depo. at 78-84;

8   Mejia Depo. at 70-71, 73; Rodriguez Depo. at 97; Rivera Martinez Depo. at 87-89.

9   Plaintiffs dispute this, and maintain the only information conveyed to them was

10  that it was time for count and they "did not want to do this."  Castillo Depo. at 82-

11  85, 142-44; Cornejo Depo. at 47-48, 63-65; Diaz Depo. at 46; Rodriguez Depo. at

12  94, 141-42; Lemus Campos Depo. at 92-94, 96-97, 103-105.  Plaintiffs further

13  maintain that they knew there would be consequences, but did not expect such a

14  use of force without warnings or an attempt to negotiate calmly.  *Id*.  Defendants

15  contend plaintiffs admitted in their depositions that they had no intention of

16  complying with the commands issued unless force was used, as this would help

17  them get more attention for their strike.  Lemus Campos Depo. at 97, 103-04;

18  Cortez Diaz Depo. at 83.  Plaintiffs dispute this, and contend they did not get up

19  from the tables because they were afraid and did not imagine the guards with react

20  with the force that they ultimately used.  Lemus Campos Depo. at 92-94, 96-97,

21  103, 105; Rodriguez Depo. at 141-43; Cortez Diaz Depo. at 54; Cornejo Depo. at

22  41, 45.

23       After giving numerous commands, at around 6:38 a.m., four officers

24  (including Officers Gillon, Reyes, and Martinez) attempted to remove plaintiffs

25  Rivera Martinez and Rodriguez from one of the tables.  Lt. Diaz. Decl. ¶ 18;

26  Incident Video at 6:38:00-6:38:52; Officer Gillon Depo. at 105-06, 110, 112-13,

27  164, 166.  Plaintiffs dispute this, and contend defendant Diaz sprayed plaintiffs

28

25

1   Rivera Martinez and Rodriguez with pepper spray, and that the officers injured
2   both plaintiffs when removing them.  Rivera Martinez Depo. at 90-91, 93-95;
3   Incident Video at 6:38:01-6:38:38; Rodriguez Depo. at 145, 152.  Instead of
4   complying, plaintiffs Rivera Martinez and Rodriguez grabbed each other, forcing
5   the officers to physically separate them.  Lt. Diaz. Decl. ¶ 18; Incident Video at
6   6:38:00-6:38:52; Officer Gillon Depo. at 105-06, 110, 112-13, 164, 166.  The
7   officers separated plaintiffs Rivera Martinez and Rodriguez at around 6:38 a.m.
8   without striking, punching, or kicking them.  *Id.*  Plaintiffs dispute this, and
9   contend defendant Diaz sprayed defendants Rivera Martinez and Rodriguez with
10  pepper spray before removing them from the table.  Lt. Diaz Depo. at 342-47;
11  Incident Video at 6:38:04-6:38:28; Rivera Martinez Depo. at 90-91, 93; Rodriguez
12  Depo. at 145, 152; Mejia Depo. at 75-76; Castillo Depo. at 91.

13      Plaintiff Rodriguez was escorted out of the dorm by two officers at around
14  6:39 a.m., and there is no evidence supporting his alleged injuries, including those
15  that are allegedly to have occurred outside the day room.  Lt. Diaz Decl. ¶¶ 18, 26,
16  47; Incident Video at 6:38:54-6:39:00; Rodriguez Depo. at 98-99, 101, 103, 105,
17  107-08, 114, 152-53; Jones Depo. at 110, 163.  Plaintiffs dispute this, and contend
18  plaintiff Rodriguez was injured during the interaction.  Rodriguez Depo. at 109-
19  110, 130, 152-53, 176; Lt. Diaz Depo. at 342-47; Incident Video at 6:38:01-
20  6:38:38.  Plaintiffs also contend plaintiff Rodriguez was pushed into a wall, and
21  plaintiff Rodriguez later tried to communicate his injuries to a nurse.  Rodriguez
22  Depo. at 109-10, 171-72, 176.

23      Plaintiff Rivera Martinez continued to resist officers after being separated
24  from plaintiff Rodriguez.  Lt. Diaz Decl. ¶ 18; Officer Martinez Depo. at 74-75,
25  79-80; Incident Video at 6:39:05 to 6:39:23.  Plaintiffs contend plaintiff Rivera
26  Martinez merely tried to hold on to his friend because he had been sprayed with
27  pepper spray and could not see, and was not striking or elbowing officers, but the
28

1   evidence cited by plaintiffs does not support their contention.  Defendants note that

2   although plaintiff Rivera Martinez maintains he was pepper sprayed outside the

3   dorm by defendant Diaz and other unknown GEO supervisors, defendant Diaz did

4   not leave the dorm after Rivera Martinez was escorted out, and no pepper spray

5   was deployed outside the dorm or while any plaintiff was restrained by an officer.

6   Lt. Diaz Decl. ¶¶ 20, 26; Rivera Martinez Depo. at 105-07; Officer Martinez Depo.

7   at 84-85; Officer Reyes Depo. at 117.  Plaintiffs contend defendant Diaz's

8   testimony on this point is inconsistent about whether she ever pepper sprayed

9   plaintiffs while they were restrained by other officers.  Lt. Diaz Depo. at 342-47.

10  Plaintiff Rivera Martinez's medical report taken after the incident notes that he

11  complained of right shoulder pain and was missing a crown on his upper teeth.

12  Opp. to Diaz/Campos, Ex. 7 (Medical Reports) at GEO 02242.

13       While officers were escorting plaintiffs Rivera Martinez and Rodriguez out

14  of the dorm, plaintiffs Cornejo, Castillo, Mejia, Cortez Diaz, and Lemus Campos

15  interlocked their arms and wrapped their feet around the legs of their table;

16  plaintiff Garcia also moved tables to sit next to plaintiff Lemus Campos.  Lt. Diaz

17  Decl. ¶¶ 19- 20, 22; Incident Video at 6:39:32; Officer Gillon Depo. at 104-05;

18  Cortez Diaz Depo. at 81; Castillo Depo. at 86-87.  Plaintiffs contend they only

19  moved tables and linked arms because they were afraid of defendants, and in

20  response to defendants hitting them.  Mejia Depo. 76-77.  Defendant Diaz

21  determined that plaintiffs were not going to comply with verbal commands, were

22  actively resisting and causing other detainees to become out of control, and

23  decided she needed to regain control of the situation.  Lt. Diaz Decl. ¶¶ 23-24.

24  Plaintiffs contend the situation only became out of control once defendants began

25  using force on plaintiffs, which caused other uninvolved detainees to become

26  agitated.  Cornejo Depo. at 62; Castillo Depo. at 81-82.

27       After attempting to de-escalate the situation for more than 9 minutes,

28

including giving pepper spray warnings, defendant Diaz deployed a burst of pepper spray down the middle of plaintiffs' table.  Lt. Diaz Decl. ¶¶ 23-25; Incident Video at 6:42:12; Officer Martinez Depo. at 95; Officer Reyes Depo. at 91.  Defendant Diaz intentionally did not spray plaintiffs directly, and this was the only use of force that Diaz directly used.  Lt. Diaz Decl. ¶¶ 25-27; Officer Jindi Depo. at 50; Officer Martinez Depo. at 98.  Plaintiffs dispute this and contend defendant Diaz used "quite a lot" of pepper spray on plaintiffs, including directly on them and more than once.  Cortez Diaz Depo. at 58; Castillo Depo. at 89-90.  Plaintiffs appeared unfazed by the pepper spray as they continued to remain seated at the table.  Lt. Diaz Decl. ¶ 27.  Plaintiffs dispute this, and contend they were in excruciating pain from the spray and tried to protect themselves from the fumes.  Cortez Diaz Depo. at 58; Castillo Depo. at 89-90; Cornejo Depo. at 70-71.

Beginning at 6:43 a.m., the officers attempted to remove the remaining plaintiffs from the tables after trying to convince them to comply.  Lt. Diaz Decl. ¶¶ 28-29; Officer Martinez Depo. at 99-100.  Plaintiffs contend no officers spoke to them in Spanish, and defendants used force on plaintiff Garcia to remove him.  Rodriguez Depo. at 144; Garcia Depo. at 45.  Defendants were able to eventually gain control of plaintiff Garcia and remove him from the dorm at around 6:44 a.m.  Lt. Diaz Decl. ¶ 28.

Defendant Diaz then called for additional assistance because the situation was out of control and other detainees were yelling and acting in a rowdy manner.  Lt. Diaz Decl. ¶ 27; Officer Martinez Depo. at 131-33; Officer Jindi Depo. at 46-47.  Plaintiffs again contend the situation was not out of control, and only became so once defendants began using force.  Officer Jindi Depo. at 51-52.  At around 6:45 a.m., defendants attempted to remove plaintiff Mejia and eventually walked him out of the dorm at around 6:46 a.m.  Diaz Decl. ¶¶ 29, 47; Incident Video at 6:45:58-6:46:18; Officer Gillon Depo. at 170; Mejia Depo. at 76-82.  As with their

28

1   contentions about plaintiff Garcia's removal, plaintiffs contend officers removed

2   plaintiff Mejia by using force on him including using pepper spray and hitting him.

3   Mejia Depo. at 76-80.

4          As officers were escorting plaintiff Mejia out of the dorm, defendant

5   Campos responded to defendant Diaz's call and entered the dorm at around 6:46

6   a.m.  Lt. Diaz Decl. ¶ 30; Sgt. Campos Decl. ¶¶ 4-6; Incident Video at 6:46:18.

7   Defendant Campos began assisting the other officers with removing plaintiffs, who

8   were grabbing on to each other.  Lt. Diaz Decl. ¶¶ 31, 32; Sgt. Campos Decl. ¶¶ 7-

9   9; Incident Video at 6:46:18-6:46:44; Cornejo Depo. at 68; Lemus Campos Depo.

