Rachel Steinback, SBN 310700
Law Office of Rachel Steinback
P.O. Box 291253
Los Angeles, CA 90029
(t) 213-537-5370
(f) 213-232-4003
(e) steinbacklaw@gmail.com

Carol A. Sobel, SBN 84483
Monique A. Alarcon, SBN 311650
Law Office of Carol Sobel
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
(t) 310-393-3055
(e) carolsobel@aol.com
(e) monique.alarcon8@gmail.com

*Attorneys for Plaintiffs.*
*[Additional Counsel on Following Page]*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

OMAR ARNOLDO RIVERA
MARTINEZ; ISAAC ANTONIO
LOPEZ CASTILLO; JOSUE
VLADIMIR CORTEZ DIAZ; JOSUE
MATEO LEMUS CAMPOS;
MARVIN JOSUE GRANDE
RODRIGUEZ; ALEXANDER
ANTONIO BURGOS MEJIA; LUIS
PEÑA GARCIA; JULIO CESAR
BARAHONA CORNEJO, as
individuals,

                    Plaintiffs,

v.

The GEO Group, Inc., a Florida
corporation; the City of Adelanto, a
municipal entity; GEO Lieutenant Diaz,
sued in her individual capacity; GEO
Sergeant Campos, sued in his individual
capacity; Sarah Jones,  sued in her
individual capacity; The United States
of America; Correct Care Solutions,
Inc.; and DOES 1-10, individuals;

                    Defendants.

Case No. 5:18-cv-01125-SP
*Assigned to: Honorable Sheri Pym*

**MEMORANDUM OF CONTENTIONS
OF FACT AND LAW**


*Final Pretrial Conference*:
Date: January 21, 2020
Time: 10:00 a.m.
Ctrm: 3

*Trial*
Date:        February 3, 2020
Time:        9:00 a.m.
Ctrm:        3

Catherine Sweetser, SBN 271142
Kristina Harootun, SBN 308718
Schonbrun Seplow Harris & Hoffman LLP
11543 W. Olympic Boulevard
Los Angeles, CA 90064
(t) 310-396-0731
(f) 310-399-7040
(e) csweetser@sshhlaw.com
(e) kharootun@sshhlaw.com

Colleen Flynn, SBN 234281
Law Office of Colleen Flynn
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 213-252-9444
(f) 213-252-0091
(e) cflynnlaw@yahoo.com

Matthew Strugar, SBN 232951
Law Office of Matthew Strugar
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(t) 323-696-2299
(e) matthew@matthewstrugar.com

*Attorneys for Plaintiffs.*

# **TABLE OF CONTENTS**

A.   CONTENTIONS OF FACT................................................................1

    1.   The need for the use of force/The severity of the security problem at issue. .................................................................................................3

    2.   Effort made by the officers to temper or to limit the amount of force.....3

    3.   The extent of Plaintiffs' injuries. ..............................................4

B.   CLAIMS.........................................................................................4

    1.   Battery.......................................................................................5

    2.   Assault. .....................................................................................6

    3.   California Civil Code § 52.1 (Bane Act)...................................6

    4.   Negligence (Use of Force).........................................................9

    5.   Negligence (Medical Assistance) ...........................................10

    6. Intentional Infliction of Emotional Distress ............................11

    7. Negligent Training and Supervision.......................................12

    8. Vicarious Liability .................................................................14

C.   BIFURCATION OF ISSUES..................................................15

D.   JURY TRIAL. ..........................................................................16

E.   ATTORNEYS' FEES. ...............................................................16

F.   ABANDONMENT OF ISSUES. ..............................................16

1

# <u>TABLE OF AUTHORITIES</u>

2

*Page(s)*

3

<u>*Federal Cases*</u>

4

*Bruce v. Ylst*,

5
   351 F.3d 1283 (9th Cir. 2003) ...................................................................9

6

*Doe v. Hagee*,
   473 F. Supp. 2d 989 (N.D. Cal. 2007) ....................................................15

7

*Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*,

8
   627 F. Supp. 2d 1187 (E.D. Cal. 2009)...................................................15

9

*Gomez v. Vernon*,

10
   255 F.3d 1118 (9th Cir. 2001)...................................................................9

11

*Perez v. Nevada*,
   2017 WL 4172268 (D. Nev. Sept. 20, 2017) ..........................................15

12

*Perez v. Cox*,

13
   2019 WL 4413261 (9th Cir. Sept. 16, 2019 ...........................................15