10  at 107.  Plaintiffs contend their arms were not linked at this point, and defendants

11  used unnecessary force, such as throwing plaintiff Castillo against a wall while

12  removing him.  Sgt. Campos Depo. at 124; Castillo Depo. at 96.  Defendant

13  Campos determined that the situation needed to be brought under control, and

14  deployed two bursts of pepper spray in the direction of plaintiffs Corte Diaz,

15  Lemus Campos, and Cornejo.  Sgt. Campos Decl. ¶¶ 10-11; Lt. Diaz Decl. ¶ 32;

16  Incident Video at 6:46:47-6:46:52.  Plaintiffs contend defendant Campos made no

17  effort to learn more about the situation and began deploying pepper spray within a

18  minute after entering the room, even though he was unsure if any commands had

19  been given in Spanish.  Sgt. Campos Depo. at 104-11, 115.

20         Officers continued to attempt to remove plaintiffs Cortez Diaz, Lemus

21  Campos, and Cornejo, and completed removing them from the dorm by 6:48 a.m. –

22  16 minutes after defendant Diaz had first entered.  Lt. Diaz Decl. ¶¶ 31-32;

23  Incident Video at 6:46:56-6:47:54.  Plaintiffs contend they did not refuse to get up,

24  and were injured by officers during the removal process.  Cortez Diaz Depo. at 59;

25  Cornejo Depo. at 73-74.  Medical staff were present in the dorm throughout the

26  incident, and testified that officers did not strike plaintiffs.  Jones Depo. at 110.

27  Plaintiffs contend nurse Jones's testimony actually indicates that she did not have a

28

　
1    consistent view of the room and could not clearly see everything that was

2    happening.  *Id.* at 114, 117, 121.

3           After plaintiffs were removed from the dorm, they were taken to the

4    recreation yard where they were handcuffed (if they had not already been

5    handcuffed in the room), and had no further contact with defendants Diaz and

6    Campos, or with Officers Gillon, Martinez, and Reyes.  Lt. Diaz Decl. ¶ 32; Sgt.

7    Campos Decl. ¶ 14; Officer Gillon Depo. at 118-19; Officer Martinez Depo. at 85,

8    93, 119-20; Officer Reyes Depo. at 117-19.  Plaintiffs dispute this, and contend

9    defendant Diaz continued to have contact with plaintiffs in the sense that she

10   observed their transportation later that day and issued orders placing them in

11   administrative segregation.  Lt. Diaz Depo. at 277-78; Opp. to Diaz/Campos, Ex. 2

12   (Plaintiffs' Administrative Segregation Orders).  Plaintiffs were then transported

13   from the recreation yard to another room where they were seen by medical staff,

14   decontaminated with showers, and provided new uniforms.  Lt. Diaz Decl.

15   ¶¶ 34-35; Jones Depo. at 143-44, 153-156; McCusker Decl. ¶ 9.  Plaintiffs contend

16   they were forced to wait at least two and a half hours before they received any sort

17   of medical examination, and they were improperly decontaminated with scalding

18   hot water that exacerbated their injuries.  Rivera Martinez Depo. at 55; Mejia

19   Depo. at 88; Garcia Depo. at 48; Lt. Diaz Depo. at 153-54.

20          After plaintiffs were decontaminated and seen by medical staff, they were

21   taken to administrative segregation, where plaintiffs were informed that there was

22   an investigation into their conduct and a potential for discipline.  Lt. Diaz Decl.

23   ¶¶ 38-40; McCusker Decl. ¶ 13; Diaz/Campos MSJ, Ex. C (Plaintiffs'

24   Administrative Segregation Orders) and Ex. D (Incident of Prohibited Acts and

25   Notice of Charges); Cornejo Depo. at 88-89, 91-92; Lemus Campos Depo. at 177;

26   Garcia Depo. at 50, 55-56.  Plaintiffs were later informed that the outcome of the

27   investigation related to their failure to follow commands and engage in a group

28

                                             30

1   demonstration mandated they would be disciplined.  *Id.*  Plaintiffs contend

2   defendant Diaz placed them in administrative segregation even though they were

3   behaving calmly, and GEO Group policy states that pre-disciplinary hearing

4   detentions should only be ordered as necessary.  Lt. Diaz Depo. at 274-77;

5   Diaz/Campos MSJ, Ex. I (GEO Restrictive Housing Unit Policy) at GEO 01971.

6   While in segregation, plaintiffs were provided medical care, checked on by GEO

7   Group staff, and given access to showers and phones.  Mejia Depo. at 103; Rivera

8   Martinez Depo. at 151-52.  Plaintiffs dispute that they had meaningful access to

9   phones, were provided adequate medical care, and were checked on by GEO

10  Group staff.  Garcia Depo. at 62, 64, 65, 67; Cortez Diaz Depo. at 93-100; Opp. to

11  Diaz/Campos, Ex. 41 (Letters from Plaintiffs' Counsel).  Plaintiffs claim they had

12  various issues making phone calls and contacting their attorneys.  *Id.*

13      GEO Group officers do not have access to detainee complaints or grievances

14  and do not have a means of determining which detainees have filed complaints or

15  grievances.  Lt. Diaz Decl. ¶¶ 43-45; Officer Gillon Depo. at 24.  Although

16  plaintiffs contend defendant Diaz knew about their grievances from the

17  two-page letter they wrote explaining their hunger strike and chose to retaliate

18  against them, this contention is inapposite to defendants' point and is not supported

19  by the evidence cited.  GEO Group personnel can recommend to ICE that a

20  detainee have his or her phone access restricted, but the final determination is made

21  by ICE.  Janecka Decl. ¶¶ 14-17; McCusker Decl. ¶ 14; Lt. Diaz Decl. ¶ 46; Sgt.

22  Campos Decl. ¶ 19; Diaz/Campos MSJ, Ex. J (GEO's Communication policy).

23  Plaintiffs contend other individuals at Adelanto had authority over phone blocks,

24  including the warden.  Opp. to Diaz/Campos, Ex. 51 (Email from Plaintiffs'

25  Counsel to ICE).  After the use of force incident, the incident was reviewed by

26  supervisory staff and it was determined that the use of force was reasonable and

27  appropriate.  Lt. Diaz Decl. ¶¶ 36, 47; Sgt. Campos Decl. ¶ 17; Janecka Decl.

28

1    ¶¶ 5-8; McCusker Decl. ¶¶ 10-11; Diaz/Campos MSJ, Ex. B (Use of Force Report)

2    and Ex. E (After-Action Review of 6/12/17 Use of Force Report).

3                                            **V.**

4                                   **DISCUSSION**

5    **A.    Defendants Are Entitled to Summary Judgment on Their Federal Civil**

6            **Rights Claims**

7            Plaintiffs' fifth, sixth, and seventh causes of action are brought against

8    defendants under 42 U.S.C. § 1983, alleging defendants violated their federal civil

9    rights due to retaliation, use of excessive force, and due process violations.  In the

10   SAC plaintiffs also allege they bring these claims under *Bivens*, but only as against

11   Does 7-10, who have never been named.  Thus, plaintiffs assert these claims

12   against the named defendants solely under § 1983.

13           Section 1983 provides a cause of action when any person who acts under

14   color of state law "subjects, or causes to be subjected, any citizen of the United

15   States or other person within the jurisdiction thereof to the deprivation of any

16   rights, privileges, or immunities secured by the Constitution and laws. . . ."  42

17   U.S.C. § 1983.  A claim under § 1983 must embody at least two elements: (1) the

18   plaintiff must have been "deprived of a right 'secured by the Constitution and the

19   laws' of the United States"; and (2) the plaintiff must have been deprived of this

20   right by a defendant acting under color of state law.  *Flagg Bros. v. Brooks*, 436

21   U.S. 149, 155, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978).  A private actor can be

22   sued under § 1983 if it exercises action that is "fairly attributable to the state."

23   *Lugar v. Edmonson Oil. Co., Inc.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d

24   482 (1982).  "Section 1983, however, provides no right of action against federal

25   (rather than state) officials."  *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016,

26   1019 (9th Cir. 1999) (citation omitted).

27           Defendants here argue that GEO Group and its employees were federal

28

                                              32

1  rather than state actors.  Plaintiffs disagree, arguing that GEO Group contracted
2  with the City of Adelanto, making defendants state rather than federal actors.

3        As an initial matter, plaintiffs argue the court in this case already ruled that
4  ICE delegated its responsibility to defendant City through the IGSA such that the
5  United States should be dismissed from the case, and also ruled that GEO Group
6  employees are state actors.  *See* Order Granting Defendant United States of
7  America's Motion to Dismiss (docket no. 70) at 7; Order Granting in Part and
8  Denying in Part Defendant Sarah Jones's Motion to Dismiss (docket no. 69) at 4.
9  Plaintiffs are correct that the United States argued defendants City and GEO Group
10 were independent contractors who were not under the direct control of ICE.  Yet in
11 ruling on that Motion to Dismiss, the court only discussed delegation to the extent
12 the IGSA establishes the responsibility of providing medical care is delegated to
13 the City and its sub-contractor, GEO Group.  Docket no. 70 at 7-8.  The Court did
14 not, as plaintiffs contend, hold that ICE delegated all responsibility to the City or
15 GEO Group.