14

*Reese v. Cty. of Sacramento*,

15
   888 F.3d 1030 (9th Cir. 2018)...................................................................7

16

*Rhodes v. Robinson*,
   408 F.3d 559 (9th Cir. 2005)....................................................................9

17

<u>*State Cases*</u>

18

*Biles v. Richter*,

19
   206 Cal. App. 3d 325 (1988)...................................................................15

20

*Mary M. v. City of Los Angeles*,

21
   54 Cal.3d 202 (1991)................................................................................15

22

*State Farm Fire & Casualty Co. v. Keenan*,
   171 Cal.App.3d 1 (1985).........................................................................15

23

<u>*State Statutes*</u>

24

California Civil Code § 52.1...............................................................6, 7, 16

25

<u>*Federal Rules*</u>

26

Federal Rule of Civil Procedure 16 ............................................................1

27

28

1

## <u>TABLE OF AUTHORITIES – CONT'D</u>

2

*Page(s)*

3 *<u>Other Authorities</u>*

4 Judicial Council of California Civil Jury Instruction 400 ...................................10, 11

5

6 Judicial Council of California Civil Jury Instruction 426 .......................................13

7 Judicial Council of California Civil Jury Instruction 1300 .......................................5

8 Judicial Council of California Civil Jury Instruction 1301 .......................................6

9

10 Judicial Council of California Civil Jury Instruction 3066 .......................................7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **TO THE HONORABLE COURT AND ALL PARTIES AND THEIR**

2    **ATTORNEYS OF RECORD:**

3         Plaintiffs Omar Arnoldo Rivera Martinez, Isaac Antonio Lopez Castillo, Jose

4    Bladimir Cortez Diaz, Josue Mateo Lemus Campos, Marvin Josue Grande

5    Rodriguez, Alexander Antonio Burgos Mejia, Luis Peña Garcia, Julio Cesar

6    Barahona Cornejo hereby submit their Memorandum of Contentions of Fact and

7    Law pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16-4.

8         This Memorandum of Contentions of Fact and Law is submitted before the

9    Court's rulings on Motions in *Limine* which are set for hearing on at the Pre-Trial

10   Conference.

11   **A. CONTENTIONS OF FACT**

12        Plaintiffs are eight asylum seekers who in June 2017 were detained at

13   Adelanto Detention Center. On the morning of June 12, 2017, Plaintiffs presented a

14   list of grievances to GEO Group Detention Officer Gillon, explaining that they

15   were undertaking a peaceful hunger strike until they could present their grievances

16   to a GEO or ICE supervisor. Plaintiffs returned to two tables in the day room to sit

17   and wait; as they did so, Officer Gillon's relief, Officer Jindi, appeared, and

18   announced that it was time to prep for count. Officer Gillon left the day room and

19   relayed the message, along with the documents Plaintiffs handed him, to Defendant

20   Jane Diaz, a GEO Group Lieutenant. Defendant Diaz responded to the day room,

21   accompanied by a group of GEO Group Detention Officers. When Defendant Diaz

22   walked into the day room, she began waiving her canister of OC spray and yelling

23   at Plaintiffs in English. For a few minutes, Defendant Diaz walked back and forth

24   in the day room while Plaintiffs sat calmly at their tables. The one GEO Group

25   Officer present who spoke Spanish told Plaintiffs to return to their bunks; no other

26   GEO Group Officer spoke with Plaintiffs in Spanish. After approximately ten

27   minutes, Defendant Diaz began to deploy OC spray at Plaintiffs. Following that use

28   of force, the GEO Group Officers forcibly removed Plaintiffs from the tables,

1  assaulting them in the process. Defendant Diaz again deployed OC spray at the

2  Plaintiffs who remained in the day room and called for another supervisor on her

3  radio.  Defendant Giovanni Campos, a GEO Group Sergeant, responded to the day

4  room and immediately slammed Plaintiff Mejia against a wall. Defendant Campos

5  then walked to the table where four Plaintiffs remained and unleashed his canister

6  of OC spray at those Plaintiffs.

7          All Plaintiffs were taken, in handcuffs, drenched in OC spray, from the day

8  room to the recreation yard. From there, they were taken to the Medical Unit, where

9  they were placed in a cell and forced to wait, still handcuffed. They were not

10 provided medical screening until between two to three hours after the incident, and

11 no effort to decontaminate Plaintiffs was made until some time after that. They

12 were placed, handcuffed and in their OC spray drenched clothing, in hot showers,

13 which exacerbated the pain of the spray. Meanwhile, due to the quantity of OC

14 spray deployed in the dorm where the incident occurred, the entire dorm of

15 approximately 90 other detainees was evacuated. Unlike Plaintiffs, one GEO Group

16 Officer was properly decontaminated on-site with an eyewash station and

17 subsequently taken off-site for a more thorough medical evaluation.