16       As for defendant Sarah Jones's Motion to Dismiss, the court determined that
17 Jones "may be fairly classified as a state actor for the purposes of Plaintiffs' cause
18 of action under § 1983."  Docket no. 69 at 4.  But the court did not consider the
19 issue raised here, namely, whether GEO Group and its employees were effectively
20 state or federal actors.  Instead, defendant Jones argued that as a nurse she was not
21 a government actor at all.  The court rejected this argument, relying on *West v.*
22 *Atkins*, 487 U.S. 42, 54-55, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988), in which the
23 Supreme Court held that a physician who is employed by the state to provide
24 medical services at a state prison acts "under color of state law" when he treats an
25 inmate.  In short, the law of this case to date does not resolve the question now
26 before the court.

27
28

      **1.**     **Defendants GEO Group, Diaz, and Campos Were Federal Actors and Therefore May Not Be Sued Under § 1983**

Courts consider the following four factors in determining whether a private party's actions are fairly attributable to the state: (1) public function; (2) joint action; (3) compulsion; and (4) the nexus between the private action and the state. *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  Any one of these factors alone may be sufficient to attribute the action to the government.  *Id.*  Yet, the criteria for determining what constitutes state action "lack rigid simplicity" because there may be countervailing reasons that weigh against attributing the action to the government.  *Id.*  Determining whether state action exists is a "highly factual question" that requires "sifting facts and weighing circumstances . . . to ferret out obvious as well as non-obvious State involvement in private conduct."  *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1209 (9th Cir. 2002) (internal quotation marks and citation omitted).  Although the question of whether a private party's actions constitute state action typically arises in the context of a § 1983 claim, courts have applied the same four-factor analysis to determine whether federal action exists to support *Bivens* claims.  *See Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997) ("[W]e apply similar tests to determine whether federal action exists to support a *Bivens* claim or to determine whether State action will permit a § 1983 cause of action."); *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1432 n. 3 (9th Cir. 1989) ("The standards for determining whether an action is governmental are the same whether the purported nexus is to the state or to the federal government.").

The public function test inquires whether a private entity is exercising powers "traditionally exclusively reserved to the State."  *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974).  Joint action exists where a private entity is "jointly engaged with state officials in the prohibited

1    action . . . It is enough that [the private party] is a willful participant in joint

2    activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

3    152, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  The compulsion test is satisfied

4    when the state exercises such coercive power over the private entity that "the

5    choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S.

6    991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982).  The nexus test asks whether

7    "there is such a close nexus between the State and the challenged action that

8    seemingly private behavior may be fairly treated as that of the State itself."

9    *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288,

10   295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001).

11          In the context of private prison operators, the factor or test that is discussed

12   most frequently and is oftentimes considered dispositive of the state action analysis

13   is the public function test.  A number of courts have held broadly that the power to

14   imprison an individual is one that is traditionally exercised by the states.  *See Street*

15   *v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) ("The defendants were

16   'acting under color of state law' in that they were performing the 'traditional state

17   function' of operating a prison."); *Macias v. Ryan*, 2010 WL 2228536, at *3-4 (D.

18   Ariz. May 25, 2010) ("A privately owned corporation that operates prisons

19   pursuant to contract with a state performs a public function that is traditionally the

20   exclusive prerogative of the state.").

21          In the Ninth Circuit, the weight of the case law leans toward finding that

22   private prison management companies that operate federal facilities are federal

23   actors.  *See Pollard v. The GEO Grp., Inc*., 629 F.3d 843, 854-58 (9th Cir. 2010)

24   (GEO employees acted under color of federal law where they operated a federal

25   prison under contract with the federal Bureau of Prisons), *rev'd sub nom., Minneci*

26   *v. Pollard*, 565 U.S. 118, 132 S. Ct. 617, 181 L. Ed. 2d 606 (2012) (petitioners did

27   not seek review of whether they acted under color of federal law, and the Supreme

28

1  Court did not review the Ninth Circuit's determination); *Johnson v. Corr. Corp. of*

2  *Am.*, 2014 WL 2919300, at *2-3 (S.D. Cal. June 26, 2014) (construing an ICE

3  detainee plaintiff's claims asserted under § 1983 against a private corporation

4  operating under contract with ICE as *Bivens* claims); *Karboau v. Clark*, 2012 WL

5  5350159, at *6-7 (W.D. Wash. Oct. 9, 2012) (dismissing an excessive force and

6  failure to protect claim asserted by plaintiff, an ICE detainee, against GEO Group

7  employees because the claims were beyond the reach of *Bivens*); *Bromfield v.*

8  *McBurney*, 2008 WL 2746289, at *7-13 (W.D. Wash. July 8, 2008) (where

9  defendant GEO Group had contracted with the federal government to operate a

10  federal immigration detention facility, GEO Group and its employees were acting

11  under color of federal law).  But these cases do not address the precise situation

12  here, where GEO Group contracted with the City of Adelanto rather than ICE.

13        Plaintiffs cite a number of cases supporting the proposition that private

14  correctional companies and their employees can be held liable for constitutional

15  violations under § 1983, but except as discussed below, the cited cases do not

16  involve a federal presence.  *See Oyenik v. Corizon Health Inc*., 696 Fed. Appx.

17  792, 794 (9th Cir. 2017) (no federal connection); *Winger v. City of Garden Grove*,

18  2014 WL 12852387, at *3 (C.D. Cal. Jan. 27, 2014) (no federal connection).  Thus,

19  it is necessary to look at the facts of this case.

20        As recounted above, contrary to defendants' unsupported assertion, GEO

21  Group contracted only with the City of Adelanto, not ICE, and therefore effectively

22  stood in the shoes of the City here.  But this by itself is not determinative.  Facts

23  that weigh in favor of finding that defendants GEO Group, Diaz, and Campos

24  acted as federal actors include: (1) the IGSA states that the facility is to be for the

25  exclusive use of ICE and ICE detainees, and must be in full compliance with ICE

26  detention standards and other ICE requirements (docket no. 52-2 at 3); (2) the

27  IGSA states that the authority to detain federal detainees derives from federal law

28

36

1   in the form of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (docket
2   no. 52-2 at 2); (3) plaintiffs allege there were at least some ICE agents who were
3   present at the facility and who were involved in the alleged use of excessive force,
4   subsequent retaliation, and deprivation of due process (SAC at 12, 14-15); (4)
5   plaintiffs are federal immigrant detainees; (5) GEO Group policy requires that
6   incidents involving the use of force must be reported to individuals including the
7   Facility Administrator and an ICE representative, but not any representative from
8   the City (GEO/City MSJ, Ex. H at 11); and (6) former City Manager James Hart
9   stated in his Declaration that the City did not retain control of operations at the
10  facility in light of its agreement with GEO Group (Hart Decl. ¶ 6).

11          Some facts also weigh in favor of defendants GEO Group, Diaz, and
12  Campos being considered state actors: (1) the only party with which defendant
13  GEO Group has a direct contract is defendant City (GEO/City MSJ, Ex. M); (2) the
14  Service Agreement between defendants GEO Group and City provides that the
15  City remains exclusively responsible for providing medical care to detainees
16  (GEO/City MSJ, Ex. M at 3); (3) defendant GEO Group purchased the facility
17  from defendant City in 2010 with the intent of entering into a contract with either
18  the federal government or the State of California, and the City agreed to act as an
19  agent for the IGSA if GEO Group were to negotiate an agreement with the federal
20  government (Hart Decl. ¶ 3); (4) former City Manager James Hart visited the
21  facility during his tenure as City Manager, had open communications with the
22  Warden, and was invited to attend quarterly meetings at the facility (Hart Decl.
23  ¶ 9); and (5) GEO Group forwarded communications between itself and ICE to the
24  City to keep it apprised of operations, ICE also provided the City with findings
25  from any reviews or inspections of the facility, and GEO Group personnel
26  periodically attended City Council meetings (Hart Decl. ¶¶ 11-12).  There is also
27  one undisputed fact that indicates ICE and defendant City jointly exercised
28

37

1  authority over the facility, namely, both ICE and the City retained the right to

2  perform periodic inspections of the facility (GEO/City MSJ, Ex. M at 3).

3      The court has found only a limited number of cases on point with the

4  circumstances here, namely, a private prison management corporation that

5  contracted with a state or municipality to house ICE detainees or other federal

6  inmates. In *Doe v. United States*, 831 F.3d 309 (5th Cir. 2016), ICE contracted

7  with a county, and the county then subcontracted with a private prison operator to

8  run an ICE detention center. The Fifth Circuit rejected the plaintiffs' argument that

9  the private company was acting under color of state law because it derived its

10  authority from the subcontract with the county, and instead found the private

11  company and its employees were federal actors because the detention center was

12  purely an ICE facility and the company was charged with carrying out purely ICE

13  functions. *Id.* at 314-16. It noted the conduct complained of was the failure of the

14  private company defendants to follow an ICE policy in detaining immigrants. *Id.*

15  at 316. Additionally, the terms of the subcontract gave the county minimal

16  involvement in running the detention center, with ICE promulgating all the policies

17  and procedures for the detention center's operation. *Id.* at 316-17. Further, the

18  center was owned and operated by the private company alone, not the county. *Id.*

19  at 317.

20      Similarly, in *Guzman-Martinez v. Corrections Corporation of America*,

21  2012 WL 5907081, at *8-12 (D. Ariz. Nov. 26, 2012), where ICE contracted with a

22  municipality, and the municipality then subcontracted with a private prison

23  contractor to operate an ICE detention center, the defendant contractor and its

24  employees were found to be federal, not state, actors. The court rejected the

25  plaintiff's argument that defendants were state actors by virtue of the prison

26  contractor's contractual relationship with the municipality, instead finding the

27  company's authority and obligations were "delegated by ICE through contracts

28

38

with the City." *Id.* at 11.  It also noted plaintiff was detained by ICE under federal law, and adopting policies and practices regarding ICE detention of immigrants "is traditionally the 'exclusive prerogative' of federal government, not state government." *Id.* (citation omitted).