18         Plaintiffs were each informed, tardily, that they were being placed in

19 segregation. They were not told they could contest the discipline or appear at a

20 hearing, and no Plaintiff did so. Plaintiffs were held in segregation for ten days.

21 Following this incident, Defendant GEO Group deprived Plaintiffs of access to

22 their counsel.

23         Defendants Diaz and Campos, as well as most of the other GEO Officers

24 involved in the incident, completed written reports regarding what had transpired.

25 The incident was reviewed by GEO Group officials, including Warden James

26 Janecka, who concluded that everything that occurred was in accordance with GEO

27 Group policy and that no violations had occurred. Plaintiffs' use of force expert, a

28 renowned expert on, *inter alia*, use of force in correctional facilities, called the

2

1   review 'abysmal' and 'a whitewash."

2   **1.  The need for the use of force / The severity of the security problem at**

3   **issue**

4   As is evident in the surveillance video capturing the event, the dorm began

5   reacting animatedly to the events happening in the day room <u>only after Defendants</u>

6   <u>began using force</u>. Prior to the GEO guards' application of physical force on

7   Plaintiffs, there were perhaps a handful of detainees paying any kind of attention to

8   what was happening with Plaintiffs, and they were doing so passively, simply

9   observing. The video evidence shows that it was not until GEO guards began

10  grabbing at Plaintiffs, inflicting pain, and deploying OC spray, that the other

11  detainees began reacting. Even then, according to the testimony of Nurse Jones and

12  Officer Jindi, both of whom were present at the scene, the detainees' response was

13  quickly calmed with simple entreaties. Defendants' account cannot be credited.

14  Testimony from Defendant Diaz, Officer Jindi, Nurse Jones, and Mr.

15  Schwartz all reveal that there were numerous ways the count could have been – and

16  routinely was – handled that did not require Plaintiffs to return to their bunks. The

17  whole premise of count is to make sure that every detainee is accounted for – that

18  there is no one missing. There was no question that Plaintiffs were present and

19  could be accounted for.

20  In documenting the incident on June 12, 2017, and again at his deposition in

21  this action, Mr. McCusker testified unequivocally that what transpired was not a

22  disturbance. ("Q: Sitting here today, do you still agree that it was not a major or

23  minor disturbance? A: That is correct." McCusker Dep. 46:17-19.)

24  **2. Effort made by the officers to temper or to limit the amount of force**

25  Plaintiffs' testimony reveals that only one officer ever spoke to them in

26  Spanish, and it was to warn them one time against staying at the day room tables –

27  but that officer refused to engage with them when they tried to explain what they

28  were doing, why, and what they wanted. Other GEO officers' testimony

1   corroborates this. Defendant Diaz did not consult with any supervisors – as was

2   required by the GEO Policy Manual, and which she had ample time to do, because

3   (as Defendant Diaz admitted) it was not an emergency – before deciding to deploy

4   OC spray against Plaintiffs.

5          **3. The extent of Plaintiffs' injuries**

6          Plaintiffs in discovery and at their depositions describes the injuries they

7   suffered – including excruciating pain and burning, which forced at least one

8   Plaintiff to pass out; bruises, scratches, and bleeding; a broken tooth and crown; a

9   fractured nose; a knocked-out dental plate; knee and shoulder injuries; jaw pain;

10  and significant emotional distress.

11    **B. CLAIMS**

12         Plaintiffs will present testimonial and documentary evidence, including but

13  not limited to: surveillance video footage from the portion of the incident that

14  occurred in the day room; screenshots (photographs) taken from the surveillance

15  video footage; the reports authored by the various involved GEO Group Officers,

16  including Defendants Diaz and Campos; the After-Action Report reflecting the

17  review of the incident; the Dorm Officer Logbook from June 12, 2017; documents

18  reflecting Plaintiffs' placement in segregation; the relevant portions of GEO

19  Group's Policy and Procedure Manual  for Adelanto Detention Center; the relevant

20  portions of the ICE Performance Based National Detention Standards ("PBNDS");