Plaintiffs cite to *Lacedra v. Donald W. Wyatt Detention Facility*, 334 F. Supp. 2d 114, 140-41 (D.R.I. 2004), which found a pretrial detainee in the custody of the United States Marshals Service had available remedies under § 1983 against a private prison management company and its employees.  The facility at which the plaintiff was detained was "a unique creature of state law," owned by a corporation created by a city council and financed by the Rhode Island Port Authority.  *Id.* at 121.  The municipal corporation contracted with the private prison management company to operate the facility, and contracted with the U.S. Marshal's Service to house pretrial detainees.  *Id.*  At times state prisoners were also incarcerated there.  *Id.*  The court found "[d]efendants acted under color of state law when they performed the traditional public function of prison operations."  *Id.* at 140.  In so finding, the court noted the state had funded the facility and delegated its operation to a municipality, and the fact that the plaintiff was incarcerated there "while awaiting a federal trial is fortuitous because the officials who committed the alleged constitutional violations derived their authority over Plaintiff from state rather than federal law."  *Id.* at 141.

Unlike the facility in *Lacedra*, the Adelanto facility is owned by GEO Group and houses only federal immigration detainees; it never houses state detainees.  Further, the City's role here was largely that of a middleman between ICE and GEO Group.  ICE, through the IGSA, set the standards for the facility, and persons were detained at the facility solely under the authority of ICE.  The City of Adelanto certainly played a role in effecting this arrangement, and continued to monitor the facility's operations to some extent, but on the whole the City's

1    involvement was minimal.  As such, this case is very like those in *Doe v. U.S.* and

2    *Guzman-Martinez*, in which the private operators were found to be federal actors.

3        Of course, neither *Doe* nor *Guzman-Martinez* are binding decisions for this

4    court.  The court is aware of no binding authority directly on point.  But the court

5    finds the reasoning in those cases persuasive and consistent with the more general

6    binding Supreme Court and Ninth Circuit law that governs when a private party's

7    actions may be fairly attributable to a state.  And here, under those tests,

8    particularly the public function test, the court finds defendants GEO Group, Diaz,

9    and Campos exercised powers traditionally reserved to ICE, and their actions at

10   issue in this case are not fairly attributable to the City of Adelanto.  Accordingly,

11   because GEO Group, Diaz, and Campos were not state actors, plaintiffs may not

12   bring federal civil rights claims against them under § 1983.

13       **2.    Plaintiffs Also May Not Bring Their Claims Under *Bivens***

14       In *Bivens*, 403 U.S. at 395-96, the United States Supreme Court held that a

15   violation of an individual's Fourth Amendment rights by federal officers can give

16   rise to a implied cause of action for damages.  *Bivens* actions have been implied in

17   only a few limited instances.  *See Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264,

18   60 L. Ed. 2d 846 (1979) (a damages action found to be implied in the Fifth

19   Amendment's Due Process clause in a gender discrimination suit brought by a

20   congressional staff member contending her right to equal protection was violated);

21   *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980) (a damages

22   action found to be implied in the Eighth Amendment where a federal prisoner died

23   as the result of government officials' alleged deliberate indifference to his medical

24   needs).  Courts have generally been hesitant to imply a *Bivens* action, and indeed,

25   the Supreme Court has not found that such an implied cause of action exists in any

26   case since *Carlson*.  *See Minneci*, 565 U.S. at 124 (reviewing cases in which the

27   Supreme Court has declined to find an implied *Bivens* remedy).

28

40

1      Here, as discussed, the SAC does not assert any of plaintiffs' federal civil

2  rights claims against the named defendants under *Bivens*; they are all brought

3  under § 1983.  Further, plaintiffs do not ask for the opportunity to amend the SAC

4  to bring claims under *Bivens*.  But in light of the determination above that

5  defendants GEO Group, Diaz, and Campos are federal actors who may not be sued

6  under § 1983, the court briefly considers the possibility of such amendment.

7      First, as to defendant GEO Group, courts have never implied a *Bivens*

8  remedy where the defendant is an entity instead of an individual.  *See Correctional*

9  *Servs. Corp. v. Malesko*, 534 U.S. 61, 70-73, 122 S. Ct. 515, 151 L. Ed. 2d 456

10  (2001) (no *Bivens* action against a private corporation that managed a federal

11  prison); *see also FDIC v. Meyer*, 510 U.S. 471, 484-86, 114 S. Ct. 996, 127 L. Ed.

12  2d 308 (1994) (no *Bivens* action against a federal agency).  Thus, under *Malesko*, it

13  would be futile for plaintiffs to attempt to sue GEO Group under *Bivens*.

14      Second, as to defendants Diaz and Campos, *Bivens* has never been applied to

15  an individual who was not in the direct employ of the federal government.  *See*

16  *Holly v. Scott*, 434 F.3d 287, 291 (4th Cir. 2006) (noting that each of the

17  defendants in *Bivens*, *Davis*, and *Carlson* were directly employed by the federal

18  government).  In determining whether to recognize a *Bivens* remedy, courts

19  undertake a two-step analysis: (1) "whether any alternative, existing process for

20  protecting the interest amounts to a convincing reason for the Judicial Branch to

21  refrain from providing a new and freestanding remedy in damages"; and (2) even

22  absent an alternative, whether "'any special factors counsel[] hesitation before

23  authorizing a new kind of federal litigation.'"  *Wilkie v. Robbins*, 551 U.S. 537,

24  550, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) (citation omitted).  In *Minneci*, the

25  Supreme Court undertook this analysis to determine whether employees at a

26  privately run federal prison could be sued under *Bivens* for inadequate medical care

27  in violation of the Eighth Amendment.  *Minneci*, 565 U.S. at 120, 122-23.  The

28

41

1   Court noted that prisoners ordinarily cannot bring tort actions against federal
2   employees, whereas "in the case of a privately employed defendant, state tort law
3   provides an 'alternative, existing process' capable of protecting the constitutional
4   interests at stake." *Id.* at 125-26 (quoting *Wilkie*, 551 U.S. at 550).  Given this
5   alternative remedy available, the Supreme Court concluded:

6      [W]here, as here, a federal prisoner seeks damages from privately
7      employed personnel working at a privately operated federal prison,
8      where the conduct allegedly amounts to violation of the Eighth
9      Amendment, and where that conduct is of a kind that typically falls
10     within the scope of traditional state tort law . . . , the prisoner must
11     seek a remedy under state tort law.  We cannot imply a *Bivens* remedy
12     in such a case.

13  *Id.* at 131.

14      The holding in *Minneci* is explicitly limited to Eighth Amendment cases, but
15  its reasoning applies to any case in which the defendants are private employees and
16  there are state tort remedies available to address the alleged unconstitutional
17  conduct.  *See Vega v. U.S.*, 881 F.3d 1146, 1153-55 (9th Cir. 2018) (declining to
18  recognize a *Bivens* remedy for a due process claim brought by a federal prisoner
19  against a private contractor operating a drug treatment reentry program because
20  state tort law provided an alternative remedy); *Crosby v. Martin*, 502 Fed. Appx.
21  733, 735 (10th Cir. 2012) (declining to recognize a *Bivens* remedy for an excessive
22  force claim asserted by a federal prisoner against employees of a private prison
23  because state tort law provided an alternative remedy).  State tort law provides
24  alternative remedies here.  Plaintiffs' excessive force claim overlaps with at least
25  their battery, assault, Bane Act, and negligence claims, and their due process claim
26  also overlaps to some extent with these state claims.  State tort remedies thus
27  largely address the unconstitutional conduct alleged.  The same is true for

28

42

1    plaintiffs' retaliation claim, and in any event, plaintiffs do not oppose defendants'
2    motion for summary judgment on the retaliation claim against defendants Diaz and
3    Campos. *See* Opp. to Diaz/Campos at 3 n.1. Accordingly, under *Minneci*, there is
4    no basis for the court to find an implied *Bivens* remedy against defendants Diaz
5    and Campos on any of plaintiffs' federal civil rights claims.

6         As such, even if plaintiffs wished to amend the SAC to bring their federal
7    civil rights claims against defendants GEO Group, Diaz, and Campos under
8    *Bivens*, such amendment would be futile.

9         **3.    Defendant City Is Not Liable Under *Monell***

10        Section 1983 allows for suits against entities such as municipalities acting
11   under color of state law. *See Monell v. Dep't of Social Services of City of New*
12   *York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (local
13   governments may be sued under § 1983 when a constitutional injury is inflicted as
14   a result of that government's policy or custom). Although defendants argued at the
15   hearing that the City of Adelanto would also be a federal actor here due to the
16   IGSA, the court is aware of no cases allowing *Bivens* actions to proceed against
17   municipalities. The court thus finds that, even though GEO Group was a federal
18   actor as it effectively assumed the City's role in operating the Adelanto facility for
19   ICE, the City itself remained a municipality at least insofar as it may be considered
20   a state actor for § 1983 purposes.

21        The real question here is whether the facts support liability for the City in
22   light of its minimal involvement noted above. A local government entity, such as
23   the City of Adelanto, "may not be sued under § 1983 for an injury inflicted solely
24   by its employees or agents. Instead, it is only when execution of a government's
25   policy or custom, whether made by its lawmakers or by those whose edicts or acts
26   may fairly be said to represent official policy, inflicts the injury that the
27   government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. A

28

43

1  plaintiff may establish municipal liability under § 1983 in three ways:  (1) proving

2  that the violations were committed pursuant to a formal policy or a "longstanding

3  practice or custom which constitutes the standard operating procedure of the local

4  governmental entity"; (2) establishing that the individual who committed the

5  alleged constitutional violation was an official with final policy-making authority,

6  and the violation itself was an act of official government policy; and (3) proving

7  that "an official with final policy-making authority ratified a subordinate's

8  unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979

9  F.2d 1342, 1346-47 (9th Cir. 1992) (citations omitted).  Not every decision by a

10 municipal officer will establish municipal liability under § 1983 – instead, the

11 decisionmaker must possess "final authority to establish municipal policy with

12 respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-

13 82, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

14       "One of the principal purposes of the summary judgment rule is to isolate

15 and dispose of factually unsupported claims or defenses. . . ."  *Celotex*, 477 U.S. at

16 323-24.  The burden on the party moving for summary judgment "may be

17 discharged by 'showing' – that is, pointing out to the district court – that there is an

18 absence of evidence to support the nonmoving party's case."  *Id.* at 325.