21  the relevant portions of GEO Group's Training Presentations; the contractual

22  agreement setting forth GEO Group's responsibility in operating the Adelanto

23  Detention Center; the Office of Civil Rights and Civil Liberties complaints filed by

24  one of Plaintiffs' immigration attorneys; communications between Plaintiffs' then-

25  immigration attorneys and representatives at Adelanto Detention Center;

26  documentation of Plaintiffs' injuries; relevant grievance and request forms

27  submitted by Plaintiffs; reports regarding the conditions at Adelanto Detention

28  Center; and the testimony of the individuals listed in Plaintiffs' Witness List.

Plaintiffs may also cross-examine any witness put on by Defendants or present any witness necessary for impeachment purposes.

**1. Battery**

Plaintiffs bring a Battery claim against Defendants Diaz and Campos. Each Plaintiff claims that Defendant Diaz and/or Defendant Campos committed a battery. To establish this claim, the Plaintiff must prove the following:

1. That the Defendant touched the Plaintiff or caused the Plaintiff to be touched with the intent to harm him;

2. That the Plaintiff did not consent to the touching; and

3. That the Plaintiff was harmed by the Defendant's conduct.

(Judicial Council of California Civil Jury Instruction 1300)

The key evidence to establish this claim is as follows:

Defendants Diaz and Campos each deployed OC spray multiple times. They were sprayed at close range and Defendants aimed directly at their heads and torsos, causing the OC spray to affect their eyes, mouths, arms and groins. They were "covered" and "soaked" with OC spray.[1]

The surveillance video evidence Defendant GEO Group produced to Plaintiffs corroborates their claims that Defendant Diaz and Defendant Campos each sprayed them multiple times with OC spray.

GEO Officer Reyes (who was not sprayed directly) reported that the amount of OC spray deployed was so significant that he had trouble breathing, could not see, and had to be taken outside the facility for medical attention; Officer Jindi had to go out to the yard so she could breathe and, after Plaintiffs were taken out of the

---

[1] Defendants were required, per GEO policy, to weigh their OC canisters every shift (i) upon retrieving them from the safe where they are kept and (ii) before returning them to the safe, and to record the weights on a log. PSUF ##122-125. At Defendant Diaz's deposition, she testified that she did not recall whether she had done so on June 12, 2017, and further testified she did not always follow GEO's policy. PSUF ##126, 127. Despite strict retention requirements, GEO apparently cannot find those logs – making it impossible to conclusively state how much OC spray Defendants Diaz and Campos each deployed. PSUF #128.

day room, there was so much OC spray in the dormitory areas – comprising four large rooms adjacent to the day room, spanning two stories and two wings – that GEO staff had to evacuate all staff and detainees so that it could be decontaminated.

### 2. Assault

Plaintiffs bring an Assault claim against Defendants Diaz and Campos. Each Plaintiff claims that Defendant Diaz and Defendant Campos assaulted him. To establish this claim, the Plaintiff must prove the following:

1. That the Defendant threatened to touch the Plaintiff in a harmful manner;
2. That it reasonably appeared to the Plaintiff that the Defendant was about to carry out the threat;
3. That the Plaintiff did not consent to the Defendant's conduct; and
4. That the Plaintiff was harmed; and the Defendant's conduct was a substantial factor in causing the Plaintiff's harm.

(Judicial Council of California Civil Jury Instruction 1301)

The key evidence to establish this claim is as follows:

When Defendant Diaz walked into the day room, she was already waiving a can of OC spray in her hands. Over the next several minutes, Defendant Diaz intermittently walked around the day room and returned to Plaintiffs' tables to yell at them in English (a language they neither speak nor understand) – a fact confirmed by Defendant Diaz, who at her deposition admitted that she does not speak any Spanish. During that time, despite having been informed multiple times that Plaintiffs had announced they were beginning a hunger strike, Defendant Diaz never considered calling medical staff, in contravention of GEO policy and protocol. When Nurse Jones (who was present) suggested that Defendant Diaz send Plaintiffs to the medical unit, Defendant Diaz rejected the idea.