19 Defendants here argue any § 1983 claim against defendant City fails under *Monell*

20 because there was no constitutional violation, the City's policies and procedures

21 were not the moving force behind any alleged violations, and there is no evidence

22 that the City ever delegated policy-making authority to defendant GEO Group and

23 is liable under a ratification theory.  GEO/City MSJ at 10-12; GEO/City Reply at

24 9-10.  Plaintiffs here do not identify a specific policy or custom of defendant City,

25 but argue the City is liable because it delegated final policymaking authority to

26 defendant GEO Group.  Opp. to GEO/City at 9-15.

27       To the extent the City had policymaking authority to delegate, it came from

28

44

1    ICE via the IGSA.  The court notes, however, that this would appear to be the

2    authority to make policies in compliance with ICE standards with respect to the

3    operation of the Adelanto facility.  Considering that GEO Group entirely assumed

4    that authority, it is unclear why such policies would ever be considered municipal

5    policies given how little the City had to do with the facility.  Plaintiffs appear to

6    argue that, having promptly passed the authority granted by the IGSA on to GEO

7    Group through the Service Agreement, the effect of the arrangement is that GEO

8    Group policies become City policies.  But the court is aware of no authority

9    imposing vicarious *Monell* liability on a municipality for the actions of its private

10   subcontractor.  Indeed, the notion seems to turn *Monell* on its head.  *See Pembaur*,

11   465 U.S. at 481 ("Municipal liability attaches only where the decisionmaker

12   possesses final authority to establish municipal policy with respect to the action

13   ordered.").  Plaintiffs baldly assert that "GEO's policies and practices constituted

14   the City's official municipal policy" (Opp. to GEO/City at 10), but fail to support

15   this assertion.

16        Plaintiffs argue there is caselaw establishing that a municipality may be held

17   liable for the policies of a contractor to whom it has delegated authority.  Plaintiffs

18   cite two Ninth Circuit decisions, *Hyland v. Wonder*, 117 F.3d 405 (9th Cir. 1997),

19   and *Lytle v. Carl*, 382 F.3d 978 (9th Cir. 2004), to support their argument that

20   defendant City delegated its policymaking authority such that any ratification of

21   the underlying conduct by defendant GEO Group should also be attributed to the

22   City.  In *Hyland*, the court determined that judges with the authority to fire had

23   delegated that authority to the Chief Juvenile Probation Officer, and therefore that

24   Officer acted as a final policymaker with respect to the plaintiff's firing, thereby

25   subjecting the municipality to *Monell* liability for the plaintiff's firing.  *Hyland*,

26   117 F.3d at 415-16.  That the delegated actions of a municipal employee may

27   subject the municipality to *Monell* liability is a far cry from subjecting a

28

45

1   municipality to *Monell* liability based on the delegated actions of a private

2   company that has subcontracted to operate a facility largely independent of the

3   City's involvement, and in compliance with the requirements set by a federal

4   government agency.  In *Lytle*, the court found a school district could be liable for

5   the actions taken by the Superintendent and Assistant Superintendent since the

6   Board of Trustees explicitly delegated full authority to them, making them

7   policymakers, even though their decisions were subject to review by the Board.

8   *Lytle*, 382 F.3d at 984-85.  Again, this in no way supports plaintiffs' argument that

9   a municipality may be subjected to *Monell* liability based on the policies and

10  actions of a private subcontractor.

11          This case is far closer to *Martinez v. Monterey County Sheriff's Office*, 2019

12  WL 176791 (N.D. Cal. Jan. 11, 2019), in which the county contracted with a

13  private company to provide medical services to jail inmates, although the Sheriff's

14  Office retained ultimate authority over inmate healthcare and safety.  Plaintiffs

15  argued a policy of the subcontractor was attributable to the county through their

16  contract, thereby subjecting the county to *Monell* liability.  The court rejected this

17  argument, finding plaintiffs had failed to point to any policy of the county, and that

18  plaintiffs' ratification theory likewise failed because plaintiffs failed to allege facts

19  showing the county "had a policy of adopting or otherwise authorizing [the

20  subcontractor's] policy.  [The] contract . . . alone is not sufficient." *Id.* at *4.  So

21  here too, plaintiffs have pointed to nothing that indicates the City of Adelanto in

22  any way adopted the policies of GEO Group.  Instead, it is undisputed that under

23  the Service Agreement GEO Group assumed all of the City's obligations under the

24  IGSA including being subjected to ICE requirements, GEO Group's policies and

25  procedures governed operations at the facility, GEO Group operated and managed

26  the facility, and the City retained no control and simply attended meetings on

27  occasion.  *See* 2011 Service Agreement; Janecka Decl. ¶ 3; Hart Decl. ¶¶ 6, 9.

28

1       This is not to say there could never be a case in which a private

2  subcontractor in fact was delegated authority to make municipal policy such that its

3  policies and actions could subject the municipality to liability.  But plaintiffs have

4  cited no facts suggesting this is such a case.  Nor have they pointed to any actual

5  City policies that could subject it to liability here.  Accordingly, like the other

6  defendants, defendant City is entitled to summary judgment on all of plaintiffs'

7  federal civil rights claims.

8  **B.**     **Defendant City Is Entitled to Summary Judgment, But the Other**

9          **Defendants Are Not Entitled to Summary Judgment on Their State Law**

10          **Claims**

11       Plaintiffs raise a number of state law claims in the SAC: (1) battery; (2)

12  assault; (3) negligent training and supervision of employees (with this claim

13  asserted only against GEO Group and the City); (4) intentional infliction of

14  emotional distress; (5) violation of California Civil Code § 52.1 (Bane Act); and

15  (6) negligence in failing to provide medical care.

16       The court may decline to exercise supplemental jurisdiction over state law

17  claims if "the district court has dismissed all claims over which it has original

18  jurisdiction."  28 U.S.C. § 1367(c)(3); *see, e.g., Feliz for L.P.F. v. Cnty. of Orange*,

19  2014 WL 12774219, at *1 (C.D. Cal. Oct. 21, 2014) (declining to exercise

20  supplemental jurisdiction over a state law wrongful death claim after granting

21  summary judgment on plaintiff's § 1983 claim).  But the court also has discretion

22  to continue to exercise supplemental jurisdiction following dismissal of the federal

23  law claims.  *See Vernon v. City of Santa Barbara*, 2010 WL 11530672, at *4 (C.D.

24  Cal. Nov. 18, 2010) ("[T]he Court has discretion whether to exercise jurisdiction

25  over Plaintiff's state law claims . . . after dismissing the two federal law causes of

26  action.").  In light of the stage of this case and the litigation efforts expended, the

27  court maintains its exercise of supplemental jurisdiction here.

28

1    **1.    Defendant City Is Entitled to Summary Judgment**

2    The parties dispute whether defendant City is liable for the acts of defendant

3    GEO Group and its employees.  Defendants argue plaintiffs' claims for battery,

4    assault, intentional infliction of emotional distress, violation of California Civil

5    Code § 52.1, and negligence against defendant City must fail because there is no

6    applicable exception to the general rule of non-liability for the acts of

7    subcontractors.  GEO/City MSJ at 14-17.  Defendants additionally argue plaintiffs'

8    negligent hiring and supervision claim is barred against defendant City because the

9    City owed no statutorily imposed duty to plaintiffs.  *Id.* at 18.  Even if an exception

10   existed to the general rule of non-liability, defendants argue there is no evidence to

11   support plaintiffs' state law claims.  *Id.* at 16-19.

12   **a.    Defendant City Is Not Liable as a Regulated Hirer or Under**

13   **Any Agency Theory**

14   Plaintiffs argue defendant City is liable for the acts of its subcontractor

15   under the regulated hirer exception.  Opp. to GEO/City at 19-22.  Plaintiffs argue

16   in the alternative defendant City is vicariously liable for the actions of defendant

17   GEO Group and its employees because GEO Group acted as an agent of the City.

18   *Id.* at 21-22.  In their Reply, defendants argue the regulated hirer exception has

19   only been applied to cases involving trucking and taxi companies and has never

20   been extended to facts similar to the ones presented here.  GEO/City Reply at 19-

21   22.  As for plaintiffs' argument that defendant GEO Group acted as an agent of

22   defendant City, defendants state that there is no evidence indicating such an agency

23   relationship existed.  *Id.* at 19.