### 3. California Civil Code § 52.1 (Bane Act)

Plaintiffs bring a claim for violation of the Bane Act, California Civil Code §52.1, against all Defendants. All Plaintiffs claim that Defendant Diaz, Defendant

Campos, and Defendant GEO Group violated their rights under the Bane Act, California Civil Code § 52.1. Pursuant to that law, a plaintiff who suffers damages as a result of a violation of civil rights is entitled to recover compensation for such damages. Here, all Plaintiffs claim their civil rights were violated under the Fourteenth Amendment to the United States Constitution when (1) Defendants Diaz and Campos used excessive force, (2) and Defendant Diaz violated their due process rights, and that their civil rights were violated under the First Amendment to the United States Constitution when Defendant GEO Group deprived them of access to their lawyers. The essential elements of this claim are:

1. That the Defendant interfered with, or attempted to interfere with, Plaintiff's exercise or enjoyment of rights secured by the Constitution of the United States and/or the Constitution or laws of the State of California, in the manners described above;

2. That the Defendant's actions were intentional by means of threats, intimidation or coercion; and

3. That the Defendant's conduct was a substantial factor in causing the Plaintiff to suffer harm.

(Judicial Council of California Civil Jury Instruction 3066; *Reese v. Cty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018))

The key evidence to establish this claim is as follows:

*Excessive Force:* When Defendant Diaz walked into the day room, she was already waiving a can of OC spray in her hands. Over the next several minutes, Defendant Diaz intermittently walked around the day room and returned to Plaintiffs' tables to yell at them in English (a language they neither speak nor understand) – a fact confirmed by Defendant Diaz, who at her deposition admitted that she does not speak any Spanish. During that time, despite having been informed multiple times that Plaintiffs had announced they were beginning a hunger strike, Defendant Diaz never considered calling medical staff, in

1   contravention of GEO policy and protocol. When Nurse Jones (who was present)

2   suggested that Defendant Diaz send Plaintiffs to the medical unit, Defendant Diaz

3   rejected the idea.

4       Defendants Diaz and Campos each deployed OC spray multiple times. They

5   were sprayed at close range and Defendants aimed directly at their heads and

6   torsos, causing the OC spray to affect their eyes, mouths, arms and groins. They

7   were "covered" and "soaked" with OC spray.[2]

8       The surveillance video evidence Defendant GEO Group produced to

9   Plaintiffs corroborates their claims that Defendant Diaz and Defendant Campos

10  each sprayed them multiple times with OC spray.

11  *14th Amendment:* After the incident occurred, the Plaintiffs were held in

12  segregation.  Plaintiffs were each informed, tardily, that they were being placed in

13  segregation. They were not told they could contest the discipline or appear at a

14  hearing, and no Plaintiff did so. Plaintiffs were held in segregation for ten days.

15  Following this incident, Defendant GEO Group deprived Plaintiffs of access to

16  their counsel.

17      *1st Amendment:* GEO Group personnel acted to block calls to phone numbers

18  based on whether the Plaintiffs in this case were telling outside persons about the

19  hunger strike they had participated in and the excessive force they had suffered.

20  PSUF 83-86.  Plaintiffs' calls were blocked after Plaintiffs had phone calls

21  discussing the hunger strike and the excessive force they were subjected to.

22      Plaintiffs' calls were blocked purely because they reported out facts about the

23  incident to outside persons who could file grievances on their behalf and

24  _____

25  [2] Defendants were required, per GEO policy, to weigh their OC canisters every shift
    (i) upon retrieving them from the safe where they are kept and (ii) before returning

26  them to the safe, and to record the weights on a log. PSUF ##122-125. At
    Defendant Diaz's deposition, she testified that she did not recall whether she had

27  done so on June 12, 2017, and further testified she did not always follow GEO's
    policy. PSUF ##126, 127. Despite strict retention requirements, GEO apparently

28  cannot find those logs – making it impossible to conclusively state how much OC
    spray Defendants Diaz and Campos each deployed. PSUF #128.

1  encouraged them to file grievances. At the facility, calls were monitored by the

2  Security Threat Investigator, Barry Belt, who had the power to request blocking of

3  calls.  Mr. Belt always went through the Warden, who he reported to directly, to get

4  phone numbers blocked.  He would send notes concerning what had happened on

5  the calls to the Warden, and then would let the Warden make the final decision on

6  whether to recommend blocking a phone number.

7       While First Amendment rights are curtailed in prison, they are not lost. *See*

8  *Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003) (finding that prison officials can

9  be held liable for retaliatory actions). Prison officials cannot use a proper and

10  neutral procedure in retaliation for a prisoner's exercise of his constitutional rights.

11  *See, e.g., Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (holding that

12  "repeated threats of transfer because of [the plaintiff's] complaints about the

13  administration of the [prison] library" were sufficient to ground a retaliation claim).