24   Although plaintiffs allege in the SAC that defendant City's liability is based

25   on three sections of the California Government Code – §§ 815.2, 815.4, and 920 –

26   the parties only discuss the applicability of § 815.4.  California Government Code

27   § 815.4 provides that "[a] public entity is liable for injury proximately caused by a

28

1  tortious act or omission of an independent contractor of the public entity to the

2  same extent that the public entity would be subject to such liability if it were a

3  private person."  As a general rule, "the employer of an independent contractor is

4  not liable for physical harm caused to another by an act or omission of the

5  contractor or his servants."  *McCarty v. State of California Dep't of Transp*., 164

6  Cal. App. 4th 955, 970, 79 Cal. Rptr. 3d 777 (2008) (citation omitted).

7         Yet, numerous exceptions to the general rule of non-liability exist, including

8  the regulated hirer exception, which plaintiffs argue applies here.  *See Secci v.*

9  *United Independent Taxi Drivers, Inc.*, 8 Cal. App. 5th 846, 860, 214 Cal. Rptr. 3d

10  379 (2017).  The regulated hirer exception provides that "[i]f . . . an individual or

11  corporation undertakes to carry on an activity involving possible danger to the

12  public under a license or franchise granted by public authority subject to certain

13  obligations or liabilities imposed by the public authority, these liabilities may not

14  be evaded by delegating performance to an independent contractor."  *Millsap v.*

15  *Fed. Express Corp*., 227 Cal. App. 3d 425, 434, 277 Cal. Rptr. 807 (1991) (quoting

16  *Taylor v. Oakland Scavenger Co.*, 17 Cal. 2d 594, 604, 110 P. 2d 1044 (1941)).

17         Plaintiffs identify a number of cases in which an employer was found liable

18  for the acts of a subcontractor under the regulated hirer exception, but as

19  defendants point out, the cases cited by plaintiffs only discuss the exception in the

20  context of transportation companies.  Opp. to GEO/City at 19-21; GEO/City Reply

21  at 19-22.  Plaintiffs do not cite and the court is aware of no cases extending the

22  regulated hirer exception to detention facilities, jails, or prisons.  More to the point,

23  plaintiffs fail to cite any applicable regulation that would trigger the regulated hirer

24  exception here.  Although plaintiffs identify one regulation in Title 24 of the

25  California Code of Regulations that they contend governs Adelanto and its shower

26  facilities, there is no evidence indicating this regulation is even applicable to the

27  privately-owned Adelanto facility that houses ICE detainees, let alone a sufficient

28

49

1    basis for the regulated hirer exception to apply here.  *See* Opp. to GEO/City at 19.

2           Whether defendant GEO Group and its employees acted as agents of

3    defendant City presents a somewhat closer question.  "Agency and independent

4    contractorship are not necessarily mutually exclusive legal categories as

5    independent contractor and servant or employee are.  In other words, an agent may

6    also be an independent contractor."  *Jackson v. AEG Live, LLC*, 233 Cal. App. 4th

7    1156, 1184, 183 Cal. Rptr. 3d 394 (2015) (quoting *City of Los Angeles v. Meyers*

8    *Bros. Parking System, Inc*., 54 Cal. App. 3d 135, 138, 126 Cal. Rptr. 545 (1975)).

9    Factors relevant to whether an agency relationship exists include the agreement of

10   the parties and whether the principal possesses a right of control.  *Jackson*, 233

11   Cal. App. 4th at 1184.  "The existence of an agency is a factual question within the

12   province of the trier of fact whose determination may not be disturbed on appeal if

13   supported by substantial evidence."  *L. Byron Culver & Assocs. v. Jaoudi Indus. &*

14   *Trading Corp*., 1 Cal. App. 4th 300, 305, 1 Cal. Rptr. 2d 680 (1991).  "Agency is a

15   fact, the burden of proving which rests upon the party affirming its existence."

16   *Burbank v. Nat'l Cas. Co.*, 43 Cal. App. 2d 773, 781, 111 P.2d 740 (1941).

17          Although the existence of an agency relationship is a factual question that is

18   typically determined by the trier of fact, plaintiffs here have not met their burden of

19   providing evidence that might prove such a relationship existed.  The only

20   evidence relied on by plaintiffs to demonstrate the existence of an agency

21   relationship is that City Manager Hart "visited the Facility to discuss operations

22   and assess whether it was being managed properly," and also worked with the

23   Warden to resolve issues at the facility.  *See* Hart Decl. ¶ 9.  This portion of the

24   Hart Declaration may be indicative of some degree of oversight, but does not

25   demonstrate defendant City exercised any authority or control over defendant GEO

26   Group, its employees, or the operation of the Adelanto facility.  Plaintiffs cite no

27   other evidence supporting their argument that defendant GEO Group acted as an

28

agent of defendant City, and indeed, parts of the record before this court indicate
that the parties understood their relationship to be one of a contractor and
subcontractor.  *See* GEO/City MSJ, Ex. M at 1 (noting that defendant City "desires
to enter into a services contract with a subcontractor for the provision,
management, and operation of a detention facility").  Without more, plaintiffs have
not met their burden of providing evidence to prove the existence of an agency
relationship.

Accordingly, defendant City is not liable for the acts of defendant GEO
Group and its employees under either the regulated hirer exception or agency
theory.

### b.   Defendant City Did Not Owe a Special Duty to Plaintiffs

In their negligence claims, plaintiffs allege defendant City is vicariously
liable for the wrongful conduct of GEO Group's employees, and it owes a duty of
care toward plaintiffs because of its special relationship with them.  SAC at 20, 28.
Defendants argue plaintiffs' negligence claims against defendant City fail as a
matter of law under *de Villers v. Cnty. of San Diego*, 156 Cal. App. 4th 238, 67
Cal. Rptr. 3d 253 (2007).  In *de Villers*, the court held that "a direct claim against a
governmental entity asserting negligent hiring and supervision, when not grounded
in the breach of a statutorily imposed duty owed by the entity to the injured party,
may not be maintained."  *Id.* at 255-56.  To hold the governmental entity liable
under a vicarious liability theory, either the entity or its employees must "occupy a
special protective relationship to the victim."  *Id.* at 249-50; *see C.A. v. William S.
Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 875, 138 Cal. Rptr. 3d 1, 270 P.3d
699 (2012) (school district could be held vicariously liable for the negligence of
school administrators and supervisors in hiring, supervising, and retaining an
employee who was a known child molester, because school district owed a special
duty to the students in their care).

1    Plaintiffs cite *William S. Hart Union High School District* as support for

2    their argument that defendant City owed them a special duty of care based on their

3    status as detainees.  Opp. to GEO/City at 22-23.  Both *de Villers* and William S.

4    Hart. present different facts from those presented here, where there is no employer-

5    employee relationship between the governmental entity and the employees alleged

6    to have harmed plaintiffs.  Whether or not a special relationship exists between

7    jailers and detainees, the threshold question here is whether the City of Adelanto

8    owes a special duty to plaintiffs where no City employees were jailers or otherwise

9    worked at the Adelanto facility.  *See Estate of Osuna v. Cty. of Stanislaus*, 392 F.

10   Supp. 3d 1162, 1182 (E.D. Cal. 2019) (discussing *de Villers* and *William S. Hart*

11   and noting that both cases consider the liability of a governmental employer for the

12   acts or omissions of its own employee).  Plaintiffs cite no authority suggesting

13   there can be a special relationship in the instant situation, where the municipality

14   has entirely subcontracted the operation of the facility.  The lack of special

15   relationship appears particularly clear here where, as discussed above, the facility

16   in question is not even owned by the municipality and the detainees are federal

17   immigration detainees whose detention is subject to standards set by ICE.

18   Simply put, there is no basis to find defendant City may be vicariously liable

19   for the actions of its private subcontractor's employees.  Nor is there any other

20   basis to hold defendant City liable for the actions of GEO Group or its employees.

21   Accordingly, defendant City is entitled to summary judgment on all of plaintiffs'

22   claims against it.

23   **2.    The Remaining Defendants Are Not Entitled to Summary**

24   **Judgment on the State Law Claims**

25   **a.    Battery and Assault**

26   Plaintiffs allege defendants assaulted and battered them when defendants

27   used pepper spray on plaintiffs, forcibly removed them from the day room where

28

they were undertaking their hunger strike, beat plaintiffs while they were

handcuffed, and used scalding hot water to decontaminate plaintiffs.  SAC at 6-9.

Plaintiffs argue defendants are not entitled to summary judgment because every

aspect of the inquiry – the amount of force used, the extent of plaintiffs' injuries,

the need for the use of force, and any effort made by the officers to limit the

amount of force – is in dispute.

"The elements of civil battery are: (1) defendant intentionally performed an

act that resulted in a harmful or offensive contact with the plaintiff's person; (2)

plaintiff did not consent to the contact; and (3) the harmful or offensive contact

caused injury, damage, loss or harm to plaintiff." *Brown v. Ransweiler*, 171 Cal.

App. 4th 516, 526–27, 89 Cal. Rptr. 3d 801 (2009).  "A state law battery claim is a

counterpart to a federal claim of excessive use of force.  In both, a plaintiff must

prove that the peace officer's use of force was unreasonable." *Id.* at 527.

A plaintiff asserting an assault claim under California law must establish the

following elements: "(1) the defendant threatened to touch the plaintiff in a

harmful or offensive manner; (2) it reasonably appeared to the plaintiff that the

defendant was about to carry out the threat; (3) the plaintiff did not consent to the

defendant's conduct; (4) the plaintiff was harmed; and (5) the defendant's conduct

was a substantial factor in causing the plaintiff's harm." *Avina*, 681 F.3d at 1130

(citing Judicial Council of California, Civil Jury Instructions No. 1301 ("Assault")

(2012)).  In an assault claim brought against a police officer, a plaintiff must

demonstrate that the officer's use of force was unreasonable. *See Edson v. City of

Anaheim*, 63 Cal. App. 4th 1269, 1272, 74 Cal. Rptr. 2d 614 (1988); *see also

Saraceni v. City of Roseville*, 2003 WL 21363458, at *8 (Cal. Ct. App. June 13,

2003) (holding that plaintiff's assault and battery claims against an officer failed as

a matter of law because the officer used reasonable force).