14  Relatedly, the Ninth Circuit has definitively held it is unlawful for correctional

15  institutions to chill detainees' First Amendment rights – which is precisely what

16  Plaintiffs claim. *See Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005).

17       **4.  Negligence (Use of Force)**

18       Plaintiffs bring a Negligence claim against Defendants Diaz and Campos for

19  negligently assessing the need to use force against Plaintiffs.

20       When Defendant Diaz walked into the day room, she was already waiving a

21  can of OC spray in her hands. Over the next several minutes, Defendant Diaz

22  intermittently walked around the day room and returned to Plaintiffs' tables to yell

23  at them in English (a language they neither speak nor understand) – a fact

24  confirmed by Defendant Diaz, who at her deposition admitted that she does not

25  speak any Spanish. During that time, despite having been informed multiple times

26  that Plaintiffs had announced they were beginning a hunger strike, Defendant Diaz

27  never considered calling medical staff, in contravention of GEO policy and

28  protocol. When Nurse Jones (who was present) suggested that Defendant Diaz send

1  Plaintiffs to the medical unit, Defendant Diaz rejected the idea.

2       Defendant Campos arrived a few minutes after Diaz and her subordinates

3  began using force on Plaintiffs. By his own admission, he did not know anything

4  about the scene that greeted him. Nor did he, when he arrived, take the time to find

5  that out. Instead, he immediately joined two officers in throwing Plaintiff Mejia

6  against a wall and then, seconds later, deployed such large volumes of OC spray

7  against the remaining Plaintiffs that even on the grainy video it looks like a water

8  hose is spouting.

9       **5. Negligence (Medical Assistance)**

10    Plaintiffs bring a Negligence claim against Defendants Diaz and Campos for

11  negligently failing to provide timely medical assistance to Plaintiffs. In this case,

12  Plaintiffs claim that Defendant Diaz and Defendant Campos acted negligently in

13  failing to properly assess the need to use force against Plaintiffs. To establish this

14  claim, the Plaintiff must prove the following:

15     1. That the Defendant had a legal duty to ensure the Plaintiffs' physical safety;

16     2. That the Defendant breached that duty and did not properly assess the need to

17        use force against the Plaintiff;

18     3. That the Plaintiff was harmed by the Defendant's failure to make a proper

19        assessment; and

20     4. That the Defendant's negligence was a substantial factor in causing the

21        Plaintiff's harm.

22  (Judicial Council of California Civil Jury Instruction 400)

23       The key evidence to establish this claim is as follows:

24       The detainees were further hurt when the officers failed to decontaminate

25  them properly.  The officers waited over two hours to allow them to be assessed by

26  medical staff, and then put them into hot showers fully clothed and still handcuffed.

27  The hot showers exacerbated the effects of the pepper spray, creating an extremely

28  painful burning sensation.

1    Despite universally accepted protocols directing that post-spray

2  decontamination be promptly effectuated using cold or temperate water, the

3  showers at Adelanto Detention Facility had no cold (or temperate) water settings

4  and were instead equipped with a single hot water temperature setting.

5    The policy of not having cold water inside the facility damaged Plaintiffs by

6  failing to provide a safe method of decontamination for them. Plaintiffs were hurt

7  by the pain of the showers, which were at too hot a temperature for safe

8  decontamination.

9    **6. Intentional Infliction of Emotional Distress**

10  Plaintiffs bring an Intentional Infliction of Emotional Distress claim against

11  Defendants Diaz and Campos. In this case, Plaintiffs claim that Defendant Diaz and

12  Defendant Campos acted negligently in failing to provide timely medical assistance

13  to Plaintiffs. To establish this claim, the Plaintiff must prove the following:

14    1.  That the Defendant had a legal duty to ensure the Plaintiffs received timely

15        medical attention following the deployment of OC spray against Plaintiffs;

16    2.  That the Defendant breached that duty and did not ensure Plaintiff received

17        that timely medical attention;

18    3.  That the Plaintiff was harmed by the failure to receive timely medical

19        attention; and

20    4.  That the Defendant's negligence was a substantial factor in causing the

21        Plaintiff's harm.

22  (Judicial Council of California Civil Jury Instruction 400)

23    The key evidence to establish this claim is as follows:

24    When Defendant Diaz walked into the day room, she was already waiving a

25  can of OC spray in her hands. Over the next several minutes, Defendant Diaz

26  intermittently walked around the day room and returned to Plaintiffs' tables to yell