Defendants argue the video of the incident shows they deployed only short

1  bursts of pepper spray and plaintiffs admitted that they did not intend to comply

2  with officers' orders, making the use of force objectively reasonable.  Defendants

3  Diaz and Campos also argue they are not liable as supervisors for the acts of

4  others.  Plaintiffs here contend defendants Diaz and Campos did not provide

5  warnings before spraying them with pepper spray, used far more pepper spray than

6  defendants acknowledge, and supervised other GEO Group guards who beat

7  plaintiffs during and after their removal from the day room at the East Alpha

8  facility.  Opp. to Diaz/Campos at 19-20.  Plaintiffs allege defendants' use of pepper

9  spray and force caused both physical injuries and emotional damage.  *Id.*

10      Based on the record before the court, nearly all of the facts related to

11  plaintiffs' battery and assault claims remain disputed.  Some of the disputed facts

12  are: (1) defendants Diaz and Campos used at least some pepper spray on plaintiffs,

13  but the amount of pepper spray used cannot be determined with certainty because

14  the canisters used were not weighed and logged before and after the incident, and

15  the video of the incident does not clearly show when or how much pepper spray

16  was deployed (Opp. to Diaz/Campos, Ex. 15 (Lt. Diaz Depo.) at 143-47;

17  Diaz/Campos MSJ, Ex. F); (2) plaintiffs maintain they were not given warnings in

18  Spanish before pepper spray was used, and defendants contend plaintiffs

19  understood that pepper spray was about to be used, but the only officer present

20  who spoke Spanish does not recall whether he gave any pepper spray warnings,

21  and the video of the incident does not include any audio that might settle the matter

22  (Lt. Diaz Depo. at 202-12; Opp. to Diaz/Campos, Ex. 20 (Officer Martinez Depo.)

23  at 62-68, 96-98; Diaz/Campos MSJ, Ex. F); and (3) defendants contend they only

24  used minimal force, but a medical report of plaintiff Rivera Martinez taken a few

25  hours after the incident indicates that he lost a tooth at some point that morning

26  (Opp. to Diaz/Campos, Ex. 7), and plaintiffs also report suffering injuries as a

27  result of being pepper sprayed (Diaz/Campos MSJ, Ex. O (Lemus Campos Depo.)

28

at 116, 130, 138 (stating that plaintiff Lemus Campos could not tolerate the
burning in his face and eyes and yelled out for help, plaintiff felt a burning
sensation all over his body, and the burning lasted for over three days); Ex. N
(Cornejo Depo.) at 77-78 (stating that plaintiffs were screaming, yelling, and
crying because they could not bear the pain from the pepper spray, and plaintiff
Cornejo felt he was unable to breathe); Opp. to Diaz/Campos, Ex. 30 (Rodriguez
Depo.) at 158, 162-63 (stating that plaintiff Rodriguez's neck, ears, and arms began
to change color and swell from the pepper spray, and plaintiff subsequently fainted
and hit his head in the shower)).

The Ninth Circuit has held that summary judgment in excessive force cases
"should be granted sparingly" because they "nearly always requir[e] a jury to sift
through disputed factual contentions, and to draw inferences therefrom." *Santos v.
Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  Although at issue now are battery and
assault claims, the principle is the same.  Based on the extent of the disputed facts
here and the record as a whole, a rational trier of fact could find that defendants
Diaz and Campos used excessive force, and thereby committed the torts of battery
and assault, as did the other employees they supervised.  Indeed, the only facts that
appear undisputed are that defendants Diaz and Campos used some amount of
pepper spray on plaintiffs, GEO Group guards made some physical contact with
plaintiffs when removing them from the day room, and plaintiffs were seen by
medical staff and decontaminated at some point after being pepper sprayed.
Whether defendants provided warnings that plaintiffs could understand, if
plaintiffs consented in any manner to defendants' conduct by continuing their
hunger strike, the degree of the harm to plaintiffs, and whether defendants' use of
force was reasonable remain at issue.  Accordingly, the court finds defendants are
not entitled to summary judgment as to plaintiffs' battery and assault claims.

1

**b.   Intentional Infliction of Emotional Distress**

2       Under California law, a plaintiff must establish the following elements of a

3   claim of intentional infliction of emotional distress: "(1) extreme and outrageous

4   conduct by the defendant with the intention of causing, or reckless disregard of the

5   probability of causing, emotional distress; (2) the plaintiff's suffering severe or

6   extreme emotional distress; and (3) actual and proximate causation of the

7   emotional distress by the defendant's outrageous conduct." *Christensen v. Super.*

8   *Ct.*, 54 Cal. 3d 868, 903, 2 Cal. Rptr. 2d 79, 820 P. 2d 181 (1991) (citation

9   omitted).  The conduct in question "must be so extreme as to exceed all bounds of

10  that usually tolerated in a civilized community." *Id.* at 903.

11      Based on the evidence discussed above, defendants' intent when they

12  entered the day room where plaintiffs were undertaking their hunger strike,

13  whether defendants provided any warnings to plaintiffs before using pepper spray,

14  and just how much spray and other force was used remain contested.  At a

15  minimum, there is evidence from which a jury could find defendants acted

16  outrageously and with reckless disregard of the probability of causing plaintiffs

17  emotional distress.  Further, plaintiffs have testified they suffered emotional

18  distress as a result of the incident.  *See* Opp. to Diaz/Campos, Ex. 27 at 168 (stating

19  that plaintiff Rivera Martinez has suffered emotional distress in the form of

20  sleeplessness and regularly thinking about the incident); Diaz/Campos MSJ, Ex. O

21  (Lemus Campos Depo.) at 177 (stating that plaintiff Lemus Campos felt depressed

22  during his time in segregation); Opp. to Diaz/Campos, Ex. 29 (Garcia Depo.) at 72

23  (stating that plaintiff Garcia has been having trouble sleeping since the incident

24  because he continues to think about what happened); Opp. to Diaz/Campos, Ex. 25

25  (Cornejo Depo.) at 111 (stating that plaintiff Cornejo is claiming emotional injuries

26  based on the pepper spray incident but not specifying the symptoms of his

27  emotional distress).  Although defendants fairly raise questions regarding whether

28

1    the emotional distress suffered was severe, given the extent of the dispute,

2    defendants are not entitled to summary judgment on plaintiffs' claim of intentional

3    infliction of emotional distress.

4            **c.    Bane Act**

5            Plaintiffs argue defendants interfered with plaintiffs' rights in violation of

6    California Civil Code § 52.1 when they used excessive force, retaliated against

7    plaintiffs, and violated their due process rights.  SAC at 26-27.  Because plaintiffs

8    contend in the SAC that defendants interfered with their rights under the First,

9    Fourth, Fifth, and Fourteenth Amendments, the court understands plaintiffs to

10   assert their claim under California Civil Code § 52.1 only as to alleged violations

11   of the United States Constitution.  The Bane Act provides a cause of action if "a

12   person or persons, whether or not acting under color of law, interferes by threat,

13   intimidation, or coercion, or attempts to interfere by threat, intimidation, or

14   coercion, with the exercise or enjoyment by any individual or individuals of rights

15   secured by the Constitution or laws of the United States, or of the rights secured by

16   the Constitution or laws of this state."  Cal. Civil Code § 52.1.  To prove a Bane

17   Act violation, a plaintiff must show:  "(1) intentional interference or attempted

18   interference with a state or federal constitutional legal right, and (2) the

19   interference or attempted interference was by threats, intimidation or coercion."

20   *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67, 183 Cal. Rptr. 3d 654

21   (2015) (citations omitted).

22           The court notes that, although it has found defendants are entitled to

23   summary judgment on their federal civil rights claims under § 1983 here, it has not

24   found plaintiffs would be unable to prove a violation of their federal civil rights as

25   alleged in the SAC.  On the contrary, for the reasons discussed above with respect

26   to the battery and assault claims, there are numerous disputed issues of fact that

27   show plaintiffs may be able to prove defendants used excessive force in violation

28

                                            57

of the United States Constitution.  Factual disputes also exist with respect to alleged due process violations by defendant Diaz, including whether plaintiffs were given an opportunity to be present for and make a statement at a hearing regarding their placement in administrative segregation.[2]  *See, e.g.,* Rivera Martinez Depo. at 154; Mejia Depo. at 161; Castillo Depo. at 111-12; Rodriguez Depo. at 158; Cornejo Depo. at 88-89; Garcia Depo. at 56.  A Bane Act claim can proceed even if a plaintiff can no longer assert a § 1983 claim based on the same underlying facts.  *See, e.g., Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040-45 (9th Cir. 2018) (finding the defendant-officer was entitled to qualified immunity on the plaintiff's Fourth Amendment excessive force claim, but summary judgment was not appropriate as to plaintiff's Bane Act claim based on the same underlying facts); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334, 949 P. 2d 941, 70 Cal. Rptr. 2d 844 (1998) (for a party to bring a claim under the Bane Act, the alleged interference need not be completed – an attempted interference is sufficient).

  In their papers and at the December 17 hearing, the parties disputed whether a claim under § 52.1 requires any additional showing of intent or of coercion apart from the acts that constitute the underlying violations.  As to whether there must be coercion apart from the underlying constitutional violations, defendants cite to

---

[2] Defendants argue plaintiffs received all the process to which they were entitled for administrative segregation, but do not appear to acknowledge any right to be heard for such placement.  *See* Diaz/Campos Reply at 19-20.  Before a detainee is placed in administrative segregation, he is entitled to: "(1) an informal nonadversary hearing within a reasonable time after placement in segregation, (2) notification of the reasons for his segregation, and (3) an opportunity to present his views."  *Carpio v. Chief Counsel, DHS-ICE*, 2018 WL 5919474, at *5 (C.D. Cal. Aug. 8, 2018), report and recommendation adopted, 2019 WL 1670940 (C.D. Cal. Apr. 16, 2019).  Disciplinary segregation requires more procedural protections, and "[p]retrial detainees may be subjected to disciplinary segregation only with a due process hearing to determine whether they have in fact violated any rule."  *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996).