27  at them in English (a language they neither speak nor understand) – a fact

28  confirmed by Defendant Diaz, who at her deposition admitted that she does not

1  speak any Spanish. During that time, despite having been informed multiple times

2  that Plaintiffs had announced they were beginning a hunger strike, Defendant Diaz

3  never considered calling medical staff, in contravention of GEO policy and

4  protocol. When Nurse Jones (who was present) suggested that Defendant Diaz send

5  Plaintiffs to the medical unit, Defendant Diaz rejected the idea.

6        Defendants Diaz and Campos each deployed OC spray multiple times.

7  Plaintiffs were sprayed at close range and Defendants aimed directly at their heads

8  and torsos, causing the OC spray to affect their eyes, mouths, arms and groins.

9  They were "covered" and "soaked" with OC spray.

10        The surveillance video evidence Defendant GEO Group produced to

11  Plaintiffs corroborates their claims that Defendant Diaz and Defendant Campos

12  each sprayed them multiple times with OC spray.

13        The detainees were further hurt when the officers failed to decontaminate

14  them properly.  The officers waited over two hours to allow them to be assessed by

15  medical personnel, and then put them into hot showers fully clothed and still

16  handcuffed.  The hot showers exacerbated the effects of the pepper spray, creating

17  an extremely painful burning sensation.

18        The showers at the facility only had one temperature available: hot water.

19  Using warm or hot water on pepper spray can increase the burning sensation and

20  further hurt detainees; Captain McCusker classifies the pain from OC Spray as an 8

21  out of 10 and noted that the first time being exposed is the most painful and

22  traumatic.  The facility had received complaints about the water being too hot in the

23  past, and during the incident the detainees complained to the officers about the

24  extreme burning sensation from the hot water.

25        **7.  Negligent Training and Supervision**

26    1.  Plaintiffs bring a Negligent Training and Supervision claim against

27        Defendant GEO Group, Inc. Each Plaintiff claims that he was harmed by

28        Defendant Diaz and/or Defendant Campos and that Defendant GEO Group,

1    Inc. is responsible for that harm because GEO Group negligently trained and
2    supervised Defendants Diaz and Campos in violation of California law. To
3    establish this claim, the Plaintiff must prove the following: That GEO Group
4    hired Defendants Diaz and Campos (which is undisputed);

5    2. That GEO Group was negligent in training and supervising Defendants Diaz
6    and Campos as to the performance of their job duties;

7    3. That GEO Group knew or should have known that Defendants Diaz and
8    Campos became unfit and/or incompetent and that this unfitness and/or
9    incompetence created a particular risk to others;

10   4. That Defendants Diaz and Campos's unfitness and/or incompetence as a
11   result of GEO Group's negligent training and supervision harmed the
12   Plaintiff; and

13   5. That GEO Group's negligence in training and supervision was a substantial
14   factor in causing the Plaintiff's harm.

15   (Judicial Council of California Civil Jury Instruction 426)

16       The key evidence to establish this claim is as follows:

17       Sergeant Campos and Lieutenant Diaz, and the other officers, were not
18   adequately trained on when a major use of force was and was not warranted.
19   Sergeant Campos and Lieutenant Diaz classified this incident as a rebellion.
20   "Rebellion" is a vague term which in the policies justifies a major use of force; both
21   Campos and Diaz identified peaceful "noncompliance" as a rebellion.  No one
22   receives training on the meaning of that term at the facility.  The Warden explained
23   at deposition that a rebellion is when a large group of detainees tries to actively take
24   over a portion of the facility.  The policy explicitly states that pepper spray is a
25   major use of force.

26       In most facilities, a refresher course in OC spray use is required each year,
27   but GEO Group did not refresh the training on OC spray protocols. Campos said
28   that he did not remember the factors required to deploy OC spray.  GEO Group has

1    not made any changes to their general training even after needing to retrain

2    individual staff following detainee grievances; nor did they make a change to their

3    training after this incident.  GEO also did not properly train its officers on

4    decontamination to ensure that decontamination happened as soon as possible and

5    is done with cold water.  In this case, Plaintiffs were left drenched in pepper spray

6    for over two hours and then showered, fully clothed, in hot water.

7        Warden Janecka, who had the power to make changes at the facility,

8    including to policy, arrived to the scene shortly after the incident and observed the

9    amount of pepper spray still in the air.  The Warden also watched a video of the

10   incident and reviewed all the serious incident reports before initialing them and

11   sending them on to corporate headquarters.  Warden Janecka and Captain

12   McCusker both ratified what had happened during the incident and found that

13   Lieutenant Diaz was not out of policy and had acted in accordance with her

14   training.