1    *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959, 137 Cal. Rptr. 3d

2    839 (2012), a false imprisonment case, which held that the Bane Act "requires a

3    showing of coercion independent from the coercion inherent in the wrongful

4    detention case." But since *Shoyoye* was decided, caselaw has established that no

5    such independent showing is required, particularly in excessive force cases like

6    this. *See Cornell v City & County of San Francisco*, 17 Cal. App. 5th 766, 802

7    n.31, 225 Cal. Rptr. 3d 356 (2017) ("[w]here Fourth Amendment unreasonable

8    seizure or excessive force claims are raised and intentional conduct is at issue,

9    there is no need for a plaintiff to allege a showing of coercion independent from

10   the coercion inherent in the seizure or use of force") (internal quotation marks and

11   citations omitted); *accord Reese*, 888 F.3d at 1043 ("the Bane Act does not require

12   the 'threat, intimidation or coercion' element of the claim to be transactionally

13   independent from the constitutional violation alleged").

14          As for the intent required, "the Bane Act requires a 'specific intent to

15   violate'" the plaintiff's constitutional right. *Reese*, 888 F.3d at 1043 (quoting

16   *Cornell*, 17 Cal. App. 5th at 801); *see Sandoval v. County of Sonoma*, 912 F.3d

17   509, 520 (9th Cir. 2018) (specific intent inquiry asks, first, if "'the right at issue

18   [is] clearly delineated and plainly applicable'" and, second, if the defendant

19   committed the act "'with the particular purpose of depriving the citizen victim of

20   his enjoyment of the interests protected by that right'") (quoting *Cornell*, 17 Cal.

21   App. 5th at 803). But while more than general intent is required, "it is not

22   necessary for the defendants to have been 'thinking in constitutional *or legal terms*

23   at the time of the incidents, because a reckless disregard for a person's

24   constitutional rights is evidence of a specific intent to deprive that person of those

25   rights.'" *Reese*, 888 F.3d at 1045 (citation omitted).

26          Here, the disputed facts, including those concerning the amount of pepper

27   spray deployed, whether plaintiffs were warned in Spanish before the spray was

28

1  used, and the amount of other force used, are such that a jury could find defendants
2  acted in reckless disregard of plaintiffs' constitutional rights.  As such, defendants
3  are not entitled to summary judgment on the Bane Act claim.

4                    **d.    Negligence (Use of Force and Medical Assistance)**

5          Plaintiffs allege defendants were negligent in failing to properly assess the
6  need to use force against plaintiffs and in failing to provide timely medical
7  assistance.  Opp. to Diaz/Campos at 23-24.  Defendants argue Diaz and Campos
8  responded reasonably to plaintiffs' refusal to comply with commands, and had no
9  independent duty to provide medical care to plaintiffs because this duty is
10 delegated to medical staff.  Diaz/Campos MSJ at 24-25.  Plaintiffs acknowledge
11 defendants Diaz and Campos were not required to provide medical care to
12 plaintiffs, but maintain they had a duty to ensure plaintiffs received timely medical
13 attention, which they did not.  Opp. to Diaz/Campos at 24.  Plaintiffs argue
14 defendants were negligent in their assessment of the need to use force, and failed to
15 ensure that plaintiffs received timely medical attention.  *Id.* at 23-24.

16        "The elements of any negligence cause of action are duty, breach of duty,
17 proximate cause, and damages."  *Peredia v. HR Mobile Servs., Inc*., 25 Cal. App.
18 5th 680, 687, 236 Cal. Rptr. 3d 157 (2018).  Defendants do not dispute they owed a
19 duty to plaintiffs with respect to their use of force, but do dispute they owed
20 plaintiffs a duty with respect to medical care.  Defendants cite to a declaration
21 stating detainees who have been pepper sprayed will be decontaminated as soon as
22 possible, such as in a shower, and then examined by the medical unit staffed by
23 Correction Care Solutions.  McCusker Decl. ¶ 9.  But although this shows
24 correctional officers did not render the ultimate medical care, it does nothing to
25 show they did not have a duty to obtain medical care for detainees.  Further, the
26 caselaw cited by plaintiffs establishes defendants did indeed have such a duty.  *See,*
27 *e.g., Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("clearly established

28

1   that the officers could not intentionally deny or delay access to medical care")

2   (citation omitted).

3         As with the facts concerning plaintiffs other claims, nearly all the facts

4   relevant to plaintiffs' negligence claim against defendants GEO Group, Diaz, and

5   Campos remain disputed.  In addition to the facts regarding use of force discussed

6   above, defendants contend plaintiffs were promptly seen by medical staff after they

7   were pepper sprayed per GEO policy, but the medical evaluations of plaintiffs,

8   which were taken before they were decontaminated, indicate that there was an

9   approximately two-to-three-hour gap between when plaintiffs were pepper sprayed

10   and when they were seen by medical staff.  Opp. to Diaz/Campos, Ex. 7.  In

11   addition, temperature logs from various weeks in May, June, and July 2017

12   indicate that water temperatures at the facility ranged from approximately 100 to

13   120 degrees Fahrenheit, but plaintiffs contend the water used to decontaminate

14   them was very hot.  Opp. to Diaz/Campos, Ex. 46 (Log of Water Temperatures);

15   Ex. 25 (Cornejo Depo.) at 78.  Given these disputed facts, defendants are not

16   entitled to summary judgment on their negligence claim.

17         **e.**   **Negligent Training and Supervision**

18         Plaintiffs contend defendant GEO Group negligently hired, trained, and

19   supervised its employees.  In particular, plaintiffs argue defendant GEO Group

20   negligently trained and supervised its employees about its use of force policy,

21   especially in terms of when and how pepper spray can be used, and failed to

22   provide cold showers and train employees on the temperature of water that should

23   be used during a pepper spray decontamination.  Opp. to GEO/City at 23-24.

24         "A plaintiff alleging negligent training under California law must show that

25   the employer negligently trained the employee as to the performance of the

26   employee's job duties and as a result of such negligent instruction, the employee

27   while carrying out his job duties caused injury or damage to the plaintiff." *Garcia*

28

61

1  *ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1208 (E.D. Cal.
2  2009) (citation omitted).  "Liability for negligent hiring/retention occurs when the
3  employer knew or should have known that hiring or retaining the employee created
4  a particular risk or hazard and that particular harm materializes." *Id.* (citation
5  omitted).

6      Among the facts that remain disputed are GEO Group's policy regarding its
7  use of force, and whether defendants Diaz and Campos were adequately trained in
8  this policy such that they could execute it properly.  Per GEO Group policy, pepper
9  spray may only be used after the initial stages of the use of force continuum have
10 been exhausted.  *See* Diaz/Campos MSJ, Ex. H (GEO Group Use of Force Policy)
11 at GEO 1987, 1995.  These initial stages require that officers demonstrate their
12 presence, provide verbal commands, and demonstrate a show of force before
13 pepper spray is used.  *Id.*  In her Declaration, defendant Diaz states that GEO
14 guards were able to communicate with plaintiffs in Spanish and provided sufficient
15 warnings before using pepper spray.  Diaz Decl. at 6.  Yet plaintiffs testified at
16 their depositions that they did not understand what GEO Group guards were
17 ordering them to do because the instructions were only given in English.
18 Rodriguez Depo. at 141-44; Castillo Depo. at 144; Cornejo Depo. at 63-65.

19     A factual dispute also exists as to whether GEO Group adequately trains its
20 officers on decontamination procedures for pepper spray, and if defendants Diaz
21 and Campos complied with existing procedures.  GEO Group policy requires
22 officers to decontaminate and clean detainees "in a manner consistent with the
23 chemical agent [OC] employed."  Diaz/Campos MSJ, Ex. H (GEO Group Use of
24 Force Policy) at GEO 1995.  GEO Group policy further mandates that "staff shall
25 seek the assistance of qualified health personnel upon gaining physical control of
26 the detainee" and the detainee "shall be examined by qualified health personnel,
27 and any injuries noted, should be immediately treated."  *Id.*  Although the GEO
28

Group Policy Manual does not state what temperature of water should be used during the decontamination process, several officers testified that they were taught during trainings to use cold water.  Officer Juarez Depo. at 18; Lt. Diaz Depo. at 153-58.  Plaintiffs contend hot water was used to decontaminate them, and submit monthly water temperature recordings taken from May to July 2017 at Adelanto showing temperatures in detainee units and intake showers ranged from approximately 100 degrees to 115 degrees.  Opp. to Diaz/Campos, Ex. 46.  Plaintiffs further contend there was a significant delay between when they were pepper sprayed and when they were seen by medical staff.  Medical reports completed by medical staff indicate that the incident occurred around 6:30 a.m., and plaintiffs were seen anywhere from 9:00 a.m. to 9:55 a.m.  Opp. to Diaz/Campos, Ex. 7.

Given these and other genuine disputes of material fact, defendants are not entitled to summary judgment on plaintiffs' negligent training and supervision claim against defendants GEO Group, Diaz, and Campos.

## VI.

## ORDER

IT THEREFORE IS ORDERED that defendants' Motions for Summary Judgment (docket nos. 108 and 111) are granted in part and denied in part as follows:  (1) defendants' motions are granted with respect to plaintiffs' federal civil rights claims (the fifth, sixth, and seventh causes of action), and those claims are dismissed with prejudice; (2) defendant City of Adelanto is granted summary judgment on all claims against it, and City of Adelanto is dismissed from the case with prejudice; and (3) in all other respects defendants' motions are denied.

DATED:  January 7, 2020

SHERI PYM
United States Magistrate Judge