15       As policymakers for GEO, Warden Janecka and Captain McCusker also both

16   ratified the policy of not having cold water showers available, even though

17   supervisors were given pepper spray to carry and use. The Warden was also

18   responsible for the decision to block detainee's phone calls on the basis that facts

19   about the incident were given to outside persons and the press.

20   **8.  Vicarious Liability**

21       Claims 1-6 are also brought against Defendant GEO Group, Inc. on a theory

22   of vicarious liability. It is undisputed that Defendants Diaz and Campos were

23   employees of GEO Group and were acting within the scope of their employment at

24   all times relevant to the case, so if Plaintiffs establish any claim against either

25   Defendant, that claim will also succeed against Defendant GEO Group.

26       GEO employees committed a number of underlying torts, including

27   negligence, battery, assault, intentional inflict of emotional distress, and violation of

28   the Bane Act.  In addition, GEO employees Janecka and Belt also negligently and

1    purposefully retaliated against Plaintiffs. Janecka failed to ensure that cold water

2    was present to decontaminate victims of OC spray, and Janecka and Belt acted in

3    concert to retaliate against Plaintiffs for telling people outside the facility what

4    happened to them by blocking communications. GEO is liable for these actions in

5    *respondeat superior* as all these torts were committed within the scope of their

6    employment. *Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 209 (1991).

7         "A plaintiff alleging negligent training under California law must show that

8    the employer negligently trained the employee as to the performance of the

9    employee's job duties and as a result of such negligent instruction, the employee

10   while carrying out his job duties caused injury or damage to the plaintiff." *Garcia*

11   *ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1208 (E.D. Cal.

12   2009) (citing *State Farm Fire & Casualty Co. v. Keenan*, 171 Cal.App.3d 1, 23

13   (1985)). "In general, the issue of a defendant's negligence presents a question of

14   fact for the jury." *Biles v. Richter*, 206 Cal. App. 3d 325, 332, 253 (1988).

15        The deficient training in use of force and decontamination in this case makes

16   it reasonably foreseeable that "[GEO] knows or should have known that [Campos

17   and Diaz] presented a risk of danger to others." *Doe v. Hagee*, 473 F. Supp. 2d

18   989, 998 (N.D. Cal. 2007) (citation omitted).  Without proper supervision and

19   training, Diaz and Campos knew they could act with impunity and suffer no

20   consequence. *Perez v. Nevada*, No. 215CV01572APGCWH, 2017 WL 4172268, at

21   *6 (D. Nev. Sept. 20, 2017), *aff'd sub nom. Perez v. Cox*, No. 17-17140, 2019 WL

22   4413261 (9th Cir. Sept. 16, 2019) (denying motion to dismiss negligent supervision

23   claim when complaint alleged that defendant Nevada Department of Corrections

24   when it did not train subordinates to address widespread practice that was against

25   its policy).

26        **C. BIFURCATION OF ISSUES**

27        Plaintiffs do not oppose bifurcation of the amount of punitive damages

28   conditioned on Defendants' agreement that they will not mention Defendants'

1  ability or inability to pay during the preliminary portion of the trial. Plaintiffs

2  oppose any other proposed bifurcation.

3     **D. JURY TRIAL**

4        The parties have timely demanded a trial by jury.

5     **E. ATTORNEYS' FEES**

6        Should Plaintiffs prevail, they may request attorneys' fees under California

7  Civil Code § 52.1 (Bane Act).

8     **F. ABANDONMENT OF ISSUES**

9        Plaintiffs have not abandoned any issues.

10

11  Dated:  January 14, 2020                    LAW OFFICE OF RACHEL STEINBACK

12                                              LAW OFFICES OF CAROL A SOBEL
                                                SCHONBRUN SEPLOW HARRIS
13                                              & HOFFMAN LLP
                                                LAW OFFICE OF COLLEEN FLYNN
14                                              LAW OFFICE OF MATTHEW STRUGAR

15

16                                              By:  /s/ Rachel Steinback
                                                     Rachel Steinback
17                                                   Monique Amanda Alarcon
                                                     Catherine E. Sweetser
18                                                   Kristina Harootun
                                                     Colleen Flynn
19                                                   Matthew Strugar
20                                                   *Attorneys for Plaintiffs.*

21

22

23

24

25

26

27

28